# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

July 28, 2006

Kim J. Landsman
(212) 336-2980
Direct Fax  (212) 336-2985
kjlandsman@pbwt.com

**Filed Electronically**

Honorable Gustave J. DiBianco
United States Magistrate Judge
United States Courthouse
PO Box 7396
100 South Clinton Street
Syracuse, New York 13261

> **Re:    Haritatos v. Hasbro, Inc. and Toy 'R Us-NY LLC,**
> **Civil Action 05-CV-930**

Dear Judge DiBianco:

We are counsel for defendant Hasbro, Inc. ("Hasbro") and write in reply to Mr. Purcell's July 26, 2006 letter to the Court opposing Hasbro's motion to compel ("Motion").

First, Mr. Purcell's arguments concerning the May 31st cut-off for fact discovery are spurious. As Hasbro explained in its June 26, 2006 letter, we are not trying to enforce the May 31st cut-off that the parties originally proposed since, as the Court knows, we are scheduling depositions for Hasbro's witnesses for subsequent dates. It merely serves as a guidepost for Plaintiff's dilatory disclosure of Mr. Versace. Accordingly, Plaintiff's contention that Hasbro's Motion is untimely is utterly without merit.

Second, although Plaintiff has made some additional productions since Hasbro filed its Motion, his document production remains far from complete.

(1) Plaintiff's Customers: Documents concerning the location of Plaintiff's customers are absolutely essential to Defendants' ability to defend this case. Defendants must be able to show that few, if any, of Plaintiff's products are sold outside of the Rome-Utica area and, therefore, that Plaintiff's mark has no source-identifying significance beyond this region. Plaintiff suggests that there are "alternative" less burdensome means of providing this information, but he does not say what they might be. In any event, it is not overly burdensome for Plaintiff to retrieve U.P.S. manifests from his warehouse. There are not that many. Hasbro does not seek credit card records and Plaintiff's concern about the identity of his customers is similarly a red herring because Plaintiff may produce the documents pursuant to the protective

Honorable Gustave J. DiBianco
July 28, 2006
Page 2

order entered in this case.[1]  In addition, Sharon Haritatos testified that Plaintiff maintains records that include the location of consumers who purchase his products over the telephone, via mail order, or through the www.turkeyjoints.com website.  See Exhibit 1 hereto.  Plaintiff should produce these and any other documents responsive to Hasbro's Requests Nos. 12, 13, and 14. Plaintiff brought this case and he cannot now complain about producing documents that so clearly rebut his claims.

(2), (3), and (4).  Plaintiff claims to have produced documents responsive to these requests since Hasbro filed its motion, but we have no way of knowing whether Plaintiff's production is complete.  Accordingly, Plaintiff should either produce all documents responsive to Hasbro's Requests Nos. 15, 25, 26, 27, and 38, or confirm that he has produced all responsive documents.

(5) "Original Thin Shell Candy Turkey Joints" Mark:  Nora Haritatos' 1976 application to register the "Original Thin Shell Candy Turkey Joints" trademark will reveal the mark used by the Haritatos business in 1976 when Plaintiff claims it was using the Candyland mark.  Accordingly, this application will provide evidence that Hasbro is the prior user of the Candy Land® mark, that Plaintiff's use of the mark has been sporadic at best, and that Mr. Haritatos' testimony is not credible.

(6) Legal Expenses And Daynotes:  Plaintiff does not oppose Hasbro's request for documents related to the legal expenses and daynotes related to this litigation; he only objects to producing such documents related to the Trademark Trial and Appeal Board ("TTAB") Opposition unless and until the Court decides to permit him to amend his Complaint to add a claim for these damages.  But Mr. Haritatos has alleged these damages (indeed, they are the only damages he has alleged) and there is no reason to delay producing these documents until some unknown date.  Defendants obviously need to know both the extent of the damages alleged by Plaintiff and whether Mr. Purcell's bills were reasonable or he was billing his client for the vexatious and obstructionist behavior that has been so readily evident in this case.

