# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

July 28, 2006

Kim J. Landsman
(212) 336-2980
Direct Fax (212) 336-2985
kjlandsman@pbwt.com

**Filed Electronically**

Honorable Gustave J. DiBianco
United States Magistrate Judge
United States Courthouse
PO Box 7396
100 South Clinton Street
Syracuse, New York 13261

> Re:    **Haritatos v. Hasbro, Inc. and Toy 'R Us-NY LLC,**
>        **Civil Action 05-CV-930**

Dear Judge DiBianco:

We are counsel for defendant Hasbro, Inc. ("Hasbro") and write in response to
Mr. Purcell's July 26, 2006, letter to the Court requesting to extend the discovery deadlines,
including the deadline for disclosing expert witnesses.  Plaintiff seeks an extension of the
deadlines to disclose an expert on U.S. trademark law and procedure on the grounds that he
could not disclose his expert prior to the testimony of Defendants' witnesses.  But Plaintiff
has failed to explain why his expert needs the testimony of Defendants' business people to "assist the
trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

Plaintiff appears to believe that he can present expert testimony as to trademark
law and procedure, but the courts in this circuit have not allowed such testimony.  "[T]he expert
testimony of an attorney as to an ultimate issue of domestic law or as to the legal significance of
facts is inadmissible."  Motown Prod., Inc. v. Cacomm, Inc., 668 F. Supp. 285, 288-89 (S.D.N.Y.
1987), rev'd on other grounds, 849 F.2d 78 (2d Cir. 1988) (excluding affidavit of trademark
lawyer opining that trademark was "suggestive").  "It is not for witnesses to instruct the jury as to
applicable principles of law, but for the judge."  U.S. v. Scop, 846 F.2d 135, 140 (2d Cir. 1988)
(citing Marx & Co., Inc. v. Diners' Club Inc., 550 F.2d 505, 509-10 (2d Cir. 1977)).  "[T]he
Second Circuit applies strict standards to the admissibility of expert opinions, disagreeing with
other circuits when necessary[.]"  Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Group,
14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998).

Plaintiff cites a single case from a district court in Illinois for the proposition that
it is "standard practice" for parties to offer expert testimony on trademark law and procedures,
but the case actually refutes his position.  In Sam's Wines & Liquors Inc. v. Wal-Mart Stores
Inc., 32 U.S.P.Q.2d 1906, 1912 (N.D. Ill. 1994), plaintiff offered an expert to testify concerning

Honorable Gustave J. DiBianco
July 28, 2006
Page 2

"the procedures, standards, customs, usage, and practices in the United States Patent & Trademark Office ("PTO") and among in-house trademark counsel and the trademark bar." Id. The court allowed testimony on "the technical aspects of applying for and obtaining a federal trademark registration" and "the similarities of the parties' respective marks" but precluded the expert from testifying "on the legal standards applicable to this case or the results of her legal research as they apply to the ultimate issue of trademark infringement or likelihood of confusion." Id. at 1913. The procedures of the PTO are not at issue in this case and Plaintiff admits there are no similarities between the marks at issue as the parties use them, see Exhibit 1 hereto, so the case is unhelpful to him. Moreover, the testimony of Hasbro's business people is irrelevant to any such opinion.

Mr. Purcell's letter lists several proposed subjects of testimony for his expert, but the only subjects cited in Mr. Purcell's letter that might relate in any way to Hasbro's business people are "Hasbro's [alleged] efforts to acquire Plaintiff's rights in his registered trademark and whether Defendant Hasbro's activities in licensing its allegedly infringing trademark to Toys 'R Us and others were willful and in bad faith." That states the conclusion he expects from his expert but does not explain why his expert needs the testimony of Hasbro's business people. In sum, Mr. Purcell still has not explained why his client was unable to name an expert and produce an expert report within the existing deadlines.

Plaintiff has repeatedly delayed the progress of this case, first by obstructing the entry of a protective order, then by waiting until late in discovery to notice the depositions of Defendants' employees. He should not now be allowed to further delay the case when he cannot articulate a proper subject for his proposed expert's testimony or why his expert needs the testimony of Hasbro's business people to offer an expert opinion. Merely stating that his "expert's testimony will be intertwined with the unique facts of this case" is simply conclusory and unhelpful.

Accordingly, we respectfully request that the Court deny Plaintiff's motion to extend the discovery deadlines.

