# C.1

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

April 17, 2006

**By E-Mail and Mail Confirmation**

Michael D. Sant'Ambrogio
(212) 336-2436
Direct Fax  (212) 336-7948
mdsantambrogio@pbwt.com

Robert E. Purcell, Esq.
Wall Marjama & Bilinski LLP
101 South Salina Street, Suite 400
Syracuse, NY  13202

Re:    **Haritatos v. Hasbro**

Dear Bob:

I am writing concerning deficiencies in Haritatos's Responses to Hasbro's First Set of Requests to Plaintiff For Production of Documents and Things.

First, Haritatos's production of documents in the Trademark Trial and Appeal Board ("TTAB") proceeding does not obviate the need for him to produce documents in this proceeding if they are responsive to Hasbro's discovery requests.  As you are aware, an order for protecting confidentiality of information covering discovery in the TTAB proceedings limits the use of confidential material to the TTAB proceeding.  Neither Hasbro nor Haritatos may use any of the confidential material produced in the TTAB proceeding in this case without the other's express permission.  Moreover, Toys "R" Us was not a party to the TTAB proceeding and has not received any of the documents produced therein.  Accordingly, please immediately produce all responsive documents produced in the TTAB proceedings or provide us with written permission to use them and provide copies to our co-defendant (*i.e.*, documents numbered STH 000001-STH 000096), as well as the transcript and exhibits to Spero T. Haritatos's February 16, 2005 deposition, in the present litigation.

Second, Haritatos asserts the same boiler-plate objections to each of Hasbro's requests for production.  In most cases, the reason for the objections is not at all apparent.  In many cases, the objections are absurd.  Solely by way of example, Hasbro's first request for production seeks "Two samples of any actual or intended products and services by Plaintiff in the United States that bear Plaintiff's CANDYLAND mark."  The request is simple and straightforward.  Yet, Haritatos responds that the request is "vague, ambiguous, and unintelligible. . . .  overbroad, oppressive, and unduly burdensome and seeks information outside the scope of discovery permitted by the Federal Rules of Civil Procedure....  seeks information not in the possession, custody, or control of Plaintiff" and so forth.  This is but one example, based on your very first objection.  Moreover, Haritatos asserts the very same objections to every request for production, suggesting that you have not taken the time to read the requests.  Accordingly, please withdraw Haritatos's objections on these bases or provide an explanation of why each such request is vague, ambiguous, unintelligible, overbroad, oppressive, unduly

Robert E. Purcell
April 17, 2006
Page 2

burdensome, beyond the scope of discovery, not relevant to the subject matter of this litigation, or is not reasonably calculated to lead to the discovery of admissible evidence. We would prefer not to have to bring a motion to compel to deal with such boilerplate objections.

Third, in several cases Haritatos asserts that he has already produced responsive documents in the TTAB proceeding when, in fact, Haritatos refused to produce the requested documents in the TTAB. (As you will recall, Hasbro's motion to compel, which specifically addressed some of these requests, was pending when the TTAB proceeding was suspended.) Specifically, you represented to counsel for Hasbro that you would neither search for nor collect documents that identify (1) the channels of trade through which Haritatos's products bearing the CANDYLAND mark have been or will be sold or provided; (2) the geographic area in which the products bearing Haritatos's CANDYLAND mark are sold; and (3) the demographics of actual or intended clients and consumers for products bearing Haritatos's CANDYLAND mark, or documents relating to the prosecution of Plaintiff's application for Plaintiff's CANDYLAND mark. It is therefore difficult to understand how you could genuinely believe that Haritatos "has already produced such documents in connection with the [TTAB] proceeding." *See* Haritatos's Responses to Requests Nos. 10, 11, 12, and 28. Accordingly, please correct your responses and produce all responsive documents to Hasbro's Requests Nos. 10, 11, 12, and 28. In addition, please produce copies of any customer lists in Haritatos' possession, custody, or control in response to Request No. 14.

Fourth, there are instances in which Haritatos asserts that he has already produced responsive documents in the TTAB proceeding when, in fact, Haritatos did not produce the requested documents, despite promising to do so. Accordingly, please correct your responses and produce all responsive documents to Requests Nos. 15 and 38.

Fifth, Haritatos objects to producing documents concerning "communications between Haritatos and any other person regarding any mark that incorporates the words "CANDYLAND," "CANDY LAND," or any similar name or mark" as overly broad and as harassment." But Plaintiff's efforts to protect its CANDYLAND mark are directly relevant to the strength of Plaintiff's CANDYLAND mark and whether he has acquiesced in its dilution. Accordingly, please produce all documents responsive to Request No. 25.

Sixth, Plaintiff objects to Request No. 26 "to the extent that … Hasbro has already produced such documents to Plaintiff." Plaintiff makes a similar objection to Request No. 27. Please confirm that Haritatos does not possess any documents responsive to these requests other than those which you have already produced in the TTAB proceeding or have been produced to Haritatos by Hasbro.

Seventh, you contend that you have already produced documents concerning Nora Haritatos' "Original Thin Shell Candy Turkey Joints" trademark registration, including any specimens submitted therewith, obtained in 1976. That is not correct. Therefore, please immediately produce all documents responsive to Request No. 39.

1269834v1

Robert E. Purcell
April 17, 2006
Page 3

      Similarly, please withdraw your objections to Request No. 40, which requests documents concerning the use of the "Original Thin Shell Candy Turkey Joints" trademark, which was registered by Haritatos's business in 1976 when he claims to have been using the "Original Candyland Candy Turkey Joints" trademark, and produce all documents responsive to this request. These documents are directly relevant to Haritatos' dubious claim that he was using his CANDYLAND mark during this time period.

      Eighth, Plaintiff did not provide any response to Requests Nos. 41, 43, 44 and 47. Accordingly, please provide a response to these requests immediately. In addition, please be more careful in responding to Hasbro's discovery requests in the future.

      Now that the protective order is in place, there is no excuse for further delays in Haritatos's document production. Hasbro is ready to produce its own documents in this case, but we will not do so while Haritatos continues to flout his discovery obligations. Accordingly, we propose that each party produce its responsive documents in this case no later than April 28, 2006.

      Thank you for your cooperation.

Sincerely yours,

Michael D. Sant'Ambrogio

cc: John G. McGowan, Esq. (by e-mail)

# C.2

# Wall Marjama
An Intellectual Property Practice

101 South Salina Street, Suite 400
Syracuse, New York 13202
Telephone: (315) 425-9000
Facsimile: (315) 425-9114

**Robert E. Purcell**
E-Mail: rpurcell@wallmarjama.com

May 2, 2006

**BY FIRST CLASS MAIL AND E-MAIL mdsantambrogio@pbwt.com**
Michael D. Sant'Ambrogio, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Re:   **Haritatos v. Hasbro**
     **Our File No. 115_003**

Dear Michael:

Thank you for being patient in awaiting a response to your letter dated April 17, 2006.

With regard to the documents that Mr. Haritatos produced in connection with the TTAB proceeding, Hasbro may use them in connection with the instant federal trademark infringement lawsuit. To the extent that such documents have been designated confidential in connection with the TTAB proceeding, Mr. Haritatos would require that Hasbro treat them as confidential pursuant to the protective order in the federal court lawsuit. Mr. Haritatos also has no objection to Hasbro providing copies of those documents to co-defendant Toys 'R Us, however, we need written assurance from Toys 'R Us that it will treat any materials designated as confidential in accordance with the requirements of the protective order in the federal court lawsuit.

With regard to the proposed "use" of the transcript and exhibits to Mr. Haritatos's February 16, 2005 deposition in the TTAB proceeding, I have no objection to the "use" of such deposition transcript and exhibits for purposes of possible impeachment of Mr. Haritatos in connection with the federal court lawsuit. To the extent that either of the co-defendants intends to "use" the deposition transcript and exhibits affirmatively in the lawsuit, such as, but not limited to, support in connection with any motion for summary judgment, I would like to address with you and Toys 'R Us the issue of whether the time of Mr. Haritatos's February 16, 2005 deposition will be applied to the requirement of Rule 30(d)(2) that "a deposition is limited to one day of seven hours."

Your letter asked me to reconsider my objection to Hasbro's first request for production of documents. I have reconsidered Mr. Haritatos's response, and believe the response is well-founded. I do note, however, that the last two paragraphs of the response should be amended to read as follows:


**Wall Marjama**

Plaintiff does not have any samples of any actual or intended services, since services, by their nature, are intangible. Plaintiff objects to providing any samples of intended products since such products inherently do not yet bear Plaintiff's CANDYLAND mark. Plaintiff objects to providing any samples of his actual products bearing his CANDYLAND mark because many of the products are apt to melt.

Plaintiff previously produced to Hasbro photographs of his retail store and of jars containing "Turkey Joints" candy, which photographs depict various products offered by Plaintiff with the CANDYLAND mark. Plaintiff also refers Hasbro to Plaintiff's website for further depictions regarding his products.

You also asked me to reconsider some responses to the effect that responsive documents have already been produced in connection with the TTAB proceeding. You have maintained that since I objected to producing some of the documents requested in Hasbro's request for documents in TTAB proceeding, that I have not produced all of the requested documents. Regardless of the nature of the document requests, the objections, and the documents produced by Mr. Haritatos in connection with the TTAB proceeding, with regard to the request in the instant federal court lawsuit, Mr. Haritatos has set forth his objections, and to the extent that he does not object to the request, he has already produced the documents to Hasbro, and therefore, believes that he need not re-produce those documents. You also specifically request that Haritatos produce any customer lists in his possession, custody, or control, however you do not explain how those customer lists might be relevant to the instant federal court lawsuit. If you provide such an explanation, I would naturally reconsider Mr. Haritatos's position regarding your request.

Next, you claim that Mr. Haritatos did not produce certain documents requested by Hasbro in the TTAB proceeding despite promising to do so, however, I am at a loss to recall, verify, or contest your claim. Will you please point me to Mr. Haritatos's supposed promise as well as indicate which of the document requests in the current federal court litigation would encompass the supposedly promised documents.

You next contend that the document request no. 25 is not overly broad and harassment because the documents are "directly relevant to the strength of Plaintiff's CANDYLAND mark and whether he has acquiesced in its dilution." However, the document request is so broad as to encompass perhaps the huge majority of plaintiff's business correspondence over several decades. Accordingly, I continue to believe that the document request is overly broad and a harassment.

You also inquire as to whether Mr. Haritatos has produced all the documents responsive to request no. 26. He has been in possession of a copy of selected pages of defendant Toys "R Us website in which the CANDY LAND name and mark is displayed. Such print-outs are considered work product. Moreover, we believe that Defendant Hasbro is well aware of such website, since Defendant Hasbro licensed the use of such name and mark to defendant Toys "R Us. Also, since serving responses to Hasbro's document requests in the instant federal court lawsuit, Defendant Toys 'R Us has produced documents to Mr. Haritatos pursuant to discovery requests. To the extent that Hasbro is



seeking copies of those documents, Mr. Haritatos is taking the position that Hasbro should obtain those documents through its own discovery requests served upon Defendant Toys 'R Us.

You next claim that Mr. Haritatos has not produced all documents concerning a certain trademark registration obtained in 1976. Please advise me as to what documents you believe have not been produced, and I will reconsider first, whether such documents exist, second, whether they have already been produced, and third, whether there is any reasonable basis for objecting to their production.

You also asked me to reconsider the objections to Hasbro's document request no. 40. You claim that the production of all documents concerning the use of a term that does not include the mark "CANDYLAND" is relevant to the instant proceedings. I fail to see the nexus between the requested documents and your hypothesis or any other relevance to the request.

You also note that the responses to requests no. 41, 43, 44 and 47 are incomplete. Indeed they are incomplete. Mr. Haritatos will provide amended responses. In light of this error and oversight, we will heed your admonition to "please be more careful in responding to Hasbro's discovery requests in the future."

