# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

SPERO HARITATOS, an Individual,

    Plaintiff,

   v.

HASBRO, INC., a Rhode Island corporation and
TOYS "R" US-NY LLC, a New York limited
liability corporation,

    Defendants.

**NOTICE OF
MOTION**

05 Civ. 930 (DNH/GJD)

  **PLEASE TAKE NOTICE** that upon and for the reasons set forth in the accompanying Memorandum of Law, defendant Toys "R" Us – Delaware, Inc. (improperly sued herein as Toys "R" Us-NY, LLC) (hereafter "TRU"), will move this Court before the Hon. David N. Hurd, United States District Judge, at the Alexander Pirnie Federal Building, 10 Broad Street, Utica, New York, on October 13, 2006, at 10:00 a.m. or as soon thereafter as counsel may be heard, for an order, pursuant to Rule 702 of the Federal Rules of Evidence, precluding at trial the testimony of Plaintiff's expert witness, Seigrun D. Kane, Esq.

Dated:  September 11, 2006

**BOND, SCHOENECK & KING, PLLC**

By:  _____
John G. McGowan, Esq.
Bar Roll No. 501388

*Attorneys for Toys "R" Us-NY, LLC*
Office and Post Office Address
One Lincoln Center
Syracuse, New York  13202
Telephone: (315) 218-8000
Facsimile: (315) 218-8100

To:    Denis J. Sullivan, Esq.
Wall, Marjama Law Firm
101 South Salina Street
Suite 400
Syracuse, NY 13202
315-671-4238

Kim J. Landsman, Esq.
Patterson, Belknap Law Firm
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2980

1223124.1 9/11/2006

# ATTACHMENT "1"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

SPERO HARITATOS, an Individual,

Plaintiff,

v.

HASBRO, INC., a Rhode Island corporation and
TOYS "R" US-NY LLC, a New York limited
liability corporation,

Defendants.

**ATTORNEY
AFFIDAVIT**

05 Civ. 930 (DNH/GJD)

STATE OF NEW YORK    )
                     )
COUNTY OF ONONDAGA) ss:

**JOHN G. MCGOWAN**, Esq., having been duly sworn, hereby deposes and states:

1.      I am an attorney duly licensed to practice law in the State of New York and a member of the law firm of Bond, Schoeneck & King, PLLC, attorneys for Toys "R" Us – Delaware, Inc. (improperly sued herein as Toys "R" Us-NY, LLC) (hereafter "TRU").  I submit this Affidavit upon my own personal knowledge, except as to those allegations which are stated as being upon information and belief.  As to those allegations, I believe them to be true and accurate.

2.      This Affidavit is submitted pursuant to Rule 702 of the Federal Rules of Evidence in support of TRU's motion to preclude the testimony of Siegrun D. Kane ("Kane"), the expert witness of Spero Haritatos ("Plaintiff").   For the reasons set forth in the accompanying Memorandum of Law, TRU respectfully submits that the opinions proffered by Kane are improper and fail to satisfy the requirements of Rule 702 of the Federal Rules of Evidence.  Not only do the opinions usurp the role of the Court and invade upon the province of the jury, they lack the necessary factual basis.  For these reasons, TRU respectfully submits that Kane should be precluded from testifying at trial.

## PROCEDURAL BACKGROUND

3.      The instant action was commenced via the filing of a Summons and Complaint on July 25, 2005.

4.      Thereafter, an Answer was filed on behalf of TRU on September 12, 2005.

5.      Co-defendant Hasbro, Inc. ("Hasbro") also interposed an Answer on September 12, 2005.

6.      Discovery ensued, and, in accordance with Federal Rules of Civil Procedure, Rule 26(a)(2), Plaintiff served his expert disclosure on August 29, 2006.  A copy of Plaintiff's expert disclosure is attached hereto as **Exhibit A**.

## THE MOTION

7.      For reasons set forth in the accompanying Memorandum of Law, it is respectfully requested that this Court preclude the testimony of Plaintiff's expert witness as that testimony is presented, characterized and otherwise outlined in Plaintiff's expert disclosure.

**WHEREFORE**, TRU respectfully requests that the Court grant the instant motion in limine and issue an Order precluding Plaintiff's expert from testifying in the trial of this matter, along with any other and further relief which, as to this Court, seems proper and just.

John G. McGowan, Esq.
Bar Roll No.: 501388

Sworn to and subscribed before me this 11th day of September, 2006.

_____
Notary Public

PAMELA A. KEENAN
Notary Public, State of New York
Qualified in Onon. Co. No. 01ST4665605
Commission Expires March 30, 2010

# EXHIBIT "A"

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF NEW YORK

---

SPERO HARITATOS, an individual

      Plaintiff,

vs.

HASBRO, INC., a Rhode Island corporation
and TOYS "R" US-NY LLC,
a New York limited liability company

      Defendants.

Civil Action No. 05-CV-930 (DNH)(GJD)

---

## PLAINTIFF'S DISCLOSURE OF EXPERT TESTIMONY

Plaintiff, Spero Haritatos, by and through his undersigned attorneys, hereby provides a disclosure of expert testimony pursuant to Fed. R. Civ. P. 26(a)(2) and pursuant to the Court's Order entered August 11, 2006.  Plaintiff has attached a copy (including exhibits) of the Expert Report Of Siegrun D. Kane Pursuant To Federal Rule Of Civil Procedure 26(a)(2)(B).

Dated: August 29, 2006

_____
Robert E. Purcell (Bar Roll No. 510,595)
Denis J. Sullivan (Bar Roll No. 512,997)
WALL MARJAMA & BILINSKI LLP
101 South Salina St., Suite 400
Syracuse, NY 13202
Telephone:   (315) 425-9000
Facsimile:   (315) 425-9114
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 29th day of August, 2006, true and correct copies of Plaintiff's Disclosure of Expert Testimony were served on counsel as follows:

<u>BY FIRST CLASS MAIL AND ELECTRONIC MAIL:</u>

| | |
|---|---|
| Michael D. Sant'Ambrogio, Esq.<br>Kim J. Landsman, Esq.<br>Patterson Belknap Webb & Tyler LLP<br>1133 Avenue of the Americas<br>New York, NY 10036-6710<br>mdsantambrogio@pbwt.com<br><br>*Attorneys for Hasbro, Inc.* | John G. McGowan, Esq.<br>Bond, Schoeneck & King, PLLC<br>One Lincoln Center<br>Syracuse, NY 13202<br>jmcgowan@bsk.com<br><br>*Attorney for Toys "R" Us* |

Robert E. Purcell

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPERO HARITATOS, an individual | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) Civil Action No. 05-CV-930 |
| | ) (DNH/GJD) |
| HASBRO, INC., a Rhode Island corporation, | ) |
| And Toys "R" US-NY LLC, | ) |
| a New York limited company | ) |
| Defendants. | ) |

# EXPERT REPORT OF SIEGRUN D. KANE
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)

Siegrun D. Kane, Esq.

Morgan & Finnegan, L.L.P.
3 World Financial Center
New York, NY 10281-2101

1007694 v1

# TABLE OF CONTENTS

I.   QUALIFICATIONS .................................................................. 1

II.  NATURE OF DISPUTE ........................................................... 4

III. BACKGROUND FACTS ........................................................... 4

   A.   Plaintiff's Candyland Use and US PTO Filings ..................... 4

   B.   Defendant Hasbro's Candy Land Use and US PTO
        Filings ..................................................................... 9

   C.   Hasbro's Knowledge of Plaintiff's Claim of Rights to
        Candyland .............................................................. 10

   D.   Hasbro's Efforts to Exploit Candy Land ........................... 11

   E.   Hasbro's Efforts to Acquire Rights to Plaintiff's
        Candyland Mark ...................................................... 12

IV.  SUMMARY OF OPINIONS ..................................................... 14

V.   BASIS AND REASONS FOR OPINIONS ................................... 16

   A.   The Scope of Plaintiff's Incontestable Registrations ........... 16

   B.   Plaintiff's Prior Rights to Candyland ............................. 17

      1.   The Heavy Burden to Prove Abandonment .................. 17

      2.   Statutory Definition ........................................... 18

      3.   Transfer of Goodwill .......................................... 19

   C.   Reverse Confusion ................................................... 20

EXHIBIT A   Siegrun D. Kane Curriculum Vitae
EXHIBIT B   Expert Testimony in Past 4 Years
EXHIBIT C   List of Materials Reviewed
EXHIBIT D   Internet Printouts re Toys "R" Us Candyland/Candy
            Land dated August 25, 2006

1007694 v1

### EXPERT REPORT OF SIEGRUN D. KANE
### PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)

1.   I have been retained as an expert in the captioned case by counsel on behalf of plaintiff, Spero Haritatos.   This constitutes my written report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

**I.    <u>QUALIFICATIONS</u>**

2.   I am a partner in the law firm of Morgan & Finnegan, L.L.P. (the Morgan firm).   I was previously a partner in Kane Dalsimer, et al. (the Kane firm) which has been dissolved.   The Kane firm specialized in the field of intellectual property law for over 70 years and the Morgan firm has specialized in this field for over 100 years.

