**EXHIBIT 5**

**TO DECLARATION OF KIM J. LANDSMAN**

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF NEW YORK

SPERO HARITATOS, an individual

       Plaintiff,

vs.

                                  Civil Action No. 05-CV-930 (DNH)(GJD)

HASBRO, INC., a Rhode Island corporation
and TOYS "R" US-NY LLC,
a New York limited liability company

       Defendants.

### PLAINTIFF'S DISCLOSURE OF EXPERT TESTIMONY

Plaintiff, Spero Haritatos, by and through his undersigned attorneys, hereby provides a

disclosure of expert testimony pursuant to Fed. R. Civ. P. 26(a)(2) and pursuant to the Court's

Order entered August 11, 2006.  Plaintiff has attached a copy (including exhibits) of the Expert

Report Of Siegrun D. Kane Pursuant To Federal Rule Of Civil Procedure 26(a)(2)(B).

Dated: August 29, 2006

                                Robert E. Purcell (Bar Roll No. 510,595)
                                Denis J. Sullivan (Bar Roll No. 512,997)
                                WALL MARJAMA & BILINSKI LLP
                                101 South Salina St., Suite 400
                                Syracuse, NY 13202
                                Telephone:   (315) 425-9000
                                Facsimile:    (315) 425-9114
                                *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 29th day of August, 2006, true and correct copies of Plaintiff's Disclosure of Expert Testimony were served on counsel as follows:

BY FIRST CLASS MAIL AND ELECTRONIC MAIL:

| | |
|---|---|
| Michael D. Sant'Ambrogio, Esq.<br>Kim J. Landsman, Esq.<br>Patterson Belknap Webb & Tyler LLP<br>1133 Avenue of the Americas<br>New York, NY 10036-6710<br>mdsantambrogio@pbwt.com<br><br>*Attorneys for Hasbro, Inc.* | John G. McGowan, Esq.<br>Bond, Schoeneck & King, PLLC<br>One Lincoln Center<br>Syracuse, NY 13202<br>jmcgowan@bsk.com<br><br>*Attorney for Toys "R" Us* |

Robert E. Purcell

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPERO HARITATOS, an individual | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) Civil Action No. 05-CV-930 |
| | ) (DNH/GJD) |
| HASBRO, INC., a Rhode Island corporation, | ) |
| And Toys "R" US-NY LLC, | ) |
| a New York limited company | ) |
| Defendants. | ) |

## EXPERT REPORT OF SIEGRUN D. KANE
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)

Siegrun D. Kane, Esq.

Morgan & Finnegan, L.L.P.
3 World Financial Center
New York, NY 10281-2101

TABLE OF CONTENTS

**I.**   QUALIFICATIONS ................................................................. 1

**II.**  NATURE OF DISPUTE............................................................ 4

**III.** BACKGROUND FACTS........................................................... 4

    **A.**   Plaintiff's Candyland Use and US PTO Filings................... 4

    **B.**   Defendant Hasbro's Candy Land Use and US PTO
        Filings ................................................................................. 9

    **C.**   Hasbro's Knowledge of Plaintiff's Claim of Rights to
        Candyland............................................................................ 10

    **D.**   Hasbro's Efforts to Exploit Candy Land............................ 11

    **E.**   Hasbro's Efforts to Acquire Rights to Plaintiff's
        Candyland Mark .................................................................. 12

**IV.**  SUMMARY OF OPINIONS ...................................................... 14

**V.**   BASIS AND REASONS FOR OPINIONS.................................. 16

    **A.**   The Scope of Plaintiff's Incontestable Registrations ......... 16

    **B.**   Plaintiff's Prior Rights to Candyland ................................. 17

        **1.**   The Heavy Burden to Prove Abandonment............... 17

        **2.**   Statutory Definition................................................. 18

        **3.**   Transfer of Goodwill............................................... 19

    **C.**   Reverse Confusion.............................................................. 20

EXHIBIT A   Siegrun D. Kane Curriculum Vitae
EXHIBIT B   Expert Testimony in Past 4 Years
EXHIBIT C   List of Materials Reviewed
EXHIBIT D   Internet Printouts re Toys "R" Us Candyland/Candy
             Land dated August 25, 2006

1007694 v1

### EXPERT REPORT OF SIEGRUN D. KANE
### PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(B)

1.  I have been retained as an expert in the captioned case by counsel on behalf of plaintiff, Spero Haritatos.  This constitutes my written report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

## I.    QUALIFICATIONS

2.  I am a partner in the law firm of Morgan & Finnegan, L.L.P. (the Morgan firm).  I was previously a partner in Kane Dalsimer, et al. (the Kane firm) which has been dissolved.  The Kane firm specialized in the field of intellectual property law for over 70 years and the Morgan firm has specialized in this field for over 100 years.

