# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

SPERO HARITATOS, an Individual,

                Plaintiff,

v.

HASBRO, INC., a Rhode Island corporation and TOYS "R" US-NY LLC, a New York limited Liability corporation,

                Defendants.

Case No. 05-CV-930 (DNH/GJD)

### PLAINTIFF'S OPPOSITION TO (1) DEFENDANT HASBRO'S MOTION TO PRECLUDE THE EXPERT TESTIMONY OF SIEGRUN D. KANE AND (2) DEFENDANT TOYS 'R US -NY LLC'S MOTION IN LIMINE TO PRECLUDE THE TESTIMONY OF SIEGRUN D. KANE

TABLE OF CONTENTS

1. Preliminary Statement................................................................... 1
2. Factual Background...................................................................... 2
   A. The History of Plaintiff's Use of the Mark CANDYLAND ....... 2
   B. Plaintiff's Current Understanding of Defendant Hasbro's Use Of the Term "CANDYLAND"....................................... 6
   C. Hasbro's Attempt to Acquire Plaintiff's Trademark Registration And Trademark Rights................................................6
   D. Hasbro's Licensing Activities, Including Its License For Defendant TRU To Use The "CANDY LAND" Mark In Connection With Candy................................................. 7
3. Legal Analysis............................................................................. 8
   A. Siegrun Kane's Expert Opinions......................................... 8
   B. The Applicable Legal Standard For Determining Whether Ms. Kane's Expert Testimony Should Be Precluded..................... 9
   C. Ms. Kane's Testimony "Will Assist The Trier Of Fact To Understand The Evidence Or To Determine A Fact In Issue".... 10
   D. Ms. Kane's Opinions Possess Sufficient Factual Basis............ 13
4. Conclusion..................................................................14

Plaintiff, Spero Haritatos, by and through his undersigned attorneys, hereby submits a brief in opposition to Defendant Hasbro's Motion to Preclude the Expert Testimony of Siegrun D. Kane and to Defendant Toys 'R Us -NY LLC's Motion in Limine to Preclude the Testimony of Siegrun D. Kane.

### 1. Preliminary Statement

Both Defendants attack Ms. Kane's expert report allegedly because her report provides opinions regarding only conclusions of law. Defendant Toys 'R Us -NY LLC (hereinafter "TRU") additionally alleges that Ms. Kane's opinions lack an appropriate factual basis.

Neither of the Defendants contests Ms. Kane's qualifications as an expert to render the opinions set forth in her expert report. Indeed, Ms. Kane has authored a major treatise on trademark law and procedure entitled "Trademark Law A Practitioner's Guide" published by the Practicing Law Institute first published in 1987 and currently in its fourth edition with supplements issued annually. The text of the treatise comprises over 700 pages. Also, Ms. Kane has previously testified as an expert in connection with trademark matters, and she otherwise possesses sterling credentials.

Both Defendants' briefs regurgitate a host of general law to the effect that expert witnesses may not testify on matters of law, however, neither of the Defendants offers any support for their contentions that the specific analysis or opinions rendered by Ms. Kane have been found by any court to constitute matters of law. To the contrary, several cases have found testimony on such matters to be helpful and admissible.

Defendant TRU's argument that Ms. Kane's opinion lacks a requisite factual basis is ludicrous.

Ms. Kane's testimony, analysis, and opinions would greatly "assist the trier of fact to understand the evidence or to determine a fact in issue", and consequently, her expert opinion should be deemed admissible.

## 2. Factual Background

### A. The History of Plaintiff's Use of the Mark CANDYLAND

Plaintiff, Spero Haritatos, is the current family member in a lineage of the Haritatos family that have owned and operated businesses selling candy under the CANDYLAND mark.

The Haritatos family came to the United States from Greece in the early 1900s.

