# EXHIBIT A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SPERO HARITATOS,

                    Plaintiff,

        - against -

HASBRO, INC.
and TOYS "R" US-NY LLC,

                Defendants.

                        :     05 Civ. 930 (DNH/GJD)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT HASBRO, INC.'S INITIAL DISCLOSURES

       Defendant Hasbro, Inc. ("Hasbro"), by its undersigned attorneys, hereby submit to

Plaintiff Spero Haritatos the following Initial Disclosures pursuant to Rule 26(a)(1) of the

Federal Rules of Civil Procedures.  These Initial Disclosures are based on information

reasonably available to Hasbro as of the date hereof.  Hasbro reserves the right to supplement

these disclosures as circumstances warrant.  In addition, Hasbro expressly reserves all objections

to the use for any purpose of these Initial Disclosures or any of the information referenced herein

in this case or any other case or proceeding.

By making these disclosures, Hasbro does not represent that it is identifying every document, tangible thing, or witness possibly relevant to all issues that may eventually be raised in this lawsuit. Pursuant to Rule 26(a)(1) and other applicable Federal Rules of Civil Procedure, Hasbro is not disclosing documents or information protected by the attorney-client privilege or work-product immunity. Hasbro's disclosures represent a good faith effort to identify information it reasonably believes is required by Rule 26(a)(1).

Hasbro's disclosures are made without in any way waiving: (1) the right to object on the ground of competency, privilege, relevancy and materiality, hearsay, or other proper ground; (2) the right to object to the use of any such information, for any purpose, in whole or in part, in any subsequent proceeding in these actions or any other action; and (3) the right to object on any and all grounds, at any time, to any other discovery request or proceeding involving or relating to the subject matter of these disclosures.

The disclosures set forth below are made subject to the above objections and qualifications.

1. **Rule 26(a)(1)(A):** *The name and, if known, the address and telephone number of each individual likely to have discoverable information that Hasbro may use to support its claims, unless solely for impeachment.*

All of Hasbro's employees may be contacted only through Hasbro's counsel.

| Name | Company | Responsibility | Contact Information |
|------|---------|----------------|---------------------|
| Frank Bifulco | Hasbro | President, United States Games | Patterson Belknap Webb & Tyler LLP |
| Mark Blecher | Hasbro | Senior Vice President Marketing, Hasbro Games Group | Patterson Belknap Webb & Tyler LLP |

2

| Bryony Bouyer | Hasbro | Senior Vice President, Americas, Hasbro Properties Group | Patterson Belknap Webb & Tyler LLP |
|---|---|---|---|
| David Dubosky | Hasbro | Vice President, Legal | Patterson Belknap Webb & Tyler LLP |
| Bruce Kelly | Hasbro | Senior Attorney, Legal | Patterson Belknap Webb & Tyler LLP |
| Tom Kluisaritz | Hasbro | Vice President, Consumer Products, North America | Patterson Belknap Webb & Tyler LLP |
| Ron Lombardi | Toys "R" Us | Lawyer | |
| Mathew Loncar | Toys "R" Us | Lawyer | |
| Andrea Mealey | Hasbro | Attorney, Legal | Patterson Belknap Webb & Tyler LLP |
| Jane Ritson-Parsons | Hasbro | President, Hasbro Properties Group | Patterson Belknap Webb & Tyler LLP |
| Dale Siswick | Hasbro | Senior Vice President, Research and Development, Hasbro Games Group | Patterson Belknap Webb & Tyler LLP |
| Mark Stark | Hasbro | Vice President, Marketing, Hasbro Games Group | Patterson Belknap Webb & Tyler LLP |
| Mark Sullivan | Hasbro | Senior Vice President, Sales & Administration, Hasbro Games Group | Patterson Belknap Webb & Tyler LLP |
| Michael Tabakin | Toys "R" Us | Licensing, Sales Promotion, and Marketing | |
| Paul Vanasse | Hasbro | Director, Intellectual Properties, Legal | Patterson Belknap Webb & Tyler LLP |
| Helen Van Tassel | Hasbro | Marketing/PR Specialist, Hasbro Games Group | Patterson Belknap Webb & Tyler LLP |

| E. David Wilson | Hasbro | Executive Vice President, Global Business Development, Hasbro Games Group | Patterson Belknap Webb & Tyler LLP |
|---|---|---|---|

    2.    **Rule 26(a)(1)(B):** *A description by category and location of all documents, date compilations, and tangible things in the possession, custody or control of Hasbro that it may use to support its claims or defenses, unless solely for impeachment .*

By providing the following description of documents pursuant to Rule 26(a)(1)(B), Hasbro does not waive its right to withhold production of any document in its possession which is protected by the attorney-client privilege, the work-product immunity, or any other claim of privilege or immunity, or Hasbro is prohibited from producing under a legitimate confidentiality agreement, or where production of such a document would be otherwise unlawful.

Hasbro possesses the following categories of documents that it may use in support of its claims or defenses herein:

    1.    Documents relating to the advertising and promotion of Hasbro's CANDY LAND properties;

    2.    Documents concerning consumers' recognition of Hasbro's famous CANDY LAND trademark;

    3.    Documents relating to the market for games and goods that are a natural extension of Hasbro's famous CANDY LAND games;

    4.    Documents concerning the likelihood of consumer confusion resulting from Hasbro's use of its CANDY LAND mark and plaintiff's use of his Candyland mark, if any;

    5.    Information regarding sales of Hasbro's CANDY LAND properties;

    6.    Information regarding the channels of trade in which Hasbro's CANDY

LAND properties are marketed, distributed and sold;

7.    Financial information relating to CANDY LAND; and

8.    Documents concerning plaintiff's business and the goods sold by plaintiff.

3.    **Rule 26(a)(1)(C):** *A computation of any category of damages and the documents on which such computation is based, including the materials bearing on the nature and extent of injuries suffered.*

Hasbro has not yet calculated the exact amount of damages stemming from any infringement of its famous CANDY LAND mark by plaintiff, as any calculation likely will be based, in part, on information to be produced by plaintiff in this case. Pursuant to the Lanham Act, Hasbro's damages may include plaintiff's profits, Hasbro's lost sales, as well as lost opportunities, loss of goodwill, or damages based on advertising expenses or based on incremental cost analysis or other models, enhancements, punitive, exemplary, or additional damages, attorneys fees and costs.

4.    **Rule 26(a)(1)(D):** *Any insurance agreement under which an person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.*

Hasbro is not aware of any such agreement at this time.

5

Dated:  New York, New York
        October 27, 2005

PATTERSON BELKNAP WEBB & TYLER LLP

Kim J. Landsman
(Bar Roll No. 513364)
Michael D. Sant'Ambrogio
(Bar Roll No. 513363)
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  212-336-2980
Facsimile:  212-336-2985

*Attorneys for Defendant Hasbro, Inc.*

6

# EXHIBIT B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------ x
                                     :
SPERO HARITATOS,                     :
                                     :
                  Plaintiff,         :     05 Civ. 930 (DNH/GJD)
                                     :
          - against -                :
                                     :
HASBRO, INC.                         :
and TOYS "R" US-NY LLC,              :
                                     :
                  Defendants.        :
                                     :
------------------------------------ x

### DEFENDANT HASBRO, INC.'S
### RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Hasbro,

Inc. ("Hasbro"), by its attorneys of record, Patterson Belknap Webb & Tyler LLP, hereby

responds to Plaintiff's First Set of Interrogatories To Defendants:

### GENERAL OBJECTIONS

1.      Hasbro objects to Plaintiff's Interrogatories to the extent they seek to

impose obligations in addition to or different from those embodied in the Federal Rules of Civil

Procedure and the Northern District of New York Local Rules.

2      Hasbro objects to Plaintiff's interrogatories on the grounds that they exceed twenty-five in number including their discrete subparts in violation of Fed. R. Civ. P. 33. Based on Plaintiff's definition of "state the basis," Interrogatory No. 8 constitutes no less than sixteen interrogatories including the subparts.

3      Hasbro objects to each interrogatory to the extent it seeks information protected from discovery by the attorney-client, work product, or other applicable privileges. The provision of any response herein is not and cannot be deemed a waiver of such or any other privilege. Hasbro will produce a privilege log for each responsive document that is withheld on the grounds of the aforementioned privileges. Hasbro will not place on the privilege log any communications between Hasbro and Hasbro's principal outside counsel because disclosing the subject matter of such communications would inherently invade the attorney-client and work-product privileges.

4      Hasbro objects to each interrogatory that purports to ask it to answer on behalf of defendant TOYS "R" US-NY LLC and will not answer any interrogatory seeking information about that defendant.

5      Hasbro objects to each interrogatory to the extent it seeks confidential or proprietary business or financial information or trade secrets of any kind without a suitable protective order agreed to by the parties or ordered by the court.

6      An agreement to produce documents in response to any interrogatory should not be construed as a representation that such documents exist, only that a good faith search for responsive documents will be undertaken.

7      The fact that Hasbro is willing to respond to any particular Interrogatory does not constitute an admission or acknowledgement that the Interrogatory is proper, that the

2

information sought is relevant and/or admissible, that the Interrogatory is within the proper

bounds of discovery, or that other Interrogatories will be treated in a similar fashion.  For any

and all responses made to each Interrogatory, Hasbro reserves all objections or other questions

regarding the competency, relevance, materiality, privilege or admissibility of such information

as evidence in this suit or any other proceeding, action, or trial.

        8      The responses herein are based on Hasbro's current knowledge and belief,

and Hasbro reserves the right to supplement, amend, modify or correct these responses should

additional information become available.

        9      Hasbro objects to the definitions to the extent that they purport to require

Hasbro to answer on behalf of its predecessors.  Hasbro can only answer as to the knowledge of

its employees.

        All responses herein are made on an express reservation of the General Objections

set forth above and any specific objections set forth below.

## RESPONSES TO SPECIFIC INTERROGATORIES

### Interrogatory No. 1:

        Describe the circumstances regarding how and when each of the Defendants first
became aware of the Haritatos CANDYLAND Mark, and describe in detail any actions planned
or taken with respect to Defendants' use, or intended use, of the term "CANDY LAND" or any
other similar term, in connection with Defendants' products, advertising, or marketing as a result
thereof.

### Objections and Response:

        Hasbro objects to this interrogatory as overbroad, unduly burdensome, and as

seeking information that is irrelevant and not reasonably calculated to lead to the discovery of

admissible evidence.  Hasbro further objects to this interrogatory as seeking information

protected by the attorney-client privilege, work product privilege or other applicable privilege.

3

Subject to the foregoing and the General Objections, Hasbro states that it has been aware of

Plaintiff's CANDYLAND registration since about 1995.

**Interrogatory No. 2:**

Identify every person having knowledge of each formal or informal investigation, study, survey, and/or search, if any conducted by or on behalf of any of the Defendants respecting the term "CANDY LAND" or other similar term, and describe in detail the nature and substance of each such person's knowledge, including the results of such investigation, study, and/or search.

**Objections and Response:**

Hasbro objects to this interrogatory as overbroad, vague and ambiguous, and as

seeking information that is irrelevant and not reasonably calculated to lead to the discovery of

admissible evidence. Hasbro further objects as unduly burdensome the identification of "every"

person with knowledge of each formal or informal investigation of the CANDY LAND mark, a

mark that was first used more than 50 years ago and has been used on numerous and varied

products since then. Hasbro further objects to this interrogatory as seeking information protected

by the attorney-client privilege, work product privilege or other applicable privilege.

Subject to and without waiving the foregoing and the General Objections, Hasbro

identifies the following employees as having the most knowledge of investigations conducted by

Hasbro regarding the term CANDY LAND:

Tim Eio, Manager, Marketing, Hasbro Games (2002-2004). Mr. Eio was

responsible for and is knowledgeable concerning the day-to-day management of the CANDY

LAND brand. This includes the creation of advertising and promotional materials. Since

November 2004, Shauna Collins has assumed these responsibilities.

