## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| SPERO HARITATOS, | : |
| | : |
| Plaintiff, | :      05 Civ. 930 (DNH/GJD) |
| | : |
| - against - | : |
| | : |
| HASBRO, INC. and | : |
| TOYS "R" US-NY LLC, | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS'  MEMORANDUM OF LAW IN
## OPPOSITION TO PLAINTIFF'S MOTION TO RECONSIDER
## OR CERTIFY FOR INTERLOCUTORY APPEAL

Kim J. Landsman, Esq.
(Bar Roll No. 513,364)
Amanda K. Kramer, Esq.
(Bar Roll No. 514,218)
PATTERSON BELKNAP WEBB
   & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2980
Facsimile:  (212) 336-2985

*Attorneys for Defendant Hasbro, Inc.*

John G. McGowan, Esq.
(Bar Roll No. 501388)
BOND, SCHOENECK & KING, PLLC
One Lincoln Center
Syracuse, New York 13202-1355
Telephone:  (315) 218-8121
Facsimile:  (315) 218-8100

*Attorneys for Defendant Toys "R" Us-NY LLC*

Table of Contents

Page

PRELIMINARY STATEMENT ..................................................................1

THE COURT'S DECISION.......................................................................3

ARGUMENT ..........................................................................................4

   I.  PLAINTIFF ASSERTS NO PROPER BASIS FOR RECONSIDERATION..........4

   II. THE COURT CORRECTLY HELD THAT PLAINTIFF WAS NOT
      ENTITLED TO ANY MONETARY REMEDIES...................................6

   III. THERE IS NO BASIS TO CERTIFY
       AN INTERLOCUTORY APPEAL. .......................................................12

CONCLUSION..........................................................................................15

<u>Table of Authorities</u>

<u>Cases</u>

<u>In re AroChem Corp.</u>,
  176 F.3d 610 (2d Cir. 1999) ................................................................12

<u>Banff, Ltd. v. Colberts, Inc.</u>,
  996 F.2d 33 (2d Cir. 1993) ................................................................11

<u>Brown v. Middaugh</u>,
  1999 WL 242662 (N.D.N.Y. Apr. 21, 1999) ..........................................5

<u>Davidson v. Scully</u>,
  172 F. Supp. 2d 458 (S.D.N.Y. 2001) ...................................................5

<u>Delaney v. Selsky</u>,
  899 F. Supp. 923 (N.D.N.Y. 1995) .......................................................4

<u>Doe v. New York City Dep't of Soc. Servs.</u>,
  709 F.2d 782 (2d Cir. 1983) .................................................................4

<u>Edison Bros. Stores, Inc. v. Cosmair, Inc.</u>,
  651 F. Supp. 1547 (S.D.N.Y. 1987) ....................................................11

<u>In re Enron Corp.</u>,
  2007 WL 2780394 (S.D.N.Y. Sep. 24, 2007) ................................. 12-13

<u>First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc.</u>,
  2004 WL 1575396 (S.D.N.Y. Jul. 15, 2004) ...................................... 8-9

<u>In re Flor</u>,
  79 F.3d 281 (2d Cir. 1996) ................................................................12

<u>Freeman v. N.B.C., Inc.</u>,
  1993 WL 524858 (S.D.N.Y. Dec.15, 1993) ..........................................13

<u>Gaston v. Coughlin</u>,
  102 F. Supp. 2d 81 (N.D.N.Y. 2000) .....................................................5

<u>George Basch Co. v. Blue Coral, Inc.</u>,
  968 F.2d 1532 (2d Cir. 1992) ....................................................... passim

<u>Gelman v. Ashcroft</u>,
  372 F.3d 495 (2d Cir. 2004) .................................................................7

i

Glendora v. Press,
    2007 WL 3254242 (N.D.N.Y. Nov. 2, 2007) ...................................................5

Goodheart Clothing Co., Inc. v. Laura Goodman Enterprises, Inc.,
    962 F.2d 268 (2d Cir. 1992) ....................................................................11

Gordon and Breach Science Publishers S.A. v. American Institute of Physics,
    166 F.3d 438 (2d Cir. 1999) ....................................................................10

International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,
    80 F.3d 749 (2d Cir. 1996) ...................................................................1, 7

Lang v. Ret. Living Publ'g Co.,
    949 F.2d 576 (2d Cir. 1991) ...........................................................8, 10, 11

In re Perry H. Koplik & Sons, Inc.,
    2007 WL 3010142 (S.D.N.Y. Oct. 11, 2007) .................................................13

Sands, Taylor & Wood, Co. v. Quaker Oats Co.,
    978 F.2d 947 (7th Cir. 1992) ....................................................................8

Shrader v. CSX Transp., Inc.,
    70 F.3d 255 (2d Cir. 1995) ...................................................................4-5

Star Indus. Inc. v. Bacardi & Co.,
    412 F.3d 373 (2d Cir. 2005), cert. denied 547 U.S. 1019 (2006)......................11

Swanson v. Georgetown Collection, Inc.,
    1995 WL 72717 (N.D.N.Y. Feb. 14, 1995).....................................................8

Twin Peaks Prods., Inc. v. Publ'ns Intern., Ltd.,
    996 F.2d 1366 (2d Cir. 1993) ..................................................................11

United States v. Wilkerson,
    361 F.3d 717 (2d Cir. 2004) ....................................................................7

W.E. Bassett Co. v. Revlon, Inc.,
    435 F.2d 656 (2d Cir. 1970) ....................................................................2

Williston v. Eggleston,
    410 F. Supp. 2d 274 (S.D.N.Y. 2006) .........................................................12

W.W.W. Pharm. Co., Inc. v. The Gillette Co.,
    984 F.2d 567 (2d Cir. 1993) ................................................................8, 11

Statutes

15 U.S.C. § 1117(a) ...................................................................................................11

28 U.S.C. § 1292(b)..............................................................................................12, 13

Miscellaneous

Restatement (Third) of Unfair Competition § 37 cmt.e .......................................2, 7

Defendants Hasbro, Inc. ("Hasbro") and Toys "R" Us-NY LLC ("Toys 'R' Us") (collectively "Defendants") respectfully submit this memorandum of law in opposition to the motion by plaintiff Spero Haritatos ("plaintiff" or "Haritatos") to reconsider or certify for immediate appeal the Court's decision that he is not entitled to any monetary remedies.

## PRELIMINARY STATEMENT

The Court correctly found, and plaintiff does not dispute, that plaintiff has no evidence that the use of Hasbro's famous CANDY LAND mark by Toys "R" Us in the candy section of its Times Square Store was done with any intention to cause confusion or to capitalize on Haritatos's reputation or good will. Without such evidence of bad faith, also referred to as willful deception, the Court correctly held that plaintiff is not entitled to any monetary remedies.

Plaintiff's motion for reconsideration claims that the issue of monetary remedies was not adequately briefed before, but that is not a proper basis for such a motion. To the extent the motion is premised on the contention that the Second Circuit has been inconsistent or unclear in maintaining willful deception as the requirement for recovery of a defendant's profits, plaintiff is wrong. The Second Circuit has consistently required willful deception, though it has not always used that exact phrase.

The case this Court cited in precluding monetary remedies, <u>George Basch Co., Inc. v. Blue Coral, Inc.</u>, 968 F.2d 1532 (2d Cir. 1992), was not overruled, as plaintiff contends, by <u>International Star Class Yacht Racing Association v. Tommy Hilfiger, U.S.A., Inc.</u>, 80 F.3d 749 (2d Cir. 1996), nor could it be. One panel of the Court of Appeals may not reverse a prior panel; only the en banc court may do so.

1

At any rate, far from disagreeing with George Basch, Hilfiger cited the prior case and merely used different language to restate its willful deceptiveness standard: "[A]n accounting of profits should be limited to cases of fraudulent infringement, i.e., 'to acts intended to create confusion or deceive prospective purchasers.'" Id. at 754 (quoting Restatement (Third) of Unfair Competition § 37 cmt. e).

The remainder of plaintiff's request for reconsideration rests on his attorney's speculation that the Second Circuit would apply a different, more lenient standard of bad faith to reverse confusion than it has applied to the more usual cases of forward confusion. Such self-serving speculation is contradicted by the Second Circuit's adoption of the same standards of liability for the two types of infringement case and, furthermore, falls far short of the "clear error of law" required for reconsideration.

To the extent, however, that plaintiff points out that the Second Circuit has used the overall concept of "bad faith" as the standard for willful infringement, an award of defendants profits, and as one of the factors in likelihood of confusion, any error in the Court's analysis benefited plaintiff. Specifically, we respectfully submit that the only error the Court made in considering remedies was to state in dictum (since such a holding had not been requested by any party[1]) that its preclusion of monetary remedies did not

_____

[1] The parties' briefs did not deal with any purported difference between the standards for bad faith when assessing willful infringement, which may qualify a case for an award of attorneys' fees, and monetary remedies. Plaintiff's brief opposing summary judgment nowhere mentioned recovery of attorneys fees. It also conflated the standards for willful infringement and entitlement to monetary remedies at 20-24. Haritatos relied principally on W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 662 (2d Cir. 1970), which quoted approvingly the district court's opinion finding willful infringement because the defendant in "deliberately and unnecessarily duplicating plaintiff's mark, *acted in a way that was calculated to appropriate or otherwise benefit from the good will plaintiff had nurtured.*" (emphasis added). Here, of course, there was no goodwill to appropriate because plaintiff had no recognition and was pleading reverse confusion, and Hasbro used its own famous CANDY LAND mark and indicia, not plaintiff's mark.

2

mean that plaintiff would be precluded from seeking an award of attorneys' fees if he proved willful infringement. A finding of willful infringement, which is the predicate for an award of attorneys fees, necessarily requires the same finding of defendants' bad faith/willful deception that the Court found lacking.

There is, accordingly, no basis for reconsidering the portion of the Court's partial summary judgment decision that deprived plaintiff of any entitlement to monetary remedies. If the case proceeds to trial we will, at an appropriate time, request that the Court bar any entitlement to attorneys' fees as well.

The Second Circuit has consistently held that a plaintiff is not entitled to any damages in the absence of any actual confusion, and plaintiff admits there was none. It has also consistently held that a plaintiff is not entitled to defendants' profits in the absence of intent to confuse, and the Court found (and plaintiff admits) that there was no contested issue of fact as to any such intent. Accordingly, there is no basis for reconsideration of partial summary judgment or for any interlocutory certification of any such question to the Court of Appeals.

## THE COURT'S DECISION

Citing <u>George Basch Co. v. Blue Coral, Inc.</u>, 968 F.2d 1532 (2d Cir. 1992), this Court held that "a showing of willful deceptiveness is a prerequisite to recovery of damages and/or profits in a trademark infringement action." Memorandum-Decision and Order dated October 23, 2007 ("Decision") at 13. Because Haritatos is relying on reverse confusion, willful deception would require plaintiff "to show that the defendant intended to confuse or deceive consumers into believing . . . that the defendant is the source of the plaintiff's goods." <u>Id.</u> Because "Plaintiff has not produced any

3

evidence that defendants willfully sought to convince consumers that they were the source of plaintiff's candy goods," he did not raise a factual question "as to whether defendants' actions were willfully deceptive," id., and therefore "is not entitled to recover any monetary damages or an accounting of defendants' profits," id. at 14.

The Court nevertheless held that plaintiff had raised factual questions related to the Polaroid factor of bad faith by "produc[ing] evidence that Hasbro initiated negotiations with him in an attempt to secure rights to the "CANDY LAND" mark in connection with candy goods and, after negotiations failed, continued to license the mark to TRU." Decision at 12. Based on that, the Court stated that "plaintiff has raised questions of fact as to whether defendants willfully infringed on his trademark rights." Decision at 13. Defendants previously argued, and respectfully submit again, that the evidence of prior negotiations is not sufficient to raise any inference of bad faith that would be a sufficient basis for a finding of willful infringement or an attorneys' fee award.

## ARGUMENT

## I.  PLAINTIFF ASSERTS NO PROPER BASIS FOR RECONSIDERATION.

Plaintiff's brief does not address the standard for reconsideration. It is a strict one, however. As recently summarized by Chief Judge Mordue:

> A court may justifiably reconsider its previous ruling if:
> (1) there is an intervening change in the controlling law; (2)
> new evidence not previously available comes to light; or
> (3) it becomes necessary to remedy a clear error of law or
> to prevent manifest injustice. Delaney v. Selsky, 899 F.
> Supp. 923, 925 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing
> Doe v. New York City Dep't of Soc. Servs., 709 F.2d 782,
> 789 (2d Cir.), cert. denied, 464 U.S. 864 (1983)).
>
> The standard for granting a motion for reconsideration is
> strict. See Shrader v. CSX Transp., Inc., 70 F.3d 255, 257

4

> (2d Cir. 1995). "A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." Davidson v. Scully, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001) (citing Shrader, 70 F.3d at 257). In other words, "[a] motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of by prior rulings or to put forward additional arguments that a party could have made but neglected to make before judgment." Brown v. Middaugh, No. 96-CV-1097, 1999 WL 242662, *1 (N.D.N.Y. Apr. 21, 1999) (citation omitted).

Glendora v. Press, 2007 WL 3254242, at *3 (N.D.N.Y. Nov. 2, 2007) (attached hereto as Exhibit 1).

The only enunciated basis for reconsideration in plaintiff's brief is the contention that "the monetary relief issue was not adequately briefed or argued." Pl. Br. at 1.[2] That is not a proper basis for reconsideration and, to the contrary, runs directly afoul of the prohibition stated above against using reconsideration "to put forward additional arguments that a party could have made but neglected to make." Id. Moreover, plaintiff's counsel should have heeded the admonition that "any litigant considering bringing a motion for reconsideration must evaluate whether what may seem to be a clear error of law is in fact simply a point of disagreement between the Court and the litigant." Gaston v. Coughlin, 102 F. Supp. 2d 81, 83 (N.D.N.Y. 2000) (citation omitted).

_____

[2] "Pl. Br." refers to Plaintiff's Memorandum of Law in Support of His Motion for Reconsideration of the Portion of the Court's Order Dated October 23, 2007, Holding that Plaintiff Is Not Entitled to Recover Monetary Damages or an Accounting of Defendants' Profits, or in the Alternative, for Certification of the Question for Interlocutory Appeal.

To the extent plaintiff is trying to claim a clear error of law, that argument fails because, as shown below, the Court's ruling precluding him from monetary remedies relies on consistently enunciated Second Circuit law.

## II.   THE COURT CORRECTLY HELD THAT PLAINTIFF WAS NOT ENTITLED TO ANY MONETARY REMEDIES.

Plaintiff asserts that he "will present three separate, distinct arguments" in support of reconsideration. As set out in Pl. Br. at 2, they are that:

(1)   His evidence does in fact show "'willful deceptiveness' as that term was interpreted by the <u>George Basch</u> decision."

(2)   "[T]he Second Circuit abandoned the 'willful deceptiveness' standard in favor of other, more lenient standards."

(3)   He predicts that the Second Circuit would apply a different conception of bad faith to reverse confusion than it has to the more common contention of confusion from the senior to the junior user.

As to the first argument, plaintiff merely rehashes the argument he made in his brief opposing summary judgment: that the mere fact that Hasbro was aware of Haritatos's federal registration and his candy store and tried to negotiate with him to avoid this litigation is sufficient evidence of "bad faith" to justify disgorgement of profits. In addition to this not being a proper basis for reconsideration, the problem with this argument is two-fold: (1) Plaintiff admits that he has no evidence of any intent by Hasbro to cause confusion or deception between the licensed use of the CANDY LAND indicia in a Toys "R" Us store in Manhattan, which is what the phrase "willful deception" clearly means and what the Second Circuit has clearly stated that it means. (2) The

record is clear that Hasbro did not profit from its one-time royalty-free license for a single Toys "R" Us store.

As to the second argument, the case he relies on, International Star Class Yacht Racing Association v. Tommy Hilfiger, U.S.A., Inc., 80 F.3d 749 (2d Cir. 1996), did not "abandon[] the George Basch 'willful deceptiveness' standard." (Pl. Br. at 6.) To the contrary, the Hilfiger case quite explicitly reaffirmed the willful deceptiveness standard using slightly different language: Hilfiger held that, "[a]s recognized by the Restatement [(Third) of Unfair Competition], an accounting of profits should be limited to cases of fraudulent infringement, i.e., *'to acts intended to create confusion or deceive prospective purchasers*.'" Id. at 754 (quoting Restatement (Third) of Unfair Competition § 37 cmt. e) (emphasis added). "Willful deception" is just shorthand for "acts intended to create confusion or deceive purchasers."

Hilfiger did not, therefore, abandon the standard the Second Circuit had established a few years before in George Basch. Nor could it have done so without the Court of Appeals considering the issue en banc. See, e.g., Gelman v. Ashcroft, 372 F.3d 495, 499 (2d Cir. 2004) (Second Circuit panels "are 'bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court.'") (quoting United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004)).

As to the third argument, Plaintiff's prediction that the Second Circuit would adopt a different conception of bad faith for reverse confusion than it has for the

more usual type of confusion from senior to junior user is undermined by the fact that the

Second Circuit has adopted the same factors for liability as to both types of confusion.

See W.W.W. Pharmaceutical v. Gillette Co., 984 F.2d 567, 571-72 (2d Cir. 1991) (using

Polaroid test to assess allegation of reverse confusion); Lang v. Ret. Living Publ'g. Co.,

949 F.2d 576, 580, 583 (2d Cir. 1991) (same).  To the extent that there is any difference,

it is that a defendant's bad faith is far less likely in reverse confusion and therefore

generally of less relevance to the overall analysis.  As then-District Judge Pooler held in

rejecting the applicability in the Second Circuit of the Seventh Circuit case on which

Haritatos relies:

> Relying on Sands, Taylor & Wood, Co. v. Quaker Oats
> Co., 978 F.2d 947, 961 (7th Cir. 1992), Swanson argues
> that because this is a reverse confusion case, she need not
> establish that Georgetown intended to capitalize on her
> reputation and good will.  However, the law is to the
> contrary in the Second Circuit.  Even in reverse confusion
> cases, the Polaroid bad faith factor looks to whether or not
> the defendant adopted its mark with the intention of trading
> on the plaintiff's reputation and good will.  W.W.W.
> Pharmaceutical, 984 F.2d at 575. Here, as in WWW
> Pharmaceutical, the relative size and market strengths of
> the parties indicates that Georgetown had no intent to trade
> on Swanson's reputation and therefore did not act in bad
> faith.

Swanson v. Georgetown Collection, Inc., 1995 WL 72717, at *13 (N.D.N.Y. Feb. 14,

1995) (attached hereto as Exhibit 2).  To the extent there is any difference between a

traditional trademark infringement case and one alleging reverse confusion, it is that bad

faith is all the less likely and harder to prove in the latter.  See, e.g., W.W.W. Pharm. Co.

v. Gillette Co., 984 F.2d 567, 575 (2d Cir. 1993) ("Given Gillette's name recognition and

good will, and WWW's obscurity, any confusion would have redounded to the plaintiff's

rather than the defendant's, benefit."); First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l

8

Inc., 2004 WL 1575396, at *12 (S.D.N.Y.  Jul. 15, 2004) ("In the context of reverse confusion, it is unlikely that a larger and better known junior user intends to trade on the reputation of the lesser-known plaintiff.  This factor is therefore less relevant in a reverse confusion inquiry . . . .") (attached hereto as Exhibit 3).

Moreover, a  mere prediction about the future course of appellate decisions is not a proper basis for reconsideration; it does not address whether this Court committed a "clear error of law" or that the Court's decision based on current precedent constitutes a "manifest injustice."

What plaintiff's reliance on Hilfiger shows is not that the case established a standard for disgorgement of profits different from and more lenient than George Basch, but that the standard for disgorgement of profits and for the finding of willfulness that may allow an award of attorneys are essentially the same.  That standard, often called by the more general name of bad faith, is willful deception – i.e., an intention to cause consumer confusion or deception.

Hilfiger enunciated "bad faith" as the standard for both disgorgement of profits and willful infringement:  "In order to recover an accounting of an infringer's profits, a plaintiff must prove that the infringer acted in bad faith.  Similarly, an award of attorney fees may be justified when bad faith infringement has been shown."  80 F.3d at 753 (internal citations omitted).  The authorities cited for the bad faith standard show that it means willful deceptiveness.

Hilfiger's holding that bad faith was necessary to support disgorgement of profits cited the comment e to § 37 of the Restatement (Third) of Unfair Competition, quoted at page 7 above, which limits disgorgement of profits to cases involving "acts intended to create confusion or deceive prospective purchasers," as well as George Basch, 968 F.2d at 1540, which this Court relied on to hold that "the plaintiff must show that the defendant engaged in willful deceptiveness" in order to recover defendant's profits. Decision at 13. What follows from this is that the concept of bad faith that the Second Circuit referred to in Hilfiger and elsewhere is an intention to cause consumer confusion or deception – i.e., willful deceptiveness. Both George Basch and Hilfiger (as well as subsequent cases) consistently hold that that willful deceptiveness must be proven to recover defendants' profits. What also follows from Hilfiger's enunciation of bad faith infringement as supporting an award of attorneys' fees is that willful deception is required for that as well.