Accordingly, Hasbro respectfully requests that the Court order Plaintiff to produce the requested documents and respond to Hasbro's First Set of Interrogatories and Hasbro's Second Set of Requests For Production by a date certain.

Respectfully submitted,

Kim J. Landsman

cc:     Robert E. Purcell, Esq. (e-mail)
        John G. McGowan, Esq. (e-mail)

---

[1] The identity of the purchases may be relevant if they are simply Mr. Haritatos' relatives.

1297739v2

# Exhibit 1

```
                                                                    Page 1
 1

 2          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF NEW YORK
 3      _____

 4      SPERO T. HARITATOS,

 5               Plaintiff,

 6      vs.                          Case No.  05CIV.930(DNH/GJD)

 7      HASBRO, INC. AND

        TOYS "R" US_NY LLC,

 8

                 Defendants.

 9      _____/

10

                 DEPOSITION of SHARON HARITATOS, held on May 18,
11

        2006, at the offices of Accurate Court Reporting, Inc.,
12

        1618 Genesee Street, Utica, New York, commencing at 10:00
13

        a.m., before Brenda J. Shimer, Court Reporter and Notary
14

        Public in and for the State of New York.
15

16

17

18

19

20

21

22

23

24

25
```

Page 34

1
2  confidential.
3      MR. MCGOWAN:  Agreed.
4      Q.   And do you have any -- so in 2004
5  here Defendant's Exhibit-14, it lists $400,000
6  in gross revenues, is that correct?
7      A.   Yes.
8      Q.   Is that an accurate representation of
9  your gross revenues in 2004?
10     A.   Yes.
11     Q.   And you found that from looking at
12  your tax returns, is that correct?
13     A.   Tax returns and book.
14     Q.   And book?
15     A.   Yes.
16     Q.   Now when you say book, what is that?
17  What do you mean --
18     A.   My ledgers.  I have a Quick Books
19  Program that I use and just look up sales
20  and such there.
21     Q.   Okay.  That's something on the
22  computer that you use?
23     A.   Correct.
24     Q.   Okay.  What percentage of this
25  400,000 was derived from your wholesale

Page 35

1
2  business?
3      A.   85 percent, 90, I'm guessing.
4      Q.   85 to 90?
5      A.   Yeah.
6      Q.   Are you pretty certain that it falls
7  within that range somewhere?
8      A.   I would say, yeah.
9      Q.   Okay.  That's your best estimate as
10  you sit here today?
11     A.   Best estimate, yep.
12     Q.   Could you determine exactly how much
13  it was?
14     A.   Yes.
15     Q.   How would you do that?
16     A.   I would just check the figures and
17  see what the percentage is.
18     Q.   So you can just with the computer
19  run a little program and it will spit out.
20     A.   It's not that sophisticated but with
21  a calculator I could figure it out.
22     Q.   It's not that difficult?
23     A.   No.
24     Q.   Do you think that, that percentage
25  has remained constant since 1999, 85 to 90

Page 36

1
2  percent of wholesale?
3      A.   I would say so, yes.
4      Q.   What are the other outlets that you
5  -- and when I say "you" maybe I should be
6  more specific, when I say your business, I
7  mean Mr. Haritatos' candy business that you
8  work in.  Do you understand that?
9      A.   I understand.
10     Q.   How else does your business sell
11  candy, besides the wholesale business?
12     A.   Out of our retail shop.
13     Q.   And what is the name of that?
14     A.   The retail shop is Nora's Candy
15  Shop.
16     Q.   And those sales are made to the
17  customers who walk into Nora's Candy Shop?
18     A.   Correct.
19     Q.   Anyone else, besides walk-in
20  customers?
21     A.   No, just walk-in customers.
22     Q.   And those walk-in customers, what do
23  they purchase?
24     A.   Turkey Joints, clusters, any candies
25  that we carry, ice cream.