Respectfully submitted,

Kim J. Landsman

cc:    Robert E. Purcell, Esq. (e-mail)
       John G. McGowan, Esq. (e-mail)

1297704v2

# Exhibit 1

Page 1

1

2                    UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF NEW YORK

3

4    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

5    SPERO HARITATOS,

6                           Plaintiff,

7         -vs-                      Index No.:

                                    05 CIV 930 (DNH/GJD)

8

     HASBRO, INC. and

9    TOYS "R" US-NY LLC,

10                          Defendant.

11   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

12

13                       Examination Before Trial of

14                  SPERO T. HARITATOS, Plaintiff, held at

15                  the offices of BOND, SCHOENECK & KING,

16                  PLLC, Syracuse, New York, on May 17,

17                  2006, before MELISSA A. LANNING, Court

18                  Reporter and Notary Public in and for

19                  the State of New York.

20

21

22

23

24

25

Page 310

```
1            SPERO T. HARITATOS        310
2    happens to every witness, and it happens to a lot of
3    lawyers, too.
4            All right.  Let's take a look at the jar for
5    your turkey joints.
6        A.   All right.
7        Q.   Are there any similarities between the
8    turkey joints mark and Hasbro's Candyland mark?
9        A.   No, I don't believe so.
10       Q.   Okay.  They're not the same color,  correct?
11       A.   Correct.
12       Q.   In fact, they're written in different
13   scripts, correct?
14       A.   I guess so.
15       Q.   And Hasbro uses two words in it's Candyland
16   name and you use one word in your Candyland name in
17   your turkey joints mark, correct?
18       A.   Correct.
19       Q.   So there's a different number of words
20   between the two marks?
21       A.   Yes.
22       Q.   Okay.  The overall design of the two marks
23   is different, correct?
24       A.   Correct.
25       Q.   And the overall impression created by the
```

Page 311

```
1            SPERO T. HARITATOS        311
2    two marks is different, correct?
3        A.   Correct.
4        Q.   Okay.  Has anyone ever told you that
5    Hasbro's Candyland mark is similar in the way it looks
6    to your turkey joints mark?
7        A.   I remember a long time ago someone mentioned
8    it years ago.
9        Q.   They mentioned what?
10       A.   That it's very -- it's similar to ours.
11       Q.   When did this happen?
12       A.   Oh, a long time ago.
13       Q.   Ten years ago?
14       A.   Yeah.  I don't know.  I don't remember.
15       Q.   More than ten years, or less than ten
16   years?
17       A.   It could have been more than ten years.
18       Q.   And who was this person?
19       A.   I don't know.  Just a customer brought it
20   up.
21       Q.   Somebody who had walked into your store?
22       A.   Yeah, I believe so.
23       Q.   And what did they say?
24       A.   Nothing.  That it looked very similar to
25   ours.
```

Page 312

```
1            SPERO T. HARITATOS        312
2        Q.   They said that Hasbro's Candyland board game
3    mark looked similar to your turkey joints mark?
4        A.   The Candyland mark, the original Candyland.
5    It still looked like Candyland.
6        Q.   Do you think that there's any similarity?
7    You just testified that there is no similarity between
8    the two marks, correct?
9        A.   Yes.  I don't see it.
10       Q.   Okay.  And has anyone ever inquired about a
11   relationship between your business and Toys "R" Us?
12       A.   A relationship?
13       Q.   (Nodding.)
14       A.   I don't believe so.
15       Q.   Has anyone ever inquired about any
16   association between you and Toys "R" Us?
17       A.   I don't believe so.
18       Q.   Okay.  And has anyone ever inquired about a
19   relationship between you and Hasbro?
20       A.   Except for -- no.  Except for McLaughlin at
21   the time.
22       Q.   Hasbro's --
23       A.   Hasbro's McLaughlin.
24       Q.   Aside from some person from Hasbro, has
25   anyone ever inquired about a relationship between you
```

Page 313

```
1            SPERO T. HARITATOS        313
2    and Hasbro?
3        A.   No.
4        Q.   Okay.  And you're not aware of anybody who
5    was confused about the origins of the goods that
6    Toys "R" Us was selling in their candy department,
7    right?
8        A.   No.
9        Q.   Okay.  You don't have any reason to believe
10   that anyone would have been confused by the goods that
11   are being -- strike that.
12           You have no reason to believe that anyone
13   would have been confused about the origins of the goods
14   that were being sold in the Toys "R" Us candy
15   department since 2001?
16       A.   I can't say that.  I don't know.
17       Q.   What I'm asking you, sir, is do you have any
18   reason to believe that anyone was confused about the
19   origin of the goods sold in Toys "R" Us candy
20   department since 2001?
21       A.   Well, I can't say that.
22       Q.   Do you have a reason to believe that they
23   would have been confused?
24       A.   I don't.
25       Q.   It's a "yes" or "no" question.
```