Very truly yours,

WALL MARJAMA & BILINSKI LLP

Robert E. Purcell

REP/jml

# C.3

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

May 9, 2006

**By E-Mail and Mail Confirmation**

Michael D. Sant'Ambrogio
(212) 336-2436
Direct Fax (212) 336-7948
mdsantambrogio@pbwt.com

Robert E. Purcell, Esq.
Wall Marjama & Bilinski LLP
101 South Salina Street, Suite 400
Syracuse, NY 13202

        Re:    **Haritatos v. Hasbro**

Dear Bob:

        I am writing in response to your May 2, 2006 letter. Depositions are scheduled for May 17 and 18, 2006, less than ten days away, yet Haritatos continues to give Hasbro the run-around regarding his document production. If this does not end immediately, we will have to seek the Court's assistance.

### Requests Nos. 10, 11, 12, 14, and 28

        Please either confirm that you have produced all documents responsive to Hasbro's Requests Nos. 10, 11, 12, 28, and, in addition, immediately produce Haritatos's customer lists in response to Request No. 14, or state that you are withholding responsive documents and any purported basis for doing so, so that we can seek to compel production. These documents are relevant to the channels of trade and geographic areas in which Haritatos' products are sold, as well as the nature of his customers and any alleged recognition of his asserted mark.

### Requests Nos. 15 and 38

        It is not necessary for us to remind you of the promises that you have broken. It is necessary for you to produce all documents responsive to Requests Nos. 15 and 38. Please do so immediately or state that you are withholding responsive documents and any purported basis for doing so.

### Request Nos. 25 and 27

        Hasbro is willing to limit Request No. 25 to communications regarding any non-party's use of a mark that incorporates the words "CANDYLAND", "CANDY LAND," or any similar name or mark. Accordingly, please produce all documents responsive to Request No. 25 with this limitation or state that you are withholding responsive documents, along with the purported basis for doing so. Please do the same for Request No. 27.

Robert E. Purcell
May 9, 2006
Page 2

### Request No. 26

We fail to see how the pages Haritatos (or you on his behalf) printed out from the Toys "R Us website constitute work product. In addition, the fact that Toys "R Us has produced other documents in this case (though not produced any website pages) does not obviate the need for Haritatos to produce responsive documents. Accordingly, please produce all documents responsive to Request No. 26 or state that you are withholding responsive documents, along with the purported basis for doing so.

### Request No. 39

Your letter feigns ignorance regarding whether Haritatos has produced documents concerning the "Original Thin Shell Candy Turkey Joint." It is not Hasbro's responsibility to remind you of what documents you have and have not produced. Accordingly, please confirm that you have produced all documents in Haritatos' possession, custody, or control (this includes non-privileged documents held by Haritatos' attorneys) responsive to Request No. 39 or state that you are withholding responsive documents, along with the purported basis for doing so.

### Haritatos Deposition in the TTAB Proceeding

There is simply no excuse for your attempt to restrict either the use of the deposition in the TTAB proceeding or the time we are permitted to take Haritatos's deposition in this one. The TTAB protective order gave you 30 days from service of the transcript to make confidential designations, if you so desired. You did not make any such designations, and the transcript is therefore not covered by that protective order. If you disagree and believe that the Court should determine whether the prior deposition can be used in this action for any purpose, we will approach the Court for such an order. At any rate, although it might not take a full day to depose Haritatos, we are entitled to it if necessary.

Time is of the essence due to the approaching depositions and close of discovery. Your game of hide and seek is a wasteful distraction and is contrary to the Court's admonition that attorneys "cooperate and act in good faith regarding any discovery dispute and to avoid trivial disputes which simply create unnecessary work." Transcript of Teleconference, Mar. 28, 2006, at 23:24-24:1. Accordingly, please respond by close of business tomorrow by producing responsive documents or stating that you are withholding responsive documents, along with the purported basis for doing so. We will then determine whether it is necessary to move to compel discovery and adjourn the depositions.

Sincerely yours,

Michael D. Sant'Ambrogio

Robert E. Purcell
May 9, 2006
Page 3


cc:  John G. McGowan, Esq. (by e-mail)

1277759v1

# C.4

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

June 8, 2006

Kim J. Landsman
(212) 336-2980
Direct Fax  (212) 336-2985
kjlandsman@pbwt.com

**By E-Mail and Mail Confirmation**

Robert E. Purcell, Esq.
Wall Marjama & Bilinski LLP
101 South Salina Street, Suite 400
Syracuse, NY  13202

Re:   <u>Haritatos v. Hasbro, Inc. and Toy 'R Us-NY LLC,</u>
<u>Civil Action 05-CV-930</u>

Dear Bob:

I am writing concerning several discovery and other matters in the above-referenced case that we need to discuss as soon as possible to comply with our meet and confer obligations.

## Potential Mediation

Please call me to discuss your mediation suggestion.  We are not averse to mediation, but only if there is a legitimate possibility of it being fruitful.  While we are not asking that you put a specific offer on the table before we decide about mediation, we do think that you should give us an idea of what you are looking for at this point.  If you are still looking for a license with extravagant minimum royalties, as in the settlement proposals you previously made, then mediation would be a waste of time and money, and my client would then prefer to invest its resources in a successful litigation outcome.

## Haritatos' Deposition Notices

You have noticed six individual depositions of current and former Hasbro employees and a Rule 30(b)(6) deposition with 23 topics.  This is clearly excessive and overly burdensome.  We cannot help but believe it is hardly a coincidence that these notices come on the heels of your suggestion that we mediate.  Moreover, there is no way that many people can rearrange their busy schedules to be available at your convenience over three consecutive days in Providence.  I would suggest that you begin with the depositions of three Hasbro employees – David Dubosky, Jane Ritson-Parsons, and Tom Klusaritz – and that we discuss whether your really need more after you have completed those.  At any rate, you should not assume that any depositions can occur on the dates noticed.  We need to confer as to what depositions should go forward first and then I will endeavor to find available dates.

Robert E. Purcell, Esq.
June 8, 2006
Page 2

### Haritatos' Second Amended and Supplemental Initial Disclosures

On June 1, 2006, Haritatos served Plaintiff's Second Amended and Supplemental Initial Disclosures Pursuant to Fed. R. Civ. P. 26(A)(1), in which Plaintiff named for the first time Rocco L. Versace, Esq. as an individual likely to have discoverable information concerning Tasos Haritatos' acquisition of the Candyland candy manufacturing operations and assets in about 1974. As you know, we are now past the May 31 date that the parties agreed should be the cut-off for fact discovery. Hasbro objects to Plaintiff's disclosure at this late date of Mr. Versace as a person with discoverable information that Plaintiff may use to support his claims or defenses and, unless you agree not to use his testimony, we will move to preclude it.

### Haritatos' Document Production

Plaintiff's document production remains woefully deficient, notwithstanding the thirty-three pages of documents that Haritatos produced on June 1, 2006. Specifically, we are still awaiting the production of documents responsive to the Hasbro's First Set of Requests for Production:

#### Requests Nos. 12, 13, and 14

Plaintiff has not produced documents identifying the geographic area in which his products are sold with the Candyland mark or the demographics of actual or intended consumers or customers for products bearing the Candyland mark, nor has plaintiff produced all documents and things identifying any actual or intended consumers or customers for products bearing his Candyland mark. These documents will shed light on the scope of Haritatos' alleged use of his Candyland mark, the protection (if any) to which it is entitled, and the likelihood (or lack thereof) of consumer confusion stemming from Toys "R" Us's alleged use of Hasbro's CANDY LAND mark

We know from recent deposition testimony that Plaintiff maintains records that include the addresses of consumers who purchase his products over the telephone, via mail order, or through the www.turkeyjoints.com website. Accordingly, please immediately produce these and any other documents responsive to Requests Nos. 12, 13, and 14.

#### Requests Nos. 15 and 38

Aside from Spero Haritatos' 2005 Schedule C (Form 1040) Profit or Loss From Business, Plaintiff has not produced any documents that show his sales and revenues for each year of his products bearing the Candyland mark. Please immediately produce Spero Haritatos' Schedule C (Form 1040) Profit or Loss From Business for each year since 1999, as well as any other documents responsive to Requests Nos. 15 and 38.

Robert E. Purcell, Esq.
June 8, 2006
Page 3

### Requests Nos. 25 and 27

Haritatos has not produced any documents concerning communications regarding any non-party's use of a mark that incorporates the words, "CANDYLAND", "CANDY LAND", or any similar name or mark. Yet Haritatos alleged in his recent deposition that he communicated with Coldstone Creamery and an individual in Rome, New York concerning their alleged use of a "CANDY LAND" mark. Accordingly, please immediately produce all documents concerning these communications and any other documents responsive to Requests Nos. 25 and 27 that pertain to a non-party's use of a mark that incorporates the words, "CANDYLAND", "CANDY LAND", or any similar name or mark.

### Request No. 26

Haritatos has still not produced any documents concerning the alleged use of the CANDY LAND name or mark by Defendant Toys "R" Us-NYC LLC. Yet you indicated in your May 2, 2006 letter to Mr. Sant'Ambrogio that Mr. Haritatos is in possession of a copy of selected pages of Defendant Toys "R Us's website in which the CANDY LAND name and mark is displayed. We fail to see how the pages that Haritatos (or you on his behalf) printed out from the Toys "R" Us website constitute work product. Accordingly, please immediately produce these pages and any other documents concerning the alleged use of the CANDY LAND name or mark by Defendant Toys "R" Us-NYC LLC.

### Request No. 39

Haritatos has not produced all documents concerning Nora Haritatos' application to register the "Original Thin Shell Candy Turkey Joints" mark, including but not limited to the application itself. Accordingly, please immediately produce all documents in Haritatos possession, custody, or control (this includes non-privileged documents held by Haritatos' attorneys) responsive to Request No. 39.

### Request No. 46

Hasbro requested that Haritatos produce all documents upon which Plaintiff relies for his assertions in this action. In his recent deposition, Haritatos alleged as damages (indeed, his only damages) the costs that he has incurred in prosecuting this lawsuit as well as his opposition before the Trademark Trial and Appeal Board. Please immediately produce all documents concerning Haritatos' alleged legal fees and costs in connection with this lawsuit and any proceeding before the Trademark Trial and Appeal Board involving Hasbro.

Robert E. Purcell, Esq.
June 8, 2006
Page 4


      Please let me know when is the earliest time you can discuss these issues by phone.  Thank you for your cooperation.

                  Sincerely yours,

                  Kim J. Landsman


cc:    John G. McGowan, Esq. (by e-mail)

1285236v1

# C.5

## Sant'Ambrogio, Michael (x2436)

| | |
|---|---|
| **From:** | Robert Purcell [rpurcell@wallmarjama.com] |
| **Sent:** | Wednesday, June 21, 2006 4:18 PM |
| **To:** | Landsman, Kim J. (x2980) |
| **Cc:** | jmcgowan@bsk.com |
| **Subject:** | Hasbro |

Kim:

My father is still alive, though his nurse on Monday predicted that he would pas away yesterday or today. In any event, I am now in my office and will try to advance the Hasbro lawsuit.

I have reviewed your letter dated June 20, 2006 concerning the dates and times for three depositions of Hasbro personnel. The dates are fine; the times are not. I would like to begin the depositions at 10:00a.m. on Monday (to accommodate John McGowan's return from vacation the previous day) and 9:00a.m. on Tuesday and on Wednesday. Although I think the depositions should not require a full 7 hours each day, you never know, and I do not want to contend with any time squeeze. Therefore, please let me know if you will not accommodate my request that the depositions commence at the foregoing times.

Second, I have not received any response from you concerning my e-mail dated June 15, 2006 regarding Hasbro's production of certain documents concerning its lawsuit involving the "candyland.com" domain name. What is Hasbro's position?

Third, I have not received any response from you or John McGowan regarding another one of my e-mails dated June 15, 2006 concerning the proposed rescheduling of the deadlines for submitting expert reports. What are your respective positions?