3.   I have been involved in the practice of intellectual property law with a primary concentration on trademark and unfair competition law for over 35 years.

4.   I joined the Kane firm in 1963, following my graduation from Harvard Law School in that year.   I joined the Morgan firm in November 1999.

5.   I received a B.A. degree cum laude from Mount Holyoke College in 1960.

6.   I am admitted to practice before the courts of the state of New York and am a member of various bars including the Supreme Court of the United States, the Court of Appeals for the Second Circuit, the Court of Appeals

1007694 v1

for the Fifth Circuit, the Court of Appeals for the Seventh Circuit, the Court of Appeals for the Ninth Circuit, the Court of Appeals for the Federal Circuit, the District Court for the Southern District of N.Y. and the District Court for the Eastern District of N.Y.

7.   I am the author of "Trademark Law A Practitioners Guide" published by the Practising Law Institute.   This text was first published in 1987.   A second edition was published in 1991, a third edition in 1997 and a fourth edition in 2002. Supplements are issued annually.   This text covers various aspects of U.S. trademark law including the selection, searching, clearance and use of trademarks, the registering and maintaining of trademark registrations, the establishing of trademark rights, the assignment and licensing of trademarks, and the prosecution and defense of trademark litigation before the courts and the U.S. Patent and Trademark Office.   The current edition of this text comprises over 700 pages with forms and color illustrations of products involved in various cases.

8.   I have also authored numerous articles and have made numerous presentations to various organizations and moderated panels on trademark law issues.   A list of publications and presentations over the past 10 years is set forth in my curriculum vitae attached hereto as Exhibit A.

1007694 v1

9.   My oral presentations have included lectures at programs sponsored by the Practising Law Institute, the American Bar Association and The International Trademark Association (INTA).

10.  I am a member of the Advisory Board of the Bureau of National Affairs, Inc., Patent, Trademark and Copyright Journal and have held this position since 1988.   The function of this Board is to provide the editors of the Journal with the members' experienced judgment in evaluating current patent, trademark and copyright developments.

11.  I also served as a member of the U.S. Patent and Trademark Office Committee for Trademark Affairs from 1989-1993 and again from 2002-2004. Other Board memberships and professional organizations are set forth in my curriculum vitae (Exhibit A).

12.  I have provided expert testimony during the past 4 years as set forth in Exhibit B.

13.  My practice of trademark law over the past 35 years has included the counseling of clients with respect to the nature and use of trademarks, the type of use that qualifies as trademark use, procedures for the selecting and searching of trademarks, the making of public record claims to trademark rights through the filing of applications and maintenance documents with the U.S. Patent and Trademark Office (US PTO).

14. The materials I have considered in forming the opinions expressed in this report are set forth in EX. C attached.

## II.   NATURE OF DISPUTE

15. I understand that there is a dispute between the parties relating to rights in the mark Candyland in connection with candy.

## III.   BACKGROUND FACTS

16. Based on my review of the materials set forth in EX. C attached and discussions with counsel for plaintiff, I have summarized my understanding of the background facts as follows:

### A.   Plaintiff's Candyland Use and US PTO Filings

17. Plaintiff Spero Haritatos is the successor to the business of manufacturing and selling candies under the Candyland name.  The business was founded in the early 1920s and run by Haritatos family members since that time. Plaintiff  and its predecessors are referred to herein as plaintiff unless otherwise indicated.   Plaintiff's principal product is the "Original Candyland Candy Turkey Joints."  The product consists of a center of chocolate and brazil nuts encased in a hard silvery sugar shell.  In the early years, the Candyland product was sometimes referred to as Turkey Bones. See 1921-1922 newspaper ads EX. B to Haritatos Jan. 31, 2005 Motion for

Summary Judgment before the US PTO Trademark Trial and Appeal Board (TTAB Sum. J.)

18. The Candyland name has been used in a variety of ways during the course of plaintiff's business, e.g., on labels, packages, business cards, brochures, signs, letterhead,  EX. 13, 16-18 to Spero Haritatos May 17, 2006 Depo., EX. D, F & G to TTAB Sum. J.

19. Candyland was the name of plaintiff's original soda fountain store located at 126 West Dominick Street in Rome, New York.  EX. 17 to Spero Haritatos May 17, 2006 Depo.

20. Olga Haritatos married Fred Haritatos, one of the owners of the Candyland business, in 1945.  Olga Haritatos  May 18, 2006 Depo. p. 19.   Olga Haritatos (born 19  19) regularly visited the original Candyland store as a young girl.  She recalls:

- Sales of Turkey Joints bearing the name Candyland on the label from the time she was a young girl until the time she left the business in 1970. Olga Haritatos  Depo. p.76. See also Olga Haritatos Aff. ¶¶ 3,4,6.

- During the onset of World War II, Candyland increased its offerings to sandwiches and other food products and became more like a restaurant.

- By the 1950s, the Candyland operation offered other candies, e.g. Easter chocolates. Olga Haritatos Depo. pp. 73-74.

21. Olga Haritatos worked at the Candyland restaurant beginning in about 1960 through about 1970.  Olga Haritatos Depo. pp. 23, 76.

22. In the early 1970s, the Haritatos brothers sold their interest in the Candyland business. One of the brothers, George Haritatos, continued in the restaurant business at another location under the name Liberty Lane Restaurant. Spero Haritatos May 17, 2006 Depo. p. 69. See Also Spero Haritatos Jan. 31, 2005 Aff. ¶20. Olga Haritatos Depo. p. 40.

23. Around the same time, the Candyland restaurant owners (George and Fred Haritatos, Fred's wife Olga and George Christopoulos) sold the candy making equipment to plaintiff's father, Tasos Haritatos. Contracts April 30, 1974 and May 3, 1974 EX B, C to Haritatos TTAB Sum. J. Reply. Spero Haritatos May 17, 2006 Depo. pp. 61-65.

24. Along with the candy making equipment, Tasos Haritatos acquired the recipe, the ingredients and the labels used for the Original Candyland Candy Turkey Joints. Olga Haritatos Depo. 78-79; Spero Haritatos Aff. ¶21.

25. Tasos Haritatos ran the candy business out of his home at North Doxtater Street in Rome, New York with his wife, Nora. The operation at North Doxtater Street was known and has continued to be known as both "Nora's Candy Shop" and "Candyland." Spero Haritatos Aff. ¶21. See business cards, advertising. EX. F to TTAB Sum. J.; EX. 19 STH 000068

26. In the early 1980s, Nora Haritatos died and her son, Spero Haritatos, who had worked in the Candyland candy business since the mid 1970s, acquired that business from his father, Tasos Haritatos.   Spero Haritatos May 17, 2006 Depo., p. 21; Spero Haritatos Aff. ¶24

27. Since the early 1970s and continuing to the present, Candyland has sold Original Candyland Candy Turkey Joints as well as other candies, e.g. peanut brittle, molded chocolates and caramels under the name Candyland. Spero Haritatos May 17, 2006  Depo. pp. 19-20.   Candyland Peanut Butter Sticks have been sold for 10-15 years. *Id.* at 149.  EX. 18 STH 01.

28. During the past 10 years, Original Candyland Candy Turkey Joints have been sold in Price Chopper supermarkets in the areas around  Rome, Syracuse, Utica and Albany, New York.  Spero Haritatos  Feb.  16, 2005 Depo. pp. 70-71 (attached as EX. N to Declaration of Sant'Ambrogio in Support of  Hasbro's Opposition to TTAB Sum. J.).

29. Plaintiff's Candyland products have been shipped to states outside of New York since the early 50s.  See Customer letters,  EX. 20 to Spero Haritatos May  17,  2006 Depo.   Plaintiff has sold  Candyland  products over the internet to states all around the country since around 2000-2001.  Sharon Haritatos May 18, 2006  Depo. pp. 42-44  Plaintiff also sells to other outlets outside of Rome including Long Island. Id. at 31.

30.  Plaintiff is the owner of the following registrations in the US PTO:

| Mark | Goods | Alleged First Use | Reg. No. & Date | Filed |
|------|-------|-------------------|-----------------|-------|
| CANDYLAND | Candy | 11/21/75 | 1,949,876 Jan. 23, 1996 | Dec. 3, 1992 |
| Original Candyland Candy Turkey Joints | Candy | 11/21/75 | 1,294,740 Sep. 11, 1984 | Dec. 8, 1982 |

31.  Said registrations have become "incontestable" under 15 U.S.C. §1065.

32.  On April 26, 2004, plaintiff filed an intent to use application for the mark Candyland for ice cream, frozen custard, frozen yogurt and frozen confections, Application S.N. 78407842. Examination of this application was suspended pending outcome of the opposition plaintiff had previously filed to Hasbro's intent to use application for Candy Land on beverages. The opposition as to beverages was suspended pending outcome of the subject action.

33.  In May 2004, plaintiff began selling Original Candyland Candy Turkey Joints ice cream. Plaintiff's ice cream is carried at his retail store and at Price Chopper in Rome, New York. Spero Haritatos May 17, 2006 Depo. p. 91, 277.