3.  I have been involved in the practice of intellectual property law with a primary concentration on trademark and unfair competition law for over 35 years.

4.  I joined the Kane firm in 1963, following my graduation from Harvard Law School in that year.  I joined the Morgan firm in November 1999.

5.  I received a B.A. degree cum laude from Mount Holyoke College in 1960.

6.  I am admitted to practice before the courts of the state of New York and am a member of various bars including the Supreme Court of the United States, the Court of Appeals for the Second Circuit, the Court of Appeals

for the Fifth Circuit, the Court of Appeals for the Seventh Circuit, the Court of Appeals for the Ninth Circuit, the Court of Appeals for the Federal Circuit, the District Court for the Southern District of N.Y. and the District Court for the Eastern District of N.Y.

7.  I am the author of "Trademark Law A Practitioners Guide" published by the Practising Law Institute.  This text was first published in 1987.  A second edition was published in 1991, a third edition in 1997 and a fourth edition in 2002. Supplements are issued annually.  This text covers various aspects of U.S. trademark law including the selection, searching, clearance and use of trademarks, the registering and maintaining of trademark registrations, the establishing of trademark rights, the assignment and licensing of trademarks, and the prosecution and defense of trademark litigation before the courts and the U.S. Patent and Trademark Office.  The current edition of this text comprises over 700 pages with forms and color illustrations of products involved in various cases.

8.  I have also authored numerous articles and have made numerous presentations to various organizations and moderated panels on trademark law issues.  A list of publications and presentations over the past 10 years is set forth in my curriculum vitae attached hereto as Exhibit A.

9.  My oral presentations have included lectures at programs sponsored by the Practising Law Institute, the American Bar Association and The International Trademark Association (INTA).

10. I am a member of the Advisory Board of the Bureau of National Affairs, Inc., Patent, Trademark and Copyright Journal and have held this position since 1988.  The function of this Board is to provide the editors of the Journal with the members' experienced judgment in evaluating current patent, trademark and copyright developments.

11. I also served as a member of the U.S. Patent and Trademark Office Committee for Trademark Affairs from 1989-1993 and again from 2002-2004. Other Board memberships and professional organizations are set forth in my curriculum vitae (Exhibit A).

12. I have provided expert testimony during the past 4 years as set forth in Exhibit B.

13. My practice of trademark law over the past 35 years has included the counseling of clients with respect to the nature and use of trademarks, the type of use that qualifies as trademark use, procedures for the selecting and searching of trademarks, the making of public record claims to trademark rights through the filing of applications and maintenance documents with the U.S. Patent and Trademark Office (US PTO).

– 3 –

14. The materials I have considered in forming the opinions expressed in this report are set forth in EX. C attached.

## II.   NATURE OF DISPUTE

15. I understand that there is a dispute between the parties relating to rights in the mark Candyland in connection with candy.

## III.   BACKGROUND FACTS

16. Based on my review of the materials set forth in EX. C attached and discussions with counsel for plaintiff, I have summarized my understanding of the background facts as follows:

### A.   Plaintiff's Candyland Use and US PTO Filings

17. Plaintiff Spero Haritatos is the successor to the business of manufacturing and selling candies under the Candyland name. The business was founded in the early 1920s and run by Haritatos family members since that time. Plaintiff and its predecessors are referred to herein as plaintiff unless otherwise indicated. Plaintiff's principal product is the "Original Candyland Candy Turkey Joints." The product consists of a center of chocolate and brazil nuts encased in a hard silvery sugar shell. In the early years, the Candyland product was sometimes referred to as Turkey Bones. See 1921-1922 newspaper ads EX. B to Haritatos Jan. 31, 2005 Motion for

Summary Judgment before the US PTO Trademark Trial and Appeal Board (TTAB Sum. J.)

18.  The Candyland name has been used in a variety of ways during the course of plaintiff's business, e.g., on labels, packages, business cards, brochures, signs, letterhead,  EX. 13, 16-18 to Spero Haritatos May 17, 2006 Depo., EX. D, F & G to TTAB Sum. J.