In 1919, Harry Patanos, Jimmy Kekis, and an unknown partner operated a confectionary business in Syracuse, New York and developed a special, trade secret process for making a unique confection originally known as "Turkey Bones" because of its resemblance to real turkey bones. The candy was fashioned of a center of chocolate and Brazil nuts encased in a hard, silvery, sugar shell. A picture of a recently manufactured Turkey Joints candy from Plaintiff's company's "Candyland" website is set forth below:



In about 1921, Jimmy Kekis and Spero Haritatos (Plaintiff's uncle and one of Harry Patanos's nephews), opened a soda fountain in Rome, New York and named the soda fountain "Candyland". The Turkey Bones candy was made in the upstairs of the

2

Candyland store, and the Candyland store offered the candy for sale. Plaintiff's archival scrapbook records show advertisements placed in the Rome Sentinel Newspaper circa. November 22, 1921, and circa. 1922 which display "The Candyland" offering the Turkey Bones candy and inviting the public to witness the manufacture of the Turkey Bones candy.

Sometime in the 1920s, the candy's name became known as "Turkey Joints" instead of "Turkey Bones". Plaintiff's archival scrapbook also contains an antique label on the back of which is printed the year date "1930", which label includes a reference to "Turkey Joints" and references "The Candyland" located in Rome, N.Y. A copy of this label is displayed below:



Since at least about 1926, the Candyland store sold jars of Turkey Joints with a green label prominently referencing "Candyland".

At the onset of World War II, Rome's nearby Griffiss Air Force Base became active with large numbers of servicemen, which created a great demand for food products in the Rome area. Consequently, the Candyland soda fountain increased its offerings to include sandwiches and other food products, and became more like a restaurant. At this time, John, Pete, and Fred Haritatos, brothers of old Spero Haritatos, joined in running the store. In 1948, brother Tasos Haritatos started working at the Candyland restaurant, including the candy manufacturing portion of the business. In the 1950s, Tasos Haritatos

3

married one of the Candyland restaurant's pretty young waitresses named Nora Schapano, and they moved to a family home at 321 North Doxtater Street in Rome, New York.

Brother George Haritatos joined the Candyland restaurant and candy business in about 1960.

Due to the increasing age of most of the Haritatos brothers, they sold their interest in the Candyland business in about 1972. One of the brothers, George Haritatos, continued the restaurant business, albeit, under the name Liberty Lane Restaurant. Tasos Haritatos acquired the rights to the secret recipe for making the Turkey Joints candy and to the candy making business. He then moved the candy operation to his home at North Doxtater Street. Tasos Haritatos continued to sell the Turkey Joints candy under the name and trademark "CANDYLAND", and the store at North Doxtater Street was known and has continued to be known as both "Nora's Candy Shop" and as "Candyland" in signage, business cards, packaging, telephone directories, etc.

Plaintiff, Spero Haritatos, is the son of Tasos and Nora Haritatos and was born in 1961. Spero Haritatos has actively and substantially continuously worked in connection with the Candyland candy operations since the early 1970s through the present.

In 1982, Nora Haritatos died, and in 1993, Tasos Haritatos died. In 1983, their son Plaintiff, Spero Haritatos, acquired the "Candyland" candy business.

A picture of a recent green label for jars of Candyland's relatively recently manufactured Turkey Joints appears below. The label has remained substantially the same for several decades, except for the address of Candyland.



The Candyland Turkey Joints (labeled as "Original Candyland Turkey Joints" and as "Manufactured at Candyland") quickly became so popular as to achieve an intense, almost mania-like customer loyalty. Persons visiting the Rome, New York area were introduced to the Turkey Joints and reordered more when they got back home. Also, persons who relocated from the Rome area continued to order more when they moved away. Persons who continued to reside in the Rome area offer the Turkey Joints to friends and family located elsewhere, especially during the holidays. Griffiss Air Force Base was also operational for several decades in the 1900s, and the demand for the Turkey Joints accompanied the servicemen on their travels. Consequently, since at least the early 1940s, Candyland's Turkey Joints bearing the CANDYLAND mark have been shipped extensively throughout the United States.