Mark Stark, Vice President, Marketing, Hasbro Games (1999-present). Mr. Stark

is responsible for and knowledgeable concerning the marketing of the Milton Bradley brand

portfolio, which includes preschool games, children's games and puzzles. As such, he oversees

4

the CANDY LAND brand, which is part of the preschool games category, including any

marketing, advertising, promotion and packaging activities, as well as the strategy and direction

of any new product development within the CANDY LAND brand. Mr. Stark has had

responsibilities for CANDY LAND as an employee of Hasbro since 1994.

Paul Vanasse, Director, Intellectual Properties, Office of the General Counsel

(1985 to present). Mr. Vanasse works under the direct supervision of the lawyers in Hasbro's

Legal Department and has day-to-day responsibility for maintaining Hasbro's intellectual

properties, including the CANDY LAND trademark, and enforcing those rights.

**Interrogatory No. 3:**

Identify by product code, package code, or other specific indicia, each product
and/or service that any of the Defendants have manufactured, advertised, marketed, offered for
sale, licensed, distributed, or otherwise caused to be provided in the United States, or intend to
manufacture, advertise, offer for sale, license, distribute, or otherwise cause to be provided in the
United States, in connection with the term "CANDY LAND" or any other similar term.

**Objections and Response:**

Hasbro objects to this interrogatory as unduly burdensome, overbroad, vague and

ambiguous. Hasbro further objects to this interrogatory as seeking confidential or proprietary

information without entry of a suitable protective order.

Subject to and without waiving the foregoing and the General Objections, and

subject to a suitable protective order, Hasbro will respond pursuant to Fed. R. Civ. P. 33(d) by

producing documents from which the burden of deriving or ascertaining the answer will be

substantially the same for Plaintiff as it would be for Hasbro.

**Interrogatory No. 4:**

For each different product and/or service that any of the Defendants has
manufactured, advertised, marketed, offered for sale, licensed, distributed, or otherwise caused to
be provided in the United States, in connection with the term "CANDY LAND" or any other
similar term, state the volume of sales in the United States, in dollars and in individual units, for
each year to the present.

5

**Objections and Response:**

Hasbro objects to this interrogatory as unduly burdensome, overbroad, vague and ambiguous. Hasbro further objects to this interrogatory as seeking confidential or proprietary information without entry of a suitable protective order.

Subject to and without waiving the foregoing and General Objections, and subject to a suitable protective order, Hasbro will respond pursuant to Fed. R. Civ. P. 33(d) by producing documents from which the burden of deriving or ascertaining the answer will be substantially the same for Plaintiff as it would be for Hasbro.

**Interrogatory No. 5:**

Identify every person on a supervisory, managerial, or professional level knowledgeable about any of the Defendants' intended or actual use, advertising, licensing, or promotion of products and/or services in connection with the term "CANDY LAND" or any other similar term since 1995, and describe in detail the nature and substance of each such person's knowledge.

**Objections and Response:**

Hasbro objects to this interrogatory as overbroad. Hasbro further objects as unduly burdensome the identification of "every" person with knowledge of the facts relating to Hasbro's use in the United States of the term CANDY LAND, a mark that has been used on numerous and varied products. Subject to and without waiving the foregoing and the General Objections, Hasbro identifies the following employees as having the most knowledge of Hasbro's use, advertising, licensing, or promotion of CANDY LAND products:

Mark Blecher, Senior Vice President, Hasbro Games Group (2004-present). Mr. Blecher is responsible for and knowledgeable concerning all aspects of marketing of Hasbro games, including the CANDY LAND brand products.

Bryony Bouyer, Senior Vice President, Hasbro Properties Group (2004-present). Ms. Bouyer is responsible for and knowledgeable concerning all aspects of the licensing of

6

Hasbro properties, including the CANDY LAND brand products. Ms. Bouyer has been an employee of Hasbro since 2000.

Tom Klusaritz, Vice President, Hasbro Properties Group (1999-present). Mr. Klusaritz is responsible for and knowledgeable concerning all aspects of licensing of Hasbro properties, including the CANDY LAND brand products. Mr. Klusaritz reports to Ms. Bouyer.

Lee McLaughlin, former Director, Licensing, Hasbro Properties Group. Mr. McLaughlin was responsible for and knowledgeable concerning licensing of Hasbro properties, including the CANDY LAND brand products. Mr. McLaughlin was an employee of Hasbro between 1996 and 2005.

Mark Morris, Director, Public Relations, Hasbro Games (1998-2005). Mr. Morris was responsible for coordinating and knowledgeable concerning all public relations activities related to Hasbro's games, including the CANDY LAND game. His duties included coordinating press releases, responding to media inquiries, and interacting with consumers with respect to any questions or concerns they may have about any of Hasbro's games. In addition, Mr. Morris was responsible for special events designed to attract publicity for CANDY LAND, such as the recent 55th anniversary of the game. Mr. Morris had responsibilities for the CANDY LAND game as an employee of Hasbro since 1986.

Jane Ritson-Parsons, President, Hasbro Properties Group (2001-present). Ms. Ritson-Parsons is responsible for and knowledgeable concerning all aspects of marketing and licensing worldwide of the Hasbro properties, including the CANDY LAND brand products. Ms. Ritson-Parsons has been an employee of Hasbro since 1992.

Pat Schmidt, Vice President, Consumer Products, North America, Hasbro Properties Group (1989-2004). Ms. Schmidt was responsible for and is knowledgeable

7

concerning the domestic licensing of all Hasbro properties (except for publishing), including the

CANDY LAND mark. Since 2004, Tom Klusaritz, has assumed some of these responsibilities.

Mark Stark, Vice President, Marketing, Hasbro Games (1999-present). Mr. Stark

is responsible for and knowledgeable concerning the marketing of the Milton Bradley brand

portfolio, which includes preschool games, children's games and puzzles. As such, he oversees

the CANDY LAND brand, which is part of the preschool games category, including any

marketing, advertising, promotion and packaging activities, as well as the strategy and direction

of any new product development within the CANDY LAND brand. Mr. Stark has had

responsibilities for CANDY LAND as an employee of Hasbro since 1993.

Mark Sullivan, Senior Vice President, Sales & Administration, Hasbro Games

Group. Mr. Sullivan is responsible for and knowledgeable concerning all aspects of sales related

to the Hasbro game products, including the CANDY LAND game. Mr. Sullivan is also

responsible for and knowledgeable concerning Hasbro's key sales accounts, including Toys "R"

Us.

Helen Van Tassel, Marketing/Public Relations Specialist, Hasbro Games (1998-

present). Ms Van Tassel was the assistant to the Director of Public Relations. Ms. Van Tassel's

duties include coordinating press releases, responding to media inquiries, and interacting with

consumers with respect to any questions or concerns they may have about any of Hasbro's

games.

**Interrogatory No. 6:**

Identify every person having knowledge of any of the Defendants' contention, if
any, that Haritatos does not have rights in the Haritatos CANDYLAND Mark to assert against
any of the Defendants or otherwise lacks standing to bring or maintain this lawsuit, and describe
in detail the nature and substance of each such person's knowledge.

8

**Objections and Response:**

Hasbro objects to this Request as inherently invasive of the attorney-client

privilege, attorney work product, or other privilege. Hasbro further objects to the Request

because it seeks the identity of persons with knowledge of legal conclusions and is not a proper

subject for inquiry. The persons with knowledge of Hasbro's legal conclusions are Hasbro's

outside counsel and the members of the Hasbro Legal Department.

**Interrogatory No. 7:**

Identify every person having knowledge of any of the Defendant's contentions, if
any, that there is no substantial likelihood of confusion between Haritatos' CANDYLAND Mark
and any Defendants' use of the term CANDY LAND in connection with edible products, and
describe in detail the nature and substance of each such person's knowledge.

**Objections and Response:**

Hasbro objects to this interrogatory as seeking information protected by the

attorney-client privilege, work product privilege or other applicable privilege. Moreover,

virtually everyone with any knowledge of plaintiff and Hasbro would know that there is no

likelihood of confusion.

Subject to and without waiving the foregoing and General Objections, Hasbro

refers Plaintiff to the persons identified in response to Interrogatory No. 5 as having the most

knowledge of Hasbro's CANDY LAND products, the fame of Hasbro's CANDY LAND mark,

and the unlikelihood of any confusion between Haritatos' CANDYLAND Mark and Defendants'

use of the term CANDY LAND in connection with edible products, if any.

**Interrogatory No. 8:**

State the Basis for any of the Defendants' contention, if any, that (a) any
Defendants' use of the term "CANDY LAND" is not likely to confuse, cause mistake, or deceive,
purchasers or consumers of Defendants' Edible CANDY LAND Products into believing that any
of the Defendants are affiliated, connected, or associated, with Haritatos, (b) Haritatos's use of
the term "CANDYLAND" is not likely to confuse, cause mistake, or deceive purchasers or
consumers of Defendants' Edible CANDY LAND Products into believing that Haritatos is
affiliated, connected, or associated with any of the Defendants, (c) any of Defendants' Edible

9

CANDY LAND Products originate with, are sponsored by, or are approved by, Haritatos, or (d) any of Haritatos CANDYLAND Products originate with, are sponsored by, or approved by any of the Defendants.

**Objections and Response:**

Subject to and without waiving the General Objections, Hasbro directs Plaintiff to

its Answer and Counterclaims, which contain a statement of Hasbro's defenses to Plaintiff's

Complaint. Hasbro further responds that virtually no one associates the name CANDYLAND

with Haritatos, and he has no trademark rights in that name.

**Interrogatory No. 9:**

Identify all persons, employed, hired, retained, or to be offered, or expected to be employed, hired, retained, or offered by any of the Defendants as expert consultants or witnesses in connection with this lawsuit, the subjects about which each such expert has been retained or is intended to be retained, and the substance of any testimony or evidence any of the Defendants intend to offer through each such expert in any motion or brief submitted by any of the Defendants, or at any trial or hearing in this matter.

**Objections and Response:**

Hasbro objects to this interrogatory as seeking information protected by the

attorney-client privilege, work product privilege or other applicable privileges. At this point in

the case, Hasbro has not identified any expert consultants or witnesses. The parties have agreed

on a later time for disclosing testifying experts, and Hasbro does not waive its right to name

expert consultant(s) or witness(es) and reserves the right to supplement or amend its response to

this interrogatory request as discovery continues.

**Interrogatory No. 10:**

Identify every person having knowledge about any instances of possible confusion respecting the term "CANDY LAND" or respecting any of the Defendants' products, or respecting Haritatos's products (such as an inquiry whether any of the Defendants' businesses were sponsored, affiliated, associated or endorsed by or connected with Haritatos, or any of the Defendants' receipt of any misdirected mail, telephone calls, orders or complaints intended for Haritatos), and for each such person, describe in detail such person's knowledge.

10

## Objections and Response:

Hasbro objects to this interrogatory as vague and ambiguous. To the extent this interrogatory is asking Hasbro to identify persons with knowledge of confusion as to whether Hasbro's products were sponsored, affiliated, associated or endorsed by or connected with Haritatos, Hasbro states that there is no such confusion and therefore no person to identify.

## Interrogatory No. 11:

Identify every person having knowledge of any objections (a) by either Haritatos or others to any of the Defendants' use of the term "CANDY LAND" or any other similar term, or (b) by any of the Defendants to a third party's use of the term "CANDY LAND" or any similar term, and for each such person, describe in detail such person's knowledge.

## Objections and Response:

Hasbro objects to this interrogatory as overbroad, vague and ambiguous, and as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Hasbro further objects as unduly burdensome the identification of "every" person with knowledge of any objections by Hasbro to a third party's use of the term "CANDY LAND", a mark that was first used by Hasbro more than 50 years ago and that numerous parties, including Plaintiff, have sought to exploit for their own advantage. Hasbro further objects to this interrogatory as seeking information protected by the attorney-client privilege, work product privilege or other applicable privilege.

Subject to and without waiving the foregoing and General Objections, Hasbro identifies the following employee as most knowledgeable:

Paul Vanasse, Director, Intellectual Properties, Office of the General Counsel (1985 to present). Mr. Vanasse works under the direct supervision of the lawyers in Hasbro's Legal Department and has day-to-day responsibility for maintaining Hasbro's intellectual properties, including the CANDY LAND trademark, and enforcing those rights.