We respectfully submit, therefore, that the Court erred in plaintiff's favor in distinguishing the bad faith required for a finding of willful infringement from that required for an accounting of defendants' profits. The standard for "willful infringement" constituting "exceptional circumstances" for purposes of awarding attorneys' fees is the same as that for assessing the 'good or bad faith factor' in the likelihood-of-confusion analysis and the availability of monetary remedies. That standard is "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and good will." Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 583 (2d. Cir. 1991) (good faith factor in likelihood of confusion); see also Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 166 F.3d 438, 439 (2d Cir. 1999) ("In a suit under the Lanham Act,

attorney fees should be awarded only in 'exceptional cases,' 15 U.S.C. § 1117(a), and only 'on evidence of fraud or bad faith.'") (quoting Twin Peaks Prods., Inc. v. Publ'ns Intern., Ltd., 996 F.2d 1366, 1383 (2d Cir. 1993)); Star Indus. Inc. v. Bacardi & Co., 412 F.3d 373, 388 (2d Cir. 2005) ("Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products.") (citing Lang); Banff, Ltd. v. Colberts, Inc., 996 F.2d 33, 35 (2d Cir. 1993) (equating willful infringement with "deliberately deceptive conduct"); Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc., 962 F.2d 268, 272 (2d Cir. 1992) ("When bad faith infringement is shown, a district court is authorized to award attorney fees on the basis that an 'exceptional case[ ]' has been established . . . . ").

The Court's statement that plaintiff could be entitled to an award of attorneys' fees for willful infringement without evidence of "willful deceptiveness," is therefore at odds with Second Circuit cases.

The Court of Appeals's holding in W.W.W. Pharmaceutical Co., Inc. v. The Gillette Co., 984 F.2d 567, 575 (2d Cir. 1993), concerning an accusation of reverse confusion brought by an obscure manufacturer against Gillette, applies equally here:

> [The good faith] factor of the *Polaroid* test considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang*, 949 F.2d at 583 (quoting *Edison Bros. Stores, Inc. v. Cosmair, Inc.,* 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987)). Given Gillette's name recognition and good will, and WWW's obscurity, any confusion would have redounded to the plaintiff's, rather than the defendant's, benefit.

11

Just as there is no evidence of Hasbro's or Toys "R" Us's bad faith for purposes of entitlement to monetary remedies, there is none for purposes of considering willful infringement.

### III.    THERE IS NO BASIS TO CERTIFY AN INTERLOCUTORY APPEAL.

"The decision whether to grant an interlocutory appeal from a district court order lies within the district court's discretion." In re Enron Corp., 2007 WL 2780394, at *7 (S.D.N.Y. Sept. 24, 2007) (attached hereto as Exhibit 4). For the Court to exercise that discretion, however,

> The order being appealed must "(1) involve a controlling question of law (2) over which there is substantial ground for difference of opinion," and the movant must also show that "(3) an immediate appeal would materially advance the ultimate termination of the litigation."

Id. (quoting 28 U.S.C. § 1292(b)). An interlocutory appeal will be granted

> only when the movant demonstrates the existence of "exceptional circumstances" sufficient to overcome the "general aversion to piecemeal litigation" and to "justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." Interlocutory appeal "is limited to 'extraordinary cases where appellate review might avoid protracted and expensive litigation,' ... and is not intended as a vehicle to provide early review of difficult rulings in hard cases."

Id. (quoting Williston v. Eggleston, 410 F. Supp. 2d 274, 276 (S.D.N.Y. 2006); In re AroChem Corp., 176 F.3d 610, 619 (2d Cir. 1999); In re Flor, 79 F.3d 281, 284 (2d Cir. 1996)).

None of the requisites for certification exists here. As to the first prong, "the question of law must refer to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record.'" In re Enron, 2007 WL

2780394, at *4 (citation and quotation marks omitted).  The issue here is one of applying

law to the facts:  whether on this record devoid of any evidence of actual confusion or

intent to cause confusion, a defendant may nevertheless be deemed a willful infringer and

required to pay attorneys' fees because the defendant had prior negotiations with the

plaintiff to resolve the trademark issue without litigation.  Cases such as this where the

issue is one "regarding application of the appropriate law to the relevant facts are

generally not suitable for certification under § 1292(b)."  Freeman v. N.B.C., Inc., 1993

WL 524858, at *2 (S.D.N.Y. Dec. 15, 1993) (citations omitted) (attached hereto as

Exhibit 5); In re Perry H. Koplik & Sons, Inc., 2007 WL 3010142 (S.D.N.Y. Oct. 10,

2007) (attached hereto as Exhibit 6).

       Plaintiff premises his request for § 1292(b) certification on three

contentions:  (1) that the Second Circuit has set inconsistent standards for entitlement to

monetary relief; (2) that it is "likely that the Second Circuit would establish a more

lenient standard than the 'willful deceptiveness' standard adopted by this Court"; and (3)

that an immediate interlocutory appeal "may materially advance the ultimate termination

of this litigation."  Pl. Br. at 8.

       As shown above, the first two contentions misconstrue the Second Circuit

cases that have consistently required bad faith in the form of an intention to cause

confusion for a plaintiff seeking monetary remedies who cannot show actual confusion.

With respect to the third contention, plaintiff contradicts himself:  On the one hand he

argues that the "unmodified Order substantially diminishes any chance for settlement of

this lawsuit and provides an incentive for the parties to proceed through trial and appeal";

13

on the other hand, he contends that an interlocutory appeal will not delay this lawsuit because it would not stay proceedings in the district court.  Pl. Br. at 8.

If an immediate appeal does not delay the trial, then he would have the same decision that he faces now:  Is it worth going to trial to try to get an injunction, given that the act that engendered this lawsuit – use of the CANDY LAND indicia in one section of one Toys "R" Us store – ended long ago and Hasbro has no current plans to license its CANDY LAND game to anyone else for use in connection with candy?  If not, the question is whether his contingency-fee lawyer nevertheless convince him to go to trial because the lawyer wants a shot – however remote – at an award of attorneys' fees.[5]

The real problem with this Court's Order from the perspective of the plaintiff is that it puts him in potential conflict with his own attorney:  Proceeding to trial has no monetary upside for Haritatos himself; the potential upside is only to his attorney in the prospect left open by the Court's Order of seeking attorneys fees at the end.  It should go without saying that it is not the responsibility of this Court to resolve that conflict.

In sum, plaintiff has not satisfied the statutory requisites for an interlocutory appeal and, even if he had, this Court should not exercise its discretion to grant it.

_____

[5] This concern may be all the greater in light of Hasbro's pending motion for sanctions that include the award against plaintiff's lawyer of attorneys' fees Hasbro incurred to deal with plaintiff's disregard of his discovery obligations.

## **CONCLUSION**

For the reasons stated above, the Court should deny plaintiff's motion for reconsideration or for interlocutory appeal on a certified question.

Dated:  November 26, 2007                        Respectfully Submitted,


/s/  Kim J. Landsman_____        /s/  John G. McGowan_____
Kim J. Landsman                                 John G. McGowan
(Bar Roll No. 513,364)                          (Bar Roll No. 501,388)
Amanda K. Kramer
(Bar Roll No. 514,218)                          BOND, SCHOENECK AND KING, PLLC
PATTERSON BELKNAP WEBB &                         One Lincoln Center
TYLER LLP                                        Syracuse, New York  13202-1355
1133 Avenue of the Americas                      Telephone:  (315) 218-8121
New York, New York 10036-6710                    Facsimile:  (315) 218-8100
Telephone:  (212) 336-2980
Fax:  (212) 336-2985                             *Attorneys for Defendant Toys "R" Us-NY*
                                                 *LLC*
*Attorneys for Defendant Hasbro, Inc.*

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused a copy of the foregoing

**DEFENDANTS' MEMORANDUM OF LAW OPPOSITION TO THE MOTION**

**FOR RECONSIDERATION OR TO CERTIFY FOR AN INTERLOCUTORY**

**APPEAL** to be filed with the Court, with copies served electronically on the counsel set

forth below on November 26, 2007:

> Robert E. Purcell, Esq.
> Hiscock & Barclay
> Attorneys for Plaintiff Spero Haritatos
> One Park Place
> Syracuse, New York  13202
> (315) 422-2131
> rpurcell@hiscockbarclay.com

/s/___Kim J. Landsman_____
Kim J. Landsman

16

# EXHIBIT 1

Slip Copy
Slip Copy, 2007 WL 3254242 (N.D.N.Y.)
**(Cite as: Slip Copy)**

Page    1

Glendora v. Press
N.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
GLENDORA, Plaintiff,
v.
Eric W. PRESS, Defendant.
No. 1:07-CV-0940 (NAM)(RFT).

Nov. 2, 2007.

Glendora, pro se.

### DECISION AND ORDER
NORMAN A. MORDUE, Chief U.S. District
Judge.

### I. Background

**\*1** Currently before the Court is a motion from
plaintiff Glendora (1) objecting to the Order signed
by Magistrate Judge Randolph F. Treece striking
plaintiff's motion for default judgment (Dkt. No. 5
at 1-25);(2) objecting to the return of certain papers
she submitted to the Clerk of the Court and seeking
a refund of the filing fee (*id.* at 26-32) and (3) for
reconsideration of this Court's Order dated October
9, 2007. *Id.* at 33-97.In addition to these requests,
plaintiff has included in her submission what appear
to be discovery requests, or notices to admit,
addressed to Magistrate Judge Treece, the Clerk of
the Court, and the undersigned. *See*Dkt. No. 5 at 3-
11, 18-23, 25-29, 37-61, and 67-97.

Plaintiff commenced this action by filing a *pro se*
Complaint against defendant Press, a City Court
Judge in the City of White Plains, New York,
regarding plaintiff's dissatisfaction with court
proceedings presided over by Judge Press in August
2007. *See*Dkt. No. 1. In its October 9, 2007 Order,
the Court found that:
With respect to Eric Press, the law in this Circuit
clearly provides that "[j]udges enjoy *absolute
immunity* from personal liability for 'acts committed
within their judicial jurisdiction.' " *Young v. Selsky,*
41 F.3d 47, 51 (2d Cir.1994) (emphasis added)
(quoting *Pierson v. Ray,* 386 U.S. 547 (1967)).
"The absolute immunity of a judge applies however
erroneous the act may have been, and however
injurious in its consequences it may have proved to
the plaintiff." *Young,* 41 F .3d at 51 (internal

quotations omitted).

Dkt. No. 3 at 2. Accordingly, Judge Press was
dismissed as a party to this action. *Id.* at 3. In light
of plaintiff's *pro se* status, and because it was
unclear whether plaintiff was attempting to assert
claims against other parties,FN1 plaintiff was
provided with an opportunity to submit an amended
complaint to the Court. *Id.* After submitting her
original complaint, plaintiff also submitted to the
Court for filing a motion seeking default judgment
against defendant Press. By Order of Magistrate
Judge Randolph F. Treece filed on October 10,
2007, plaintiff's motion for default judgment was
stricken from the docket as prematurely filed
because defendant Press had yet to be served with
the summons and complaint. Dkt. No. 4. Plaintiff
has now submitted the present motion. Dkt. No. 5.

FN1. It appears that plaintiff does not intend to
name any other defendants. *See*Dkt. No. 5 at 47.

### II. Discussion

#### A. Objection to Magistrate Judge Treece's Order

Plaintiff objects to the Order of Magistrate Judge
Treece filed on October 10, 2007, *see*Dkt. No. 4,
which directed that plaintiff's motion for default
judgment be stricken from the docket as premature.
Dkt. No. 5 at 5-23.Federal Rule of Civil Procedure
("Fed. R. Civ.P.") 72(a) states:
Within ten (10) days after being served with a copy
of the magistrate judge's order [on a nondispositive
issue], a party may serve and file objections to the
order; a party may not thereafter assign as error a
defect in the magistrate judge's order to which
objection was not timely made. The district judge to
whom the case is assigned shall consider such
objections and shall modify or set aside any portion
of the magistrate judge's order found to be clearly
erroneous or contrary to law.

**\*2** Fed.R.Civ.P. 72(a).

The Court has reviewed the Order dated October 10,
2007, and finds that it is not clearly erroneous or
contrary to law. *See*28 U.S.C. § 636(b)(1)(A).
Plaintiff contends that her motion for a default
judgment against defendant Press was not premature
because she herself served defendant Press by first

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



class mail on August 22, 2007, with a copy of her complaint and two copies of a waiver of service. Dkt. No. 5 at 18.Plaintiff's argument is wholly without merit. In the first instance, plaintiff's "service" was itself premature since plaintiff did not actually commence this action until September 9, 2007. Moreover, plaintiff does not allege that defendant Press actually signed and returned the waiver of service to plaintiff. While failure to sign and return a waiver of service may result in a defendant later incurring costs for personal service, such failure does not subject the recalcitrant defendant to the jurisdiction of the Court and does not constitute service. SeeFed.R.Civ.P. 4(d)(2). In order to obtain jurisdiction over a defendant who has not signed a waiver of service, a plaintiff is required to actually serve the defendant with a summons and complaint; something that plaintiff in this case did not do. SeeFed.R.Civ.P. 4.

Besides objecting to the terms of Magistrate Judge Treece's Order itself, plaintiff seems to object to Magistrate Judge Treece's jurisdiction to take action in this case. Plaintiff challenges Judge Treece's jurisdiction on the basis that she did not consent in writing to having a magistrate judge act in her case. Plaintiff's argument is misplaced. While it is true that a magistrate judge has no authority to deal with dispositive matters in an action unless all of the parties to the action consent to such jurisdiction in writing, see28 U.S.C. § 636(c), the same does not hold true as to non-dispositive matters. 28 U.S.C. § 636(b)(1)(A) states that, with certain exceptions not relevant to the present discussion, "a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court ...." Accordingly, Magistrate Judge Treece, as the magistrate judge assigned to this case, had full authority to issue the Order striking plaintiff's premature motion for default judgment.

Accordingly, plaintiff's objections to the Order dated October 10, 2007, are denied and the Order is affirmed.

B. Objection to action by the Clerk and request for refund of filing fee

Upon filing her complaint, plaintiff paid the statutory filing fee for this action. Plaintiff now seeks a refund of the filing fee. Dkt. No. 5 at 31.Plaintiff requests the refund because, among other things, she feels that the Clerk of the Court improperly returned papers to her which she wished to have filed in her action.FN2See id. at 26-27.Plaintiff contends that this action resulted in a "consumer fraud" and "false advertising" because "you [the court] are advertised as a 'court' (you are not) and [the clerk] as a 'clerk' (you are not) and as giving justice (you have not)."Id. at 31.

FN2. Plaintiff also complains that her case was assigned to the undersigned, whose chambers are located in Syracuse, New York. Plaintiff says that she "did not file her case in Syracuse. She filed her case in Albany. She did not give [the Clerk] jurisdiction to move it to Syracuse. She has the right to chart her own litigation."Dkt. No. 5 at 29.Plaintiff is advised that cases filed in the Northern District of New York are randomly assigned to a District Judge and a Magistrate Judge. All of the judges in the Northern District of New York have jurisdiction to hear cases anywhere within the District.

*3 In the first instance, the papers which were previously returned to plaintiff, which were captioned for Supreme Court, Westchester County, were understandably and properly returned to the plaintiff as a courtesy since it appeared that plaintiff had mis-directed them. Plaintiff has now returned the papers to the Court and has clearly evinced her intent that they be filed as papers in support of her action. Dkt. No. 5 at 26.The Clerk has now filed the papers as supplemental papers in support of plaintiff's action.

Turning to plaintiff's request for a refund of the filing fee, there is no basis upon which the Court can reasonably conclude that plaintiff is entitled to a refund of her filing fee. See, e.g. Goins v. DeCaro, 241 F.3d 260, 261 (2d Cir.2001) ("fee paying litigants have no opportunity to obtain a refund of their filing fees in the event that they withdraw their appeals"); Lucien v. DeTalla, 141 F.3d 773, 775 (7th Cir.1998) ("Filing fees are part of the costs of litigation"); Bell v. Clark, 194 F.3d 781, 782 (7th Cir.1999) ("no refund of filing fee just because an appellant, petitioner, or other seeker of judicial review is dissatisfied with the outcome of his quest."); Bresette v. Buffalo-Reyes, No. 06-C-338-C, 2006 WL 3017256, at *1 (W.D.Wis. Aug. 7, 2006) ("There is no provision in the Federal Rules of Civil Procedure or in any statute enacted by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

Page   3

Congress that authorizes a district court to refund a filing fee in instances where the case is closed following a ruling by the judge.") (citing *Bell,* 194 F.3d at 782)). Accordingly, plaintiff's request that the filing fee be refunded is denied.

### C. Motion for reconsideration

Plaintiff has also moved for reconsideration of this Court's Order dated October 9, 2007, which dismissed defendant Press and granted plaintiff permission to submit an amended complaint should she wish to proceed with this action. Dkt. No. 5 at 33-97.

A court may justifiably reconsider its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent manifest injustice. *Delaney v. Selsky,* 899 F.Supp. 923, 925 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Doe v. New York City Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir.), *cert. denied,* 464 U.S. 864 (1983)).

The standard for granting a motion for reconsideration is strict. *See Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). "A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." *Davidson v. Scully,* 172 F.Supp.2d 458, 461 (S.D.N.Y.2001) (citing *Shrader,* 70 F.3d at 257). In other words, "[a] motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of by prior rulings or to put forward additional arguments that a party could have made but neglected to make before judgment." *Brown v. Middaugh,* No. 96-CV-1097, 1999 WL 242662, *1 (N.D.N.Y. Apr. 21, 1999) (citation omitted).

*4 Plaintiff has not indicated upon which justification she bases her motion for reconsideration. However, because plaintiff rehashes her previous arguments against Judge Press and does not suggest either that there has been an intervening change in the controlling law or that she has discovered new evidence, the Court assumes that plaintiff seeks to argue that reconsideration is necessary to remedy a clear error or law or to

prevent manifest injustice. Based upon the Court's review of the relevant law and its application to the facts of this case, the Court concludes that its previous decision was legally correct and did not work a manifest injustice on plaintiff. Accordingly, the Court denies plaintiff's motion for reconsideration of the Order dated October 9, 2007.

### D. Notices to admit

With respect to plaintiff's questions directed to Magistrate Judge Treece, the Clerk of the Court, and the undersigned, the requests are wholly improper. None of the aforesaid parties are defendants to this lawsuit and are therefore not subject to discovery.

### E. Amended complaint

By this Court's Order dated October 9, 2007, plaintiff was given permission to submit an amended complaint within thirty days of the filing date of that Order. Plaintiff's time to submit an amended complaint will expire on November 8, 2007. In light of plaintiff's *pro se* status, the Court will grant plaintiff an extension of time until December 10, 2007, to submit an amended complaint if she wishes to do so. Failure of plaintiff to submit an amended complaint by December 10, 2007, will result in dismissal of this action without further order of this Court.

In the event that plaintiff does submit an amended complaint, plaintiff is advised that the amended complaint must comply with the Local Rules of Practice of the Northern District of New York, including Rule 10.1(a) which requires that all papers submitted to the Court be "single sided and double-spaced." Rule 10.1(a) also states that "[d]ocuments that do not comply with [its] requirements may be rejected upon order of the Court."

WHEREFORE, after reviewing plaintiff's submissions and the applicable law, and for the reasons stated herein, it is hereby

ORDERED that plaintiff's objections to Magistrate Judge Treece's Order dated October 10, 2007, are DENIED and the Order dated October 10, 2007, is AFFIRMED, and it is further

ORDERED that plaintiff's request for a refund of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: Slip Copy)

Page   4

the filing fee for this action is DENIED; and it is further

ORDERED      that      plaintiff's      motion      for reconsideration of the Order dated October 9, 2007, is DENIED, and it is further

ORDERED that plaintiff may file an amended complaint, if any, *on or before December 10, 2007,* and it is further

ORDERED that if plaintiff fails to file an amended complaint on or before December 10, 2007, the Clerk is directed to enter judgment dismissing this action without further order of the Court, and it is further

**\*5** ORDERED that, in view of this Court's findings on the insufficiency and/or deficiency of the complaint herein, plaintiff is directed *not* to file any other motion until an amended complaint is submitted to the Court and approved for filing, and it is further

ORDERED, that upon full compliance by plaintiff with this Order as directed above, the file in this matter be returned to the Court for further review, and it is further

ORDERED that the Clerk serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

N.D.N.Y.,2007.
Glendora v. Press
Slip Copy, 2007 WL 3254242 (N.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 2

Not Reported in F.Supp.                                                                    Page   1
Not Reported in F.Supp., 1995 WL 72717 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**
c

Swanson v. Georgetown Collection, Inc.
N.D.N.Y. 1995
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
Victoria A. SWANSON, Plaintiff,
v.
GEORGETOWN COLLECTION, INC., Defendant.
Civ. A. No. 94-CV-1283.

Feb. 14, 1995.

Duker & Barrett, Albany, NY (George F. Carpinello, Scott Dales, of counsel), for plaintiff. King & Spalding, Atlanta, GA (Joan L. Dillon, Louis N. Jameson, of counsel), Grass, Balanoff & Whitelaw, P.C., Syracuse, NY (Mary Lannon Fangio, of counsel), for defendant.

MEMORANDUM-DECISION AND ORDER
POOLER, District Judge.