Page 37

1
2      Q.   So they can purchase anything that
3  you make in the retail candy shop, in Nora's
4  shop?
5      A.   Yes, anything we make in the
6  factory, yes, they can purchase in the shop.
7      Q.   In Nora's Candy Shop?
8      A.   In the retail, Nora's Candy Shop.
9      Q.   I messed that up, not you.  I was
10  trying to clear it up there.  So what
11  percentage of the sales from Nora's Candy
12  Shop, last year, 2004, were Turkey Joints?
13     A.   That would also be the bulk of the
14  sales.  So I would go again with 85 -- 85
15  percent, I would estimate.
16     Q.   Is that also a figure that you could
17  determine looking at your records?
18     A.   A little bit more difficult from
19  tapes but I could probably guesstimate, I
20  guess, on that.  I would have to look at it
21  more closely.
22     Q.   Okay.  And what percentage of your
23  gross revenues in 2004 were derived from
24  sales through Nora's Candy Shop?
25     A.   Ten percent.

Page 42

1
2    Q.   Okay.  Who are the customers that
3  are purchasing your product over the web
4  site?
5    A.   What do you mean by who?  The
6  general public.
7    Q.   Where do they live?
8    A.   We have had -- I can't tell you
9  states that we haven't had orders from.
10  Hawaii, Alaska, California, Florida.  Again,
11  not any state, Toronto, Canada; Colorado.  I
12  mean, like I said, there is really not a
13  state that I can think of that we haven't
14  shipped candy to.
15    Q.   Okay, so you believe you have
16  shipped candy to all 50 states?
17    A.   Yeah, best estimate I would say yes.
18    Q.   And that's based on your experience
19  actually, looking at the web site?
20    A.   Right.
21    Q.   And shipping the product out,
22  correct?
23    A.   Correct.
24    Q.   Have you ever done a study or a
25  survey to actually check whether you have

Page 43

1
2  actually sold in all 50 states?
3    A.   No.
4    Q.   Do you have the information on the
5  states you are selling -- let me rephrase
6  that.  Do you have information on the
7  addresses of the people that you sell product
8  to over the web site?
9    A.   I would have addresses because I
10  have to ship to those addresses.
11    Q.   So you have records if you needed to
12  know where you have shipped to, you could
13  determine that?
14    A.   Yes.
15    Q.   And how far back do those records
16  go?
17    A.   On that web site '90 and, a guess,
18  '92, I'm going to guess.  I know that the
19  web site was informational.  Initially, there
20  was no ordering on it for about a year.
21  Shopping cart didn't come on until maybe '92,
22  '93.
23    Q.   I thought you testified before --
24    A.   '99 was informational.  So it would
25  be 2000/2001 with the shopping cart.

Page 44

1
2    Q.   Okay.  And you have records back
3  until then of the places that you have
4  shipped to?
5    A.   Yeah, as long as I have had the
6  shopping cart I can.
7    Q.   And here, in the exhibit, Defendant's
8  14, you have gross revenues listed back to
9  1999.
10    A.   Um-um.
11    Q.   So I guess in 1999, you didn't sell
12  anything over the web, correct?
13    A.   Not through shopping cart, per se.
14  That doesn't mean that someone didn't see our
15  web site and call.
16    Q.   Good point.  Okay.
17    A.   Because we did have a presence but
18  we didn't have the ability for people to
19  shop yet at that point via the Internet.
20    Q.   So the first year in which your
21  gross revenue were going to include sales
22  over the web is 2000, is that correct?
23    A.   If that's when I instituted the
24  shopping cart.  I am thinking it was
25  2000/2001.  Something I certainly can find

Page 45

1
2  out.
3    Q.   And as you sit here today, do you
4  believe that since 2000, or whenever the web
5  site had the shopping cart, the web site has
6  accounted for about five to six percent of
7  your gross revenues?
8    A.   Best guess yes.
9    Q.   It hadn't grown since then?
10    A.   I can't say definitely, maybe one,
11  two percent.  I don't know.  I can't say,
12  unless I look at...
13    Q.   But you do have records you could
14  look at to determine that, correct?
15    A.   Right.
16    Q.   Now, is there any other way in which
17  your business sells candy?
18    A.   Phone orders and mail.
19    Q.   Okay.  Tell me about those.
20    A.   Those would be customers that have
21  just had our -- or ordered for many years
22  and keep the address on file and the regular
23  accounts that just call and that don't have
24  access to the Internet and they just call
25  and phone in their order or just mail it in.