Fourth, thank you for providing me with unredacted copies of Hasbro documents HG001775-HG001830, as I requested in my e-mail to you dated June 11, 2006. Please let me know Hasbro's position about providing unredacted copies of other Hasbro documents, as requested in yet another of my e-mails to you dated June 15, 2006.

Fifth, Hasbro served a first set of interrogatories and a second set of document requests by mail on May 31, 2006. During our telephone conversation June 14, 2006 regarding Hasbro's attempt to preclude the proffer of Mr. Versace's testimony, you took the position that the parties had informally agreed to a factual discovery cut-off date of May 31, 2006 and therefore Plaintiff's i̇ ̇ ̇tification of Mr. Versace as a witness was belated. When I mentioned Local Rule 16.2, which provides, "Discovery requests ṫ ̇ ̇ ̇all for responses or scheduled depositions after the discovery cut-off will not be enforceable except by order of the court for good cause shown." and that Hasbro's discovery served May 31, 2006 would require responses well after that date, you commented that the discovery requests were simply more detailed requests encompassed within Hasbro's earlier discovery, and therefore were implicitly permitted. You also commented that Hasbro's participation in scheduling depositions of Defendants was simply a courtesy to Plaintiff, and no indication or concession that Hasbro was not adhering to the alleged May 31 factual discovery cut-off date. I do not see how Hasbro's discovery requests served May 31, especially a first set of interrogatories, could possibly be encompassed within earlier requests. Moreover, I have re-read Local Rule 16.2 and find no exception for discovery requests that are considered to be simply more detailed versions of prior requests. Given Hasbro's position regarding the allegedly agreed upon factual discovery cut-off date, I believe that Local Rule 16.2 precludes Hasbro from enforcing its discovery requests served May 31 without order of the court for good cause. Therefore, unless and until Hasbro obtains any such order, Hasbro's discovery requests are belated according to its own contention regarding the factual discovery cut-off date, and Plaintiff need not and will not provide responses.

Sixth, during our telephone conversation on June 14, you asked me to respond to the portion of your letter to me dated June 8, 2006 pertaining to Plaintiff's allegedly insufficient production of documents. I have reviewed Local Rules 7.1 (d) 8. and 16.2, which require that any motions to compel discovery be filed no later than 10 days after the discovery cut-off date. Given Hasbro's position regarding the factual discovery cut-off date, Hasbro's complaints about Plaintiff's document production are now late and moot.

Robert E. Purcell
Wall Marjama & Bilinski, LLP
101 South Salina Street - Suite 400
Syracuse, New York 13202
Phone: 315-425-9000
Facsimile: 315-425-9114
i̇ ̇ ̇cell@wallmarjama.com

# D.1

1

2                     UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF NEW YORK

3

4      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

5    SPERO HARITATOS,

6                           Plaintiff,

7           -vs-                    Index No.:

                                   05 CIV 930 (DNH/GJD)

8

     HASBRO, INC. and

9    TOYS "R" US-NY LLC,

10                          Defendant.

11     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

12

13                     Examination Before Trial of

14                   SPERO T. HARITATOS, Plaintiff, held at

15                   the offices of BOND, SCHOENECK & KING,

16                   PLLC, Syracuse, New York, on May 17,

17                   2006, before MELISSA A. LANNING, Court

18                   Reporter and Notary Public in and for

19                   the State of New York.

20

21

22

23

24

25

**Page 2**

```
1
2   APPEARANCES:
3   For the Plaintiff:
            WALL, MARJAMA & BILINSKI, LLP
4           Attorneys at Law
            101 South Salina Street, Suite 400
5           Syracuse, New York  13202
            BY: ROBERT E. PURCELL, ESQ.
6
7
    For the Defendant, Hasbro, Inc.:
8           PATTERSON, BELKNAP, WEBB & TYLER,
                  LLP
9           Attorneys at Law
            1133 Avenue of the Americas
10          New York, New York  10036-6710
            BY: MICHAEL D. SANT'AMBROGIO, ESQ.
11
12
    For the Defendant, Toys "R" Us - NY, LLC:
13          BOND, SCHOENECK & KING, PLLC
            Attorneys at Law
14          One Lincoln Center
            Syracuse, New York  13202
15          BY: JOHN G. McGOWAN, ESQ.
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1
2
3                    EXHIBITS
4   Number    Description              Page
5   10        4/30/74 Contract          58
6   11        5/3/74 Contract           58
7   12        1976 Trademark Registration  72
8   13        Photocopy of Original Turkey
                  Joint Label          72
9
    14        Interrogatory Responses   92
10
    16        Wholesale Receipt from Nora's
11                Candy Shop           104
12  17        Photocopy of Photograph   170
13  18        Compilation of Photographs of
                  Candyland Candy Turkey Joints
14                jars, boxed candies, etc.  143
15  19        Compilation of Newspaper
                  Articles             173
16
    20        Compilation of Letters, re:
17                Orders of Turkey Joints  175
18  21        Photocopy of Hasbro's Candyland
                  mark                 308
19
    22        Photocopy of Hasbro's Candyland
20                mark                 308
21  30        1992 Application to Register
                  Candyland            162
22
    33        2005 1040 with Attached
23                Schedules, 11 pgs.    164
24                   *     *     *
25
```

**Page 3**

```
1
2              EXAMINATIONS
3   Witness:                    Page
4   SPERO T. HARITATOS
5   EXAMINATION BY MR. SANT'AMBROGIO . . . . 8, 305
6   EXAMINATION BY MR. McGOWAN . . . . . . . 208, 321
7
8
9          *      *      *
10
11
12              EXHIBITS
13  Number    Description          Page
14  1         First Set of Requests to
                  Plaintiffs        58
15
    2         TTAB Deposition Transcript
16                of Spero T. Haritatos  305
17  4         1982 Trademark Application  22
18  5         Specimen from 1982
                  Application for Trademark  41
19
    6         1990 Certificate of
20                Registration      29
21  7         Compilation of Declarations  34
22  8         Certificate of Authority  48
23
24              (CONT'D ON NEXT PAGE)
25
```

**Page 5**

```
1
2                  REQUESTS
3   1.  Page 70, Line 22:
        Q.  Have you searched for that business
    certificate?
4       A.  Yes.
        Q.  And did you find it?
5       A.  Yes.
        Q.  And where is it?
6       A.  It's not with me right now.
        Q.  Did you give it to your lawyer?
7       A.  I believe so.
        Q.  And this is a business certificate for
8   Candyland --
        A.  Candyland.
9       Q.  -- dating from 1973?
        A.  Yes.
10      Q.  We'll ask that your lawyer produce that.
            MR. PURCELL:  If I have it, have
11          had it at any time, I'm sure it was
            produced.
12          MR. SANT'AMBROGIO:  We have no
            business certificate from Candyland in
13          1973.
14  2.  Page 235, Line 13:
        Q.  Do you have any -- do you have the documents
15  by which that tax identification number was applied
    for?
16      A.  I don't think so.
        Q.  I would ask you, sir, to make a search for
17  any document applying for that tax identification
    number, to provide them to Mr. Purcell and we will ask
18  for those, and of course we will do it formally.
19
20
21
22          *      *      *
23
24
25
```

1         SPERO T. HARITATOS      6
2         IT IS HEREBY STIPULATED by and
3 between counsel for the respective
4 parties that this Deposition is to be
5 held pursuant to the Federal Rules of
6 Civil Practice; that the presence of a
7 Referee is waived; that the filing of
8 the minutes are waived; that the witness
9 may be sworn by Melissa A. Lanning,
10 Court Reporter and Notary Public in and
11 for the State of New York; and that all
12 objections, except those as to form, are
13 reserved until the time of trial.
14
15      *       *       *
16
17         VIDEOGRAPHER:  My name is
18 Christine Clark for VIdeo Vision,
19 13 Chestnut Street Clinton, New York.
20 Today's date is May 17th, 2006, and the
21 time is 9:28 a.m.  This testimony is
22 being taken at One Lincoln Center,
23 Syracuse, New York.  The caption of the
24 case is Spero Haritatos, Plaintiff
25 versus Hasbro, Incorporated, and Toys

1         SPERO T. HARITATOS      7
2 "R" Us New York, LLC, Defendants.
3         This witness is Spero Haritatos.
4 This testimony is being taken on behalf
5 of the defendant and is being recorded
6 in the digital format at the standard
7 play mode.
8         Will counsel please state their
9 appearance for the record.
10         MR. PURCELL:  This is Bob Purcell
11 representing the plaintiff,
12 Spero Haritatos.
13         MR. SANT'AMBROGIO:  Michael
14 Sant'Ambrogio from Patterson, Belknap
15 representing the defendant, Hasbro,
16 Incorporated.
17         MR. McGOWAN:  John McGowan, Bond,
18 Schoeneck & King of Syracuse.  We
19 represent the defendant Toys "R" Us-NY,
20 LLC.
21         VIDEOGRAPHER:  Thank you.
22
23 S P E R O   T.  H A R I T A T O S, having been called
24 as a witness, being duly sworn, testified as
25 follows:

1         SPERO T. HARITATOS      8
2
3 EXAMINATION BY MR. SANT'AMBROGIO:
4    Q.  Good morning, Mr. Haritatos.
5    A.  Good morning.
6    Q.  How are you today?
7    A.  Good.  And yourself?
8    Q.  Good.  We have before met; have we not?
9    A.  Yes, we have.
10    Q.  In fact, I took your deposition in February
11 or January of 2005, correct?
12    A.  I think it was February.
13    Q.  February of 2005?
14    A.  Right.
15    Q.  Okay.  Thank you.  I know we went over some
16 of the ground rules of the deposition the last time but
17 I want to kind of go over them once more to make sure
18 they're in your head.  If you do not hear any part of
19 the question I ask you, please ask me to repeat the
20 question or ask the court reporter to repeat it.  If
21 you don't understand a question, please let me know,
22 and I will attempt to rephrase the question so that
23 it's understandable to you.
24         Please allow me to finish asking all of my
25 questions before you answer.  The court reporter is

1         SPERO T. HARITATOS      9
2 going to be recording everything that both of us say
3 today, and we want to make sure it's easy for her to
4 record all of that accurately.
5         Also, in order for her to do that, I need
6 all of your responses to be verbal.  So I know we all
7 have a tendency to nod our heads or shake our heads in
8 response to answers, but please try to answer questions
9 verbally.  Do you understand all of that?
10    A.  Yes.
11    Q.  Okay.  Thank you.  Have you ever been
12 deposed before?
13    A.  Yes.
14    Q.  Okay.  And you mentioned before that I
15 deposed you last year, correct?
16    A.  Correct.
17    Q.  Okay.  And what was that deposition in
18 connection with?
19    A.  With the -- the Hasbro case and the Toys "R"
20 Us.
21    Q.  Was that in -- was that -- are you sure
22 about that?  I think -- wasn't it the Hasbro -- the
23 trademark opposition between yourself and Hasbro?
24    A.  Right.  It was -- yes, the opposition
25 between the trademark with Hasbro.