34. In around January or February 2005, plaintiff had discussions with Price Chopper regarding a possible license arrangement for Price Chopper's sales of Candyland ice cream. Id. at 252-253.

**B.      Defendant Hasbro's Candy Land Use and US PTO Filings**

35. Defendant Hasbro is the owner of the Candy Land mark for a children's board game. Defendant Hasbro's Candy Land registration covering the board game issued June 26, 1951, Reg. No. 544,328, and recites a first use of March 15, 1949. The goods are described as "board games played with movable pieces." Hasbro's Answer and Counterclaim, ¶32. Hasbro also claims ownership of a number of registrations for Candy Land for other non-edible products, namely, books, playing cards, computer game programs, phonograph records and beach towels. *Id.* at ¶35.

36. On April 14, 2003, Hasbro filed an intent to use application S.N. 76/506,818 to register Candy Land on beverages, namely spring and mineral water; flavored water; carbonated and non-carbonated soft drinks and soda; fruit juices; vegetable juices; fruit flavored drinks; sport drinks; energy drinks; concentrates, syrups and powders for use in the preparation of soft drinks and fruit flavored drinks.

37. On Dec. 17, 2003, plaintiff Spero Haritatos filed an opposition to Hasbro's intent to use application for Candy Land on beverages, Opp. No.

91/159,145.   These opposition proceedings were suspended pending disposition of the subject suit.

38. Sometime after this suit was filed in July 2005, the Toys "R" Us use of Candy Land was discontinued.

### C.   Hasbro's Knowledge of Plaintiff's Claim of Rights to Candyland

39. Hasbro has known of plaintiff's claim of rights to the mark Candyland for candy since at least 1995.  Plaintiff's registration for Original Candyland Candy Turkey Joints Reg. No. 1,294,740 and  plaintiff's application for Candyland in block letter form were listed in a search report requested by Hasbro on August 31, 1995.  Plaintiff's said application for Candyland issued as Registration No. 1,949,876 on January 23, 1996.   Said Registration for Candyland No. 1,949,876 and plaintiff's registration for Original Candyland Candy Turkey Joints Reg. No. 1,294,740 were also listed in another search report Hasbro requested on July 21, 1997.   See Hasbro Response to Plaintiff's Requests for Admissions, ¶¶1-2, 7-8.

40. Hasbro did not seek to oppose or cancel any of plaintiff's registrations covering the mark Candyland until after plaintiff opposed Hasbro's intent to use application on beverages.  Id at ¶6.

41. Hasbro did not ask plaintiff to cease its use of Candyland or claim that plaintiff's use of Candyland was an infringement of Hasbro's Candy Land

mark until after plaintiff filed this suit in July, 2005.   Id. ¶ 13-14; Hasbro's
Answer and Counterclaim Request for Relief ¶C.

### D.   Hasbro's Efforts to Exploit Candy Land

42. On June 1, 2001, Hasbro licensed Defendant Toys "R" Us to use the
Candy Land mark in connection with a candy department in the Toys "R"
Us store at Times Square, New York City.   PX. 18.   The Candy Land
department was set up to replicate the Hasbro Candy Land game.   The
Candy Land name appeared in various contexts including use on empty
bags which the customer could fill with loose candy, stickers, signage,
screens with running text, barrels filled with candy and brochures.   PX. 4,
10, TRU 000270, 271, PX. 3 TRU 000297, 316.

43. In December 2001, Hasbro also began exploring a "major venture into
Food/Candy and other potential categories."   Hasbro foresaw "fantastic
seasonal opportunities, e.g. Christmas, Valentine's Day, Easter, most
notably for the food and candy segment."   Targeted distribution channels
were:   mass, grocery, drug, movie theaters, and fund raising channels—
door to door sales.   Initial targeted confectioners were Nestle, Mars,
Hershey, Godiva.   The CVS chain was a contemplated locale for the Candy
Land candy boutiques.   See Dec. 19, 2001 e-mail HG000167-168.   Licenses
with respect to Candy Land candy, Candy Land boutiques and Candy Land

ice cream were explored in 2003 and 2004.  HG000424-445, 824-827, 1338, 1421-1422.  Hasbro's potential national roll out of the Toys "R" Us Candy Land was also under discussion.  HG000444.

44.  Toys "R" Us promoted Candy Land to New York visitors on its website. PX. 10.  Internet tourist guides commented on Toys "R" Us and its Candy Land as a major attraction for visitors to New York.  See internet printouts. Exhibit D attached.  Although Toys "R" Us could not estimate the number of visitors to its Times Square store for the years 2002 and 2003, it was able to provide an estimate for 2004, namely 9 to 9 1/2 million visitors and for 2005, approximately 10 million visitors.

### E.    Hasbro's Efforts to Acquire Rights to Plaintiff's Candyland Mark

45.  In about August 2002, while Hasbro's license of Candy Land to Toys "R" Us was in effect, Hasbro approached plaintiff with a proposal for acquiring rights under plaintiff's Candyland mark. Thomas Wall Jan. 27, 2005 Affidavit in support of TTAB Sum. J para 3.

46.  The Hasbro license to Toys "R" Us expired on January 31, 2003.

47.  Hasbro's internal memo dated July, 2003 reported negotiations with Spero Haritatos who "owns trademark in 'candy' category."  See p. 21 July 2003 HG000444.

48.   In September, 2003, plaintiff rejected Hasbro's proposal and negotiations broke down.   Thomas Wall Jan. 27, 2005 Affidavit in support of TTAB Sum. J, para 5.

49.   In a draft  Licensing Agreement Hasbro proposed on January 19, 2005, Hasbro stated, "For the avoidance of doubt, it is understood that no confectionary items may bear the 'Candy Land' logo specifically, as the Licensor does not own the Candy Land trademark for candy products." HG001530

50.   Although the Hasbro Toys "R" Us license was not renewed and plaintiff had rejected Hasbro's proposal, Toys "R" Us continued to use Candy Land until after this suit was filed in July, 2005.  Toys "R" Us has indicated that it discontinued use of Candy Land by November, 2005.   However, references to the Toys "R" Us Candyland/Candy Land continue to appear on the internet.   See  EX. D attached.

51.   During negotiations relating to Hasbro's efforts to acquire plaintiff's rights to the mark Candyland, Hasbro did not disclose to plaintiff Hasbro's license of Candy Land to Toys "R" Us for the Times Square store or Hasbro's interest in the nationwide rollout of the Toys "R" Us Candy Land.  Under Hasbro's proposal to plaintiff, plaintiff would not have received any compensation for the Toys "R" Us Candy Land use which was royalty free.

1007694 v1

Thomas Wall Jan. 27, 2005 Affidavit in support of TTAB Sum.J., para. 4;
Plaintiff's EX 18.

## IV.   SUMMARY OF OPINIONS

52. Based on my understanding of the facts and the materials I have reviewed,
my opinions are summarized as follows:

53. Plaintiff's registrations covering Candyland have achieved incontestable
status and as such are conclusive proof of plaintiff's ownership and
exclusive right to use the registered marks on candy.   Said registrations
create a presumption that plaintiff is entitled to use the registered marks
throughout the nation.

54. Plaintiff's Reg. No. 1,949,876 for Candyland in block letter form extends
to all types of candy and is not limited to any particular style of type.

55. Plaintiff's own use of the mark Candyland dating back to 1983 and his
registrations covering Candyland for candy issued in 1984 and 1996 are
prior to defendant Hasbro's 2001 licensed use of Candy Land to Toys "R"
Us.   Thus, plaintiff has prior rights to the mark Candyland in connection
with candy.

56. The use of Candyland by plaintiff's predecessors dating back to the 1920s
is prior to Hasbro's use of Candy Land for a board game.  The long history
of plaintiff's predecessors' commercial activities under the mark Candyland

– 14 –

is supported by documents and the testimony of family members involved in the business.    These materials do not show abandonment of the Candyland mark which requires proof of non-use accompanied by an intent not to resume commercial use of the mark.    15 U.S.C. §1127

57. Trademark infringement under the Lanham Act is established when defendant's use is likely to cause confusion, mistake or deception.    15 U.S.C. §1114 (1) (a).    Reverse confusion is one form of likely confusion. Reverse confusion  occurs when the junior user's presence is likely to so swamp the senior user that he loses the value of his mark, control over his good will and reputation, and his ability to move into new markets.    The prominence and attraction of the Toys "R" Us Times Square store and the promotion of Candy Land to out of town visitors provides the factual context for application of the doctrine of reverse confusion.    Reverse confusion is rendered likely in this case in light of the similarity in the marks and the goods, the strength of the Hasbro brand, the promotion of the parties' goods over the internet, the mobile nature of the consumers, the relatively low cost of the products, Hasbro's interest in further national exploitation of the Candy Land mark for candy and ice cream, and Hasbro's knowledge of and attempt to acquire plaintiff's rights.

## V.    BASIS AND REASONS FOR OPINIONS

### A.    The Scope of Plaintiff's Incontestable Registrations

58. Plaintiff's registrations covering the mark Candyland have become incontestable under 15 U.S.C. §1065.  Incontestable status is achieved upon the filing of a declaration that attests, *inter alia,* to a period of five years of continuous use of the mark following issuance of the registration.