19.  Candyland was the name of plaintiff's original soda fountain store located at 126 West Dominick Street in Rome, New York.  EX. 17 to Spero Haritatos May 17, 2006 Depo.

20.  Olga Haritatos married Fred Haritatos, one of the owners of the Candyland business, in 1945.  Olga Haritatos  May 18, 2006 Depo. p. 19.   Olga Haritatos (born 19  19) regularly visited the original Candyland store as a young girl.  She recalls:

- Sales of Turkey Joints bearing the name Candyland on the label from the time she was a young girl until the time she left the business in 1970. Olga Haritatos  Depo.  p.76. See also Olga Haritatos Aff. ¶¶ 3,4,6.

- During the onset of World War II, Candyland increased its offerings to sandwiches and other food products and became more like a restaurant.

- By the 1950s, the Candyland operation offered other candies, e.g. Easter chocolates.  Olga Haritatos Depo.  pp. 73-74.

21.  Olga Haritatos worked at the Candyland restaurant beginning in about 1960 through about 1970.  Olga Haritatos Depo.  pp. 23, 76.

22. In the early 1970s, the Haritatos brothers sold their interest in the Candyland business. One of the brothers, George Haritatos, continued in the restaurant business at another location under the name Liberty Lane Restaurant. Spero Haritatos May 17, 2006 Depo. p. 69. See Also Spero Haritatos Jan. 31, 2005 Aff. ¶20. Olga Haritatos Depo. p. 40.

23. Around the same time, the Candyland restaurant owners (George and Fred Haritatos, Fred's wife Olga and George Christopoulos) sold the candy making equipment to plaintiff's father, Tasos Haritatos. Contracts April 30, 1974 and May 3, 1974 EX B, C to Haritatos TTAB Sum. J. Reply. Spero Haritatos May 17, 2006 Depo. pp. 61-65.

24. Along with the candy making equipment, Tasos Haritatos acquired the recipe, the ingredients and the labels used for the Original Candyland Candy Turkey Joints. Olga Haritatos Depo. 78-79; Spero Haritatos Aff. ¶21.

25. Tasos Haritatos ran the candy business out of his home at North Doxtater Street in Rome, New York with his wife, Nora. The operation at North Doxtater Street was known and has continued to be known as both "Nora's Candy Shop" and "Candyland." Spero Haritatos Aff. ¶21. See business cards, advertising. EX. F to TTAB Sum. J.; EX. 19 STH 000068

26. In the early 1980s, Nora Haritatos died and her son, Spero Haritatos, who had worked in the Candyland candy business since the mid 1970s, acquired that business from his father, Tasos Haritatos.   Spero Haritatos May 17, 2006 Depo., p. 21; Spero Haritatos Aff.  ¶24

27. Since the early 1970s and continuing to the present, Candyland has sold Original Candyland Candy Turkey Joints as well as other candies, e.g. peanut brittle, molded chocolates and caramels under the name Candyland. Spero Haritatos May 17, 2006  Depo. pp. 19-20.   Candyland Peanut Butter Sticks have been sold for 10-15 years. *Id.* at  149. EX. 18 STH 01.

28. During the past 10 years, Original Candyland Candy Turkey Joints have been sold in Price Chopper supermarkets in the areas around  Rome, Syracuse, Utica and Albany, New York. Spero Haritatos  Feb.  16, 2005 Depo. pp. 70-71 (attached as EX. N to Declaration of Sant'Ambrogio in Support of  Hasbro's Opposition to TTAB Sum. J.).

29. Plaintiff's Candyland products have been shipped to states outside of New York since the early 50s.  See Customer letters,  EX. 20 to Spero Haritatos May 17, 2006 Depo.   Plaintiff has sold Candyland products over the internet to states all around the country since around 2000-2001.   Sharon Haritatos May 18, 2006  Depo. pp. 42-44  Plaintiff also sells to other outlets outside of Rome including Long Island. Id. at 31.

30. Plaintiff is the owner of the following registrations in the US PTO:

| Mark | Goods | Alleged First Use | Reg. No. & Date | Filed |
|------|-------|-------------------|-----------------|-------|
| CANDYLAND | Candy | 11/21/75 | 1,949,876 Jan. 23, 1996 | Dec. 3, 1992 |
| Original Candyland Candy Turkey Joints | Candy | 11/21/75 | 1,294,740 Sep. 11, 1984 | Dec. 8, 1982 |

31. Said registrations have become "incontestable" under 15 U.S.C. §1065.

32. On April 26, 2004, plaintiff filed an intent to use application for the mark Candyland for ice cream, frozen custard, frozen yogurt and frozen confections, Application S.N. 78407842. Examination of this application was suspended pending outcome of the opposition plaintiff had previously filed to Hasbro's intent to use application for Candy Land on beverages. The opposition as to beverages was suspended pending outcome of the subject action.