In addition to local press coverage about the Candyland Turkey Joints, more widely distributed publications have featured articles about the Candyland Turkey Joints: (a) an article appearing in the November-December 1986 edition of <u>New York Alive</u> magazine; (b) a book entitled <u>Food Finds</u> and subtitled "America's Best Local Foods and the People Who Produce Them" published by Harper Collins, publisher in New York City; and (c) an article appearing in the November 1999 edition of <u>Saveur</u> magazine.

5

Since at least the early 1970s, and continuing to the present, the "Candyland" business has sold not only the candy known as "Turkey Joints", but also peanut brittle, nonpareils, chocolate and nut clusters, caramel and nut clusters, chocolate novelties (e.g., Easter themed chocolates), caramel corn, fudges, truffles, chocolate suckers, and hard candy suckers. All of these candy products have been sold in boxes, glass jars, or other containers bearing labels or imprinted with the "CANDYLAND" mark and name. In addition, the "Candyland" business started selling ice cream in late April-early May, 2004. The ice cream has been and continues to be sold to the present in containers bearing the "CANDYLAND" mark.

On December 3, 1992, Plaintiff filed an application for U.S. trademark registration of the term "CANDYLAND" for the goods "candy". The application issued to U.S. Trademark Registration No. 1,949,876 for the mark "CANDYLAND" for the goods "candy" on January 23, 1996. Plaintiff filed an appropriate affidavit of use, and the registration was granted incontestable status in 2002 and currently enjoys incontestable status.

### B. Plaintiff's Current Understanding of Defendant Hasbro's Use of the Term "CANDYLAND"

Defendant Hasbro, Inc. ("Hasbro") is a very large company generally engaged in the business of selling children's toys and games. Hasbro's 2003 Annual Report reports its net revenues for the year 2003 as $3.14 <u>billion</u> dollars and reports employing approximately 6,900 persons. Apparently, in about 1949, Hasbro or its purported predecessors, started marketing a board game known as "CANDY LAND". The board game has enjoyed considerable commercial success.

### C. Hasbro's Attempt to Acquire Plaintiff's Trademark Registration and Trademark Rights

Hasbro has known about Plaintiff's use and federal registration of his "CANDYLAND" mark in connection with candy products since at least 1995. Hasbro never notified Plaintiff that his use or registration of the mark offended Hasbro's rights and never demanded that Plaintiff cease and desist his use of the mark

In late 2002, Hasbro contacted Plaintiff about acquiring rights under Plaintiff's "CANDYLAND" mark. Plaintiff referred the matter to his trademark attorney, Thomas Wall. Discussions with Hasbro culminated a written offer by Hasbro dated April 11, 2003, the general, proposed terms of which were that,

- Plaintiff would assign his "CANDYLAND" trademark and trademark registration to Hasbro.
- Hasbro would allow Plaintiff to use the mark royalty-free the United States and Canada only "in substantially the same form and manner" as he had been using the mark.
- Hasbro would pay to Plaintiff royalties from its sale of candy under the "CANDYLAND" or "CANDY LAND" marks in the United States and Canada.
- Hasbro would pay to Plaintiff royalties from its sale of food products sold under the "CANDYLAND" or "CANDY LAND" marks in the United States and Canada.

It is noteworthy that Hasbro filed an intent-to-use application for federal registration of the mark "CANDY LAND" for a wide variety of beverages on April 14, 2003 (three days after making the written offer) without informing Plaintiff of its filing of the application[1].

Plaintiff had several problems with Hasbro's proposed agreement. The parties continued negotiations in the summer of 2003, and by letter dated September 11, 2003, Thomas Wall informed Hasbro that Plaintiff would not enter into the proposed agreement and would maintain ownership of his "CANDYLAND" mark and registration.