11

**Interrogatory No. 12:**

For each of the Defendants' defenses and/or counterclaims in this lawsuit, describe in detail in at least 100 words the factual basis and nature of such defense.

**Objections and Response:**

Hasbro objects to this interrogatory as seeking information protected by the attorney work product privilege. Subject to and without waiving the foregoing and General Objections, Hasbro states as follows:

Hasbro owns the federal trademark Registration No. 544,328 for the mark CANDY LAND for, *inter alia*, goods and services in International Class 28, namely board games played with moveable pieces. Registration No. 544,328 was registered on June 26, 1951 and is now incontestable. Hasbro has continuously used this CANDY LAND mark in commerce since 1949, and Hasbro's use of the CANDY LAND mark has become famous worldwide. Hasbro's use of the CANDY LAND mark predates Haritatos's use of his Candyland mark, if any. Plaintiff did not even begin to call his business CANDYLAND, let alone use the name of the business as a trademark, until at least the 1980s.

The CANDY LAND trademark has become a valuable corporate asset of Hasbro and Hasbro uses the CANDY LAND mark for a variety of products geared toward children that are a natural extension of the board game. Hasbro has also licensed the CANDY LAND mark for a variety of products geared toward children that are a natural extension of the board game. Plaintiff's alleged uses of his CANDYLAND mark is on goods that are a natural extension of Hasbro's famous CANDY LAND goods. Moreover, Plaintiff's CANDYLAND mark has no source identifying capacity when used in connection with a candy store.

There is no likelihood that consumers will confused by the use of Hasbro's famous CANDY LAND mark in connection with candy or other edible products, which is a

12

natural extension of the use of the CANDY LAND mark in connection with a game that is all about candy.  But if Plaintiff is correct (and Hasbro contends that he is not) that there is likely to be confusion between the licensed use of elements of Hasbro's famous CANDY LAND brand in connection with a section of a retail store in New York, New York, and plaintiff's use of his alleged CANDYLAND mark in connection with the sale of candy, then it is Plaintiff who has infringed Hasbro's trademarks in the CANDY LAND game and associated products because Hasbro has had priority of use of the CANDY LAND mark since long before Plaintiff began to use his CANDYLAND mark, if at all, and the use of the CANDYLAND mark in connection with the sale of candy is a natural extension of Hasbro's prior use in connection with a children's board game with a candy theme.

In addition, Hasbro will respond pursuant to Fed. R. Civ. P. 33(d) by producing documents from which the burden of deriving or ascertaining the answer will be substantially the same for Plaintiff as it would be for Hasbro.

**Interrogatory No. 13:**

Identify every person having knowledge of any facts forming the basis of each of the Defendants' defenses and/or counterclaims in this lawsuit, and for each such person, describe in detail such person's knowledge.

**Objections and Response:**

Hasbro objects to this interrogatory as seeking information protected by the attorney work product privilege.  Subject to and without waiving the foregoing and the General Objections, Hasbro identifies the following employees as having the most knowledge of the factual basis of Hasbro's defenses and counterclaims in this litigation:

Mark Blecher, Senior Vice President, Hasbro Games Group (2004-present).  Mr. Blecher is responsible for and knowledgeable concerning all aspects of marketing of Hasbro games, including the CANDY LAND brand products.

13

Bryony Bouyer, Senior Vice President, Hasbro Properties Group (2004-present). Ms. Bouyer is responsible for and knowledgeable concerning all aspects of the licensing of Hasbro properties, including the CANDY LAND brand products. Ms. Bouyer has been an employee of Hasbro since 2000.

Tom Klusaritz, Vice President, Hasbro Properties Group (1999-present). Mr. Klusaritz is responsible for and knowledgeable concerning all aspects of licensing of Hasbro properties, including the CANDY LAND brand products. Mr. Klusaritz reports to Ms. Bouyer.

Lee McLaughlin, former Director, Licensing, Hasbro Properties Group. Mr. McLaughlin was responsible for and knowledgeable concerning licensing of Hasbro properties, including the CANDY LAND brand products. Mr. McLaughlin was an employee of Hasbro between 1996 and 2005.

Mark Morris, Director, Public Relations, Hasbro Games (1998-2005). Mr. Morris was responsible for coordinating and knowledgeable concerning all public relations activities related to Hasbro's games, including the CANDY LAND game. His duties included coordinating press releases, responding to media inquiries, and interacting with consumers with respect to any questions or concerns they may have about any of Hasbro's games. In addition, Mr. Morris was responsible for special events designed to attract publicity for CANDY LAND, such as the recent 55th anniversary of the game. Mr. Morris had responsibilities for the CANDY LAND game as an employee of Hasbro since 1986.

Jane Ritson-Parsons, President, Hasbro Properties Group (2001-present). Ms. Ritson-Parsons is responsible for and knowledgeable concerning all aspects of marketing and licensing worldwide of the Hasbro properties, including the CANDY LAND brand products. Ms. Ritson-Parsons has been an employee of Hasbro since 1992.

14

Mark Stark, Vice President, Marketing, Hasbro Games (1999-present).  Mr. Stark is responsible for and knowledgeable concerning the marketing of the Milton Bradley brand portfolio, which includes preschool games, children's games and puzzles.  As such, he oversees the CANDY LAND brand, which is part of the preschool games category, including any marketing, advertising, promotion and packaging activities, as well as the strategy and direction of any new product development within the CANDY LAND brand.  Mr. Stark has had responsibilities for CANDY LAND as an employee of Hasbro since 1994.

Mark Sullivan, Senior Vice President, Sales & Administration, Hasbro Games Group.  Mr. Sullivan is responsible for and knowledgeable concerning all aspects of sales related to the Hasbro game products, including the CANDY LAND game.  Mr. Sullivan is also responsible for and knowledgeable concerning Hasbro's key sales accounts, including Toys "R" Us.

Helen Van Tassel, Marketing/Public Relations Specialist, Hasbro Games (1998-present).  Ms Van Tassel was the assistant to the Director of Public Relations.  Ms. Van Tassel's duties include coordinating press releases, responding to media inquiries, and interacting with consumers with respect to any questions or concerns they may have about any of Hasbro's games.

Paul Vanasse, Director, Intellectual Properties, Office of the General Counsel (1985 to present).  Mr. Vanasse works under the direct supervision of the lawyers in Hasbro's Legal Department and has day-to-day responsibility for maintaining Hasbro's intellectual properties, including the CANDY LAND trademark, and enforcing those rights.

**Interrogatory No. 14:**

For each of Defendants' counterclaims, describe in detail in at least 100 words the nature of the damages or other monetary relief sought, and present a detailed calculation of the amount of such damages or other monetary relief.

**Objections and Response:**

Hasbro objects to this interrogatory as seeking information protected by the attorney work product privilege. Subject to and without waiving the foregoing and the General Objections, Hasbro states as follows:

Hasbro seeks a judgment dismissing Plaintiff's Complaint with prejudice; awarding Hasbro its costs of defending this action, including reasonable attorneys' fees, costs and disbursements. In the unlikely event that the Court were to find that there is likely to be confusion between the licensed use of Hasbro's famous mark in connection with a section of a retail store in New York, New York, and plaintiff's use of a similar mark in connection with the sale of candy, then Hasbro seeks permanent injunctive relief enjoining Plaintiff from advertising, promoting, or selling any goods or services using his alleged CANDYLAND mark or any other mark that is confusingly similar to Hasbro's CANDY LAND mark; awarding Hasbro permanent injunctive relief directing Plaintiff to destroy all packages, wrappers, bottles, containers, catalogues, advertisements and other promotional materials which bear the CANDYLAND name; awarding Hasbro its damages in an amount to be determined by the trier of fact; and granting such other, further, and different relief as this Court may deem just and necessary.

Hasbro cannot calculate the amount of the damages or other monetary relief that it seeks until it has reviewed the evidence of confusion, if any, and the profits that Plaintiff has derived from this confusion, neither of which have been produced in this litigation at this time.

**Interrogatory No. 15:**

Identify every person having knowledge of the nature or calculation of any of the Defendants' damages or other monetary relief sought, and for each such person, describe in detail such person's knowledge.

16

## Objections and Response:

Hasbro objects to this interrogatory as seeking information protected by the attorney work-product privilege. Subject to and without waiving the foregoing and the General Objections, Hasbro identifies the following employees as having the most knowledge of Hasbro's costs in defending this action and, if Plaintiff produces evidence of consumer confusion and his profits derived from said confusion, will likely have the most knowledge regarding the damages and other monetary relief sought from Plaintiff:

Mark Blecher, Senior Vice President, Hasbro Games Group (2004-present). Mr. Blecher is responsible for and knowledgeable concerning all aspects of marketing of Hasbro games, including the CANDY LAND brand product.

Bryony Bouyer, Senior Vice President, Hasbro Properties Group (2004-present). Ms. Bouyer is responsible for and knowledgeable concerning all aspects of the licensing of Hasbro properties, including the CANDY LAND brand products. Ms. Bouyer has been an employee of Hasbro since 2000.

Tom Klusaritz, Vice President, Hasbro Properties Group (1999-present). Mr. Klusaritz is responsible for and knowledgeable concerning all aspects of licensing of Hasbro properties, including the CANDY LAND brand products. Mr. Klusaritz reports to Ms. Bouyer.

Jane Ritson-Parsons, President, Hasbro Properties Group (2001-present). Ms. Ritson-Parsons is responsible for and knowledgeable concerning all aspects of marketing and licensing worldwide of the Hasbro properties, including the CANDY LAND brand products. Ms. Ritson-Parsons has been an employee of Hasbro since 1992.

Mark Stark, Vice President, Marketing, Hasbro Games (1999-present). Mr. Stark is responsible for and knowledgeable concerning the marketing of the Milton Bradley brand portfolio, which includes preschool games, children's games and puzzles. As such, he oversees

17

the CANDY LAND brand, which is part of the preschool games category, including any marketing, advertising, promotion and packaging activities, as well as the strategy and direction of any new product development within the CANDY LAND brand.  Mr. Stark has had responsibilities for CANDY LAND as an employee of Hasbro since 1994.

Paul Vanasse, Director, Intellectual Properties, Office of the General Counsel (1985 to present).  Mr. Vanasse works under the direct supervision of the lawyers in Hasbro's Legal Department and has day-to-day responsibility for maintaining Hasbro's intellectual properties, including the CANDY LAND trademark, and enforcing those rights.

**Interrogatory No. 16:**

Identify every person having knowledge of any charge of infringement or unfair competition involving the term "CANDY LAND" or any other similar term, and for each such person, describe in detail such person's knowledge.

**Objections and Response:**

Hasbro objects to this interrogatory as overbroad and as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Hasbro further objects as unduly burdensome the identification of "every" person with knowledge of any charge of infringement or unfair competition involving the term "CANDY LAND", a mark that was first used by Hasbro more than 50 years ago and that numerous parties, including Plaintiff, have sought to exploit for their own advantage.

Subject to and without waiving the foregoing and General Objections, Hasbro identifies the following employee as most knowledgeable:

Paul Vanasse, Director, Intellectual Properties, Office of the General Counsel (1985 to present).  Mr. Vanasse works under the direct supervision of the lawyers in Hasbro's Legal Department and has day-to-day responsibility for maintaining Hasbro's intellectual properties, including the CANDY LAND trademark, and enforcing those rights.

## VERIFICATION

I, Paul N. Vanasse, declare and state under penalty of perjury as follows:

1.     I am Director of Intellectual Properties for Opposer Hasbro, Inc.

2.     I have read the foregoing Hasbro's Response To Plaintiff's First Set of

Interrogatories.

3.     The answers therein are true and correct to the best of my knowledge and

information, based, in part, on documents kept in the ordinary course of business and on

information obtained from other employees of Hasbro, Inc.

Executed in Pawtucket, Rhode Island on November 18, 2005.