INTRODUCTION

**\*1** Plaintiff Victoria Swanson ("Swanson") seeks a preliminary injunction barring defendant Georgetown Collection ("Georgetown") from using the trademark "Faraway Friends" for its collection of porcelain international dolls and from marketing these dolls with a pen pal concept. Swanson has used the words "Far Away Friends" to describe her soft sculpture cloth dolls since 1984. In June 1985, she registered "Far Away Friends" as a trademark with the United States Patent and Trademark Office. Her registration was cancelled in January of 1992. Georgetown applied to use the words "Faraway Friends" as a trademark on September 16, 1993 and has been marketing its dolls with the "Faraway Friends" trademark since that date.

BACKGROUND

I. PROCEDURAL

Swanson commenced this action by filing a complaint with the office of the Clerk of the Court on September 30, 1994. The complaint alleges claims under Section 1125(a)(1) of the Lanham Act and Section 368-d of General Business Law of New York as well as the common law tort of unfair competition. Swanson served her motion for a preliminary injunction on December 12, 1994. On February 6, 1995, we heard oral argument followed by a short hearing on disputed evidentiary issues.

II. JURISDICTION

We have jurisdiction over the Lanham Act claim pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 and over the pendent state claims pursuant to 28 U.S.C. § 1367.

III. FACTUAL

The parties raise very few factual disputes. Therefore, unless specifically controverted, we treat each party's allegations as factual for the purposes of this motion.

A) Swanson's "Far Away Friends"

Swanson created "Far Away Friends" in 1984. Swanson Deposition Transcript ("Sw.Tr."), 12. Her soft fabric dolls are approximately twenty-one inches tall and each represents a different nation and wears a sweatsuit with an emblem in the nation's colors. Sw.Tr., 15; Pl.Exh. 3 FN1. Swanson maintains an inventory of doll parts and assembles the dolls to order. *Id* at 17-18. Depending on volume requirements, she may assemble the dolls herself, get assistance from a neighbor, or piecemeal them out to a local sewing center or fabric store. *Id.* at 18-19. She sells the dolls for $35.00 (less if bought in volume). Sw.Tr., 25, 74.

Swanson, who is an educator, sells her Far Away Friends dolls in connection with a pen pal program. Sw.Tr., 12-15. She offers each doll purchaser an opportunity to correspond with a pen pal from a different country.

Over the years, Swanson has marketed the dolls in several different ways. For the first two years she sold them from her home. Affidavit of Victoria A. Swanson sworn to December 2, 1994 ("Swanson Aff."), ¶ 9. In 1986 she opened a shop in Fayetteville, New York and began to sell the dolls along with other items from that location. *Id.* In February 1986, Swanson attended the International Toy Fair in New York City and approached representatives of Golden Games about her Far

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Away Friends Dolls. Sw.Tr., 34.   She entered into a licensing agreement with Golden Games in March 1986. *Id.* at 36  The original agreement was for three years, but the parties extended it through December 31, 1990. *Id.* at 42-43.   Swanson received $80,000.00 for the licensing agreement. *Id.* at 48.   The agreement also called for her to received royalties of five percent on sales. *Id.* at 49.

**\*2** The testimony on plaintiff's individual marketing efforts during the period of the licensing agreement is somewhat unclear.   However, she believed that she still had the right to sell her soft sculptured dolls and she did sell them at least in connection with programs at various area schools and perhaps from her shop. *Id.* at 39-40.   Her shop closed in 1991. Sw.Aff., ¶ 9.

Golden Games designed a variety of promotional and packaging materials for Far Away Friends. Many of the materials contained a logo in the shape of a cancelled postage stamp.   A doll's head is at the center of the stamp with the words "Far Away" above the head, the word "Friends" below the head, and the legend "T.M." in the lower right hand corner.   Dep.Exh. P-1, P-2; P-6.   Golden Games created a number of prototypes for the dolls that it exhibited at trade shows and to prospective investors and test marketed the dolls in schools.   Swanson Aff., ¶ 15.   Golden Games also listed "Far Away Friends" as one of its products in the 1987-88 directory issue of "Playthings" (Transcript, Deposition of Arthur Johnson, Exh. 1) and featured the Far Away Friends in its offering prospectus. Declaration of Jack Willert dated January 19, 1995 ("Willert Decl."), ¶ 8.

Swanson has not claimed, however, that Golden Games either marketed or advertised the dolls to the general public.   Golden Games made no sales and Swanson received no royalties.   Preliminary Injunction Hearing Transcript ("Tr."), 106.

After the expiration of her agreement with Golden Games, Swanson continued to try to market her "Far Away Friends" concept to other toy manufacturers. Sw.Tr., 53, 63;  Sw.Aff., ¶¶ 19-23.   While Ganz Brothers and a children's clothing manufacturer indicated interest, Swanson was not able to finalize an agreement.   Sw.Aff., ¶¶ 19-23.   Swanson has also continued her individual sales of Far Away

Friends both through the schools in Onondaga County and from her home. *Id.,* ¶ 18, Sw.Tr., 21. During the entire period from 1984 to the present, Swanson has sold approximately 2,500 dolls.   From the beginning of 1992 to the present, Swanson has sold fewer than fifty dolls.   Dep.Exh. P-31 through P-42.   Swanson has made all of her sales in Onondaga County, New York although consumers have shipped some of the dolls purchased out of state.   Sw.Tr., 37-39;  66-70.

Plaintiff indicates her trademark on her dolls by writing "Vicky Swanson Creator of Far Away Friends R" or "Far Away FriendsR Vicky Swanson Creator" on their bodies under their clothing. Pl.Exhs. 3 and 5.   Prior to entering into her licensing agreement with Golden Games, Swanson also hung a hang tag from the wrist of each doll. Tr., 109.   The logo on the hang tag consisted of a grey globe with the words "Far Away Friends" in red letters in a white space at the center. Immediately below the words "Far Away Friends" were a series of stylized human figures with linked arms. *Id.;*  Pl.Exh. 3.   The tags contained the "TM" legend below and to the right of the globe. Swanson abandoned the hang tags as a result of her licensing agreement with Golden Games.   Tr., 109.

**\*3** After she stopped using the hang tag, Swanson began attaching an 8 1/2   x 11 sheet of paper folded in two to form a leaflet to each doll she sells. Pl.Exh. 4, Tr., 110.   Swanson rolls up the leaflet and fastens it to the dolls wrist with a rubber band. *Id.*  The cover says: "Hi!  I'm your far away friend from (name of country)."   The center pages give five or six short paragraphs of information concerning the doll's country.   Pl.Exh. 4.   Beneath the informational paragraphs, the leaflet continues: "For more information on how to get a real far away friend in (name of country) Call:  Vicky Swanson Creator of:  Far Away Friends R (315) 457-4352". *Id.*

Thus a current consumer will see Swanson's trademark only if he or she undresses the doll or unrolls the leaflet fastened to its wrist.

Swanson has received publicity for the "Far Away Friends" in the Syracuse newspapers.   Dep.Exh. P-529;  Sw.Tr. at 23;   Affidavit of LouAnne Raulli sworn to December 1, 1994 ("Raulli Aff."), ¶ 4.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Swanson targets her letter writing program at children ages eight to sixteen. Sw.Tr., 23. A Golden Games brochure indicates that the dolls are intended for ages three and up. Dep.Exh. P-2. Georgetown urges that the dolls are most appropriately targeted at three to five year old children. Declaration of Maurene Souza made January 31, 1995 (Souza Decl.), ¶ 5.

### B. Georgetown's "Faraway Friends"

In late 1991, Georgetown began concept development on a series of dolls from foreign lands. Affidavit of Stephanie Weaver ("Weaver Aff.") sworn to January 7, 1995, ¶ 8. Initial plans called for the doll to be marketed in two editions-a collector's edition made in porcelain and a "kids' edition" in vinyl. Weaver Aff., Exh. D-1 (Georgetown apparently dropped the idea of a children's edition sometime after November 18, 1991. *Id.,* Exh. D-3 to D-14). Georgetown retained a Norwegian doll artist, Sissel Skille, to design the dolls. *Id.,* ¶ 9. During the development stage, Georgetown referred to its international collection most frequently as "Penpals" but it did use other names and other spelling variations of Penpals as well. Weaver Aff., Exh. D-1 to D-14.

Georgetown adopted the name "Faraway Friends" for its international collection in August 1993 after it found that the name "PenPals" was not available. *Id.,* ¶¶ 8, 12-13. Georgetown filed an application to register the mark "Faraway Friends" with the United States Patent and Trademark Office on September 16, 1993. *Id.,* ¶ 13. The application was published for opposition on March 8, 1994 and granted registration on November 22, 1994. *Id.,* ¶ 13 and Exh. D.

Georgetown's Faraway Friends are approximately 17 inches tall. They have porcelain heads, forearms, lower legs, hands and feet and cloth bodies. Def.Exh. H through J. Georgetown has produced three dolls to date: Kristin from Norway, Mariama from Senegal and Dara from Thailand. Kristin is priced at $118.00 and Dara and Mariama at $135.00. Def.Exh. F and G and Weaver Aff., Exh. A. Each doll is dressed in native dress and carries a prop characteristic of her country. Exh. H, I, J. Each comes with a packet of letters from her pen pals (other dolls in the collection and other

fictional characters). *Id.* Georgetown does not offer the purchaser an opportunity to correspond with the doll or with a living pen pal. *Id.*

*\*4* Each doll has a hangtag which gives greatest prominence to the name of the doll but also contains the "Faraway Friends" trademark and references to the Georgetown Collection and to "Artist's Edition." *Id.* The "Faraway Friends" trademark is also either on the back of the doll's neck under its hair or on its back. *Id.*

The boxes in which the dolls are packaged feature the name of the doll most prominently. *Id.* The top of the Mariama box also contains the artist's name and an indication that the doll is "From the 'Faraway Friends' TM collection." Exh. J. The tops of the other two boxes do not contain any reference to "Faraway Friends." Exh. H, I. Instead, the "Faraway Friends" trademark can be found on one of the ends of the boxes. *Id.* Also on the ends of the boxes are references to Georgetown's "Artists Edition" trademark and to the Georgetown Collection itself. *Id.*

Within the boxes, the dolls are wrapped in tissue paper printed with the words "Georgetown Collection." Exh. H, I, J.

Georgetown markets through direct mail to existing customers and through advertisements in doll collector's and women's service magazines, the coupon section of Sunday newspapers and Sunday supplements. Tr., 143-144. A typical magazine ad begins with a three quarters width page, the top two-thirds of which are occupied by a head and shoulders full color photograph of the doll and a headline ("Would you like to be my penpal?" for Kristin and "Listen to the Song of My Shell" for Mariama). Def.Exh. F and G. The bottom third of the page contains a tear off order blank. The reverse side of this page contains the reverse of the order form and the doll's story. In Kristin's case, there is also a full length picture of the doll. The full page following is dominated by a picture of the doll but also contains the doll's name, a reference to Georgetown Collection, a reference to the artist and the Artist's Edition Trademark. The "Faraway Friends" trademark is found only in the body of the story on the second page along with references to the Artists' Edition, and to the artist and to Georgetown Collection.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Georgetown's Sunday Supplement advertisement for Mariama contains no reference to the "Faraway Friends" trademark and again features pictures of the doll most prominently.   The name Georgetown Collection and the "Artist's Edition" Trademark are included in the advertisement.   Def.Exh. E.   The Direct Mail advertisement gives greatest prominence to a picture of the doll and lesser prominence to the Georgetown Collection name as well as the Artists Edition and Faraway Friends trademarks.   Weaver Aff., Exh. A.

The "Faraway Friends" produced $1,104,000 in sales through November 1994.   Tr., 154. Georgetown's president, Jeffrey McKinnon, indicated that liquidation of existing inventory would produce an additional $343,000.00 and that production plans were "on hold" because of this litigation.   McKinnon said that the sales figures were "disappointing" but that he hoped later dolls in the series would trigger an interest in the entire series and revitalize sales.   Tr., 158.

*5 Georgetown characterizes its market as adult women over 30 who collect dolls for themselves or their children and indicates that the dolls are neither intended as toys nor safe as toys.   Weaver Aff., ¶ 5; Souza Decl., ¶ 7.

    C. Contacts between Swanson and Georgetown;
    Georgetown's Knowledge of Swanson's Mark

At some point in the development of its international collection, Georgetown made a trademark search for "Pen Pals" and found that there were already two applications for that title, one of which was for a doll.   Tr., 116.   Georgetown then came up with thirteen additional names from which it selected "Faraway Friends" in early August 1993.   Tr., 117-118, Def.Exh. B.   On August 5, 1993, a Trademark search revealed that "Far Away Friends" had been registered as a trademark by Victoria Swanson and Nicholas Bishop d/b/a Nanacodba Nanaco but that the mark had been cancelled in January 1992 because its owner had failed to file an affidavit of continuous use.   Weaver Aff., Exh. B.

The parties agree that Stephanie Weaver, Georgetown's concept development manager, called Swanson on or about August 10, 1993 but they differ sharply as to their recollection of the conversation.   Swanson states that she clearly

informed Weaver that she continued to use the "Faraway Friends" trademark in connection with both dolls and a letter writing program.   Tr., 80. She also testified that she informed Weaver of her attempts to get other licensing arrangements and that she told Weaver to have Georgetown's lawyer call. *Id.* at 80-83.

Weaver, on the other hand, believed that Swanson told her that she had made dolls but was now "done," that she had at one time leased her idea to Golden Games and had attempted to market the idea to a bear company in Canada, and was now operating a letter writing club.   Tr. at 122.

Swanson's credibility is supported by her contemporaneous notes as well as the fact that she was in fact still selling dolls with the "Far Away Friends" Trademark at the time of the phone call. Pl.Exh. 6.   On the other hand, Weaver had little motivation not to honestly record Swanson's report. According to her unrebutted testimony and that of Jeffrey McKinnon, Georgetown easily could have switched the name of the series at the time of the August 10th phone call.   Tr., 125, 143.   Switching product names at the last moment is common practice in the toy industry.   Declaration of James V. Calgiano executed January 31, 1995, ¶ 3.

A little over a month after Weaver's conversation with Swanson, Georgetown began advertising their first Faraway Friend Doll.   Weaver Aff., ¶ 14.

Weaver and Swanson had no further direct contact until April 1, 1994.   Swanson initiated the April 1st contact by calling Georgetown's customer service department late in March 1994 after being informed by a friend of Georgetown's advertisement for "Faraway Friends" in the Sunday Supplement of the local paper.   Sw.Tr., 85.   When Weaver returned Swanson's call, Swanson complained of the infringement of her trademark and told Weaver that she had never stopped marketing her "Far Away Friends" dolls.   Weaver asked that Swanson provide verification of sales and any materials she had concerning the dolls.   Swanson confirmed the call in a letter that she faxed to Weaver on April 5, 1994.   Pl.Exh. 2.   This confirmatory letter stated: "As I stated on Friday April 1, 1994 I'am [*sic*] still continuing marketing Far Away Friends and am very concerned with the imposition that this has placed on my marketing endeavors....   I have never

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                Page   5
**(Cite as: Not Reported in F.Supp.)**

stopped selling Far Away Friends dolls."

**\*6** Weaver also confirmed her request for documentation in a letter dated April 7, 1994. Weaver Aff., Exh. D-126. She stated:
Without the items that I asked you for on April 1: any samples of sales invoices for dolls, photos (you mentioned that you had a full color brochure) of your dolls, or labels from the dolls that show your use of the mark, I cannot respond to your comments. You know how we use the mark, but I still have not seen anything that would let me know how you use it. Until I see something from you that shows you have and are using the mark on dolls as a trademark, I cannot tell you that we will give up our use of the mark.

*Id.* Weaver also asked for the name and address of Swanson's lawyer. *Id.*

Swanson did not supply the materials that Weaver requested. Tr., 101. She explained that by the time Weaver requested documentation she had lost her trust in Georgetown. *Id.* She also testified that she had spoken to an attorney who advised her not to send the materials. *Id.*

On May 6, 1994, Weaver again wrote to Swanson. Weaver Aff. Exh. D-128. In this letter she stated that the parties had spoken on April 11, 1994 and that Swanson had agreed to send samples of her use of the "Far Away Friends" name but had failed to do so. She also stated:
At this point, I am left to understand from your lack of further correspondence on this matter and the absence of the samples you were to provide that you do not to [*sic*] intend to pursue this matter further. Accordingly, we have decided to move forward. Please feel free to call if you have any questions or comments....

On May 19, 1994, Swanson's attorney responded to Weaver's May 6th letter. Carpinello Affidavit sworn to December 12, 1994 ("Carpinello Aff."), Exh. B. Swanson's attorney warned Georgetown that although Swanson preferred to resolve the matter amicably, she was fully prepared to take legal action to protect her mark if necessary. *Id.* The parties continued to attempt settlement during the summer of 1994. Reply affidavit of George F. Carpinello sworn to January 23, 1995 ("Carpinello Reply Aff."), ¶ 7.

**D. Allegations Relevant to Irreparable Harm**

Plaintiff brings this motion at this time because she wishes to attend the annual mid-February international toy fair in New York City to market her "Far Away Friends." Swanson Aff., ¶ 31. Swanson believes that she will have to demonstrate to any potential licensee that it will not face litigation over the trademark. *Id.*, ¶¶ 21, 29.

**E. Allegations of Actual Confusion**

Swanson has submitted three affidavits in support of her claim that consumers will be and have been confused about the origin of her dolls.

LouAnne Raulli, a long-time friend of Swanson's, states that she saw an advertisement for Georgetown's Faraway Friends in the coupon section of the Sunday newspaper. Raulli Aff., ¶ 6. Raulli stated that because the advertisement contained the words "Faraway Friends" and referred to a pen pal concept, her first reaction was that Swanson was finally getting the recognition she deserved. *Id.*, ¶¶ 7, 8. She therefore called Swanson to congratulate her and was informed that the dolls in the advertisement were not hers. Raulli did not claim that she was an actual or potential customer of Swanson's.

**\*7** Margaret Glenn is a school teacher in the Syracuse School System and a doll collector who has purchased approximately twenty dolls from Swanson. Affidavit of Margaret C. Glenn sworn to December 5, 1994, ¶¶ 2, 3, 6. She first saw Swanson's dolls at her Fayetteville shop. *Id.*, ¶ 5. In July 1994, Glenn saw an advertisement for a Georgetown Collection "African-American" doll in a doll magazine. *Id.*, ¶¶ 8, 9. The advertisement contained both the "Faraway Friends" name and a reference to a pen pal program; Glenn recognized both as connected with Swanson and therefore assumed the dolls were connected to her. *Id.*, ¶¶ 9, 10. After seeing the advertisement, Glenn called Georgetown but Georgetown's responses to her questions only confused her further about the connection of the doll with Swanson. *Id.*, ¶¶ 13, 14, 15. Glenn then called Swanson who told her the doll was not hers and that she had not authorized the use of the name "Far Away Friends." *Id.*, 17.

Finally, Renny DowDell, a teaching assistant at Dr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                  Page    6
**(Cite as: Not Reported in F.Supp.)**

Martin Luther King School in Syracuse, indicates that Swanson used to bring pictures of her "Far Away Friends" and educational literature into his school. Affidavit of Renny DowDell sworn to December 1, 1994, ¶ 4. Sometime in the spring of 1994 DowDell saw a talk show or "infomercial" which featured Georgetown's "Faraway Friends." *Id.,* ¶¶ 5, 6. Because of the name and the discussion of letters from foreign countries, DowDell assumed he would soon see Swanson on the show but he did not. *Id.,* ¶ 7. He became confused about the origin of the dolls. *Id.,* ¶ 8. A few days later, he approached Swanson who told him she was not involved with the dolls mentioned on television and had not authorized Georgetown to use her name. *Id.,* ¶ 9. DowDell testified at his deposition that the dolls he saw on television looked like Swanson's dolls. Dep.Tr., 8. DowDell has never purchased a doll from Swanson. *Id.* at 5.

DISCUSSION

I. THE LANHAM ACT CLAIM

Initially Swanson claimed that Georgetown had violated 15 U.S.C. § 1125(a)(1) by confusing and deceiving the public as to the origin of its goods and as to Swanson's sponsorship or approval of these goods. Complaint ¶ 40. On this motion,FN2 however, plaintiff relies on a reverse confusion theory-that is that because Georgetown is a dominant force in the market, "consumers [will] mistakenly believe that [her] products originate with [Georgetown]." *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 741 (2d Cir.1994). The harm sought to be prevented by a reverse confusion claim is harm to the reputation of the senior user based on the consuming public's belief that the senior user has infringed the junior user's trademark. *W.W.W. Pharmaceutical Co., Inc. v. Gilette Co.,* 984 F.2d 567, 571 (2d Cir.1993).

Swanson believes that she has demonstrated that she is entitled to a preliminary injunction on her Lanham Act claim because she has shown both that she is the senior user of a protectible mark and that Georgetown's use of the mark is likely to cause confusion among consumers as to the source of Swanson's dolls. Georgetown argues that Swanson's sales have been too few and too sporadic, especially over the past few years, to protect her mark, that there is no likelihood of confusion, and

that any presumptive entitlement Swanson might have to a preliminary injunction is defeated by her delay in bringing this action and her further delay in making the motion.