DEPOSITION OF SHARON HARITATOS, MAY 18, 2006

Page 46

1
2      Q.   Let's start with phone orders, those
3   are orders that are placed over the
4   telephone?
5      A.   Correct.
6      Q.   And do they call Nora's Candy Shop?
7      A.   Yes.
8      Q.   Okay.  So is that recorded as a
9   sale through Nora's Candy Shop?
10     A.   Yes.
11     Q.   So do the phone orders, are they
12  included within the 10 percent of gross
13  revenues that you estimate Nora's Candy Shop
14  accounts for?
15     A.   I would say yes.  Trying to think
16  how the books work.  Yes.
17     Q.   And what percentage of your gross
18  revenues do you think specifically come from
19  phone orders?
20     A.   Very small.
21     Q.   Very small.
22     A.   Very small.  Trying to have them go
23  through the secure web site if I can coax
24  the people to use that.  I prefer not to
25  take credit card orders over the phone.  I'm

Page 47

1
2   trying to switch them over to that.
3      Q.   So is that, like, one percent?
4      A.   Maybe less.
5      Q.   Okay.  Do you keep records of phone
6   orders, as well?
7      A.   Yes.
8      Q.   So could you determine the percent
9   that the phone orders would constitute?
10     A.   They would be in the over-the-counter
11  -- I would not be able to distinguish
12  between -- yes, I could distinguish between a
13  phone order.  Yes, I can.
14     Q.   And do you keep a record of where
15  you ship a product to, based on a phone
16  order?
17     A.   Yeah.
18     Q.   And what do people order over the
19  phone?
20     A.   Turkey Joints.
21     Q.   Is it all Turkey Joints?
22     A.   For the most part.  Again, 95
23  percent.  Then clusters or such like that.
24     Q.   So occasionally there are other
25  candies thrown in there?

Page 48

1
2      A.   Yeah.
3      Q.   Okay.  And where are the people
4   located who are placing phone orders?
5      A.   They would be all over the country.
6   We have -- I can't be specific.  I know we
7   have regular customers in Florida, Virginia.
8   Trying to think.  They are the older
9   customers that don't -- that are afraid to
10  use the Internet.
11     Q.   So when they call do you generally
12  tell them to use the Internet?
13     A.   If you have access, I try to
14  persuade them to use the Internet because
15  it's a secure site, and I don't have to keep
16  credit card records that way.  I would just
17  as soon had that process through the bank,
18  so I don't have access.
19     Q.   Right, okay.  And you mentioned
20  before mail order.  Can you tell me about
21  that?  What's the mail order business of Mr.
22  Haritatos' candy business?
23     A.   Those would be folks calling and
24  inquiring about pricing and then sending a
25  check and a letter.

Page 49

1
2      Q.   So they call first?
3      A.   Find out how much the candy is, the
4   volume and shipping and write a check and
5   mail it.
6      Q.   And what percentage of your gross
7   revenues in 2004 was derived from the mail
8   order business?
9      A.   That's -- I'm trying to get that
10  smaller and smaller and trying to get them
11  to access the web site, as well.  So that's
12  very -- it's small.
13     Q.   So even smaller than the phone order
14  business?
15     A.   Yes, very small.
16     Q.   Okay.  And what are they ordering?
17     A.   Turkey Joints.
18     Q.   Anything else besides Turkey Joints?
19     A.   Sometimes clusters, fudge.
20     Q.   But it's -- what would you say, what
21  percentage is Turkey Joints?
22     A.   95 percent.
23     Q.   Okay.  And do you also keep records
24  of mail order shipments?
25     A.   Yes.