Page 70

```
1              SPERO T. HARITATOS         70
2     Q.    Now, did the Liberty Lane restaurant sell
3   turkey joints?
4     A.    Yes.
5     Q.    Okay.  And they sold the turkey joints made
6   by your father?
7     A.    Correct.
8     Q.    So your father made turkey joints for them
9   after 1974?
10    A.    My mother and father, correct.
11    Q.    Your mother and father.  And they sold it --
12  they made them under the business name Nora Haritatos,
13  correct?
14    A.    Candyland.
15    Q.    Do you have any reason to believe that they
16  used the Candyland name to sell the goods?
17    A.    I believe my -- I think it was registered
18  or -- either a d/b/a was formed in '73, or business
19  certificate, I believe.
20    Q.    Do you own that business certificate?
21    A.    No, I don't.
22    Q.    Have you searched for that business
23  certificate?
24    A.    Yes.
25    Q.    And did you find it?
```

Page 71

```
1              SPERO T. HARITATOS         71
2     A.    Yes.
3     Q.    And where is it?
4     A.    It's not with me right now.
5     Q.    Did you give it to your lawyer?
6     A.    I believe so.
7     Q.    And this is a business certificate for
8   Candyland --
9     A.    Candyland.
10    Q.    -- dating from 1973?
11    A.    Yes.
12    Q.    We'll ask that your lawyer produce that.
13           MR. PURCELL:  If I have it, have
14           had it at any time, I'm sure it was
15           produced.
16           MR. SANT'AMBROGIO:  We have no
17           business certificate from Candyland in
18           1973.
19           MR. PURCELL:  I'll double-check,
20           but -- first of all, whether I have it.
21           Second of all, whether I do have it,
22           whether it was sent and produced to
23           Hasbro.
24           MR. SANT'AMBROGIO:  Okay.  Thank
25           you.
```

Page 72

```
1              SPERO T. HARITATOS         72
2   BY MR. SANT'AMBROGIO:
3     Q.    I'd like to introduce what's been marked as
4   Defendant's Exhibit 12, and I'll also introduce what's
5   been marked as Defendant's Exhibit 13.
6              (Whereupon, Exhibit Numbers 12
7           and 13 were marked for identification,
8           this date.)
9   BY MR. SANT'AMBROGIO:
10    Q.    Defendant's Exhibit 12 is a 1976
11  registration for a trademark, correct?
12    A.    Correct.
13    Q.    And it's a registration for the Original
14  Thin Shell Candy Turkey Joints trademark, correct?
15    A.    Correct.
16    Q.    Okay.  And this was registered by
17  Nora Haritatos, correct?
18    A.    Correct.
19    Q.    And she filed to register this mark in 1976,
20  correct?
21    A.    Correct.
22    Q.    Okay.  And that was Nora Haritatos located
23  at 321 North Doxtater Avenue, correct?
24    A.    Correct.
25    Q.    But we can't tell from this document whether
```

Page 73

```
1              SPERO T. HARITATOS         73
2   Nora Haritatos was an individual or a business, can
3   we?
4     A.    No.
5     Q.    Okay.  And if you could turn to Defendant's
6   Exhibit 13, you produced this in connection with the
7   Trademark Trial and Appeal Board proceeding, correct?
8     A.    Correct.
9     Q.    And again in connection with this
10  litigation, correct?
11    A.    Correct.
12    Q.    So this was something that you found in your
13  records, correct?
14    A.    Correct.
15    Q.    Where did you find it?
16    A.    I found it in a file of old documents and
17  papers that I was going through.
18    Q.    Okay.  And how did you come to posses this
19  document?
20    A.    I'm not sure.  I think it was from a
21  customer.
22    Q.    And do you remember when the customer gave
23  it to you?
24    A.    No, I don't.
25    Q.    Okay.  And what is this?
```

19 (Pages 70 to 73)

Page 282

SPERO T. HARITATOS          282

1
2    A.   I think the radio.
3    Q.   All right.
4    A.   And I think we also advertised with the
5    Sentinel.
6    Q.   Okay.  The Rome Sentinel?
7    A.   The Rome Sentinel, I believe.
8         MR. McGOWAN:  This is probably a
9         good spot, because we just got our
10        five-minute warning.
11        VIDEOGRAPHER:  Go off the record
12        4:34.
13        (Whereupon, a brief recess was
14        taken.)
15        VIDEOGRAPHER:  Back on record
16        4:47.
17   BY MR. McGOWAN:
18   Q.   Mr. Haritatos, if you're able to, could you
19   describe for us what, if any, changes you made in where
20   you advertised comparing the year 2005 with the year
21   2004?
22   A.   The changes, I did some stuff with the
23   Sentinel.  I went back to newspaper advertising and
24   radio.
25   Q.   Okay.  And you eliminated what?

Page 283

SPERO T. HARITATOS          283

1
2    A.   The Keeler Show.
3    Q.   All right.  Now, Mr. Haritatos, --
4    Mr. Haritatos, did you keep any record -- any written
5    record of reports from anyone that they were confused
6    as to the source of any candy products sold at Toys "R"
7    Us Times Square store?
8    A.   No.
9    Q.   Did anybody ever come into your store and
10   say words, in substance, gee, are you doing business in
11   Times Square?
12   A.   No.
13   Q.   Or we saw a Candyland in Times Square; is
14   that yours?
15   A.   No.
16   Q.   Or did you know somebody's got a Candyland
17   down there in a store in Times Square?
18   A.   No.
19   Q.   Mr. Haritatos, do you claim that you've lost
20   any sales of candy products by virtue of the fact that
21   Times Square -- that the Toys "R" Us store in
22   Times Square is alleged to have use the term Candyland?
23   A.   I can't say that I have evidence of losing
24   sales because of it.  However, they're using my name,
25   and I registered it; and I'm out of -- and I'm trying

Page 284

SPERO T. HARITATOS          284

1
2    to stop them from using it, and I'm out of attorney
3    fees and costs associated with it, but I can't say that
4    they've -- that we've actually lost sales from that.
5    Q.   Okay.  Okay.  And I understand what you're
6    saying.  I'm not trying to get away from it; you've
7    said what you've said.  But you don't say there's any
8    products that you could have sold but didn't because
9    Toys "R" Us is down there in New York City and was
10   using that term that you claim you have the right to
11   control?
12   A.   Right, I can't say that.
13   Q.   All right.
14   A.   But it's like if -- how about if I use
15   Candies "R" Us?  I mean, would Toys "R" Us have a
16   problem with it?  I think they would.  Or make a board
17   game out of chocolate and use Candyland with it.  You
18   people would have an issue with that also.
19        MR. McGOWAN:  Move to strike the
20        portion as nonresponsive.
21   Q.   You had indicated earlier this morning in
22   questioning that you were into your sports as a high
23   schooler, true?
24   A.   Correct.
25   Q.   You played some sport or sports on the

Page 285

SPERO T. HARITATOS          285

1
2    varsity level?
3    A.   Yeah, I tried.
4    Q.   What did you play?
5    A.   I played football.  I ran track.
6    Q.   Okay.  And your dad always managed to find a
7    way to make sure that the work was available for you
8    when you got home from practice?
9    A.   Absolutely.
10   Q.   All right.  And you were expected to do that
11   work, weren't you?
12   A.   Absolutely.
13   Q.   When you graduated from high school you
14   joined up with your dad in the family business, true?
15   A.   Yes, true.
16   Q.   And he continued to be in charge?
17   A.   My dad?
18   Q.   Yes, sir.
19   A.   He was always in charge.
20   Q.   I understand.  You graduated from high
21   school in 1980?
22   A.   Correct.
23   Q.   All right.  Did there come a time that you
24   took over the business from your dad?
25   A.   Well, yes, I did.

# D.2


**Wall Marjama**
An Intellectual Property Practice

101 South Salina Street, Suite 400
Syracuse, New York 13202
Telephone: (315) 425-9000
Facsimile: (315) 425-9114

**Robert E. Purcell**
E-Mail: rpurcell@wallmarjama.com

June 1, 2006

**BY FIRST CLASS MAIL**
Michael D. Sant'Ambrogio, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

> Re: **Haritatos v. Hasbro**
> **Our File No. 115_003**

Dear Michael:

    As part of Spero Haritatos's production of documents, I have enclosed documents bearing Bates nos. STH000500-00532.

Very truly yours,
**WALL MARJAMA & BILINSKI LLP**

Robert E. Purcell

REP/jml
Encl.

Certificate of Conducting Business under an Assumed Name
For Individual, Laws 1948

TUTTLE LAW PRINT, PUBLISHERS, RUTLAND, VT. 05701

# Business Certificate

**I Hereby Certify** that I am conducting or transacting business under the name or designation of

CANDYLAND , 321 North Doxtater Street,

at    Rome                                    *County of*    Oneida
*State of New York.*

*My full name is\**              TASOS HARITATOS

*and I reside at*              321 North Doxtater Street
Rome, New York

## CERTIFIED COPY

FILED
ONEIDA COUNTY CLERK
1976 MAR -1  PM 12: 09
BY _____

**In Witness Whereof,** *I have this*   27th   *day of*   February       19 76 ,
*made and signed this certificate.*

*Tasos. Haritatos*

**State of New York.**       } *s.s.:*
**County of**   Oneida

*On this*   27th *day of*   February       19 76 , *before me personally appeared*

TASOS HARITATOS

*to me known and known to me to be the individual   described in and who executed
the foregoing certificate, and   he   thereupon   duly acknowledged to me that
he   executed the same.*

James P. Kehoe, Jr. Notary Public
Oneida County, My commission expires 3/30/76

*\*Print or type name.*
*\*If under 81 years of age, state "I am............years of age".*

STH 000523

STH 000524

| Date Filed | Nature of Paper |
|---|---|
|  |  |

CERTIFICATES OF AMENDMENT AND OF DISCONTINUANCE

INDEX No.

**Certificate**

of

TASOS HARTTATOS

*CONDUCTING BUSINESS UNDER*
*THE NAME OF*

CANDYLAND

1 /143

**E**

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

May 31, 2006

Michael D. Sant'Ambrogio
(212) 336-2436
Direct Fax (212) 336-7948
mdsantambrogio@pbwt.com

**By E-Mail and Mail Confirmation**

Robert E. Purcell, Esq.
Wall Marjama & Bilinski LLP
101 South Salina Street, Suite 400
Syracuse, NY  13202

            Re:    <u>Haritatos v. Hasbro</u>

Dear Bob:

            I am enclosing (1) Hasbro's First Set of Interrogatories to Plaintiff and (2) Hasbro's Second Set of Requests to Plaintiff For Production of Documents and Things.  We believe that Hasbro's First Set of Requests for Production of Documents and Things requested virtually all of these documents.  Nevertheless, to eliminate any doubt as to the documents that we require and our intent to move to compel production if you continue to refuse to produce these documents, we are serving these more specific requests.

            Thank you for your cooperation.

                                    Sincerely yours,

                                    Michael D. Sant'Ambrogio

cc:  John G. McGowan, Esq. (by e-mail)

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

SPERO HARITATOS,

                  Plaintiff,

           - against -

HASBRO, INC.
and TOYS "R" US-NY LLC,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - x

05 Civ. 930 (DNH/GJD)

## DEFENDANT HASBRO, INC.'S
## <u>FIRST SET OF INTERROGATORIES TO PLAINTIFF</u>

       Pursuant to Rule 33 of the Federal Rules of Civil Procedure Defendant Hasbro,

Inc. ("Hasbro"), by its attorneys of record, Patterson Belknap Webb & Tyler LLP, hereby

requests that, within thirty days of the date of service hereof, Spero T. Haritatos ("Plaintiff")

answer the following interrogatories in writing under oath.

1283293v1

## DEFINITIONS AND INSTRUCTIONS

1.      "Plaintiff" shall refer to Spero T. Haritatos and to any and all agents, representatives, employees, attorneys, accountants, and all the persons or entities acting or purporting to act on Spero T. Haritatos's behalf or under his control, or any one of the foregoing.

2.      The term "Complaint" shall mean the Plaintiff's Complaint in this action.

3.      The term "Plaintiff's CANDYLAND mark" is defined as any and all uses or intended uses by him in connection with goods or services of the words CANDYLAND, whether together or as two words.

4.      The term "Hasbro's CANDY LAND marks" is defined as any and all uses or intended uses by Hasbro in connection with goods or services of the words CANDY LAND, whether together or as two words.

5.      The term "person" is defined as any natural person or any business, corporation, partnership, legal or governmental entity or association.

6.      The term "concerning" means relating to, referring to, describing, evidencing or constituting.

7.      The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including but not limited to any written, graphic or recorded material of any kind or nature, whether drafts, originals or non-identical copies (including without limitation, audio or video tapes, cartridges, graphic matter, computer tape, computer discs or any other computer retrievable form, records of telephone messages, appointment calendars, etc.), regardless of origin.

8.      The term "communication" shall mean both oral, written and electronic communications, as well as any note, memorandum or other record thereof.