59. Incontestable registrations, subject to certain exceptions, are conclusive proof of plaintiff's ownership and exclusive right to use the mark in commerce for the goods specified in the registration.   15 U.S.C. §1115(b); Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 196, 205 (1985).

60. A defendant charged with infringing an incontestable registration cannot defend on the grounds that the mark is descriptive.   Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., *supra.*

61. Plaintiff's registrations create a presumption that the registrant is entitled to use the registered mark throughout the nation.  Draeger Oil Co., Inc. v. Uno-Ven Co., 314 F.3d 299, 302 (7th Cir. 2002).

62. Plaintiff's registration for Candyland in block letter form is not limited to a particular type of candy and is not limited to a particular style of type.  See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition

§ 19:58 (4th ed.); Sally Beauty Company, Inc. et al v. Beautyco, Inc., 304 F.3d 964, 970 (10th Cir. 2002).

## B.   Plaintiff's Prior Rights to Candyland

63. Plaintiff Spero Haritatos acquired the Candyland candy business around 1983.  Regardless of whether plaintiff is entitled to rely on his predecessors' use, plaintiff's own use and registration of Candyland is prior to Hasbro's 2001 use of Candy Land in connection with candy.

64. Defendant Hasbro seeks an injunction prohibiting plaintiff's use of Candyland on any goods or services and requiring plaintiff to destroy all packages and promotional materials which bear the Candyland name. Hasbro's Answer & Counterclaim Prayer for Relief  ¶¶C, D.  However, plaintiff's predecessors' use of Candyland back to the early 1920s is long prior to any use of Candy Land  by Hasbro.

65. Absent proof that plaintiff's predecessors abandoned the mark, plaintiff Spero Haritatos is entitled to rely on the use of Candyland by his predecessors and therefore plaintiff's rights date back to the predecessors' use in the 1920s.

## 1.   The Heavy Burden to Prove Abandonment

66. Abandonment occurs when a mark no longer serves to identify the origin and quality of the owner's goods or services.  Abandonment means that the

owner has forfeited his trademark rights and the mark is fair game for any merchant or manufacturer who seeks to use it. See Sutton Cosmetics (P.R.), Inc. v. Lander Co., 455 F.2d 285, 288 (2d Cir. 1972); P. Daussa Corp. v. Sutton Cosmetics (P.R.), Inc., 462 F.2d 134, 136 (2d Cir. 1972). "Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.'" Cumulus Media, Inc. v. Clear Channel Communications, Inc., 304 F.3d 1167, 1175 (11th Cir. 2002) (citations omitted); see also Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980).

## 2.   **Statutory Definition**

67. Under the Lanham Act, a mark is considered abandoned if its use has been discontinued with intent not to resume such use. 15 U.S.C. § 1127.

68. "A putative trademark infringer thus must prove two separate elements to interpose the defense of abandonment successfully:  that the plaintiff has ceased using the mark in dispute, and that he has done so with an intent not to resume its use." Cumulus, supra, 304 F.3d at 1173-74.

69. Non-use for three consecutive years constitutes prima facie evidence of abandonment. 15 U.S.C. § 1127.

70. "Use" means "the bona fide use of that mark made in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. §1127.

### 3.    Transfer of Goodwill

71. Even where use has been discontinued, goodwill does not ordinarily disappear overnight. "Erosion from non-use is a gradual process.  As long as the mark has significant remaining value and the owner intends to use it in connection with substantially the same business or service, the public is not deceived." Defiance Button Mach. Co. v. C&C Metal Prods. Corp. 759 F.2d 1053, 1060 (2d Cir.), cert. denied 474 U.S. 844 (1985).

72. Here, the defendant has not established that plaintiff's predecessors ceased using Candyland in their candy business or that any cessation of use was with the intent not to resume use.   Moreover, the continued commercial activities of plaintiff's predecessors negate any intent not to resume use.

73. The transfer of the candymaking equipment and related materials to plaintiff's father and the continued use of the Candyland mark following the transfer further negates any intent to abandon.   Plaintiff's father's acquisition of the candymaking equipment, recipe, raw materials and labels enabled him to carry on the business in real continuity with its past, thus

supporting the transfer of good will.  Merry Hull & Co. v. Hi-Line Co., 243

F. Supp. 45, 51 (S.D.N.Y. 1965).

74.  Where a business has been acquired it can be presumed that the trademark

has been passed along with the business even if the mark is not mentioned

in the transfer documents.  J. Thomas McCarthy, McCarthy on Trademarks

and Unfair Competition § 18:37 (4th ed. 2005)

**C.**    <u>**Reverse Confusion**</u>

75.  Two types of likely confusion support a claim of infringement under the

Lanham Act:  ordinary confusion and reverse confusion:

> Under the Lanham Act confusion is ordinarily the
> misimpression that the senior user (Haritatos) is the source
> of the junior user's (Hasbro's) goods.  Reverse confusion is
> the misimpression that the junior user is the source of he
> senior user's goods.  Banff, Ltd., f/k/a Sweater Bee By
> Banff, Ltd. v. Federated Department Stores, Inc., and
> Bloomingdale's, 841 F.2d 486, 490 (2nd Cir. 1988)

76.  Reverse confusion occurs where the junior user is better known than the

senior user.  Consumers who encounter the senior user's products may

believe they are associated with the better-known junior user.  Banff Ltd.,

*supra*.  The result is that the senior user loses the value of the trademark and

control over its goodwill, reputation and ability to enter new markets.

Consumers may even believe that the senior user is an unauthorized

infringer and in that way injure the senior user's reputation and impair its

good will.  Banff Ltd., *supra*, 841 F.2d at 490.

> The objectives of that Act—to protect an owner's interest in
> its trademark by keeping the public free from confusion as
> to the source of goods and ensuring fair competition—are as
> important in a case of reverse confusion as in typical
> trademark infringement.  Were reverse confusion not a
> sufficient basis to obtain Lanham Act protection, a larger
> company could with impunity infringe the senior mark of a
> smaller one.  *id.* at 490-491

See also Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co. 408 F

Supp. 1219. 1236 (D. Colo. 1976) aff'd with modification as to amount,

561 F.2d 1365, 1372 (10th Cir. 1977) cert. dismissed, 434 U.S. 1052 (1978).

77.  Factors to consider in evaluating a claim for reverse confusion include :

 (1)  the degree of similarity between the owner's mark and the
alleged infringing mark;

 (2)  the strength of the two marks, weighing  both a
commercially strong junior user's mark and a conceptually
strong senior user's mark in the senior user's favor;

 (3)  the price  of the goods and other factors indicative of the
care and attention expected of consumers when making a
purchase;

 (4)  the length of time the defendant has used the mark without
evidence of actual confusion arising;

 (5)  the intent of the defendant in adopting the mark;

 (6)  the evidence of actual confusion;

(7)  whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8)  the extent to which the targets of the parties' sales efforts are the same;

(9)  the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10)  other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

A&H Sportswear, Inc. et al. v. Victoria's Secret Stores, Inc. et al. 237 F.3d

198, 234 (3rd Cir. 2000)

78.  As to similarity in marks, any difference between Candy Land as two

words versus Candyland as one word is not likely to be noticed or

remembered.  See e.g. EX. D reference to Toys "R" Us Candyland as one

word and Candy Land as two words.  Also, plaintiff has used Candyland in

a variety of formats such that any differences between plaintiff's specific

use and Hasbro's use cannot assure against likely confusion.  Both marks

are used in connection with relatively inexpensive candy.  While it appears

that no evidence of confusion has surfaced during the period Toys "R" Us'

was using Candy Land,  this is not surprising where low cost products are

involved.  Customers may not be aware that they are confused or bother to report their confusion.

79. As to the strength of the marks, in a reverse confusion case "a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark." "The lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion. " A&H Sportswear, *supra*. 237 F.3d at 231, citation omitted.  Here, Hasbro, as the larger, more powerful company, has the ability to exploit the Candy Land mark on candy so as to overwhelm the market with its advertising.

80. Also, Hasbro was actively pursuing further commercial activities for Candy Land candy on a national scale which would increase the likelihood of confusion.  The Hasbro use, if not halted, has the potential to swamp plaintiff's use.

81. I further note that Hasbro relied on Spero Haritatos' testimony that a customer asked Mr. Haritatos whether his business was affiliated with the Candy Land board game. Hasbro cites this testimony as proof that consumers associate plaintiff's Candyland name with the board game and

its source—Hasbro.  Hasbro's TTAB Opposition to Haritatos' Motion for Summary Judgment, dated March 2, 2005, pp. 22-23.   Consumers who associate plaintiff's Candyland with the  board game are even more likely to associate Hasbro's better known  Candy Land candy as the source of plaintiff's lesser known Candyland candy.  Since it is plaintiff, not Hasbro, who has prior rights to Candyland for candy, such a mistaken association constitutes reverse confusion.