33. In May 2004, plaintiff began selling Original Candyland Candy Turkey Joints ice cream. Plaintiff's ice cream is carried at his retail store and at Price Chopper in Rome, New York. Spero Haritatos May 17, 2006 Depo. p. 91, 277.

34. In around January or February 2005, plaintiff had discussions with Price Chopper regarding a possible license arrangement for Price Chopper's sales of Candyland ice cream. Id. at 252-253.

## B.    Defendant Hasbro's Candy Land Use and US PTO Filings

35. Defendant Hasbro is the owner of the Candy Land mark for a children's board game. Defendant Hasbro's Candy Land registration covering the board game issued June 26, 1951, Reg. No. 544,328, and recites a first use of March 15, 1949. The goods are described as "board games played with movable pieces." Hasbro's Answer and Counterclaim, ¶32. Hasbro also claims ownership of a number of registrations for Candy Land for other non-edible products, namely, books, playing cards, computer game programs, phonograph records and beach towels. Id. at ¶35.

36. On April 14, 2003, Hasbro filed an intent to use application S.N. 76/506,818 to register Candy Land on beverages, namely spring and mineral water; flavored water; carbonated and non-carbonated soft drinks and soda; fruit juices; vegetable juices; fruit flavored drinks; sport drinks; energy drinks; concentrates, syrups and powders for use in the preparation of soft drinks and fruit flavored drinks.

37. On Dec. 17, 2003, plaintiff Spero Haritatos filed an opposition to Hasbro's intent to use application for Candy Land on beverages, Opp. No.

91/159,145.    These opposition proceedings were suspended pending disposition of the subject suit.

38. Sometime after this suit was filed in July 2005, the Toys "R" Us use of Candy Land was discontinued.

### C.    Hasbro's Knowledge of Plaintiff's Claim of Rights to Candyland

39. Hasbro has known of plaintiff's claim of rights to the mark Candyland for candy since at least 1995.  Plaintiff's registration for Original Candyland Candy Turkey Joints Reg. No. 1,294,740 and  plaintiff's application for Candyland in block letter form were listed in a search report requested by Hasbro on August 31, 1995.  Plaintiff's said application for Candyland issued as Registration No. 1,949,876 on January 23, 1996.    Said Registration for Candyland No. 1,949,876 and plaintiff's registration for Original Candyland Candy Turkey Joints Reg. No. 1,294,740 were also listed in another search report Hasbro requested on July 21, 1997.  See Hasbro Response to Plaintiff's Requests for Admissions, ¶¶1-2, 7-8.

40. Hasbro did not seek to oppose or cancel any of plaintiff's registrations covering the mark Candyland until after plaintiff opposed Hasbro's intent to use application on beverages. Id at ¶6.

41. Hasbro did not ask plaintiff to cease its use of Candyland or claim that plaintiff's use of Candyland was an infringement of Hasbro's Candy Land

mark until after plaintiff filed this suit in July, 2005.   Id. ¶ 13-14; Hasbro's Answer and Counterclaim Request for Relief ¶C.

**D.    Hasbro's Efforts to Exploit Candy Land**

42. On June 1, 2001, Hasbro licensed Defendant Toys "R" Us to use the Candy Land mark in connection with a candy department in the Toys "R" Us store at Times Square, New York City.   PX. 18.   The Candy Land department was set up to replicate the Hasbro Candy Land game.   The Candy Land name appeared in various contexts including use on empty bags which the customer could fill with loose candy, stickers, signage, screens with running text, barrels filled with candy and brochures.   PX. 4, 10, TRU 000270, 271, PX.  3 TRU 000297, 316.

43. In December 2001, Hasbro also began exploring a "major venture into Food/Candy and other potential categories."   Hasbro foresaw "fantastic seasonal opportunities, e.g. Christmas, Valentine's Day, Easter, most notably for the food and candy segment."   Targeted distribution channels were:    mass, grocery, drug, movie theaters, and fund raising channels— door to door sales.    Initial targeted confectioners were Nestle, Mars, Hershey, Godiva.  The CVS chain was a contemplated locale for the Candy Land candy boutiques.  See Dec. 19, 2001 e-mail HG000167-168.  Licenses with respect to Candy Land candy, Candy Land boutiques and Candy Land

- 11 –

ice cream were explored in 2003 and 2004. HG000424-445, 824-827, 1338, 1421-1422. Hasbro's potential national roll out of the Toys "R" Us Candy Land was also under discussion. HG000444.