At absolutely no time during the negotiations did Hasbro ever mention or state any words to the effect that Hasbro believed Plaintiff's registration to be invalid, illegitimate, or improper. Rather, Hasbro consistently took the position that it wanted to own the registration so that it alone could enforce the registered mark, with the benefits accorded the registration, against others.

D. Hasbro's Licensing Activities, Including Its License For Defendant TRU To Use The "CANDY LAND" Mark In Connection With Candy

---

[1] Plaintiff later opposed Hasbro's application in the United States Patent and Trademark Office, which proceeding has been suspended pending the outcome of this litigation.

Unbeknownst to Plaintiff, at the time Hasbro was negotiating to acquire Plaintiff's rights and registration for "CANDYLAND" for candy, Hasbro had <u>already</u> licensed one of its major customers, TRU, to use the "CANDY LAND" mark for candy products and was negotiating with other companies to license the "CANDY LAND" mark for a wide variety of edible products. TRU has offered a variety of "CANDY LAND" candy from the "CANDY LAND" department of its massive, flagship store in Times Square in New York City, and through advertisements, press releases, and visitors to the store has exposed many millions of people to its use of "CANDY LAND" for such candy products.

Hasbro continued to permit TRU to use the "CANDY LAND" mark for candy for almost two years <u>after</u> Plaintiff told Hasbro that Plaintiff would not assign his rights to the "CANDYLAND" mark and registration, and while knowing of Plaintiff's incontestable, federally registered rights in the "CANDYLAND" mark for candy. TRU ceased using the "CANDY LAND" mark for candy only after this lawsuit was filed.

### 3. Legal Analysis

A.   Siegrun Kane's Expert Opinions

Ms. Kane's 26-page Expert Report contains the following summary of opinions (see pages 14-15):

> 52. Based on my understanding of the facts and the materials I have reviewed, my opinions are summarized as follows:
>
> 53. Plaintiff's registrations covering Candyland have achieved incontestable status and as such are conclusive proof of plaintiff's ownership and exclusive right to use the registered marks on candy. Said registrations create a presumption that plaintiff is entitled to use the registered marks throughout the nation.
>
> 54. Plaintiff's Reg. No. 1,949,876 for Candyland in block letter form extends to all types of candy and is not limited to any particular style of type.
>
> 55. Plaintiff's own use of the mark Candyland dating back to 1983 and his registrations covering Candyland for candy issued in 1984 and 1996 are prior to defendant Hasbro's 2001 licensed use of Candy Land to Toys "R" Us. Thus, plaintiff has prior rights to the mark Candyland in connection with candy.
>
> 56. The use of Candyland by plaintiff's predecessors dating back to the 1920s is prior to Hasbro's use of Candy Land for a board game. The long history of plaintiff's predecessors' commercial activities under the mark Candyland is supported by documents and the testimony of family members involved in the

business. These materials do not show abandonment of the Candyland mark which requires proof of non-use accompanied by an intent not to resume commercial use of the mark. 15 U.S.C. § 1127

57. Trademark infringement under the Lanham Act is established when defendant's use is likely to cause confusion, mistake or deception. 15 U.S.C. § 1114 (1) (a). Reverse confusion is one form of likely confusion. Reverse confusion occurs when the junior user's presence is likely to so swamp the senior user that he loses the value of his mark, control over his good will and reputation, and his ability to move into new markets. The prominence and attraction of the Toys "R" Us Times Square store and the promotion of Candy Land to out of town visitors provides the factual context for application of the doctrine of reverse confusion. Reverse confusion is rendered likely in this case in light of the similarity in the marks and the goods, the strength of the Hasbro brand, the promotion of the parties' goods over the internet, the mobile nature of the consumers, the relatively low cost of the products, Hasbro's interest in further national exploitation of the Candy Land mark for candy and ice cream, and Hasbro's knowledge of and attempt to acquire plaintiff's rights.