_____
PAUL N. VANASSE

Sworn to before me this
_13th_ day of _November_, 2005

_____
Notary Public

My Commission Expires on
January 14, 2007

Vanasse VERIFICATION for
Interrogatory Responses.DOC

1233475v1

Sean Wiggins, Intellectual Property Paralegal, Office of the General Counsel (2002 to present).  Mr. Wiggins works under the direct supervision of Paul Vanasse and the lawyers in Hasbro's Legal Department and has day-to-day responsibilities for maintaining Hasbro's intellectual properties, including the CANDY LAND trademark, and enforcing those rights.

Dated:  New York, New York
        November 22, 2005

PATTERSON BELKNAP WEBB & TYLER LLP

Kim J. Landsman
(Bar Roll No. 513,364)
Michael D. Sant'Ambrogio
(Bar Roll No. 513,363)
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  212-336-2980
Facsimile:  212-336-2985

*Attorneys for Defendant Hasbro, Inc.*

19

# EXHIBIT C

4 of 250 DOCUMENTS

**IN RE: THE SINGER COMPANY, N.V. et al., Debtors. THE SINGER COMPANY B.V. and SINGER DO BRASIL INDUSTRIA E COMERCIO LTDA., Plaintiffs, -against- GROZ-BECKERT KG and DYNO CORPORATION, Defendants. GROZ-BECKERT KG, Counterclaim and cross-claim plaintiff, -against- SINGER DO BRASIL INDUSTRIA E COMERCIO LTDA., Counterclaim defendant, and DYNO CORPORATION, Cross-claim defendant.**

**01 Civ. 0165(WHP) (Consolidated with 01 Civ. 6389.)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 8609*

**May 14, 2002, Decided
May 14, 2002, Filed**

**PRIOR HISTORY:** Singer Co. B. V. v. Groz Beckert KG (In re Singer Co. N.V.), *2000 Bankr. LEXIS 1782, 46 Collier Bankr. Cas. 2d (MB) 962 (Bankr. S.D.N.Y. 2000)*

**DISPOSITION:** [*1] Preliminary injunction staying Florida Action and enjoining Dyno and Groz from further litigating Florida Action affirmed. Denial of Groz's cross-motion to dismiss affirmed in part. Adversary complaint's trademark infringement claim dismissed. Grant of summary judgment for Singer Plaintiffs on first and second claims of adversary complaint reversed. Denial of Groz's motion for discovery pursuant to Federal Rule of Civil Procedure 56(f) affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Debtors, a company and its subsidiaries, filed for Chapter 11 bankruptcy in New York. After the stays issued and the plan was confirmed, defendant patent owner filed a patent infringement case in Florida. Debtors filed an adversary proceeding in New York. The bankruptcy court took jurisdiction and issued its ruling, which the patent owner appealed.

**OVERVIEW:** The patent owner held patents for sewing machine needles pursuant to a transfer from one of debtor's affiliated companies. In the bankruptcy proceeding, debtors failed to list an implied license for the needles as an asset for reorganization purposes. A patent infringement action erupted over the alleged license on the eve of debtors' re-emergence from bankruptcy. Inter alia, the instant court held that the bankruptcy court properly retained jurisdiction over the subject matter

because continuation of the Florida action would compromise the reorganization. The bankruptcy court's decision to stay the Florida action and enjoin the patent owners from further litigation was largely based on a finding that resolution of the dispute over the implied license would significantly impact the debtor's revenues. That finding was not clearly erroneous. Thus, the injunction staying the Florida action and enjoining the patent owners from pursuing that litigation was affirmed. However, the declaration of one of debtor's executives was inadmissible. The evidence offered by the patent owners therefore defeated the debtor's summary judgment motion on the issue of the license.

**OUTCOME:** The court affirmed the injunction staying the Florida action, affirmed in part the denial of the patent owner's cross-motion to dismiss, dismissed the trademark infringement claim, reversed the grant of summary judgment to the debtors on the first and second claims of their complaint, reinstated the patent owner's counter and cross-claims for patent infringement, and confirmed the denial of the patent owner's request for discovery.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Clear Error Review*
*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*

[HN1] With any bankruptcy appeal, the federal district court must accept the bankruptcy court's findings of fact unless clearly erroneous, while conclusions of law are reviewed de novo.

***Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > General Overview***
[HN2] The Bankruptcy Code provides that an automatic stay dissolves once a debtor has completed the reorganization process. *11 U.S.C.S. § 362*(c).

***Bankruptcy Law > Case Administration > Administrative Powers > Stays > General Overview***
***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Core Proceedings***
***Civil Procedure > Jurisdiction > General Overview***
[HN3] Allegations concerning stay violations are claims arising under the Bankruptcy Code and give rise to core proceedings.

***Bankruptcy Law > Case Administration > Administrative Powers > Stays > General Overview***
***Civil Procedure > Judgments > Entry of Judgments > Stays of Proceedings > Automatic Stays***
[HN4] It is totally improper to extend an automatic stay after the effective date has passed.

***Bankruptcy Law > Case Administration > Court Powers***
[HN5] A bankruptcy court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of Title *11 U.S.C.S. § 105*. This includes the ability to restrain actions pending elsewhere.

***Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Implementation***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
[HN6] A bankruptcy court must first establish that it has subject matter jurisdiction before issuing an injunction post-confirmation. After confirmation of a Chapter 11 reorganization plan, a bankruptcy court retains jurisdiction only to the extent provided in the plan of reorganization.

***Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Implementation***

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
[HN7] A reorganization plan cannot grant unlimited jurisdiction; it may only exercise subject matter jurisdiction to the extent conferred by *28 U.S.C.S. § 1334*(b).

***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts***
***Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Implementation***
[HN8] See *28 U.S.C.S. § 1334*(b).

***Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Implementation***
[HN9] In the United States Court of Appeals for the Second Circuit, the test to determine whether "related to" jurisdiction exists is whether the action's outcome might have any conceivable effect on the bankrupt estate or any significant connection with it.

***Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Effects of Confirmation***
***Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Implementation***
[HN10] A bankruptcy estate generally ceases to exist upon plan confirmation. Except as otherwise noted in the plan or order confirming the plan, the confirmation of a plan vests all of the property of the estate with the debtor. *11 U.S.C.S. § 1141*(b).

***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts***
***Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Implementation***
[HN11] Even if a dispute concerns property that is no longer part of a dissolved bankruptcy estate, there is no dispute that a bankruptcy court's jurisdiction, which is derivative of the jurisdictional grant in *28 U.S.C.S. § 1334* (a), (b), continues post-confirmation to protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation. Post-confirmation jurisdiction is particularly appropriate where the plan and confirmation order preserve the bankruptcy court's jurisdiction. Moreover, courts have broadly interpreted whether a particular matter might have a conceivable effect or a significant connection with the bankrupt estate in post confirmation proceedings. For example, post-confirmation jurisdiction exists over a dispute between a debtor-tenant's lessor and a guarantor on the grounds that the dispute's outcome might alter estate distribution.

***Bankruptcy Law > Claims > Types > Definitions***
***Trademark Law > Special Marks > Trade Names > General Overview***

[HN12] The Bankruptcy Act was intended to protect and rehabilitate debtors. It should not be used as a shield behind which a debtor may sustain misappropriation of a trade name to which he is not rightfully entitled.

***Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Implementation***

[HN13] A reorganized debtor enters the business world without special protections, and may not come running to the bankruptcy court every time something unpleasant happens, but must protect its interests in the way provided by the applicable non-bankruptcy law. Since the purpose of reorganization clearly is to rehabilitate the business and start it off on a new and to-be-hoped-for more successful career, it should be the objective of courts to cast off as quickly as possible all leading strings which may limit and hamper the reorganized debtor's activities and throw doubt upon its responsibility.

***Bankruptcy Law > Practice & Proceedings > Jurisdiction > Federal District Courts***
***Patent Law > Remedies > Collateral Assessments > Increased Damages***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview***

[HN14] Although courts have rarely addressed the jurisdiction of bankruptcy courts in intellectual property matters, a patent action could affect the property available for distribution to creditors (as well as other rights and obligations of the debtor) and therefore arguably is a matter within the Bankruptcy Court's *28 U.S.C.S. § 1334*(b) "related to" jurisdiction.

***Bankruptcy Law > Reorganizations > Plans > Postconfirmation > Implementation***
***Trademark Law > Conveyances > General Overview***
***Trademark Law > Infringement Actions > General Overview***

[HN15] The bankruptcy court retains post-confirmation jurisdiction of a matter to the extent allowed under *28 U.S.C.S. 1334*(b).

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview***

***Civil Procedure > Summary Judgment > Opposition > General Overview***
***Civil Procedure > Summary Judgment > Standards > Genuine Disputes***

[HN16] Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Materiality is determined by the governing substantive law. An issue of fact is "material" if it might affect the outcome of the suit under the governing law while an issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. In determining whether the movant has met this burden, the court must resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants***
***Civil Procedure > Summary Judgment > Evidence***
***Civil Procedure > Summary Judgment > Standards > Genuine Disputes***

[HN17] If the moving party meets its initial burden, the non-moving party must then come forward with specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c). The non-moving party must do more than simply show there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation. Where it is apparent that no rational finder of fact could find in favor of the non-moving party because the evidence to support its case is so slight, summary judgment should be granted. The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient. Instead, the non-movant must offer concrete evidence from which a reasonable juror could return a verdict in his favor.

***Civil Procedure > Summary Judgment > Opposition > General Overview***
***Civil Procedure > Summary Judgment > Supporting Materials > Affidavits***

[HN18] Fed. R. Civ. P. 56(e) provides in part that supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants***

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Opposition >*
*General Overview*

[HN19] The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. When a moving party fails to present evidence to demonstrate that no genuine dispute exists, summary judgment must be denied, even if no opposing evidence is presented. Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment.

*Governments > Legislation > Statutory Remedies &*
*Rights*
*Patent Law > Infringement Actions > Exclusive Rights*
*> Manufacture, Sale & Use*
*Patent Law > Ownership > Conveyances > Licenses*

[HN20] An implied license signifies a patent owner's waiver of the statutory right to exclude others from making, using, or selling the patented invention. An implied license can arise by acquiescence, conduct, equitable estoppel or legal estoppel. The burden of proving the establishment of an implied license falls to the party defending against infringement. An implied license is a question of law.

*Patent Law > Ownership > Conveyances > Licenses*

[HN21] The sale of a machine will give rise to an implied license in a patent if the equipment involved has no other noninfringing uses, and the circumstances plainly indicate that the grant of a license should be inferred. The circumstances analyzed are those existing at the time of the sale. The noninfringing use must be reasonable but need not be the most profitable alternative.

*International Trade Law > Imports & Exports > General Overview*
*Patent Law > Ownership > Conveyances > General*
*Overview*

[HN22] An implied license immunizes its holder from litigation for conduct that is otherwise infringing and unlawful.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*

*Patent Law > Ownership > Conveyances > General*
*Overview*

[HN23] In a patent case, to establish the existence of an implied license by equitable estoppel, the alleged infringer must demonstrate: (1) that the patent owner, through statements or conduct, gave an affirmative grant of consent or permission to make, use, or sell to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patent owner is allowed to proceed with its claim. An implied license will arise under equitable estoppel only if the alleged infringer had knowledge of the patent and its owner. Moreover, the alleged infringer must have reasonably inferred that the patent owner acquiesced to the allegedly infringing activity for some time. The allegedly infringing parties' reliance must be objectively reasonable. An implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party.

*Patent Law > Ownership > Conveyances > General*
*Overview*

[HN24] In a patent case, an implied license pursuant to equitable estoppel is distinguishable from one that arises under legal estoppel, which encompasses situations where the patent owner licensed or assigned a right, received consideration, and then sought to derogate from the right granted.

*Patent Law > Infringement Actions > Defenses > Implied License*
*Patent Law > Ownership > Conveyances > Licenses*

[HN25] There is no decision importing the "arm's length" element into the implied patent license defense. Although that element may exist in some of the decisions where an implied license was found, it is not a prerequisite to those results.