A. Standard for a Preliminary Injunction

**\*8** In order to obtain a preliminary injunction, the movant must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). This standard applies to trademark infringement cases. *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988). However, in a trademark case, the movant can establish both irreparable harm and a likelihood of success by showing that there is a likelihood of confusion assuming that she has a protectible mark. *Id.*

B. Does Swanson's Delay Destroy the Presumption of Irreparable Harm Which Would Otherwise Flow From a Showing of Likelihood of Confusion?

Georgetown argues that we should not accord Swanson the benefit of inferring irreparable harm from a showing of a likelihood of confusion because Swanson waited too long to bring this action and to make her motion for a preliminary injunction. "Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 276 (2d Cir.1985); *see also Majorica, S.A. v. R.H. Macy & Co., Inc.,* 762 F.2d 7, 8 (2d Cir.1985). However, significant delay does not always preclude a finding of irreparable harm; it simply destroys the presumption of irreparable harm otherwise flowing from a showing of likelihood of confusion. *Dial-A-Mattress v. Mattress Madness,* 841 F.Supp.1339, 1358 (E.D.N.Y.1994).

In this case, Swanson delayed filing suit over a year after she learned that Georgetown was considering the name "Faraway Friends" and six months after she learned Georgetown had begun marketing porcelain dolls under that name. Her preliminary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



injunction motion was filed approximately two and one half months after commencement of the action. Similar delays have been held to destroy the presumption of irreparable harm. *See Citibank,* 756 F.2d 273, 276 (plaintiff brought its preliminary injunction motion over a year after defendant announced an intention to operate in plaintiff's area and ten weeks after it was explicitly informed that an office would open in the New York City area); *Comic Strip, Inc. v. Fox Television Stations,* 710 F.Supp. 976, 981 (maximum delay of seven months with three months passing after the conclusion of settlement negotiations).

Swanson argues that her delay in pursuing injunctive relief should not be held against her because Georgetown has failed to show prejudice from the delay, because she was engaged in settlement negotiations until shortly before she filed suit, and because Georgetown intentionally appropriated her mark. None of Swanson's arguments are persuasive with respect to the issue raised by Georgetown, i.e. whether the presumption of irreparable harm stemming from a showing of likelihood of confusion has been vitiated.

*9 While plaintiff's lack of diligence without a showing of prejudice does not constitute laches, it does tend to rebut the presumption of irrebuttable harm. *Majorica.,* 762 F.2d 8. In addition, even assuming plaintiff's counsel to be correct in asserting that settlement negotiations continued to the eve of filing the complaint, plaintiff has offered no plausible excuse for not filing her preliminary injunction motion with her complaint. This two and one half month delay after filing "somewhat vitiates the notion of irreparable harm." *Comic Strip,* 710 F.Supp. at 981. Finally, Georgetown's reliance on *Harlequin Enterprises Ltd. v. Gulf of Western Corp.,* 644 F.2d 946 (2d Cir.1981) to support its argument that defendant's intentional appropriation of plaintiff's mark bars its use of the delay as a defense misconstrues Georgetown's argument. *Harlequin* did hold that laches was not a defense against injunctive relief where defendant intentionally appropriated plaintiff's mark. *Id.* at 950. However, we do not understand Georgetown to raise laches as a defense; rather we understand Georgetown to argue (a) that Swanson has delayed significantly in bringing this motion, (b) that this delay negates the presumption of irrebuttable harm, and (c) that Swanson has not shown actual

irreparable harm. We also note that we do not believe plaintiff has demonstrated a likelihood of showing bad faith infringement. See 23-24, *infra.*

We believe that the question is a close one, but we find Swanson's delay to be significant and therefore find that she cannot rely on a presumption of irreparable harm but must show actual harm.

C. Actual Showing of Irreparable Harm

Plaintiff has not claimed that she is losing sales because of the confusion between her mark and Georgetown's. Instead, she claims that she is losing the ability to market her mark, her concept and her dolls. Specifically, she states that she wishes to attend the trade show in mid-February and that she will be unable to obtain a licensee without an injunction against Georgetown's use of the mark. Although Swanson claims to have been actively seeking a new licensee for the past four years, she did not attend the trade show in 1993 or 1994. Tr. at 89-90. She explained that she did not attend in 1993 because of matrimonial difficulties and that she did not attend in February of 1994 because she was concerned about Georgetown's use of her mark. *Id;* Swanson Aff., ¶ 30.

With respect to the specific kind of harm contemplated by a reverse confusion claim-i.e. a belief that the senior user is infringing the junior user's mark, the proof Swanson has offered tends to show the opposite. The non-parties who have submitted affidavits in her behalf appeared to believe when they saw the Georgetown advertisements that Swanson had hit the big time, not that she was infringing Georgetown's trademark.

Because Swanson-whatever the validity of her reasons FN3-has not attended the toy fair for two years, because she has not been successful in arranging a new licensing agreement in the four years since her prior agreement lapsed and because she has shown no imminent threat of irreparable harm to her reputation, her claim that she will suffer irreparable harm if Georgetown is not enjoined pending trial can only be considered speculative. "To establish irreparable harm, plaintiffs must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.' " *Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 975 (2d Cir.1989) (quoting *Consolidated Brands,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: Not Reported in F.Supp.)

*Inc. v. Mondi,* 638 F.Supp. 152, 155 (E.D.N.Y.1986)). Plaintiff has not demonstrated actual, imminent injury and therefore her request for a preliminary injunction must be denied.

### D. Likelihood of Success

**\*10** We have noted that the question of whether plaintiff has delayed too long to claim a presumption of irreparable harm based on likelihood of confusion is a close one. However, we also believe that plaintiff has failed to shown a likelihood of success. We believe that plaintiff has established a likelihood of success on her claim that she has a protectible mark but not on her claim that Georgetown's use of its mark is likely to cause relevant confusion.

*1. Protectibility of the Mark.* Section 1125(a) of the Lanham Act protects unregistered trademarks. *Two Pesos, Inc. v. Taco Cabana,* 112 S.Ct. 2753, 2757 (1992). In order to demonstrate that an unregistered mark is protectible, its user must show that (s)he was the first user and that (s)he intends to continue exploiting the mark commercially. *La Societe Anonyme des Parfums LeGalion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271 (2d Cir.1974). The proponent must demonstrate "that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory." *Id.* at 1272.

Georgetown argues that because plaintiff has sold fewer than 50 dolls since 1992 began, she cannot demonstrate any rights in the "Far Away Friends" mark. Swanson urges-and we agree-that low volume sales do not disqualify a mark if those sales are part "of an ongoing program to exploit the mark commercially." *Id.* at 1272. *La Societe Anonyme* emphasizes both the senior user's disinterest in using the mark commercially and its concomitant interest in keeping a competitor from using it. *La Societe Anonyme,* 495 F.2d 1272-73; *see also Procter & Gamble Co. v. Johnson & Johnson Inc.,* 485 F.Supp. 1185, 1203-1207 (S.D.N.Y.), *aff'd*636 F.2d 1203 (2d Cir1980). Georgetown has offered no proof that Swanson had a trade-restricting motive and Swanson has offered proof of continuous albeit small sales and of continued attempts to market her concept. We therefore find that Swanson has shown a likelihood that she can establish she has a protectible mark.FN4

*2. Degree of Protection.* We turn next to the

degree of protection Swanson's mark enjoys. Trademarks are classified as "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos,* 112 S.Ct. 2753, 2757 (citing *Abercrombie & Fitch v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir1976)). The categories are listed in ascending order of protection. *Hasbro,* 858 F.2d at 73. Suggestive, arbitrary and fanciful marks are entitled to trademark protection without proof of secondary meaning. *Id.*

Georgetown initially claimed that Swanson's trademark was merely descriptive; however, at oral argument Georgetown's counsel conceded that at least as applied to dolls, Swanson's trademark was suggestive. Tr. at 56. We agree that plaintiff's mark is suggestive. "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Hasbro,* 858 F.2d at 73 (quoting *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968)). In this case, it takes at least some imagination to conjure up a doll from the words "Far Away Friends." The leap required is not an extensive one, however, and we therefore decline to classify "Far Away Friends" as arbitrary or fanciful.

**\*11** *3. Likelihood of Confusion.* Because "Far Away Friends" is suggestive and thus entitled to protection without proof of secondary meaning, we turn next to plaintiff's showing on likelihood of confusion. The crucial inquiry is whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.)*cert. den.*439 U.S. 1116 (1979). In order to assess the likelihood of confusion between different products, the court must assess "the strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.1961). Each *Polaroid* factor must be examined to determine how it bears on the ultimate question of likelihood of confusion as to source. *Hasbro,* 858 F.2d at 75. In addition, the factors are not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: Not Reported in F.Supp.)

Page    9

exclusive; the court may weigh other factors as appropriate. *Id.*

*(a) Strength of the Mark.* "[S]trength of the senior user's mark is the mark's 'tendency to identify the goods sold under the mark as emanating from a particular.... source.' " *Hasbro,* 858 F.2d at 76 (quoting *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979)). A mark's suggestiveness does not necessarily control the characterization of its strength. *Id.* It is, however, useful in assessing the strength. *Western Publishing Co., Inc. v. Rose Art Industries, Inc.,* 910 F.2d 57, 61 (2d Cir.1990). The strength of the mark depends on its origin indicating quality in the eyes of the purchasing public. *McGregor-Doniger,* 599 F.2d at 1131. The mark's strength must therefore be viewed in its commercial context. *Centaur Communications Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1226 (2d Cir.1987).

Because Swanson's mark cannot be seen by the purchasing consumer without undressing the doll or taking the rubber band off the brochure attached to the doll's wrist, it does little to indicate the origin of Swanson's products to the purchasing public. Much more salient in creating buyer identification is the fact that purchasers buy directly from Swanson.

In addition, Swanson's sales, especially in recent years, have been low in volume and have not penetrated beyond the Syracuse and Onondaga County markets. The Second Circuit has recognized low sales volume and low national recognition as factors which may be considered in assessing a mark's strength even in a reverse confusion case. *W.W.W. Pharmaceutical,* 984 F.2d at 573.

Based on the low visibility of Swanson's mark, the low volume of sales and lack of national recognition, she has failed to show that she will be able to prove it is anything more than a relatively weak mark.

**\*12** *b. Similarity of the Marks.* To judge the similarity of two marks, a court must determine whether they would convey the same general impression to purchasers when viewed separately. *Western Publishing Co.,* 910 F.2d at 61. Here the only difference between the two marks themselves is a space between the words "Far" and "Away" in

Swanson's mark and the absence of a capitol "a" in Georgetown's. In addition, both products use a pen pal concept albeit in different ways.

We must also consider, however, "the products' sizes, logos, typefaces, and package designs." *W.W.W. Pharmaceutical,* 984 F.2d at 573. In Swanson's presentation of her mark, the mark itself is clearly a dominant element. In Georgetown's presentation, the mark is substantially subordinate to the name of the doll and somewhat subordinate both to the Georgetown name and to the "Artists' Edition" TM Balancing all these factors, we find that Swanson has shown a moderately strong similarity between the marks.

*c. Competitive Proximity.* The fact that two products are in the same general field does not by itself mean that they are in competitive proximity. *See W.W.W. Pharmaceutical,* 984 F.2d at 573 (deodorant and lip gloss do not serve the same purpose although both are in the general product class of personal care products); *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 582 (2d Cir.1991) (a publishing house and a magazine although both in the general field of publishing are not competitive). Although both Swanson's and Georgetown's products are dolls and both involve pen pal concepts, they do not directly compete against each other. Georgetown's "Faraway Friends" cost approximately four times more than Swanson's "Far Away Friends." Swanson's dolls are clearly intended for children. Swanson argues that Georgetown's "Faraway Friends" are also marketed at least in part at children because of the emphasis on the pen pal concept. However, price and marketing strategy indicate that the pen pal concept as used by Georgetown is part of its overall attempt to win an adult audience. Moreover, the two dolls are marketed entirely differently; Swanson uses direct contact with potential consumers while Georgetown uses direct mail, newspaper inserts, and magazine advertisements.

While both Georgetown and Swanson sell dolls, Swanson clearly intends that her dolls be used as educational toys and part of a letter writing program. Georgetown, on the other hand, creates, markets and prices its dolls for the adult market. Swanson's showing of competitive proximity is thus relatively weak.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*d. Bridging the Gap.* This factor refers to "the likelihood of whether the senior user will enter the market of the junior user." *Nikon Inc. v. Ikon Corp.,* 987 F.2d 91, 95 (2d Cir.1993). Swanson has not claimed that she has any intention of entering into the market served by Georgetown's dolls.

*e. Actual Confusion.* In a reverse confusion case, the relevant confusion is a belief by the senior user's purchasers or prospective purchasers that the senior user's product was produced by or affiliated with the junior user. *Lang,* 949 F.2d at 583. It is also confusion which affects buying decisions. *Id.* Here Swanson presents three affidavits in an attempt to show actual confusion. Two are from individuals (DowDell and Raulli) who do not purport to be either actual or prospective purchasers of Swanson's dolls. Both DowDell and Raulli also indicate that they thought Swanson produced Georgetown's dolls and not that Georgetown produced Swanson's. The Glenn affidavit does indicate some perception that Swanson may have marketed her idea to Georgetown (and by implication therefore that Swanson's continued use of the mark might be an infringement). However, Glenn knew Swanson personally and was able to clarify her confusion quickly. Because Swanson has given only very limited evidence of actual confusion and no evidence of actual confusion relevant to buying decisions and because her current market is small enough to enable her to clarify actual confusion readily, we do not treat actual confusion as a significant factor in this analysis.

*13 *f. Bad Faith.* Relying on *Sands, Taylor & Wood, Co. v. Quaker Oats Co.,* 978 F.2d 947, 961 (7th Cir.1992), Swanson argues that because this is a reverse confusion case, she need not establish that Georgetown intended to capitalize on her reputation and good will. However, the law is to the contrary in the Second Circuit. Even in reverse confusion cases, the Polaroid bad faith factor looks to whether or not the defendant adopted its mark with the intention of trading on the plaintiff's reputation and good will. *W.W.W. Pharmaceutical,* 984 F.2d at 575. Here, as in *WWW Pharmaceutical,* the relative size and market strengths of the parties indicates that Georgetown had no intent to trade on Swanson's reputation and therefore did not act in bad faith. *Id.*

Even actual knowledge of a preexisting trademark does not necessarily give rise to an inference of bad faith. *Id.* There must be additional evidence of an intention to promote confusion between the two products. *Id.* Here we find it likely that Swanson at some point in the August 1993 conversation told Weaver that she was still marketing dolls but because the conversation touched on a great number of topics and a long chronology, we also consider it likely that Weaver may not have understood that Swanson still produced the dolls. In any event, because Swanson has failed to show the type of bad faith relevant to reverse confusion cases under Second Circuit cases, our finding on the factual issue is not dispositive.

*g. Quality of the Junior User's Product.* If the junior user's product is of very inferior quality to that of the senior user, it may damage the senior user's reputation and thus support a finding of likelihood of confusion. *W.W.W. Pharmaceutical Co.,* 984 F.2d at 575. Moreover, very similar quality may also promote confusion. *Banff, Ltd. v. Federated Department Stores, Inc.,* 841 F.2d 486, 492 (2d Cir.1988). Swanson has not claimed that Georgetown's dolls are of inferior quality to her own. Because the dolls are so different in market and form, it is very difficult to evaluate whether they are similar in quality. It appears that both dolls are carefully made and of good quality. However, the very difficulty of the comparison leads us to the conclusion that similarity of quality would be entitled to very little weight in this analysis. Similarity of quality between two very dissimilar products will not confuse an appreciable number of ordinary consumers.

*h. Sophistication of the Relevant Consumer Group.* In a reverse confusion case, the court must assess the sophistication of the senior user's consumers. *Sterling Drug,* 14 F.3d at 742. Here, plaintiff has urged that her consumers are children, the least sophisticated of consumers. However, it is a fairer interpretation of her testimony to find that although children may initially ask for the dolls, it is the parents who make the ultimate decision. Sw.Tr. at 23-25. In the absence of additional proof, there is no reason to find that parents as consumers are either exceptionally sophisticated or exceptionally unsophisticated.

*14 Viewing the *Polaroid* factors singly and in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
**(Cite as: Not Reported in F.Supp.)**

Page   11

combination, we find that Swanson has failed to demonstrate that there is a substantial likelihood that an appreciable number of consumers will be confused by the similarity between her mark and Georgetown's.   We are particularly persuaded by the lack of competitive proximity, the weakness of Swanson's mark, and the lack of a showing that she intends to bridge the gap between her market and Georgetown's.

Because plaintiff has not established irreparable harm, it is not necessary to consider her Lanham Act claims under the alternative *Jackson Dairy* test of irreparable harm and "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the Party requesting the preliminary relief."  596 F.2d at 72.

## II. PLAINTIFF'S REMAINING CLAIMS

Section 368-d of New York's General Business Law requires a showing of likelihood of injury to business reputation or a showing that a trademark will be diluted.  N.Y. General Business Law § 368-d; *Lever Bros. Co. v. American Bakeries Co., Inc.,* 537 F.Supp. 248, 256 (E.D.N.Y.), *aff'd* 693 F.2d 251 (2d Cir1962).   The plaintiff need not show likelihood of confusion or that her product is in direct competition with her competitor's.   *Allied Maintenance Corp v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 543-544.   However, the proponent of protection must show an unusually strong mark.   *See Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983) (indicating that the standard for strong marks under *Allied* may be higher than for a Lanham Act claim).   Because we have already held that Swanson has a relatively weak mark, we also must find a failure to show a strong mark for Section 368-d purposes.

Swanson has similarly failed to show a likelihood of success on her common law unfair competition claim.   To succeed on an unfair competition claim, she must show a likelihood of confusion and an element of bad faith.  *Stern's Miracle-Gro v. Shark Products, Inc.,* 823 F.Supp. 1077, 1093 (S.D.N.Y.1993).   We have already held that plaintiff has failed to establish a likelihood of success as to likelihood of confusion.

## CONCLUSION

Plaintiff's request for injunctive relief is denied.

SO ORDERED.

FN1.  Exhibits from the preliminary injunction hearing are identified as "Pl.Exh." or "Def.Exh." Exhibits from the various depositions will be identified as "Dep.Exh."

FN2. This argument was first explicitly made in oral argument at the preliminary injunction hearing. Transcript at 18, 30-31.

FN3.  In February 1994, Swanson did not know of Georgetown's allegedly infringing use of the mark. She did not learn of the advertisements for Georgetown's dolls until the end of March 1994. She did not act on any infringement by Georgetown in any way until she learned that they were actually using the mark.   Therefore, her claim that she stayed away from the 1994 fair because of trademark concerns is suspect.

FN4. We believe the volume of plaintiff's sales is better analyzed as part of her showing on the strength of her mark.  *See infra* at 20-21.
N.D.N.Y. 1995
Swanson v. Georgetown Collection, Inc.
Not Reported in F.Supp., 1995 WL 72717 (N.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 3

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1575396 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

H

First Nat'l. Bank of Omaha, Inc. v. Mastercard
Intern. Inc.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
FIRST NATIONAL BANK OF OMAHA, INC.,
Plaintiff,
v.
MASTERCARD INTERNATIONAL
INCORPORATED, Defendant.
MASTERCARD INTERNATIONAL
INCORPORATED, Plaintiff,
v.
FIRST NATIONAL BANK OF OMAHA, INC.,
Defendant.
No. 03 Civ. 707(DLC), 02 Civ. 3691(DLC).

July 15, 2004.

Russell H. Falconer, Steven R. Gustavson, Paul J.
Reilly, Baker Botts LLP, New York, New York, for
MasterCard International Inc.
Bartholomew L. McLeay, Suzanne M. Shehan,
Kutak Rock LLP, Omaha, NE, for First National
Bank of Omaha.

*OPINION AND ORDER*
COTE, J.
**\*1** On May 12, 2004, a jury unanimously found that
plaintiff First National Bank of Omaha ("FNBO")
failed to prove its claim that its SMARTONE
trademark is infringed by the use of the
ONESMART trademark by MasterCard
International Incorporated ("MasterCard") in
connection with smart card services. Typically, a
smart card is a plastic card that contains a computer
chip enabling the card's holder to purchase goods
and services, to access financial or other records,
and to perform various operations requiring data
stored on the chip. The trial was limited to the
question of whether MasterCard caused reverse
confusion among the actual or potential FNBO agent
banks to whom MasterCard's ONESMART program
of smart card services was marketed.

FNBO now moves pursuant to Rule 65(d),
Fed.R.Civ.P., to enjoin MasterCard permanently
from using the terms ONESMART, ONESMART
MASTERCARD, or any variant thereof (excluding
the MasterCard logo) on any chip card, debit card,

credit card, or advertising prototype that is used or
proposed to be used by or with *consumers* in the
banking, credit card or smart card service industries.
FNBO does not specify whether it seeks to prevail
on a claim of forward or reverse confusion. To date,
MasterCard has not used the ONESMART mark or
variants in connection with smart card services
offered or advertised to consumers.