9.      The term "identify" shall mean:

2

(a)     when referring to a person, to give the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment.  Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person; and

(b)     with respect to documents, to give, to the extent known, the type of document, general subject matter, date of the document and author(s), addressee(s) and recipient(s).

10.     In responding to these interrogatories, Plaintiff may, in lieu of identifying any document, attach a copy of the document as an exhibit to its answers to these interrogatories or produce the document for inspection and copying as if requested pursuant to Rule 34 of the Federal Rules of Civil Procedure.  To the extent that a document does not constitute the complete and full answer to any interrogatory, a narrative answer supplementing the document designation shall be supplied.

11.     The following rules of construction apply:

(a)     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside the scope.

(b)     The use of the singular form of any word includes the plural and vice versa.

3

12.    As to each document (or portion thereof) that Plaintiff declines to produce on the ground of privilege, Plaintiff shall provide the following information:

      (a)    the type of document, e.g., letter or memorandum;

      (b)    the general subject matter of the document;

      (c)    the date of the document;

      (d)    the author(s) of the document;

      (e)    the name of each person to whom such document was addressed, given or sent, or who received such document or a copy thereof and the relationship of the author(s), addressee(s) and recipient(s) to each other;

      (f)    the identity of each person having possession, custody or control of such document, or a copy thereof; and

      (g)    the nature of the privilege claimed.

13.    As to each oral communication Plaintiff declines to divulge on the ground of privilege, Plaintiff shall provide the following information:

      (a)    the name of the person making the communication and the names of the persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communication;

      (b)    the date and place of the communication;

      (c)    the general subject matter of the communication; and

      (d)    the nature of the privilege claimed.

14.    Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, Plaintiff has a continuing duty to furnish additional and supplemental documents and responses as and where such further documents and responses become known or available between the time of the initial response thereunder and the time of the hearing or trial in this proceeding.

## INTERROGATORIES

1.    Identify separately each product produced, distributed, marketed or sold or intended to be produced, distributed, marketed or sold in connection with Plaintiff's CANDYLAND mark and for each such product:

(a) identify the date and circumstances of actual or intended first use and, if different, the date and circumstance of first use in commerce in the United States of Plaintiff's CANDYLAND mark in connection with the product;

(b) state Plaintiff's total annual sales by gross revenue, net revenue, and unit volume for each calendar year since 1972 that such goods were produced or provided, or projections of total annual sales of such goods for each year the goods or services are intended to be offered;

(c) state Plaintiff's annual sales by gross revenue, net revenue, and unit volume derived from any such goods that were shipped to addresses outside of New York State for each calendar year since 1972;

(d) state Plaintiff's annual sales by gross revenue, net revenue, and unit volume derived from any such goods other than those stated in (c) above that plaintiff believes were sold outside of New York State for each calendar year since 1972;

5

(e) state Plaintiff's annual sales by gross revenue, net revenue, and unit volume for each calendar year since 1972 derived from goods sold at "wholesale";

(f) identify all media by either name of network or television station, radio station, magazine, publication, newsletter, website(s) or newspaper in which advertising or marketing for each product has occurred since 1972 or is planned to occur;

(g) state separately for each calendar year since 1972 the actual or intended expenditures or value of advertising, promotion, marketing, client or consumer relations, and public relations for each of these products and services;

2.      State the first year that Plaintiff used Plaintiff's CANDYLAND mark separate and apart from the words "ORIGINAL CANDYLAND CANDY TURKEY JOINTS" in connection with the sale of any goods or services and identify all documents evidencing his first such use of the mark.

3.      State Plaintiff's annual sales by gross revenue, net revenue and unit volume for each calendar year since 1972 for Plaintiff's Turkey Joints candy.

4.      Identify each person who has inquired about, commented upon, or contacted Plaintiff regarding the source or sponsorship of any product or service bearing Hasbro's CANDY LAND mark.

6

1283293v1

Dated:  New York, New York
       May 31, 2006

                           PATTERSON BELKNAP WEBB & TYLER LLP

                           Kim J. Landsman
                           (Bar Roll No. 513,364)
                           Michael D. Sant'Ambrogio
                           (Bar Roll No. 513,363)
                           1133 Avenue of the Americas
                           New York, New York 10036-6710
                           Telephone:  212-336-2980
                           Facsimile:  212-336-2985

                           *Attorneys for Defendant Hasbro, Inc.*

1283293v1

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing **HASBRO'S FIRST**

**SET OF INTERROGATORIES TO PLAINTIFF** to be served by email and First Class Mail

this 31st day of May, 2006 on:


Robert E. Purcell, Esq.
Attorney for Plaintiff Spero Haritatos
Wall Marjama & Bilinski LLP
101 South Salina Street, Suite 400
Syracuse, New York  13202
(315) 425-9000


and

John G. McGowan Esq.
Attorney for Defendant Toys "R" Us
One Lincoln Center
Syracuse, New York  13202-1355
(315) 218-8121


Michael D. Sant'Ambrogio

8

1283293v1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - x
SPERO HARITATOS,                        :
                           Plaintiff,   :      05 Civ. 930 (DNH/GJD)
               - against -              :
                                        :
HASBRO, INC.                            :
and TOYS "R" US-NY LLC,                 :
                                        :
                          Defendants.   :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DEFENDANT HASBRO, INC.'S
## SECOND SET OF REQUESTS TO PLAINTIFF
## FOR PRODUCTION OF DOCUMENTS AND THINGS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure Defendant Hasbro, Inc. ("Hasbro"), by its attorneys of record, Patterson Belknap Webb & Tyler LLP, hereby requests that, within 30 days of the date of service hereof, Plaintiff Spero T. Haritatos ("Plaintiff") produce at the offices of Patterson Belknap Webb & Tyler LLP, 1133 Avenue of the Americas, New York, New York 10036, the following documents and things in Plaintiff's or his affiliates', agents', or representatives' possession, custody or control for inspection and copying.

## DEFINITIONS AND INSTRUCTIONS

1.    "Plaintiff" shall refer to Spero T. Haritatos and to any and all agents, representatives, employees, attorneys, accountants, and all the persons or entities acting or purporting to act on Spero T. Haritatos's behalf or under his control, or any one of the foregoing.

2.    The term "Complaint" shall mean the Plaintiff's Complaint in this action.

3.    The term "Plaintiff's CANDYLAND mark" is defined as any and all uses or intended uses by him in connection with goods or services of the words CANDYLAND, whether together or as two words.

4.    The term "Hasbro's CANDY LAND marks" is defined as any and all uses or intended uses by Hasbro in connection with goods or services of the words CANDYLAND, whether together or as two words.

5.    The term "person" is defined as any natural person or any business, corporation, partnership, legal or governmental entity or association.

6.    The term "concerning" means relating to, referring to, describing, evidencing or constituting.

7.    The term "document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including but not limited to any written, graphic or recorded material of any kind or nature, whether drafts, originals or non-identical copies (including without limitation, audio or video tapes, cartridges, graphic matter, computer tape, computer discs or any other computer retrievable form, records of telephone messages, appointment calendars, etc.), regardless of origin.

8.    The term "communication" shall mean oral, written and electronic communications, as well as any note, memorandum or other record thereof.

9.    The following rules of construction apply:

2

(1)     The connectives "and" and "or" shall be construed either

disjunctively or conjunctively as necessary to bring within the

scope of the discovery request all responses that might otherwise

be construed to be outside the scope.

(2)     The use of the singular form of any word includes the plural and

vice versa.

10.     As to each document (or portion thereof) that Plaintiff declines to produce

on the ground of privilege, Plaintiff shall provide the following information:

(1)     the type of document, e.g., letter or memorandum;

(2)     the general subject matter of the document;

(3)     the date of the document;

(4)     the author(s) of the document;

(5)     the name of each person to whom such document was addressed,

given or sent, or who received such document or a copy thereof

and the relationship of the author(s), addressee(s), and recipient(s)

to each other;

(6)     the identity of each person having possession, custody or control of

such document, or a copy thereof; and

(7)     the nature of the privilege claimed.

11.     Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, Plaintiff

has a continuing duty to furnish additional and supplemental documents and responses as and

where such further documents and responses become known or available between the time of the

initial response thereunder and the time of the hearing or trial in this proceeding.

## DOCUMENTS AND THINGS REQUESTED

1.      All documents concerning the www.turkeyjoints.com website, including but not limited to all reports or other data generated in connection with the website.

2.      All documents evidencing the shipping address of any customer to whom you have shipped candy during the past five years, the specific product(s) that you shipped to the customer, and the amount of each product that you shipped to the customer.

3.      All documents evidencing any sales of your candy products in New York City.

4.      Schedule C (Form 1040) Profit or Loss From Business for Spero T. Haritatos for each year from 1999 to 2004.

5.      All documents concerning tax identification number 16-1187432.

6.      All documents evidencing Plaintiff's first use of Plaintiff's CANDYLAND mark separate and apart from the words "ORIGINAL CANDYLAND CANDY TURKEY JOINTS."

7.      All documents concerning any legal fees and costs paid by you or on your behalf in connection with this civil action.

8.      All documents concerning any estimates of legal fees and costs associated with this civil action.

9.      All documents concerning any legal fees and costs paid by you or on your behalf in connection with any proceeding before the Trademark Trial and Appeal Board involving Hasbro.

10.     All documents concerning any other damages claimed in this action.

4

Dated:  New York, New York
        May 31, 2006

PATTERSON BELKNAP WEBB & TYLER LLP

Kim J. Landsman
(Bar Roll No. 513,364)
Michael D. Sant'Ambrogio
(Bar Roll No. 513,363)
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  212-336-2980
Facsimile:  212-336-2985

*Attorneys for Defendant Hasbro, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing **HASBRO'S SECOND**

**SET OF REQUESTS TO PLAINTIFF FOR PRODUCTION OF DOCUMENTS AND**

**THINGS** to be served by email and First Class Mail this 31st day of May, 2006 on:


Robert E. Purcell, Esq.
Attorney for Plaintiff Spero Haritatos
Wall Marjama & Bilinski LLP
101 South Salina Street, Suite 400
Syracuse, New York  13202
(315) 425-9000

and

John G. McGowan Esq.
Attorney for Defendant Toys "R" Us
One Lincoln Center
Syracuse, New York  13202-1355
(315) 218-8121


Michael D. Sant'Ambrogio

1283290

6

F

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

June 26, 2006

Kim J. Landsman
(212) 336-2980
Direct Fax  (212) 336-2985
kjlandsman@pbwt.com

**Filed Electronically**

Honorable Gustave J. DiBianco
United States Magistrate Judge
United States Courthouse
PO Box 7396
100 South Clinton Street
Syracuse, New York 13261

> Re:    **Haritatos v. Hasbro, Inc. and Toy 'R Us-NY LLC,**
> **Civil Action 05-CV-930**

Dear Judge DiBianco:

We are counsel for defendant Hasbro, Inc. ("Hasbro") and write in response to yet another letter from Mr. Purcell to the Court. Mr. Purcell has asked the Court to order mediation and to provide in limine approval for his disclosure of a witness seven months after his initial disclosures, months after his amended disclosures, after we went to Syracuse and Utica for depositions of his witnesses, and after the parties' agreed cutoff for factual discovery.

We also seek the Court's assistance in dealing with plaintiff's refusal to produce documents in response to several requests for production, or even to respond to document requests and interrogatories resulting from and served soon after his deposition.

## Mediation

We do not believe it is appropriate to disclose the content of prior settlement discussions between the parties, and Mr. Purcell at least comes very close to that line (and, we believe, crosses it) at various points in his letter. Suffice it to say, therefore, that although we are amenable to settling cases and often find mediation helpful, we do not see it as a fruitful exercise here.

This case is about a brief, royalty-free license to Toys 'R Us to use Hasbro's Candy Land® trademark and the design elements of the game for a candy section of its Times Square store. Even if plaintiff were to prevail (which we think extremely unlikely), there are no cognizable damages from that use.