82. As to Hasbro's intent, Hasbro was aware in 1995 of plaintiff's registration for Original Candyland Candy Turkey Joints and plaintiff's application to register Candyland for candy.  Hasbro was aware in 1997 that plaintiff's application for Candyland had issued to registration.  Yet, in June, 2001, Hasbro proceeded to license Toys "R" Us to use Candy Land in association with candy sold at the Toys "R" Us Time Square Store.

83. The  fact  that  Hasbro  approached  plaintiff  to  acquire  his  rights  in Candyland  indicates  that  Hasbro  considered  plaintiff's  rights  to  pose  a problem with respect to Hasbro's licensed use of Candy Land in association with candy.  Indeed, Hasbro acknowledged in Jan. 2005, after negotiations with plaintiff broke down, that it did not own the Candy Land trademark for candy products.  HG001529-1530  Yet, Hasbro permitted Toys "R" Us to continue using Candy Land until this suit was filed.  Hasbro's conduct may

be considered evidence of an "aura of indifference" to plaintiff's rights and a "smug willingness" to treat plaintiff's good will as a nullity. See W.E. Bassett Company v. Revlon, Inc., 305 F.Supp. 581, 587-88 (S.D.N.Y. 1969), aff'd in pertinent part 435 F.2d 656, 662 (2d Cir. 1970)

84. In terms of competition, channels of trade and target customers, there is considerable overlap. The Toys "R" Us Candy Land use in the Times Square store was exposed to millions of customers annually who came from all over the country and all over New York State. The Toys "R" Us Candy Land was featured on the Toys "R" Us website and even now, after Toys "R" Us discontinued its use, appears on the internet in travel articles:

> . . . and then, of course, CANDYLAND! That's why we"R"e here! That's why we came! And now that you"R"e on a sugar high, why not take another spin on the Ferris Wheel. Wheee! Toys R Us: Candyland!, VirtualTourist.com printed, dated February 24, 2005, printed August 25, 2006

> . . . the main reason to go in is to ride the ferris wheel or to look at some of the other "attractions," including the giant T-Rex from Jurassic Park or the Candy Land candy area. Toys R. Us Times Square, taquitos.net, printed August 25, 2006. See EX. D attached.

85. Plaintiff's distribution is not limited to its retail location in Rome, New York. Plaintiff sells through Price Chopper outlets in Rome, Albany, Utica and Syracuse, New York and other outlets in New York (e.g. Long Island) and elsewhere. Plaintiff ships its products around the U.S. Plaintiff also

promotes its Candyland products over the internet.  It can be expected that the millions of customers who visited Toys "R" Us in Times Square or encountered Toys "R Us Candyland over the internet include plaintiff's customers or potential customers.

86. It also appears that, prior to this suit, Hasbro was actively pursuing significant commercial efforts that would move the Hasbro Candy Land use to even closer proximity with plaintiff's Candyland.  For example, a national roll out was contemplated for the Toys "R" Us Candy Land use as well as licenses to candy manufacturers with broad national distribution.

87. Applying the pertinent reverse confusion factors to the facts here, in my opinion there is a likelihood of reverse confusion.

88. I will be compensated at the rate of $550 per hour for my work in this case.  My compensation does not depend upon the outcome of this litigation and I have no other financial interest in the outcome of this litigation.

Date:  August 28, 2006          Respectfully submitted,

*Siegrun O Kane*

Siegrun D. Kane

# EXHIBIT A

## EXHIBIT A

### Siegrun D. Kane Curriculum Vitae

**<u>Partner in Intellectual Property Law Firm:</u>**
Morgan & Finnegan
3 World Financial Center
New York, New York 10281-2101
Phone: (212) 415-8700
Fax: (212) 415-8701

Practice of intellectual property law with primary concentration in trademark and unfair competition law for over 35 years.

**<u>Education</u>:**
Mount Holyoke College (B.A., cum laude, 1960)

Harvard University (L.L.B., 1963)

**<u>Bar Admissions</u>:**
New York; the Supreme Court of the United States, United States Courts of Appeal for the Second Circuit, Fifth Circuit, Seventh Circuit, Ninth Circuit, Federal Circuit, United States District Courts for the Southern and Eastern Districts of N.Y.

**<u>Author</u>:**
<u>Trademark Law: A Practitioner's Guide</u>, Fourth Edition, Practising Law Institute (PLI) (Copyright 1987, 1989, 1991, 1997, 2002) (supplemented annually).

**<u>Published Articles/Lectures</u>:**

**<u>Practising Law Institute (PLI):</u>**

Trademarks Just Ain't What They Used To Be: 5 Years of the Supreme Court's Effort to Rein in Trademark Owners (Sept. 2005)

A Trademark Decathlon: 10 Essential Trademark Topics (Sept. 2004)

Trademark Infringement Litigation 2004: "Lost in Translation"

The Evolution of Dilution: Survival of the Strongest

- i –

1007694 v1

Trademark Infringement Litigation 2003: "The Road to Perdition"

"Trademark Infringement Litigation 2002: 'The Sorcerer's Stone'"

"Trademark Infringement Litigation 2001: 'What Judges Want'"

"Trademark Infringement Litigation 2000: 'Eyes Wide Shut'"

"Trademark Infringement Litigation 1999: 'You've Got Mail'"

"Trademark Infringement Litigation 1998: 'Midnight in the Garden of Good and Evil'"

"Trademark Infringement Litigation 1997: 'Sense & Sensibility'"

"Appearances May Be Deceiving: Trademark Protection for Package Appearance, Product Design and Color" (1996)

"Trademark Infringement Litigation 1996: 'The Day of the Copycat'"


**Moderator and Organizer: (PLI)**

Global Trademark and Copyright Protection (each year from 1991-1999)


**International Trademark Association (INTA):**

" Establishing and Presenting Evidence—Views from the Bench and Bar" (2005)

"Point/Counterpoint:  Trade Dress and Product Configurations on the Edge" INTA 2002 Leadership Meeting

**American Bar Association (ABA):**
  Elements of Trademark Parody (or Who Laughs Last)" (1993)

" Stopping the Importation of Gray Market Goods" (1988)

CLE Trademark Program Spring 1986, 1987 (Organizer and Moderator)

1007694 v1

**Other:**

Oregon/Washington Patent Law Association Joint Conference (1995)

Washington State Bar Association CLE Seminar (1992, 1995)

**Professional Organizations and Memberships:**

Bureau of National Affairs' Patent, Trademark & Copyright Journal Advisory Board (1988 to present)

U.S. Patent and Trademark Office Advisory Committee for Trademark Affairs (1989 - 1993; 2002 - 2004)

Practising Law Institute's Intellectual Property Advisory Committee

Member, Advisory Board, McCarthy Center for Intellectual Property and Technology Law at the University of San Francisco

Designated Member, INTA Panel of Neutrals

American Bar Association

International Trademark Association

New York Patent, Trademark and Copyright Law Association (Director, 1980-1983)

Pharmaceutical Trade Marks Group

The Best Lawyers in America 1997-

Who's Who in the East

Who's Who in American Law

Who's Who in Intellectual Property

# EXHIBIT B

## EXHIBIT B

### Expert Testimony in Past 4 Years

I have provided expert testimony in the matter of Purebred Company, Inc. v. Star Kist Foods, Inc. d/b/a The Nature's Recipe Co. and H.J. Heinz Co. d/b/a Heinz Specialty Pet Food, Civil No. 00-D-665 on behalf of Purebred Company, Inc.; Ciphertrust, Inc. v. Trusecure Corp., Betrusted US, Inc. and Betrusted Holdings, Inc., Civil Action No. 1:04cv1232 on behalf of Trusecure Corp., Betrusted US, Inc. and Betrusted Holdings, Inc.; Phillips-Van Heusen Corp., Calvin Klein, Inc. and Calvin Klein Trademark Trust, v. Calvin Clothing Company, Inc. and Star Ride Kids, Inc., Civil Action No. 05-CV-6802 on behalf of Phillips-Van Heusen Corp., Calvin Klein, Inc. and Calvin Klein Trademark Trust.