44. Toys "R" Us promoted Candy Land to New York visitors on its website. PX. 10. Internet tourist guides commented on Toys "R" Us and its Candy Land as a major attraction for visitors to New York. See internet printouts. Exhibit D attached. Although Toys "R" Us could not estimate the number of visitors to its Times Square store for the years 2002 and 2003, it was able to provide an estimate for 2004, namely 9 to 9 1/2 million visitors and for 2005, approximately 10 million visitors.

### E.    Hasbro's Efforts to Acquire Rights to Plaintiff's Candyland Mark

45. In about August 2002, while Hasbro's license of Candy Land to Toys "R" Us was in effect, Hasbro approached plaintiff with a proposal for acquiring rights under plaintiff's Candyland mark. Thomas Wall Jan. 27, 2005 Affidavit in support of TTAB Sum. J para 3.

46. The Hasbro license to Toys "R" Us expired on January 31, 2003.

47. Hasbro's internal memo dated July, 2003 reported negotiations with Spero Haritatos who "owns trademark in 'candy' category." See p. 21 July 2003 HG000444.

48.  In September, 2003, plaintiff rejected Hasbro's proposal and negotiations broke down.  Thomas Wall Jan. 27, 2005 Affidavit in support of TTAB Sum. J, para 5.

49. In a draft  Licensing Agreement Hasbro proposed on January 19, 2005, Hasbro stated, "For the avoidance of doubt, it is understood that no confectionary items may bear the 'Candy Land' logo specifically, as the Licensor does not own the Candy Land trademark for candy products." HG001530

50.  Although the Hasbro Toys "R" Us license was not renewed and plaintiff had rejected Hasbro's proposal, Toys "R" Us continued to use Candy Land until after this suit was filed in July, 2005.  Toys "R" Us has indicated that it discontinued use of Candy Land by November, 2005.   However, references to the Toys "R" Us Candyland/Candy Land continue to appear on the internet.  See  EX. D attached.

51. During negotiations relating to Hasbro's efforts to acquire plaintiff's rights to the mark Candyland, Hasbro did not disclose to plaintiff Hasbro's license of Candy Land to Toys "R" Us for the Times Square store or Hasbro's interest in the nationwide rollout of the Toys "R" Us Candy Land.  Under Hasbro's proposal to plaintiff, plaintiff would not have received any compensation for the Toys "R" Us Candy Land use which was royalty free.

- 13 –

Thomas Wall Jan. 27, 2005 Affidavit in support of TTAB Sum.J., para. 4;

Plaintiff's EX 18.

## IV.    **SUMMARY OF OPINIONS**

52.  Based on my understanding of the facts and the materials I have reviewed, my opinions are summarized as follows:

53.  Plaintiff's registrations covering Candyland have achieved incontestable status and as such are conclusive proof of plaintiff's ownership and exclusive right to use the registered marks on candy.  Said registrations create a presumption that plaintiff is entitled to use the registered marks throughout the nation.

54.  Plaintiff's Reg. No. 1,949,876 for Candyland in block letter form extends to all types of candy and is not limited to any particular style of type.

55.  Plaintiff's own use of the mark Candyland dating back to 1983 and his registrations covering Candyland for candy issued in 1984 and 1996 are prior to defendant Hasbro's 2001 licensed use of Candy Land to Toys "R" Us.  Thus, plaintiff has prior rights to the mark Candyland in connection with candy.

56.  The use of Candyland by plaintiff's predecessors dating back to the 1920s is prior to Hasbro's use of Candy Land for a board game.  The long history of plaintiff's predecessors' commercial activities under the mark Candyland

is supported by documents and the testimony of family members involved
in the business.    These materials do not show abandonment of    the
Candyland mark which requires proof of non-use accompanied by an intent
not to resume commercial use of the mark.    15 U.S.C. §1127

57. Trademark infringement under the Lanham Act is established when
defendant's use is likely to cause confusion, mistake or deception.    15
U.S.C. §1114 (1) (a).    Reverse confusion is one form of likely confusion.
Reverse confusion  occurs when the junior user's presence is likely to so
swamp the senior user that he loses the value of his mark, control over his
good will and reputation, and his ability to move into new markets.    The
prominence and attraction of the Toys "R" Us Times Square store and the
promotion of Candy Land to out of town visitors provides the factual
context for application of the doctrine of reverse confusion.    Reverse
confusion is rendered likely in this case in light of the similarity in the
marks and the goods, the strength of the Hasbro brand, the promotion of the
parties' goods over the internet, the mobile nature of the consumers, the
relatively low cost of the products, Hasbro's interest in further national
exploitation of the Candy Land mark for candy and ice cream, and Hasbro's
knowledge of and attempt to acquire plaintiff's rights.