Although not totally clear from each of the Defendants' motions, it appears that these are the opinions that each of the Defendants contends are simply legal conclusions, and as for which Defendant TRU contends Ms. Kane has no proper factual basis. Plaintiff will demonstrate that each of these contentions is without merit.

B. <u>The Applicable Legal Standard For Determining Whether Ms. Kane's Expert Testimony Should Be Precluded</u>

Neither of the Defendants contends that Ms. Kane does not possess "specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue", that is, neither of the Defendants contends that Ms. Kane is unqualified to testify about the subject of her opinions as an expert.

Indeed, Ms. Kane possesses sterling credentials in the field of trademark law and procedure and possesses knowledge, skill, experience, training, and education that qualifies her to render her opinions. In addition to practicing in the field of trademark law for over the past 35 years, Ms. Kane has authored a major treatise entitled "<u>Trademark Law A Practitioner's Guide</u>" published by the Practicing Law Institute, which treatise currently comprises over 700 pages. The treatise was first published in 1987 and has been reprinted in four different editions, and supplements are currently

issued annually. She has also authored numerous articles, made numerous presentations to various organizations, and moderated panels on trademark law issues. She has also previously testified as a trademark law and procedure expert in three prior lawsuits.

FED. R. EVID. 702 sets forth when an expert may testify:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, if the expert's knowledge "will assist the trier of fact to understand the evidence or to determine a fact and issue", then the expert witness "may testify thereto in the form of an opinion or otherwise". Such testimony is not objectionable simply because it might embrace "an ultimate issue to be decided by the trier of fact". FED. R. EVID. 704.

As stated in the Advisory Committee Notes to FED. R. EVID. 702:

> An intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge...
>
> ....
>
> ... "There is no more certain test for determining when expert may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."... When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time.

It is noteworthy that case law decisions to the effect that certain expert opinions are inadmissible very often involve motions for preliminary injunction, motions for summary judgment, and trials to the court -- instances where the trier of fact is the judge, rather than a jury. In contrast, where the trier of fact is a jury, as is the instance here, courts have been much more inclined to permit expert testimony.

C. <u>Ms. Kane's Testimony "Will Assist The Trier Of Fact To Understand The Evidence Or To Determine A Fact In Issue"</u>

Defendants' memoranda in support of their motions are replete with general law to the effect that an expert may not render legal conclusions. However, neither of the

Defendants cites to any case law supporting their view that the opinions rendered by Ms. Kane constitute "legal conclusions". Indeed, it appears that her opinions relate to factual matters that are to be decided by the trier of fact (in this case, a jury, since a jury demand has been timely and properly made). Furthermore, FED. R. EVID. 702 expressly states that an expert witness "may testify" where the expert's "specialized knowledge will assist the trier the fact to understand the evidence <u>or</u> to determine a fact in issue". (emphasis added).

One major treatise has recognized that experts in "trademark law or procedures" might offer testimony at trial regarding searching procedures, procedures in the United States Patent and Trademark Office, third party uses in registrations of trademarks, and how trademarks are categorized, and "[I]n short, counsel might use a trademark expert for almost any facet of a trademark trial."[2] (see Exhibit A attached hereto). Consistent with the foregoing treatise summary, courts have admitted expert testimony regarding trademark law and procedure in a wide variety of contexts. See, e.g., <u>Waco International Inc. v. KHK Scaffolding Houston Inc.</u>, ___ F. 3d. ___, 61 U.S.P.Q.2d 1460 (5th Cir. 2002) (there is no error in the district court's admission of an attorney's expert witness testimony regarding the issues an attorney typically investigates in determining whether to pursue an *ex parte* seizure order in a trademark case.); <u>C.P. Interest Inc. v. California Pools Inc.</u>, ___ F 3d ___, 57 U.S.P.Q.2d 1690 (5th Cir. 2001) (The district court did not abuse its discretion in allowing the trademark attorney testify as an expert regarding the transfer of trademark rights, the geographic remoteness of trademark usage, and trademark infringement. The court of appeals recognized that his testimony overlapped with issues to be decided by the jury).