*Contracts Law > Defenses > Equitable Estoppel > General Overview*
*Patent Law > Infringement Actions > Defenses > Implied License*
*Patent Law > Ownership > Conveyances > General*
*Overview*

[HN26] Estoppel as a contract defense is distinct from equitable estoppel as a basis for an implied license in a patent.

*Patent Law > Ownership > Conveyances > Licenses*

*Patent Law > Remedies > Declaratory Relief*
[HN27] The party asserting the existence of an implied license in a patent has the burden of demonstrating its existence.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
*Patent Law > Remedies > General Overview*
[HN28] A finding of laches bars relief on a patent owner's claim only with respect to damages accruing before the suit was filed.

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > Abuse of Discretion*
[HN29] Bankruptcy court discovery orders are reviewed under an abuse of discretion standard.

**COUNSEL:** For Groz-Beckert KG: Jeffrey S. Trachtman, Esq., Kramer Levin Naftalis & Frankel LLP, New York, NY.

For The Singer Co. B.V., Singer Brasil Industria e Comercio Ltda.: George A. Zimmerman, Esq., Shmuel Vasser, Esq., Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY.

For Dyno Corporation: Barry G. Magidoff, Esq., Greenberg Traurig LLP, New York, NY.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEYWilliam H. Pauley

**OPINION:**

### MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

These consolidated bankruptcy appeals arise from an adversary proceeding filed by The Singer Company and Singer do Brasil Industria e Comercio Limitada ("Singer Brasil") (collectively "the Singer Plaintiffs") against Groz-Beckert KG ("Groz") [*2] in the Southern District of New York. Groz appeals from an order staying its patent infringement action in the Southern District of Florida (the "Florida Action"), and denying its cross-motion to dismiss the adversary proceeding. (See Order dated Nov. 8, 2001.) In a separate appeal now consolidated with this action, Groz appeals from the bankruptcy court's order granting the Singer Plaintiff's motion for summary judgment and denying Groz's request for discovery under *Federal Rule of Civil Procedure 56(f)*.

For the reasons set forth below, this Court affirms the injunction staying the Florida Action, affirms in part the denial of Groz's cross-motion to dismiss, dismisses the trademark infringement claim, reverses the grant of summary judgment to the Singer Plaintiffs on the first and second claims of their complaint, reinstates Groz's counter and cross-claims for patent infringement, and confirms the denial of Groz's request for discovery under *Federal Rule of Civil Procedure 56(f)*.

BACKGROUND

This appeal arises at the intersection of bankruptcy and intellectual property law. The underlying adversary proceeding involves the unusual circumstance where a debtor overlooks the [*3] intellectual property necessary to its business operations and fails to list it as an asset for purposes of reorganization. Here, a dispute erupted concerning the ownership of that forgotten intellectual property on the eve of the debtors' re-emergence from bankruptcy. Thus, this appeal stems from a dispute over the reach of the bankruptcy court's subject matter jurisdiction just as the debtor resumes post-reorganization commercial activity.

This decision presumes familiarity with this Court's memorandum and order withdrawing the reference of adversary proceeding number 00-2685 from the bankruptcy court. See *The Singer Co. B.V. v. Groz-Beckert KG (In re The Singer Company, N.V. et al.), 2000 U.S. Dist. LEXIS 2629, No. 01 Civ. 0165 (WHP), 2002 WL 243779* (S.D.N.Y. Feb. 15, 2002) ("Singer I"). The relevant facts are set forth below.

On September 12 and 13, 1999, The Singer Company N.V. and certain of its affiliates, including Singer Brasil, ("the Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On August 24, 2000, the joint plan of reorganization was confirmed. (See First Am. Joint Plan of Reorg. ("the Plan").) The Plan provided that the automatic [*4] stay pursuant to *11 U.S.C. § 362* would remain in force until the Plan's effective date on September 14, 2000 ("the Effective Date"). (See Trachtman Ex. G: Order Confirming the First Am. Joint Plan.) The Singer Plaintiffs are reorganized debtors.

Singer Brasil manufactured sewing needles covered by U.S. Patent No. *4,519,330*, titled "Sewing Needle with Two Portion Shank" (the " *'330* patent"). The parties dispute whether Singer Brasil continues to manufacture sewing needles covered by that patent. See Singer I, at *1 n.2. Groz's predecessor acquired the *'330* patent in November 1999 from Singer Spezialnadelfabric GmbH ("Singer Germany") in a German insolvency proceeding. The central issue in the adversary proceeding is whether Singer Brasil had an implied license in the *'330* patent from Singer Germany.

Dyno Corporation ("Dyno") has been Singer Brasil's exclusive United States importer of needles covered by the *'330* patent since 1994. (See Compl. Ex. B: Trademark License Agreement ("Dyno License").) Notwithstanding Singer Germany's sale of the *'330* patent, Dyno continued to import and distribute the patented sewing needles (the "Household Needles"). [*5]

On August 10, 2000, Groz filed the Florida Action against Dyno alleging infringement of the *'330* patent and seeking a permanent injunction and an accounting and assessment of damages.

On September 11, 2000, the Singer Plaintiffs filed an adversary proceeding against Groz and Dyno in the Bankruptcy Court for the Southern District of New York. The Singer Plaintiffs sought a trident of declarations that (1) Singer Brasil owns an implied license in the *'330* patent; (2) the implied license is property of Singer Brasil's estate under *§ 541(a) of the Bankruptcy Code*; and (3) the Florida action is void because it violates the automatic stay pursuant to *§ 362 of the Bankruptcy Code*. Their complaint further sought a finding of contempt against Groz, a permanent injunction prohibiting Groz and Dyno from further litigating the Florida Action, a stay of the Florida Action under *§ 105(a) of the Bankruptcy Code*, and injunctive relief and damages for alleged trademark infringement. (Complaint at 2, 12-13.) That same day, the Singer Plaintiffs moved for a stay of the Florida Action pursuant to *11 U.S.C. §§ 105*(a) and 362(a)(1) and (3). (Debtors' Mot. for Stay dated Sept. 11, 2000.) [*6] Groz responded with a cross-motion to dismiss the complaint on October 20, 2000.

The bankruptcy court issued its opinion on November 3, and a corresponding order on November 8, 2000. Bankruptcy Judge Lifland first held that Singer Brasil was the real party in interest in the Florida Action, and thus, the stay provisions applied to that action. Judge Lifland next found that the Florida Action violated § 362(a)(1) of the automatic stay provisions of the Bankruptcy Code. (See Op. at 11.) The bankruptcy court further held that Singer Brasil had an implied license in the *'330* patent, that Singer Brasil's implied license constituted an asset of the bankruptcy estate, and that the Florida Action therefore violated the automatic stay provision *11 U.S.C. § 362*(a)(3) as it sought possession or control over property of the estate. Based on the foregoing, the bankruptcy court deemed the Florida Action void ab initio. The bankruptcy court also stayed the Florida Action pending a final determination in the adversary proceeding and enjoined Groz and Dyno from "taking any action whatsoever under, in connection with or with respect of" the Florida Action. (Order at [*7] 3.)

Finally, Judge Lifland denied Groz's cross-motion to dismiss on the grounds that (1) the Singer Plaintiffs presented the requisite prima facie showing of jurisdiction; (2) the Plan authorized the bankruptcy court to retain jurisdiction of the adversary proceeding; and (3) the Singer Plaintiffs adequately pleaded claims for relief to overcome a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. (Op. at 17-18.)

Groz appeals that decision on the grounds that the Florida Action did not violate the automatic stay. Groz also contends that after the Plan's Effective Date, the bankruptcy court lacked subject matter jurisdiction to enjoin further litigation in the Florida Action. In addition, Groz asserts that the bankruptcy court erred by not dismissing the complaint, on the grounds that the Singer Plaintiffs were forum shopping and it lacked jurisdiction over the patent and trademark claims after the Effective Date.

The Singer Plaintiffs counter that the Plan's Effective Date does not curtail the bankruptcy court's jurisdiction over this adversary proceeding, and otherwise assert the correctness of the bankruptcy court's stay, injunction and denial of Groz's cross-motion [*8] to dismiss.

## DISCUSSION

### I. Appeal From the Decision Granting a Stay and Injunction and Denying Groz's Motion to Dismiss

This Court has jurisdiction over Groz's appeal pursuant to *28 U.S.C. § 158*(a)(1). [HN1] As with any bankruptcy appeal, this Court must accept the bankruptcy court's findings of fact unless clearly erroneous, while conclusions of law are reviewed de novo. See *Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.), 896 F.2d 1384, 138 (2d Cir. 1990).*

A. The Stay Pursuant to *11 U.S.C. §§ 362*(a)(1) and (3)

[HN2] The Bankruptcy Code provides that an automatic stay dissolves once a debtor has completed the reorganization process. *11 U.S.C. § 362*(c). Thus, the automatic stay of the Florida Action lifted on September 14, 2000, the Effective Date of the Plan. The bankruptcy court held that "[HN3] allegations concerning stay violations are claims arising under the Bankruptcy Code and give rise to core proceedings . . . . Under this broad grant of subject matter jurisdiction, there can be no question that this Court now has jurisdiction [*9] to issue an injunction to stay Groz's actions against Dyno." (Op. at 4.) Courts have held, however, that "[HN4] it would be totally improper" to extend an automatic stay after the effective date has passed. See In the *Matter of Pan Am. School of Travel Inc., 47 B.R. 242, 244 (S.D.N.Y. 1985).* Here, it is not clear whether Judge Lifland stayed the Florida Action based on its violation of the automatic

stay or on other jurisdictional grounds. (See Op. at 11; Order at 2.) However, in issuing the preliminary injunction Judge Lifland also relied on a separate basis for subject matter jurisdiction: his finding that Singer Brasil's reorganization prospects would be compromised by the continuation of the Florida Action. (Op. at 12.) Because that basis provided subject matter jurisdiction, the bankruptcy court properly retained jurisdiction over the adversary proceeding after the Effective Date.

B. Review of the Preliminary Injunction

The bankruptcy court issued a preliminary injunction staying the Florida Action and prohibiting Groz and Dyno from litigating the Florida Action until a final determination of the adversary proceeding. (Order at 2-3.) That injunction issued [*10] under *11 U.S.C. § 105*(a) and *Federal Bankruptcy Rule of Procedure 7065*. (See Op. at 11-15.) Judge Lifland issued the injunction on November 8, 2000, which was after the September 14, 2000 Effective Date of the Plan. Groz appeals, asserting that the bankruptcy court lacked subject matter jurisdiction to issue the injunction.

[HN5] A bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *11 U.S.C. § 105*. This includes the ability to restrain actions pending elsewhere. *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 63 (2d Cir. 1986)*.

[HN6] A bankruptcy court must first establish that it has subject matter jurisdiction before issuing an injunction post-confirmation. See 8 Lawrence P. King, Collier on Bankruptcy P 1142.04[1] (15th ed. 2001) ("When a bankruptcy court is asked to consider a plan-related matter after confirmation, the court must, as a threshold matter, determine whether it has jurisdiction under *28 U.S.C. § 1334*."); see also *Manville Corp., 801 F.2d at 63* [*11] ("Section 105(a) does not, however, broaden the bankruptcy court's jurisdiction, which must be established separately under *28 U.S.C. § 157* . . . ."). After confirmation of a chapter 11 reorganization plan, a bankruptcy court retains jurisdiction "only to the extent provided in the plan of reorganization." *Hosp. and Univ. Prop. Damage Claimants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 7 F.3d 32, 34 (2d Cir. 1993)*.

The Plan retains broad jurisdictional powers for the bankruptcy court. It states in pertinent part:

> The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan, including, among other things, the following matters: . . . (b) to

adjudicate any and all adversary proceedings, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan . . . and all controversies and issues arising from or relating to any of the foregoing . . . (f) to issue orders in aid of execution, implementation or consummation of the Plan . . . (o) to hear any other matter not inconsistent with the Bankruptcy Code [*12] . . . .