The early procedural history of this action is set
forth in detail in this Court's February 23, 2004
Opinion ("February Opinion") denying the parties'
motions for summary judgment, familiarity with
which is presumed. *MasterCard Int'l Inc. v. First
Nat'l Bank of Omaha,* No. 02 Civ. 3691(DLC),
2004 WL 326708 (S.D.N .Y. Feb. 23, 2004). In
brief, FNBO sent a letter on April 10, 2002,
demanding that MasterCard cease and desist in its
use of the ONESMART mark and abandon its
ONESMART trademark applications. On May 15,
MasterCard filed a complaint for a declaratory
judgment (the "MasterCard Action") that its use of
ONESMART, ONESMART MASTERCARD, or
variants thereof did not infringe FNBO's trademark
rights in the term SMARTONE. On July 30, FNBO
filed a complaint in the District of Nebraska seeking
an injunction and damages against MasterCard on
grounds of infringement, and subsequently moved to
dismiss or to transfer the MasterCard Action to
Nebraska. FNBO's motion to dismiss or transfer
was denied on November 13, 2002, *MasterCard
Int'l Inc. v. First Nat'l Bank of Omaha,* No. 02 Civ.
3691(DLC), 2002 WL 31521091 (S.D.N.Y. Nov.
13, 2002). The action filed by FNBO was assigned
to this Court on January 29, 2003.

After discovery had concluded in these actions, both
FNBO and MasterCard moved for partial summary
judgment. On September 19, 2003, FNBO sought
summary judgment on its claim to enjoin
MasterCard from using the ONESMART mark, and,
specifically, on the following three elements of its
claim: first, that FNBO's SMARTONE mark is a
valid mark entitled to protection; second, that there
is a likelihood of confusion between ONESMART
and SMARTONE; and third, that FNBO used the
SMARTONE mark prior to MasterCard's use of
ONESMART. On October 17, MasterCard moved
for summary judgment dismissing FNBO's claims
for monetary relief. Both the FNBO and MasterCard

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



motions for summary judgment were denied in the February Opinion.FN1*MasterCard*, 2004 WL 326708 at *12. The February Opinion also granted a motion *in limine* brought by MasterCard to exclude under Rules 403 and 702, Fed.R.Evid., survey evidence prepared by an FNBO expert that was intended to measure actual reverse confusion among actual or potential FNBO agent banks.

FN1. It is worth noting that while FNBO's trademark SMARTONE was registered on December 23, 2003, the Court was not notified of this development until after the issuance of the February Opinion. FNBO's federal registration was therefore not considered in deciding the motions for summary judgment.

*2 A jury trial in the FNBO Action began on May 3, 2004. The issue at trial was whether FNBO was entitled to money damages as a result of MasterCard's creation of a likelihood of reverse confusion between the SMARTONE and ONESMART marks among actual or potential FNBO agent banks.FN2These banks are the only prospective purchasers of FNBO's smart card services to whom MasterCard's ONESMART program has been presented and therefore the only market relevant to a claim for damages.

FN2. The parties agreed that no claim of forward confusion would be presented at trial.

The following witnesses testified at trial in this order: George Schmezel, Director of Marketing for FNBO; Steven Schulz, Vice President of FNBO's consumer bank; Denise Mazour, an attorney specializing in trademark and copyright law who handled FNBO's SMARTONE application; Christopher Rieck, Vice President for Product Services at MasterCard; Saima Rahmanzai, a senior auditor at FNBO; Elias Eliopoulous, President of FNBO's consumer bank; Jonathan Knowles, an expert witness on brand strategy for FNBO; Cate Elsten, an expert witness on damages for FNBO; Arthur Kranzley, Chief E-business Officer and Executive Vice President of MasterCard; Scott Phillips, an expert witness on damages for MasterCard; Colm Dobbyn, Senior Vice President and Assistant General Counsel for MasterCard; and Robyn Hohns, a consultant who worked at a MasterCard facility. In addition, video footage of the deposition testimony of Christina Costa, who handled MasterCard's promotion of the ONESMART program, was played for the jury, as was footage of the testimony of the following individuals concerning third party use of the term "smart one": Peter Schork, Vice President of the Bank of Ann Arbor; Radu Achiriloaie, Vice President of Oblio Telecom, Inc.; and Badar Khan, Senior Vice President of Marketing for SmartEnergy, Inc.

The evidentiary portion of the trial concluded on May 10, and on May 12, a unanimous jury found that FNBO failed to prove its claim. The factual record upon which this motion for a permanent injunction is based was closed at the conclusion of trial on May 12. Both parties declined the opportunity to supplement the record. FNBO's motion for a permanent injunction was submitted on May 28, in accordance with the schedule set forth in a May 12 Order. For the following reasons, FNBO's motion for a permanent injunction is denied.

*Findings of Fact*

*FNBO and SMARTONE*

FNBO is a national bank that offers credit card services and processing to its own customers, to those of its affiliates, and to agent banks in at least seven states.FN3FNBO's processing services are used principally by mid-sized banks. FNBO entered the smart card market on the belief there was significant potential for future growth in the industry and adopted the SMARTONE name because it felt the term would appeal to consumers across FNBO's agent bank network. FNBO submitted an application to the United States Patent and Trademark Office ("PTO") on November 24, 2000 for federal registration of the SMART ONE trademark in connection with banking services, credit card services, and smart card services.FN4

FN3. Affiliate banks are owned by FNBO, while agent banks are those that allow FNBO to do their credit card processing.

FN4. On April 29, 2003, FNBO amended its PTO application for registration of the SMART ONE mark to apply for registration of SMARTONE instead. This Opinion uses the amended version of FNBO's mark.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**\*3** FNBO has featured the SMARTONE card on its website and sent out two waves of direct mail solicitations to a specially selected set of its customers: 400,000 mailings in September 2002, and 700,000 mailings in March 2003. The mailings targeted customers FNBO believed would be particularly receptive to a smart card product. The mailings generated a better response rate than is typical in direct mail campaigns and resulted in the issuance of approximately 9,000 FNBO SMARTONE cards as of the Summer of 2003.FN5 These smart cards include the bank's name and symbol (an encircled "1") in the upper left corner, a holographic chip accompanied by the word smart along the left side of the card, the term "smartOne" in distinctive font in the center of the card, and the VISA name (in larger font than either the bank or "smartOne" name) displayed across the striped blue and gold VISA symbol in the lower right corner of the card. FNBO has done no additional consumer advertising.

FN5. FNBO claims that 40,000 smart cards bearing the SMARTONE name were issued as of May 2004. This claim is not directly supported by the evidentiary record.

In addition to consumer marketing, FNBO has spoken to two of its agent banks about issuing smart cards bearing the SMARTONE mark. FNBO has sent solicitations to the customers of one of these banks, Hibernia, on its behalf. The card advertised features the Hibernia name in the upper left corner, as well as the holographic chip and SMARTONE and VISA marks as described above. FNBO's name is not included on the front of the Hibernia smart card, and FNBO does not intend to include its name on any SMARTONE cards issued by its other agent banks. FNBO testified that it intended for these SMARTONE cards to be understood by consumers as an offering of the issuing agent bank.

To date, FNBO has spent approximately six million dollars on the development and marketing of its chip card program. FNBO decided to halt its smart card program roughly one year ago as a result of business considerations as well as uncertainty related to the outcome of this lawsuit. FNBO received a federal registration for the term SMARTONE in connection with banking services, credit card services, and smart card services on December 23, 2003.FN6

FN6. As determined prior to trial, FNBO is the senior user vis-a-vis MasterCard. FNBO's registration grants it a constructive use date retroactive to the date the application was filed. *Warnervision Entertainment, Inc. v. Empire of Carolina, Inc.,* 101 F.3d 259, 260 (2d Cir.1996); 15 U.S.C. § 1057(c). A trademark owner has priority over all other users except those who used or filed an application for registration of the mark prior to the owner's filing, and have not abandoned the mark. 15 U.S.C. § 1057(c). It is undisputed that FNBO's application preceded MasterCard's first use of its mark.

*MasterCard and ONESMART*

MasterCard is a global payment systems company whose members include the financial institutions that issue MasterCard cards to consumers. MasterCard competes with other international card networks such as Visa and American Express. MasterCard itself is not a bank and does not issue bank cards.

MasterCard filed two applications to register the ONESMART trademark on June 4, 2001-the first for use in the field of financial services, including credit and other payment card services, and the second for use in connection with computer hardware. MasterCard uses the term ONESMART in conjunction with the ONESMART MASTERCARD program of services and support, including system design and hardware selection, provided to member banks who choose to offer smart cards to their customers. The ONESMART MasterCard program is directed primarily at the network's largest member banks, such as Citibank and Capital One, who have the resources to invest in developing a smart card offering for consumers. MasterCard's advertising campaign, which began in April 2002, included a website, trade show presentation, advertisements in banking industry trade journals, and informational brochures distributed to some of MasterCard's member banks. MasterCard concluded its advertising in 2002.

**\*4** These materials use the term ONESMART MASTERCARD and the slogan ONESMART CARD. MORE SMART CHOICES, as well as the term ONESMART followed by nouns such as "card," "choice," and "move." Although the term ONESMART does not always directly precede

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



MASTERCARD, it is clear that the ONESMART MASTERCARD program is being advertised. The brochures also display prototype smart cards on which "YourBank" is written on the upper right corner over a stylized "One SMART" logo in smaller font. The MasterCard name and symbol of overlapping circles appear prominently in the lower right corner. A holographic chip similar to that on the SMARTONE card is located on the left side of the card. Only a few banks have expressed interest in putting the ONESMART name on a smart card, and none have done so to date.FN7MasterCard has not presented the ONESMART MASTERCARD program to consumers or advertised it in the consumer market.

FN7. MasterCard did suggest to at least one of these banks that it delay use of the name until the resolution of this litigation, however.

In addition to the two applications to register ONESMART filed in June 2001, MasterCard filed applications to register ONESMART MASTERCARD for financial services and computer hardware on October 11, 2001. On February 6, 2002, it applied for the trademark ONE SMART CARD. MORE SMART CHOICES in the financial services industry. On February 24, MasterCard applied to register a stylized version of the ONESMART mark (the "Stylized Application"), displayed as "One SMART," for use in connection with financial services. The Stylized Application, which was sent to a different trademark examiner than the previous ONESMART applications, was registered on February 18, 2003. The other MasterCard applications have been approved for publication by the PTO, but none has been registered.

MasterCard's trademark applications were handled by Assistant General Counsel and Senior Vice President Colm Dobbyn, who testified at trial. Prior to seeking registration of the term ONESMART, Dobbyn conducted a full trademark search in May 2001, uncovering a pending application for the mark ONE SMART LOAN.COM, later abandoned, as well as numerous applications for the SMART ONE trademark. Within the class of financial services, the search described an application for the mark SMARTONE RATE, to be used in connection with the provision of electric power, as well as FNBO's SMARTONE application for use connection with

credit and smart card services and a similar, but later-filed application by Capital One for the same mark. Outside of the financial services class, the trademark search revealed six applications for the SMART ONE mark.

On October 3, 2001, Dobbyn provided the following e-mail opinion ("October 3 Opinion") concerning MasterCard's ONESMART trademark application:

[W]e are aware of a prior trademark filing for SMART ONE by First National bank of Omaha ... First National Bank of Omaha has priority over Capital One and should be able to prevent Capital One from registering the same mark (our interest is in the term ONE SMART, which is arguably distinguishable from SMART ONE.) ...

*5 [T]he filings [by] Capital One and First National of Omaha are not the only references that are of potential interest to the adoption of ONE SMART by MasterCard; *the terms "smart" and "one" are common components of numerous trademark filings by various parties....*

*As a result of the numerous prior filings and uses of the "Smart One" and "One Smart" terminology, it is our opinion that it would be difficult for MasterCard to obtain exclusive trademark rights over the term ONE SMART in the United States.*Nevertheless, we believe that it may be possible to obtain certain limited rights over the composite mark ONE SMART MASTERCARD, given our broad existing rights in the MASTERCARD mark.

*[H]owever, we would be prepared to argue to the Trademarks Office that ONE SMART is sufficiently different from SMART ONE that the two terms can co-exist.*We have already filed applications for both ONE SMART MASTERCARD and ONE SMART alone, with the understanding that it may be necessary to abandon attempts to register ONE SMART itself. *We would recommend the term be used as a composite form-ONE SMART MASTERCARD. We cannot rule out the possibility of an opposition proceeding or other legal action being taken by First National Bank of Omaha or by any other third party, however.*

(Emphasis supplied.) Dobbyn's opinion is consistent with MasterCard's continued efforts to register the ONESMART mark, including its Stylized Application in February 2002, and with its decision to launch the ONESMART MASTERCARD program in April 2002. Subsequent to the October 3

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Opinion, Dobbyn reviewed all MasterCard literature containing the ONESMART term to ensure that it complied with his opinion. MasterCard inadvertently failed to list the Stylized Application in a complaint and declaration filed with this Court.

*The Smart Card Industry*

Smart card programs have been more successful outside of the United States, particularly in Europe. At present, over 150 million MasterCard cards with smart card capabilities have been issued overseas. Although most of these cards were issued prior to the international launch of the ONESMART MASTERCARD program in April 2002, ONESMART MASTERCARD has generated additional smart card activity abroad. Within this country, however, the smart card market has been difficult at best. The reasons for the poor performance of smart cards in the United States include the unwillingness of merchants to purchase and install the expensive equipment and software necessary to utilize the card's "smart" capabilities, and the existence in this country of a rapid and extensive verification system that reduces the incidence of credit card fraud without the need to resort to the protections against fraud provided by the smart card. The "killer application" for smart card technology that the industry had hoped would drive consumer demand and merchant acceptance has thus far failed to materialize. Both FNBO and MasterCard acknowledge that the smart card market appears to have reached at least a temporary plateau, although FNBO executives continue to believe that it will be followed by strong future growth.

*Third-Party Use*

**\*6** A smart card business plan prepared by FNBO identifies as FNBO's primary competition other banks and credit card providers establishing smart card programs and suggests that telephone, gas and electric companies also posed a threat in the electronic cash and internet payment markets. Within these areas, detailed evidence of three concurrent third party uses of the term SMARTONE or a variant thereof was presented at trial. These include the Bank of Ann Arbor, which uses "Smart One" to describe checking account services that were offered to customers in a county in Michigan prior to FNBO's application for the SMARTONE mark; Oblio Telecom, which has sold over 12

million prepaid phone cards under the name "Smart 1"; and SMARTONE RATE, used by SmartEnergy.com in a pilot financing services program for purchasers of electrical power, which has since been discontinued.

*Discussion*

*Trademark Infringement*

The Lanham Act, 15 U.S.C. §§ 1051*et seq.,* protects the owner of a registered trademark from the use in commerce of any "colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with such use is likely to cause confusion, or to cause mistake, or to deceive."15 U.S.C. § 1114(1)(a)."To prevail on a claim of trademark infringement, a plaintiff must show, first, that its mark merits protection, and, second, that the defendant's use of a similar mark is likely to cause consumer confusion."*Brennan's, Inc. v. Brennan's Restaurant, L.L.C.,* 360 F.3d 125, 129 (2d Cir.2004).FN8

FN8. FNBO seeks an injunction preventing the use of "ONESMART, ONESMART MASTERCARD, or any variant thereof" in the consumer market. This Opinion addresses only FNBO's strongest argument-that the ONESMART mark, standing alone, creates a likelihood of confusion with the SMARTONE mark. There is no need to address the weaker arguments concerning the composite term or variants thereof.

1. *Protectibility of the Mark*

A valid and protectible mark must be capable of distinguishing the products it marks from those of others. *TCPIP Holding Co., Inc. v. Haar Communications, Inc.,* 244 F.3d 88, 93 (2d Cir.2001); *Lane Capital Management, Inc. v. Lane Capital Management, Inc.,* 192 F.3d 337, 344 (2d Cir.1999). There are five categories of terms, reflecting both the mark's eligibility for protection and the degree of protection that it is accorded under the law. *Lane,* 192 F.3d at 344. In descending order of strength, these categories are: fanciful, arbitrary, suggestive, descriptive and generic. *Id.* A fanciful mark, accorded the highest level of protection, is not a real word but is invented for its use as a mark. *Id.* An arbitrary mark uses a common word in an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



unfamiliar way. *Id.* A suggestive mark "merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods."FN9*Id.* Marks classified in these three categories-fanciful, arbitrary, and suggestive-are all considered "inherently distinctive" and therefore protectible, but a mark that is merely suggestive is accorded the lowest degree of protection in this ranking. *Id.*

FN9. Of the remaining categories, a descriptive mark employs ordinary language to describe a product's features or its use, and requires a showing that the mark has acquired secondary meaning to be considered protectible. *TCPIP,* 244 F.3d at 93. A generic mark is a common means of identifying a product or its source and is not protectible. *Id.*

The registration of a trademark with the PTO is prima facie evidence that the mark is valid and protectible. *Lane,* 192 F.3d at 345. When the PTO registers a trademark without requiring proof of secondary meaning, a presumption arises that the mark is more than merely descriptive and is therefore inherently distinctive. *Id.* A defendant may rebut this presumption by demonstrating that the purchasing public does not perceive a mark to be distinctive. *Id.* at 345.

**\*7** Because SMARTONE was registered by the PTO on December 23, 2004 without proof of secondary meaning, there is a presumption that the mark is inherently distinctive. At trial, MasterCard stipulated that SMARTONE is a suggestive mark and therefore has not offered any evidence of public perception to rebut the presumption of SMARTONE's distinctiveness. Although the parties' stipulation to SMARTONE's classification as suggestive is not binding on this Court, an independent evaluation of the mark results in the same conclusion. The term SMARTONE employs common words in a familiar order to suggest the "smart" feature of FNBO's card, while still requiring the purchaser to use imagination to identify the complete nature of the product.

### 2. Likelihood of Forward Confusion

To prevail on a theory of forward confusion, a plaintiff must establish that "numerous ordinary prudent purchasers are likely to be misled or

confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark."*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 217 (2d Cir.2003) (citation omitted). A finding of infringement, moreover, requires a "probability of confusion, not a mere possibility."*Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 743 (2d Cir.1998).

To assess the likelihood of consumer confusion between two marks, a court applies the eight-factor test set forth in Judge Friendly's landmark decision *Polaroid Corp. v. Polarad Electronics, Corp.,* 287 F.2d 492, 495 (2d Cir.1961).*Brennan's,* 360 F.3d at 130;*see also*Virgin *Enterprises Ltd. v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003). This test suggests analysis of the following non-exclusive factors: (1) the strength of the plaintiff's mark, (2) the degree of similarity between the two marks, (3) the competitive proximity of the products, (4) the likelihood the plaintiff will bridge any gap, (5) actual confusion (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's products, and (8) the sophistication of the purchasers. *Brennan's,* 360 F.3d at 130. This is not a mechanical inquiry in which any one factor is dispositive. *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 269 F.3d 114, 119 (2d Cir.2001). Rather, "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product."*Brennan's,* 360 F.3d at 130 (citation omitted).

### Strength of the Plaintiff's Mark

"The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis."*Brennan's,* 360 F.3d at 130. Strength is measured by two components: inherent distinctiveness and distinctiveness in the marketplace. *Id.* at 130-31;*see also*Streetwise, 159 F.3d at 743. Inherent distinctiveness describes a mark's abstract potential to identify goods and is analyzed according to the same categories and ranking used to evaluate the protectibility of a mark. *Brennan's,* 360 F.3d at 131. A suggestive mark is inherently distinctive, although not as theoretically strong as an arbitrary or fanciful mark. *Lane,* 192 F.3d at 344. This hierarchy is imposed because the more descriptive-rather than arbitrary-a mark is, the more likely it is that consumers will assume similar

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



marks were chosen because they describe similar products, not because the products come from the same source. *TCPIP,* 244 F.3d at 100-01.

**\*8** Distinctiveness in the marketplace, or acquired distinctiveness, gauges the degree of consumer recognition the mark has achieved among members of the purchasing public as the designator of the plaintiff's services. *Brennan's,* 360 F.3d at 131; *TCPIP,* 244 F.3d at 100. To support a finding that a mark has acquired this secondary meaning, a plaintiff must show that "a significant number of prospective purchasers understand the term when used in connection with the particular kinds of goods involved in the registration certificate as indicative of an association with a specific entity." *Genessee Brewing Co. Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 143 n. 4 (2d Cir.1997).FN10 Factors relevant to this analysis include: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."*Id.* (citing *Centaur Communications v. A/S/M Communications,* 830 F.2d 1217, 1222 (2d Cir.1987)).

FN10. This entity, however, may be anonymous. *Patsy's,* 317 F.3d at 217.

SMARTONE is an inherently distinctive but weak mark. There is little evidence that SMARTONE has acquired secondary meaning. The only advertising by FNBO has been through its website and two series of direct mailings to existing customers. There was no presentation at trial of any consumer studies, unsolicited media coverage, or attempts to plagiarize the SMARTONE mark.FN11 The term was only presented to consumers in September 2002, and FNBO halted the marketing of its SMARTONE program approximately one year later. Several third parties, moreover, have employed the term "Smart One" in related financial, phone, and energy industries in the consumer marketplace.

FN11. As FNBO concedes, MasterCard chose the ONESMART mark independently and decided to investigate its availability before it learned of FNBO's SMARTONE mark.

In the Summer of 2003, 9,000 SMARTONE smart cards were in the marketplace. While this may have

been a better return than FNBO expected on its direct mailings, there is no evidence that the SMARTONE name contributed to these sales. In fact, it is more reasonable to infer that these FNBO customers responded based on their associations with the FNBO and VISA trademarks or their desire to try the new smart card technology. The SMARTONE mark appears on the FNBO smart card amidst the bank's prominent name and the unmistakable VISA name and symbol, and across from a holographic chip next to which the word "smart" appears. The same is true of smart cards offered by Hibernia and proposed to other FNBO agent banks. The card that FNBO hopes that its affiliate and agent banks will use will each carry that bank's name and the Visa marks, but not FNBO's name or logo. Amidst this jumble of better-known names and symbols, there is little reason to find that consumers will attach meaning to the SMARTONE name or view it as designating a single source of the smart cards or services provided by their financial institutions.