We told Mr. Purcell that we could not consider mediation until we had some idea of what Mr. Haritatos is looking for. What little information he has provided, together with the

Honorable Gustave J. DiBianco
June 26, 2006
Page 2

lessons from prior attempts at settlement , make it painfully clear that Mr. Haritatos is using this case as leverage to try to negotiate a lucrative license for rights he cannot legitimately claim for things utterly extraneous to this litigation.  As long as that is his goal, and as long as the proposals are based on the premise that Mr. Haritatos or his lawyer know how to run Hasbro's business better than its own business people do, there is no hope of settlement; the gap between parties is far too wide for a mediator to bridge.

## Belated Disclosure of Mr. Versace

Plaintiff first served his initial disclosures October 27, 2005.  He served amended and supplement disclosures March 15, 2006.  Neither disclosure mentioned a prior lawyer of one of plaintiff's relatives named Mr. Versace.  It was not until June 1, 2006 that plaintiff amended his initial disclosures to state that Mr. Versace was a witness on the subject of "Tasos Haritatos's acquisition of the CANDYLAND candy manufacturing operations and assets in about 1974."

That disclosure comes seven months after the initial disclosures and is, more importantly, also after the depositions of plaintiff's witnesses were taken in Syracuse and Utica.  Had Mr. Purcell disclosed Mr. Versace before the depositions of plaintiff's other witness, we could have taken his deposition at the same time without an extra trip to Utica.

The disclosure of Mr. Versace also came after the date the parties had previously agreed would be the cut-off date for factual discovery.  The Court has noted Mr. Purcell's "microscopic" approach to discovery, and we do not wish to emulate it.  The Court's scheduling order does not set a cut-off date for factual discovery, but simply one for the close of all discovery.  The Court noted at the time that the parties were free to make their own agreements about interim dates.  We are not trying to strictly enforce the agreed May 31 cut-off for factual discovery since, as the Court knows, we are scheduling depositions for Hasbro's witnesses for subsequent dates.

The significance of the disclosure of Mr. Versace after the date agreed by the parties for the close of factual discovery is simply that it serves as an additional guide and reality check for when a disclosure is too late.  Mr. Purcell has insisted on punctilious compliance with the initial disclosure requirements, and he should observe it himself.

## Plaintiff's Refusal to Respond to Document Requests and Interrogatories

Plaintiff has refused to produce documents in response to several requests contained in Hasbro's First Requests For Production of Documents and Things, which Hasbro served on October 27, 2006 (attached hereto as Exhibit 1):

(1) Plaintiff's Customers

Plaintiff has refused to produce documents concerning the consumers or customers for plaintiff's products bearing the "Candyland" mark, including most importantly their geographic location.  See Requests No. 12, 13, and 14.  These documents will shed light on

Honorable Gustave J. DiBianco
June 26, 2006
Page 3

the strength (or weakness) of Mr. Haritatos' alleged Candyland mark and the likelihood (or lack thereof) of consumer confusion stemming from Toys 'R Us's alleged use of Hasbro's Candy Land® mark in New York City. Defendants believe that plaintiff sells very little, if any, of his product outside the Rome-Utica area and, therefore, that his mark has no source-identifying significance beyond this region. Accordingly, consumers in New York City are not likely to identify Hasbro's famous Candy Land® mark with Mr. Haritatos' candy business.

We know from recent deposition testimony that Plaintiff maintains records that include the location of consumers who purchase his products over the telephone, via mail order, or through the www.turkeyjoints.com website. These are the only consumers who potentially purchase plaintiff's products outside the central New York region. Thus, these documents are highly relevant to Plaintiff's allegation that visitors to the Toys 'R Us Times Square Store are likely to confuse its products with Mr. Haritatos' business in Rome, New York.

(2) Mr. Haritatos' Sales And Revenues

Aside from Spero Haritatos' 2005 Schedule C (Form 1040) Profit or Loss from Business, plaintiff has not produced any documents that show his sales and revenues related to products bearing the Candyland mark. *See* Requests Nos. 15 and 38. These documents will shed light on the strength (or weakness) of Mr. Haritatos' alleged Candyland mark and the likelihood (or lack thereof) of consumer confusion stemming from Toys 'R Us's alleged use of Hasbro's famous Candy Land® mark. Mr. Haritatos surely possesses a copy of his Schedule C (Form 1040) for each year since at least 1999 and they should not be difficult to produce.

(3) Non-Party Use Of The Candyland Mark

Mr. Haritatos has not produced any documents concerning any non-party's use of a mark that incorporates the word, "Candyland", or any similar name or mark. *See* Requests Nos. 25 and 27. Yet Haritatos alleged in his recent deposition that he communicated with Coldstone Creamery and an individual in Rome, New York concerning their use of a "Candyland" mark. These documents will shed light on the extent of any efforts by plaintiff to protect his mark as well as the extent of third-party use of the "Candyland" mark in connection with edible products, which defendants contend is quite extensive. Accordingly, these documents are relevant to the strength (or weakness) of plaintiff's mark, whether Candyland is a generic name for a candy store, and whether Mr. Haritatos has abandoned any rights that he may have once had by acquiescing in third-party use of his alleged mark. Mr. Haritatos' lawyer, Mr. Purcell, presumably maintains any cease and desist letters that he has sent and they would be easy to produce.

(4) Alleged Use Of Hasbro's Candy Land® Mark By Toys 'R Us

Mr. Haritatos has refused to produce documents concerning the alleged use of Hasbro's Candy Land® mark by defendant Toys 'R Us. *See* Request No. 26. Yet Mr. Purcell stated in a May 2, 2006 letter to Mr. Sant'Ambrogio that Mr. Haritatos possessed a copy of

Honorable Gustave J. DiBianco
June 26, 2006
Page 4

selected pages of Defendant Toys 'R Us's website in which Hasbro's Candy Land® name and mark is displayed. These documents are obviously directly relevant to plaintiff's claims in this case concerning Toys 'R Us's alleged use of Hasbro's Candy Land® mark.

(5)  Nora Haritatos' Application To Register The
"Original Thin Shell Candy Turkey Joints" Mark

Mr. Haritatos has not produced all documents concerning Nora Haritatos' application to register the "Original Thin Shell Candy Turkey Joints" mark, including but not limited to the complete application itself (Mr. Haritatos has produced a single page from the application). *See* Request No. 39. Nora Haritatos is the plaintiff's deceased mother and at one time was also the name of plaintiff's candy business. (In his recent deposition, Mr. Haritatos denied that "Nora Haritatos" was ever the name of his business, notwithstanding the fact that he applied to register two trademarks with the United States Patent and Trademark Office ("PTO") "doing business as Nora Haritatos.") In 1976, Nora Haritatos applied to register the "Original Thin Shell Candy Turkey Joints" mark with the PTO. This trademark application, including the product specimens and affidavits contained therein, will show that, contrary to Mr. Haritatos' testimony and his sworn affidavits to the PTO, his family's business was using the "Original Thin Shell Candy Turkey Joints" mark in 1976, *not* the "Candyland" mark that he alleges defendants have infringed. Accordingly, this application will provide evidence that Hasbro is the prior user of the Candy Land® mark and that Mr. Haritatos' testimony is not credible.

(6)  Mr. Haritatos Legal Expenses And Mr. Purcell's Daynotes

In his recent deposition, Mr. Haritatos alleged as damages the costs that Mr. Haritatos has incurred in prosecuting this lawsuit as well as his opposition before the Trademark Trial and Appeal Board ("TTAB"). Indeed, these were the *only* damages that Mr. Haritatos alleged he has suffered because of Toys 'R Us's alleged use of Hasbro' Candy Land® mark. Leaving aside for the moment the propriety of bringing a lawsuit to recover the costs of the lawsuit brought, defendants are entitled to all documents concerning any the damages claimed, which appear to be the legal fees and costs incurred by Mr. Haritatos in this civil action and any proceeding before the TTAB involving Hasbro, including but not limited to all of Mr. Purcell's bills and daynotes. The defendants obviously need to know both the extent of the damages alleged by Haritatos and whether Mr. Purcell's bills were reasonable or he was billing his client for vexatious and obstructionist behavior.

Hasbro's Good Faith Efforts To Resolve The Dispute

Hasbro's counsel first raised the deficiencies in Mr. Haritatos' document production with Mr. Purcell by letter dated April 17, 2006. *See* Exhibit 2 hereto. This should have provided sufficient time to resolve the dispute before Mr. Haritatos' May 17, 2006 deposition, but Mr. Purcell did not respond to Hasbro until May 2, 2006, and then Mr. Purcell gave Hasbro the run-around, asking questions about Hasbro's requests that appeared designed to obstruct rather than facilitate discovery. *See* Exhibit 3.

Honorable Gustave J. DiBianco
June 26, 2006
Page 5

On May 9, 2006, Hasbro's counsel once again wrote Mr. Purcell in another effort to resolve the dispute before Mr. Haritatos' deposition. *See* Exhibit 4. Mr. Purcell never responded to this letter. Accordingly, on May 16, 2006, Mr. Sant'Ambrogio telephoned Mr. Purcell and asked whether he was going to produce any documents in advance of (or even at) Mr. Haritatos's deposition the following day. Mr. Purcell responded that he would not, although it now appears from Mr. Haritatos' deposition testimony that Mr. Purcell had in his possession documents that he waited until after Mr. Haritatos' deposition to produce. *See* Exhibit 5 (Tr. of Haritatos Depo. 5/17/06, at 70-71; Purcell 6/1/06 letter to Sant'Ambrogio enclosing documents).

On June 8, 2006, Hasbro's counsel wrote to Mr. Purcell a third time regarding Mr. Haritatos' document production, reiterating the categories of documents that Hasbro sought, and asked to discuss these issues with him by telephone once again. Mr. Purcell did not respond. On June 14, 2006, Hasbro's counsel raised the issue with Mr. Purcell during a telephone conference. When asked whether he was going to produce any documents in response to Hasbro's requests, Mr. Purcell said that he did not know. Counsel for Hasbro pointed out that Mr. Purcell had had months to consider his response and warned him that Hasbro would move to compel if Mr. Haritatos did not produce the documents requested by the close of business Friday, June 16, 2006.

These requests were first served on Mr. Haritatos on October 27, 2005, they were reiterated in correspondence dated April 17, May 9, and June 8, 2006, and they were raised again by Hasbro's counsel in telephone conversations with Mr. Purcell on May 16 and June 14, 2006. Nevertheless, Hasbro decided to give Mr. Purcell an additional grace period before moving to compel due to an illness in Mr. Purcell's family.

Then, on June 21, 2006, Mr. Purcell took the position that because Hasbro contended that plaintiff's disclosure of Mr. Versace was too late (as discussed above), any motion to compel by Hasbro would also be too late and, therefore, Haritatos would not produce any further documents in response to Hasbro's requests. *See* Exhibit 6. In addition, Mr. Purcell contended that Hasbro's First Set of Interrogatories and Second Set of Requests for Production, which Hasbro served on May 31, 2006 to follow-up on the Haritatos depositions, were also too late and Mr. Purcell stated that Mr. Haritatos would not even respond to these. This position is utterly outrageous, inasmuch as Mr. Purcell is simultaneously insisting that depositions he wants go forward but our discovery is too late.

This obstructionist behavior should not be tolerated. Accordingly, Hasbro requests that the Court order Mr. Haritatos to produce all documents concerning:

(1) the consumers or customers for plaintiff's products bearing the Candyland mark, including but not limited to records concerning the location of and goods purchased by his customers over the telephone, via mail order, or through the www.turkeyjoints.com website, and any other documents responsive to Requests No. 12, 13, and 14;

Honorable Gustave J. DiBianco
June 26, 2006
Page 6

    (2) Spero Haritatos' Schedule C (Form 1040) Profit or Loss From Business for each year since 1999, and any other documents responsive to Requests Nos. 15 and 38;

    (3) any non-party's use of a mark that incorporates the word, "Candyland", or any similar name or mark, and any other documents responsive to Requests Nos. 25 and 27;

    (4) the alleged use of Hasbro's Candy Land® mark by defendant Toys 'R Us, and any other documents responsive to Request No. 26;

    (5) Nora Haritatos' application to register the "Original Thin Shell Candy Turkey Joints" mark, and any other documents responsive to Request No. 39;

    (6) Mr. Haritatos' claimed damages apparently consisting of legal expenses, including Mr. Purcell's bills in this civil action and any proceeding before the TTAB involving Hasbro, and any other documents responsive to Request No. 46.