1007694 v1

# EXHIBIT C

## EX. C

## LIST OF MATERIALS REVIEWED

• Plaintiff's Complaint and Jury Demand, defendant Hasbro's Answer and Counterclaims; defendant Toys "R" Us Answer

• Plaintiff Spero Haritatos Reg. No. 1,949,876, Jan. 23, 1996, for the mark Candyland

• Plaintiff Spero Haritatos Reg. No. 1,294,740, Sep. 11, 1984, for the mark Original Candyland Candy Turkey Joints

• Defendant Hasbro Reg. No. 544,328, June 26, 1951, for the mark Candy Land

• Plaintiff's and Hasbro's submissions to the US PTO Trademark Trial and Appeal Board re Haritatos motion for summary judgment relating to Hasbro's intent to use application, opposition 91/159,145

    • Opposer's motion for summary judgment dated Jan. 31, 2005 with exhibits A-H and supporting affidavits

        o Affidavit of Robert E. Purcell, dated January 31, 2005 with exhibits A through F

        o Affidavit of Spero Haritatos, dated Jan. 31, 2005 (attached as EX. A to Purcell Affidavit)

        o Affidavit of Olga Haritatos, dated January 31, 2005

        o Affidavit of Thomas J. Wall, dated January 27, 2005

    • Applicant's memorandum of law in opposition to opposer's motion for summary judgment dated Feb. 14, 2005 (including exhibit 1) and supporting affidavits

        o Declaration of Michael Sant'Ambrogio dated March 2, 2005 with exhibits A-W

     ○ Affidavit of Mark Stark, dated March 2, 2005 with exhibits A-C

    • Opposer's Reply Brief in Support of Motion for Summary Judgment dated Mar. 11, 2005 with exhibits A-C

• TTAB decision denying motion for summary judgment dated June 28, 2005

• Various documents pertaining to Toys "R" Us Times Square store and use of Candy Land, including Plaintiffs Exhibit No. 3, 4, 10, document No. TRU000270, 271, 297, and 316

• Deposition transcript of Spero Haritatos dated May 17, 2006 (including exhibits No. 1-2, 4-8, 10-14, 16-22, 27, 30, and 33)

• Deposition transcript of Olga Haritatos dated May 18, 2006 (including exhibits No. 24 and 26)

• Deposition of Sharon Haritatos dated May 18, 2006

• Hasbro June 2001 Candy Land license agreement with Toys "R" Us (plaintiff's exhibit 18)

• Plaintiff's Requests for Admissions dated June 21, 2006

• Hasbro response to plaintiff's Requests for Admissions dated July 24, 2005 [Sic]

• Hasbro internal memos re potential Candyland licenses, Haritatos negotiations (documents Nos. HG000167-000168, 424-445, 824-827, 1336, 1338, 1421-1422, 1529-1536)

• Internet printouts re Toys "R" Us Candyland/Candy Land (dated August 25, 2006)

• Plaintiff's US PTO intent to use application for ice cream, frozen custard, frozen yogurt, and frozen confections, SN #78407842 filed April 26, 2004

• Hasbro's US PTO intent to use application for beverages, namely spring and mineral water, flavored water, carbonated and non-carbonated soft drinks and soda, fruit juices, vegetable juices, fruit flavored drinks, sport drinks, energy drinks, concentrates, syrups and powders for use in the preparation of soft drinks and fruit flavored drinks, SN #76506818 filed April 14, 2003

# EXHIBIT D



THE LOWEST RATE. On our hotels ONLY AT BestWestern.com

Become a Virtual Tourist Member Today!  Sign Up



VirtualTourist.com
*Real Travelers · Real Info*

Search:     Dest

| Home | Travel Guides | Book Travel | Meet Members | Travel Deals | Trip Planner |

Home » Travel Guides » North America » United States of America » New York State » New York City » Shopping » Toys R Us

# New York City Travel Guide

Sponsored Links for New York City

**Luxurious NYC Hotels**
Official St. Regis Site. Exclusive Offers. Superior Service. Book Now!

**Crowne Plaza New York**
Official site. Upscale hotel with superior meeting accommodations.

**Sofitel - Official Site**
Sofitel New York - luxury rooms and service near Broadway.

**The Benjamin Hotel**
Official Site - A luxury hotel for discerning travelers. Reserve today

**New York Hotel**
Book at the Waldorf for an Elegant & Luxurious Stay in New York City

| Overview | Hotels | Things to Do | Restaurants | Nightlife | Shopping | Transporta |

**Toys R Us, New York City**
See all New York City Shopping



by cielo85

New York City Shopping: Toys R Us tips, reviews and photos posted by real travelers and New York City locals.

**Toys R Us**
1514 BROADWAY

• 27 Photos
• 21 Reviews

New York City Resources: Forums | Deals | Meetings | Local Members | Meml

 **New York City Toys R Us Reviews**          **Tips 1 - 10 of 21**

**Hotels      Flights**

Popular Shopping (19) | Miscellaneous Shopping Tips (362) | All Tips (575)

Sort By:  Most Recent | Best Rated

### Toys R Us: Candyland!          Tip Rating: ⭐⭐⭐⭐⭑

**Search Hotels**
Find the best room rates

◉ All New York City Hotels

Check-In Date:
mm/dd/yyyy

Check-Out Date:
mm/dd/yyyy

Guests
1

By cruisingbug on February 24, 2005          Send to a Friend
Email Me
See My New York City Page

The Toys R Us in Times Square is a tourist attraction in itself. I don't know if anyone actually buys any toys here! Before you even walk in, notice the changing window advertisements, plastic sheets that just keep on rotating out. As you enter the front doors, you'll see a HUGE Ferris wheel INSIDE the store! Cool! You can buy tickets for the Ferris wheel in the basement area - about $2 each if I remember right. The cars of the Ferris wheel are all toy-related - from Toy Story, Barbie, Hot Wheels, Mr. Potato Head, etc. Fun! After your ride, check out the giant Jurassic Park T-Rex, run around inside Barbie's Dollhouse (and see some schmantzy collector Barbies) and then, of course, CANDYLAND! That's why we're here! That's why we came! And now that you're on a sugar high, why not take another spin on the Ferris wheel. Wheee!

Toys, of course. But I'm a big girl, so I go for the sugar. Candyland has all the candies you remember from when you were little. Pop rocks? Got 'em. Ring candy. Yep. Candy necklaces. GIANT Tootsie Rolls. Every possible color of M&Ms. Even Bertie Bott's Every Flavor Beans. Grab a bag and start samplin' (pay for them samples, please). More fun than Hershey's Chocolate World! :)



Toys R Us Times Square, New York City
by cruisingbug
Send Photo to a Friend

**New York City Deals**

United Last Minute Deal / Air From San Francisco, CA
(0 comments, 12:25 AM Aug. 25, 2006)

$199 - NYC Hotel w/Upgrade & $25 Credit
(0 comments, 8:45 PM Aug. 24, 2006)

$99 -- Nantucket from New York (Roundtrip), Last-Minute
(0 comments, 9:19 PM Aug. 23, 2006)

» All New York City Deals
» Post a New York City Deal

**FREE VT Deals Newsletter**
great deals, inside tips & no spam

(enter your email)   [Subscribe]

Leave a Comment

**Theme:** Toys and Games
**Directions:** Times Square
**Website:** http://www.toysrustimessquare.com



Rate ✍ Not Helpful ◯ 1  ◯ 2  ◯ 3  ◯ 4  ◯ 5 Very Helpful ✍

**Popular Hotels and Accommodations in New York City**

■ Hotel Pennsylvania
■ Milford Plaza
■ Carter
■ Marriott Marquis NYC
■ Jazz on the Park Hostel
■ The Waldorf Astoria
■ Gershwin Hotel
■ Roosevelt Hotel New York

Hotels  Flights  Cars
Rough Guide   Road
Trips

Ads by Gooooooo

**The Online Ca**
Huge variety o
Fast shipping
friendly
www.theonlinecan

**Get creative v
M&M'S®**
Custom Print y
or make your c
blend at mymn
www.mymms.com

**Store Vintage**
Browse a hug
now. Find exa
you want today
www.ebay.com

**A&A Global Ir**
Bulk Vending I
& Supplies To
Candy & Much
www.aaglobalind.c

**Promotional I**
Wide array of a
priced promoti
product giveav
www.tradeshowexl

taquitos.net > travel guide > New York City > Shopping > Toys R Us Times Square

# Toys R Us Times Square

**Location:** 1514 Broadway at 44th Street, Times Square

More New York City Shopping

**Our thoughts:** If you're looking for the continuing evidence that Times Square has been made family-friendly, look no further than the Toys R Us store at Times Square. Nothing says family more than a giant indoor ferris wheel.

The store has several floors all filled with toys, games, dolls, stuffed animals, and other things that you would buy for kids. But you don't really have to go and buy anything -- the main reason to go in is to ride the ferris wheel or to look at some of the other 'attractions,' including the giant T-Rex from Jurassic Park or the Candy Land candy area.

The ferris wheel boards at the bottom of the store (you enter the store on the first floor and then go down to the basement to get to the ferris wheel). Each car on the wheel represents a different toy-related theme or toy line, such as Sesame Street, Toy Story, or a fire truck. The wheel is 60 feet high, which means you go pretty high in the air and get to see a few of the floors while on the ride. It wasn't a bad ride, but you will probably only want to go on it once.

The T-Rex is free -- it's on the second floor near all the action figures. You will see lots of people taking photos of the T-Rex, and occasionally the Rex will roar, scaring the little children who might happen to be nearby. There is a ramp that goes along next to the T-Rex that brings you to another action figure area, and we're always a bit wary walking by the T-Rex, anticipating that it might turn its head and give us a big roar, but we've been lucky so far.

The Candy Land area is also located on the second floor, and has a large selection of bulk candy and other wrapped candy, so if you have a sweet tooth you'll want to visit here. There's also a very giant Barbie area, but we've never visited it because we don't

play with Barbies.