## V.   BASIS AND REASONS FOR OPINIONS

### A.   The Scope of Plaintiff's Incontestable Registrations

58. Plaintiff's registrations covering the mark Candyland have become incontestable under 15 U.S.C. §1065.  Incontestable status is achieved upon the filing of a declaration that attests, <u>inter alia,</u> to a period of five years of continuous use of the mark following issuance of the registration.

59. Incontestable registrations, subject to certain exceptions, are conclusive proof of plaintiff's ownership and exclusive right to use the mark in commerce for the goods specified in the registration.   15 U.S.C. §1115(b); Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 196, 205 (1985).

60. A defendant charged with infringing an incontestable registration cannot defend on the grounds that the mark is descriptive.   Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., *supra.*

61. Plaintiff's registrations create a presumption that the registrant is entitled to use the registered mark throughout the nation.  Draeger Oil Co., Inc. v. Uno-Ven Co., 314 F.3d 299, 302 (7th Cir. 2002).

62. Plaintiff's registration for Candyland in block letter form is not limited to a particular type of candy and is not limited to a particular style of type.  See J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition

§ 19:58 (4th ed.); Sally Beauty Company, Inc. et al v. Beautyco, Inc., 304 F.3d 964, 970 (10th Cir. 2002).

## B.    Plaintiff's Prior Rights to Candyland

63.  Plaintiff Spero Haritatos acquired the Candyland candy business around 1983.  Regardless of whether plaintiff is entitled to rely on his predecessors' use, plaintiff's own use and registration of Candyland is prior to Hasbro's 2001 use of Candy Land in connection with candy.

64.  Defendant Hasbro seeks an injunction prohibiting plaintiff's use of Candyland on any goods or services and requiring plaintiff to destroy all packages and promotional materials which bear the Candyland name. Hasbro's Answer & Counterclaim Prayer for Relief ¶¶C, D.  However, plaintiff's predecessors' use of Candyland back to the early 1920s is long prior to any use of Candy Land by Hasbro.

65.  Absent proof that plaintiff's predecessors abandoned the mark, plaintiff Spero Haritatos is entitled to rely on the use of Candyland by his predecessors and therefore plaintiff's rights date back to the predecessors' use in the 1920s.

### 1.    The Heavy Burden to Prove Abandonment

66.  Abandonment occurs when a mark no longer serves to identify the origin and quality of the owner's goods or services.  Abandonment means that the

owner has forfeited his trademark rights and the mark is fair game for any merchant or manufacturer who seeks to use it. See Sutton Cosmetics (P.R.), Inc. v. Lander Co., 455 F.2d 285, 288 (2d Cir. 1972); P. Daussa Corp. v. Sutton Cosmetics (P.R.), Inc., 462 F.2d 134, 136 (2d Cir. 1972). "Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,' or 'strict burden of proof.'" Cumulus Media, Inc. v. Clear Channel Communications, Inc., 304 F.3d 1167, 1175 (11th Cir. 2002) (citations omitted); see also Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980).

## 2.    <u>Statutory Definition</u>

67. Under the Lanham Act, a mark is considered abandoned if its use has been discontinued with intent not to resume such use. 15 U.S.C. § 1127.

68. "A putative trademark infringer thus must prove two separate elements to interpose the defense of abandonment successfully: that the plaintiff has ceased using the mark in dispute, and that he has done so with an intent not to resume its use." Cumulus, supra, 304 F.3d at 1173-74.

69. Non-use for three consecutive years constitutes prima facie evidence of abandonment. 15 U.S.C. § 1127.

70. "Use" means "the bona fide use of that mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. §1127.

### 3.    Transfer of Goodwill

71. Even where use has been discontinued, goodwill does not ordinarily disappear overnight. "Erosion from non-use is a gradual process. As long as the mark has significant remaining value and the owner intends to use it in connection with substantially the same business or service, the public is not deceived." Defiance Button Mach. Co. v. C&C Metal Prods. Corp. 759 F.2d 1053, 1060 (2d Cir.), cert. denied 474 U.S. 844 (1985).