Although a lawyer may not testify as to <u>purely</u> legal matters, he or she may testify as to legal matters that involve questions of fact. See, e.g., <u>Waco International</u>, <u>supra.</u>

Ms. Kane's opinions include opinions to the effect that Plaintiff enjoys prior, superior trademark rights to the mark "CANDYLAND" in connection with candy, that Plaintiff's predecessors did not abandon any trademark rights in the term "CANDYLAND" in connection with candy, and that Defendants' activities are likely to

---

[2] 5 L. Horowitz and E. Horowitz, Intellectual Property Counseling and Litigation § 83.03[1][b] (see Exhibit A attached hereto)

11

cause confusion, mistake or deception, especially under a relatively unconventional doctrine known as "reverse confusion". As explained by Ms. Kane, in the normal trademark context, an analysis is made as to whether people are apt to confuse a junior (later) user's trademark as indicating that the junior user or the junior's products are associated in some way with a larger, senior (earlier) user of a trademark. In the reverse confusion situation, the analysis is whether people are apt to believe that the senior user or the senior user's products are associated with the junior user or the junior user's products. Plaintiff submits that both the Court and, in this case, the jury, as the trier of fact, will greatly benefit by hearing Ms. Kane's testimony regarding her analysis and opinions concerning these issues.

Defendants complain that Ms. Kane's expert report reads like a "legal brief". First, her report does not read like a legal brief. Second, it is perfectly permissible for Ms. Kane to cite to the law for setting forth what should be the proper facts to analyze and the weight to be accorded those facts. Third, Plaintiff's research indicates that Ms. Kane's opinions set forth <u>supra.</u> are directed to issues of fact, and not conclusions of law.[3]

---

[3] In the Second Circuit, the issue of likelihood of confusion in a trademark case is a question of <u>fact</u>. See, e.g., Cadbury Beverages Inc. v. Cott Corp., __ F.3d __, 37 U.S.P.Q. 2d 1508 (2d Cir. 1996) ("Our task on this appeal, then, is to determine whether any reasonable trier of fact could conclude that confusion is likely…"); American International Group, Inc. v. London American International Corporation Limited, 664 F.2d 348, 351 (2d Cir. 1981) ("Whether or not there is a likelihood of confusion is a question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods or services of the parties. A variety of factors may be material in assessing the likelihood of confusion. We listed eight such factors in Polaroid ….")
   Other federal courts of appeals have held likewise. See, e.g., Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 57 U.S.P.Q 2d 1617 (7th Cir. 2001); Sunbeam Prods. Inc. v. West Bend Co., 123 F.3d 246, 44 U.S.P.Q. 2d 1161 (5th Cir. 1997); Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 38 U.S.P.Q. 2d 1449 (4th Cir. 1996); Versa Prods. Co. v. Bifold Co., 50 F.3d 189, 33 U.S.P.Q. 2d 1801, 1808 (3d Cir. 1995), cert. denied, 516 U.S. 808 (1995); J.M. Huber Corp. v. Lowery Wellheads, Inc., 778 F.2d 1467, 228 U.S.P.Q. 206 (10th Cir. 1985); Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 228 U.S.P.Q. 346 (9th Cir. 1985); Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 2, 216 U.S.P.Q. 599 (11th Cir. 1982); Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 207 U.S.P.Q. 465 (1st Cir. 1980); Squirt Co. v. Seven-Up Co., 628 F.2d 1086, 207 U.S.P.Q. 897 (8th Cir. 1980).
   Courts in the Second Circuit have often permitted expert testimony on the issue of likelihood of confusion. See e.g., Pilot Corporation of America v. Fisher-Price, Inc., 344 F.Supp. 2d 349, 359 (D. Conn. 2004) ("Because the expert testimony on likelihood of confusion was by far the most significant evidence…."); Toy Manufacturers of America, Inc. v. Helmsley-Spear, Inc., 960 F.Supp. 673, 682 (S.D.N.Y. 1997) ("However, plaintiff's expert witness testified that there is a high likelihood of confusion…."); McGraw Hill, Inc. v. Comstock Partners, Inc., 743 F.Supp. 1029, 1035 (S.D.N.Y. 1990) ("However, the Lanham Act only requires "likelihood of confusion, and plaintiff has submitted the testimony and survey findings of a marketing expert on this issue."); Oxford Industries, Inc. v. JBJ Fabrics, Inc., 1988 WL 9959, 6 U.S.P.Q. 2d 1756 (S.D.N.Y. 1988) ("Regarding the critical issue of likelihood of confusion, the court gives great weight to the highly credible testimony of defendant's expert witness….").