(Plan at 76-78.) [HN7] However, a reorganization plan cannot grant unlimited jurisdiction; it "may only exercise subject matter jurisdiction to the extent conferred by *28 U.S.C. § 1334*(b)." *Portfolio Lease Funding Corp., No. 1 v. Seagate Tech., Inc. (In re Atlantic Computer Systems, Inc.), 163 B.R. 704, 707 (S.D.N.Y. 1994)*. [HN8] Section 1334(b) states in relevant part:

> Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

(emphasis added).

[HN9] In the Second Circuit, the test to determine whether "related to" jurisdiction exists is whether the action's outcome might have any conceivable effect on the bankrupt estate or any significant connection with it. *Publicker Indus., Inc. v. United States (In re Cuyahoga Equip. Corp.), 980 F.2d 110, 114 (2d Cir. 1992)*(citations omitted); *LTV Corp. v. Back (In re Chateaugay Corp.), 201 B.R. 48, 63 (S.D.N.Y. 1996)*. [*13]

[HN10] A bankruptcy estate generally ceases to exist upon plan confirmation. "Except as otherwise noted in the plan or order confirming the plan, the confirmation of a plan vests all of the property of the estate with the debtor." *11 U.S.C. § 1141*(b). One bankruptcy court held that

> confirmation and substantial consummation of the Debtor's Joint Plan means that this Debtor's estate no longer exists . . . . This adversary proceeding, while it might affect the post-confirmation, liquidated [debtor] or its parent corporation (holder

of the residue interest in the remaining undistributed cash held by the Trusts), cannot affect the Debtor's non-existent estate.

Portfolio Lease Funding Corp., No. 1., *163 B.R. at 706.*

Yet [HN11] even if a dispute concerns property that is no longer part of a dissolved bankruptcy estate, "there is no dispute that a bankruptcy court's jurisdiction, which is derivative of the jurisdictional grant in §§ 1334 (a) and (b), continues post-confirmation to protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation." *LTV, 201 B.R. at 64* [*14] (internal punctuation and citations omitted); see also *Falise v. Am. Tobacco Co., 241 B.R. 48, 61-62 (E.D.N.Y. 1999)* (a post-confirmation bankruptcy court retains jurisdiction over matters concerning the implementation or execution of a confirmed plan). Postconfirmation jurisdiction is particularly appropriate where the plan and confirmation order preserve the bankruptcy court's jurisdiction. *LTV, 201 B.R. at 64.* Moreover, "courts have broadly interpreted whether a particular matter might have a 'conceivable effect' or a 'significant connection' with the bankrupt estate in post confirmation proceedings". *LTV, 201 B.R. at 63-64* (collecting cases). For example, post-confirmation jurisdiction exists over a dispute between a debtor-tenant's lessor and a guarantor on the grounds that the dispute's outcome might alter estate distribution. *Hunnicutt Co., Inc. v. TJX Cos., Inc. (In re Ames Dep't Stores, Inc.), 190 B.R. 157, 160-62 (S.D.N.Y. 1995).*

C. Jurisdiction Over Intellectual Property Disputes

Ideally, during reorganization a debtor will identify the intellectual property essential to its functions. But when ownership [*15] of that intellectual property is either presumed or undisputed, debtors might not identify that intellectual property as an asset. Thus, bankruptcy courts are confronted with a difficult decision when a third party contests a reorganized debtor's intellectual property ownership: (1) whether to consider the previously unasserted intellectual property as an asset of the estate, and relatedly, whether litigation concerning that asset could have any conceivable effect on or connection to that estate; or alternatively, (2) to conceptualize the dispute as a post confirmation litigation similar to commercial disputes, such as tort actions that all business entities confront.

Courts have struggled with this distinction, but have not allowed allegedly infringing conduct to continue unabated in the name of protecting the implementation or reorganization of a bankruptcy plan. See *Bambu Sales, Inc. v. Sultana Crackers, Inc., 683 F. Supp. 899, 917*

*(E.D.N.Y. 1988)* ("[HN12] The Bankruptcy Act was intended to protect and rehabilitate debtors. It should not be used as a shield behind which a debtor may sustain misappropriation of a trade name to which he is not rightfully entitled."); [*16] accord Larami Ltd. v. Yes! *Entertainment Corp., 244 B.R. 56, 60 (D.N.J. 2000).* [HN13] A reorganized debtor enters the business world without special protections, and "may not come running to the bankruptcy court every time something unpleasant happens," but "must protect its interests in the way provided by the applicable non-bankruptcy law." *Pettibone Corp. v. Easley, 935 F.2d 120, 122 (7th Cir. 1991);* see also *North Am. Car Corp. v. Peerless Weighing & Vending Mach. Corp., 143 F.2d 938, 940 (2d Cir. 1944)* ("Since the purpose of reorganization clearly is to rehabilitate the business and start it off on a new and to-be-hoped-for more successful career, it should be the objective of courts to cast off as quickly as possible all leading strings which may limit and hamper [the reorganized debtor's] activities and throw doubt upon its responsibility.").

At the same time, however, intellectual property often forms the cornerstone for a business' operations. A company may rely on a patent, trademark, copyright, trade secret or license to continue to operate as it had before entering bankruptcy proceedings. Bankruptcy law commentators have observed [*17] that

> [HN14] although courts have rarely addressed the jurisdiction of bankruptcy courts in intellectual property matters, a patent action could affect the property available for distribution to creditors (as well as other rights and obligations of the debtor) and therefore arguably is a matter within the Bankruptcy Court's [§ 1334(b)] 'related to' jurisdiction . . . . The debtor's activities that allegedly violated intellectual property rights can often represent a substantial portion of the debtor's business. Additionally, damage claims arising out of the debtor's alleged infringement can often times be substantial, thereby affecting the distributions to all of the debtor's creditors.

Richard M. Cieri et al., Protecting Technology and Intellectual Property Rights When a Debtor Infringes on Those Rights, *8 Am. Bankr. Inst. L. Rev. 349, 360 (2000).*

In Larami, the court opted to balance intellectual property rights against bankruptcy protection interests.

Faced with a patent dispute filed against a post-petition debtor prior to confirmation, the court held that the automatic stay provision *11 U.S.C. § 362*(a)(3) precluding litigation [*18] seeking to possess or control property of a bankruptcy estate was inapplicable as the plaintiff merely sought to enjoin infringing conduct, not to assert ownership over the allegedly infringing debtor's inventory or equipment. *Larami, 244 B.R. at 56.* Yet the district court transferred that action to the bankruptcy court, noting that "clearly, the resolution of this patent infringement suit will impact the administration of the bankruptcy estate." *Larami, 244 B.R. at 60 n.6.*

The instant situation is further complicated by Singer Brasil's assertion of an implied license in the *'330* patent as a defense to patent infringement. *Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687 (Fed. Cir. 1986).* Unless and until it was sued, it is unlikely that Singer Brasil would have contemplated listing a legal defense - an implied license - among its assets.

Judge Lifland's decision to stay the Florida Action and enjoin Groz and Dyno from further litigating that action is largley based on his finding of fact that resolution of the dispute concerning Singer Brasil's claimed implied license in the *'330* patent would significantly impact [*19] Singer Brasil's revenues. (Op. at 12-13.) Those findings of fact are not clearly erroneous. The bankruptcy court reached that conclusion with detailed knowledge of the Plan's structure and determined that the adversary proceeding was "related to" its administration of the estate. Thus, it properly found that it had subject matter jurisdiction over the adversary proceeding. Accordingly, the injunction staying the Florida Action and enjoining Groz and Dyno from pursuing that litigation is affirmed.

D. Review of the Substantive Bases for the Injunction

The Bankruptcy Court issued the injunction pursuant to *Federal Rule of Civil Procedure 65*, as applied to adversary proceedings under *Federal Rule of Bankruptcy Proceeding 7065* and under *11 U.S.C. § 105*(a). (Op. at 11-15.) Groz disputes the bankruptcy court's fact findings that the Florida Action would impact the bankruptcy reorganization, and instead characterizes the potential harm to Singer Brasil's business as the risk attendant to any business operation. (Groz. Br. at 24-29.) The Singer Plaintiffs counter that Groz failed to dispute that Singer Brasil would suffer irreparable harm absent an injunction as [*20] sale of the "' *'330* Patent needles constitute 8.5% of Singer Brasil's aggregate sales - a substantial part of its business and that the Plan was confirmed under the presumption that Singer Brasil would continue to operate as it had in the past, i.e. manufacture the needles.'" (Pls.' Opp. at 45 (quoting Op. at 12))

Groz objects to the bankruptcy court's finding that the Florida Action would have a deleterious effect on Singer Brasil's ability to operate as contemplated under the Plan. However, the bankruptcy court was not clearly erroneous in its finding that the outcome of the Florida Action could impact implementation of the Plan. Accordingly, Groz's appeal to vacate the injunction on the grounds of insufficient impact on the bankruptcy estate is denied.

E. Review of denial of Groz's cross-motion to dismiss

Groz asserts that the bankruptcy court should have dismissed the adversary complaint for lack of subject matter jurisdiction. (Groz Br. at 30.) For the reasons stated in sections C and D, the bankruptcy court's denial of Groz's motion to dismiss for lack of subject matter jurisdiction is affirmed.

Groz further contends that the complaint's trademark infringement claim should [*21] have been dismissed because the Singer Plaintiffs failed to allege that it would have any impact on the bankruptcy proceeding to justify resolution in the adversary proceeding. (Groz Br. at 30-31; Reply at 23.) The Singer Plaintiffs' response only addressed Groz's request for more detailed pleadings pursuant to *Federal Rule of Civil Procedure 12(e)*. (See Pls.' Opp. at 47.)

Bankruptcy Judge Lifland disagreed with Groz's argument, noting that the Plan's broad grant of jurisdiction included the trademark dispute. The Opinion states "The [Plan] provides that this Court shall retain jurisdiction 'to hear and determine all matters involving claims or Causes of Action involving any of the Debtors or their property.'" (See Op. at 17.) The bankruptcy court also asserted that Groz had conceded jurisdiction over the adversary proceeding. (Op. at 17.)

As stated above, [HN15] the bankruptcy court retains post-confirmation jurisdiction of a matter to the extent allowed under *28 U.S.C. 1334*(b). The Singer Plaintiffs have failed to allege any facts to demonstrate that Groz's alleged trademark infringement impedes their ability to operate or otherwise interferes with the execution [*22] of the Plan. This silence contrasts with their assertion that 8.5% of Singer Brasil's aggregate sales are attributable to the sale of needles covered by the *'330* patent. (Adv. Compl. P 20.) Thus, unlike their allegations concerning the *'330* patent, the Singer Plaintiffs have not presented facts to place the trademark claim outside the realm of ordinary post-confirmation commercial disputes. See In re *Matter of Pan Am. School of Travel Inc., 47 B.R. at 245* (holding that the trademark in-

fringement and unfair competition action was not "related to" the bankruptcy estate on the grounds it would not impact the handling and administration of the estate); *Bambu Sales, 683 F. Supp. at 917; Larami, 244 B.R. at 18; Pettibone, 935 F.2d at 122.* Accordingly, the adversary complaint's seventh claim alleging trademark infringement is dismissed.

Groz also contends that the trademark claims should be dismissed on the ground that the Singer Plaintiffs failed to establish personal jurisdiction for the purpose of that claim, and further alleges that its request pursuant to *Federal Rule of Civil Procedure 12(e)* for more detailed pleadings [*23] should have been granted. (Groz Br. at 31.) Because this Court dismisses the trademark claim, it need not address those arguments.

## II. Appeal from the Bankruptcy Court's Summary Judgment Decision

On January 3, 2001, the Singer Plaintiffs moved for summary judgment of claims one through six of their adversary complaint. Groz opposed the motion and cross-moved for partial summary judgment on February 14, 2001. The bankruptcy court granted the Singer Plaintiff's motion in part and denied Groz's motion, finding that Singer Brasil had an implied license in the '330 patent, and that the license was an asset of the Singer Plaintiff's bankruptcy estate under *Bankruptcy Code § 541(a)(1).* (Order dated May 21, 2001 ("Summ. J. Order") at 2.) Bankruptcy Judge Lifland also denied Groz's request for discovery under *Federal Rule of Civil Procedure 56(f)* as applied to bankruptcy court proceedings by *Federal Rule of Bankruptcy Procedure 7056.* Groz now appeals from the bankruptcy court's decision on several grounds.