SMARTONE is therefore a weak mark. Though suggestive, there is no evidence that it has yet acquired any significant level of distinctiveness in the consumer marketplace or that it is likely to become associated in consumers' minds with a particular smart card source.

*Similarity of the Marks*

**\*9** When evaluating the similarity of two marks, a court must "take into account the overall context in which the marks appear and the totality of circumstances that could cause consumer confusion."*EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos,* 228 F.3d 56, 66 (2d Cir.2000). The prominent use of a brand name alongside a trademark can serve to dispell confusion as to the source of a product. *Nabisco, Inc. v. Warner-Lambert, Co.,* 220 F.3d 43, 46-47 (2d Cir.2000); *W.W.W. Pharmaceutical Co ., Inc. v. Gilette Co.,* 984 F.2d 567, 573 (2d Cir.1993). The ultimate question is whether any similarity "is more likely than not to cause consumer confusion." *Brennan's,* 360 F.3d at 133.

Although the SMARTONE and ONESMART marks both contain the words "one" and "smart," the similarity between these transposed marks is lessened substantially by their commercial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



presentation, particularly alongside the well-known Visa and MasterCard brands. SMARTONE appears exclusively on smart cards emblazoned with the famous Visa logo and blue and gold striped symbol, while ONESMART always appears on cards featuring the MasterCard mark and its symbol of interlocking red and yellow circles. These brands and logos are the predominant marks on both smart cards and, in the absence of a significant campaign to create secondary meaning for the ONESMART term, are the most likely to be recognized as the source of the card at issue. They are also understood by the public to be staunch competitors in the credit card field.FN12

FN12. FNBO argues that many consumers do not understand that Visa and MasterCard are different organizations. The only evidence on which it bases this contention is a one-word response from a MasterCard executive to a question during his deposition. The response is of little value without the context in which it was asked and is insufficient to support the unreasonable inference that consumers do not distinguish between the Visa and MasterCard brands.

In addition, the smart cards at issue feature the name of the issuing consumer bank-an institution with which the cardholder is likely familiar or has an existing relationship. Finally, the marks are presented differently on the two cards, with *"smartOne"* appearing in the center of the FNBO card and *"OneSMART"*FN13 included in the upper right corner of the MasterCard smart card.

FN13. The appearance of the quoted terms is only approximated in this Opinion. The distinct commercial impressions created by the marks is heightened by the different fonts employed, particular for the latter portion of the ONESMART mark.

In this commercial context, the similarity between the two marks is unlikely to cause consumer confusion as to the source of the FNBO and MasterCard member bank products. Consumers are more likely to view the source of the product as one of the Visa or MasterCard card networks, well-known competitors, or as the familiar issuing bank clearly indicated on the smart card. It is far less likely that the SMARTONE and ONESMART marks will be viewed by consumers as designating

the source-rather than the nature-of the smart card product. In the totality of circumstances in which consumers are presented with the SMARTONE and ONESMART marks, there is an insufficient basis to find that their similarity is likely to cause confusion as to the source of the smart card on which they appear.

*Proximity of the Products in the Market and Likelihood of Bridging the Gap*

The proximity inquiry assesses the extent to which the products compete with each other, evaluating the nature of the products and the structure of the relevant market. *Brennan's,* 360 F.3d at 134. "[T]he closer the secondary user's [services] are to those the consumer has seen under the prior user's brand, the more likely that the consumer will mistakenly assume a common source."*Virgin,* 335 F.3d at 150.

*\*10 FNBO is seeking a limited injunction preventing MasterCard from entering the consumer market. If smart cards bearing the ONESMART mark were issued to consumers, products bearing the SMARTONE and ONESMART marks would operate at the same commercial level. The prospect of such competition, however, is difficult to assess with precision.FN14

FN14. MasterCard does not issue bank cards and does not decide whether the term appears on smart cards held by consumers. The decision to employ the ONESMART term is made by member banks who choose to participate in the ONESMART MASTERCARD program. To date, only a few banks have participated in the program, fewer have inquired about use of the mark, and none have employed the name on smart cards presented to consumers. FNBO requests an injunction preventing competitive use at the consumer level, but numerous factors, including the limited success of the ONESMART MASTERCARD program, and the poor performance of the smart card market suggest that any use of the ONESMART mark on consumer cards is uncertain at best.

MasterCard argues that FNBO's voluntary withdrawal of its claim of contributory infringement prior to trial represents an acknowledgment that MasterCard is not encouraging its member banks to use ONESMART on cards. It is unnecessary to reach this argument given the Court's conclusion that there is no likelihood of confusion between the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: Not Reported in F.Supp.2d)

Page   9

SMARTONE and ONESMART marks.

*Actual Confusion*

Under the Lanham Act, actual confusion refers to "consumer confusion that enables a seller to pass his goods off as the goods of another."*The Sports Authority, Inc. v. Prime Hospitality Corp .,* 89 F.3d 955, 963 (2d Cir.1996) (citation omitted). Although evidence of actual confusion is highly relevant, it is well-established that a plaintiff need not offer such evidence to prevail in a claim for injunctive relief under the Lanham Act. *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986).

FNBO has presented no evidence of actual consumer confusion as to the source of cards bearing the SMARTONE and ONESMART marks. This absence of direct evidence is to be expected since no smart cards bearing the ONESMART mark have been issued or marketed to consumers and does not prevent FNBO from prevailing under the Lanham Act. FNBO did not conduct a survey to measure consumer confusion. FNBO offered no admissible evidence at trial of actual confusion between the SMARTONE and ONESMART marks among members of FNBO's actual and potential agent banks.FN15

FN15. The only evidence of actual confusion that FNBO sought to present was survey evidence so flawed that any probative value was outweighed by its potential to prejudice the jury. *MasterCard,* 2004 WL 326708 at *7-10. The survey's flaws, which are described in detail in the February Opinion, include the small number of respondents surveyed, the survey's failure to address non-response bias, and the lack of resemblance between the survey questions and conditions and the actual decision-making process of the relevant agent bank employees. *Id.* at *9-10. These deficiencies also preclude assigning any weight to this evidence at this stage of the proceedings.

*MasterCard's Alleged Bad Faith*

This factor "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product ."*Nora Beverages,* 269 F.3d at 124 (citation

omitted)."Full knowledge of a prior use of a protected mark is not necessarily inconsistent with a finding of good faith, particularly where the alleged infringer is unsure as to the scope of protection." *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 483 (2d Cir.1996) (citation omitted). Ultimately, the determination of whether a party acted in bad faith is not of high relevance, however, since "it does not bear directly on whether consumers are likely to be confused."*Virgin,* 335 F.3d at 151;*TCPIP,* 244 F.3d at 102.

There is no basis for a finding that MasterCard acted in bad faith in its adoption, use or registration of the ONESMART mark.FN16To begin, there is no evidence that MasterCard adopted the ONESMART mark with any intention of capitalizing on FNBO's goodwill or with the intent to cause confusion between the SMARTONE and ONESMART marks. FNBO's allegations that MasterCard displayed bad faith by adopting, using and registering the ONESMART mark with knowledge of FNBO's prior use were not borne out by the evidence presented at trial. The evidence of MasterCard's trademark counsel was particularly compelling. Mr. Dobbyn is an experienced trademark attorney who analyzed the legal issues with care and precision. His testimony was entirely credible and established that MasterCard obtained first-rate legal advice and relied upon that advice in its decisions.

FN16. FNBO relies on the February Opinion to argue that the evidence supports MasterCard's bad faith in the adoption and use of the ONESMART mark. MasterCard's motion for summary judgment was denied on the ground that the evidence submitted in connection with the motion raised a material issue of fact. The evidence presented at trial, however, resolves this issue-there is no basis to conclude that MasterCard demonstrated bad faith in its efforts to register or market the ONESMART mark.

*11 As MasterCard's in-house counsel, Dobbyn conducted a full trademark search and issued an opinion suggesting that MasterCard argue to the PTO that SMARTONE and ONESMART could co-exist in the financial services market.FN17 MasterCard's subsequent marketing of the ONESMART MASTERCARD program was conducted in accordance with his recommendations, and its trademark applications, including the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Stylized Application, were similarly consistent with his advice. MasterCard's omission of the Stylized Application-a public document-from a list included in documents filed with this Court was inadvertent and insufficient to suggest bad faith.FN18

FN17. In contrast, FNBO did a truncated trademark search and its submissions to the PTO contained false statements and omissions. Because MasterCard informed the PTO of these deficiencies prior to its decision to register FNBO's SMARTONE mark, the Court concluded that the flaws were not material and refused to charge the jury on MasterCard's claim that the SMARTONE registration should be cancelled due to fraud on the PTO.

FN18. There is no need to address FNBO's claim, asserted for the first time in its reply brief, that the Court should draw an adverse inference against MasterCard because it refused to produce information relating to the advice of counsel. No evidence warranting such an inference has been presented.

*Quality of MasterCard's Products*

The quality of a junior user's product may be relevant to the likelihood of confusion analysis in two ways: "(1) an inferior product may cause injury to the plaintiff trademark owner because people may think that the senior and junior products came from the same source; or (2) products of equal quality may tend to create confusion as to the source because of this very similarity."*Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 505 (2d Cir.1996). FNBO has developed its own chip technology, employing chips purchased from a third-party vendor. MasterCard's ONESMART MASTERCARD program permits member banks to select the chip technology they employ. There is no evidence upon which to evaluate the relative quality of the services that might be offered under each mark. There is, however, no reason to believe that MasterCard member banks would utilize inferior chip technology and insufficient evidence about the range in the menu of services that may be offered with competing smart cards to conclude that confusion in the smart card market would be created as a result of competing cards employing similar technologies.

*Sophistication of Consumers*

A likelihood of confusion analysis examines the level of sophistication of the relevant purchasers-here, consumers in the smart card market. A court considers "the general impression of the ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue."*Streetwise Maps,* 159 F.3d at 746.

FNBO has not presented any evidence concerning the sophistication of consumers making decisions between smart cards. While consumers are not expected to possess the expertise of the agent bank employees who were the focus of the trial in this action, it is reasonable to assume that, at a minimum, smart card purchasers are familiar with the Visa and MasterCard brands-including their competitive status. It is likely, therefore, that the relevant consumers will distinguish between smart cards bearing the Visa and MasterCard brands, undermining any confusion that may result from the use of the SMARTONE and ONESMART brands.

In sum, the weakness of the SMARTONE mark in the commercial context and the presence of strong brand names minimizing any potential confusion caused by similarity between the SMARTONE and ONESMART marks weigh heavily against finding a likelihood of confusion between the marks. FNBO does seek an injunction preventing the use of ONESMART on what are theoretically competitive smart card products, but the speculative nature of such use lessens the relevance of this factor to the inquiry at hand. There is insufficient evidence upon which to find a probability,FN19 as opposed to a mere possibility, that consumer confusion as to the source of smart card services bearing the SMARTONE trademark would result from the use of MasterCard's ONESMART mark on smart cards issued or marketed to consumers.

FN19. In its reply brief, FNBO relies for the first time on *Banff, Ltd. v. Federated Department Stores, Inc.,* 841 F.2d 486 (2d Cir.1988), to support its claim that it is entitled to a permanent injunction based on a balancing of the *Polaroid* factors. In *Banff,* however, the marks at issue-the brand names "Bee Wear" and "B Wear" used on women's clothing labels-clearly and meaningfully identified to consumers the source of the goods to which they were attached. This is not true of the SMARTONE and ONESMART marks.



### 3. Likelihood of Reverse Confusion

*12 FNBO does not identify whether it bases its request for an injunction in whole or part on a likelihood of reverse confusion. Reverse confusion occurs when a bigger and better-known "junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter."*Ameritech, Inc. v. American Information Technologies Corp.,* 811 F.2d 960, 964 (6th Cir.1987); *see alsoA & H Sportswear Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 228 (3d Cir.2000); *W.W.W. Pharmaceutical Co. Inc. v. Gillette Co.,* 984 F.2d 567, 571 (2d Cir.1993); *Sands, Taylor & Wood Co. Quaker Oats Co.,* 978 F.2d 947, 957 (7th Cir.1992) ; *Banff, Ltd. v. Federated Dep't Stores,* 841 F.2d 486, 490 (2d Cir.1988). For confusion to be considered reverse, it must be more likely that consumers will first encounter the junior user's-rather than the senior user's-goods. *A & H Sportswear,* 237 F.3d at 230;*Banff,* 841 F.2d at 490 . The senior user is harmed if its trademark is deprived of its ability to identify and distinguish its services or if purchasers erroneously believe the senior user is infringing the mark of the junior user. *W.W.W. Pharmaceutical,* 984 F.2d at 571.

The likelihood of reverse confusion is measured according to the *Polaroid* factors described above, with the following distinctions as to the first factor, the strength of the plaintiff's mark, and the sixth factor, the defendant's good faith. In cases of forward confusion, the first *Polaroid* factor assesses the strength of the senior user's mark. For both forward and reverse confusion claims, a plaintiff with a conceptually weak mark is less likely to prevail. *A & H Sportswear,* 237 F.3d at 231. A plaintiff with a mark that is commercially weak, however, is more likely to succeed in establishing reverse confusion, particularly against a defendant with a far stronger mark. *Id.*

The sixth factor in the traditional *Polaroid* analysis examines whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation or goodwill. *Brennan's,* 360 F.3d at 130. In the context of reverse confusion, it is unlikely that a larger and better known junior user intends to trade on the reputation of the lesser-known plaintiff.

This factor is therefore less relevant in a reverse confusion inquiry, although any finding that the defendant adopted its mark with an intent to cause any form of confusion should weigh in favor of the plaintiff. *A & H Sportswear,* 237 F.3d at 232.

As an initial matter, FNBO has failed to establish the relevance of an analysis of the likelihood of reverse confusion between the SMARTONE and ONESMART marks among consumers. FNBO has presented no evidence that MasterCard is likely to saturate the consumer market with the ONESMART mark. It is reasonable to infer from the evidentiary record at trial-including the limited success of the ONESMART MASTERCARD program, the lack of interest expressed by member banks in the ONESMART name, and the lackluster market for smart cards in the United States-that any use of the ONESMART mark at the consumer level will be limited in scope. Such use, moreover is unlikely to occur in the near future given the perceived lack of consumer demand and the time and expense required by member banks to develop the requisite chip technology.

*13 FNBO, on the other hand, has already developed its chip technology and entered the consumer market, where it claims to have exceeded its own performance goals with 40,000 existing smart cards issued to consumers. FNBO is poised to continue and expand its marketing campaign if it chooses to do so. There is no basis to find that the ONESMART mark is likely to overwhelm FNBO's existing SMARTONE mark, as is required to form the factual predicate on which a claim for reverse confusion is based.

It is therefore unnecessary to undertake an examination of the *Polaroid* factors to determine whether there is a likelihood of reverse confusion. Were such an analysis warranted, however, FNBO fares no better under this theory than it did on its claim of forward confusion. The first factor in a reverse confusion analysis-the relative strength of the marks-does not favor FNBO. Although FNBO's SMARTONE mark is commercially weak, as described above, MasterCard's ONESMART mark is no stronger and is unlikely to attain significant commercial strength. MasterCard's ONESMART mark has not yet been advertised to consumers or appeared on any smart cards available to consumers. Evidence was presented that member banks have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                    **Page   12**
**(Cite as: Not Reported in F.Supp.2d)**

expressed little interest in the ONESMART mark itself and that several have or plan to employ different names on smart cards issued in accordance with the ONESMART MASTERCARD program. There is little reason to believe that the ONESMART name will be featured prominently in consumer advertising. The ONESMART mark, moreover, would be used in conjunction with the name of the issuing bank and with the prominent MasterCard logo and symbol, undermining consumers' association of the ONESMART mark with the source of the smart card services in the same manner that weakened the commercial strength of the SMARTONE mark.

The analysis of remaining *Polaroid* factors in the previous section applies to the reverse confusion inquiry as well. There is similarly no basis upon which to find a likelihood of reverse confusion meriting the issuance of permanent injunction preventing the use of the ONESMART mark at the consumer level.

*Conclusion*

FNBO's motion for a permanent injunction preventing the use of the term ONESMART, ONESMART MASTERCARD, or any variant thereof of on chip cards, debit cards, or credit cards marketed to consumers is denied. The Clerk of Court shall enter judgment for MasterCard in both actions.

SO ORDERED:

S.D.N.Y.,2004.
First Nat'l. Bank of Omaha, Inc. v. Mastercard Intern. Inc.
Not Reported in F.Supp.2d, 2004 WL 1575396 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 4

Slip Copy                                                                    Page    1
Slip Copy, 2007 WL 2780394 (S.D.N.Y.)
**(Cite as: Slip Copy)**
**H**

In re Enron Corp.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re ENRON CORP., et al., Reorganized Debtors.
Enron Corp., Plaintiff,
v.
Springfield Associates, L.L.C. and Westpac
Banking Corporation, Defendants.
Springfield Associates, L.L.C., Appellant,
v.
Enron Corp., Appellee.
No. 01-16034.
Adversary Proceeding No. 05-01025.
Nos. 06 Civ. 7828(SAS), 07 Civ.1957(SAS).

Sept. 24, 2007.

*MEMORANDUM OPINION AND ORDER*
SHIRA A. SCHEINDLIN, U.S.D.J.
**\*1** Appellant Springfield Associates, L.L.C.
("Springfield") seeks certification for interlocutory
appeal of this Court's August 27, 2007 Opinion and
Order (the "August 27 Opinion") and Judgment
dated August 28, 2007. Familiarity with the August
27 Opinion is presumed. Springfield seeks
certification of the following two questions:
(i) whether equitable subordination under section
510(c) of the Bankruptcy Code and disallowance
under section 502(d) of the Bankruptcy Code can be
applied, as a matter of law, to claims held by a
transferee to the same extent as they would be
applied to such claims if they were still held by the
transferor based solely on alleged acts or omissions
on the part of the transferor, where no such acts or
omissions on the part of the transferee have been
alleged, and (ii) if so, whether potential equitable
subordination and/or disallowance turn on the
distinction between a claim transferred by sale and a
claim transferred by assignment.FN1

FN1. Notice of Motion by Springfield Associates,
LLC to Modify Order and Judgment for
Certification of Interlocutory Appeal at 2.

For the reasons discussed below, the motion to
certify for interlocutory appeal is denied.

### I. LEGAL STANDARD

Appeals of interlocutory district court orders are
governed by 28 U.S.C. § 1292(b). Under section
1292(b), the order being appealed must "(1) involve
a controlling question of law (2) over which there is
substantial ground for difference of opinion," and
the movant must also show that "(3) an immediate
appeal would materially advance the ultimate
termination of the litigation."FN2In addition, leave
to appeal is warranted only when the movant
demonstrates the existence of "exceptional
circumstances" FN3 sufficient to overcome the
"general aversion to piecemeal litigation" FN4 and
to "justify a departure from the basic policy of
postponing appellate review until after the entry of a
final judgment."FN5Interlocutory appeal "is limited
to 'extraordinary cases where appellate review might
avoid protracted and expensive litigation,'... and is
not intended as a vehicle to provide early review of
difficult rulings in hard cases."FN6The decision
whether to grant an interlocutory appeal from a
district court order lies within the district court's
discretion.FN7

FN2.28 U.S.C. § 1292(b).

FN3.*Williston v. Eggleston,* 410 F.Supp.2d 274,
276 (S.D.N.Y.2006).

FN4.*In re AroChem Corp.,* 176 F.3d 610, 619 (2d
Cir.1999).*Accord Ted Lapidus, S.A. v. Vann,* 112
F.3d 91, 95 (2d Cir.1997).

FN5.*In re Flor,* 79 F.3d 281, 284 (2d Cir.1996)
(quotation omitted).

FN6.*In re Levine,* No. 94-44257, 2004 WL 764709,
at \*2 (S.D.N.Y. Apr. 9, 2004) (quoting *German v.
Federal Home Loan Mortgage Corp.,* 896 F.Supp.
1385, 1398 (S.D.N.Y.1995)).

FN7.*See, e.g., Swint v. Chambers County Comm'n,*
514 U.S. 35, 47 (1995) ("district courts [have] first
line discretion to allow interlocutory appeals"); *In re
Kassover,* 343 F.3d 91, 94 (2d Cir.2003); *DM
Rothman Co., Inc. v. Cohen Mktg. Int'l, Inc.,* No.
98 Civ. 7905, 2006 WL 2128064, at \*1 (S.D.N.Y.
July 27, 2006).

"In regard to the first prong, the 'question of law'
must refer to a 'pure' question of law that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



reviewing court could decide quickly and cleanly without having to study the record."FN8The question must also be "controlling" in the sense that reversal of the district court's order would terminate the action, or at a minimum that determination of the issue on appeal would materially affect the litigation's outcome.FN9

FN8.*In re Worldcom, Inc.,* No. M47, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003).