In addition, Hasbro respectfully requests that the Court order Mr. Haritatos to respond to Hasbro's First Set of Interrogatories and Hasbro's Second Set of Requests For Production by a date certain.

Respectfully submitted,

Kim J. Landsman

cc:    Robert E. Purcell, Esq. (e-mail)
       John G. McGowan, Esq. (e-mail)

1290113

# G

Page 1

1

2          UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF NEW YORK

3    _____

4    SPERO T. HARITATOS,

5              Plaintiff,

6    vs.                        Case No. 05CIV.930(DNH/GJD)

7    HASBRO, INC. AND

     TOYS "R" US_NY LLC,

8

               Defendants.

9    _____/

10

                DEPOSITION of SHARON HARITATOS, held on May 18,

11

     2006, at the offices of Accurate Court Reporting, Inc.,

12

     1618 Genesee Street, Utica, New York, commencing at 10:00

13

     a.m., before Brenda J. Shimer, Court Reporter and Notary

14

     Public in and for the State of New York.

15

16

17

18

19

20

21

22

23

24

25

DEPOSITION OF SHARON HARITATOS, MAY 18, 2006

Page 2

```
 1
 2   APPEARANCES:
 3   For Plaintiff:
     WALL, MARJAMA, BILINSKI & BURR
 4   Attorneys at Law
     101 South Salina Street
 5   Syracuse, New York  13202
     BY:  ROBERT E. PURCELL, ESQ.
 6
     For Defendant:
 7   PATTERSON, BELKNAP, WEBB (Hasbro) TYLER,
     LLPAttorneys at Law
 8   1133 Avenue of the Americas
     New York, New York  10036-6710
 9   BY:  MICHAEL D. SANT'AMBROGIO, ESQ.
10   For Defendant:
     BOND, SCHOENECK & KING, P.L.L.C.
11   (Toys "R" Us)
     Attorneys at Law
12   One Lincoln Center
     Syracuse, New York  13202-1355
13   BY:  JOHN G. McGOWAN, ESQ.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2      INDEX OF EXHIBITS
 3
 4   IDENTIFICATION                MARKED
 5
 6   Exhibit-27                    9
 7   Subpoena in Civil Case
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2   VIDEO DEPOSITION OF SHARON HARITATOS
 3      May 18, 2006
 4      THE VIDEOGRAPHER:  My name is
 5   Corrine Gates for Video Vision, 13 Chestnut
 6   Street, in Clinton, New York.  Today's date
 7   is May 18, 2006, and the time is 1:09.
 8   This testimony is it being taken at 1618
 9   Genesee Street in Utica, New York.  The
10   caption of the case is Spero Haritatos versus
11   Hasbro, Incorporated, and Toys "R" Us-NY LLC.
12   This witness is Sharon Haritatos.  This
13   testimony is being taken on behalf of the
14   Defendant and is being recorded in the
15   digital format at the standard play mode.
16   Would the attorneys please announce their
17   appearances.
18      MR. PURCELL:  This is Bob Purcell
19   appearing on behalf of the plaintiff, Spiro
20   Haritatos.
21      MR. SANT'AMBROGIO:  Mike Sant'Ambrogio
22   from Patterson Belknap, appearing on behalf
23   of Defendant Hasbro, Incorporated.
24      MR. MCGOWAN:  John McGowan, Bond,
25   Schoeneck & King, on behalf of Defendant,
```

Page 5

```
 1
 2   Toys"R" Us.
 3      SHARON HARITATOS,
 4   called as a witness and being duly sworn,
 5   testifies as follows:
 6      EXAMINATION
 7   BY-MR.SANT'AMBROGIO:
 8      Q.   Good morning, Mrs. Haritatos, how are
 9   you -- actually afternoon -- good afternoon,
10   how are you?
11      A.   Good.
12      Q.   My name is Mike Sant'Ambrogio, and I
13   represent Hasbro in this litigation.  And do
14   you understand I am going to be asking you
15   some questions today?
16      A.   Yes.
17      Q.   Okay. I just want to go over a few
18   ground rules that will help us to conduct
19   this deposition today.  If I ask you a
20   question and you don't understand my
21   question, please let me know, and I will
22   attempt to rephrase the question, okay?
23      A.   Okay.
24      Q.   If you don't hear a question, you
25   can also ask me to repeat it.  Please allow
```

DEPOSITION OF SHARON HARITATOS, MAY 18, 2006

Page 38

1
2    Q.   Ten percent?
3    A.   Yeah.
4    Q.   Okay, is there any other way in
5    which your business sells candy?
6    A.   Web site.
7    Q.   And that is www.turkeyjoints.com.?
8    A.   Correct.
9    Q.   How long have you had the web site?
10   A.   1999, I believe.
11   Q.   You believe since 1999?
12   A.   Yeah.
13   Q.   And is it possible for someone to
14   purchase Turkey Joints if they go to
15   turkeyjoints.com?
16   A.   Yes.
17   Q.   Can they purchase anything else?
18   A.   Clusters and fudge currently.  And
19   whatever I want to put in the catalog, if we
20   have any kind of specials.
21   Q.   And what percentage of your gross
22   revenues in 2004 were derived from the web
23   site, turkeyjoints.com?
24   A.   Maybe five, six.  I don't --
25   guesstimate.

Page 39

1
2    Q.   Okay.  You would guess about -- your
3    best guess as you sit here today is about
4    five or six percent?
5    A.   Yes.
6    Q.   Okay.  And do you keep records of
7    the sales that you make through the web
8    site?
9    A.   Yes.
10   Q.   Okay.  How does that work?  Let's
11   say I go to the web site and I -- is there
12   someplace I can click on and purchase Turkey
13   Joints?
14   A.   Shopping cart.
15   Q.   Shopping cart, okay.  And then how
16   do you find out about my order?
17   A.   You open up -- it's an order screen
18   just for the day's work, whatever orders may
19   have come in and you see customer list.
20   Click on the customer list and you see the
21   order.
22   Q.   You click on a customer list and it
23   tells you --
24   A.   Those are the orders that came in
25   that day and then you just process the

Page 40

1
2    orders from clicking on each order as you go
3    down through.
4    Q.   What does that mean, to process the
5    order?
6    A.   Read the order, see if we have
7    everything in stock.  Package it, packing
8    slip, apply a UPS label.
9    Q.   Do you do that yourself?
10   A.   Yes.
11   Q.   Does anybody else do that?
12   A.   Yes.
13   Q.   Who else is involved in taking the
14   web site orders?
15   A.   Would be my sister, Karen Williams.
16   Q.   Okay, anybody else?
17   A.   We have people that do the packaging
18   but not anyone else that would get on the
19   web site usually but the two of us.
20   Q.   Okay, so other people help with the
21   packaging?
22   A.   The packaging and we type up a UPS
23   label but the web site would just be Karen
24   and myself.
25   Q.   Does Spero do that at all?

Page 41

1
2    A.   Not usually.
3    Q.   Who are the people that help with
4    the packaging?
5    A.   Would be Marlena Eaton and Brianna
6    Williams.
7    Q.   And are you related to them in any
8    way?
9    A.   Brianna is my niece, Karen's
10   daughter.
11   Q.   What about Marlena Eaton?
12   A.   Not related, an employee.
13   Q.   She is not related to Spero
14   Haritatos either?
15   A.   No.
16   Q.   Okay.  What percentage of your sales
17   in 2004 through the turkeyjoints.com were for
18   Turkey Joints?
19   A.   Again the bulk of it.  I am going
20   to guess again 90.
21   Q.   Again, could you determine the
22   percentage if you looked at your records?
23   A.   Yes.
24   Q.   That would be easy for the web site?
25   A.   Yes.

Page 42

1
2      Q.   Okay.  Who are the customers that
3   are purchasing your product over the web
4   site?
5      A.   What do you mean by who?  The
6   general public.
7      Q.   Where do they live?
8      A.   We have had -- I can't tell you
9   states that we haven't had orders from.
10   Hawaii, Alaska, California, Florida.  Again,
11   not any state, Toronto, Canada; Colorado.  I
12   mean, like I said, there is really not a
13   state that I can think of that we haven't
14   shipped candy to.
15      Q.   Okay, so you believe you have
16   shipped candy to all 50 states?
17      A.   Yeah, best estimate I would say yes.
18      Q.   And that's based on your experience
19   actually, looking at the web site?
20      A.   Right.
21      Q.   And shipping the product out,
22   correct?
23      A.   Correct.
24      Q.   Have you ever done a study or a
25   survey to actually check whether you have

Page 43

1
2   actually sold in all 50 states?
3      A.   No.
4      Q.   Do you have the information on the
5   states you are selling -- let me rephrase
6   that.  Do you have information on the
7   addresses of the people that you sell product
8   to over the web site?
9      A.   I would have addresses because I
10   have to ship to those addresses.
11      Q.   So you have records if you needed to
12   know where you shipped to, you could
13   determine that?
14      A.   Yes.
15      Q.   And how far back do those records
16   go?
17      A.   On that web site '90 and, a guess,
18   '92, I'm going to guess.  I know that the
19   web site was informational.  Initially, there
20   was no ordering on it for about a year.
21   Shopping cart didn't come on until maybe '92,
22   '93.
23      Q.   I thought you testified before --
24      A.   '99 was informational.  So it would
25   be 2000/2001 with the shopping cart.

Page 44

1
2      Q.   Okay.  And you have records back
3   until then of the places that you have
4   shipped to?
5      A.   Yeah, as long as I have had the
6   shopping cart I can.
7      Q.   And here, in the exhibit, Defendant's
8   14, you have gross revenues listed back to
9   1999.
10      A.   Um-um.
11      Q.   So I guess in 1999, you didn't sell
12   anything over the web, correct?
13      A.   Not through shopping cart, per se.
14   That doesn't mean that someone didn't see our
15   web site and call.
16      Q.   Good point.  Okay.
17      A.   Because we did have a presence but
18   we didn't have the ability for people to
19   shop yet at that point via the Internet.
20      Q.   So the first year in which your
21   gross revenue were going to include sales
22   over the web is 2000, is that correct?
23      A.   If that's when I instituted the
24   shopping cart.  I am thinking it was
25   2000/2001.  Something I certainly can find

Page 45

1
2   out.
3      Q.   And as you sit here today, do you
4   believe that since 2000, or whenever the web
5   site had the shopping cart, the web site has
6   accounted for about five to six percent of
7   your gross revenues?
8      A.   Best guess yes.
9      Q.   It hadn't grown since then?
10      A.   I can't say definitely, maybe one,
11   two percent.  I don't know.  I can't say,
12   unless I look at...
13      Q.   But you do have records you could
14   look at to determine that, correct?
15      A.   Right.
16      Q.   Now, is there any other way in which
17   your business sells candy?
18      A.   Phone orders and mail.
19      Q.   Okay.  Tell me about those.
20      A.   Those would be customers that have
21   just had our -- or ordered for many years
22   and keep the address on file and the regular
23   accounts that just call and that don't have
24   access to the Internet and they just call
25   and phone in their order or just mail it in.