**Tip:** The bathroom is on the second floor in the back near the board games.

More from **Times Square**

## Hotels

- Crowne Plaza Times Square Manhattan
- Millennium Broadway

## Restaurants

- ESPN Zone
- Howard Johnson's Times Square
- Times Square McDonald's

## Shopping

- Spirit of Broadway
- Virgin Megastore Times Square

## Shows

- The Late Show with David Letterman

more from New York City...    [go]

**Find the best hotels rates in New York City**

**Visit Taquitos.net's other travel guides:**

Boston    Hawaii's Big Island    Las Vegas
Los Angeles    Orlando

**Latest snack review from Taquitos.net:** Archer Farms Maple Barbecue Potato Chips

**Dog Treats & Toys**
Great info site w/ buyer's guide. Treats, unique toys and more!

**Schleich Animal Figures**
Schleich Toy Animals. Choose from 200 farm, wildlife or pet figures.

**Giant Stuffed Animals**
Huge stuffed plush dinosaurs, pets, wild animals, dragon & more.

**Twix candy bar**
Butterfinger, Snickers M&M, Twix, Reese's, and more.

Ads b

The web just got less useful. Taquitos.net

[XML]  [MY YAHOO!]  [Google Reader]  [Bloglines]

*the taquitos.network:*
travel.taquitos.net
chickenortuna.com
popcornreviews.com
pretzelreviews.com
taquitos.net

*travel guides:*
Las Vegas
Orlando
Boston
Hawaii
Los Angeles

*services:*
Cheap Web Hosting

Email us:
chiptasters@taquitos.net

Copyright © 2006 taquitos.net

# ATTACHMENT "2"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

SPERO HARITATOS, an Individual,

              Plaintiff,

        v.

HASBRO, INC., a Rhode Island corporation and
TOYS "R" US-NY LLC, a New York limited
liability corporation,

              Defendants.

05 Civ. 930 (DNH/GJD)

## MEMORANDUM OF LAW OF TOYS "R" US-NY LLC
## IN SUPPORT OF THE MOTION IN LIMINE

**BOND, SCHOENECK & KING, PLLC**
*Attorneys for Toys "R" Us-NY LLC*
Office and P.O. Box
One Lincoln Center
Syracuse, New York 13202
Telephone:  (315) 218-8000

John G. McGowan, Esq.

1220541.1

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACT .......................................................................................... 1

ARGUMENT

THE ANTICIPATED TESTIMONY OF PLAINTIFF'S EXPERT WITNESS IS WHOLLY
IMPROPER.  AS SUCH, THE WITNESS SHOULD BE PRECLUDED  FROM TESTIFYING
AT TRIAL ............................................................................................................. 2

    A.   Kane's Opinions with Respect to the Applicable Law in this Matter Are Improper.......... 3

    B.   Kane's Opinions Lack the Requisite Factual Basis ........................................................ 7

CONCLUSION....................................................................................................... 9

1220541.1

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir. 1986)........................................4

*Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996) ......................7

*Deghand v. Wal-Mart Stores*, 980 F. Supp. 1176 (D. Ka. 1997)......................................7

*Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461 (SDNY 2005) ...............7

*Marriot v. County of Montgomery*, 426 F. Supp. 2d 1 (NDNY 2006) ..............................3

*Marx & Co., Inc., et al. v. The Diner's Club, Inc.*, 550 F.2d 505 (2d Cir. 1977)........................3. 4

*Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983)..............................................5

*Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1988) ...........................................................4

*US v. 77,8919.10 Acres of Land More or Less*, 647 F.2d 104 (10th Cir. 1981)..............................2

*United States of America v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991).........................................2, 3

*United States v. Zipkin*, 729 F.2d 384 (6th Cir. 1984).......................................................5

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005)....2, 7, 8, 9

1220541.1

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of Toys "R" Us – Delaware, Inc. (improperly sued herein as Toys "R" Us-NY, LLC) (hereafter "TRU") pursuant to Rule 702 of the Federal Rules of Evidence in support of its motion in limine to preclude the testimony of Spero Heritatos' ("Plaintiff") expert witness, Siegrun D. Kane, Esq. ("Kane").   Kane's anticipated testimony, as set forth in Plaintiff's expert disclosure, is wholly improper for two reasons.   First, Plaintiff's expert disclosure establishes that, while testifying, Kane intends to instruct the jury on the law and opine as to how the law should be applied to the facts.   Such testimony, however, usurps the role of both the Court and the jury, and for that reason falls well outside the scope of acceptable expert testimony.   Second, Kane's opinions are devoid of factual support and amount to nothing other than speculation and conjecture.

For these reasons, the opinions are improper and do not constitute expert testimony that will "assist" the jurors, as required by Rule 702 of the Federal Rules of Evidence.   As such, is it is respectfully submitted that Kane should be precluded from testifying in the trial of this matter.

## STATEMENT OF FACT

The instant dispute arises out of TRU's use of Hasbro's famous CANDY LAND trademark (with its distinctive candy-cane design) in connection with signage in the candy department of the TRU flagship store in Times Square, New York City.   Plaintiff argues that TRU's use of the CANDY LAND mark in such a manner is likely to cause confusion between that mark and the Plaintiff's own mark, CANDYLAND.   Plaintiff further argues that such use by TRU infringes his alleged Candyland mark for candy. Plaintiff asks the Court to award damages and to enjoin Hasbro from using its CANDY LAND mark in connection with edible products. In addition, plaintiff asks the Court to enjoin Hasbro from pursuing the registration of the term

1

"CANDY LAND" on any edible product and from challenging plaintiffs registration of "CANDYLAND" for any edible product.

## ARGUMENT

### THE ANTICIPATED TESTIMONY OF PLAINTIFF'S EXPERT WITNESS IS WHOLLY IMPROPER.  AS SUCH, THE WITNESS SHOULD BE PRECLUDED FROM TESTIFYING AT TRIAL

Rule 702 of the Federal Rules of Evidence ("FRE") allows for the presentation of expert testimony in a civil action to the extent that "specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue." *See* FRE R 702.  An expert who is proven to be qualified in a given area of study will generally be allowed to provide such opinions.

However, Rule 702 does not provide an expert witness *carte blanche* to discuss any topic or issue that he or she feels may be appropriate.  As an initial matter, the proffered testimony and opinions of an expert witness must not invade upon the province of either the jury or the court. *See United States of America v. Bilzerian,* 926 F.2d 1285 (2d Cir. 1991).  Specifically, "use of expert testimony must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Bilzerian,* 926 F.2d at 1294 (2d Cir. 1991).  In addition, the proffered opinion must be based upon a sufficiently established factual foundation.  *See Zenith Electronics Corp. v. WH-TV Broadcasting Corp.,* 395 F.3d 416 (7th Cir. 2005); *see also US v. 77,8919.10 Acres of Land More or Less,* 647 F.2d 104, 108 (10th Cir. 1981) (to have probative value, the opinion must have a rational foundation.)  An expert opinion that is based on unrelated facts or factual assumptions that are not supported by the evidence must be excluded. *See Zenith Electronics Corp.,* 395 F.3d 416.

1220541.1

In the case at bar, as further discussed below, the anticipated testimony of Plaintiff's expert witness runs afoul of both of these well-established legal principles.

**A.    Kane's Opinions with Respect to the Applicable Law in this Matter Are Improper.**

The Second Circuit has consistently held that "it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Marx & Co., Inc., et al. v. The Diner's Club, Inc.*, 550 F.2d 505, 509-510 (2d Cir. 1977); *see also Bilzerian*, 926 F.2d 1285. "Although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294. Simply stated, "an expert's testimony on issues of law is inadmissible." *Id*. at 1294. This long-standing principle of law has been readily accepted and acknowledged by the federal districts within the Second Circuit, including this Court. *See Marriot v. County of Montgomery*, 426 F. Supp. 2d 1 (NDNY 2006) (expert's opinions as to an ultimate question of law were excluded as improper and irrelevant).

In *Marx*, above, the plaintiffs sued the defendants alleging, *inter alia*, breach of contract in connection with the sale of unregistered stocks. During the trial the plaintiffs offered testimony from an attorney who was accepted by the court as an expert in the field of securities law. However, the testimony elicited from the expert strayed far beyond mere opinions on the factual matters at issue in the case. As noted by the Second Circuit, the expert "construed the contract, as a matter of law, and include[d] his opinion that the [defendants' defenses] were unacceptable as a matter of law." *Id*. at 508. In addition, the expert "gave his conclusions as to the legal sufficiency of various facts adduced at trial." *Id*. at 510.

In support of its decision to exclude the testimony as improper, the Court stated "it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Id*. at 509. The would-be testimony was precluded because the expert "gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed [defendants'] conduct." *Id*. at 509. The Court stated that "such testimony amounts to nothing more than an expression of the [witness'] general belief as to how the case should be decided." *Id*. at 510. Because "it is for the jury to evaluate the facts in the light of the applicable rules of law," the Court precluded the testimony.