72. Here, the defendant has not established that plaintiff's predecessors ceased using Candyland in their candy business or that any cessation of use was with the intent not to resume use. Moreover, the continued commercial activities of plaintiff's predecessors negate any intent not to resume use.

73. The transfer of the candymaking equipment and related materials to plaintiff's father and the continued use of the Candyland mark following the transfer further negates any intent to abandon. Plaintiff's father's acquisition of the candymaking equipment, recipe, raw materials and labels enabled him to carry on the business in real continuity with its past, thus

supporting the transfer of good will.  Merry Hull & Co. v. Hi-Line Co., 243

F. Supp. 45, 51 (S.D.N.Y. 1965).

74.  Where a business has been acquired it can be presumed that the trademark

has been passed along with the business even if the mark is not mentioned

in the transfer documents.  J. Thomas McCarthy, McCarthy on Trademarks

and Unfair Competition § 18:37 (4th ed. 2005)

## C.    Reverse Confusion

75.  Two types of likely confusion support a claim of infringement under the

Lanham Act:  ordinary confusion and reverse confusion:

> Under the Lanham Act confusion is ordinarily the
> misimpression that the senior user (Haritatos) is the source
> of the junior user's (Hasbro's) goods.  Reverse confusion is
> the misimpression that the junior user is the source of he
> senior user's goods.  Banff, Ltd., f/k/a Sweater Bee By
> Banff, Ltd. v. Federated Department Stores, Inc., and
> Bloomingdale's, 841 F.2d 486, 490 (2nd Cir. 1988)

76.  Reverse confusion occurs where the junior user is better known than the

senior user.   Consumers who encounter the senior user's products may

believe they are associated with the better-known junior user.  Banff Ltd.,

*supra*.  The result is that the senior user loses the value of the trademark and

control  over  its  goodwill,  reputation  and  ability  to  enter  new  markets.

Consumers  may  even  believe  that  the  senior  user  is  an  unauthorized

infringer and in that way injure the senior user's reputation and impair its

good will.  Banff Ltd., *supra*, 841 F.2d at 490.

> The objectives of that Act—to protect an owner's interest in
> its trademark by keeping the public free from confusion as
> to the source of goods and ensuring fair competition—are as
> important in a case of reverse confusion as in typical
> trademark infringement.  Were reverse confusion not a
> sufficient basis to obtain Lanham Act protection, a larger
> company could with impunity infringe the senior mark of a
> smaller one.  *id*. at 490-491

See also Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co. 408 F

Supp. 1219. 1236 (D. Colo. 1976) aff'd with modification as to amount,

561 F.2d 1365, 1372 (10th Cir. 1977) cert. dismissed, 434 U.S. 1052 (1978).

77.  Factors to consider in evaluating a claim for reverse confusion include :

(1) the degree of similarity between the owner's mark and the
alleged infringing mark;

(2) the strength of the two marks, weighing  both a
commercially strong junior user's mark and a conceptually
strong senior user's mark in the senior user's favor;

(3) the price  of the goods and other factors indicative of the
care and attention expected of consumers when making a
purchase;

(4) the length of time the defendant has used the mark without
evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7)  whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8)  the extent to which the targets of the parties' sales efforts are the same;

(9)  the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10)  other facts suggesting that the consuming public might expect the larger, more powerful company to manufacture both products, or expect the larger company to manufacture a product in the plaintiff's market, or expect that the larger company is likely to expand into the plaintiff's market.

A&H Sportswear, Inc. et al. v. Victoria's Secret Stores, Inc. et al. 237 F.3d 198, 234 (3rd Cir. 2000)

78. As to similarity in marks, any difference between Candy Land as two words versus Candyland as one word is not likely to be noticed or remembered.  See e.g. EX. D reference to Toys "R" Us Candyland as one word and Candy Land as two words.  Also, plaintiff has used Candyland in a variety of formats such that any differences between plaintiff's specific use and Hasbro's use cannot assure against likely confusion.  Both marks are used in connection with relatively inexpensive candy.  While it appears that no evidence of confusion has surfaced during the period Toys "R" Us' was using Candy Land,  this is not surprising where low cost products are

involved. Customers may not be aware that they are confused or bother to report their confusion.