Even if Ms. Kane's opinions even arguably relate to a conclusion of law or a legal issue, FED. R. EVID. 702 expressly permits such testimony where such specialized knowledge "will assist the trier of fact to understand the evidence".

### D. Ms. Kane's Opinions Possess Sufficient Factual Basis

Defendant TRU, but not Defendant Hasbro, has challenged Ms. Kane's expert report on the basis that "her opinions are devoid of factual support and amount to nothing other than speculation and conjecture." (See page 1 of Defendant TRU's memorandum of law in support of its motion in limine)  Defendant TRU, however, fails to indicate what facts should or must be a basis for Ms. Kane's opinions or to point out where her opinion is devoid of considering such facts.  It appears that Defendant TRU's only specifically alleged deficiency is that Ms. Kane's opinion provides no support for her opinion that customers may not be aware that they are confused or bother to report the confusion. Defendant TRU further explains that Ms. Kane could have conducted customer surveys or polled the end-users of the products at issue to determine if there was, in fact, any confusion.  Defendant TRU provides absolutely no support other than broad legal maxims for its contentions.  First, Defendant TRU does not even attempt to show how the alleged lack of a requisite factual basis undermines each and all of Ms. Kane's opinions. Second, Plaintiff submits that Ms. Kane's report does contain sufficient factual analysis to support each of her specific, foregoing opinions.  Third, Trademark law practitioners often make analyses, formulate opinions, and recommend causes of action for their clients regarding potential confusion without customer surveys or polls.  Moreover, courts themselves render decisions and judgments respecting such matters without evidence of customer surveys or polls.  To the extent that TRU believes that additional surveys or polls or information should have been considered, Defendant TRU is permitted to try to impeach Ms. Kane's testimony and opinion in accordance with standard techniques for cross-examination of experts.[4]

---

[4] As stated by the U.S. Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) in connection with the use of expert testimony, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595.

13

### 4. Conclusion

Neither of the Defendants has satisfied its burden of demonstrating that Ms. Kane's testimony, set forth in her expert disclosure, should be precluded. Rather, her testimony will assist the trier of fact "to understand the evidence" and "to determine a fact in issue". All aspects of her testimony have a sufficient factual basis. Defendants are naturally permitted to offer competing expert testimony and opinions, to cross-examine and attempt to impeach Ms. Kane with regard to her testimony and opinion, and to argue to the jury how they believe the facts warrant a factual determination that is different from what Ms. Kane proffers.

Defendants' motions to preclude Ms. Kane's expert testimony should be denied.

Respectfully submitted,

**SPERO T. HARITATOS**

By his attorneys,

s/Robert E. Purcell
Robert E. Purcell, Esq.
Bar Roll No. 510,595
Denis J. Sullivan
Bar Roll No. 512,997
WALL MARJAMA & BILINSKI, LLP
101 South Salina Street #400
Syracuse, New York 13202
Telephone: (315) 425-9000
Facsimile: (315) 425-9114

**Attorneys for Plaintiff**
SPERO HARITATOS