Groz first contends that an implied license could not arise between Singer US or Singer Germany and Singer Brasil as they were related companies. (Groz Summ. J. App. Br. at 15-18.) [*24] Groz further contends that the bankruptcy court erred in finding an implied license, arguing that the Singer Plaintiffs failed to present sufficient facts to establish the requisite elements for an implied patent license. (Groz. Summ. J. App. Br. at 18-25.) Relatedly, Groz asserts that the bankruptcy court erroneously granted summary judgment based on disputed facts regarding the implied license. (Groz. Summ. J. App. Br. at 29-33.) Groz also disputes the bankruptcy court's invocation of the doctrines of laches and estoppel to defeat Groz's cross-motion for summary judgment of noninfringement. (Groz. Summ. J. App. Br. at 25-28.) Groz asserts the declaration of Robert S. Turnbull, an executive with both Singer Brasil and the Singer Company, N.V., was deficient under Rule 56(e) and thus the bankruptcy court erroneously relied on it. (Groz. Summ. J. App. Br. at 31-33.) Finally, Groz contends the denial of

its request for discovery under Rule 56(f) was in error. (Groz. Summ. J. App. Br. at 34-37.)

The Singer Plaintiffs counter that (1) the discovery Groz sought was neither relevant nor material, and Groz's dilatory conduct provides an additional basis for denial of discovery under Rule [*25] 56(f); (2) the corporate relationship between Singer US, Singer Germany and Singer Brasil does not preclude an implied license; (3) the shipment of a machine from Singer Germany to Singer Brasil establishes an implied license, as the machines had no noninfringing uses; (4) an implied license also exists pursuant to equitable estoppel; and (5) Groz's summary judgment cross-claim for noninfringement is barred by laches and the doctrine of res judicata as applied to the reorganization process. (Pls.' Summ. J. App. Br. at 12-30, 33-45.)

[HN16] Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. See *Fed. R. Civ. P. 56(c).* The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. See *Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir. 1997).* Materiality is determined by the governing substantive law. *Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).* An issue of fact is "material" if it might "affect the outcome of the suit under the governing law [while] [*26] an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Shade v. Housing Auth. of New Haven, 251 F.3d 307, 314 (2d Cir. 2001).* In determining whether the movant has met this burden, this Court must resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. *Flanigan v. General Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).*

[HN17] If the moving party meets its initial burden, the non-moving party must then come forward with "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(c);* accord *Carlton v. Mystic Transit., Inc., 202 F.3d 129, 133 (2d Cir. 2000).* The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986),* and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).* Where it is apparent that no rational finder of fact "could [*27] find in favor of the non-moving party because the evidence to support its case is so slight," summary judgment should be granted. *Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).* "The mere existence of a scintilla of evidence in support of the (nonmovant's) position will be

insufficient." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Instead, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Liberty Lobby, 477 U.S. at 252.*

The Singer Plaintiffs rely on the declaration of Robert S. Turnbull to support their Rule 56.1 Statement. Turnbull's declaration states "the facts described herein are to the best of my knowledge, information and belief." (Turnbull Decl. at 2.) Groz contends that Turnbull's declaration is inadmissible hearsay, as it is not based on Turnbull's personal knowledge. [HN18] Rule 56(e) provides in pertinent part that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that [*28] the affiant is competent to testify to the matters stated therein." The Turnbull declaration fails to meet that standard, as it does not delineate which statements are based on Turnbull's personal knowledge, nor does it show affirmatively that he is competent to testify to its contents. See *Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir. 1988)* ("Because there is no way to ascertain which portions of [the] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment.").

The Singer Plaintiffs assert that as an executive, Turnbull could testify to the actions of lower level employees without personal knowledge of their acts. (Pls.' Summ. J. App. Opp. at 12-13.) That argument, however, is unavailing because the Turnbull declaration does not describe the actions of "lower level employees" but instead sets forth the actions of Singer Germany, Singer Brasil, Singer U.S., and Groz as corporate actors. Moreover, the decision the Singer Plaintiffs cite is inapplicable, as it addresses a supervisor's affidavit in response to a request under the Freedom [*29] of Information Act, in which the supervisor averred that lower level employees had performed thorough record searches. See *Carney v. United States Dep't of Justice, 19 F.3d 807, 813-14 (2d Cir. 1994)* ("An affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e); there is no need for the agency to supply affidavits from each individual who participated in the actual search."). Thus, this Court will not consider Turnbull's declaration, as it is not admissible evidence. In turn, the Singer Plaintiffs' Rule 56.1 statement offers little support for their motion, as it is grounded on the Turnbull declaration.

When questioned about this lack of admissible evidence, counsel for the Singer Plaintiffs directed this Court to the transcript of the oral argument for the Singer Plaintiffs' preliminary injunction motion before Bank-

ruptcy Judge Lifland. (See Nov. 16, 2001 Tr. at 22-23.) Although it was not an evidentiary hearing, counsel for the Singer Plaintiffs made a proffer that summarized what they anticipated their evidence would show. (Oct. 31, 2000 Tr. at 20-21) ("On the affirmative part of our case, the proffer [*30] will be as follows . . . . I believe the testimony will also say . . . .") (emphasis added.) The bankruptcy court accepted that proffer, but did not require Mr. Turnbull, who apparently was present, to testify to the facts asserted in the proffer. (Oct. 31, 2000 Tr. at 21; Nov. 16, 2001 Tr. at 22.)

The Singer Plaintiffs' failure to submit admissible evidence subverts the purpose of summary judgment motions: "[HN19] The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Charles A. Wright et al., 10B Federal Practice and Procedure, § 2739 (3d ed. 2002) (quoting Advisory Comm. Notes to 1963 amendment to *Fed. R. Civ. P. 56(e)*). When a moving party fails to present evidence to demonstrate that no genuine dispute exists, summary judgment must be denied, even if no opposing evidence is presented. See *Adickes v. S.H. Kress & Co., 398 U.S. 144, 160, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)* (citing with approval the Advisory Comm. Notes to the 1963 amendment to *Fed. R. Civ. P. 56(e)*: "'where the evidentiary matter in support of the motion does not establish the absence [*31] of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.'"); accord *Heath v. John Morrell & Co., 768 F.2d 245, 249 (8th Cir. 1985)*. Here, regardless of whether this Court accepts the Singer Plaintiffs' proffer as properly admitted evidence, the evidence Groz offered nevertheless defeats the Singer Plaintiffs' motion for summary judgment on the issue of the implied license. See *Celotex Corp. v. Catrett, 477 U.S. 317, 331-332, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* ("If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment."). Accordingly, on de novo review, the Singer Plaintiffs' motion for summary judgment of an implied license is denied.

## A. The Implied License

The Singer Plaintiffs moved for summary judgment of the adversary complaint's first claim, seeking a declaratory judgment that Groz owns the *'330* patent subject to the Singer Plaintiffs' implied license. (Pls.' Summ. J. Opp. at 1; Adv. Compl. P 33.) In response, Groz cross-moved for summary judgment [*32] that the Singer Plaintiffs infringe the *'330* patent. (Groz Summ. J. Br. at 6.) An implied license is a defense to infringement. See *Carborundum Co. v. Molten Metal Equip. Innovations,*

*Inc., 72 F.3d 872, 878 (Fed. Cir. 1995).* The bankruptcy court found that the Singer Plaintiffs had an implied license on two bases: sale of the needle manufacturing machines and equitable estoppel.

### 1. Sale of the MABU 12 T-Press Machine

In 1983, Singer Germany sold to Singer Brasil a machine, the MABU 12 T-Press, outfitted to produce needles covered by the *'330* patent. (Turnbull Decl. Ex. B: Invoice.) The parties dispute whether the sale of that machine and the surrounding circumstances support a finding that Singer Brasil has an implied license in the *'330* patent.

[HN20] An implied license signifies a patent owner's waiver of the statutory right to exclude others from making, using, or selling the patented invention. *Wang Labs., Inc. v. Mitsubishi Electronics Am., Inc., 103 F.3d 1571, 1580 (Fed. Cir. 1997).* An implied license can arise by acquiescence, conduct, equitable estoppel or legal estoppel. *Wang Labs., 103 F.3d at 1580.* The burden of proving [*33] the establishment of an implied license falls to the party defending against infringement. *Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 924 (Fed. Cir. 1984).* An implied license is a question of law, *Met-Coil Sys., 803 F.2d at 687,* but summary judgment may be denied if the underlying facts and circumstances are in dispute. See, e.g., *Lifescan, Inc. v. Polymer Tech. Int'l Corp., 1995 U.S. Dist. LEXIS 4916, No. C94-672R, 1995 WL 271599,* at *15 (W.D. Wash. 1995).

[HN21] The sale of a machine will give rise to an implied license in a patent if the equipment involved has no other noninfringing uses, *Bandag, 750 F.2d at 925-26,* and the circumstances plainly indicate that the grant of a license should be inferred, *Met-Coil Sys., 803 F.2d at 686.* The circumstances analyzed are those existing at the time of the sale. *Met-Coil Sys., 803 F.2d at 687.* The noninfringing use must be reasonable but need not be the most profitable alternative. See *Glass Equip. Dev., Inc. v. Besten, Inc., 174 F.3d 1337, 1342-43 (Fed. Cir. 1999).*

The bankruptcy court erred in granting summary judgment finding an implied [*34] license based on sale of the MABU 12 T-Press ("the MABU") because there is evidence that the machine had noninfringing uses. As Groz contends, the use of the MABU for manufacture and sale of the Household Needles in Latin America did not infringe the *'330* Patent. See *Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 1033 (Fed. Cir. 1995)* (A United States Patent only protects against infringing activity in or importation into the United States.). The bankruptcy court discounted Groz's assertion, finding that noninfringing use outside of the United States is not a "reasonable" use. Relying on Glass Equipment Development and its treatment of "reasonable," the bankruptcy

court concluded that because that decision did not involve use of a domestic patent abroad, such a use could not be reasonable. (Summ. J. Op. at 18.)

In Bandag, the Federal Circuit referred to "unreasonable" use as "unwise from a business standpoint." *750 F.2d at 925.* Use of the MABU in Brasil for sale of needles in Latin America, then, was not unreasonable. In fact, as the record demonstrates it was profitable. (See Hammer Decl. P 8.)

[HN22] An implied license immunizes its [*35] holder from litigation for conduct that is otherwise infringing and unlawful. Thus, it would have been legally futile for Singer Germany to sue Singer Brasil for patent infringement as long as Singer Brasil did not import the Household Needles through Dyno into the United States. See *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 650, 59 L. Ed. 398, 35 S. Ct. 221 (1915); Ortho Pharm., 52 F.3d at 1031-32.* Thus, Singer Brasil's manufacture and sale of the Household Needles in Latin America was a noninfringing use of the MABU. See *Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 531, 32 L. Ed. 2d 273, 92 S. Ct. 1700 (1972); Rotec Indus., Inc. v. Mitsubishi Corp., 215 F.3d 1246, 1251 (Fed. Cir. 2000).* The Federal Circuit suggested that "it may even have been reasonable to refrain from operating the equipment until expiration of the [] patent . . . , rather than to risk infringement . . . ." *Bandag, Inc., 750 F.2d at 925.* Just as forbearance until patent expiration is a reasonable noninfringing use of a machine, use outside of the United States must similarly qualify as a reasonable [*36] noninfringing use. Notably, the Singer Plaintiffs failed to present evidence to support their conclusory assertion that the MABU had no noninfringing uses.

Moreover, Groz submitted further evidence of noninfringing uses. The Buchle declaration attaches a German brochure for MABU machines. (Buchle Decl. P 7: Ex. A.) Buchle avers that

> the brochure indicates that the MABU 12 T--PRESS may be used for many uses, such as punching, cutting out, or perforating holes in, for example, sheet metal. Thus, although the MABU 12 T--PRESS may be used to manufacture Household Needles if fitted with additional special equipment (e.g. a special mold for making Household Needles), it also has numerous uses other than to make needles that infringe the *'330* patent.