FN9.*See In re XO Commc'ns, Inc.,* No. 03 Civ. 1898, 2004 WL 360437, at *3 (S.D.N.Y. Feb. 26, 2004); *North Fork Bank v. Abelson,* 207 B.R. 382, 389-90 (E.D.N.Y.1997).

As to the second prong, the "substantial ground for a difference of opinion" must arise out of a genuine doubt as to whether the district court applied the correct legal standard in its order.FN10The requirement that such a substantial ground exist may be met when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit."FN11 However, it is not sufficient that the relevant case law is "less than clear" or allegedly "not in accord," FN12 or that there is a "strong disagreement among the parties." FN13"A mere claim that a district court's decision was incorrect does not suffice to establish substantial ground for a difference of opinion."FN14Rather, the district court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is *substantial* ground for dispute."FN15

FN10.*In re Worldcom,* 2003 WL 21498904, at *10 (citation omitted).

FN11.*In re Lloyd's Am. Trust Funds Litig.,* No. 96 Civ. 1262, 1997 WL 458739, at *5 (S.D.N.Y. Aug. 12, 1997) (citing *Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 25 (2d Cir.1990)).

FN12.*North Fork Bank,* 207 B.R. at 390.

FN13.*In re Iridium Operating LLC,* Nos. 99-45005, 01-02952, M47, 2003 WL 21507196, at *1 (S.D.N.Y. June 30, 2003) (stating that to demonstrate that there is a substantial ground for difference of opinion a party "must show that the issue is difficult and of first impression and involves

more than just a strong disagreement among the parties" (quotation omitted)).

FN14.*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,* No. 04 Civ. 10014, 2005 WL 3440701, at *2 (S.D.N.Y. Dec. 14, 2005) (citations omitted).

FN15.*In re Flor,* 79 F.3d at 284 (quotation omitted).*Accord Marlin v. United States Trustee,* 333 B.R. 14, 20 (W.D.N.Y.2005).

**\*2** Finally, as to the third prong, " '[a]n immediate appeal is considered to advance the ultimate termination of the litigation if that appeal promises to advance the time for trial or shorten the time required for trial.' " FN16 Courts place particular emphasis on the importance of this last factor.FN17

FN16.*Transportation Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.,* 358 F.Supp.2d 347, 350 (S.D.N.Y.2005) (quoting *In re Oxford Health Plans, Inc.,* 182 F.R.D. 51, 53 (S.D.N.Y.1998)).

FN17.*See Koehler v. Bank of Bermuda, Ltd.,* 101 F.3d 863, 865-66 (2d Cir.1996) ("The use of § 1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation."); *Lerner v. Millenco, L.P.,* 23 F.Supp.2d 345, 347 (S.D.N.Y.1998) ("The Court of Appeals has emphasized the importance of the third consideration in determining the propriety of an interlocutory appeal.").

## II. DISCUSSION

There are no exceptional circumstances present in this case sufficient to overcome the general aversion to piecemeal litigation and to justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment. Springfield relies heavily on the fact that this Court granted interlocutory appeal of the Bankruptcy Court's Orders and argues that the same reasoning should apply to certify the August 27 Opinion for appeal. FN18The Court's reasoning in granting that interlocutory appeal, however, relied in large part on the breadth of the Bankruptcy Court's rulings and the threat to the markets that those rulings posed. FN19In the Court's August 27 Opinion, the Court significantly scaled back the Bankruptcy Court's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



rulings, and this Court's narrow holdings took care to ensure that the markets would not be disturbed. FN20Thus, this case no longer satisfies the criteria for interlocutory review.

FN18. Leave to file the interlocutory appeal from the Bankruptcy Court orders was sought by various defendants and permitted intervenors, including defendant Springfield and permitted intervenor Citibank. *See In re Enron Corp.,* No. M-47, 2006 WL 2548592, at *1 (S.D.N.Y. Sept. 5, 2006).

FN19.*See id.*(granting leave to appeal in part because of the appellants' concerns regarding the "uncertainty that these rulings-if left undisturbed-would inject into the market for the sale of postpetition claims").

FN20. Industry Amici's brief in support of Springfield's motion for certification asserts that without immediate appeal to the Second Circuit and perhaps the Supreme Court, uncertainty in the markets will persist. That concern is not significant given this Court's pointed statements in the August 27 Opinion that "the concerns raised by Industry Amici with respect to the effects of the Bankruptcy Court's rulings on the markets for distressed debt are no longer present. *Equitable subordination and disallowance arising out of the conduct of the transferee will not be applied to good faith open market purchasers of claims."In re Enron Corp.* No. 06 Civ. 7828, 2007 WL 2446498, at *13 n. 76 (S.D.N.Y. Aug. 27, 2007) (emphasis added) (citation omitted).*See also id.* at *13 n. 104 ("sales of claims on the open markets are indisputably sales").

It bears repeating that interlocutory appeal is "not intended as a vehicle to provide early review of difficult rulings in hard cases ."FN21Although there were undoubtedly several issues of first impression raised by this appeal, this is not true of one of the two issues of which Springfield seeks certification. Specifically, there is no substantial ground for a difference of opinion that transfers by sale and transfers by assignment are distinct. Nor can there be any dispute as to the general principle of assignment law-that an assignee stands in the shoes of the assignor and subject to all equities against the assignor-applies to assignments of bankruptcy claims.

FN21.*In re Levine,* 2004 WL 764709, at *2.

Moreover, the issues decided by this Court and remanded to the Bankruptcy Court are not "pure" questions of law that the reviewing court could decide quickly and cleanly without having to study the record.FN22Rather, this Court remanded the case to the Bankruptcy Court to determine, *inter alia,* whether Springfield obtained the claims by way of an assignment or a sale. That determination may well require a factual inquiry at trial.

FN22.*In re Worldcom, Inc.,* 2003 WL 21498904, at *10.

Finally, an interlocutory appeal to the Second Circuit would not advance the ultimate termination of the litigation. To the contrary, it may significantly delay the proceedings in Bankruptcy Court.FN23The Mega Claim Action is scheduled to go to trial in April of 2008. An interlocutory appeal could delay that trial for over a year, at the expense of all of the parties involved in this already protracted bankruptcy case. Indeed, the fact that the proceedings below may moot Springfield's appeal altogether (*e.g.,* if Springfield is found to be a bona fide purchaser for value of Citibank's claims, that would require dismissal of the claims for equitable subordination and disallowance predicated on the conduct of Citibank) also weighs against certification.

FN23. Indeed, it is interesting that neither Citibank nor Enron have joined with Springfield in this request for certification.

### III. CONCLUSION

*3 For the reasons set forth above, Springfield's motion for leave to seek an interlocutory appeal of the August 27 Opinion is denied. The Clerk of the Court is directed to close this motion [No. 66 on the Docket Sheet].

SO ORDERED:

S.D.N.Y.,2007.
In re Enron Corp.
Slip Copy, 2007 WL 2780394 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# EXHIBIT 5

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 524858 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**
**H**

Freeman v. National Broadcasting Co., Inc.
S.D.N.Y.,1993.
Only the Westlaw citation is currently available.
    United States District Court, S.D. New York.
        Jacob FREEMAN, et al., Plaintiffs,
                        v.
    NATIONAL BROADCASTING COMPANY,
            INC., Defendant.
            No. 85 CIV 3302 (LBS).

            Dec. 15, 1993.

            OPINION AND ORDER
ROBERTS, United States Magistrate Judge:
**\*1** Plaintiffs, employees of National Broadcasting
Company, Inc. ("NBC"), brought this action to
recover back overtime pay pursuant to the Fair
Labor Standards Act ("FLSA"), 29 U.S.C. § 207 *et
seq.* Defendant now moves this court for an order
pursuant to 28 U.S.C. § 1292(b) certifying for
interlocutory appeal my August 20, 1993 Opinion
and Order ("Opinion and Order"), which found that
because defendant NBC failed to prove that
plaintiffs were exempt from the FLSA overtime
provisions, plaintiffs were entitled to back overtime
pay from 1983 onward.

For the following reasons, the defendant's motion is
denied.

            HISTORY OF LITIGATION

In 1985, 149 NBC employees brought this action
against NBC under the FLSA, alleging improper
calculation of overtime compensation.     In July
1989, I denied cross-motions for summary
judgment.     The claims of three plaintiffs-Jacob
Freeman, Bernard Brown, and Robert Garner-were
then severed so that they could be treated as "test
cases" in the interest of judicial economy.     In
addition, the parties in the test cases agreed to defer
the determination of damages until after completion
of the trial on the issue of liability.    The non-jury
trial commenced in February 199 FN1 and on
August 20, 1993, I issued an Opinion and Order
finding that NBC violated the FLSA.    The parties
are currently engaged in discovery pertaining to the
calculation of damages.

On November 22, 1993, NBC moved pursuant to 28

U.S.C. § 1292(b) for certification of an immediate
interlocutory appeal of my decision.     Defendant
also submitted a memorandum of law in support of
its motion for certification ("Defendant's Memo.").
On December 13, 1993, plaintiffs submitted a
memorandum of law in opposition to the motion for
certification.

            APPLICABLE LAW

Section 1292(b) provides that an interlocutory order
of a district court may be certified for immediate
appeal if the court is:
of the opinion that such order involves a controlling
question of law as to which there is substantial
ground for difference of opinion and that an
immediate appeal from the order may materially
advance the ultimate termination of the litigation * *
*.

28 U.S.C. § 1292(b).

The Second Circuit has "urge[d] the district courts
to exercise great care in making a § 1292(b)
certification."     *Westwood Pharmaceuticals Inc. v.
National Fuel Gas Distribution Corp.,* 964 F.2d 85,
89 (2d Cir.1992).     Moreover, "only 'exceptional
circumstances [will] justify a departure from the
basic policy of postponing appellate review until
after the entry of a final judgment.' "     *Klinghoffer v.
S.N.C. Achille Lauro,* 921 F.2d 21, 25 (2d
Cir.1990) (quoting *Coopers & Lybrand v. Livesay,*
473 U.S. 463, 475 (1978)).

            *Controlling Question of Law*

Questions regarding application of the appropriate
law to the relevant facts are generally not suitable
for certification under § 1292(b).
The question concerning plaintiffs' standing which
the government seeks to have certified for review
does not concern a dispute or disagreement as to the
applicable law, but instead it involves whether the
court's application of the decided and governing
case law to the relevant facts is appropriate.     I do
not believe such issues were intended for
certification under § 1292.

**\*2** *Abortion Rights Mobilization, Inc. v. Regan,* 552
F.Supp.   364,   366   (S.D.N.Y.1982);     *see also*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                              Page    2
**(Cite as: Not Reported in F.Supp.)**

*Benfield v. Mocatta Metals Corp.,* 91 Civ. 8255
(LJF), 1993 WL 148978 *7 (S.D.N.Y. May 5,
1993) (determination of when statute of limitations
accrued involved application of the appropriate legal
standard to the facts alleged and did not involve a
controlling question of law).

Similarly, mixed questions of law and fact are not
appropriate for certification under § 1292(b). *See
Securities and Exchange Commission v. First Jersey
Securities, Inc.,* 587 F.Supp. 535, 536
(S.D.N.Y.1984) (motion for certification denied
because "appeal would necessarily present a mixed
question of law and fact"); *Weisman v. Darneille,*
78 F.R.D. 671, 674 (S.D.N.Y.1978) (since basis of
court's order involved mixed questions of law and
fact, certification inappropriate).

In making my determination that the plaintiffs were
not exempt as administrative and/or professional
employees and therefore entitled to overtime under
the FLSA, my primary task involved applying the
appropriate statue and Department of Labor
Regulations and Interpretations to the facts
pertaining to the particular plaintiffs. I agreed with
the court in *Dalheim v. KDFW TV,* 918 F.2d 1220,
1226-27 (5th Cir.1990), that "the inquiry into
exempt status is 'intensely factbound and case
specific,' and that '[e]ach case must be judged on its
own peculiar facts.' " Opinion and Order at 108
(citations omitted). I proceeded by applying the
FLSA to the specific facts regarding the plaintiffs'
work duties and responsibilities and determined that
the plaintiffs were not exempt under the FLSA.
Defendant's appeal would therefore necessarily
present mixed questions of law and fact, if not
exclusively the application of the governing statute
and regulations to the relevant facts.

Accordingly, defendant's request for certification
does not present issues of controlling law.

*Substantial Ground for Difference of Opinion*

Moreover, the only substantial ground for difference
of opinion that might exist pertains to the
application of the FLSA to the facts of a particular
case. That is not sufficient to warrant certification
of an interlocutory appeal. *Long Island Lighting
Co. v. Transamerica Delaval, Inc.,* 648 F.Supp.
988, 991 (S.D.N.Y.1986) ("If any ground for
difference of opinion exists * * * it bears upon

applying this law to the circumstances of a particular
case."); *Pollack v. Laidlaw Holdings, Inc.,* 90
Civ. 5788 (PKL), 1993 WL 254932 *3 (S.D.N.Y.
June 25, 1993) (plaintiffs did not proffer authority
to show that court's determination was in substantial
doubt).

In addition, there is no conflicting authority on the
issues presented by the defendant. *Von Bulow by
Auersperg v. Von Bulow,* 634 F.Supp. 1284, 1312
(S.D.N.Y.1986). The cases cited by the defendant
in support of its assertion that there is conflicting
authority simply represent determinations by various
courts based on the particular facts that were before
them, which does not qualify as conflicting
authority.FN2

*Materially Advance Ultimate Termination*

**\*3** Finally, defendant has failed to demonstrate that
the immediate appeal of the Opinion and Order will
materially advance the ultimate termination of the
litigation. Although a reversal by the Second
Circuit would presumably avoid further proceedings
over the damages issue with respect to the three
plaintiffs in this case, I am not convinced that an
appeal will materially advance the termination of
this case *or* the cases that have yet to be tried.

This case is not in its initial stages of litigation; a
trial has been conducted and an Opinion and Order
on liability has been issued. All that remains is the
calculation of damages, which should not take a
significant amount of time. An interlocutory
appeal, on the other hand, will inevitably delay
termination. *See Long Island Lighting v.
Transamerica Delaval, Inc.,* 648 F.Supp. 988, 991
(S.D.N.Y.1986) (motion for certification denied in
part because interlocutory appeal more likely to
delay the conclusion of litigation than to advance
termination).

Nor will an appeal necessarily materially advance
termination for the remaining plaintiffs. Although
the three named plaintiffs' actions were severed to
function as test cases for the remaining claims, a
decision by the Second Circuit will not necessarily
terminate their claims. As discussed earlier, these
cases are extremely factbound, so it is possible that a
Second Circuit reversal would not be dispositive of
the remaining plaintiffs' claims.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                    Page    3
**(Cite as: Not Reported in F.Supp.)**

Since the prompt adjudication of damages will be
the most expedient way to resolve this case, I find
that an appeal will not materially advance the
termination of the case.

CONCLUSION

Having examined the criteria delineated in § 1292(b)
in the context of the circumstances of the present
motion, I find that NBC has failed to demonstrate
exceptional    circumstances    warranting    an
interlocutory appeal.

SO ORDERED

FN1. The parties consented to trial before me
pursuant to 28 U.S.C. § 636(c).

FN2. Moreover, after I issued my Opinion and
Order, the Second Circuit decided *Reich v. State of
N.Y.,* 3 F.3d 581 (2d Cir.), *petition for cert. filed,*
62 U.S.L.W. 3378 (Nov. 18, 1993), which held
that investigators did not come within the FLSA's
administrative exemption.    In making its
determination, the court confirmed a number of the
legal premises upon which I based my Opinion and
Order, and discouraged broad application of the
FLSA overtime exemption provisions.    *Reich*
therefore undercuts defendant's argument that there
are substantial differences of opinion regarding the
application of the FLSA to the facts of this case.
S.D.N.Y.,1993.
Freeman v. National Broadcasting Co., Inc.
Not Reported in F.Supp., 1993 WL 524858
(S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**EXHIBIT 6**

--- B.R. ----                                                                    Page    1
--- B.R. ----, 2007 WL 3010142 (S.D.N.Y.)
**(Cite as: --- B.R. ----)**
**H**

In re Perry H. Koplik & Sons, Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
     United States District Court,S.D. New York.
In re PERRY H. KOPLIK & SONS, INC., Debtor.
Michael S. Fox, as Litigation Trustee of Perry H.
       Koplik & Sons, Inc., Plaintiff,
                    v.
Bank Mandiri, formerly known as Bank Dagang
              Negara, Defendant.
            No. M-47 (VM).
       Bankruptcy No. 02-B-40648 (REG).
        Adversary No. 05-01136-REG.

               Oct. 10, 2007.

Background: Litigation trustee appointed under
debtor's confirmed Chapter 11 plan initiated
adversary proceeding against Indonesian bank for its
alleged wrongful refusal to honor letter of credit
(LOC) that had been issued in debtor's favor prior
to commencement of its bankruptcy case. The
United States Bankruptcy Court for the Southern
District of New York, Robert E. Gerber, 357 B.R.
231, denied bank's motion to dismiss. Bank moved
for leave to appeal.

Holdings: The District Court, Victor Marrero, J.,
held that:

(1) there were no controlling questions of law
regarding principles of comity and res judicata, and

(2) there was no substantial ground for difference of
opinion regarding judicial estoppel.

Motion denied.

[1] Bankruptcy 51 ⬙ 3768

51 Bankruptcy
     51XIX Review
          51XIX(B) Review of Bankruptcy Court
               51k3766 Decisions Reviewable
                    51k3768   k.  Interlocutory  Orders;
Collateral Order Doctrine. Most Cited Cases
Party seeking interlocutory appeal has burden of
showing exceptional circumstances to overcome
general aversion to piecemeal litigation and justify
departure from basic policy of postponing appellate

review until after entry of final judgment. 28
U.S.C.A. § 1292(b).

[2] Bankruptcy 51 ⬙ 3768

51 Bankruptcy
     51XIX Review
          51XIX(B) Review of Bankruptcy Court
               51k3766 Decisions Reviewable
                    51k3768   k.  Interlocutory  Orders;
Collateral Order Doctrine. Most Cited Cases
In determining whether order involves "controlling"
question of law, for purposes of granting
interlocutory appeal, resolution of issue need not
necessarily terminate action; however, question of
law is controlling if reversal of district court's order
would terminate action. 28 U.S.C.A. § 1292(b).

[3] Bankruptcy 51 ⬙ 3768

51 Bankruptcy
     51XIX Review
          51XIX(B) Review of Bankruptcy Court
               51k3766 Decisions Reviewable
                    51k3768   k.  Interlocutory  Orders;
Collateral Order Doctrine. Most Cited Cases
"Question of law," for purposes of interlocutory
appeal, must refer to pure question that reviewing
court could decide quickly and cleanly without
having to study record. 28 U.S.C.A. § 1292(b).

[4] Bankruptcy 51 ⬙ 3768

51 Bankruptcy
     51XIX Review
          51XIX(B) Review of Bankruptcy Court
               51k3766 Decisions Reviewable
                    51k3768   k.  Interlocutory  Orders;
Collateral Order Doctrine. Most Cited Cases
For there to be "substantial grounds" for difference
of opinion, for purposes of interlocutory appeal,
issue must involve more than strong disagreement
between parties; however, substantial grounds may
exist if issue is difficult and of first impression, or if
there is conflicting authority on issue. 28 U.S.C.A.
§ 1292(b).

[5] Bankruptcy 51 ⬙ 3768

51 Bankruptcy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



--- B.R. ----
(Cite as: --- B.R. ----)

Page   2

51XIX Review
    51XIX(B) Review of Bankruptcy Court
        51k3766 Decisions Reviewable
            51k3768   k.   Interlocutory   Orders;
Collateral Order Doctrine. Most Cited Cases
In determining whether "substantial grounds" for
difference of opinion exist, for purposes of
interlocutory appeal, district judge must analyze
strength of arguments in opposition to challenged
ruling. 28 U.S.C.A. § 1292(b).

[6] Bankruptcy 51  3768

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3766 Decisions Reviewable
                51k3768   k.   Interlocutory   Orders;
Collateral Order Doctrine. Most Cited Cases
Immediate interlocutory appeal is considered to
advance ultimate termination of litigation if that
appeal promises to advance time for trial or to
shorten time required for trial. 28 U.S.C.A. §
1292(b).

[7] Courts 106  512

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(C) Courts of Different States or
Countries
            106k512 k. Comity Between Courts of
Different Countries. Most Cited Cases
Decision to grant comity is matter within court's
discretion, and burden of proof to establish its
appropriateness is upon moving party.

[8] Courts 106  512

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(C) Courts of Different States or
Countries
            106k512 k. Comity Between Courts of
Different Countries. Most Cited Cases

Judgment 228  830.1

228 Judgment
    228XVII Foreign Judgments
        228k830 Judgments of Courts of Foreign
Countries

228k830.1 k. In General. Most Cited
Cases
Comity will be granted to decision or judgment of
foreign court if it is shown that foreign court is
court of competent jurisdiction, and that laws and
public policy of forum state and rights of its
residents will not be violated.

[9] Bankruptcy 51  3768

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3766 Decisions Reviewable
                51k3768   k.   Interlocutory   Orders;
Collateral Order Doctrine. Most Cited Cases
Bankruptcy court's ruling that principles of comity
did not warrant recognition of Indonesian legal
proceedings was based on factual determination, and
thus did not involve question of law as to which
immediate   interlocutory   appeal   would   be
appropriate. 28 U.S.C.A. §§ 158(a)(3), 1292(b).