DEPOSITION OF SHARON HARITATOS, MAY 18, 2006

Page 46

1
2      Q.   Let's start with phone orders, those
3    are orders that are placed over the
4    telephone?
5      A.   Correct.
6      Q.   And do they call Nora's Candy Shop?
7      A.   Yes.
8      Q.   Okay.  So is that recorded as a
9    sale through Nora's Candy Shop?
10     A.   Yes.
11     Q.   So do the phone orders, are they
12   included within the 10 percent of gross
13   revenues that you estimate Nora's Candy Shop
14   accounts for?
15     A.   I would say yes.  Trying to think
16   how the books work.  Yes.
17     Q.   And what percentage of your gross
18   revenues do you think specifically come from
19   phone orders?
20     A.   Very small.
21     Q.   Very small.
22     A.   Very small.  Trying to have them go
23   through the secure web site if I can coax
24   the people to use that.  I prefer not to
25   take credit card orders over the phone.  I'm

Page 47

1
2    trying to switch them over to that.
3      Q.   So is that, like, one percent?
4      A.   Maybe less.
5      Q.   Okay.  Do you keep records of phone
6    orders, as well?
7      A.   Yes.
8      Q.   So could you determine the percent
9    that the phone orders would constitute?
10     A.   They would be in the over-the-counter
11   -- I would not be able to distinguish
12   between -- yes, I could distinguish between a
13   phone order.  Yes, I can.
14     Q.   And do you keep a record of where
15   you ship a product to, based on a phone
16   order?
17     A.   Yeah.
18     Q.   And what do people order over the
19   phone?
20     A.   Turkey Joints.
21     Q.   Is it all Turkey Joints?
22     A.   For the most part.  Again, 95
23   percent.  Then clusters or such like that.
24     Q.   So occasionally there are other
25   candies thrown in there?

Page 48

1
2      A.   Yeah.
3      Q.   Okay.  And where are the people
4    located who are placing phone orders?
5      A.   They would be all over the country.
6    We have -- I can't be specific.  I know we
7    have regular customers in Florida, Virginia.
8    Trying to think.  They are the older
9    customers that don't -- that are afraid to
10   use the Internet.
11     Q.   So when they call do you generally
12   tell them to use the Internet?
13     A.   If you have access, I try to
14   persuade them to use the Internet because
15   it's a secure site, and I don't have to keep
16   credit card records that way.  I would just
17   as soon had that process through the bank,
18   so I don't have access.
19     Q.   Right, okay.  And you mentioned
20   before mail order.  Can you tell me about
21   that?  What's the mail order business of Mr.
22   Haritatos' candy business?
23     A.   Those would be folks calling and
24   inquiring about pricing and then sending a
25   check and a letter.

Page 49

1
2      Q.   So they call first?
3      A.   Find out how much the candy is, the
4    volume and shipping and write a check and
5    mail it.
6      Q.   And what percentage of your gross
7    revenues in 2004 was derived from the mail
8    order business?
9      A.   That's -- I'm trying to get that
10   smaller and smaller and trying to get them
11   to access the web site, as well.  So that's
12   very -- it's small.
13     Q.   So even smaller than the phone order
14   business?
15     A.   Yes, very small.
16     Q.   Okay.  And what are they ordering?
17     A.   Turkey Joints.
18     Q.   Anything else besides Turkey Joints?
19     A.   Sometimes clusters, fudge.
20     Q.   But it's -- what would you say, what
21   percentage is Turkey Joints?
22     A.   95 percent.
23     Q.   Okay.  And do you also keep records
24   of mail order shipments?
25     A.   Yes.

DEPOSITION OF SHARON HARITATOS, MAY 18, 2006

Page 50

1
2     Q.   So you could find out where you
3  shipped those products to, as well?
4     A.   Yes.
5     Q.   Is there any other means by which
6  your candy business -- Mr. Haritatos' candy
7  business sells candy?
8     A.   No.
9     Q.   We have just discussed all the
10  different ways in which candy is sold by his
11  business, correct?
12     A.   Yes.
13     Q.   Drawing your attention back to
14  Defendant's Exhibit-14.  In 2005 your husband
15  estimated that gross revenues would reach $1
16  million, correct?
17     MR. PURCELL:  Designating that as
18  confidential, so...
19     A.   Correct.
20     Q.   You testified that you did not help
21  him arrive at this figure, is that correct?
22     A.   Correct.
23     Q.   Okay.  Did he discuss this figure
24  with you?
25     MR. MCGOWAN:  When?

Page 51

1
2     Q.   Did he discuss this $1 million
3  figure with you before he signed these?
4  Actually, first, sorry -- withdraw that.
5  If you can turn to the page number 19.  See
6  that?  Do you see where Mr. Haritatos signed
7  this -- these Interrogatory Responses?
8     A.   Yes.
9     Q.   Is that his signature, do you
10  recognize it?
11     A.   Yes.
12     Q.   And do you understand by this that
13  he swore these were true?
14     A.   Yes.
15     Q.   Okay.  Now, returning to page 9, did
16  he discuss the $1 million figure -- his $1
17  million estimate of his gross revenues in
18  2005, before he signed these Interrogatory
19  Responses?
20     A.   Yes.  I can't tell you when exactly.
21     Q.   And what did he say about that
22  figure?
23     A.   Well, he was hopeful that Price
24  Chopper might be able to do some work with
25  him with the ice cream and distribution.

Page 52

1
2     Q.   Now, do you see where it says here
3  licensing in the parenthesis?
4     A.   Um-um.
5     Q.   Did he tell you that he expected to
6  license something to Price Choppers?
7     A.   It was discussed.  It was hoped to
8  but that was about the extent of it.
9     Q.   So the $1 million figure -- his
10  estimate of the $1 million figure, you said,
11  was based in part on licensing, is that
12  correct?
13     A.   I don't know if I could say it was
14  based on licensing at this point.  I can't
15  be that specific.
16     Q.   Did he tell that he believed that
17  licensing would help him to achieve $1
18  million in gross revenues in 2005, in words
19  or substance?
20     A.   Yes.
21     Q.   Did you think that, that was a
22  reasonable estimate of his business' gross
23  revenues in 2005?
24     A.   I don't think it was unreasonable,
25  had things worked out differently.  I don't

Page 53

1
2  think it was unreasonable.
3     Q.   And how would things have worked out
4  differently?
5     A.   I know they had talked, possibly, of
6  having ice cream produced, private packaging
7  through Price Chopper.  So the distribution
8  could be larger on the ice cream.  And that
9  just didn't -- hasn't panned out yet.
10     Q.   Okay.  Price Chopper has not --
11  well, let me ask you this.  The idea was
12  that Price Chopper would make the ice cream?
13     A.   Yes, they would have a packing house
14  do it.
15     Q.   So they would make the ice cream and
16  they would then distribute the ice cream?
17     A.   Correct.
18     Q.   And they would distribute to a
19  larger area than it's currently sold in?
20     A.   Correct.
21     Q.   And they would pay Mr. Haritatos
22  some money in exchange for that?
23     A.   Yes.
24     Q.   In connection with that, they would
25  pay him some money?



UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------x
SPERO HARITATOS,

                              Plaintiff,

vs.                                 2005-CV-930

HASBRO, INC.,   TOYS "R" US-NY, LLC,


                              Defendant.

--------------------------------------------x

        Transcript of a Telephone Conference held on

March 28, 2006, at the James Hanley Federal Building,

100 South Clinton Street, Syracuse, New York, the

HONORABLE GUSTAVE J. DiBIANCO, United States

Magistrate Judge, Presiding.



                    A P P E A R A N C E S

For Plaintiff:       WALL, MARJAMA LAW FIRM
(Via telephone)      Attorneys at Law
                     101 South Salina Street
                     Suite 400
                     Syracuse, New York  13202
                        BY:  ROBERT E. PURCELL, ESQ.


For Defendant:       PATTERSON, BELKNAP LAW FIRM
(Hasbro)             Attorneys at Law
(Via telephone)      1133 Avenue of the Americas
                     New York, New York  10036-6710
                        BY:  KIM J. LANDSMAN, ESQ.
                             MICHAEL D. SANT'AMBROGIO, ESQ.


For Defendant:       BOND, SCHOENECK & KING, PLLC
(Toys "R" Us)        Attorneys at Law
(Via telephone)      One Lincoln Center
                     Syracuse, New York  13202-1355
                        BY:  JOHN G. McGOWAN, ESQ.

1    disputes which simply create unnecessary work since they do

2    not involve significant issues.

3                    It appears to me that your pursuit,

4    Mr. Purcell, of this issue over default is a perfect example

5    of a minor distracting issue which has nothing to do with the

6    merits of this case.

7                    In my view, the proper way to pursue the

8    failure of an adversary to meet discovery requests is a Rule

9    37 motion to compel.  I have never ever seen a request to

10   enter default or default judgment based upon some adversary's

11   failure to participate or engage in discovery.  Rule 37(a)(2)

12   specifically provides for situations where a party fails to

13   make a Rule 26(a) disclosure.  The rule provides for a motion

14   to compel disclosure and for appropriate sanctions, which do

15   not appear to me to include default.  The provision for a

16   judgment of default is included in Rule 37(b)(2)(C), as a

17   sanction, excuse me, for failure to comply with a court

18   order.  This sanction is also referenced in Rule 37(d) which

19   provides sanctions for failure to attend a deposition, answer

20   interrogatories, or produce documents.  None of these require

21   the entry of default as is required under Rule 55.

22                    You state in your letter, Mr. Purcell, that

23   the local rules requiring a motion under Rule 55 seeking a

24   default judgment to be accompanied by a clerk's entry of

25   default is of questionable prudence, and questionable

25

 1    legality, in quotes, in view of the current status of Second

 2    Circuit law.  I don't agree that the cases you've cited for

 3    that proposition stand for the proposition you say they stand

 4    for.  My research shows that one specific Second Circuit

 5    case, American Alliance Insurance Company, Ltd. v. Eagle

 6    Insurance Company, 92 F.2d 57 at Page 59, and that's Second

 7    Circuit 1996, the entry of default judgment would be

 8    procedurally flawed by lack of compliance with the rule --

 9    with the requirement of Rule 55(a) that the clerk enter a

10    default.  If an order to move for a default judgment under

11    Rule 55 and entry of default is required, then it is neither

12    of questionable prudence nor of questionable legality for the

13    Court to require the submission of an entry of default along

14    with a motion for a default judgment.  I note that the

15    Eastern, Southern, Western Districts of New York have the

16    identical local rule.

17              In one other case out of the Western District,

18    Tesillo v. Emergency Physician Associates, a judge in the

19    Western District specifically stated that the plaintiff's

20    motion for a default judgment was insufficient in its failure

21    to contain the clerk's certificate, noting the entry of

22    default.

23              I will not order the clerk to enter default.

24    The practice in this district is that defaults are entered by

25    the clerk only when there is a failure to answer.  Rule 55,

1    to my knowledge, has never ever been used to enforce some

2    discovery sanction or utilized as a discovery sanction.

3                    I don't believe that there has been a default

4    in the sense contemplated in Rule 55.  And I think further

5    that your effort to move for a default under Rule 55 and Rule

6    26(g)(3) which does not mention default as a sanction created

7    confusion and delay, about which you're now complaining, and

8    your insistence in pursuing the matter in this way is, this

9    tremendous effort and waste of time in pursuing this Rule 55

10   is beginning to approach what I would consider vexatious

11   litigation.  So you should be guided accordingly.

12                   And I think this case is off to a very bad

13   start in terms of the language used in your letters,

14   Mr. Purcell, and the accusations which have freely been made.

15   Whether Mr. Landsman purposely avoided citing that case, or

16   tactically did not want to cite that case does not compel a

17   conclusion that there was some intentional effort to misguide

18   the Court.  If there had been a history of that, that would

19   be a different matter, but there has been no history of that

20   and I think your efforts in that regard are misguided.

21                   I will reserve decision on the motion to

22   amend, and I am directing that the attorneys cooperate with

23   one another, remain and act civilly to one another, and not

24   bring trivial matters to the attention of this very busy

25   court.  Thank you all for participating.

1                    MR. LANDSMAN:  Thank you, your Honor.

2                    MR. McGOWAN:  Thank you.

3                    (Telephone Conference Adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25