Other federal circuits have reached similar conclusions. In *Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1988), the Tenth Circuit held that a district court was in error when it allowed the plaintiff's expert witness, an attorney, to opine with respect to his views regarding the "law which governed the verdict and . . . whether defendants' conduct violated that law." *Id*. at 806. The court, sitting *en banc*, found that the expert testimony was beyond the scope of that allowed by Rule 702 because it would not "assist" the trier of fact. Specifically, the Court stated:

> Testimony on ultimate issues of law by the legal expert is inadmissible because it is detrimental to the trial process. If one side is allowed the right to call an attorney to define and apply the law, one can reasonably expect the other side to do the same. Given the proclivity of our brothers and sisters at the bar, it can be expected that both legal experts will differ over the principles applicable to the case. The potential is great that jurors will be confused by these differing opinions, and that confusion may be compounded by different instructions given by the Court.

*Id*. at 809. The Court concluded that "when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case." *Id*. at 810. *See also Adalman v. Baker, Watts & Co.*, 807 F.2d 359 (4th Cir. 1986) (attorney as expert witness could not give opinion on meaning and application of the law as it invaded the

1220541.1

province of the judge); *United States v. Zipkin*, 729 F.2d 384 (6th Cir. 1984) (expert witness could not opine as to his interpretation of the law as it was the jury's responsibility to apply the law to the facts); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236 (5th Cir. 1983) (expert witness precluded from offering legal conclusion on a party's alleged contributory negligence as it infringed upon the role of the jury).

In the case at bar, just as in *Marx* and *Specht*, above, the opinions offered by Kane are improper as they amount to nothing more than jury instructions. Instead of addressing factual issues and attempting to "assist" the jury in resolving factual disputes, Kane intends to (1) present a statement of what may (or may not) be considered applicable law, (2) interpret that law, and (3) based on those interpretations, provide her own opinion as to the legal conclusions that should be drawn from the available facts. *See* the accompanying Declaration of John G. McGowan, Esq. ("McGowan Dec."), Exhibit A.

Specifically, Kane anticipates presenting, *inter alia*, the following opinions at trial:

1.  "Plaintiff's registrations covering Candyland have achieved <u>incontestable status and as such are conclusive proof of plaintiff's ownership and exclusive right</u> to use the registered marks on candy." *See* the McGowan Dec., Exhibit A, ¶ 53. [Emphasis added].

2.  "[P]laintiff has <u>prior rights</u> to the mark Candyland in connection with candy." *See* the McGowan Dec., Exhibit A, ¶ 55. [Emphasis added].

3.  There available facts "<u>do not show abandonment of the Candyland mark which requires proof of non-use accompanied by an intent not to resume commercial use of the mark</u>. 15 U.S.C. § 1127." *See* the McGowan Dec., Exhibit A, ¶ 56. [Emphasis added].

4.  "<u>Trademark infringement under the Lanham Act is established when defendant's use is likely to cause confusion, mistake or deception. 15 U.S.C. § 1114(1)(a).</u> Reverse confusion is one form of likely confusion. <u>Reverse confusion occurs when the junior user's presence is likely to so swamp the senior user that he loses the value of his mark, control over his good will and reputation, and his ability to move into new markets.</u> The prominence and attraction of the Toys "R" Us Times Square store and the promotion of Candy Land visitors provides the factual

context for application of the doctrine of reverse confusion." *See* the McGowan Dec., Exhibit A, ¶ 57. [Emphasis added].

These opinions set forth legal standards and/or conclusions that reach far beyond the scope of proper expert testimony. Indeed, Plaintiff's expert disclosure is replete with citations to federal authority, both statutory and common law, and is more akin to a memorandum of law or pattern jury instructions than acceptable expert testimony.

This conclusion is confirmed when one refers to the section of the Plaintiff's expert disclosure entitled "Basis and Reasons for Opinions." In this section, instead of presenting a factual foundation for her opinions, Kane simply regurgitates statutory language and court-crafted dicta relating to a claim of trademark infringement. *See* the McGowan Dec., Exhibit A, ¶¶ 58-88. Where one would expect to find a clear assessment of factual issues (such as the results of surveys given to possible consumers or the analysis of financial data from the parties), there is nothing but statements of law. *See* the McGowan Dec., Exhibit A, ¶¶ 58 – 87. The disclosure even includes an entire sub-section entitled "Statutory Definition." Kane ends her expert disclosure by doing the very thing the Second Circuit has deemed to be most inappropriate; she steps into the shoes of the jurors and applies the law to the available facts and concludes, "applying the pertinent reverse confusion factors to the facts here, in my opinion there is a likelihood of reverse confusion." *See* the McGowan Dec., Exhibit A, ¶ 87.

The opinions contained in Plaintiff's expert disclosure are the epitome of the type of expert testimony that the Second Circuit has held must be precluded if the integrity of the trial system is to be maintained. Clearly, it is Kane's intent to tell the jury what the law is and then how that law is to be applied to the facts, many of which she has no basis for (e.g., concluding at paragraph 78 that consumers may be confused but don't realize it). To allow Kane to offer the opinions set forth within the expert disclosure would not only usurp the authority of the Court (in

6

instructing the jury on the law), but would also invade upon the realm of the jury (in applying the law to the facts). As such, it is respectfully submitted that Plaintiff's expert should be precluded from testifying at trial in this matter.

**B.      Kane's Opinions Lack the Requisite Factual Basis**

It is improper for a District Court to admit the assumptions and/or opinions of an expert in the absence of a proper factual basis for such testimony. *See Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996). Rule 702 "requires that expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation." *Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461, 473 (SDNY 2005). "An expert opinion must be based on facts that enable the expert 'to express a reasonably accurate conclusion as opposed to conjecture or speculation.'" *Deghand v. Wal-Mart Stores,* 980 F.Supp. 1176, 1180 (D. Ka. 1997). [Citations omitted]. It is clear that a "witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Fed. R. Evid. 702 defines that term." *See Zenith Electronics Corp.*, 395 F.3d 416, 419.

In *Zenith Electronics Corp.*, above, the Seventh Circuit excluded expert testimony regarding damages where the opinions rendered were not based upon established facts. In that case, which involved a dispute between two different cable television providers in San Juan, Puerto Rico, the defendant's expert testified that the defendant would have "experienced rapid [financial] growth paralleling that of DirecTV." *Id.* at 418. In support of his opinions on damages, the expert proffered testimony addressing (1) the alleged number of customers who purchased cable television services from defendant's competitor, DirecTV, for a five year period

in San Juan, and (2) the number of customers who would have purchased services from the defendant instead of DirecTV during that same time period.

After reviewing the pertinent testimony, the Court determined that it was lacking any factual basis, and was, therefore, improper.  The Court stated:

> [the expert] might have based at least the former [opinion] on DirecTV's actual sales in other markets, but he did not do so. Instead, he proposed to testify that San Juan is "unique" and that all experience in other markets is irrelevant.  He took the same approach to the second task, estimating [defendant's] potential share of the digital-broadcasting business.  [Defendant] uses a technology known as multipoint multichannel digital system or MMDS.  Other markets have MMDS service using equipment that meets the 1998 DVB standard, and [the expert] might have used data from these to gauge the potential for such service in San Juan . . . Again, however, Shapiro made no efforts to calculate the potential subscriber base or use data from other markets.

*Id*. at 418.  Because the testimony was devoid of a factual basis derived from accepted analytic strategies, the "opinions" amounted to nothing other than the expert's own independent belief. As the Court stated, an expert "may be the world's leading student of MMDS services, but if he could or would not explain how his conclusions met [Rule 702's] requirements, he was not entitled to give expert testimony."  The Court concluded that "an expert who supplies nothing but the bottom line supplies nothing of value to the judicial process."  *Id*. at 419.

In the case at bar, Kane has failed to provide anything but "the bottom line."  While Kane opines that "[c]ustomers may not be aware that they are confused or bother to report their confusion," *see* the McGowan Dec., Exhibit A, ¶ 78, she provides no support for this conclusion. Kane could have conducted customer surveys or polled the end-users of the products at issue to determine if there was, in fact, any confusion.  Her opinions could have been based upon an in-depth factual analysis of such information.  However, such analytical steps were not taken.

Instead, Kane simply provides a reiteration of the law and then states in a most conclusory fashion that, even if they don't know it, customers may be confused.

This testimony is based solely on Kane's own belief in her status as an "expert," rather than acquired factual data, and is improper. "Reliable inferences depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert." *Zenith Electronics Corp.*, 395 F.3d at 420. In this case, Kane has provided nothing other than her own "say-so" in support of her conclusions. As a result, it is respectfully submitted that the proffered opinions are without a proper factual basis, do not meet the requirements of Rule 702 and should be precluded.

## <u>CONCLUSION</u>

For the reasons set forth above, it is respectfully requested that the Court issue an Order granting the instant motion and precluding Plaintiff's expert from testifying in the trial of this matter, along with any other and further relief which, as to this Court, seems just and proper.

Dated: September 11, 2006

**BOND, SCHOENECK & KING, PLLC**

By:  John G. McGowan, Esq.
Bar Roll No. 501388

*Attorneys for Toys "R" Us-NY, LLC*
Office and Post Office Address
One Lincoln Center
Syracuse, New York  13202
Telephone:     (315) 218-8000
Facsimile:     (315) 218-8100

1220541.1