79. As to the strength of the marks, in a reverse confusion case "a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark." "The lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion. " A&H Sportswear, *supra.* 237 F.3d at 231, citation omitted. Here, Hasbro, as the larger, more powerful company, has the ability to exploit the Candy Land mark on candy so as to overwhelm the market with its advertising.

80. Also, Hasbro was actively pursuing further commercial activities for Candy Land candy on a national scale which would increase the likelihood of confusion. The Hasbro use, if not halted, has the potential to swamp plaintiff's use.

81. I further note that Hasbro relied on Spero Haritatos' testimony that a customer asked Mr. Haritatos whether his business was affiliated with the Candy Land board game. Hasbro cites this testimony as proof that consumers associate plaintiff's Candyland name with the board game and

its source—Hasbro.  Hasbro's TTAB Opposition to Haritatos' Motion for Summary Judgment, dated March 2, 2005, pp. 22-23.  Consumers who associate plaintiff's Candyland with the  board game are even more likely to associate Hasbro's better known Candy Land candy as the source of plaintiff's lesser known Candyland candy.  Since it is plaintiff, not Hasbro, who has prior rights to Candyland for candy, such a mistaken association constitutes reverse confusion.

82.  As to Hasbro's intent, Hasbro was aware in 1995 of plaintiff's registration for Original Candyland Candy Turkey Joints and plaintiff's application to register Candyland for candy.  Hasbro was aware in 1997 that plaintiff's application for Candyland had issued to registration.  Yet, in June, 2001, Hasbro proceeded to license Toys "R" Us to use Candy Land in association with candy sold at the Toys "R" Us Time Square Store.

83.  The fact that Hasbro approached plaintiff to acquire his rights in Candyland indicates that Hasbro considered plaintiff's rights to pose a problem with respect to Hasbro's licensed use of Candy Land in association with candy.  Indeed, Hasbro acknowledged in Jan. 2005, after negotiations with plaintiff broke down, that it did not own the Candy Land trademark for candy products.  HG001529-1530  Yet, Hasbro permitted Toys "R" Us to continue using Candy Land until this suit was filed.  Hasbro's conduct may

be considered evidence of an "aura of indifference" to plaintiff's rights and a "smug willingness" to treat plaintiff's good will as a nullity. See W.E. Bassett Company v. Revlon, Inc., 305 F.Supp. 581, 587-88 (S.D.N.Y. 1969), aff'd in pertinent part 435 F.2d 656, 662 (2d Cir. 1970)

84. In terms of competition, channels of trade and target customers, there is considerable overlap. The Toys "R" Us Candy Land use in the Times Square store was exposed to millions of customers annually who came from all over the country and all over New York State. The Toys "R" Us Candy Land was featured on the Toys "R" Us website and even now, after Toys "R" Us discontinued its use, appears on the internet in travel articles:

> . . . and then, of course, CANDYLAND! That's why we"R"e here! That's why we came! And now that you"R"e on a sugar high, why not take another spin on the Ferris Wheel. Wheee! Toys R Us: Candyland!, VirtualTourist.com printed, dated February 24, 2005, printed August 25, 2006

> . . . the main reason to go in is to ride the ferris wheel or to look at some of the other "attractions," including the giant T-Rex from Jurassic Park or the Candy Land candy area. Toys R. Us Times Square, taquitos.net, printed August 25, 2006. See EX. D attached.

85. Plaintiff's distribution is not limited to its retail location in Rome, New York. Plaintiff sells through Price Chopper outlets in Rome, Albany, Utica and Syracuse, New York and other outlets in New York (e.g. Long Island) and elsewhere. Plaintiff ships its products around the U.S. Plaintiff also

promotes its Candyland products over the internet. It can be expected that the millions of customers who visited Toys "R" Us in Times Square or encountered Toys "R Us Candyland over the internet include plaintiff's customers or potential customers.

86. It also appears that, prior to this suit, Hasbro was actively pursuing significant commercial efforts that would move the Hasbro Candy Land use to even closer proximity with plaintiff's Candyland. For example, a national roll out was contemplated for the Toys "R" Us Candy Land use as well as licenses to candy manufacturers with broad national distribution.

87. Applying the pertinent reverse confusion factors to the facts here, in my opinion there is a likelihood of reverse confusion.

88. I will be compensated at the rate of $550 per hour for my work in this case. My compensation does not depend upon the outcome of this litigation and I have no other financial interest in the outcome of this litigation.

Date:  August 28, 2006          Respectfully submitted,

Siegrun D. Kane

- 26 –