(Buchle Decl. P 7.) The Singer Plaintiffs counter that the machine fitted with the specialized mold had no other

purposes, (Pls.' Summ. J. App. Br. at 31), and the bankruptcy court focused on the fact that the MABU was shipped with a specialized mold (See Summ. J. Op. at 16-17). However, "reasonable noninfringing use" is defined broadly and can include reselling the equipment, using the equipment as replacement parts, modification [*37] of the equipment, or even refraining from use until the relevant patent expires. *Bandag, 750 F.3d at 924-25; Glass Equip. Dev., 174 F.3d at 1343 n.3.; Lifescan, 1995 U.S. Dist. LEXIS 4916, 1995 WL 271599,* at \*15. Thus, Groz's evidence as to the MABU's noninfringing uses renders the bankruptcy court's summary judgment finding an implied license based on sale of the MABU improper.

2. Implied License by Equitable Estoppel

The bankruptcy court also concluded that Singer Brasil held an implied license that arose pursuant to the doctrine of equitable estoppel. [HN23] To establish the existence of an implied license by equitable estoppel, the alleged infringer must demonstrate "(1) [that the patent owner,] through statements or conduct, gave an affirmative grant of consent or permission to make, use, or sell to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the [patent owner] is allowed to proceed with its claim." *Winbond Elecs. Corp. v. Int'l Trade Comm'n, 262 F.3d 1363, 1374 (Fed. Cir. 2001)* (citations omitted). An implied license [*38] will arise under equitable estoppel only if the alleged infringer had knowledge of the patent and its owner. *Winbond Elecs., 262 F.3d at 1374.* Moreover, the alleged infringer must have reasonably inferred that the patent owner acquiesced to the allegedly infringing activity for some time. *Winbond Elecs., 262 F.3d at 1374.* n1 The allegedly infringing parties' reliance must be objectively reasonable. *Wang Labs., 103 F.3d at 1580; Medeco Security Locks, Inc. v. Lock Tech. Corp, 1976 U.S. Dist. LEXIS 11664, 199 U.S.P.Q. 519, 524 (S.D.N.Y. 1976)* ("An implied license arises out of the objective conduct of the parties, which a reasonable man would regard as indicating that an agreement has been reached." (citation omitted)). "An implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party." *H.M. Stickle v. Heublien, Inc., 716 F.2d 1550, 1559 (Fed. Cir. 1983).*

n1 [HN24] An implied license pursuant to equitable estoppel is distinguishable from one that arises under legal estoppel, which encompasses situations where the patent owner licensed or assigned a right, received consideration, and then sought to derogate from the right granted.

See *Wang Labs., 103 F.3d at 1580.* Legal estoppel is not an issue in this case.

[*39]

The undisputed facts are as follows. In or about 1990 Singer "decided that the bulk of New Household Needle shipments to the United States would come from Singer Brasil." (Hammer Decl. P 8.) Hammer defined "Singer" to connote "the parent company and related entities that owned or controlled Singer Germany and Singer Brazil." (Hammer Decl. P 1.) As a result of that manufacturing shift from Singer Germany to Singer Brasil, Singer Germany experienced a seventy-three percent drop in annual sales volume "due to the fact that Singer Brazil sold Household Needles in the United States" in 1991. (Hammer Decl. P 8.) Thus, as of 1990, Singer Brasil engaged in infringing conduct - importing needles covered by the '330 patent into the United States.

In late 1986, almost four years prior to that manufacturing shift, Singer sold the '330 patent to Singer Germany. (Coch. Aff. P 13.) The Coch Affidavit does not define "Singer" other than as collective companies. (Coch. Aff. P 5.) As a result of that sale, when Singer directed Singer Brasil to import the Household Needles into the United States in 1990, Singer did not own the '330 patent. Thus, Singer Brasil could not have reasonably relied on Singer's [*40] statements or conduct as permission to infringe the '330 patent. The Winbond Electronics decision makes it clear that the alleged infringer must have knowledge of both the patent and its owner before an implied license can arise. *262 F.3d at 1374.* Accordingly, no implied license could exist between Singer and Singer Brasil.

As the owner of the patent, Singer Germany could have affirmatively granted consent or permission through its statements or conduct. See *Winbond Elecs., 262 F.3d at 1374.* Singer Germany sold and shipped the MABU to Singer Brasil in or about 1986, but that conduct occurred before Singer Brasil began shipping the Household Needles into the United States. Hammer avers in his declaration that "at the time that Singer Germany shipped the Mabu 12T-Press to Singer Brazil it was anticipated that, pursuant to Singer's direction, Singer Brazil would sell the Household Needles made with the Mabu 12T-Press in Latin American countries, and not in the United States." (Hammer Decl. P 6.) No evidence in the record before this Court indicates that Singer Germany made an affirmative grant of consent or permission to Singer Brasil to infringe the [*41] '330 patent. While it is true that Hammer, the Production Manager for Singer Germany from 1968-1999, traveled to and met with Singer Brasil needle personnel, his last visit was in 1989. (Hammer Dec. PP 1, 7.) Accordingly, there can be no finding of an

Case 6:05-cv-00930-DNH-GJD   Document 149-4   Filed 06/29/07   Page 43 of 44

Page 14
2002 U.S. Dist. LEXIS 8609, *

implied license by equitable estoppel from Singer Germany on summary judgment.

Groz argues that implied licenses may only arise between entities engaged in "arm's length transactions." (Groz Summ. J. App. Br. at 16-18.) Groz asserts that Singer Germany's and Singer Brasil's United States corporate parent directed the conduct of the two parties such that neither party acted of its own volition. (Groz. Summ. J. App. Br. at 16-18.) Yet Groz cites scant and unpersuasive authority supporting that legal theory, and this Court finds [HN25] no decision importing the "arm's length" element into the implied license defense. Although that element may have existed in some of the decisions where an implied license was found, it was not a prerequisite to those results. See, e.g., *Wang Labs., 103 F.3d 1571; Met-Coil Sys., 803 F.2d 684.* Groz's reliance on *United States v. Kokayi, M.D., 968 F. Supp. 870 (E.D.N.Y. 1997),* [*42] is misplaced. That decision addresses the statutory creation of a student loan program, and held that a defaulting student could not raise estoppel as a defense. *Kokayi, 968 F. Supp. at 875.* That decision does not address implied patent licenses. [HN26] Moreover, estoppel as a contract defense is distinct from equitable estoppel as a basis for an implied license in a patent. See *Wang Labs., 103 F.3d at 1581* (comparing the estoppel analysis in implied license cases with the analysis in equitable estoppel cases).

Both the Singer Plaintiffs and the bankruptcy court interpreted Groz's theory as an effort to pierce the corporate veil or create an alter-ego argument. (Summ. J. Op. at 7-9; Pls.' Summ. J. App. Opp. at 17.) But Groz specifically disavows that interpretation as a "red herring," and even concedes that "such basic, day-to-day corporate control may not suffice to pierce the veil and impose liability on a parent, but it does negate the arm's-length dynamic necessary to establish estoppel or implied license." (Groz Summ. J. App. Reply at 7; Groz Summ. J. App. Br. at 17.) This Court, however, will not attempt to find a veil-piercing argument that Groz explicitly [*43] disavows. Inasmuch as Groz argues that the corporate relationships among Singer Brasil, Singer Germany, and their United States parent bars an implied license, this Court is unpersuaded.

### 3. Groz's Cross Motion for Summary Judgment

In addition to opposing the Singer Plaintiffs' summary judgment motion, Groz moved for summary judgment dismissing claims one and two of the adversary complaint. (Groz Summ. J. Opp. and Cross-mot. at 6-16.) As noted above, those claims sought a declaratory judgment that Singer Brasil owned an implied license in the '330 patent and that the implied license was an asset of the bankruptcy estate. (Adv. Compl. at 9.) [HN27] The party asserting the existence of an implied license

has the burden of demonstrating its existence. *Bandag, 750 F.2d at 924.* As discussed above, the Singer Plaintiffs failed to establish the existence of an implied license either by the sale of a machine or through equitable estoppel.

The bankruptcy court held that Singer Brasil had an implied license which was part of the bankruptcy estate. (Order at 3-4.) Notably, the bankruptcy court does not discuss the implied license as part of the bankruptcy estate, and the parties' [*44] briefs barely touch that issue. Because this Court reverses the bankruptcy court's finding of an implied license, it declines to entertain abstractions such as whether an implied license could have been an asset in the bankruptcy estate.

The bankruptcy court also dismissed with prejudice Groz's counterclaim alleging patent infringement by Singer Brasil. (Summ. J. Op. at 21-23; Summ. J. Order at 4.) It is not evident to this Court what prompted the bankruptcy court's action since the opinion does not state the basis. To the extent that dismissal was based on a finding of an implied license, that dismissal is reversed in light of this Court's determination that genuine disputes of material fact exist concerning an implied license.

To the extent the dismissal was based on a finding of laches, that too, is reversed. [HN28] A finding of laches bars relief on a patent owner's claim only with respect to damages accruing before the suit was filed. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1041 (Fed. Cir. 1992)* (citing *Leinoff v. Louis Milona & Sons, Inc., 726 F.2d 734, 741 (Fed. Cir. 1984)).* Thus, even if this Court were to find that laches [*45] is an equitable bar to Groz's counterclaim of infringement, that finding would not dispose of Groz's claim -- it would merely limit Groz's recovery. Groz could still recover damages incurred after it filed its counterclaim.

Accordingly, the bankruptcy court's dismissal of Groz's counterclaim for infringement based on laches is reversed as it was incorrect as a matter of law, and Groz's counterclaim against Singer Brasil for patent infringement is reinstated. Similarly, the bankruptcy court's order dismissing Groz's cross-claim against Dyno for patent infringement is reinstated.

### B. Groz's Cross-Motion for Discovery Pursuant to Rule 56(f)

Groz appeals from the bankruptcy court's denial of its request for discovery pursuant to *Federal Rules of Bankruptcy Procedure 7056.* (Groz Summ. J. App. Br. at 31-35.) Bankruptcy Judge Lifland denied Groz's request on the grounds that (1) Groz possessed the information it sought either in its witness Hans Hammer or its ownership of Singer Germany; (2) none of the information

sought presented any genuine issues of material facts; and (3) Groz was dilatory in not propounding discovery until five months after the Singer Plaintiffs filed the [*46] action. (Summ. J. Op. at 23-26.)

[HN29] Bankruptcy court discovery orders are reviewed under an abuse of discretion standard. *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.), 1997 U.S. Dist. LEXIS 713, Nos. 96 Civ. 5801 (JFK), 96 Civ. 6479 (JFK), 1997 WL 31197,* at *8 (S.D.N.Y. Jan. 28, 1997). Although the bankruptcy court allowed the Singer Plaintiffs to move for summary judgment soon after the Singer Plaintiffs replied to Groz's counterclaims, the parties were aware of the pivotal issues in this litigation long before Groz first propounded discovery in February 2001. Thus, the bankruptcy court's denial of Groz's request for discovery under Rule 56 cannot be said to be an abuse of discretion.

### CONCLUSION

For the reasons set forth above, the preliminary injunction staying the Florida Action and enjoining Dyno and Groz from further litigating the Florida Action is affirmed, the denial of Groz's cross-motion to dismiss is affirmed in part, the adversary complaint's trademark infringement claim is dismissed, the grant of summary judgment for the Singer Plaintiffs on the first and second claims of the adversary complaint is reversed, Groz's counter and cross-claim alleging patent infringement [*47] are reinstated, and the denial of Groz's motion for discovery pursuant to *Federal Rule of Civil Procedure 56(f)* is affirmed.

The parties are directed to appear before this Court for a status conference on June 21, 2002 at 11:30 a.m. in Courtroom 11D, located at 500 Pearl Street, New York, New York.

Dated: May 14, 2002

New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.