[10] Bankruptcy 51  3768

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3766 Decisions Reviewable
                51k3768   k.   Interlocutory   Orders;
Collateral Order Doctrine. Most Cited Cases

Bankruptcy 51  3772

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3772 k. Petition for Leave;  Appeal as
of Right;  Certification. Most Cited Cases
Question of whether bankruptcy court properly ruled
that res judicata did not warrant recognition of
Indonesian legal proceedings was not controlling, as
required for interlocutory appeal, since court had
ruled alternatively that comity did not warrant
recognition of Indonesian proceedings;  granting
leave to appeal would result in piecemeal litigation.
28 U.S.C.A. §§ 158(a)(3), 1292(b).

[11] Bankruptcy 51  3768

51 Bankruptcy
    51XIX Review

Westlaw.

51XIX(B) Review of Bankruptcy Court
51k3766 Decisions Reviewable
51k3768 k. Interlocutory Orders;
Collateral Order Doctrine. Most Cited Cases
Although issue of whether bankruptcy court erred in
ruling that Chapter 11 trustee was not judicially
estopped from litigating in United States against
Indonesian bank was controlling question of law,
interlocutory appeal was not warranted, since there
was no substantial ground for difference of opinion.
28 U.S.C.A. §§ 158(a)(3), 1292(b).

DECISION AND ORDER
VICTOR MARRERO, District Judge.
*1 Bank Mandiri ("Bank Mandiri"), defendant in the
underlying bankruptcy adversary proceeding,
brought this action seeking leave to appeal from the
denial of its motion to dismiss (the "Order") issued
by the Bankruptcy Court for this District (the
"Bankruptcy Court") on October 23, 2006. *See In re
Perry H. Koplik & Sons, Inc.,* 357 B.R. 231
(Bankr.S.D.N.Y.2006); *see also* 28 U.S.C. §
158(a)(3) (" § 158(a)(3)"); Federal Rule of
Bankruptcy Procedure 8001(b) and 8003.

Before the Court is a petition requesting a
determination that Bank Mandiri may appeal the
Order to this Court pursuant to § 158(a)(3). That
provision authorizes appeals, "with leave of the
court, from other interlocutory orders and decrees"
of the Bankruptcy Court. 28 U.S.C. § 158(a)(3). On
appeal, Bank Mandiri requests a reversal of the
Order.FN1

Plaintiff Perry H. Koplik & Sons, Inc. ("Koplik"),
Debtor in the bankruptcy proceeding, argues that
leave to appeal should not be granted because (1)
Bank Mandiri did not meet its burden of showing
"exceptional circumstances;" (2) Bank Mandiri did
not raise controlling questions of law as to which
there is a ground for substantial difference of
opinion; and (3) an immediate appeal would not
advance the current litigation. (Plaintiff s
Memorandum of Law Answering Defendant's
Motion for Leave to Appeal, dated Dec. 1, 2006
("Pl.Mem.")) For reasons explained below, the
Court denies Bank Mandiri's motion for leave to
appeal.

I. BACKGROUND

Koplik, a New York corporation in the paper

milling business, entered into a purchase and sales
contract (the "Contract") with P.T. Citra Hutama
Kertasindo ("Kertasindo"), an Indonesian company,
to purchase second-hand paper mill machines and
equipment. The contract provided that Koplik would
finance the purchase, on condition that Kertasindo
would secure its payment obligation with a letter of
credit.

On January 28, 1999, Kertasindo procured a letter
of credit in the amount of $5.3 million (the "Letter
of Credit") from Bank Mandiri's predecessor, Bank
DaGang Negara, an Indonesian bank with a branch
located in New York. The Letter of Credit provided
that Kertasindo was obligated to pay Koplik upon
receipt of the paper mill machines and equipment
and, in the event that Kertasindo defaulted, Bank
Mandiri would pay Koplik.

In March and April of 1999, Kertasindo received the
paper mill machines and equipment but defaulted on
its obligation to pay Koplik. In May 1999, Koplik
attempted to collect payment from Bank Mandiri
under the Letter of Credit but Bank Mandiri
declined to honor it.

On March 10, 2000, Koplik filed suit against
Kertasindo and Bank Mandiri in the Surabaya
District Court in Indonesia seeking to recover
payment on the $5.3 million debt. In July 2000, the
Surabaya District Court ruled that the Letter of
Credit was binding and ordered Bank Mandiri to pay
Koplik $5.3 million (the "July 2000 District Court
Decision"). *See In re Koplik,* 357 B.R. at 235. Bank
Mandiri appealed to the Indonesian High Court, an
intermediate appellate court, which on September
11, 2000, "cancelled" the July 2000 District Court
Decision (the "September 2000 High Court
Decision"). *Id.*

*2 Koplik appealed the September 2000 High Court
Decision to the Indonesian Supreme Court,
Indonesia's Highest Court, and, in a decision dated
May 30, 2002, the Indonesian Supreme Court
reinstated the July 2000 District Court Decision
enforcing the Letter of Credit (the "May 2002
Supreme Court Decision"). *See id.*

Bank Mandiri appealed the May 2002 Supreme
Court Decision and, on September 29, 2003, the
Indonesian Supreme Court vacated its earlier
decision enforcing the Letter of Credit on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



--- B.R. ----

(Cite as: --- B.R. ----)

ground that there was a defect in the power of attorney provided by Koplik (the "September 2003 Supreme Court Decision"). The Indonesian Supreme Court explained that Koplik was required to have the power of attorney acknowledged by a notary public, which Koplik had done, and, to have the acknowledgment of the power of attorney "legalized" FN2 by an officer of the Indonesian Consul in New York, which Koplik had not done.

During the course of these events, in December 2002, a separate litigation was filed in Indonesia's Surabaya District Court by Kertasino against Koplik regarding the validity of the Contract. That court rendered a decision on July 15, 2003 (the "July 2003 District Court Decision") holding that the Contract was void for fraud, thereby declaring the Letter of Credit null and void and ordering Bank Mandiri to "suspend the payment" on the Letter of Credit until "judgment for this case has been final, binding and enforceable." *Id.* at 237.In June 2006, Koplik appealed the July 2003 District Court Decision and that appeal is currently pending. *Id.*

Also during this period, on March 11, 2002, Koplik's creditors filed an involuntary action in the Bankruptcy Court pursuant to Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 et seq. The Chapter 7 proceeding was converted to a Chapter 11 Plan of Reorganization, pursuant to which a trustee was appointed. *See id.* § 1101 et seq. On February 8, 2005, Michael S. Fox (the "Trustee") filed a complaint in the Bankruptcy Court and in May 2005, an amended complaint. On May 16, 2005, Bank Mandiri filed a motion to dismiss the amended complaint asserting that (1) the action is barred by res judicata, (2) comity requires respect for the proceeding in Indonesia, (3) doctrines of collateral and judicial estoppel preclude the Trustee from relitigating, (4) Koplik's Plan of Reorganization did not properly preserve the Bankruptcy Court's retention of jurisdiction over the Trustee's claims, and (5) the Bankruptcy Court lacked personal jurisdiction over Bank Mandiri.

On October 23, 2006, the Bankruptcy Court issued the Order denying Bank Mandiri's motion to dismiss. Bank Mandiri's instant appeal followed.

## II. DISCUSSION

### A. LEGAL STANDARD

Because the Order did not address the merits of the parties' underlying dispute, it was not a "final order" appealable as of right under § 158(a)(1). Pursuant to § 158(a)(3), "with leave of the court," district courts have jurisdiction to hear appeals from "interlocutory orders and decrees" of the bankruptcy courts. 28 U.S.C. § 158(a)(3). To determine whether leave to appeal should be granted, district courts apply the standards prescribed in 28 U.S.C. § 1292(b) (" § 1292(b)").*See In re Kassover,* 343 F.3d 91 (2d Cir.2003); *In re Enron Corp.,* No. 01-16034, 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006).

*3 Under § 1292(b), the district court, in its discretion, may permit an appeal of an interlocutory order from the bankruptcy court if (1) "such order involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion" and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation."28 U.S.C. § 1292(b). Interlocutory appeals permitted under § 1292(b) are "disfavored." *In re Enron Corp.,* 2006 WL 2548592, at *3 (citation omitted). The Second Circuit has "repeatedly urged the district courts to exercise great care in making a § 1292(b) certification."*Westwood Pharm., Inc. v. Nat'l Fuel Gas Dist. Corp.,* 964 F.2d 85, 89 (2d Cir.1992) (citation omitted). The Circuit Court has also stressed that "the district court's power to grant an interlocutory appeal should not be 'liberally construed.' "*In re Worldcom, Inc.,* Nos. 02-13533, 04-04338, 2006 WL 3592954, at *2 (S.D.N.Y. Dec. 7, 2006) (citing *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave,* 921 F.2d 21, 24-25 (2d Cir.1990)).

[1] The party seeking an interlocutory appeal has the burden of showing "exceptional circumstances" to "overcome the general aversion to piecemeal litigation" and "justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment."*Klinghoffer,* 921 F.2d at 24;*In re Flor,* 79 F.3d 281, 284 (2d Cir.1996); *Williston v. Eggleston,* 410 F.Supp.2d 274, 276 (S.D.N.Y.2006).

[2][3] As to the first prong, whether or not the order "involves a controlling question of law," the "resolution of an issue need not necessarily terminate an action in order to be controlling[;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



however,] ... it is clear that a question of law is controlling if reversal of the district court's order would terminate the action."*Klinghoffer,* 921 F.2d at 24.Additionally, the question of law must "refer to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record."*In re Enron,* 2006 WL 2548592, at *4 (citation and quotation marks omitted); *Freeman v. NBC, Inc.* No. 85 CV 3302, 1993 WL 524858, at *2 (S.D.N.Y. Dec. 15, 1993) (citations omitted). Moreover, "[q]uestions regarding application of the appropriate law to the relevant facts are generally not suitable for certification under § 1292(b)."*Freeman,* 1993 WL 524858, at *2 .

[4][5] As to the second prong, for there to be "substantial grounds for difference of opinion," the issue "must involve more than strong disagreement between the parties."*In re Enron,* 2006 WL 2548592, at *4 (citation and quotation marks omitted). However, "this prong will be satisfied if the issue is 'difficult and of first impression,' "*In re XO Communications, Inc.,* Nos. 02-12947, 03 Civ. 1898, 2004 WL 360437, at *3 (S.D.N.Y. Feb. 26, 2004), or if "there is conflicting authority on the issue."*Morris v. Flaig,* 511 F.Supp.2d 282, ----, 2007 WL 1029337, *21 (E.D.N.Y.2007) (citations omitted). In determining whether a substantial ground for difference of opinion exists, "[i]t is the duty of the district judge ... to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a substantial ground for dispute."*In re Flor,* 79 F.3d at 284 (citations and quotation marks omitted). Moreover, a bare claim that a bankruptcy court's ruling was incorrect is not sufficient to satisfy the standard. *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,* No. 04 Civ. 10014, 2005 WL 3440701, at *2 (S.D.N.Y. Dec. 14, 2005).

*4 [6] As to the third prong, an immediate appeal is considered to advance the ultimate termination of the litigation if that "appeal promises to advance the time for trial or to shorten the time required for trial."*Transport Workers Union of Am., Local 100, AFL-CIO v. N.Y.C. Transit Auth.,* 358 F.Supp.2d 347, 350 (S.D.N.Y.2005) (citations and quotation marks omitted).

### B. APPLICATION OF § 1292(B) STANDARDS

In the instant case, Bank Mandiri's motion for leave to appeal seeks a reversal of the Order on the grounds that the Bankruptcy Court erred in ruling that principles of comity and res judicata did not warrant recognition of the Indonesian legal proceedings, and that the Trustee is not judicially estopped from litigating in the United States against Bank Mandiri.

The Court finds that there are no controlling questions of law in this dispute for which substantial ground for difference of opinion exists.

### 1. Recognition of the Indonesian Legal Proceedings

With respect to the questions of res judicata and international comity, Bank Mandiri's appeal does not present a "pure question of law" that this Court could decide "quickly and cleanly" without studying the record. *In re Enron,* 2006 WL 2548592, at *4. Rather, the instant motion presents a question as to whether the Bankruptcy Court properly evaluated admissible evidence presented in determining that comity should not be granted to the Indonesian legal proceedings.

[7][8] The decision to grant comity is a matter within a court's discretion and the burden of proof to establish its appropriateness is on the moving party. *See Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d Cir.1993)."Comity will be granted to the decision or judgment of a foreign c ourt if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated."*Cunard S.S. Co. Ltd. v. Salen Reefer Services AB,* 773 F.2d 452, 457 (2d Cir.1985) (citations omitted).

[9] In the instant case, the Bankruptcy Court evaluated the evidence presented by Bank Mandiri and Koplik and made a factual determination that comity should not be granted. A factual determination by the Bankruptcy Court is accorded deferential review by this Court and is not a question of law as to which an immediate interlocutory appeal is appropriate under § 1292(b). *See Morris,* 511 F.Supp.2d at ----, 2007 WL 1029337, at *21.

[10] Because the Court denies the motion for leave to appeal the question of comity, whether the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Indonesian court's decisions should have res judicata effect is not appropriate for interlocutory appeal. *See In re Jackson Brook Institute, Inc.,* 280 B.R. 1, 5 (D.Me.2002) ("If the parties could be successful on alternative grounds or asserted theories, the question asserted may not be controlling.").

Bank Mandiri argues that the Trustee should be barred by the doctrine of res judicata from arguing that the Letter of Credit is valid and enforceable against Bank Mandiri because that issue was raised in the July 2003 District Court Decision. However, one reason the Bankruptcy Court rejected Bank Mandiri's argument was that it found that the July 2003 District Court Decision was not entitled to comity. *See In re Koplik.* 357 B.R. at 245. Therefore, granting Bank Mandiri leave to appeal on the question of res judicata when the issue of comity has been decided against it, a decision Bank Mandiri may very well appeal, will result in "piecemeal litigation" and "does not justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Klinghoffer,* 921 F.2d at 24; *In re Flor,* 79 F.3d 281, 284 (2d Cir.1996); *Williston,* 410 F.Supp.2d at 276. Accordingly, Bank Mandiri's appeal is denied with respect to comity and res judica as the Court finds that there are no controlling questions of law for which there is a substantial ground for difference of opinion.

### 2. *Judicial Estoppel*

\*5 [11] Bank Mandiri argues that a controlling question of law regarding judicial estoppel requires an interlocutory review of the Bankruptcy Court's order. On this point, Bank Mandiri presents a controlling question of law because reversal of the Bankruptcy Court's order on appeal would "terminate the action," insofar as it would resolve all claims against Bank Mandiri and it involves, arguably, a pure question of law that does not require the Court to review the record. *See In re Bradlees Stores, Inc.,* Nos. 00-16033, 00-16035, 00-16036, 01-CV-3934, 2001 WL 1112308, at \*10 (S.D.N.Y. Sept. 20, 2001) (stating that "the ultimate determination that judicial estoppel does or does not apply is generally a question of law").

Although as to this issue, Bank Mandiri satisfies the first prong of the analysis under § 1292(b), there is no substantial ground for difference of opinion with respect to judicial estoppel. First, Bank Mandiri does not argue that a conflict in the law of judicial estoppel exists in the Second Circuit. *See Morris,* 511 F.Supp.2d at ----, 2007 WL 1029337, at \*21 (stating that this prong can be satisfied if "there is conflicting authority on the issue.") (citations omitted). The law of judicial estoppel is well settled in the Second Circuit. The doctrine "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by the party in a prior legal proceeding." *Bridgeway Corp. v. Citibank,* 201 F.3d 134, 141 (2d Cir.2000) (citation and quotation marks omitted). The Second Circuit explained that "a party invoking judicial estoppel must show that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner." *Id.* (citation and quotation marks omitted). The type of "inconsistency" required is a "clear inconsistency between the party's present and former positions." *Id.* (citation and quotation marks omitted).

Second, the issue before the Court does not present a question that is "difficult and of first impression." *In re XO Communications, Inc.,* 2004 WL 360437, at \*3. The "mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor,* 79 F.3d at 284 (citations omitted). Rather, Bank Mandiri's central argument is that the Bankruptcy Court misapplied the Second Circuit's opinion in *Bridgeway.* 201 F.3d 134; (*see* Def. Mem. 11-12.)

In that case, Bridgeway Corp. ("Bridgeway") brought suit in Liberia against Citibank, seeking a declaratory judgment that Citibank was obligated to pay Bridgeway in United States dollars, rather than in Liberian currency. The trial court found in favor of Citibank but, on appeal, the decision was reversed by the Liberian Supreme Court and judgment was entered for Bridgeway. Bridgeway commenced an action in New York state court to enforce the Liberian judgment and Citibank removed to federal district court, where it sought to defend the claim by challenging the legitimacy of the Liberian judicial system. Bridgeway moved for summary judgment, arguing that Citibank was judicially estopped from questioning the fairness of the Liberian judiciary. The district court denied the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



motion and, sua sponte, granted summary judgment in favor of Citibank. The district court found, "as a matter of law, Liberia's courts did not constitute 'a system of jurisprudence likely to secure an impartial administration of justice' and that, as a result, the Liberian judgment was unenforceable in the United States."*Id.* (*quoting Bridgeway Corp. v. Citibank,* 45 F.Supp.2d 276, 287 (S.D.N.Y.1999)). The Second Circuit affirmed on appeal.

**\*6** Before the Circuit Court, Bridgeway argued that Citibank participated in at least "a dozen civil cases in Liberia" and "in several of those cases, Citibank appeared as a Plaintiff ... without there raising any objections to the fairness of Liberian justice, [therefore,] Citibank should now be estopped from calling into question the validity of Liberian judgments."*Id.* at 141.Citibank responded that its participation in litigation in Liberia did not amount to an admission of the fairness of the Liberian judicial system.

The Second Circuit explained that "[i]n order for Bridgeway to prevail, we must conclude that voluntarily participating in litigation in a foreign tribunal is fundamentally inconsistent with the belief that the tribunal is unlikely to provide an impartial forum or one that comports with notions of due process."*Id.* The Second Circuit stated that "such a position is without merit" because "[d]efending a suit where one has been haled into court, and suing where jurisdiction and venue readily exist do not constitute assertions that the relevant courts are fair and impartial."*Id.* In denying Bridgeway's appeal, the Second Circuit found that it "did not view Citibank's voluntary participation in Liberian litigation, even as a plaintiff, as clearly contradictory to its present position."*Id.*

In the instant case, Bank Mandiri is arguing that because Koplik initiated lawsuits in Indonesia against Bank Mandiri, the Court must conclude that Koplik's voluntary initiation of litigation in Indonesia is "clearly inconsistent" with the belief that the Indonesian court system is, unlikely to provide an impartial forum or one that comports with notions of due process. However, the Bankruptcy Court, relying on *Bridgeway,* rejected that argument. Bank Mandiri's claim that the Bankruptcy Court's decision was incorrect "does not suffice to establish substantial ground for a difference of opinion."*Morris,* 511 F.Supp.2d at ----

, 2007 WL 1029337, at *21 (citation and quotation marks omitted). Nor does it "justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Klinghoffer,* 921 F.2d 21 at 24;*In re Flor,* 79 F.3d 281, 284 (2d Cir.1996); *Williston,* 410 F.Supp.2d at 276.Accordingly, because the Court finds that there is no controlling question of law for which there is a substantial ground for a difference of opinion, Bank Mandiri's appeal is denied with respect to judicial estoppel.

### III. *ORDER*

For the reasons stated above, it is hereby

ORDERED that the motion of defendant Bank Mandiri for leave to appeal the Bankruptcy Court's Order dated October 23, 2006 issued in adversary proceeding No. 05-01136 is denied.

The Clerk of Court is directed to close this case.

SO ORDERED.

FN1. Pursuant to Rule 8003 of the Federal Rules of Bankruptcy Procedure, Bank Mandiri's questions for appeal are: (1) "whether a plaintiff who initiates a litigation in a foreign jurisdiction and obtains an adverse result in that jurisdiction is judicially estopped from then initiating a subsequent litigation in the United States on identical claims and issues to obtain a more favorable result;" (2) "whether, in considering deference to a foreign judgment, a court may ignore direct and uncontroverted evidence of procedures compatible with due process in the foreign judicial system and lack of corruption in the specific foreign legal proceedings at issue in favor of hearsay reports of general corruption in a foreign judicial system as a whole, despite a long line of decisions in this Circuit specifically prohibiting 'sweeping condemnations' of foreign judiciaries;" and (3) "whether a foreign judgment may be accorded res judicata collateral estoppel effect pending appeal in the foreign jurisdiction?"(See Bank Mandiri's Memorandum of Law in Support of its Motion to Dismiss for Leave to Appeal to the United States District Court the Denial of its Motion to Dismiss the Amended Complaint, dated Nov. 17, 2006 ("Def.Mem."))

FN2. This refers to a second level of authorization

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



--- B.R. ----
**(Cite as: --- B.R. ----)**

Page   8

similar to what New York practitioners refer to as a
"notarial flag" to attest that the notary is a notary.
*See id.* at 236.
S.D.N.Y.,2007.
In re Perry H. Koplik & Sons, Inc.
--- B.R. ----, 2007 WL 3010142 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

