UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
SPERO HARITATOS,


                              Plaintiff,


vs.                                  6:05-CV-930


HASBRO, INC., ET AL.,


                              Defendants.


-------------------------------------------x

        Transcript of Motion Hearing held on

March 4, 2008, at the James Hanley Federal

Building, 100 South Clinton Street, Syracuse,

New York, the HONORABLE GUSTAVE J. DiBIANCO,

United States Magistrate Judge, Presiding.



                A P P E A R A N C E S

For Plaintiff:        HISCOCK & BARCLAY, LLP
                      Attorneys at Law
                      One Park Place
                      Syracuse, New York  13202
                        BY:  ROBERT E. PURCELL, ESQ.
                             RICHARD HUGHES, ESQ.
                             KATHRYN DALEY CORNISH, ESQ.


For Defendant:        PATTERSON BELKNAP WEBB & TYLER, LLP
(Hasbro)              Attorneys at Law
                      1133 Avenue of the Americas
                      New York, New York  10036-6710
                        BY:  KIM J. LANDSMAN, ESQ.

For Defendant:        BOND, SCHOENECK & KING, PLLC
(Toys "R" Us)         Attorneys at Law
                      One Lincoln Center
                      Syracuse, New York  13202
                        BY:  JOHN G. McGOWAN, ESQ.


            JODI L. HIBBARD, RPR, CRR, CSR
                  (315) 234-8547

1

2                  I N D E X   O F   T E S T I M O N Y

3

4    Witness                    D     C     RD    RC    FRD    FRC

5    Robert E. Purcell       65    124   138   --    --     --

6    Spero Haritatos        141    --    --    --    --     --

7    Amanda Kramer          152   154    --    --    --     --

8    Kim J. Landsman        163    --    --    --    --     --

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Open Court, 10:10 a.m.)

 2              THE CLERK:  Spero Haritatos versus Hasbro,

 3     Inc., et al., 05-CV-930, may I have the appearances for the

 4     record.

 5              MR. PURCELL:  Thank you, your Honor.  Robert

 6     E. Purcell appearing on behalf of the plaintiff Spero

 7     Haritatos.  With me today is Mr. Haritatos at counsel table

 8     and his wife Sharon Haritatos in the gallery.  Also with me

 9     today are co-counsel Richard Hughes and Katie Cornish.

10              THE COURT:  Good morning to plaintiffs.

11              MR. LANDSMAN:  Morning, your Honor, Kim

12     Landsman of Patterson, Belknap, Webb & Tyler for defendant

13     Hasbro and with me also from Patterson, Belknap is Amanda

14     Kramer.

15              THE COURT:  Okay, good morning to you.

16              MR. McGOWAN:  Good morning, your Honor, John

17     McGowan for Toys "R" Us.

18              THE COURT:  Okay.  Good morning to you,

19     Mr. McGowan, I did get your letter, I looked at it last

20     night, the February 29th letter, where you announce that

21     you're withdrawing the motion to disqualify the Hiscock firm

22     and I've granted that request and therefore your motion to

23     disqualify is withdrawn.

24              MR. McGOWAN:  It is, your Honor.  Thank you.

25              THE COURT:  So I don't know if we need you to

1    participate this morning, you're welcome to observe but --

2              MR. McGOWAN:  I may stay just for a moment or

3    two, your Honor.

4              THE COURT:  Okay.  I'll have the clerk

5    distribute copy of this, you'll get it of course

6    electronically, but I granted that request by Mr. McGowan.

7    So this morning we'll be concerned only with the motion for

8    sanctions brought by Hasbro.  Okay.  Mr. Landsman, you ready

9    to proceed?

10             MR. PURCELL:  Yes, your Honor.

11             THE COURT:  Okay, go ahead.

12             MR. LANDSMAN:  I was telling Ms. Gridley this

13   has the most sensitive microphones I've ever dealt with.

14             THE COURT:  I see that.  We'll all be able to

15   hear each other.

16             MR. LANDSMAN:  May I please the court, we

17   represent defendant Hasbro, Inc. and we're here to seek

18   sanctions against plaintiff and/or his attorney Mr. Purcell

19   for essentially obstructing and delaying discovery every step

20   of the way.  They've failed to produce discovery pursuant to

21   two court orders and have interposed a mind-boggling number

22   of boilerplate objections to every request we've made.

23             We start here with your Honor's August 11th,

24   2006 order where you declare, we had moved to compel

25   production from the plaintiff on our first document request

1    and also moved to compel responses on the second set of

2    document requests and the first set of interrogatories that

3    he refused to respond to at all because he said we were out

4    of time.  The court declared his position unreasonable and

5    solved the problem by extending discovery deadlines.  And

6    then --

7                    THE COURT:  This is the August 11th order?

8                    MR. LANDSMAN:  Yes, your Honor.  And then this

9    language, that it was a clear admonishment against just the

10   kind of behavior that has brought us here, your Honor stated

11   that, "This court will no longer be involved in minor

12   disputes in which it appears that the parties are simply

13   attempting to avoid or delay disclosure of information."

14               Now that order required the plaintiff to

15   produce the documents within 30 days, it is September 11th.

16   Now I'm sure Mr. Purcell will point out that he filed

17   objections to that order but he did not move to stay the

18   order, and it is crystal clear both in the Rule 72 and in the

19   case law interpreting it that the order is not stayed unless

20   explicitly done so.  It is an order of the court, it's 72

21   distinguishing 72(a) of orders on nondispositive motions and

22   72(b), recommendations.  Your Honor's order was not a

23   recommendation.

24               And then the case law also makes that clear

25   including cases we've cited here on the slide from the

1    Southern and Eastern District which state in clear language

2    that the mere filing of objections does not automatically

3    stay a magistrate judge's order.

4              So he had to produce documents by

5    September 11th and respond to our discovery requests by

6    September 11th.  He of course did not.  And also at any rate

7    Judge Hurd denied his objections in the October 19th order

8    and Judge Hurd ordered that all discovery be produced, all

9    outstanding discovery, that is everything outstanding, not

10   just what we've moved on, be produced by November 30th, 2006.

11   He didn't comply with that order either.  As of

12   November 30th, 2006, we'd gotten nothing from him.  We didn't

13   get anything in fact until mid-January 2007.

14             Now I want to emphasize here that we're not

15   talking, when we talk about the discovery that has been

16   blocked, about a few minor details or one or two missing

17   items.  We're talking about wholesale blocking of discovery

18   requests and this slide we set out for your Honor as to each

19   of our discovery requests what is missing or deficient, and

20   even before we get to the January discovery requests, there

21   are 37 separate requests we did not get sufficient answers

22   to, including about eight document requests, numerous

23   interrogatories, and on the requests to admit which we'll go

24   into a minute, basically when we were asking about

25   websites, the plaintiff saying he couldn't find out any

1    information which was nonsense.

2              And the blocking of discovery was not for lack

3    of trying, on Hasbro's part.  Your Honor may recall that in

4    the letters that were exchanged on this back -- it was last

5    fall, Mr. Purcell made the point that we had not attempted to

6    meet and confer on the deficient or missing responses, in

7    fact as shown in this slide there were numerous letters sent

8    to plaintiff, none of which did us any good, and then some of

9    the letters he simply quibbled and argued with us.  Others

10   were ignored and then orders were ignored.  So he refused to

11   budge notwithstanding multiple letters attempting to confer

12   and obtain the outstanding discovery.  The only production

13   that plaintiff made following the court's two orders was not

14   made until January 2007, three months after Judge Hurd had

15   denied the objections through your Honor's order and five

16   months after your Honor's order.

17             What we first found out, we first got an

18   e-mail in December 7th and Mr. Purcell actually was kind

19   enough to attach to his exhibits various strings of e-mails

20   concerning this document production that was eventually made

21   in January, and in a voice mail to me he said that he had two

22   boxes of Fed Ex courier stuff that the Haritatoses had gotten

23   together since I think two or more months ago before he left

24   his old firm, Wall, Marjama, and vaguely said, well, it may

25   be some of the stuff that the magistrate judge's order

1    required them to produce, haven't Bates stamped it yet.   In

2    other words, he's still not ready to produce anything in

3    December 14th, 2006.

4              Now although he has not told us exactly when

5    he got those documents, he has said in the declaration that

6    he submitted to this court that he had them before he left

7    Wall, Marjama on October 16th; in other words he had -- he

8    should have gotten them before, well before September 11th

9    and produced them in response to your Honor's order.   He at

10   least had them when he left Wall, Marjama and he didn't

11   produce them.   Then whenever he got them from Wall, Marjama,

12   it's not quite clear in his papers but it seems to have been

13   at least the first week of December, it then takes him until

14   the second week in January to actually send them to us,

15   notwithstanding the fact that we made it clear right from the

16   beginning that if he so insisted, we would pay for it,

17   although that was not the way we had proceeded in the past.

18             On December 7th he told me he had two boxes of

19   documents in an e-mail but was not ready to produce them.   On

20   December 27th he e-mailed me again that the documents were

21   not ready, that's in his Exhibit 25, he asked how I wanted to

22   proceed, I said, let's proceed the way we always have, you

23   copy them and send them to me, it's not worth my time to come

24   up to Syracuse to see what I want and don't want, just send

25   them.   And I ended that e-mail by saying, bill us for that if

1   you wish.  And yet it wasn't again until the second week in

2   January that we finally got those documents.

3                Now I want to go through just a couple of

4   examples and we'll go through this more in the testimony of

5   the obstructionist type of responses that we got to our

6   request, and I put up on this slide just an example of our

7   first request, a very simple one for two samples of the

8   products at issue where he says he's used the Candyland mark.

9                And you see in the first paragraph of the

10  response, it's basically every boilerplate objection known to

11  any lawyer who's ever practiced including that request for

12  two samples of product is vague, ambiguous, and

13  unintelligible.  This litany, this paragraph litany of every

14  conceivable boilerplate objection was made in response to

15  every single document request we ever made, all 40 something

16  of them, which shows that there was absolutely no thought put

17  into it.

18               And as is obvious from looking at a request

19  for two samples, there can't be any thought put into an

20  objection that a request for two samples of products is vague

21  or unintelligible.  When you finally get to the end of that

22  response in -- I'm sorry, the second paragraph right in the

23  middle, he then objects, and this is in the spring, objects

24  to producing samples because the products are apt to melt.

25  This is at a time when his client claims that he's shipping

1    products by mail and yet his lawyer is telling me, oh, I

2    can't send you samples of products, they might melt.  Well,

3    you know, we're not that concerned about the melting product,

4    we wanted to see what they came in and he wouldn't even send

5    us that.

6              Now if you look at what he did with our sets

7    of interrogatories which is, this is on the slide here and

8    we're using the example of a simple interrogatory seeking the

9    names of products using the Candyland mark and the date that

10   he first used the Candyland mark on any such product, the

11   sheer length of the response is telling enough.  Again, the

12   first paragraph is just every conceivable boilerplate

13   objection, and again, this -- these kind, that first

14   paragraph appeared at, I think in all of his interrogatory

15   responses, at least in virtually all of them.

16             And then at the end he does something that is

17   also entirely improper, he refers us to deposition

18   transcripts.  Now Rule 33(d) allows a party in answer to an

19   interrogatory request to refer to business records.  Nothing

20   allows him to refer simply to other documents or an entire

21   deposition transcript, and even if you're referring to a

22   business record, the rule says that you've got to at least

23   tell the other party where to find them, to specify the

24   records.  He was here just referring to entire deposition

25   transcripts without giving us lines or pages to look at.  And

1    what this is designed to do is just sort of say, just kind of

2    reference everything just like boilerplate objections are

3    intended to say, well, if sometime later on you say that I

4    didn't produce what I was supposed to do, I can say that I

5    interjected an objection, and the objections basically don't

6    allow us to know what he is or isn't producing and whether he

7    is in fact producing everything that is in response,

8    notwithstanding the objections.

9                    THE COURT:  What's the date of this

10   interrogatory, do you recall?

11                   MR. LANDSMAN:  I could find it in just a

12   minute, your Honor.

13                   THE COURT:  Is this one of the early sets?

14                   MR. LANDSMAN:  This was a set that was part of

15   the August 11th order, we had served it before the order, he

16   had refused to respond to it because he said that we had

17   taken the position that fact discovery had been over by

18   agreement of the parties, even though the actual pretrial

19   order didn't distinguish between fact and expert discovery,

20   and then your Honor's -- we in our letter motion to the court

21   asked to order him to respond and that's what you did in the

22   August 11th order.

23                   THE COURT:  So this is a response that you got

24   to -- after the August 11th order, in January?

25                   MR. LANDSMAN:  Yes, your Honor, it's a

1    response to a May 31st, 2006 interrogatory and I think he

2    responded sometime around September 18th.

3              THE COURT:  Okay, thank you.

4              MR. LANDSMAN:  It's actually our Exhibit 11,

5    your Honor, which says that it was served October 16th, 2006.

6              Now let's go to example of the abuses that

7    occurred in the first request for admissions.  And the ones

8    that we are focusing on here had to do with websites from

9    various stores around the country that were selling candy

10   under the name Candyland.  This was intended to show as we

11   did on our motion for summary judgment that the mark was at

12   best weak and probably generic, and in our request to admit

13   and request number 19, for example, we referred him to a very

14   specific URL, a very specific website and said, here's what

15   it says, and in our Exhibit 39, you can see a printout from

16   that website, and it's not very hard to find, you simply type

17   in the URL that we told him to type in, and yet he said that

18   after making reasonable inquiry, information known or readily

19   obtainable is insufficient to enable plaintiff to admit or

20   deny that request.  And he did that as shown in our previous

21   slide to approximately, I believe it was 20 requests to admit

22   about what was in various websites.

23             Now one last example here is from the second

24   set of requests for production of documents which again came

25   in in October and was the subject of your Honor's August

1   order, we were simply asking for documents evidencing sales

2   in New York City and that's obviously relevant because he's

3   accusing Toys "R" Us in New York City of doing something that

4   would cause confusion with him in Rome, New York.  The claim

5   that he's made is that Toys "R" Us' use of Candyland at its

6   store only in Manhattan was what caused this so-called

7   trademark infringement.  So again, we see this litany of

8   every boilerplate objection known to man, adding -- I don't

9   know whether you would call this insult to injury or

10  whatever, that the word evidencing is too vague, as if a

11  lawyer doesn't know what evidencing means, and just refused

12  to produce anything.

13           Now as I mentioned, we finally got two boxes

14  of documents in January that apparently Mr. Purcell had back,

15  at least back in October and had at his new firm sometime in

16  early December, and after looking through those, we realized

17  that there were some follow-up discovery requests that needed

18  to be made because even those documents were not completely

19  adequate to comply with our requests and we wanted to just

20  tie a few things down.  And so we served some more requests

21  to admit, we served one document request simply for a sample

22  of a product called Coco-Monds which had all of a sudden

23  appeared and we didn't know exactly what it was and whether

24  it used Candyland, so the only document request was for

25  Coco-Monds.  We asked for admissions just saying that the

1    documents you've now sent us is all you're ever going to rely

2    on for sales in New York City, and then because these

3    documents were essentially Federal Express labels that just

4    showed weight and what was -- and where something was sent,

5    didn't tell us what the products were, we asked in an

6    interrogatory that he specify exactly which products were

7    sold where, because we couldn't tell that from the documents.

8    And these document, these discovery requests were served

9    January 31st, they would have been due March 2nd, the end of

10   February was the absolute discovery cutoff, and we got this

11   e-mail from Mr. Purcell on February 23rd saying that because

12   his response would be due two days over the discovery cutoff,

13   notwithstanding the fact that he had failed to produce the

14   documents for months, he was just not going to comply, not

15   going to do anything.

16              And I would ask that we recall in the context

17   of that response what your Honor had originally said in

18   August 11th, in that order prior to ordering the discovery,

19   that his position is unreasonable, the problem will be solved

20   by the court's extending discovery deadlines.  To the extent

21   the plaintiff's objection to production of this information

22   is that it has been requested too late, then plaintiff should

23   produce the requested information immediately since the

24   deadlines will now be extended.  And then most tellingly,

25   "This court will no longer be involved in minor disputes in

1   which it appears that the parties are simply attempting to

2   avoid or delay disclosure of information or simply arguing

3   that one party is not going to produce information because

4   the other party has not produced it."  That was an

5   admonishment that Mr. Purcell clearly disregarded.  He has

6   wasted enormous amounts of our time and money that Hasbro has

7   to spend on our fees and expenses with this, and we're

8   seeking sanctions for that.  We think that first of all, we

9   should be -- get our attorneys' fees for the unnecessary time

10  that we've had to put into dealing with his obstreperousness.

11           Secondly, another sanction that is well

12  settled in the case law is establishing certain facts for

13  which discovery has been blocked.

14           And then on the request to admit that he has

15  not adequately responded to, the standard remedy for that is

16  to deem certain facts admitted.

17           And then at an absolute minimum we believe

18  that we should at least get the discovery we asked for, and

19  that the court has ordered a long time ago that we should

20  get.

21           On attorneys' fees, there are at least three

22  sources for that.  One is in the case law including the

23  Second Circuit's *Agee* opinion that's up on the screen that

24  gives the courts inherent power to award attorneys' fees

25  against a party and its counsel when they've acted in bad

1    faith, vexatiously or for oppressive reasons.  Rule 37 of

2    course also provides for the assessment of costs in addition

3    to other sanctions against the party failing to obey the

4    order or the attorney advising that party or both.

5                    And then finally 28 U.S.C. 1927 directed

6    against attorneys and says any attorney who so multiplies the

7    proceedings unreasonably and vexatiously may be required to

8    satisfy personally the excess costs, expenses and attorneys'

9    fees reasonably incurred because of such conduct.

10                   On establishing facts, the source is Rule

11   37(b)(2)(A) through (B) and what we're asking in our motion

12   is that the following facts be definitively established and

13   inconvertible:  That plaintiff has not made any sales of

14   products bearing his Candyland mark outside of Upstate

15   New York; 2, there is no evidence of actual confusion by

16   consumers between plaintiff's Candyland mark and the use of

17   Hasbro's Candyland mark in the Times Square New York Toys "R"

18   Us store; 3, that plaintiff's Candyland mark does not appear

19   on any of the documents, packaging or marketing material

20   other than those already produced by plaintiff, in other

21   words he can't surprise us at trial with more.  Next,

22   plaintiff has not incurred any actual damages, and finally,

23   that he's not incurred any damages in the form of attorneys'

24   fees or other legal costs as a result of the complained-of

25   conduct.

```
1              As to deeming certain facts admitted, we have
2    up on the screen and have mentioned in our motion a total of
3    approximately 20 requests for admission that we believe
4    should be deemed admitted because they were simply asking him
5    to look at websites, confirm what was on the websites, we
6    gave him the exact URLs and yet he said that he did not have
7    sufficient information to admit or deny.  So that's what
8    we're here for, your Honor.  Thank you very much.
9              THE COURT:  Okay.  On the issue of attorneys'
10   fees, do you have any document that shows the amount of time
11   and the fees?
12             MR. LANDSMAN:  We were in the process of
13   preparing that, it's a fairly tedious process and I was
14   planning, if we got the attorneys' fees, to then submit them
15   in an attorney fee application.  I think it would be at least
16   in the tens of thousands of documents -- dollars, your Honor.
17             THE COURT:  Okay.  What do you, off the top of
18   your head, what do you estimate, not the amount, in terms of
19   the hours, whether your hours and associates' hours and
20   paralegal hours?
21             MR. LANDSMAN:  Yes, and oh, my God, I would
22   expect my hours would be 20 to 30 on these motions, associate
23   hours probably at least twice that much, and paralegal hours
24   of somewhere between mine and the associate hours.  But we
25   could, we would of course submit very precise numbers and as
```

1    consistent with the Second Circuit's requirements, submit the

2    contemporaneous billing reports and hour reports on them.

3                    THE COURT:  You could do that approximately

4    when?

5                    MR. LANDSMAN:  Within a week.  No later than

6    that.  We had started on it but just hadn't quite finished

7    it.

8                    THE COURT:  Okay.  Anything further?

9                    MR. LANDSMAN:  No, your Honor.  We -- we have

10   a witness to call, at least Mr. Purcell, but I assume he

11   wants to do his opening, too.

12                   THE COURT:  Okay.  Let's hear from Mr. Purcell

13   then.

14                   MR. PURCELL:  Thank you, your Honor.  My

15   adversary is very big on argument but very low on proof.  I'd

16   like to take this real slow for the court.  Instead of

17   relying on my adversary's broad statements that all of this

18   discovery is the same nature and so forth, let's go through

19   one by one to see what discovery responses were made, what

20   discovery was produced and so forth, and see whether there's

21   been some egregious conduct by either my client or me.

22                   First of all, your Honor, my client is

23   literally a mom-and-pop operation, it is Mr. and

24   Mrs. Haritatos running a sole proprietorship, they have had

25   three part-time employees helping out with their business.

1    This is also not the first piece of litigation between

2    Mr. Haritatos and Hasbro.  These two parties went at it in

3    the Trademark Office before this lawsuit was filed in a

4    trademark opposition proceeding.  Mr. Haritatos asserted his

5    registered trademark for Candyland for candy products against

6    Hasbro's application to try to register the term Candyland

7    for a variety of beverage products.  The parties in the

8    Trademark Office proceeding were entitled to discovery and

9    indeed they took lots of discovery, Judge.  Before this case

10   was even filed, Hasbro had engaged in tons of discovery

11   trying to find out what my client was doing and so forth and

12   indeed did find out what my client was doing.

13          If you turn to Exhibit 1 of the plaintiff's

14   exhibit binder, Judge, I have submitted my own declaration

15   and have put forth some of the discovery that went on in the

16   Trademark Office proceedings before this proceeding was even

17   filed again.

18          Direct the court's attention to Page 2, all

19   right.  Hasbro served a first set of requests for production

20   of documents and things, there were 27 numbered requests in

21   the Trademark Office proceedings.  They also served seven

22   interrogatories, there were nine numbered interrogatories.

23   Later on, January 26th, 2005, they served a second set of

24   requests for production of documents and things.  Then in

25   January 28th, in 2005 they made a request for entry upon land

1    for inspection.  February 14th, they served a third set of

2    requests for production of documents and things, there were

3    eight numbered requests there.

4                On February 15th, 2006, Hasbro actually

5    inspected the premises of my client.  They went to my

6    client's candy shop and could take all the pictures they

7    wanted inside and out.  All the candy was on display there,

8    whatever packaging was on display, the words Candyland around

9    the clock, anything they wanted to do, and indeed they did

10   take photographs of the inside and out of my client's candy

11   shop, to see what it was doing, what products it was offering

12   for sale and so forth.

13               Then on February 16th they also took a full

14   day deposition of my client Spero Haritatos, was 178 pages of

15   deposition transcript and 22 deposition exhibits.

16               Later on, July 8th, 2005 they served a fourth

17   set of requests for production of documents, and shortly

18   thereafter the instant lawsuit was filed, Judge.  There was a

19   ton of discovery that already went on in the Trademark Office

20   proceedings.  They inspected my client's premises, they took

21   a full day of his deposition, they knew what the case was

22   about, they asked everything they could about his business

23   and the history of his business and what products he made and

24   what -- how many sales he made of each type of product and

25   the wholesale, resale, they went all through that sort of

1    stuff.

2              So with that background, we now start this

3    lawsuit.  And they've served a slew of discovery in this

4    lawsuit.  They again took Mr. Haritatos' deposition for a

5    full day and this time there were 323 pages of transcript,

6    Mr. Haritatos' deposition, and 33 numbered exhibits, in this

7    case.  They had two full days of Mr. Haritatos, they've got

8    over 500 pages of deposition transcript of him, and they've

9    got something like 50 some deposition exhibits.  They took

10   Mrs. Haritatos' deposition for an afternoon, they took his

11   aunt's deposition, they took a deposition of third party,

12   they've served interrogatories, document requests, requests

13   for admission in this lawsuit in addition to what they

14   already had in the Trademark Office.  We produced most of

15   this stuff, Judge, already in the Trademark Office proceeding

16   years ago.  For them to come before your Honor and say, gosh,

17   we first asked for this stuff in this lawsuit and we just

18   didn't get it, and gosh, your Honor should entertain this

19   motion for sanctions or discovery long after factual

20   discovery has been cut off and completed is a bit outrageous.

21             Let's go through first your Honor's order of

22   August 11th and see what we did and didn't -- what we did and

23   did not do with regard to that order.  I direct your

24   attention to Plaintiff's Exhibit 13, specifically Page 8 of

25   that order.  Have it, your Honor?

1           THE COURT:  I have it.

2           MR. PURCELL:  In your August 11th order, you

3      address several different letter motions by the parties,

4      mostly by me, and here's the one you addressed with regard to

5      Hasbro and you order, "Hasbro has requested information,

6      including customer lists; the application for the Turkey

7      Joints registration; and information regarding damages.  This

8      court finds that this information is relevant and

9      discoverable, given the protective order that has been

10     entered in this case."

11          I appealed your Honor's decision to

12     Judge Hurd, I'm entitled to do under Rule 72.  My adversary

13     says, oh, no, you've got to comply with the court's order and

14     you -- it's immaterial and irrelevant what you do on appeal

15     before the District Court judge.  I submit that's not the

16     state of the law.  If it were the state of the law, it would

17     simply eviscerate Rule 72.  There would be no need to appeal

18     a magistrate's ruling, it would be meaningless, it would be a

19     waste of everyone's time to appeal a magistrate's ruling if

20     one had to abide by the magistrate ruling before asking the

21     court judge to remand it, vacate it, clarify it, reverse it,

22     affirm it, whatever.

23          It's also noteworthy that when my adversary

24     says this stuff was due under your order, 30 days from your

25     order regardless of the appeal, September 11th came and went

1    and yet my adversary didn't say, hey, Bob Purcell, where's

2    all this stuff that you're supposed to get pursuant to

3    Magistrate DiBianco's order?  We know you got to appeal

4    before Judge Hurd but that doesn't count and here's some case

5    law to say you need to turn that stuff over immediately,

6    doesn't matter if you got an appeal.  They didn't do any such

7    thing, Judge.  They now come before you and say that's what I

8    should have done in their opinion.  Again, I don't think

9    that's the law because it simply eviscerates Rule 72.  They

10   made no complaint at that point in time.

11          Let's go to Hasbro's opposition brief in

12   connection with my appeal before Judge Hurd and see what they

13   specifically told Judge Hurd they wanted.  Okay.  And that's

14   at Exhibit 14 and specifically starting at Page 6 of that

15   Exhibit 14, Judge.  They're saying one of the things you

16   ordered was plaintiff's customers, plaintiff has refused to

17   produce documents concerning the customers for plaintiff's

18   products bearing the Candyland mark, including most

19   importantly their geographic location.

20          What your Honor ordered my client to produce

21   was customer lists.  I think I informed your Honor during

22   oral argument in connection with the August 11th order that

23   my client did not have customer lists.  I confirm my client

24   has never had customer lists, there are none.  But in an

25   attempt to comply in good faith with your Honor's order, my

1   client did to go back to its warehouse, went back several

2   years, got all the documents it could concerning what we call

3   UPS manifests.  Every time product was shipped, it was

4   shipped by UPS.  My client's records, which they maintained

5   in their warehouse, they retrieved, they investigated, they

6   got them, and they photocopied them.  There were almost 6,000

7   pages of those things, Judge.  It took my client about four

8   days and three people working full time during those days to

9   get those documents and make the copies.

10           They sent them to me at my old law firm in two

11   big boxes.  I direct the court's attention to, attention to

12   Plaintiff's Exhibit Number 30.  And Judge, I represent to the

13   court these are two cardboard boxes sent to me by Mr. and

14   Mrs. Haritatos containing subboxes identified with specific

15   years in which the UPS manifests are contained and that these

16   two boxes contain about 5,593 pages of those various

17   manifests.  These boxes and these pages were created by

18   Mr. and Mrs. Haritatos, I think in the late September or

19   early October time frame.  I had them in my office at my old

20   law firm, anticipating that Judge Hurd would probably affirm

21   your ruling and rather than getting into some contentiousness

22   about what customer lists were, we would in good faith go

23   back for many years and get these documents from the UPS

24   manifests to show where all these products were shipped.

25           Now granted, there was some people who walked

1    in off the street to the candy shop, may have paid cash and

2    so forth that are not in the UPS manifest, but these are the

3    shipping records and the best we can possibly do to show the

4    identities and locations of customers.  My client wanted to

5    get those boxes of documents to me because if Judge Hurd's

6    order presumably affirming your ruling came down in November

7    or December, they were going to be very busy with the candy

8    making season around Thanksgiving and Christmas.  They said,

9    let's do it now because it's going to take a lot of our time

10   to do this and let's get it out of the way.  The boxes were

11   there in my office when I left that firm in October 16th,

12   2006.  I had told my secretary on at least three occasions

13   that these two big boxes which are literally 3 feet or so

14   from her desk are the shipping records for Mr. and

15   Mrs. Haritatos and we're getting these in anticipation that

16   Judge Hurd may affirm your Honor's ruling, that if he does,

17   we'll have these ready to give to the other side at that

18   time.

19            I left my law firm and joined Hiscock, Barclay

20   on October 17th, 2006.  I was denied access to litigation

21   files which were still at my old law firm.  Jim Muldoon of my

22   former law firm took control of the case during that period

23   of time.  I was not aware of Judge Hurd's affirming decision

24   which came down after I left the -- my old law firm, the

25   Wall, Marjama, Bilinski firm, and in fact Mr. Muldoon was

1    saying that he would -- was refusing to turn over litigation

2    files to Hiscock, Barclay under any circumstance.

3                I unexpectedly received the litigation file

4    from my old law firm on about December 6th, 2006.  It came

5    unexpectedly, no forewarning it was coming, in fact contrary

6    to Mr. Muldoon's previous positions.  It was disheveled, I

7    had to organize this litigation file which it was extremely

8    voluminous, it probably takes up 10 shelves of space.  I also

9    noted that there's basically no correspondence at all in that

10   litigation file from the time I left the firm, the pleadings

11   were scant.  I discovered Judge Hurd's order and I sent an

12   e-mail to my adversary, Mr. Landsman, on December 7th,

13   informing him about the situation.  That e-mail is attached

14   to my declaration in Exhibit 1, direct your Honor's attention

15   to the next to the last page of Plaintiff's Exhibit Number 1.

16   This e-mail confirms with Mr. Landsman, I just received the

17   litigation files from my old law firm, I'm trying to

18   construct the pleadings and correspondence portions.  I've

19   also just been made aware that Judge Hurd denied plaintiff's

20   objections to Magistrate DiBianco's ruling though I have yet

21   to review that ruling by Judge Hurd.  Would you please allow

22   me a few days to get back up to speed on this case and

23   address this matter.  I believe that I have in my possession

24   two very large boxes of courier records for shipping candy

25   products but I do not know if they have been Bates stamped or

1    otherwise cataloged or if the ruling applies to other

2    documents as well.  And I continue on.

3                    Mr. Landsman has fortunately printed up a tape

4    recording of a voice mail message that I left with him on

5    December 14th, 2006 which is Hasbro's Exhibit 31.  So a week

6    later, I called and left a voice mail message with

7    Mr. Landsman, do you have that exhibit, your Honor?

8                    THE COURT:  This is the Hasbro exhibit?

9                    MR. PURCELL:  Exhibit 31 of the defendant's

10   exhibits, Hasbro's exhibits.

11                   THE COURT:  I do.

12                   MR. PURCELL:  So I call Mr. Landsman on

13   Thursday, December 14th, "I was just calling about the

14   discovery that's due in the Haritatos case.  Unfortunately

15   the litigation file I've gotten from my former law firm is

16   bereft of any correspondence and owned a handful of pleadings

17   since I left there two months ago so I'm trying to

18   reconstruct things," all right.

19                   Then down the next paragraph, "Secondly, I

20   have two big boxes of Fed Ex or overnight courier stuff that

21   Spero and Sharon Haritatos got together.  I think it was

22   about two months ago before I left the Wall, Marjama firm.

23   It may be some of the stuff that the magistrate's order

24   required them to produce.  I haven't Bates stamped it all yet

25   but I want to let you know it's here and maybe talk to you

1   about how to get them to you expeditiously if that's the

2   stuff you want.  If you want to come up here and take a look

3   at it," faded off, let me know.  "Anyway, please give me a

4   call at my new office in Syracuse," here, okay.

5            I offered to produce the documents to

6   Mr. Landsman and as your Honor knows, production means only

7   produce them for inspection and if they seek to copy them,

8   they can decide to copy them.  I was making them available to

9   Mr. Landsman as early as reasonably possible once I got them

10  in my possession, and instead of trying to work things out,

11  we see unfortunately a -- my later string of e-mails between

12  my new law firm, Hiscock, Barclay, and Mr. Landsman's law

13  firm down in New York City.

14           Those e-mails start in Plaintiff's

15  Exhibit Number 25, 26, et. seq., would -- I'd like to direct

16  your attention to Exhibit 25.

17           THE COURT:  Go ahead.

18           MR. PURCELL:  All right.  This series of

19  e-mails will reveal that starting in January 1st,

20  Mr. Landsman demanded that I make photocopies of the

21  documents and provide them to him.  Told him that there were

22  about 6,000 pages, my client, you know, was not prepared to

23  absorb the cost of that photocopying.  It was one thing for

24  him to have provided copies of documents before when we were

25  talking about tens or even hundreds of things, but there was

1  almost 6,000 pages of documents.  So do you want to pay for

2  them, you'll see some bickering in the e-mails back and

3  forth, Judge, in the first few days of January, where

4  eventually Mr. Landsman's law firm says, okay, send these

5  documents out to an outside photocopying service called

6  Avalon, right here in Syracuse, and have Avalon make copies

7  of those and put them on a CD for us, a disk, all right.  And

8  that's what we did.  And finally Mr. Landsman's law firm

9  agreed to bear the cost of 900 and some dollars for Avalon to

10  make those copies.  Avalon sent the disk I understand to

11  Mr. Landsman's law firm on January 11th, 2007.  There was no

12  bad faith involved in trying to ignore your Honor's ruling or

13  Judge Hurd's affirmance of your ruling.  There was every

14  attempt to try to get these things over to my adversary as

15  soon as reasonably possible and to cooperate with them in

16  getting the documents to them.

17          It was unfortunate my former law firm which

18  was handling the case denied me access to those files during

19  that period of time and perhaps they should have done

20  something themselves to speed things along and comply with

21  that order, but Mr. Landsman's request here is to try to

22  punish my client or to punish me for that, and I think that

23  would be extremely unfair to do that under the circumstances,

24  Judge.

25          It also is noteworthy that we did not try to

1    literally interpret your Honor's ruling to produce customer

2    lists because we don't have any, we tried in good faith and

3    spent many days by many people searching for, obtaining and

4    copying these records and eventually getting them over to

5    Mr. Landsman.

6                    Let's go to the next thing, and going back to

7    Exhibit 14 which is Hasbro's opposition to my appeal to

8    Judge Hurd on Page 8, the second category is Mr. Haritatos'

9    sales and revenues.  First of all, it's very unclear to me

10   that your Honor ordered anything to be produced with regard

11   to Mr. Haritatos' sales and revenues.  But we had already, I

12   think even in the Trademark Office proceeding, provided him

13   with copies of Mr. Haritatos' income tax returns for several

14   years.  Those income tax returns showed the revenues,

15   expenses and so forth of his business, his only business

16   which was the Candyland business over several years.  They

17   were already provided to them long ago.  To the extent that

18   they even wanted more information such as the UPS manifests

19   and identification of the customers and so forth, they

20   obviously got that.

21                   The next thing they want is nonparty use of

22   the Candyland mark.  Again, it's unclear that your Honor's

23   order of August 11th ordered anything about this sort of

24   thing, but that was also already produced.  That means

25   somebody was using Candyland other than the parties in this

1    lawsuit and whatever we had, Judge, I think we produced to

2    the other side.  I don't think they can point to anything

3    that we withheld, they haven't even argued that today.

4              The next thing is category 4, the alleged use

5    of Hasbro's Candyland mark by Toys "R" Us.  All right,

6    they're asking Mr. Haritatos to produce to Hasbro copies of

7    documents pertaining to the co-defendant Toys "R" Us' use of

8    the mark.  Now keep in mind, Judge, that Hasbro was the

9    company that licensed Toys "R" Us, those two companies are in

10   cahoots with each other, yet they're asking my client to

11   provide them with stuff pertaining to the Toys "R" Us use of

12   the Candyland mark.

13             The things that we have are two categories.

14   One is they are the things that Toys "R" Us and Hasbro

15   themselves produced to us in this litigation or in the

16   Trademark Office litigation, and two, there is a website

17   printoff that I personally made of the Toys "R" Us website

18   that I maintain is work product.  That's what I've got,

19   that's what I told them that I've got in regard to this.

20   There's nothing Mr. Haritatos has in addition to those two

21   things I just told you about.  Again, they're not here today

22   complaining about that or contending that we have something

23   that we withheld in that category.

24             If we turn the page to Page 9 of Plaintiff's

25   Exhibit 14, let's see the next category that Mr. Landsman was

1    telling Judge Hurd that something that you ordered to be

2    produced, and indeed this one you did order, Judge.  The Nora

3    Haritatos application to register the original thin-shell

4    candy Turkey Joints mark.  You did order it, Judge Hurd

5    affirmed that order.  They haven't come here today saying

6    that we had documents we didn't produce.  But nevertheless

7    they told you and they told Judge Hurd that we hadn't given

8    them any documents respecting this trademark application.

9    That simply was untrue.  We gave them what we had.

10              Let's go to Plaintiff's Exhibit 22, please,

11   your Honor.  This is a printout that I obtained from the

12   United States Patent and Trademark Office database of the

13   Nora Haritatos application to register the original

14   thin-shell candy Turkey Joints mark, all right.  This is

15   available to the public, from the Trademark Office database,

16   all right.  This is the registration at issue.

17              Let's look at a couple things here, Judge.

18   First of all, you don't see the word Candyland anywhere.

19   This lawsuit's about the trademark Candyland, not about the

20   Turkey Joints, not about thin shell or any of that sort of

21   stuff, it's about Candyland.  I maintain that this request

22   was irrelevant, but nevertheless I had already given to them

23   what we had with regard to this application registration.

24              Let's look more carefully at this

25   registration, Judge.  At the bottom of the first page of

1    Exhibit 22, you will see that the registration issued on
2    November 2nd, 1976, over 30 years ago, and we turn the next
3    page, what the database tells us is that this registration
4    was canceled on March 29th, 1983, went dead, was dead, about
5    25 years ago.  So when I asked Mr. Haritatos to, you know,
6    well, even though it's not relevant, let's just get the stuff
7    that pertains to this registration, whatever you got, Spero,
8    let's produce it, here's something that we have here, we go
9    to Exhibit 23, Judge.  I sent to Hasbro's attorneys by letter
10   dated June 1st, 2006, some documents that were Bates stamped
11   as originating with Mr. Haritatos.  And if, as I have also
12   attached some of those documents bearing those Bates stamp
13   numbers on them and you will see that these documents pertain
14   to the Nora Haritatos application that we've been talking
15   about, and they're one, two, three, four, five, six, seven,
16   looks like there's about eight pages, including a three-page
17   copy of the application itself that Mr. Haritatos had found
18   somewhere in his records going back 30 years, Judge, that
19   we'd already produced to Hasbro on June 1st, 2006.  And they
20   have the audacity to come before you later, Judge, and ask
21   you for an order of August 11th, 2006 and tell you that we
22   hadn't given them any stuff on this application when in fact
23   we'd given them already what we had.
24              Let's go to the next category of what Hasbro
25   believes you ordered in your August 11th order as reflected

1    in their opposition brief before Judge Hurd which again is

2    Plaintiff's Exhibit 14, and I'm looking again at Page 9.

3    This category is Mr. Haritatos' legal expenses.  And this is

4    a fairly unique and distinct type of category of damages,

5    Judge.  What Mr. Haritatos is seeking as one element of

6    damages in this lawsuit is his legal fees in connection with

7    the Trademark Office opposition proceeding that he brought

8    against Hasbro.  To my personal knowledge there is only one

9    case decision addressing this issue.  It comes out of the

10   First Circuit Court of Appeals and it firmly stated that such

11   type of damages are recoverable for trademark infringement

12   where the plaintiff prevailed in a trademark infringement

13   case, he was able to recover his legal costs associated with

14   the litigated proceeding in the Trademark Office.  So I had

15   First Circuit authority for that.  They say, okay, provide us

16   with all documents concerning those legal expenses, all

17   right.

18              Now some of those documents of course, Judge,

19   include the correspondence between the parties in the

20   Trademark Office litigation, the pleadings in the Trademark

21   Office litigation, the deposition transcripts and exhibits in

22   that Trademark Office litigation.  All those things concern

23   in a broad sense the legal fees.  What they additionally

24   wanted and interpret your order as requiring was

25   Mr. Purcell's bills and day notes, all right.  Now first of

1   all, I don't know what day notes means, I've been practicing

2   law for 30 years, I don't know what day notes means.  I do

3   know what the bills were and we did address that with your

4   Honor and before Judge Hurd.  I have no problem in turning

5   those invoices over to my adversary, except for the fact that

6   the time entries on those invoices might reveal, well might

7   reveal attorney-client privileged information.  And I just

8   couldn't turn those over without some sort of okay by my

9   adversary or the court, okay, saying mask out what you rule,

10  believe in good faith is attorney-client information;

11  otherwise turn it over or things of that nature.

12              I would be happy, Judge, to find those

13  invoices, to turn them to the court in camera to let the

14  court determine what's attorney-client privilege, mask out

15  whatever the court feels is appropriate and turn them over to

16  the other side.  But I admittedly did not produce those

17  invoices to my adversary in response to either your order or

18  Judge Hurd's order but I think it's for obviously a very,

19  very good reason, and I'm not trying to be obstreperous.

20  I've tried to offer that to my adversary, to accept masked

21  copies, they simply won't do that.

22              THE COURT:  What type entries are you

23  referring to?

24              MR. PURCELL:  Well, in connection with my

25  bills to my client Spero Haritatos in connection with the

1    Trademark Office proceedings, naturally there's an entry for

2    the date services were rendered, the amount of time spent on

3    those services and a description of the services which could

4    be doing legal research on certain issues, communicating with

5    client about settlement and so forth, maybe communications

6    with potential witnesses or experts, that sort of thing may

7    be revealed and well may be revealed in those invoices, as

8    well as of course a running tally of the hourly rate --

9    disbursements and so forth which, you know, are I don't think

10   going to be troublesome.

11            I also should bring to the court's attention

12   that this issue is probably moot at the moment.  Judge, back

13   up.  The defendants here moved for summary judgment before

14   Judge Hurd several months ago.  They made three arguments.

15   They first argued that Mr. Haritatos had a mark Candyland

16   that was generic and therefore he had no rights in the

17   trademark Candyland despite the fact that the Trademark

18   Office had granted him a registration.  Judge Hurd said, no,

19   I think that there's plenty of evidence here that his mark is

20   protectable.

21            Secondly, they argue, well, even if he does

22   have some protectable registered rights in this mark, Judge,

23   there could be no possibility of a likelihood of confusion in

24   this case, you know, we are the mighty Hasbro and Toys "R"

25   Us, the company up in Rome, nobody would possibly be

1    confused, have a likely confusion between us using Candyland

2    for candy products and Mr. Haritatos using Candyland for

3    candy products.  Judge Hurd was unpersuaded, no, looks like

4    there's plenty of evidence here to go forward for trial.

5               Their third argument was, but Mr. Haritatos

6    isn't entitled to damages.  Why?  Because he allegedly can

7    come forward with no evidence of actual confusion, people

8    being actually confused between the two companies or the

9    products.  Judge Hurd decided that, well, that's not really

10   the issue, but the real issue in Judge Hurd's mind was that

11   the Second Circuit law said that the infringer must engage in

12   infringement in a willfully deceptive manner, almost like a

13   counterfeiting type situation, and since we did not have

14   sufficient evidence to show the defendants engaged in willful

15   deceptiveness, he granted their partial summary judgment

16   motion denying us a request for damages.

17              I asked for reconsideration saying the judge

18   was relying upon a case that nobody had cited, I commented to

19   the judge in motion for reconsideration that prior Second

20   Circuit law and subsequent Second Circuit law used a totally

21   different standard such as willfulness or bad faith.  He

22   denied my motion for reconsideration but granted my request

23   to certify the issue for interlocutory appeal before the

24   Second Circuit.  Currently I have a request for the Second

25   Circuit to take up the appeal of this issue about whether my

1       client's entitled to damage recovery in the absence of a

2       showing of willful deceptiveness, especially in a case such

3       as this involving reverse confusion.

4               Judge Hurd, as you know, has stayed this

5       litigation pending the outcome of that potential

6       interlocutory appeal.  So right now as the case stands, there

7       is no right of my client to seek damages.

8               All right.  Let's go next to these things

9       that -- these things, discovery they served at the end of

10      January and couldn't get it served on time which they say was

11      I think Mr. Landsman's word was they served them late

12      because, because we didn't get these two boxes of UPS

13      manifests to them earlier.

14              In the context of this, Judge, you had, had

15      really brought -- one of us brought a discovery dispute

16      before you, there was an earlier discovery cutoff date of I

17      think May of 2006 or something.  And Hasbro had belatedly

18      served discovery back when the discovery cutoff date was I

19      think May something, 2006.  And I objected, your Honor said,

20      well, we're going to take care of that by extending the

21      factual discovery deadline, discovery cutoff date so answer

22      those, Mr. Purcell, which I did at that time.  All right.

23              But at that point in time, Judge, they were

24      obviously alerted by me to this local court rule which says,

25      get your paper discovery served in time so that the responses

1    are due before discovery cutoff date.  It's not only in the

2    local court rules, they had a prewarning from me months

3    before in the case that, hey, I objected to this paper

4    discovery because earlier it wasn't served before the

5    discovery cutoff date, and here they go again.  They make no

6    excuse as to why they waited so long to serve the discovery,

7    why they didn't ask the court to extend the discovery cutoff

8    date at least in part.  Just during the discovery period they

9    could have moved and said, Judge, you know, we know we served

10    these things late, they're not that onerous, could you please

11    extend the discovery cutoff date for just these few things if

12    you would, please, but they didn't do that.  They didn't ask

13    your Honor for any extension of discovery cutoff date.

14              After the discovery cutoff date came and went,

15    then they come back and say, oh, let's go backwards, can you

16    order them to answer these things.  Let's go through them.

17    One of them is at Plaintiff's Exhibit Number 32.  I'm

18    directing your attention to the second page of that

19    Exhibit 32.  Keep in hind, your Honor, that my adversary said

20    they couldn't get this discovery out the door because they

21    were waiting and waiting and waiting for those UPS manifests.

22    This interrogatory says, identify each product or goods sold

23    by plaintiff from 1995 to present.  For each product or good

24    identify the following, it's got a list, all right.  What

25    does that have to do with UPS manifests or customer list and

1    that stuff?  Nothing.

2                    Interrogatory number 14 on the same page,

3    state whether the product Coco-Monds, sold on the website,

4    has the word Candyland.  What does that have to do with the

5    UPS manifests, customer list?  Nothing.  There was no reason

6    not to get these out the door earlier.

7                    And then what really galls me about this,

8    Judge, is interrogatory number 13.  Let's compare

9    interrogatory number 13 with the very first interrogatory in

10   this lawsuit which is at, let's see, Exhibit Number 7 in the

11   defendant's binder.  We'll see that there's a big overlap and

12   duplication here, Judge.  Forget about the fact that the

13   Trademark Office proceedings had similar interrogatories by

14   Hasbro, they now have an interrogatory number 13, first

15   served at the end of January 2007 which is duplicative of

16   something they basically already asked in other

17   interrogatories and of course stuff that they asked

18   Mr. Haritatos about in two separate depositions.

19                   THE COURT:  Which interrogatory number are you

20   referring to?

21                   MR. PURCELL:  I'm looking at interrogatory

22   number 1 starting on Page 4 of Defendant's Exhibit Number 7.

23   Okay.  So number 1 says, "Identify separately each product

24   produced, distributed, marketed, or sold or intended to be

25   produced, distributed, marketed, or sold in connection with

1   plaintiff's Candyland mark, and for each such product," okay,

2   "identify the date," let's just take it.  So comparing with

3   interrogatory number 13, "Identify each product or good sold

4   by plaintiff from 1995 to present.  For each product:"  In

5   response to interrogatory number 1 on Page 5, of course we

6   make the boilerplate objections but then we say the products

7   include a hard-coated chocolate candy known as Turkey Joints,

8   peanut brittle, nonpareils, chocolate and nut clusters,

9   caramel and nut clusters, chocolate novelties, Easter-themed

10  chocolates, caramel corn, fudges, truffles, chocolate

11  suckers, hard candy suckers, and ice cream.  Approximately

12  90 percent of plaintiff's sales have been from the Turkey

13  Joints candy with other products contributing about 1 percent

14  each of total sales, all right.  Sounds pretty similar to

15  what interrogatory number 13's asking, Judge.

16           Then they ask, "Identify the date and

17  circumstances of actual or intended first use," and after the

18  boilerplate stuff we tell them, looking at the bottom of

19  Page 5, I think it's one of the things they highlighted on

20  the screen for you, Judge.  "The mark was first used in

21  connection with the Turkey Joints candy about 1919, is

22  believed to have been first used in interstate commerce at

23  about that time.  The mark was first used in connection with

24  the other products except ice cream since at least as early

25  as 1975 and is believed to be first used in connection with

1    those products at least as early as 1945.  It is believed

2    that the mark was first used in interstate commerce in

3    connection with the other products except ice cream since at

4    least as early as 1975, and is believed to have been used in

5    interstate commerce in connection with such products since at

6    least as early as 1945.  The mark was first used in

7    connection with ice cream in late April or early May 2004 and

8    is believed to have been first used in interstate commerce

9    shortly thereafter."

10             That's pretty clear, Judge, and considering

11   the facts of the age of my clients, they can't be very well

12   compelled to try to get a better date than 1945 or 1930.

13   They simply aren't that old, Judge, they're trying to do the

14   best they can from reconstructing the records and knowing

15   what their parents and family members have said about the

16   uses of the mark.

17             And we look at their interrogatory number 13e,

18   says, "The percentage of plaintiff's total revenue

19   represented by the sale of each product from each year the

20   product was sold."  Well, I already told them that in

21   interrogatory number 1, we said, 90 percent of plaintiff's

22   sales have been from the Turkey Joints candy with the other

23   products contributing approximately 1 percent each of total

24   sales.  And they've taken his deposition for two solid days,

25   Judge.  And they come here and tell you, Judge, they couldn't

1    have served this interrogatory because they're waiting,

2    waiting, waiting for the UPS manifests and the two boxes to

3    get to them.

4                Let's look at interrogatory number 3, or I'm

5    sorry, Plaintiff's Exhibit Number 33, this is another piece

6    of paper discovery they served at the end of January

7    belatedly.  Just take a glance at some of these.  These are

8    requests for admissions.  "You," Mr. Haritatos, "have no

9    evidence of customers in New York, New York to whom you have

10   sold goods via mail order or otherwise outside your store in

11   the past five years other than those identified in your

12   January 11th, 2007 production of documents numbered," such

13   and such.  Did this really have to wait, Judge?  They

14   couldn't have served it on January 14th or 20th on time?

15   They say, oh, because they got the stuff on January 11th, it

16   took them until January 31st to get this request for

17   admission out the door.  Took them 20 days after they got the

18   documents, it took them 20 days to ask Mr. Haritatos, admit,

19   admit that the only evidence that you have or documents that

20   you have of these sales in the New York, New York area are in

21   that batch.  I think that's disingenuous, Judge.

22                THE COURT:  Why is it disingenuous?

23                MR. PURCELL:  Because the evidence can be

24   other than documentary evidence, Judge.  Mr. Haritatos has

25   testified that there was one particular customer in the Long

1    Island area that he believed satisfied the New York City area

2    who came up I think with her station wagon, bought the stuff

3    and took it back with her station wagon, all right.  It's one

4    of those very unique sort of walk-in customers and that's in

5    his deposition testimony, for example.

6                    THE COURT:  So you would simply deny the

7    admission, request for admission.

8                    MR. PURCELL:  Yes.

9                    THE COURT:  But you're contending that it took

10   them two weeks to examine hundreds of documents and that was

11   unreasonable?

12                   MR. PURCELL:  They didn't have to examine

13   those documents in order to formulate this request for

14   admission, Judge.

15                   THE COURT:  Didn't the documents concern

16   customers?

17                   MR. PURCELL:  Yes, they did.

18                   THE COURT:  The documents that you sent in

19   mid-January concerned customers?

20                   MR. PURCELL:  Yes, they did.

21                   THE COURT:  So isn't this referring to

22   customers?

23                   MR. PURCELL:  Yes.

24                   THE COURT:  So what's so disingenuous about

25   this particular interrogatory?

1          MR. PURCELL:  I don't think you need to review

2   5,593 pieces of paper to finally say, hmm, I guess I better

3   ask this request for admission.  This request for admission

4   was on their tongues probably before we even produced

5   anything, Judge, okay.

6          THE COURT:  I don't see the point.  Go ahead.

7          MR. PURCELL:  Okay.  All right.  Next, let's

8   go to Plaintiff's Exhibit Number 34.  This is the third piece

9   of paper discovery that they say couldn't have been done

10  because of plaintiff's delay in getting the documents of the

11  UPS manifest to them.

12         THE COURT:  I didn't hear that argument.  I

13  heard Mr. Landsman say that after we reviewed those

14  voluminous documents, further discovery came to mind or

15  further discovery was in order, I didn't hear him say what

16  you just said.

17         MR. PURCELL:  This is interesting, I didn't

18  hear him say what you think he said, Judge.  But my

19  recollection is that he went on the website and learned

20  something about these Coco-Monds.  Well, the website has

21  nothing to do with the UPS manifest, Judge, and now we've got

22  Exhibit 34 which is another request for documents and things

23  pertaining to the Coco-Monds which he told us today when and

24  how he first came to know about the Coco-Monds stuff which he

25  said was from the website.  I believe that's what he said

1      today, Judge, and it wasn't from anything to do with UPS

2      manifests, and here we have a request for documents and

3      things directed again to the Coco-Monds stuff.

4              Let's --

5              THE COURT:  Let's take a short recess at this

6      point and reconvene at 11:30.

7              THE CLERK:  Court recesses.

8              (Whereupon a recess was taken from 11:21 a.m.

9              to 11:38 a.m.)

10             (Mr. McGowan left the proceedings.)

11             MR. PURCELL:  Thank you, your Honor.  Picking

12     up the last point of argument, your Honor, you asked me

13     wasn't it reasonable to infer that the request for admissions

14     served by Hasbro January 28th, 2007 were really timely

15     considering the production of UPS manifests on January 11th.

16     I countered by saying that, Judge, this was probably already

17     in their mind regardless of what that production of documents

18     actually showed, and I'd like to show you what Hasbro was

19     thinking months before then, Judge.

20             If we refer to plaintiff's, I'm sorry,

21     Hasbro's Defendant's Exhibit 13, this is Mr. Haritatos'

22     response to Hasbro's first requests for admission.  These

23     requests were served September 15th, 2006.  And if you look

24     at Page 7 of the responses, direct your attention to request

25     number 10 and request number 11.  Request number 10 says,

1    "You," Mr. Haritatos, "do not sell any goods to any retail

2    customers for resale outside of New York State.

3                    "See the general objections.  Plaintiff

4    objects to the request as being vague and indefinite, since

5    plaintiff understands that by definition of a 'retail'

6    customer is a customer that does not resell an item.  To the

7    extent that plaintiff understands the request, it is

8    admitted."

9                    Number 11.  "You," Mr. Haritatos, "do not sell

10   any goods to retail customers for resale in New York City."

11                   Basically the same objection and the same

12   admission.

13                   Hasbro was thinking about this stuff months

14   before, Judge, they were concentrating on what's the evidence

15   you have of sales and so forth in New York City.  They had

16   requests for admissions, they were deposing Mr. Haritatos

17   about that, he told them about this woman in Long Island and

18   so forth, and for them to come before you and say, gosh, we

19   weren't really sure we wanted to ask those requests for

20   admission on January 28th until we had a full opportunity to

21   look through the entire 5,593 pages of documents is

22   disingenuous I submit to your Honor.

23                   They also complain that Mr. Haritatos has

24   improperly responded to their requests for admissions

25   regarding some third-party uses of the term Candyland in

1    connection with candy or confectionary products that they

2    found on the internet.  Now here's what Hasbro did, your

3    Honor.  They had their attorneys searching the internet to

4    see if there was anybody using Candyland as a trademark out

5    there for some products.  They found some things on the

6    internet and they produced to us certain website pages, all

7    right.  And they then say, well, these website pages in their

8    opinion show that some third parties have been using the term

9    Candyland in connection with candy products and that's

10   important in the lawsuit for some reason they say.

11           They presented this argument to Judge Hurd in

12   connection with motion for summary judgment, he was

13   unpersuaded.  What they try to do through these requests for

14   admissions is to get Mr. Haritatos to perform an

15   investigation of potential third party uses of the term

16   Candyland, then based upon his compelled investigation of

17   those third-party activities, answer the interrogatories in

18   the way that my adversary wants him to answer them.

19           It is unprecedented, your Honor, to say that

20   in responding to request for admission you must compel, you

21   must say that, oh, I not only have to tell you what I know

22   about my own activities and what I have within my own

23   possession, custody, control my own employees do but now

24   you're saying I've got to go and investigate, whether it's

25   the computer or by traveling down the road or whatever, I've

1    got to go and look at some third-party things, seek it out,

2    look it out and then I have to tell you what I think that

3    third party's doing and I've got to admit it in the way that

4    you want me to have it admitted.

5              Let's go through some of these in the

6    responses to the requests for admission.  Again it's

7    Plaintiff's Exhibit Number 13.  And we'll start with number

8    18 on Page --

9              THE COURT:  9.

10             MR. PURCELL:  9, yes, thank you.  "You,"

11   Mr. Haritatos, "have never notified a business by the name of

12   Candyland, Inc. located in St. Paul, Minnesota, that its use

13   of the term Candyland infringes your rights in your Candyland

14   mark."  Admitted.

15             19, "Candyland, Inc. in St. Paul, Minnesota

16   offers candy for sale via the internet at," this website.  He

17   lacks knowledge and information.  Does he know Candyland,

18   Inc. is doing it?  Do they, does he know that Candyland, Inc.

19   is located or is in St. Paul, Minnesota?  Does he know it's

20   really offering candy?  Is he supposed to investigate this

21   and come to some conclusion as to what they are and are not

22   doing, where they're located, whether that's really a

23   corporate entity, Candyland, Inc. and that's really the

24   entity behind the supposed website and so forth?

25             They go on and on and on, Judge, these same

1    sets of requests for admission go over and over on different

2    third-party websites throughout these requests for

3    admissions.  That's the ones they're saying that we didn't

4    respond to properly.  I submit we -- first of all, we are not

5    under any obligation under the Federal Rules of Civil

6    Procedure to make such an investigation of third-party

7    activities for our adversaries, try to compel us to respond

8    to requests for admissions in the way they want us to.  I

9    also --

10                THE COURT:  Well, probably in an ordinary case

11   litigation you may be correct, but isn't it a principle of

12   the patent and trademark law that if you allow someone else

13   to use an infringing device or a mark, that that dilutes your

14   claim that some defendant using the mark is infringing on

15   your rights?

16                MR. PURCELL:  There is a general body of law

17   to that effect, your Honor, however, it is not the law that

18   your failure to so-called police your trademark against

19   infringers is going to eviscerate your trademark rights.  It

20   would have to be so pervasive and wholesale to render your

21   mark basically protectionless that it would -- you'd have to

22   have a situation like the Thermos bottle basically where it

23   was so widespread, use of the term Thermos by third parties

24   in a generic sense that the rights in Thermos were

25   eviscerated.  Contrast it also with Xerox.  People for years

1    have said Xerox machine, Xerox copy and so forth and it might

2    be an SCM machine or an IBM photocopy machine but they still

3    call it a Xerox machine.  And even with such widespread use

4    of the term Xerox by other people when not referring to goods

5    of the trademark owner, that's not sufficient to say, oh, you

6    don't have anymore trademark rights, protectable rights in

7    the term Xerox.

8                    I realize where my adversary is trying to go

9    with this, but -- and he may, you know, present that evidence

10   at trial if he wants to, but to try to force my client to

11   take his investigation and say my client has to undertake the

12   same investigation, not just stuff that he's doing, I think

13   is too far, your Honor.  And it's also too far when you look

14   at the specific request for admission and say admit that it's

15   located in the city.  Does my client know where it's located?

16   I'm willing to stipulate, Judge, I can stipulate that these

17   website pages were in fact found and are true and accurate

18   authentic copies of website pages obtained by my adversary

19   counsel on such and such a date, I'm willing to stipulate to

20   that.  We'll see if Judge Hurd wants to admit that into

21   evidence or what weight the jury or judge want to give to

22   that evidence, that's fine.  There's not a problem in trying

23   to keep that evidence out.

24                    It's the way these requests for admissions

25   were framed, Judge.  And when we look at the specific

1    requests for admissions you can see why my client and I,

2    quite candidly, answered it the way we did.  And I think that

3    to say, oh, it's not sufficient for you just to say what, you

4    know, is in your own knowledge, your company's knowledge or

5    your employees' knowledge but you've got to go out there and

6    beat the bushes for the evidence and then tell me what you've

7    found and if I don't like what you say you found, well then

8    I'm going to go to the judge and tell the judge you haven't

9    been really honest in answering the requests for admissions.

10              THE COURT:  Didn't sound to me that Hasbro was

11   complaining about the requests to admit which had been

12   admitted.  Sounded to me that they were complaining about the

13   requests to admit that were ignored.

14              MR. PURCELL:  None of these have been ignored,

15   Judge.

16              THE COURT:  Well, I can see that but I didn't

17   hear Hasbro's argument as saying that we're complaining about

18   the fact that plaintiff admitted something.  Go ahead.

19   Please move on.

20              MR. PURCELL:  Well, we continue on, it's, for

21   example, request for admission number 20, "You have reason to

22   believe that Candyland, Inc. in St. Paul, Minnesota uses the

23   term Candyland in connection with the sale of candy.

24   Denied."  What reason do we have to believe it?  Oh, no,

25   you're supposed to go out there and beat the bushes and make

1    some sort of assessment.  I don't think that's what the

2    Federal Rules of Civil Procedure require us to do and

3    certainly don't compel us to do some sort of perfect

4    investigation that Hasbro itself apparently hasn't done and

5    can't do.  But again, we're willing to offer to stipulate

6    that these website pages are true, accurate, authentic copies

7    of things they got from the websites on such and such a date,

8    Judge.

9                 THE COURT:  You may be correct in that

10   contention, but there are much larger issues here which you

11   need to address.  The issues of the August 11th order and

12   Judge Hurd's order and things like that.

13                MR. PURCELL:  Yes.  Next my adversary says

14   that, for example, we did not provide samples of our product,

15   each one of our different products to them, that it was an

16   improper objection, that we are stonewalling discovery and so

17   forth, Judge.  Let me address that.

18                We provided photographs of many of our

19   products to them, I think it was in connection with the

20   Trademark Office proceeding, if not this proceeding.  We also

21   allowed them to come onto our premises and take the

22   photographs of all the candy in the candy displays, the

23   package candy and so forth there, they had pictures of them.

24   There's also pictures of some of the products on our website,

25   free to them, free to the public.  We told them, look at our

1    website.  We told them, look at the photographs.  We told

2    them take the photographs of the stuff.  Nevertheless they

3    say no, no, no, they really want the products, they really

4    want a couple of the chocolate-covered nut clusters, I mean

5    really, Judge, they really want two pieces of candy?  Are

6    they going to do some chemical analysis on it?  What are they

7    going to do with that stuff?  Is that reasonably calculated

8    to lead to discovery of admissible evidence?  I don't think

9    so.

10                Mr. Landsman gave a little clue, he says,

11   we're not really interested in the candy, we're interested in

12   what it comes in, the packaging.  Well, that's not what their

13   request was.  The request was for samples and to the extent

14   that you have requested the packaging, samples of packaging,

15   we provided copies of that to you way back in the Trademark

16   Office proceeding.  And you've had a chance to see our

17   packaging by coming into the premises during the Trademark

18   Office proceeding and taking all the photographs you want of

19   what's there.

20                How can it possibly be that we are bad people

21   because we resist providing two samples or three samples,

22   whatever they want of the actual candy themselves when they

23   got photographs of everything, they've got written

24   descriptions of the candy, they're permitted to take

25   photographs themselves of the candy, and the packaging

1    sometimes itself says what's in the packaging.  It's --

2    there's a point where it becomes absurd, Judge, and I think

3    that's where my adversary is in advocating that we've engaged

4    in some bad faith by saying we don't think you really need

5    the samples.

6            To the extent that they want updated sales

7    records and so forth, Judge, we can probably provide them

8    with copies of the last year's income tax returns, if it

9    needs to be updated we'll supplement that stuff.  Obviously

10   not, without a trial date, we try to supplement stuff sort of

11   all at once within reasonable time period rather than

12   piecemeal but if they want us to supplement that and update

13   that, we will.  Perhaps they will return the favor and

14   supplement all of their discovery responses too and

15   production.

16           Your Honor also asked a good question of my

17   adversary and that is there is no evidence, no documents, no

18   exhibits, no testimony to be offered by my adversary here

19   today regarding the amount or nature of their requested

20   attorneys' fees in connection with this matter, and it seems

21   that your Honor set forth an evidentiary hearing on this

22   whole matter and for my adversary to say, well, we don't care

23   what you want, Judge, we're just going to do this piecemeal

24   is improper.  And if they really had a true request for

25   attorneys' fees, I think your Honor's order compelled them to

1   make that request and present that evidence here today so

2   we'd have it out all at once.  The fact that they haven't

3   done so should be a waiver of any request for attorneys'

4   fees.

5              I think that I've covered all the points

6   raised by my adversary but I solicit my adversary to point me

7   to any particular interrogatory response, document request

8   response, request for admission response, or any other aspect

9   of the August 11th order that they think I have not addressed

10  in my opposition argument here.

11             MR. LANDSMAN:  Your Honor, I would like to

12  briefly respond to Mr. Purcell that I intend to put him on

13  the stand and there will be more than enough time to get into

14  that level of detail.

15             THE COURT:  Anything further in your argument,

16  Mr. Purcell?

17             MR. PURCELL:  Not if my adversary thinks I've

18  covered each objectionable --

19             THE COURT:  We'll turn back to Mr. Landsman.

20             MR. PURCELL:  Thanks.

21             MR. LANDSMAN:  I didn't -- just a few quick

22  points, your Honor.  First of all, I am stunned and outraged

23  that on March 4th, 2008, Mr. Purcell is arguing about the

24  relevancy or significance of the requests that he was ordered

25  to produce on September 11th, 2006.  This is just not the

1    time and place to get into that.  He's had more than enough

2    time to do that before, and I'm not intending to respond

3    about the relevancy, that's long past.

4              Secondly, this point about Rule 72 and his

5    point that it would eviscerate 72(a) and his right to object

6    if he had to move to stay rather than simply obey it, think

7    about what that would mean in an appeal from the District

8    Court.  He's -- if it eviscerates 72(a) to say you have to

9    obey the order or seek to stay it while you're appealing it

10   to the district judge, you would be eviscerating the right of

11   appeal to the court of appeals by saying that you have to

12   move to stay the District Court's order while you appeal it.

13   That's what we do in these proceedings.

14             As to this, the January 11th production and

15   whether we were bickering about the price, I would simply

16   point your Honor to --

17             THE COURT:  January 11th request.

18             MR. LANDSMAN:  I'm sorry, his production of

19   documents finally on January 11th, 2007.  His Exhibit 27

20   which has various e-mail chains and it includes on Page 2 of

21   3 where he says he's responding to my voice mail of the 18th,

22   documents have not been Bates stamped or marked confidential,

23   that's what he's got to do before he proceeds to produce

24   them.  My response is at the top of that page, and it says if

25   the -- "If the boxes which you state in your voice mail had

1    been in your possession for two or more months, certain

2    documents should have been produced and you should obviously

3    have produced them immediately," and then I say bill us for

4    that if you wish.  I never quibbled about paying for this.

5    We'd never been asked to do that before, that had not been

6    the custom in this case but I said bill us if you want to.

7                  Now, there was some discussion in

8    Mr. Purcell's remarks about problems with his old firm and he

9    had the documents before he left his old firm, he doesn't say

10   how long before he did, he had -- he got the documents from

11   his old firm sometime in the first week of December.  But the

12   problems with his old firm just don't matter here because,

13   first of all, they were due September 11th which is long

14   before he left his old firm under your order.  Two, if he had

15   a problem with his former firm that prevented compliance with

16   either your order or Judge Hurd's order, he should have come

17   to the court and asked to be relieved of it and explain why.

18   Secondly, even if he didn't get them till the first week in

19   December, there's no excuse for not turning them over

20   quickly, and bear in mind that he's saying that we didn't

21   move quickly enough between getting 5,000 documents on

22   January 11th and sending them a request on January 31st, but

23   he took five weeks to produce these documents to us that were

24   due months ago under a court order.

25                  And finally, and that's -- that is the final

59

1    point, that having egregiously missed court-ordered deadlines

2    by months to then say that our requests come two days too

3    late is just exactly the kind of thing that should not be

4    tolerated here.

5              Now finally, he says that it is unprecedented,

6    and I think that was his term, for a party to be required to

7    actually do some investigation in response to a notice to

8    admit.  And the really simple answer to that actually is

9    right there in the Federal Rules in the commentary, and the

10   answer also to his saying that he can deny something because

11   he quibbles, for example, with, well, I don't know if it's

12   Candyland, Inc., it says Candyland, Inc. on the website but I

13   don't know that it's in fact a corporation so I can deny the

14   whole thing, that's all covered.

15             Rule 36 says the answer shall specifically

16   deny the matter or set forth in detail the reasons why the

17   answering party cannot truthfully admit or deny the matter.

18   A denial shall fairly meet the substance of the requested

19   admission, and when good faith requires that a party qualify

20   an answer or deny only a part of the matter of which an

21   admission is requested, the party shall specify so much of it

22   as is true and qualify or deny the remainder, and then an

23   answering party may not give lack of information or knowledge

24   as a reason for failure to admit or deny unless the party

25   states that the party has made a reasonable inquiry and that

1   the information known or readily obtainable by the party is

2   insufficient to enable the party to admit or deny, closing

3   the quote there.

4              Now, as to the precedent for the amount of

5   investigation, Mr. Purcell exaggerates this into saying we

6   are purporting to require him to beat the bushes.  Well,

7   typing a URL into the internet is hardly beating the bushes,

8   your Honor.  It's something you do very quickly in your own

9   office, and in the rules themselves under the commentary

10  under the 1970 amendment, and this is the commentary of the

11  people who are revising the rules, it talks about there

12  being, before this amendment, a sharp split of authority on

13  the question of whether the party can base his answer on lack

14  of information without seeking additional information.  One

15  line of cases says he doesn't have to.  The majority, larger

16  group of cases supported by commentators has taken the view,

17  if responding party lacks knowledge he must inform himself in

18  reasonable fashion, and then it says the rule as revised,

19  1970, adopts the majority view as in keeping with the basic

20  principle of the discovery rules that a reasonable burden may

21  be imposed on the parties when its discharge will facilitate

22  preparation for trial and ease of the trial process.

23             Well, that just applies absolutely here.  He

24  should have said, well, I don't know if it's a corporation

25  but the rest of it is true if that's what he really meant.

1          With that, your Honor, I'd like to call my

2     first witness.  I'd like I guess as a procedural issue to ask

3     about admission of exhibits.  My understanding is that

4     Mr. Purcell has no objection to our exhibits except perhaps

5     to the deposition transcript because he didn't get the

6     specific pages until this morning.  I'm willing to forgo that

7     and use the deposition transcripts just in impeachment if

8     necessary and I'd like, just to speed things along, we're

9     happy to have admitted his exhibits and it would be easier I

10    think for everyone if our exhibits were deemed admitted so we

11    don't have to do it piecemeal through the testimony.

12              THE COURT:  I would agree with that.  Which

13    deposition transcripts are you referring to?

14              MR. LANDSMAN:  They're the depositions of --

15    there are two depositions of Spero Haritatos, one on

16    February 2005, and then another at May 17th, 2006, and those

17    are Exhibits 18 and 19.  Then there's some excerpts from

18    Sharon Haritatos' deposition which is Exhibit 20, and then

19    some excerpts from Anna Bushnell on Exhibit 21.

20              THE COURT:  18, 19, 20, 21.

21              MR. LANDSMAN:  Yes, your Honor.

22              THE COURT:  They're in your folder?

23              MR. LANDSMAN:  Yes, your Honor.

24              THE COURT:  All right.  Any objections, all

25    exhibits on both sides?

1              MR. PURCELL:  Your Honor, I have no objection

2    again except for the deposition transcript excerpts set forth

3    in my adversary's exhibit list.

4              THE COURT:  Okay, so you have no objection

5    except for Exhibits 18, 19, 20, and 21?

6              MR. PURCELL:  Correct.

7              THE COURT:  Is that right?  Okay.  All of

8    Hasbro's exhibits except 18, 19, 20, and 21 are admitted.

9    And your exhibits, no objection to those, Mr. Landsman,

10   plaintiff's exhibits?

11             MR. LANDSMAN:  None, your Honor.

12             THE COURT:  And the objections to 18, 19, 20,

13   and 21 are objections to the excerpts, did you want to submit

14   additional portions of those depositions?

15             MR. PURCELL:  Are you asking me, your Honor?

16             THE COURT:  Yes.

17             MR. PURCELL:  First of all, those were

18   proffered by my adversary and I don't intend to offer any

19   other portions of the deposition transcripts.

20             THE COURT:  So what would be the objection to

21   the excerpts then, Mr. Purcell?

22             MR. PURCELL:  The exhibit list was supposed to

23   specify the documents, and again, when referring to these

24   excerpts, I didn't get any pages at all, page numbers and so

25   forth.  Mr. Haritatos' deposition transcript, there are two

1   of them, are over 500 pages in total length, for example.

2   And my adversary just said, oh, we want to rely upon some

3   excerpts.  Well, I don't think that's enough specificity to

4   say what am I supposed to be prepared for at this hearing on

5   March 4th in reviewing whatever exhibit he plans to use so I

6   may rebut it, impeach it, counter it, and so forth, your

7   Honor.

8                   THE COURT:  All right.  So assuming that's

9   your argument, you now have the excerpts contained in these

10  four exhibits, 18 through 21.

11                  MR. PURCELL:  Yes.

12                  THE COURT:  Do you want to look at those and

13  make more specific objections or submit other portions of the

14  transcript, what's your basic objection to the excerpts?

15                  MR. PURCELL:  Well, your Honor, I just got

16  this exhibit book from my adversary at about 20 minutes of 10

17  this morning, I haven't even looked at the --

18                  THE COURT:  Haven't seen them, okay.  I will

19  give you a reasonable amount of time to at least specify what

20  your objections are to the excerpts, perhaps we can do that

21  at the end of the day so that issue will be resolved.  All

22  right.  I'll reserve decision on admission of Exhibits 18

23  through 21.  All right.  Go ahead, Mr. Landsman.

24                  MR. LANDSMAN:  Thank you, your Honor.  We call

25  Mr. Purcell.

1                   MR. PURCELL:  Your Honor, before we call me or

2    any other person as a witness, your Honor's order of

3    January 31st required each attorney submitting witness and

4    exhibit list specifying very briefly the testimony of any

5    witness and the nature of any exhibit referred to the very

6    language of specifying very briefly the testimony of any

7    witness.  What Mr. Landsman set forth for my testimony in the

8    witness list was efforts if any made by Mr. Purcell to

9    respond to defendant's discovery requests and to comply with

10   the court's motions to compel discovery which is necessary to

11   determine where the fault should lie.

12                   I submit, Judge, that this is at best just a

13   general broad topic of testimony and does not comply with the

14   court's order about specifying very briefly the testimony,

15   not the topic of the testimony, but the testimony of the

16   witness.

17                   MR. LANDSMAN:  Your Honor, I'm not sure how I

18   could say what an adversary counsel is going to say on the

19   stand.

20                   THE COURT:  I agree.  Objection overruled.

21                   MR. LANDSMAN:  I think it would be helpful if

22   the witness had in front of him both binders of exhibits.  Do

23   you want me to bring that to you?

24                   MR. HUGHES:  Your Honor, point of order,

25   should I interpose any objections that we might have or

1    should we request that the witness himself interpose

2    objections?

3                    THE COURT:  Whatever your preference is, you

4    can do that on his behalf.

5                    MR. HUGHES:  With the court's permission then

6    I will make whatever objections I think are appropriate.

7                    THE COURT:  All right.

8                    THE CLERK:  Please raise your right hand.

9

10                   R O B E R T   E .   P U R C E L L , called as

11   a witness and being duly sworn, testifies as follows:

12                   <u>DIRECT EXAMINATION BY MR. LANDSMAN</u>:

13        Q    Mr. Purcell, is it correct that you have

14   represented Mr. Haritatos continuously in this case since its

15   inception?

16        A    Yes.

17        Q    Just before we get into the specific discovery

18   here, you made a point in your opening about discovery that

19   occurred in the trademark trial and appeal board; it's

20   correct, isn't it, that there was a protective order issued

21   in that proceeding?

22        A    I think there was.

23        Q    And that protective order precluded the

24   parties from using any discovery in that proceeding for

25   anything else other than that one proceeding?

Robert Purcell - Direct by Mr. Landsman          66

1          A    I don't recall that, maybe so but I don't

2    know.

3          Q    You don't deny it?

4               MR. HUGHES:  Objection, asked and answered,

5    your Honor.

6               THE COURT:  Sustained.

7          Q    Okay.  Let me ask you to look at Exhibit 3 of

8    our -- and just for convenience, I know both sides used

9    numbers.  I can either say Hasbro Exhibit 3 each time or we

10   can just assume that they're ours unless I say otherwise.

11              THE COURT:  Whatever way works, makes it

12   quicker.

13         Q    Then if I use a number, it's ours, unless I

14   specifically say plaintiff's.  So that's our first set of

15   requests for documents and things in this case, right?

16         A    I believe so.

17         Q    And you received that and responded to it on

18   December 9th, 2005 and that's what we've marked as Exhibit 4,

19   correct?

20         A    That appears to be so.

21         Q    Okay.  And then you also amended that response

22   later in September 2006 and that's Exhibit 5, right?

23         A    It appears to be so.

24         Q    Okay.  Let me ask you to look at our request

25   on Page -- let me ask you, look at your responses which is

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    Exhibit 4 to our first request which is on Page 4, and this

2    request is for samples of products or services sold under

3    plaintiff's Candyland mark, right?

4            A    On Page 4 of Exhibit 4, I'm looking at that,

5    yes.

6            Q    Yeah, okay.  Would you agree with me that

7    your -- the first paragraph of your response is what is

8    referred to as boilerplate objections?

9            A    Generally speaking, yes.

10           Q    And isn't it a fact that you made those same

11   boilerplate objections to every single request that we made?

12           A    The boilerplate does vary, I think, from

13   response to response, but overall it's very similar.

14           Q    Can you point me to any specific variance in

15   the boilerplate?

16               (Witness reviewing document.)

17               THE COURT:  While we're waiting, Mr. Landsman,

18   this protective order you referred to, is that an exhibit

19   anywhere or can you get a copy of that to me?

20               MR. LANDSMAN:  I can get a copy of that to you

21   this week, your Honor, I'm sorry it's not in our list.

22               THE COURT:  Okay, all right.  I'll just jot

23   that down.

24           A    It appears from a quick review of it they are

25   the same throughout the response.

1           Q     And is it also correct that in your amended

2     response served September 18th, 2006, you also repeated the

3     same boilerplate objections to every request?

4           A     That appears to be true also from a quick

5     review of that document.

6           Q     I don't want to go through all of this, but

7     let me ask you this question.  Did you have any good faith

8     belief that a request for two samples of any actual or

9     intended products and services by plaintiff in the United

10    States that bear plaintiff's Candyland mark was vague,

11    ambiguous, and unintelligible?

12          A     Yeah.

13          Q     What is vague about that request?

14          A     All right.  Two samples of any intended

15    products.  What if you have a concept you intend to have some

16    product that doesn't even exist so having a sample of an

17    intended product doesn't make much sense, right?  It either

18    exists or it doesn't or you have a concept of what you might

19    want to do but you don't necessarily have one.

20                Next, the real bugaboo here is services, a

21    sample of a service.  Mr. Landsman, as a rhetorical question,

22    how do you provide two samples of a service?  Service, as you

23    know as a trademark attorney, is intangible by definition.

24    You can't provide samples of services, they're intangible.

25                Now, services by plaintiff in the United

1    States that bear plaintiff's Candyland mark, that bear it.

2    The product bears it, not the packaging of the product but

3    the product itself bears it, it's printed on the product, you

4    know the difference as a trademark attorney, printing a mark

5    on a product versus printing a mark on a packaging product or

6    advertising of that product, you're saying that bear the

7    mark.  The product, candy, that bears the mark, all right.

8    What do you really mean by bears?  It's even more nebulous

9    when you talk about a service that bears a mark.  Services

10   are intangible, that's standard trademark law, you know that,

11   and this was a goofy request, all right.  So it's

12   unintelligible to me as a trademark attorney and it's

13   unintelligible to you when you study it, anybody would.

14             THE COURT:  What about the word actual?  It

15   says two samples of any actual or intended product.

16             THE WITNESS:  All right.  Your Honor,

17   sometimes there's actual products, we have for example, my

18   client does, Easter-themed candies, they only come out at

19   Easter time, all right.  You're saying, well, I want a sample

20   of your actual product, are we supposed to make up a product

21   for them that we don't have at the moment?  Are we supposed

22   to just wait around till Easter comes and say, okay, we got

23   these Easter products, now we'll give you some?  Go

24   backwards, well, we did these Easter products, let's go back

25   and give them samples of that product too, regardless of

Robert Purcell - Direct by Mr. Landsman                70

1    whether they bear the mark, which they don't.

2              Q    Are you finished?

3              THE WITNESS:  I'm asking your Honor if you

4    have any further questions or elaboration.

5              THE COURT:  Go ahead.

6              Q    It didn't occur to you to simply say, we'll

7    produce to you what we have and we won't produce to you what

8    we don't have because that's how we do it?

9              A    Produce what we do have, what do you mean?

10   What, Mr. Landsman?  I don't understand.

11             Q    Request is, did you understand the request to

12   ask you to make up documents?

13             A    This sample isn't a document, is it?  A sample

14   is a three-dimensional product itself, isn't it?  Maybe I'm

15   getting confused, maybe you meant something different by your

16   request than I'm thinking you meant by your request which

17   just interjects further confusion.  You talking about

18   documents or are you talking about a sample?

19             Q    I asked you a question, Mr. Purcell, can you

20   answer it?

21             A    No, I can't.

22             Q    Okay, we'll move on then.  Let me ask you to

23   look at Exhibit 22.

24             A    Exhibit 22?

25             Q    Yes.

Robert Purcell - Direct by Mr. Landsman          71

1          A     Okay.

2          Q     The bottom of Page 1 to the top of Page 2.

3                THE COURT:  I'm sorry, what was the page

4     reference?

5                MR. LANDSMAN:  Bottom of Page 1 to the top of

6     Page 2, your Honor.

7                THE COURT:  Of the?

8                MR. LANDSMAN:  Of Exhibit 22.

9                THE COURT:  Go ahead.

10         Q     You see there that we asked you to withdraw

11    your boilerplate objections or provide an explanation of why

12    they applied?

13         A     Yeah, you asked me to revise each and every

14    one of my interrogatory responses to --

15         Q     We asked you to withdraw the boilerplate

16    objections or explain why they applied, right?

17         A     Or explain why, yes.

18         Q     And in your response on Exhibit 23 at the

19    bottom of Page 1 you refused, correct?

20         A     I'm sorry, where is that?

21         Q     Exhibit 23, bottom of Page 1 of your May 2nd,

22    2006 letter.

23         A     Yes.

24         Q     Okay.  Now, one of your objections was to

25    producing samples of products because they might melt,

Robert Purcell - Direct by Mr. Landsman                72

1   correct?

2           A    Are we looking at Exhibit 23?

3           Q    No, we're looking at request number 1 and your

4   response which is Exhibit 4.  Page 5, middle of the page, you

5   objected to providing any samples of any actual, you said

6   actual intended products, I don't know what that means,

7   "specially because many of the product," and this is all sic,

8   "apt to melt."  Is that right?

9           A    Yep, that's one of the reasons, yes.

10          Q    And this was in spring, right?

11          A    Let me see.  This is actually dated in

12  December.

13          Q    Sorry, December.  And you didn't have any good

14  faith belief that the products were apt to melt in December,

15  did you?

16          A    During shipping?

17          Q    Yes.

18          A    Yeah.

19          Q    You felt they could melt?

20          A    Sure.

21          Q    But you're aware, aren't you, that

22  Mr. Haritatos shipped products during that time period?

23          A    Yeah.

24          Q    So that your client wasn't afraid of them

25  melting but you were?

Robert Purcell - Direct by Mr. Landsman                73

 1          A    I was, yes, not afraid of them, I wouldn't say

 2     afraid of melting.

 3                    THE COURT:  Sorry, what was that last part?

 4                    THE WITNESS:  I wasn't afraid of them melting.

 5                    THE COURT:  You were concerned?

 6                    THE WITNESS:  One of the concerns, yes.

 7          Q    Even though your client was not?

 8          A    I don't know about my clients.

 9          Q    Well, you know that your client ships products

10     during that time period, right?

11          A    Yes.

12          Q    Okay.  Now if you go back to our letter which

13     is April 17th, 2006 which is Exhibit 22, we also pointed out

14     at the top of Page 2 under the paragraph that begins,

15     "Third," that in several instances you had asserted that you

16     had already produced responsive documents in the TTAB

17     proceeding when in fact you had refused to produce the

18     requested documents in the TTAB proceeding, do you see that?

19          A    I see the language on Exhibit 22, yes.

20          Q    And let's look at your response to that which

21     is the May 2nd, 2006 letter which is Exhibit 23 and if I can

22     help you find it, it's basically the first full paragraph of

23     Page 2.  You see that?

24          A    Yes.

25          Q    And you didn't quarrel with the fact that you

Robert Purcell - Direct by Mr. Landsman          74

1    had previously said that documents had been produced that

2    hadn't in fact been produced, right?

3         A    Well, obviously there were many documents

4    produced in connection with the TTAB proceeding and probably

5    raised objections to producing other requested documents and

6    things in the TTAB proceeding.

7         Q    So you made an objection that the documents

8    had been produced previously in a TTAB proceeding without

9    really knowing whether they had or had not, correct?

10        A    At the time that I wrote this letter on,

11   for -- on May 2nd, 2006, I don't recall.

12        Q    And you don't recall whether you knew when you

13   signed the responses to the objections whether you had in

14   fact checked to see whether any of these documents had been

15   produced or not, right?

16        A    No, that's not true because I think that the

17   interrogatories and document requests at least initially in

18   this lawsuit were very much overlapping and very, very

19   similar to those in the Trademark Office proceeding, and I

20   probably had used as a boilerplate or template I should say

21   for responding to many of the interrogatories and document

22   requests in this lawsuit very responses that I made in the

23   Trademark Office proceeding to essentially the same types of

24   interrogatories and document requests that Hasbro served in

25   the Trademark Office proceeding.

Robert Purcell - Direct by Mr. Landsman                75

1          Q    Isn't it a fact, Mr. Purcell, that you

2    objected to producing certain documents because you claimed

3    that they had been produced already in the TTAB proceeding

4    when in fact you did not know as to certain of those

5    documents whether they had or had not in fact been produced

6    before?

7          A    I don't believe that's true, but as of

8    May 2nd, 2006, I don't recall what my state of mind was at

9    that point in time but just my practice as an attorney, I

10   would not have made that statement without a good faith basis

11   for making it.

12         Q    And in your May 2nd, 2006 response you said, I

13   don't know whether I produced them before or not but if I

14   didn't produce them before, I'm not producing them now,

15   right?

16         A    Where do you see that?

17         Q    In that paragraph.

18         A    I'm sorry, which sentence are we referring to?

19         Q    I'll read the paragraph to you.  "You also

20   asked me to reconsider some responses to the effect that

21   responsive documents have already been produced in connection

22   with the TTAB proceeding.  You have maintained that since I

23   objected to producing some of the documents requested in

24   Hasbro's request for documents in the TTAB proceeding, that I

25   have not produced all of the requested documents.  Regardless

1    of the nature of the document requests, the objections, and

2    the documents produced by Mr. Haritatos in connection with

3    the TTAB proceeding, with regard to the request in the

4    instant federal court lawsuit, Mr. Haritatos has set forth

5    his objections, and to the extent that he does not object to

6    the request, he has already produced the documents to Hasbro

7    and therefore believes that he need not reproduce those

8    documents."

9              Now I'm not sure I understand that, but I was

10   trying to sort of summarize it as, are you saying that even

11   if you didn't produce in the TTAB proceeding documents that

12   you said had been produced in the TTAB proceeding, you still

13   weren't, just weren't going to produce them, is that an

14   accurate summary?

15        A    No, I don't think so.

16        Q    Okay.  Well, somebody else can try to parse

17   that language then.

18             MR. HUGHES:  Objection, move to strike

19   counsel's comments.

20             THE COURT:  Overruled, there's no jury here.

21        Q    Okay.  Now, we responded to your letter both

22   on -- in Exhibit 24 and Exhibit 25, right?

23        A    Hasbro's attorney's letter May 9th, 2006,

24   Exhibit 24 appears to respond to my May 2nd, 2006 letter,

25   Exhibit 23.

Robert Purcell - Direct by Mr. Landsman          77

1          Q     And in both of those letters --

2          A     Well, I'm not -- I don't know about

3    Exhibit 25, whether that's responding to my May 2nd, 2006

4    letter.

5          Q     Well, isn't it correct that in both of those

6    letters, we've reiterated our request or demand, however you

7    want to characterize it, that you produce documents in

8    response to certain specified document requests?

9          A     I don't know.

10         Q     Well, take a look at them.

11         A     Thank you.

12               MR. HUGHES:  Your Honor, I'm going to object.

13   I think the documents are in evidence, the documents speak

14   for themselves.  I think we're spending an awful lot of time

15   trying to restate what the documents themselves state and I

16   think that's for the court to read the documents in evidence

17   and form its own conclusions.

18               THE COURT:  We do, but it will substantially

19   simplify things if a couple of simple questions were answered

20   so I'm going to allow the question.  The question was whether

21   you requested, again requested these documents, correct?

22               MR. LANDSMAN:  Yes, your Honor.

23               THE COURT:  In two letters, the one of

24   May 9th, 2006, Exhibit 24, and a letter of June 8th, 2006,

25   Exhibit 25.

1       MR. LANDSMAN:  Yes, your Honor.

2       THE COURT:  Mr. Purcell, your answer is?

3       A    I'm having -- I'm trying to do my best, your

4   Honor, and frankly my brain is a bit fried at the moment.

5   I'm trying to figure out whether Mr. Landsman's question or

6   your question says is the June 8th, 2006 letter responsive to

7   my May 2nd letter or is it responsive to the same discovery

8   issues addressed in my May 2nd, 2006 letter and if it's

9   responding to my May 2nd, 2006 letter.  I'm still looking

10  through the June 8th, 2006 letter to see if there's a

11  reference to the May 2nd, 2006 letter or something within the

12  May 2nd, 2006 letter, and I'm sorry, I need some time, I

13  haven't looked at this stuff.  I just got these exhibits 20

14  minutes before the hearing today.

15      Q    Let me try to simplify it.  In these May 9th

16  and June 8th letters, we're continuing our attempt to get you

17  to produce the documents that we had requested in our first

18  set of requests for production in which you had refused,

19  right?

20      A    It's not totally true.  I'm looking at the

21  middle of the second page of the June 8th, 2006 letter,

22  Exhibit 25, says, "Plaintiff's document production remains

23  woefully deficient, notwithstanding the 33 pages of documents

24  that Haritatos produced on June 1st, 2006."  So apparently

25  between May 2nd, 2006 and June 8th, 2006, the plaintiff

Robert Purcell - Direct by Mr. Landsman                79

1    produced some documents.

2           Q    Let me try to short circuit it a different

3    way.  Do you still contend that we did not attempt to meet

4    and confer with you before bringing our motion to compel and

5    before bringing this motion?

6           A    Yes.

7           Q    Okay.  Let me ask you to look at the last

8    sentence of my June 8th, 2006 letter which is Exhibit 25,

9    just ask you to confirm it says, "Please let me know when is

10   the earliest time you can discuss these issues by phone.

11   Thank you for your cooperation."  You see that?

12          A    Yes.

13          Q    And now let me ask you to look at your e-mail

14   of June 21, 2006, and specifically the last sentence, last

15   two sentences.  Would it be accurate to say --

16               THE COURT:  Which exhibit is that?

17               MR. LANDSMAN:  I'm sorry, it's Exhibit 26,

18   your Honor.

19               THE COURT:  Referring to which part of that?

20          Q    The last two sentences, your Honor.  And

21   you -- would it be accurate to summarize your response there

22   as saying, well, you're now just too late after all these

23   attempts to meet and confer and you can't move to compel so

24   I'm not going to discuss it anymore?

25          A    No.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Robert Purcell - Direct by Mr. Landsman                    80

1          Q    Accurate to say that you contended that

2     because we were 10 days after the discovery cutoff, we

3     couldn't move to compel?

4                MR. HUGHES:  Objection, your Honor, again, the

5     document speaks for itself.

6                THE COURT:  It does, I'll sustain it.  Move

7     on, Mr. Landsman.

8          Q    I'll move on.  So we then brought a motion to

9     compel, right, and that motion was granted in Judge

10    DiBianco's August 11, 2006 order which overruled your

11    objections and ordered you to produce all outstanding

12    discovery by September 11th, right?

13         A    Well, it's a compound question.  Hasbro

14    brought a motion to compel some discovery of some sort, Judge

15    DiBianco held a telephonic conference I believe on that

16    motion and many other motions pending before him and he made

17    his August 11th ruling, have to go to the specific terms of

18    that order to tell you what he said or not.

19         Q    It's Exhibit 1.

20         A    Okay.

21         Q    Now there's a part of that order that you

22    didn't read when you were reading it to the court before

23    right at Page 9, second to the last Ordered, it said,

24    "Plaintiff's letter motion dated June 26, 2006 is granted,"

25    you see that?

Robert Purcell - Direct by Mr. Landsman                81

1            A    Yes.

2            Q    Yes, and let me ask you to look at Exhibit 34

3    which is my June 26, 2006 letter to Judge DiBianco.  Now

4    there's a typo I think there, it says plaintiff's letter

5    motion dated June 26, I'm pretty sure your Honor meant

6    defendant's letter because that was my letter that got

7    granted.  Did you understand that to refer to my June 26,

8    2006 letter?

9            A    I did not have any understanding about that

10   upon reading Judge DiBianco's August 11th, 2006 order.

11           Q    So I'm sorry, is it your testimony that you

12   didn't know what he was granting?

13           A    I thought he did, yes.

14           Q    That he granted our motion to compel?

15           A    He granted the relief set forth in his

16   August 11th order, he specified what relief he was granting.

17           Q    And the relief was our letter motion of

18   June 26th, 2006, right?

19           A    That's what I understand from the partial

20   sentence on Page 9 of Judge DiBianco's August 11th order,

21   yes.

22           Q    Okay.  And if you look at our June 26, 2006

23   letter which is Exhibit 34, if you look at the last two

24   pages, those two pages very explicitly tell the court what

25   relief we're seeking.  Right?

1          A     I don't know if it's specifically specific as
2     to what you're seeking, no, I don't.
3          Q     I'm sorry, you don't think that the last part
4     of Page 5 and Page 6 were specific enough?
5          A     Page 5 and Page 6.  Of?
6          Q     Of our June 26 letter.
7          A     5 and 6?
8          Q     Yes.  The bottom of Page 5, top of Page 6.
9     Beginning with, "The obstructionist behavior should not be
10    tolerated.  Accordingly, Hasbro requests that the court order
11    Mr. Haritatos to produce all documents concerning," and then
12    there are six paragraphs and then asking that the court order
13    Haritatos to respond to the first set of interrogatories and
14    second set of document requests.  Right?
15         A     I didn't understand that, no, from Judge
16    DiBianco's August 11th, 2006 order.
17         Q     Did you ever ask Judge DiBianco to clarify his
18    order to let you know more specifically what you had to do?
19         A     No.
20         Q     And I'm sorry, your testimony is that -- I'm
21    trying to figure out, is your testimony that you didn't think
22    that our request was sufficiently specific enough or you
23    didn't think Judge DiBianco's order was sufficiently
24    specific?
25         A     I thought Judge DiBianco's order was something

Robert Purcell - Direct by Mr. Landsman                83

1   that I had to comply with, all right, my client had to comply

2   with in good faith, which I think we did.

3           Q     My question was did you believe that his order

4   was not specific enough?

5           A     Was not specific enough for what?

6           Q     About what you had to do.

7           A     I guess I thought it was specific enough when

8   I looked at the phrase --

9           Q     And then --

10          A     -- in Judge DiBianco's ruling which said,

11  "Hasbro has requested information -- Hasbro has requested

12  information, including customer lists; the application for

13  their Turkey Joints registration; and information regarding

14  damages.  This court finds that this information is relevant

15  and discoverable, given the protective order that has been

16  entered in this case."  It seems that that's the specific

17  relief that Judge DiBianco was ordering, be no reason for

18  Judge DiBianco to single out this stuff and make it ambiguous

19  as to what the other stuff was that he was ordering to be

20  produced.

21          Q     I'm sorry, where were you reading from?

22          A     Top of Page 8.

23          Q     So it's your testimony that that's all you

24  thought you were ordered to do?

25          A     Yes, by the order.

Robert Purcell - Direct by Mr. Landsman                84

1          Q    And you understand, don't you, that the order,

2     actual order says, Ordered, that defendant's letter motion is

3     granted, right?

4          A    Yes.

5          Q    And you saw that in response to the objections

6     you filed with Judge Hurd we were talking about far more than

7     these specific things that were on Page 8, right?

8          A    I saw that Hasbro's contention was that Judge

9     DiBianco's order was broader than what I thought it was, yes,

10    I did see that.

11         Q    And you never said in your objections, wait a

12    minute, Hasbro is talking about something that Judge DiBianco

13    never ordered?

14         A    I don't recall what I might have stated to

15    Judge Hurd in that regard.

16         Q    Well, the objections and responses are of

17    record and they will show that there was never such a

18    contention.

19              THE COURT:  Let's take a look at this Page 9,

20    there is some confusion in the order.  In the middle of the

21    page it says, "Ordered, that plaintiff's letter motion dated

22    June 26, 2006 (Docket 59) is granted."  I think the docket

23    sheet does show that 59 was plaintiff's letter motion, says

24    letter motion from Robert E. Purcell for Spero Haritatos, so

25    it's unclear, little unclear to me.  You, Mr. Landsman,

Robert Purcell - Direct by Mr. Landsman                    85

1    contend that your June 26th letter which is Exhibit 30 --

2                    MR. LANDSMAN:  35 -- 34, sorry.

3                    THE COURT:  34, that that was your letter

4    motion, is that right?

5                    MR. LANDSMAN:  That's the only letter motion

6    that was June 26th, and you'd already denied plaintiff's

7    letter motion the paragraph before.

8                    THE COURT:  Right.

9                    MR. LANDSMAN:  And your Honor, what is Docket

10   Number 58 then?

11                   THE COURT:  58 says letter motion from Robert

12   E. Purcell for Spero Haritatos requesting an order of

13   referral to mediation and request for declaratory ruling that

14   plaintiff has not belatedly identified a potential witness so

15   as to preclude plaintiff from utilizing witness' testimony.

16   And you're correct, that was denied.  But the docket sheet

17   refers to 59 and I think I followed the docket sheet

18   unfortunately.  Well, anyway, just so I understand where

19   you're going.  Move on, please.

20                   MR. LANDSMAN:  Okay.

21                   THE COURT:  We're going to take a lunch recess

22   in a couple minutes.  Do you have more than four, five

23   minutes?

24                   MR. LANDSMAN:  I could go forward on something

25   slightly new or we could stop now, whichever your Honor

Robert Purcell - Direct by Mr. Landsman                86

1    prefers.

2                     THE COURT:  Let's just take a lunch break,

3    we'll reconvene at 2:00.

4                     (Whereupon a recess was taken from 12:45 p.m.

5                      to 2:04 p.m.)

6                     MR. HUGHES:  Your Honor, before we continue

7    with the testimony, I'd like to make a motion if I may.

8                     THE COURT:  Go ahead.

9                     MR. HUGHES:  Okay.  You recall this morning

10   there was a lot of testimony and questions related to your

11   order, specifically that paragraph which talked about

12   ordering the plaintiff's letter motion dated June 26th,

13   document 59, granted.  Do you recall all that?  And there was

14   apparently some position taken by Mr. Landsman that may have

15   been a typographical error and he was really, quote,

16   referring to his letter of June 26th which is his Exhibit 34.

17                    During the recess we went and obtained what

18   appears to be Docket Number 59 and that appears to be a

19   letter dated June 26th and the court, as expected, is again

20   one step ahead of me, your Honor, but based upon that, I

21   would like to move to strike all questions and all testimony

22   elicited by Mr. Landsman under the pretext that your order

23   referencing Docket Number 59 was in fact his letter which I

24   note by reviewing his exhibits, I don't see a copy of

25   Mr. Purcell's letter in his exhibit book.  So I would move to

Robert Purcell - Direct by Mr. Landsman                87

1    strike all testimony, all questions, and anything else in his

2    materials which attempt to elicit that that order was

3    referencing his letter versus the letter from Mr. Purcell.

4               THE COURT:  Okay.  If there were a jury

5    present, I would probably grant that, but there's no jury

6    here, and there is certainly confusion over these June 26th

7    letters.  There were two letters apparently filed on

8    June 26th.  One of them, as you learned, is Docket Number 59

9    which is Mr. Purcell's letter, and that in fact is the motion

10   that was granted which extended the discovery deadline, but

11   Mr. Landsman's long letter of -- much longer letter of

12   June 26th was also filed and of course with electronic

13   filing, everything is instantaneous, but the order is

14   correct, the order does say plaintiff's letter motion dated

15   June 26th which was Mr. Purcell's motion requesting

16   rescheduling of the discovery deadline, and we did grant

17   that.  But I'm not going to strike all that.  I understand

18   what the confusion was and of course since there's no jury, I

19   would give everything the weight according to what I need,

20   how I need to review this.

21               Mr. Landsman, you may proceed.

22               MR. LANDSMAN:  Thank you, your Honor, and I

23   apologize for the confusion that I introduced into it.

24        Q    Mr. Purcell, let's go back to that order and

25   you were before referencing Page 8 of it, that's Exhibit 1 on

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1    our documents.  You see the first full paragraph it says, "A

2    review of the discovery requested by defendant Hasbro shows

3    that the information that Hasbro was seeking in its discovery

4    requests is relevant to the issues in this action, and thus,

5    should be produced."  And then the last sentence says, "All

6    outstanding discovery relating to the letter motions

7    discussed above, and to the extent that it has not already

8    been produced, must be produced by both parties within 30

9    days of the date of this order."  Do you see that?

10            A    Yes.

11            Q    And is it correct that you did not produce any

12   additional documents by September 11th?

13            A    I don't recall.

14            Q    You don't recall?

15            A    I don't recall.

16            Q    Do you deny that nothing was produced by

17   September 11th?

18                 MR. HUGHES:  Objection, your Honor, asked and

19   answered.

20                 THE COURT:  Overruled.

21            A    Do I deny --

22            Q    Yes.

23            A    -- that documents -- no, deny it.

24            Q    Can you think of any single document you

25   produced between August 11th and September 11th, 2006?

Robert Purcell - Direct by Mr. Landsman                89

1          A    I can't think of any sitting here, today.

2          Q    Is it correct that you did not produce any

3    additional documents by November 30th which is the deadline

4    that Judge Hurd set?

5          A    I don't think that's true, I think I responded

6    to some more discovery in that time interval.

7          Q    You're correct that you sent some discovery

8    responses September 18th and my question was limited to

9    documents.

10         A    Documents other than responses to discovery

11   requests?

12         Q    Okay.  Is it correct that you did not produce

13   any documents in response to our requests for documents by

14   November 30th?

15         A    Again, I don't recall.

16         Q    And going back to the prior inquiry, is it

17   your contention that you produced any documents to comply

18   with Judge DiBianco's August 11th order?

19         A    At any time?

20         Q    At any time up until January 2008 let's say.

21         A    We had already produced -- my contention is,

22   yes, we did produce stuff.  We had in fact produced for

23   example the stuff relating to the Nora Haritatos trademark

24   application in June of 2006 as reflected in one of my

25   exhibits before the court today --

Robert Purcell - Direct by Mr. Landsman                90

1           Q    I'm sorry to interrupt, let me then withdraw

2    that question and ask --

3                MR. HUGHES:  Your Honor, I'm going to object,

4    counsel's posed a question, the witness has started to

5    respond and now counsel wants to stop.

6                THE COURT:  Yeah, he's going to withdraw the

7    question, go ahead.

8           Q    Is it correct that you cannot point to any

9    document that you produced between August 11th and

10   January 28th in response to Judge DiBianco's August 11th

11   order?

12          A    Yes, we produced the 5,593 pages of documents.

13          Q    In January 2008, right?

14          A    No.

15          Q    That's when you sent them to us, isn't it?

16          A    You asked me whether we produced them, we

17   produced them at least as early as December 14th when I put a

18   phone call in to your office which you've transcribed from

19   the voice mail indicating they're ready for your inspection.

20   Production is available for inspection and copying.  They

21   were available for inspection, copying at least as early as

22   that date.

23          Q    We'll get to that a little bit later but isn't

24   it a fact that you said you hadn't stamped them and therefore

25   they weren't ready to be copied?

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Robert Purcell - Direct by Mr. Landsman                91

1          A     They were ready to be inspected and I think

2     one of my e-mails that you'll see says that anybody reviewing

3     them must abide by the confidentiality provisions in the

4     protective order and whatever it is selected to be copied, we

5     will put the appropriate legend on them at that time, it's in

6     the e-mail exchanges.

7          Q     Let's -- let me ask you to look at your

8     exhibits, Exhibit Number 27.

9          A     I don't have that.

10          Q     I'm sorry, I thought I brought it up to you,

11     did you take it back with you?

12          A     These are defendant Hasbro's exhibits.

13          Q     I think these are yours.

14          A     Exhibit 27?

15          Q     Yes.  And on Page 2 there's an e-mail from you

16     to me dated December 27th saying the documents had not been

17     Bates stamped or stamped confidential pursuant to the terms

18     of the protective order and then you ask me to suggest how I

19     would like to proceed, right?

20          A     Yes.

21          Q     And I responded to you, let's proceed the same

22     way we always have, copy them and bill us if you wish, right?

23          A     You state, this is what you're referring to as

24     with all prior documentary discovery, please have the

25     documents copied and sent to us, that was your position.

Robert Purcell - Direct by Mr. Landsman                92

1          Q     Bill us for that if you wish, right?

2          A     Yes.

3          Q     Okay.  And then if you look back to Page 1,

4    your associate Kathryn Daley says that she thinks she can

5    make them available in electronic format, please advise if

6    that's acceptable, you see that?

7          A     Page 1 of Exhibit 27?

8          Q     Yes.

9          A     Yes.

10         Q     And I respond the same day, on January 1st,

11   2007, "Electronic format should be fine," right?

12         A     Yes.

13         Q     And then she responds, "Wonderful.  I will

14   start working on the discovery and have it to you as soon as

15   possible, thanks for your prompt reply," right?

16               MR. HUGHES:  Your Honor, we would again

17   object.  The documents are in evidence, I think we're

18   spending a lot of time rereading some of these things we

19   already read once this morning.  Documents are in evidence,

20   they speak for themselves, I think we're just wasting time.

21               THE COURT:  Well, they do, Mr. Hughes.  The

22   only problem is that there are hundreds of pages of these

23   documents and it's easier for me if we focus on the documents

24   with questions rather than my reading 4, 500 pages and

25   absorbing those and looking for the relevant matters, so I'm

Robert Purcell - Direct by Mr. Landsman                    93

1    going to allow Mr. Landsman to continue.  Overruled.

2           Q    Let me just pin down one thing here, and let's

3    assume that your voice mail of December 14th constitutes

4    production.  Is it correct that the first time you produced

5    documents in response to either Judge DiBianco's August 11th

6    order or Judge Hurd's October order was December 14th; that's

7    the earliest possible date?

8           A    No.  As I mentioned to you before, some of

9    those documents had been previously produced in June of 2006,

10   before you asked, before you told Judge DiBianco that we

11   hadn't produced those things which was inaccurate, and got

12   him to order us to produce things that we'd already produced.

13   That is Nora Haritatos' application --

14          Q    Is it correct, Mr. Purcell, that the first

15   time you produced a document after the August 11th order was

16   at best, at earliest, December 14th, 2007?

17          A    I don't recall.

18          Q    Okay.  Let me ask you to look at Exhibits 6

19   and 7 of our exhibits.  These are our first set of

20   interrogatories and your responses.  Now we served these

21   responses on May 31st, 2006, right?

22               THE COURT:  This is Exhibit 6?

23               MR. LANDSMAN:  Yes, your Honor.

24          A    Served these interrogatories?

25          Q    Yes.

Robert Purcell - Direct by Mr. Landsman                94

1          A     Exhibit 6, it appears they were served
2     May 31st, 2006.
3          Q     Okay.  And you did not respond until
4     September 28th, 2006, three-and-a-half months after they were
5     served, right?
6          A     It appears so.  It also, I think these were
7     the ones that I was saying were belatedly served and didn't
8     need responses and Judge DiBianco might have ordered to be
9     responded to.
10          Q     I'm sorry, so is it your testimony that you
11     finally responded because Judge DiBianco ordered you to or
12     was there some other reason?
13          A     Well, I'm guessing a little bit, I think that
14     if, there were -- there was discovery served May 31st, 2006,
15     it's my recollection that was beyond the discovery cutoff
16     date at that time, was my recollection sitting here today,
17     and that if that's true, then that discovery I objected to as
18     being belated and needing of no response, because Judge
19     DiBianco extended discovery cutoff date, that argument was
20     moot and therefore a response to that discovery was needed.
21     I believe sitting here today that Exhibit 7 is a response to
22     that discovery Exhibit 6 based upon Judge DiBianco's
23     extension of the discovery cutoff date.
24          Q     Judge DiBianco also explicitly ordered you to
25     respond by September 11th, didn't he?

1              MR. HUGHES:  Your Honor, I'm going to object

2      again because the order itself, it's your order, we've

3      already had discussions about the paragraphs in which you

4      made certain rulings with respect to the letter motions by

5      counsel for Hasbro, and counsel is now leaping to the

6      conclusion that despite what we now clarify, that you did not

7      grant the application contained in his letter of June 26th

8      but in fact granted the application of Mr. Purcell, the order

9      that your court entered in decision on Page 8 is pretty clear

10     as to what your direction to counsel to produce.  So by

11     counsel saying that he didn't comply with the court's order,

12     I think that needs a little bit more clarification as to what

13     specific provisions of the order, I object to that line of

14     inquiry.

15             THE COURT:  I'm going to direct that you

16     clarify that inquiry, Mr. Landsman.  Are you referring to the

17     ordering paragraphs or just Page 8 of the order?

18             MR. LANDSMAN:  Well, your Honor, I think that

19     Mr. Hughes is compounding my unfortunate confusion with even

20     more confusion of his own here because your order starts on

21     Page 7, starts out talking about our request and our letter

22     brief of June 26th and says, "Plaintiff's position is

23     unreasonable and this problem will be solved by this court's

24     order extending discovery deadlines.  To the extent that

25     plaintiff's objection to production of this information is

Robert Purcell - Direct by Mr. Landsman                96

1    that it has been requested too late, then plaintiff should

2    produce the requested information immediately since the

3    deadlines will now be extended."

4              So there's no doubt that the court ordered him

5    to respond to those requests and it goes on to say that, "A

6    review of the discovery requested shows that the information

7    is relevant and must be produced," and then the last

8    paragraph says, "All outstanding discovery to the extent not

9    already produced must be produced within 30 days of the date

10   of this order."

11             Now I will admit that I introduced some

12   unfortunate confusion about the paragraph before that but

13   there's no confusion about ordering that the interrogatories

14   be responded to and the second set of discovery -- of

15   document requests be responded to.  If Mr. Purcell wants to

16   deny that and say that he didn't understand your order that

17   way, I'm happy to -- you know, he can say that.

18             MR. HUGHES:  Your Honor, counsel overlooked

19   the -- when he quoted the first line on Page 8 of the first

20   paragraph, he overlooked the very clear itemization by this

21   court as to what it requested and what should be produced.

22             MR. LANDSMAN:  That's not -- it says

23   including, including is a very example.

24             THE COURT:  I don't think there's going to be

25   much confusion in my mind about my order, so let's move on.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

1            MR. LANDSMAN:  I can't remember what the

2    question pending was.

3            THE REPORTER:  "Question, Judge DiBianco also

4    explicitly ordered you to respond by September 11th, didn't

5    he?"

6        A    I think there's two aspects of the judge's

7    order on that discovery.  First of all on Page 7 of the

8    August 11th order, Hasbro's Exhibit 1, he talks about the

9    May 31st, discovery served by Hasbro May 31st, explained it

10   and then plaintiff refused to respond to the request, newer

11   requests, Judge DiBianco says plaintiff's position is

12   unreasonable, problem will be solved by this court's order

13   extending discovery deadlines.  To the extent plaintiff's

14   objection to this information is that it has been requested

15   late, then the plaintiff should produce the requested

16   information immediately since the deadlines will now be

17   extended.  It says to the extent plaintiff's objection to

18   this information was that it was requested, doesn't say I

19   can't make any other objections, it just says to that extent,

20   you know, produce the requested information immediately.  I

21   would have liked to have responded quicker than

22   September 18th, naturally, but I don't think I was dilatory

23   in getting the responses by September 18th.

24       Q    I don't think that was a responsive answer.

25       A    Continuing on, another part of the order said,

Robert Purcell - Direct by Mr. Landsman                98

1    all outstanding discovery relating to the letter motions.

2    And to the extent it has not already been produced,

3    presumably means production of documents rather than

4    interrogatory responses, must be produced by both parties

5    within 30 days of the date of this order.

6                    THE COURT:  All right.

7         Q    Now let me ask you to look at your responses

8    to interrogatories 1a, 1b, 1c, 1d, 1e, 1f, 1g, and 2, and ask

9    you to confirm that all of those responses begin with a

10   paragraph of an extensive litany of boilerplate objections.

11        A    Well --

12                   THE COURT:  This is Exhibit 4?

13                   MR. LANDSMAN:  I'm sorry, Exhibit 7, your

14   Honor.

15                   THE COURT:  7.

16        A    I will say that they appear to include the

17   standard boilerplate objections but I will contest there's

18   extensive litany, whatever you characterize them as being.

19        Q    Is there any boilerplate objection you believe

20   you left out?

21        A    I'm not sure what you mean by is there any

22   boilerplate objection that I left out, in this boilerplate

23   objections?

24        Q    Yes.

25        A    There could be numbers of other boilerplate

Robert Purcell - Direct by Mr. Landsman                99

1   objections beyond those that I posed here, codefense

2   privilege and so forth, bunch of other stuff, obviously that

3   doesn't -- didn't apply in this particular lawsuit.

4            Q    Okay.  You're familiar with Federal Rule of

5   Civil Procedure 33(d), correct?

6            A    Probably at one or more times in my career

7   been very familiar with them, but right now I'm not familiar

8   with it.

9            Q    Now, is it correct that your responses to

10  Exhibits 1a, 1b -- I'm sorry, interrogatories 1a, 1b, 1c, 1d,

11  1e, 1f, 1g, and 2 all refers to two depositions without

12  giving any specifics as to pages or lines?

13           A    Which ones are supposed to be relating to

14  certain deposition exhibits?

15           Q    1a.

16           A    Testimony --

17           Q    1a.

18           A    Yep.

19                THE COURT:  Give me the page numbers.

20           Q    1b.

21                THE COURT:  5, Page 5?

22                THE WITNESS:  Yes.

23           Q    1b, which is in Page 7?

24           A    1c, 1d.

25           Q    Yeah.

Robert Purcell - Direct by Mr. Landsman          100

1          A    1e.

2          Q    1f, 1g, and 2.

3          A    1g, and 2.  Yes, you were asking the same

4   sorts of things, two witnesses, Mrs. Spero Haritatos --

5          Q    Is there anything in Rule 33 that allows you

6   to answer an interrogatory by reference to deposition

7   transcripts that you're aware of?

8          A    Not specifically, no.

9          Q    Now let me ask you to look at our Exhibit 27

10  which is a letter from our office to you.

11         A    Actually can I modify that a bit, your Honor.

12  I think you're entitled to basically refer them in good faith

13  to deposition transcript testimony, where they already have

14  transcript of the deposition, where the burden of basically

15  finding that deposition testimony is at least as easy on the

16  requesting party as it is on the responding party.  I think

17  that it's unduly burdensome to require the responding party

18  to go through the transcript that the other side already has

19  and they've already asked the questions to go through it and

20  pinpoint, well, it's here and it's there and these other

21  places in the transcript, it's just an exercise in an onerous

22  burden of putting more work on responding party.  It's simply

23  duplicative.

24              THE COURT:  I think the rule says what it

25  says, Mr. Purcell, and your views about whether the rule

Robert Purcell - Direct by Mr. Landsman          101

1    makes sense or not are not that important.  Go ahead,

2    Mr. Landsman.

3              Q    Your references were not to the depositions of

4    any party, they were in the depositions of Sharon and Olga

5    Haritatos, right?  You can look back at them if you'd like

6    to.

7              A    Yeah, they're not technically parties to the

8    lawsuits.

9              Q    And an interrogatory is addressed to a party,

10   correct?

11             A    Yes.

12             Q    You understood that?

13             A    Yes.

14             Q    Now let me ask you to look at our October 6,

15   2006 letter where we take issue with various of your

16   responses, including the inappropriate boilerplate

17   objections.  Do you recall any response to that letter?

18             A    I don't recall any response.

19             Q    We don't have any in our file, that's why I

20   asked.  Now did I hear you correctly in your opening say that

21   we hadn't until recently pointed out to you that Judge

22   DiBianco's order had to be obeyed, notwithstanding objections

23   to Judge Hurd?

24             A    Can you please repeat that.

25             Q    Can you read it back, please.

1          (Whereupon the question was read.)

2          A    I think I said in my opening that when

3    September 11th came and went, I didn't receive any

4    communication from you saying, hey, where is the stuff, you

5    can't -- you need to disclose the stuff regardless of what

6    Judge Hurd may do on appeal, regardless of whether he

7    reverses Judge DiBianco or not, you have to comply with

8    Judge DiBianco's order.  I think that was what I said in

9    my --

10          Q    Okay.  Let me ask you to look at, start with

11   Page 2 of the October 6, 2006 letter.  The middle of the page

12   under the heading, plaintiff's first amended and supplemental

13   response to Hasbro's first set of requests for production of

14   documents and things.  Do you see in the third sentence we

15   said, "Although Haritatos has appealed the order, that does

16   not stay it and the appeal to Judge Hurd does not justify

17   disobedience of a court order.  Any withholding of documents

18   that the court has ordered to be produced is a contempt of

19   that order," you see that?

20          A    Yes.

21          Q    Do you regard that as being inconsistent with

22   what you said in your opening?

23          A    No, because October 6 is what, about

24   three-and-a-half weeks after September 11th.

25          Q    So again we didn't jump quickly enough for

1    you?

2           A    Do you really want me to try to answer that

3    question?

4           Q    Yeah, I do want you to answer that question.

5           A    I do not -- answer it, what you mean by jump

6    quickly enough for you, know what it means, please clarify.

7           Q    You don't understand the question, you don't

8    have to answer it.

9                MR. HUGHES:  Objection, your Honor, it's an

10   argumentative question.

11               THE COURT:  Sustained.

12          Q    All right.  Page 3, note on the second full

13   paragraph, we again remind you that you have to comply with

14   the August 11th order?

15          A    Where is that, I'm sorry?

16          Q    Page 3 of the October 6th letter.

17          A    Yes, I see that too.

18          Q    And is it your contention that that again,

19   that was not soon enough to remind you of your obligation?

20          A    It's not -- first of all I did not consider it

21   to be an obligation, I took a different position from you.  I

22   do not see any case law supported for your proposition, it's

23   just another one of millions of Hasbro's positions on various

24   issues, contentious issues in this lawsuit.  And yes, you've

25   set forth Hasbro's position as though you were judge and

1    Supreme Court justice deciding what the law was many times,

2    Mr. Landsman, and just because you say it's what I'm supposed

3    to do, doesn't necessarily mean it's so.  Maybe it is, maybe

4    it isn't.

5              Q    Did you do any legal research and did you find

6    the cases that we cited to the court in our opening?

7              A    Did I do any legal research?

8              Q    Yes.

9              A    I've done legal research on appeals of

10   Rule 72, have not seen any decisions in my legal research

11   regarding the issue of whether the magistrate's ruling is not

12   stayed pending appeal and would seem to reason that it would

13   eviscerate Rule 72 and the right to appeal if you had to

14   abide by the magistrate's decision, unlike appeals from

15   District Court to a court of appeals.

16             Q    That does not eviscerate the District Court's

17   order, that you have to move to stay before you can disobey

18   it.

19             A    There's a strong body of case law on that

20   point about staying execution of the District Court's

21   judgment and final orders in a pending appeal, that's --

22   there's a huge body of law on that.

23             Q    Let me ask you to look at your response to our

24   second set of requests for documents which is Exhibit 9.

25   That again was, as with the interrogatories, was served

1    September 18th, 2006.

2              A    It appears so.

3              Q    Let me ask you to point out one thing here.

4    Your response to request number 7 about legal fees and costs

5    in connection with a civil action, couple of questions here.

6    One is I understand you to have said in your declaration

7    before that you're on contingency so my question is were

8    there any documents concerning legal fees and costs paid in

9    connection with this civil action that were being claimed?

10             A    I -- please break up that question.

11             Q    Okay.  As of September 18th, 2006, did

12   plaintiff to your knowledge have in its possession documents

13   concerning legal fees paid by him in connection with this

14   civil action?

15             A    Yes.

16             Q    Notwithstanding the fact that you were on

17   contingency?

18             A    I don't know what you mean by notwithstanding

19   the fact that I was on contingency.

20             Q    Well, I'm sorry, my understanding of

21   contingency, correct me if you have a different one, is that

22   the plaintiff doesn't pay you along the way, that you get a

23   percentage of the plaintiff's recovery.

24             A    That's not totally true.

25             Q    So was the plaintiff paying you along the way?

1          A     Was he paying me, meaning my law firm, for

2     work done in connection with this lawsuit?

3          Q     Yeah.

4          A     Yes.

5          Q     He was paying you an hourly rate for work?

6          A     No.  No.

7          Q     What was he paying you?

8          A     For disbursements.

9          Q     Was he paying legal fees?

10          A     Well, if you encompass legal fees to mean

11     costs and so forth, yes.

12          Q     Okay.  Now you in the last paragraph object to

13     request number 7, after objecting to it as being vague,

14     ambiguous, and unin -- overbroad and duplicative for the

15     second time, then especially object to the vagueness of the

16     word concerning.  Now you're admitted to the Southern

17     District of New York, aren't you?

18          A     Yes, I was a long time ago.

19          Q     So you're required to be aware of its local

20     rules, right?

21          A     I don't know.

22          Q     Yes?

23          A     I don't know.

24          Q     Are you aware of the local rules?

25                THE COURT:  Are you talking about Southern?

Robert Purcell - Direct by Mr. Landsman                107

1                Q      The Southern and Eastern District of New York.

2                A      No.

3                Q      Okay.  Are you aware that -- let me put in

4     front of you a copy of Local Rule 26.3 and I can hand it up

5     to the court.

6                      THE COURT:  Of which, Southern?

7                      MR. LANDSMAN:  Southern and Eastern District

8     of New York.

9                      MR. HUGHES:  Those rules don't apply in this

10    court.

11                     MR. LANDSMAN:  I'm not claiming that they do,

12    your Honor, it's for a different point.

13                     MR. HUGHES:  Still going to object, your

14    Honor, I don't see the relevance.

15                     THE COURT:  I'll overrule the objection, but

16    where are you heading with this?

17                     MR. LANDSMAN:  Do you want me to hand up a

18    copy, your Honor?

19                     THE COURT:  Yes, please.

20               Q      Now let me ask you to look at 26.3(a)(7) which

21    is part of the uniform definitions and discovery requests

22    promulgated by the judges of the Eastern and Southern

23    District.  And they have a definition of concerning, see

24    that?

25               A      Yes.

Robert Purcell - Direct by Mr. Landsman                108

1          Q    Now is it your testimony that notwithstanding

2    the fact that the judges of the Eastern and Southern District

3    had a clear understanding of concerning and indeed wrote it

4    into a local rule, you didn't know what concerning meant?

5          A    Can you read that question back, please.

6               (Whereupon the question was read.)

7               MR. HUGHES:  I'm going to object, your Honor.

8          A    Yes, well --

9               THE COURT:  Overruled.

10         A    In the context of the discovery propounded by

11   Hasbro, yes, it was vague and indefinite.  I'm -- I guess I

12   got to accept your testimony that these are in fact the rules

13   of the Eastern District and Southern District, I don't know

14   if there's any testimony about that, maybe the court can take

15   judicial notice of that fact, but with great respect for

16   those courts and the judges on those courts, they put a

17   definition of concerning in here which is totally vague,

18   indefinite, doesn't help out at all.  The term concerning

19   means relating to, referring to, describing, evidencing, or

20   constituting.  Well, relating to, that's pretty broad, I've

21   always had difficulties with these interrogatories, what

22   words do you pick, referring, relating to, regarding,

23   concerning.  And when you talk about legal fees, do you want

24   a copy of the contingency fee agreement, is that what you're

25   asking in this interrogatory because that concerns legal

Robert Purcell - Direct by Mr. Landsman                    109

1    fees, for example.  Do you want copies of every single

2    document that comprises correspondence between the parties

3    because that concerns legal fees and the costs of

4    disbursements and so forth, that concerns --

5                    THE COURT:  Just restrict yourself to the

6    answer to the question, Mr. Purcell.

7            Q    Do you have anything to add?

8            A    I guess the answer to the question is that,

9    yeah, I still have trouble despite what the Eastern District

10   and Southern District may say on that point, I still have

11   trouble with the word concerning and their definition in

12   their local rules.

13           Q    When did you first get the documents from

14   Mr. Haritatos that you told us in December you had ready for

15   us to look at?

16           A    I think it was in either late September or

17   early October.

18           Q    And when were they first transferred to you

19   from Wall, Marjama?

20           A    I believe it was December 6th, 2006.

21           Q    So you had the documents at Wall, Marjama for

22   at least two weeks, possibly three weeks before you left

23   Wall, Marjama and you did not produce them to us, correct?

24           A    Correct.

25           Q    Now, you've looked at the transcript of your

Robert Purcell - Direct by Mr. Landsman                110

1    voice mail from December 14th, right?

2           A     Yes.

3           Q     And is there anything about that transcript

4    you contend is inaccurate?

5           A     Can you point me to the exhibit again?

6           Q     31.

7           A     31.  I can't contend it's an accurate -- I do

8    not have a crisp recollection of leaving you this particular

9    voice mail.

10          Q     Okay.  You said in the voice mail it may be

11   some of the stuff that the magistrate's order required

12   Haritatos to produce.  Did you at any point confirm that

13   these were all the documents that Judge DiBianco's order

14   ordered you to produce?

15          A     I don't know what I was referring to there.  I

16   hadn't seen the file in a couple months.

17          Q     My question was did you ever confirm that

18   those two boxes of documents were all of the documents that

19   Haritatos was ordered to produce?

20          A     They weren't all the documents that were

21   ordered to be produced by the August 11th order.

22          Q     And since August 11th have you produced to us

23   any documents other than those two boxes?

24          A     In connection with the judge's order?

25          Q     I said since August 11th, have you produced

Robert Purcell - Direct by Mr. Landsman          111

1     any documents other than those two boxes?

2          A     Not that I can recall.

3          Q     So you still don't know if you've complied

4     with the judge's order, do you?

5          A     I think I have.  I guess we're here today to

6     find out whether Judge DiBianco believes we've complied with

7     his order.  In fact I think I previously complied with parts

8     of that order with regard to the Nora Haritatos trademark

9     application.

10         Q     Let me ask you to look at your responses to

11    our requests for admission, which is Exhibit 13.  And I'd

12    like to direct you specifically to request Number 13 to start

13    with.  And that request asked the plaintiff to admit that

14    persons other than you are currently using, without your

15    authorization, the words Candyland or Candy Land, two words,

16    in connection with the sale of candy, correct?

17         A     Correct.

18         Q     And you said that plaintiff had made

19    reasonable inquiry and the information known or readily

20    obtainable by plaintiff is insufficient to enable plaintiff

21    to admit or deny that request.  Right?

22         A     Yes.

23         Q     Now, did you go on the internet and look at

24    any of the websites that we cited to you?

25         A     Did I personally?

Robert Purcell - Direct by Mr. Landsman                112

1          Q     Yes.

2          A     I don't know, I might have, and I might have

3    gone onto the Dolle's website because you took their

4    deposition in the case, I don't recall.

5          Q     And you heard a representative of Dolle

6    testify that they call their business Candyland, right, at

7    that deposition?

8          A     Well, I'm not sure I heard him say that.

9          Q     Well, the deposition will eventually be in

10   evidence once you tell us whether there are other objections

11   you have to it.  But did you direct anybody else, either your

12   client or anyone at your office, to look at any of the

13   websites that we cited to you in the requests to admit?

14         A     I don't recall.  Are you asking for

15   attorney-client privileged information what I would have

16   talked to my client about in the actual case?

17         Q     I'm not asking for any legal advice that you

18   gave to your client, I'm asking you whether you either

19   directed your client or asked your client to look at any of

20   the websites that had been cited in our request to admit and

21   I do not believe that calls for privileged information.

22               MR. HUGHES:  Objection, your Honor, I submit

23   that it does talk about specific communication with a client,

24   therefore it's privileged, I so therefore object.

25               THE COURT:  Well, is it for the purpose of

Robert Purcell - Direct by Mr. Landsman                113

```
 1   giving legal advice?  I think not, I think it's -- well,

 2   let's rephrase that to ask if anyone other than the client.

 3            Q    Okay.  Mr. Purcell, did you instruct anyone

 4   other than your client to look at these websites?

 5            A    Like my secretary, like work product?

 6            Q    Anybody other than your client.

 7                 THE WITNESS:  Your Honor --

 8                 MR. HUGHES:  I'll object that that's probably

 9   attorney's work product.

10                 THE COURT:  No, I'll overrule that, that's

11   qualified privilege and --

12                 MR. HUGHES:  Yeah, but it's qualified but

13   there has to be some foundation to show that the

14   qualifications have been met to allow that type of inquiry.

15                 THE COURT:  Well, has to be some foundation to

16   show that Hasbro can't --

17                 MR. HUGHES:  So there has been no foundation.

18                 THE COURT:  -- can't get --

19                 MR. HUGHES:  I'll object on the basis not only

20   work product but foundation.

21                 THE COURT:  Overruled on work product.

22            A    I don't -- to answer the question, I don't

23   recall asking.

24                 THE COURT:  You have much more?

25                 MR. LANDSMAN:  Excuse me, your Honor?
```

Robert Purcell - Direct by Mr. Landsman                    114

1              THE COURT:  You have much more?

2              MR. LANDSMAN:  A fair amount, your Honor.  I

3    want to go through, I don't want to go through all of these

4    websites, that would take way too long, but I just want to go

5    through one as an example if that's all right and then there

6    are a couple other questions.

7              THE COURT:  And do you have other witnesses,

8    too?

9              MR. LANDSMAN:  I was going to call

10   Mr. Haritatos and to the extent that we still need to explain

11   anything about those January 2008 requests, I could call

12   Ms. Kramer to explain part of what was involved in them.

13             THE COURT:  So you have two other witnesses?

14             MR. LANDSMAN:  But they should be very short.

15             THE COURT:  Okay, go ahead.

16        Q    Thank you.  Okay.  Let's look at that website

17   that's at candylandstore.com and that is referenced in

18   request to admit, let's see, where is it?  It's Number 19.  I

19   can put them up on the screen, I can, they're also in

20   exhibits in our binder, and the exhibits in our binder are at

21   Exhibit 39.  Now, in your response to Number -- Number 19

22   reads, "Candyland, Inc. in St. Paul, Minnesota offers candy

23   for sale via the internet, at www.candylandstore.com and your

24   response reads, "Plaintiff lacks knowledge or information,

25   plaintiff has made reasonable inquiry, and the information

1    known or readily obtainable by plaintiff is insufficient to

2    enable plaintiff to admit or deny."

3              So let's see how easily obtainable this

4    information is.  I've asked Ms. Kramer to have typed in that

5    website address, do you see, Mr. Purcell, that it takes you

6    to a website called candylandstore.com?

7              A    Yes.

8              Q    And do you see that it offers candy for sale?

9              A    What does -- it does, the website?

10             Q    The website offers candy for sale?

11             A    This website page, are you referring to the

12   one on the screen or the one in the book?

13             Q    I think they're the same but --

14             A    I don't know.

15             Q    Does it?

16             A    Which one do you want me to look at?

17             Q    Look at the one on the screen if that's what

18   you would prefer or look at the one in the book if you would

19   prefer, it's the same thing.

20             A    Let's look at --

21             Q    Home page for candylandstore.com.

22             A    Let's look at the one in the book.

23             Q    Let's stay in the book if you prefer, Page 1

24   and it says, "If you've scheduled a pickup time at the

25   St. Paul store, no need to wait in line," see that?

1          A     I'm on Page 1 of Exhibit 39.

2          Q     Yeah.  It says Candyland at the top, right?

3          A     Yes.

4          Q     And in a nice design, whether nice or not,

5     it's in a design.  And it shows you a bunch of candy, right?

6          A     Yes.

7          Q     Now, if you click on products and go to

8     page -- another page there towards the back of the exhibit,

9     you see that products that they're offering for sale, right,

10    click on them and add to your cart and they're all candies,

11    aren't they?

12         A     I see something that's our products, lists the

13    products, trying to see if they allegedly offer them for

14    sale.

15         Q     You're on the page that has the heading jelly

16    candies, well, let's stay on the page that says our products.

17    Okay.  And it says, "At Candyland you'll find sweet

18    mouth-watering, crunchy, chewy, or salty and always

19    delicious," and then it lists a whole bunch of candies,

20    right?

21         A     It -- I'm sorry, I'm trying to read at the

22    same time you're asking me questions and I'm not following

23    your questions.

24         Q     Are we on the same page now, the one that says

25    "Our products"?

Robert Purcell - Direct by Mr. Landsman                117

1          A    I have that, it's the fourth page of that

2    exhibit.

3          Q    Yeah, and it tells you, it has a list of

4    products that are -- you can find at Candyland, right?

5          A    I don't know, it says you can find them at

6    this Candyland or where, just our products, that's what it

7    says, our products, "At Candyland you will find sweet,

8    mouth-watering, crunchy, chewy, or salty and always

9    delicious."

10         Q    And then a list of products?

11         A    Lists the products.

12         Q    And you would not understand that to mean that

13   they're offering those for sale?

14         A    That who is?

15         Q    Candylandstore.com, and the Candyland store in

16   St. Paul for that matter.

17         A    I don't understand that.

18         Q    Okay.  Turn the page.  You ever ordered

19   products over the internet?

20         A    I have tried and I am pathetically inept at it

21   and my credit card is not taken so I rely upon other people

22   to try to get stuff off the internet.

23         Q    But you understand that where it asks you to

24   click "add to cart" it's asking you if you want to order a

25   product?

Robert Purcell - Direct by Mr. Landsman          118

1          A     That's my understanding what that is.

2          Q     When you get to the product it asks you for

3   your credit card information and then you order it?

4          A     I understand that's generally what happens

5   when you click on something that says "add to cart" there's

6   some process for ordering product, yes.

7          Q     Okay.  And then if you go a few more pages

8   back under check out, it gives you shipping options?

9          A     Yes.

10         Q     Do you understand that to mean you order and

11  they ship to you?

12         A     They, whoever, whose ever behind this website.

13         Q     This website called candylandstore.com, yes?

14         A     That's what I understand that to mean, yes.

15         Q     So you understood you could go on the

16  candylandstore.com website and order candies, right?

17         A     That I could?

18         Q     Yes.  Assuming you had a good credit card.

19         A     That's what I gain from this document,

20  Exhibit 39, which I note has dates on it January 30th, 2008,

21  and February 28th, 2008.

22         Q     Right, that's when they were printed out.

23         A     Yep, so what's your representation about this

24  exhibit, that I had this in my possession some time ago or

25  something?

1          Q    My question to you, Mr. Purcell, is simply, is

2     it correct that you understand from looking at this website

3     that you can indeed order candies from candylandstore.com?

4          A    I don't know if it's from candylandstore.com

5     but I would presume it's the, yeah, company that's operating

6     this website.

7          Q    Called candylandstore.com?

8          A    Called the website at candylandstore.com.

9          MR. HUGHES:  Objection, your Honor, I don't

10    think there's been proper foundation.  That's dated

11    February 28, 2008, there's been no foundation or testimony

12    that this website existed in its present form back in 2006,

13    early 2007 when he was under an obligation to comply with the

14    court's order, so I would object to it and move to strike

15    this exhibit and any testimony relating to it on the basis

16    there hasn't been any foundation that this is an accurate

17    replication of the website as it existed at the time that

18    counsel takes the position he was required to respond to the

19    court's order.

20          MR. LANDSMAN:  First of all, it's already been

21    admitted without objection from them; secondly, the point I'm

22    making right now and there is a continuing obligation under

23    the Federal Rules to supplement that it is very -- the point

24    I'm making is a very simple one, it is very simple to

25    ascertain and confirm what is on a website and that is

Robert Purcell - Direct by Mr. Landsman                    120

1   therefore within reasonable inquiry or information readily

2   obtainable by plaintiff under the Federal Rules.

3                  Secondly, if necessary, we could, I am happy

4   to make the representation that this is how the website

5   existed as of then because I looked at it at that time and

6   that's why we wrote the request to admit the way we did.

7                  THE COURT:  All right.  Well, based upon the

8   representation, I'll overrule the objection.  Let's move on,

9   please.

10          Q    So isn't it a fact, Mr. Purcell, that a

11  reasonable inquiry of simply visiting the website address

12  that's provided in the request for admission would have

13  allowed plaintiff to admit what we asked?

14          A    No.

15                 MR. LANDSMAN:  Again, I'm not going to go

16  through all the other ones but it would be the same sets of

17  questions.

18                 THE COURT:  Okay.

19          Q    Let me ask you to look at the second set of --

20          A    Can I have that last question read back that I

21  said no to.

22                 THE COURT:  Go ahead.

23                 (Whereupon the question was read.)

24                 THE COURT:  What's your answer?

25                 THE WITNESS:  It's still no.

Robert Purcell - Direct by Mr. Landsman          121

 1                    THE COURT:  Okay.

 2          Q    Let me ask you to look at Exhibit 11 which is

 3   plaintiff's response to our second set of interrogatories.

 4   And this was served October 16th, 2006, there's a space for

 5   verification but it's not signed.  Did you ever ask your

 6   client to verify the responses and send them to us?

 7          A    I try to habitually do that, it's required

 8   under the rules, so I presume I did, but I have no current

 9   recollection whether I did or not.

10          Q    Okay.  Did you ask Mr. Haritatos whether he

11   believed that customers of the Toys "R" Us store in Times

12   Square have been confused or mistakenly believed that

13   Haritatos is a source or sponsor of Toys "R" Us' use of the

14   Candyland mark?

15                    MR. HUGHES:  Objection, attorney-client

16   privilege.

17                    MR. LANDSMAN:  It's an interrogatory that was

18   asked, I want to find out whether --

19                    THE COURT:  Which interrogatory is it?

20                    MR. LANDSMAN:  Sorry, let me ... it's

21   interrogatory number 6.  I ask this, your Honor, because

22   before Judge Hurd, it was represented that there was no

23   evidence of actual confusion, and yet this response says yes,

24   that they do contend that.

25                    MR. HUGHES:  Your Honor, that's a contention

Robert Purcell - Direct by Mr. Landsman          122

1    in the interrogatory which is usually properly answered by

2    the counsel, plaintiff himself may not know what the legal

3    contentions are of the case.

4              THE COURT:  That's correct.  What's your

5    point, Mr. Landsman?  I'm a little confused.

6              MR. LANDSMAN:  Well, my point is that here

7    he's saying he contends there's been actual confusion yet

8    before Judge Hurd he represented there wasn't, and I want to

9    know whether this response was made in good faith.

10             THE COURT:  Response being made by

11   Mr. Purcell?

12             MR. LANDSMAN:  Well, it's a response of -- it

13   asks, does plaintiff contend, and it's, although it's phrased

14   as a contention, it's basically asking for a fact.

15             MR. HUGHES:  If that were the case, your

16   Honor, it would have been appropriate to phrase the

17   interrogatory like that.  Reading it, I certainly conclude it

18   was a contention in the interrogatory.

19             THE COURT:  Well, it's unclear whether

20   Mr. Haritatos actually signed this document in any event.

21             MR. PURCELL:  I think I can explain it, your

22   Honor.

23             THE COURT:  I think we'll just move on to

24   something else.  I'm going to sustain the objection.  It

25   would necessarily require me to start viewing the positions

Robert Purcell - Direct by Mr. Landsman          123

1    and the statements made before Judge Hurd and I want to try

2    to restrict this hearing to what's before me to the extent

3    possible.

4                    MR. LANDSMAN:  And your Honor, again, in the

5    interest of time, I'll stop my questioning there.

6                    THE COURT:  Okay.  Cross?

7                    MR. HUGHES:  Your Honor, could we have this

8    marked as an exhibit, please.

9                    THE COURT:  Sure.  Is this something new?

10                   MR. HUGHES:  I think it would be Plaintiff's

11   35.

12                   MR. LANDSMAN:  Could I just ask what it is

13   being offered for?

14                   MR. HUGHES:  Yes.  There was some testimony

15   about production of documents during the course of the

16   proceeding before the Patent and Trademark Office and there

17   was I think an argument raised by you that there was a

18   protective order in place with respect to that, and this is

19   being offered to be that protective order and what could be

20   done to use the documents obtained by Hasbro during the

21   course of that proceeding before the Patent and Trademark

22   Office.

23                   MR. LANDSMAN:  And just to save a little time,

24   could you point out for me, because I haven't seen this in

25   awhile, where the restrictions are.

Robert Purcell - Cross by Mr. Hughes                    124

1              MR. HUGHES:  Yes, the provisions of the

2      protective order start on Page 15 of Exhibit 35 marked for

3      identification.

4              THE COURT:  Do you have questions other than

5      ones relating to this exhibit?  Do you have questions --

6              MR. HUGHES:  A few, your Honor.

7              THE COURT:  Why don't you go ahead with those

8      and let Mr. Landsman look at that and we'll come back to

9      that.

10             CROSS-EXAMINATION BY MR. HUGHES:

11     Q     Mr. Purcell, you were shown by counsel for

12     Hasbro a local rule of the Southern and Eastern District, do

13     you recall that?

14     A     Yes.

15     Q     And do you recall you said I think that you

16     are admitted to practice at least before one or both of those

17     courts?

18     A     Both of those courts back about 1979.

19     Q     And when you were responding to the discovery

20     requests in this particular action, did you use or rely upon

21     the rules of the Southern or Eastern District?

22     A     No.

23     Q     When was the last time you can recall even

24     looking at the rules of -- the local rules of the Southern

25     and Eastern District in general or in particular Rule 26.3

Robert Purcell - Cross by Mr. Hughes          125

1    which defines the term according to those courts

2    "concerning"?

3              A    It's been maybe a couple of decades for the

4    Eastern District and I think many years for the Southern

5    District.

6              Q    Now, in response to your objection to the

7    definition of the word "concerning", did counsel for Hasbro

8    call your attention to this local rule of the Southern and

9    Eastern District?

10             A    I was unaware of any intention by Hasbro to

11   incorporate by reference, if you will, the meaning of

12   "concerning" set forth by the Southern District or the

13   Eastern District.

14             Q    Well, what was your concern about the word

15   "concerning"?

16             A    "Concerning" is a nebulous word, it's very,

17   very broad and the boundaries of it are uncertain.  Moreover,

18   it's so broad as to be encompassing of duplicative stuff,

19   burdensome stuff and so forth.  For example, when we're

20   requested to get documents concerning attorney's fees, do

21   they really want me to produce a copy of the contingency fee

22   agreement with a client?  Do they want me to produce copies

23   of the negotiation documents relating to that contingency

24   agreement?  They all concern, they all relate to attorneys'

25   fees in some broad sense of the term concern or relate.

Robert Purcell - Cross by Mr. Hughes                    126

1        Q    And if that were the case, would you have

2    interposed or did interpose an objection on the ground of

3    attorney-client privilege?

4        A    Well, I did.  The focus of Mr. Landsman's

5    argument in court was that he wanted, as he stated in his

6    opposition papers before Judge Hurd, he wanted the billings

7    and he wanted the day notes, whatever those are.  And as far

8    as the billings, I had I think urged before Judge DiBianco as

9    well as before Judge Hurd that I'm okay with turning the

10   stuff over provided there's some mechanism for addressing

11   what I believe is going to be substantial attorney-client

12   privileged information in those billing statements.

13       Q    And are you aware of any of the means by which

14   you could produce a document and yet maintain the

15   confidentiality of any communications contained within that

16   document?

17       A    Can you repeat the first part.

18       Q    Yeah.  Are there ways by which an attorney can

19   comply with the request and provide invoices of whatever

20   services he may have provided, and yet be able to protect

21   confidentiality of what perhaps he may have been advising the

22   client or asking the client to do?

23       A    Well, one may I guess withhold the entire

24   document saying that there's privileged stuff in there; one

25   may try to mask out the material that one claims to be

Robert Purcell - Cross by Mr. Hughes          127

1    covered by the attorney-client privilege; one may ask the

2    court for in-camera inspection of the documents, let the

3    court make that determination.  So there are a few different

4    mechanisms for I guess achieving a balance where the

5    adversary gets the information they need which is, hey,

6    please verify that when you're claiming $41,000 in

7    out-of-pocket legal fees and costs which was not on a

8    contingency fee basis, your Honor, in the Trademark Office

9    proceeding, show me that that was actually billed to the

10   client, okay.  I'll do that, but let's balance that against

11   the need not to reveal attorney-client privileged information

12   that may be set forth in that billing statement.

13        Q    Now let's -- is there a distinction between

14   fees and disbursements and costs?

15        A    Well, sometimes fees can broadly encompass

16   charges for say attorneys or paralegal work as well as

17   disbursements.  Usually disbursements and costs are

18   considered the same thing, sometimes fees are distinguished

19   from disbursements and costs, but sometimes the word fees is

20   broad enough to encompass both sort of time as well as

21   disbursements.

22        Q    Is there difference between the billing that

23   was done when you represented the plaintiff Mr. Haritatos in

24   the Trademark Office and fees in this particular action?

25        A    Yes.  In the Trademark Office, that was on an

Robert Purcell - Cross by Mr. Hughes                    128

1    hourly rate basis, there was no contingency fee arrangement

2    at all with Mr. Haritatos at that time.

3              Q    Now at this stage of the proceeding, based

4    upon the ruling of Judge Hurd on the motion for summary

5    judgment, where does that issue stand with respect to the

6    recovery of fees in that Trademark Office?

7              A    It's moot at the moment because the current

8    position of the lawsuit and of Judge Hurd is that the

9    plaintiff is not entitled to any damage recovery including

10   damages in the nature of the fees and costs associated with

11   the Trademark Office action at this juncture in the lawsuit.

12   That issue is not finally decided or dead but that's the

13   current posture.

14             Q    Now, one of the examples you gave is what I

15   would call redaction of privileged communications.  Did

16   Mr. Landsman ever suggest that to you as a way to resolve or

17   perhaps reduce discovery dispute?

18             A    Not to my recollection.

19             Q    Did Mr. Landsman, you also mentioned there's a

20   way a court can take a look at a document, is that sometimes

21   referred to as an in-camera inspection?

22             A    Yes.

23             Q    Was that ever suggested by Mr. Landsman?

24             A    No, I'm pretty sure no.

25             MR. HUGHES:  Your Honor, may I address some

Robert Purcell - Cross by Mr. Hughes                    129

1    questions now about the protective order?  Would you like me

2    to continue with the rest of my questions before I go to

3    that?

4                    MR. LANDSMAN:  Your Honor, I have no objection

5    to the admission of -- does it have a number?

6                    MR. HUGHES:  35.

7                    MR. LANDSMAN:  35, and would just point out

8    that what I was referring to was on Page 23 where it says,

9    "Disclosure of information protected under the terms of this

10   order is intended only to facilitate the prosecution or

11   defense of this case," that was what I was looking for.

12                    MR. HUGHES:  But I submit, your Honor, the

13   parties that are involved in this particular Patent and

14   Trademark Office are Hasbro and Mr. Haritatos and they always

15   have the right to use the documents themselves as long as

16   they don't disclose it to third parties or if there is an

17   issue with respect to the use of those documents, they could

18   always have gone back and petitioned the board, Trademark

19   Office for relief, either by stipulation or otherwise.

20                    So the argument that counsel had made that

21   this was, what had been produced by Mr. Haritatos in the

22   Trademark and Patent proceeding was not usable or

23   disclosable, our position has been it had already been

24   disclosed in that and it was in the possession of counsel for

25   Hasbro.

1            MR. LANDSMAN:  Well, I've never understood
2     that I had the ability as a party to disregard a court order.
3     And this is an order of the TTAB, your Honor, says you can
4     only use it in these proceedings.  This was an order that,
5     and furthermore, plaintiff himself by this point had stayed
6     those proceedings so there was no way to go back to the
7     board.  What we'd asked, what we said in the discovery
8     responses is you can't say it's been produced in the TTAB and
9     therefore you don't have to produce it again, but we can't --
10    because for, among other reasons, Toys "R" Us is entitled to
11    these documents too, but we were not, I didn't feel that
12    myself entitled to disregard the order of the TTAB,
13    particularly not with a counsel who, you know, has taken the
14    accountant's attitude towards discovery that your Honor once
15    noted of him.  I was not going to risk being in contempt of
16    the TTAB.  It would have been a very simple thing to and as
17    we also pointed out and I think this was a more important
18    point, that in responding this way, the plaintiff hadn't
19    even, didn't even seem to know or care what he had or hadn't
20    produced in the TTAB and what he had withheld, and that was
21    what we brought up in the letter where we said, you say you
22    produced this before but you didn't, therefore produce it,
23    and he said, well, if I objected to it before, then maybe I'm
24    not going to produce it again.
25            THE COURT:  Go ahead, Mr. Hughes.

Robert Purcell - Cross by Mr. Hughes

1      Q    And what was your understanding with respect

2  to the limitations, if any, imposed upon counsel for Hasbro's

3  access to the documents that you had previously produced in

4  the proceeding before the Patent and Trademark Office?

5      A    If I -- my position was if I produced them to

6  Hasbro in connection with the Trademark Office proceedings,

7  they were capable of being used in this instant lawsuit.  I

8  didn't have any objection to that, in fact when I tell them

9  these documents have already been produced, implicitly I'm

10 saying use them.  It makes no sense for me to make copies of

11 something I've already provided to you, you already have, and

12 for me to resend them to you, it's just implicit, go ahead

13 and use them, I've produced them to you already, you have

14 them, there's no need to ask me to redo the whole thing over

15 again.

16     Q    In response to that, did Mr. Landsman say that

17 he was concerned about being in violation of the order of the

18 Patent and Trademark Office?

19     A    I haven't heard anything about that to my

20 recollection until today from Mr. Landsman.

21     Q    Did Mr. Landsman approach you about perhaps

22 having a stipulation to the fact that the documents could be

23 used that had been produced before the proceeding in the

24 Patent Office?

25     A    I don't recall Mr. Landsman doing that.

Robert Purcell - Cross by Mr. Hughes                    132

1          Q     Would you look at Defendant's Exhibit 1 which

2     is the order of this court.

3          A     Yes.

4          Q     Directing your attention to Page 8, what was

5     your understanding that Judge DiBianco was ordering you to

6     produce within a certain period of time?

7          A     He was ordering that we produce customer

8     lists.

9          Q     Let's start with that one.  Did you produce a

10    customer list?

11         A     We did not produce a customer list because we

12    have never, Mr. Haritatos has never had a customer list.

13         Q     And how do you know that?

14         A     I was told that repeatedly by Mr. and

15    Mrs. Haritatos.

16         Q     Do you know whether they had made some type of

17    a diligent look for that?

18              MR. LANDSMAN:  Your Honor, I was blocked from

19    these kinds of questions on the grounds of attorney-client

20    privilege.

21              MR. HUGHES:  I'll withdraw that question then.

22              THE COURT:  If the door's open, then I'll let

23    you pursue it.  I think that we're getting somewhat afield

24    and detailing this order to death, but, you know, Mr. Purcell

25    is entitled to a full hearing and that's what he's going to

Robert Purcell - Cross by Mr. Hughes                    133

1    get.

2             Q    What was the next thing that was asked for

3    according to your understanding of this order?

4             A    Well, didn't want to totally ignore the

5    customer list information because I knew that besides the

6    customer list, Mr. Landsman was basically asking for customer

7    identities, that is customer identities and addresses and

8    their geographic locations and so forth, so I thought, well,

9    in good faith I should interpret this since I don't have any

10   customer lists, to try the best we can to get information

11   that we have in our possession, custody, control that would

12   reveal whatever information we have about the customer names

13   and addresses and that was through the UPS manifests, the

14   5,593 pages of stuff.

15            Q    Now what would the manifests disclose or what

16   did they disclose?

17            A    You know what, I've never taken a close look

18   at them, I think that they show the shipping date, the UPS

19   shipping number, the addressee to whom the stuff is shipped,

20   but I don't know.

21            Q    Would they disclose what the contents of the

22   box being shipped were?

23            A    I don't even know that.

24            Q    And what about the application for Turkey

25   Joints registration; how did you respond to that provision of

Robert Purcell - Cross by Mr. Hughes                134

1   Judge DiBianco's?

2          A    Well, there were a couple ways I responded.  I

3   first said and I urged Judge DiBianco and Judge Hurd that it

4   was irrelevant, this application registration had no bearing

5   on the instant lawsuit which related to the trademark

6   Candyland.  That argument was unpersuasive.  Then I looked

7   back, however, and thinking, well, I have produced stuff, do

8   we have any of the stuff that I haven't produced anywhere in

9   the file, and lo and behold, I found a letter dated in

10  June 2006, two months before Judge DiBianco's August 11th

11  letter in which I had provided to Hasbro's counsel all the

12  stuff that we had on this application for the Turkey Joints

13  registration, that is the Nora Haritatos application.  So

14  we'd already given the stuff, whatever we had, to Hasbro, and

15  yet Hasbro was persisting to tell the court they didn't have

16  it, we were being obstreperous, we were stonewalling

17  discovery and so forth on this, so we had already produced

18  whatever we had at that time.

19         Q    And is that contained with one of the exhibits

20  that you provided to the court?

21         A    It's in two of the exhibits that plaintiff

22  provided to the court.

23         Q    Draw the court's attention, please.

24         A    Yes.  It starts Exhibit 22 which is again

25  something I pulled off the U.S. Trademark Office database

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Robert Purcell - Cross by Mr. Hughes                    135

1    recently showing data regarding that earlier registration

2    that's 25 to 30 years old and then Exhibit 23 is a copy of my

3    letter dated June 1st to Mr. Landsman's associate Michael

4    Sant'Ambrogio in which I enclose various documents and some

5    of those I've attached to the letter in Exhibit 23.  Those

6    that I've attached to the letter in Exhibit 23 are those

7    pertaining to the registration or application at issue, the

8    Nora Haritatos application that is the thin shells

9    registration, and so forth.

10            Q    To your knowledge does the plaintiff have any

11   other additional materials related to Turkey Joints

12   registration that have not already been produced?

13            A    To my knowledge, no.

14            MR. LANDSMAN:  I just want to again note, your

15   Honor, this is opening up what they claim was privileged.

16            MR. HUGHES:  The question was to his

17   knowledge, sir.

18            MR. LANDSMAN:  And he presumably could only

19   have that knowledge from talking to his client.

20            THE COURT:  All right.  What else do you have,

21   Mr. Hughes?

22            Q    The last provision requested has to do with

23   damages.  Do you see that?

24            A    Yes.

25            Q    And had you provided to counsel for Hasbro any

Robert Purcell - Cross by Mr. Hughes                    136

1    documents related to damages?

2              A    I had provided several of the required initial

3    disclosures and supplemented those initial disclosures

4    throughout litigation, your Honor, to specify the types of

5    damages sought, the calculation of those damages as I learned

6    them, and reference to documents and deposition exhibits

7    where we were relying on those exhibits.  The term damages

8    here is not -- is broad.  And if we look at what Mr. Landsman

9    was seeking and what was at issue here, it was the damages

10   pertaining to the attorneys' fees for the Trademark Office

11   action and indeed that's what Mr. Landsman was arguing to

12   Judge Hurd as being the issue on damages.  That's the issue

13   regarding damages, that's the one I had trouble with on the

14   basis of the attorney-client privilege and information in

15   those billing statements that would be part of any

16   production.

17             Q    Well, the course of the Trademark Office type

18   of -- trademark lawsuit, are there other type damages that

19   can be recoverable by a plaintiff for a claim of trademark

20   infringement?

21             A    Yes.

22             Q    And what are some of those?

23             A    The two main ones are a recovery of actual

24   damages, that is damages to the plaintiff and as specified in

25   initial disclosures and I think in interrogatory responses,

1    we're requesting a reasonable royalty based upon the sales of

2    candy by the Hasbro and Toys "R" Us defendants.  That has

3    been a measure of damages by many courts in the United

4    States.  In addition to that, and to some degree overlapping

5    with that, is a request for the defendant's profits from the

6    sales of those infringing candy products.

7              Q    In whose possession, custody, or control would

8    that information related to that, I'll call second type of

9    damages, be?

10             MR. LANDSMAN:  Your Honor, I'm going to object

11   on relevance here.  The questions we asked were, they claimed

12   attorneys' fees as an element of damages, we asked for

13   documents evidencing them, they didn't produce them, that's

14   all we were talking about.  We're not talking about all this

15   other stuff here.

16             THE COURT:  You are referring to the TTAB?

17             MR. LANDSMAN:  That's what I had, I understood

18   plaintiff to be contending that he was going to claim as

19   damages, not as costs in this action but as damages the fees

20   and anything else he claimed in the TTAB proceeding.  I

21   wasn't sure whether they were claiming fees in this

22   proceeding as well as an element of damages and I said okay,

23   produce it, if you're claiming it.

24             THE COURT:  All right.  I'm going sustain the

25   objection at this point.  Anything further, Mr. Hughes?

1         Q     When you read Judge DiBianco's order, it

2    indicated that plaintiff's letter motion dated June 26, 2006

3    is granted and close of all discovery is extended to November

4    30th, 2006; did you read that to be a ruling in favor of the

5    defendant on any motion that they had filed?

6         A     I frankly do not recall what I thought when I

7    first read Judge DiBianco's order, but I am quite confident

8    that I've never interpreted this portion of the order

9    granting plaintiff's letter motion dated June 26, 2006 as

10   referring to the Hasbro letter motion.

11              MR. HUGHES:  That's all, thank you, Judge.

12              THE COURT:  Any --

13              MR. LANDSMAN:  Just quickly, your Honor.

14              REDIRECT EXAMINATION BY MR. LANDSMAN:

15        Q     You were at the deposition of Mr. Haritatos

16   and of Sharon Haritatos, right, you defended those

17   depositions?

18        A     Yes.

19        Q     And do you recall Mr. Haritatos testifying in

20   his deposition about keeping track of internet orders by

21   website reports?

22        A     I don't recall that.

23        Q     Let me ask you to look at Exhibit 19 of our

24   exhibits.

25              MR. HUGHES:  Objection, your Honor, beyond the

Robert Purcell - Redirect by Mr. Landsman                 139

1   scope of cross-examination.  If it's going to go beyond the

2   scope, I think he's going to make him his witness and he

3   can't --

4                   MR. LANDSMAN:  This directly relates to

5   Mr. Hughes' question about whether the Fed Ex labels

6   satisfied our document request, your Honor.

7                   THE COURT:  For the customer information?

8                   MR. LANDSMAN:  Yes.

9                   THE COURT:  All right, I'm going to allow it.

10  What exhibit are you looking at?

11                  MR. LANDSMAN:  Exhibit 19, Page 113.  I'm

12  sorry, Exhibit 19, Page -- the bottom of Page 112 of the

13  deposition to the top of Page 113.  It's the Spero Haritatos

14  deposition.

15                  THE COURT:  Yes.

16          Q    You see there that he says that they keep

17  track of internet sales by website reports?

18          A    Yes.

19          Q    Did you produce any website reports to us?

20          A    Not that I know of.

21          Q    Did you ask your client for any website

22  reports?

23          A    Yes.

24          Q    What did he say?

25          A    That -- that -- there's no printouts of

Robert Purcell - Redirect by Mr. Landsman                140

1    anything with regard to the web, that the customer

2    information they have with regard to customer identity, all

3    right, customer names and addresses, the things they have

4    relate only to the UPS manifest, there is no other

5    information.

6              Q    Did you ask him what was in the website

7    reports?

8              A    I don't recall.

9              Q    Did you ask him whether the website reports

10   could be printed out regardless of whether they actually had

11   already been printed out?

12             A    I don't recall.

13                  MR. LANDSMAN:  No further questions.

14                  MR. HUGHES:  Nothing further, your Honor.

15                  THE COURT:  Okay.  You're excused,

16   Mr. Purcell.

17                  THE WITNESS:  Thank you.

18                  (Whereupon the witness was excused.)

19                  MR. HUGHES:  Exhibit 35 is now in evidence,

20   your Honor?

21                  MR. LANDSMAN:  Without objection.

22                  THE COURT:  Okay, Exhibit 35 is received.

23                  MR. PURCELL:  Should I leave, these are my

24   exhibit books, can I take those back with me?

25                  MS. KRAMER:  Actually one of those is mine, I

Spero Haritatos - Direct by Mr. Landsman          141

1    gave --

2                    MR. LANDSMAN:  We're going to need at least my

3    book for the next witness.

4                    MS. KRAMER:  Just leave it there.

5                    THE COURT:  Take your book back, Mr. Purcell,

6    leave the other one there.

7                    MS. KRAMER:  Leave Hasbro's book, I gave

8    Hasbro exhibits to your counsel.

9                    MR. LANDSMAN:  We'd like to call Spero

10   Haritatos, please.

11                   THE COURT:  Mr. Haritatos, please come

12   forward.

13                   MR. PURCELL:  Your Honor, sorry to have this

14   logistics problem, I think both of these books are my exhibit

15   books.  Do I have any on the table?

16                   THE COURT:  Why don't you return to your table

17   and we'll see what we have.

18                   THE CLERK:  Mr. Haritatos, please raise your

19   right hand.

20

21                   S P E R O   T .   H A R I T A T O S , called

22   as a witness and being duly sworn, testifies as follows:

23                   THE COURT:  Go ahead.

24                   DIRECT EXAMINATION BY MR. LANDSMAN:

25        Q    Good afternoon, Mr. Haritatos.  I don't think

Spero Haritatos - Direct by Mr. Landsman                142

1   we've met before but I'm -- you know who I am, I'm

2   Mr. Landsman, I represent Hasbro here, and you're the

3   plaintiff in this case, correct?

4           A    Yes.

5           Q    Mr. Purcell is your attorney?

6           A    Yes.

7           Q    And he's been your attorney since the case

8   began?

9           A    Yes.

10          Q    Okay.  Have you ever looked at our first

11  request to admit?

12          A    I don't recall.

13               THE COURT:  I'm sorry, you have to speak up.

14          A    I don't remember.

15          Q    Do you remember looking at any of the websites

16  that had Candyland in their name?

17          A    I don't remember.

18          Q    Were you ever asked to look at any websites of

19  internet sites that call themselves Candyland?

20          A    No, I don't remember.

21          Q    And let me ask you to look at what's

22  Exhibit 11 in that binder of documents which is response to

23  our second set of interrogatories.

24          A    Is this 11, the page thing?

25          Q    Excuse me?

Spero Haritatos - Direct by Mr. Landsman                143

1          A    11 on here?

2          Q    Yes.  It's entitled plaintiff's response to

3    defendant Hasbro, Inc.'s second set of interrogatories to

4    plaintiff.  Have you ever seen that before?

5          A    Vaguely.

6          Q    Were you ever asked to read through it and to

7    verify the responses?

8          A    I don't recall.

9          Q    Okay.  Let me ask you to look at Exhibits 1

10   and 2 in that binder which are Judge DiBianco's order and

11   Judge Hurd's order.  Have you ever seen them before, either

12   of them?

13         A    I don't recall.

14         Q    Do you recall Mr. Purcell or anyone else ever

15   informing you of these orders?

16         A    I was told to look for documentation and I did

17   it the best of my ability.

18         Q    Okay.  When were you asked to look for

19   documentation and what specifically were you asked to look

20   for?

21         A    I don't recall the actual time, anything that

22   pertained to shipping.

23         Q    Well, there's been testimony that you sent two

24   boxes of documents containing shipping labels to Mr. Purcell.

25   Do you recall that?

Spero Haritatos - Direct by Mr. Landsman          144

1          A     Correct.

2          Q     When were you asked to look for those

3     documents?

4          A     I believe, I can't -- I think it was October,

5     I think.  I can't remember.

6          Q     October 2006?

7          A     I believe so.

8          Q     Now, the photographs of them were put into

9     evidence but it's not close enough to see what the

10    shipping -- what date the boxes were shipped to Mr. Purcell

11    and maybe I think the best way to deal with this would be to

12    ask that Mr. Purcell produce photocopies showing when exactly

13    those boxes were sent and when he received them.  Because I

14    suspect that the witness is not going to remember when you

15    did it?

16         A     I can't remember.

17              MR. HUGHES:  Your Honor, I'm going to object,

18    this is a hearing to provide evidence, it's not a discovery

19    proceeding.  And you know, now we're thinking we want

20    additional documents.  Counsel, there was an appropriate time

21    to do that in the course of the hearing, to make request for

22    additional documents seems inappropriate.

23              MR. LANDSMAN:  Your Honor, he put in

24    photographs saying this is what I got, I'm just asking for a

25    closeup.  It's not discovery, it's saying I want a better

Spero Haritatos - Direct by Mr. Landsman                    145

1   picture of what you've already put into evidence so that I

2   can see what is actually there.

3                    THE COURT:  We have an exhibit number on that?

4   I don't recall seeing it.  These are the two boxes that were

5   shipped to Mr. Purcell by Mr. Haritatos?

6                    MR. LANDSMAN:  It's Plaintiff's Exhibit 30,

7   your Honor.

8                    THE COURT:  30?

9                    MR. LANDSMAN:  Shipping labels in these

10  photographs and they would presumably tell us exactly when

11  they were sent.  And all you need to do is just zoom in on

12  it.

13                    THE COURT:  Let's ask the witness if he has

14  any better recollection.  Show him the copy of Exhibit 30.

15       Q    Do you have it in front of you, if I can

16  approach the witness?

17                    THE COURT:  Go ahead.

18       Q    It's Exhibit 30 in the different binder, this

19  is the photograph of the boxes.

20                    THE COURT:  Mr. Haritatos, you see those two

21  boxes in the photographs?

22                    THE WITNESS:  The top ones?

23                    THE COURT:  I'm sorry?

24                    THE WITNESS:  The top ones, your Honor?

25                    THE COURT:  Well, there are four

Spero Haritatos - Direct by Mr. Landsman                146

1    photographs --

2                    THE WITNESS:  Okay.

3                    THE COURT:  -- of two boxes.  Different ways

4    of looking at those.

5                    THE WITNESS:  Okay.

6                    THE COURT:  Do you recall when you shipped

7    those?

8                    THE WITNESS:  I believe it was in October,

9    yeah, I believe it was October, your Honor.

10                   THE COURT:  All right.  Go ahead, continue,

11   Mr. Landsman.  If you make that request, I'll reserve on it.

12                   MR. LANDSMAN:  I do want to make the request.

13                   THE COURT:  Okay.

14        Q    Mr. Haritatos, do you recall testifying at

15   your deposition about website reports that are kept?

16        A    I don't recall.

17        Q    Let me ask you to look at Exhibit 19 which is

18   a transcript of your deposition.  I'll show you the same

19   pages I just showed Mr. Purcell, and let me ask you to look

20   at the bottom of Page 112 of your deposition and top of Page

21   113, I'll ask you whether you recall giving this testimony.

22   "Question:  Okay.  And do you keep track of your sales via

23   the web?

24                    "Answer:  Yes.

25                    "Question:  And how do you keep track of them?

Spero Haritatos - Direct by Mr. Landsman          147

1           "Answer:  The website reports.

2           "Question:  So the website gives you reports

3    on the goods that are sold through the website?

4           "Answer:  Yes."

5           And you recall that testimony?

6           MR. PURCELL:  Your Honor, I'm going to object,

7    I realize that he asked me the same testimony, there's no

8    indication from this testimony whatsoever about these website

9    reports, we're talking about customer identities and

10   addresses and so forth.  I just realize that maybe what he's

11   talking about is website reports talking about how many

12   people hit on the website per day and things like that, but

13   maybe Mr. Haritatos can explain but I wonder where he's going

14   with this supposed impeachment testimony.

15          THE COURT:  What is the objection?

16          MR. PURCELL:  The objection is if he's using

17   this testimony to try to refresh Mr. Haritatos' recollection

18   that he has previously testified that there was customer

19   identity and address information in these website reports,

20   the testimony he previously had does not say that there was

21   customer identity or information in that website report.

22          THE COURT:  Overruled.  He'll clarify,

23   obviously Mr. Haritatos knows what he does in his business

24   and he'll clarify, just make the question simple.

25          Q    Okay.  There are website reports that help you

Spero Haritatos - Direct by Mr. Landsman                148

1   keep track of orders, right?

2        A    Not really website reports.

3        Q    What would you call them?

4        A    They're just, you know, we get like it comes

5   in -- I can't really answer all of it because I'm not

6   familiar with it.

7             THE COURT:  You have someone else in the

8   business do that?

9             THE WITNESS:  Well, there's -- yeah, Sharon

10  usually helps with it, I'm not that familiar with it.

11       Q    Have you seen reports that show orders over

12  the internet and show what they've ordered, who they are,

13  that kind of thing?

14       A    I haven't, the only -- the reports that I see

15  are the shipping documents, the manifests from UPS.

16       Q    Well, let me ask you when you said you talked

17  about website reports at your deposition what were you

18  referring to.

19       A    I believe the manifests, that's what I meant.

20       Q    And what is the manifest?

21       A    The documentation that UPS creates at the end

22  when we ship out product.

23       Q    Okay.  Maybe you don't know this, but how, you

24  create a manifest for UPS, right, to ship a product?

25       A    Correct.

Spero Haritatos - Direct by Mr. Landsman                    149

1          Q    And you create that from internet orders that
2     come over the internet that you pull from the internet,
3     right?
4          A    I don't do it, no.
5          Q    Somebody does?
6          A    Right.
7          Q    And that information that gets pulled from the
8     internet tells you who has ordered what on what date, right?
9          A    I'm not sure.
10         Q    Well, how else would you know what to ship?
11         A    I can't answer that, I don't know.
12         Q    And you've looked at the manifests that you
13    produced, right?
14         A    Well, I gave you all the information that I
15    possibly could give you.
16         Q    Okay.  And did you look at them though?
17         A    Briefly.
18         Q    Did you ask Sharon to pull and print out or
19    show you what you referred to as the website reports?
20         A    That's what we did is we gave you all the
21    information that we possibly could.
22         Q    Did you ask Sharon to give you the website
23    reports?
24         A    I asked her to help me look for all the
25    information to give you, yes.

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Spero Haritatos - Direct by Mr. Landsman          150

1          Q     Did you ask her for the website reports,

2     Mr. Haritatos, yes or no?

3          A     These are the website reports that we did.

4          Q     There's other information that you have to

5     have in order to ship products, right?

6          A     I -- we don't, I don't have any information

7     available at this point.

8          Q     What happened to it?

9          A     I'm -- it's just not there, we looked, I

10    don't -- it's not there.

11         Q     So is it your testimony that there is nothing

12    that is available either electronically or on paper that

13    would show you what product any given customer ordered over

14    the internet?

15         A     Correct, at that time I don't have anything.

16    Now we have available some stuff now because the website

17    wasn't capable of doing a lot of detail.

18         Q     Let me ask you to look at Exhibit 20 which is

19    Sharon's deposition transcript and ask you to look at the

20    bottom of Page 39, and she testified about that.

21               "You open up, it's an order screen just for

22    the day's work, whatever orders may have come in and you see

23    customer lists.  Click on the customer lists and you see the

24    order.

25               "Question:  You click on customer list and it

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Spero Haritatos - Direct by Mr. Landsman          151

1    tells you --

2                   "Those are the orders that came in that day

3    and then you just process the orders from clicking on each

4    order as you go down through."

5                   You see that?

6            A     Right.

7            Q     And then you package it and apply a UPS label.

8    Now is it your testimony you don't understand what Sharon was

9    talking about there?

10           A     I don't understand it, but --

11           Q     Did you ask her to look for that information?

12           A     Yeah, we looked.

13                  MR. LANDSMAN:  I have no further questions,

14   your Honor.

15                  MR. PURCELL:  I have no questions of

16   Mr. Haritatos.

17                  THE COURT:  Thank you, sir, you're excused.

18                  (Whereupon the witness was excused.)

19                  MR. LANDSMAN:  Could I confer with Ms. Kramer

20   for just a minute.

21                  THE COURT:  We're going to take a ten-minute

22   recess.

23                  (Whereupon a recess was taken from 3:43 p.m.

24                   to 3:55 p.m.)

25                  THE COURT:  Okay, let's try to move along,

Amanda Kramer - Direct by Mr. Landsman          152

1   it's getting late in the day.

2                  MR. LANDSMAN:  Thank you, your Honor, last

3   witness is Amanda Kramer.

4                  THE CLERK:  Please raise your right hand.

5

6                  A M A N D A   K R A M E R , called as a

7   witness and being duly sworn, testifies as follows:

8                  MR. LANDSMAN:  I just want to emphasize at the

9   beginning, your Honor, that we're calling her for a very

10  limited purpose, we're not intending to waive any privilege

11  by doing that.

12                 DIRECT EXAMINATION BY MR. LANDSMAN:

13      Q     Ms. Kramer, by whom are you employed?

14      A     Patterson, Belknap, Webb & Tyler.

15      Q     When did you start your involvement in this

16  case?

17      A     In approximately December 2006.

18      Q     Okay.  Were you involved in reviewing the

19  documents that we received from plaintiff in January 2007?

20      A     Yes.

21      Q     What were those documents?

22      A     They were about 5500 pages of I believe UPS

23  and Fed Ex shipping labels.

24      Q     Could you tell from them which products were

25  shipped?

Amanda Kramer - Direct by Mr. Landsman                    153

1           A    No.

2           Q    Did you try to correlate them with anything

3    else?

4           A    Yes, I looked at all of the pages that were

5    produced and I went to the plaintiff's website to try to see

6    if the weight that was listed on the shipping labels

7    corresponded with the weight of any of plaintiff's products

8    which would allow us to figure out which products were

9    shipped to which state and there was no correlation at all.

10          Q    Okay.  And there's been some discussion about

11   why we asked for samples of Coco-Monds.  Why did we need the

12   sample of Coco-Monds?

13          A    When I went to the plaintiff's website to look

14   at the weight and compare it to the weight that was on the

15   shipping labels, I saw a product on there that had not

16   previously been on the website and it was called Coco-Monds

17   and there wasn't a picture and we didn't know if it bore the

18   Candyland trademark or not so in trying to figure out which

19   products were shipped to which states and which ones had the

20   Candyland mark on them and which ones didn't, we needed a

21   sample of Coco-Monds.

22               MR. LANDSMAN:  Thank you, no further

23   questions.

24               THE COURT:  Any cross?

25               MR. PURCELL:  Briefly.

Amanda Kramer - Cross by Mr. Purcell                154

1                    CROSS-EXAMINATION BY MR. PURCELL:

2           Q    Ms. Kramer, were you able to decipher from any

3    of the 5,593 pages of UPS manifests the nature of any

4    products that were shipped in correspondence with the

5    particular UPS shipment?

6           A    I couldn't tell what products were shipped by

7    reviewing the labels that were produced.

8           Q    In any way, shape, or form?

9           A    No.  The labels contained the address of the

10   receiver and the shipping weight of the package.  When I

11   looked at the Candyland website, the products on the website

12   have a weight and a shipping weight and no multiplier of any

13   of the products' shipping weight or actual weight on the

14   website seemed to correspond with the shipping weight on the

15   labels.

16          Q    Okay.  Were you aware at that time that the

17   testimony of the Haritatoses has been that about 90 percent

18   of their business or so is the Turkey Joints?

19          A    I had read that, but we were not able to tell

20   where that 90 percent and where the other 10 percent fell in

21   the states that were reflected in the shipping labels.

22          Q    So by going to the website and trying to find

23   out weights and so forth and you discover this Coco-Monds

24   trademark, you for some reason thought that if you learned

25   about this one product, you would be able to decipher the

JODI L. HIBBARD, RPR, CRR, CSR
(315) 234-8547

Amanda Kramer - Cross by Mr. Purcell                    155

1    whole spectrum of what was submitted to the UPS manifest?

2          A    No, that's why we served the interrogatories

3    that asked for the identification of the products by year for

4    each of the years that were reflected in the shipping labels,

5    because we needed to know what percentage of the products had

6    the Candyland mark, what percentage didn't, for each year so

7    that we could try to make some sense of the shipping labels.

8          Q    But the answer to my question is that by --

9    rephrase my question.  So by trying to find out more

10   information in discovering this Coco-Monds thing, you weren't

11   able to find out really any more information about the UPS

12   manifests and to what products they related, correct?

13         A    Well, we didn't get any more information

14   because the plaintiff didn't respond to the discovery

15   requests.

16         Q    There was really no hope of getting realistic

17   information about the manifests and what products were

18   shipped with those UPS shipments by asking questions about

19   the Coco-Monds in interrogatories, was there?

20              MR. LANDSMAN:  Your Honor, we didn't ask

21   questions about Coco-Monds in the interrogatories, she was

22   referring and my question referred to a document request for

23   a sample of Coco-Monds, very simple.

24         Q    Let's go to -- do you have, Ms. Kramer,

25   plaintiff's --

Amanda Kramer - Cross by Mr. Purcell                    156

1          THE COURT:  What's the real relevance of all

2   of this?  Is there any?  Seems to be no dispute whatsoever

3   that no one knows what was shipped by looking at the UPS or

4   the Fed Ex labels, what's the relevance of all this?

5          MR. PURCELL:  That the discovery they sought

6   on January 28th, Judge, which they now say was triggered by

7   this inspection of the documents is simply incorrect

8   testimony, it simply is incredible.  Their third set of

9   interrogatories to plaintiff says, "State whether the product

10  Coco-Monds sold on the website www.turkeyjoints.com has the

11  word Candyland as part of its name or on the packaging and,

12  if so, state where it appears."  Does that help them get the

13  weight information for the UPS manifests and so forth?  No.

14         MR. LANDSMAN:  Your Honor, the testimony

15  wasn't that this went to the weight, it was in looking at all

16  sorts of other things we found a new product that we hadn't

17  seen before.

18         THE COURT:  I heard that and obviously they

19  found a new product and wanted to find out what it was all

20  about.  So let's --

21         MR. PURCELL:  But that was not because of the

22  delay in any production of those documents is I guess my

23  point.

24         MR. LANDSMAN:  No, in fact it should have been

25  produced a long time before we ever asked for it, we just

Amanda Kramer - Cross by Mr. Purcell          157

1    made a very specific request.

2                    THE COURT:  Anything further?

3                    MR. PURCELL:  Yes.

4              Q    Ms. Kramer, on the UPS manifests, were there

5    any customer names and addresses?

6              A    Yes.

7                    MR. PURCELL:  No further questions.

8                    THE COURT:  All right.

9                    MR. LANDSMAN:  None, your Honor.

10                   THE COURT:  Thank you, you're excused.

11                   (Whereupon the witness was excused.)

12                   THE COURT:  Any other additional --

13                   MR. LANDSMAN:  That's our case, your Honor.

14                   THE COURT:  Okay.

15                   MR. HUGHES:  Your Honor, I've had marked

16   during the recess Plaintiff's Exhibit 36 for identification.

17   I spoke with opposing counsel, he has I understand no

18   objection to its admissibility.  May I approach, your Honor.

19                   MR. LANDSMAN:  That's correct, your Honor.

20                   MR. HUGHES:  It is in fact the infamous

21   June 26th letter that the court had already gotten out of the

22   docket.

23                   THE COURT:  Right, okay.  Proceed.

24                   MR. PURCELL:  Your Honor, briefly, with regard

25   to Exhibit 35 which is the Trademark Office protective order,

1    I believe it's been stipulated this is the protective order

2    and Mr. Landsman talked about during his oral argument that

3    some provision of this agreement restricted the parties from

4    using documents other than in connection with the Trademark

5    Office proceeding and I was hoping that he might tell me

6    where that's found.

7            MR. LANDSMAN:  I thought I had, it's on

8    Page 23, Item 11, says, "Disclosure of information protected

9    under the terms of this order is intended only to facilitate

10   the prosecution or defense of this case," TTAB proceeding.

11   And as Mr. Purcell knows, he suggested that he simply agreed

12   that what had been produced in the TTAB proceeding could be

13   used here and we accepted that.

14           THE COURT:  You know, it's commonplace in

15   federal litigation to have other proceedings, administrative

16   or proceedings in other courts and that doesn't absolve a

17   party from producing the stuff twice if that's the case.

18   This whole issue of whether the material was available in

19   some other forum doesn't sound right to me.  Whether it was

20   or it wasn't, there's no problem usually with producing it

21   again so that the record before this court is complete.

22           This court doesn't want to get involved in

23   reviewing pieces of information from other courts and pieces

24   of discovery from other proceedings and administrative

25   tribunals and this and that.  That's just the way things

1    usually proceed in this court and I assume in most federal

2    courts.  That's just an observation, go ahead.

3                    MR. PURCELL:  I call Mr. Landsman to the

4    stand.

5                    MR. LANDSMAN:  Your Honor, I was not listed as

6    a witness.

7                    MR. PURCELL:  I listed rebuttal, any witness

8    needed for rebuttal or impeachment.  The first time I've

9    heard about any argument regarding this TTAB protective order

10   is today, your Honor, and I want to have Mr. Landsman rebut,

11   you know, other testimony including his own about the impact

12   of this TTAB order.  He tells the court that he thought it

13   prohibited him and his client from using any documents or

14   information we provided in the Trademark Office proceeding in

15   this proceeding.

16                   THE COURT:  I'm not going to let you get into

17   a lot of details about this, putting aside this issue of

18   whether you're allowed to testify, because I think it's being

19   argued to death.  This case in the Northern District had

20   discovery and there was, there were requests for production

21   of documents, responses.  You can't simply say, go to your

22   other files or go to some other proceeding and dig it out,

23   that's not a proper response.  It's not even clear from the

24   record before me that the same law firm that's representing

25   Hasbro in this case was representing Hasbro in the TTAB, I

1     assume that's the case.

2               MR. LANDSMAN:  It is, your Honor.

3               THE COURT:  What's -- give me an offer of

4     proof, what do you expect to establish here?

5               MR. PURCELL:  The offer of proof is that in

6     fact contrary to Mr. Landsman's portrayal to this court,

7     Hasbro and the law firm of Patterson, Belknap has used the

8     documents and information produced in the TTAB proceeding in

9     this lawsuit.  He wants to say, oh, we couldn't use those at

10    all, despite my statement, we've already produced them to

11    you, use them again and I think, your Honor, if we dig into

12    the deposition transcripts and exhibits we will see that

13    Hasbro used in depositions in this lawsuit exhibits of

14    documents that were produced in the TTAB proceeding so in

15    fact they did use them, it's my recollection anyway in this

16    lawsuit, and yet Mr. Landsman's saying, ooh, ooh, we couldn't

17    cross the border here between the two, the TTAB proceeding

18    and this proceeding.  Oh, those documents we couldn't touch,

19    we couldn't use in any way, shape, or form and yet in fact

20    it's my recollection, Judge, that they were used in this

21    lawsuit.

22              THE COURT:  How does that defend this motion

23    for sanctions under the Rule 37?

24              MR. PURCELL:  Well, to the extent Mr. Landsman

25    is saying that we didn't produce the documents because we

1    can't rely upon our prior production in connection with the

2    TTAB proceeding, among other arguments we would make is that

3    his statement that if they were produced in the TTAB

4    proceeding the parties were prohibited from using them in

5    this proceeding is false, that in fact Hasbro itself and the

6    Patterson, Belknap firm did use that information, did use

7    those documents in this proceeding.  So --

8                THE COURT:  Assuming that you're correct for

9    the sake of argument, how does that defend against their

10   motion for discovery sanctions for your alleged failures to

11   follow court orders and supply discovery?

12               MR. PURCELL:  I don't think so because the

13   court orders don't address those documents from the other

14   case, I don't think, Judge.

15               THE COURT:  I mean if it's just, you know, a

16   mud-slinging contest, that's -- that makes no sense to me.

17   They've produced tons of exhibits, you've produced tons of

18   exhibits but the issues here are very clear, the issues are

19   whether there was a failure to produce discovery after two

20   court orders, my court order and Judge Hurd's court order,

21   and whether there were other discovery abuses in terms of the

22   way material was objected to and other issues in the

23   discovery.

24               This discovery, this case has been a nightmare

25   almost from the very beginning.  There's more work in this

1  case than in any other 10 cases I've ever handled, I've been

2  on the bench for 20 years.  This case is unbelievably complex

3  because of minutia, tons and tons of minutia and

4  distractions.  But if you want, I'm going to allow you to

5  call Mr. Landsman --

6                    MR. PURCELL:  No.

7                    THE COURT:  -- despite the fact that he is not

8  on the witness list, because this is the only hearing we're

9  going to have.  After this, it's decision time.

10                   MR. PURCELL:  I think I've made my point, your

11  Honor, and you understand it and that's sufficient.

12                   THE COURT:  Mr. Landsman, would you step

13  forward, please.  I'm going to allow him to take your

14  testimony.

15                   MR. LANDSMAN:  I thought he was saying he

16  doesn't --

17                   THE COURT:  You withdraw it?

18                   MR. PURCELL:  I withdraw it, Judge, I mean I

19  made my point with you and I think you understand it and you

20  know --

21                   THE COURT:  But don't be dissuaded by my view.

22  I am going to look through all of the exhibits, if you want

23  to have Mr. Landsman testify, I'm giving you that

24  opportunity.  Don't come back in and say, well, you know, you

25  didn't want to hear his testimony.  I'll hear whatever proof

Kim Landsman - Direct by Mr. Purcell                163

1    you want to present.

2                  MR. PURCELL:  We'll put him on then.

3                  THE COURT:  All right.  Looks like I persuaded

4    him to have you testify.

5                  THE CLERK:  Please raise your right hand.

6                  MR. LANDSMAN:  Thank you, your Honor.

7

8                  K I M   J .   L A N D S M A N , called as a

9    witness and being duly sworn, testifies as follows:

10                  DIRECT EXAMINATION BY MR. PURCELL:

11         Q    Mr. Landsman, do you have a copy of the

12    protective order in the TTAB proceeding there, Exhibit 35?

13         A    It's not marked but this is what it is, yes.

14         Q    And referring to the bottom of Page 23.

15         A    Yes.

16         Q    Is it your position that this paragraph 11

17    prohibited the parties from using documents produced in the

18    TTAB proceeding in the instant lawsuit?

19                  MR. LANDSMAN:  Your Honor, he's asking for my

20    legal opinion on that.  I think he can ask questions about

21    facts but not about my legal position in light of what the

22    court order says.

23                  THE COURT:  Well, obviously I'll have to look

24    at this and interpret it, but let me hear your view about

25    that.

Kim Landsman - Direct by Mr. Purcell                    164

1          A     This protective order said that disclosure of

2     information would be only in the prosecution of the offense

3     in the TTAB case.  Therefore my position was that your

4     objection that it had been produced before was ill-founded,

5     it was then a series of correspondence going back and forth

6     in which you offered finally to let us use the information

7     that had been produced in the TTAB proceeding and we accepted

8     that finally as a way of essentially deeming the documents

9     reproduced in this case so that they could be used.

10         Q     All right.  Mr. Landsman, you said it's

11    intended to be used only in the prosecution, that's not what

12    this order says, is it?  It says disclosure of information

13    protected under the terms of this order is intended only to

14    facilitate the prosecution or defense of this case.  There's

15    nothing which says, and it shall not be used for any other

16    purpose; doesn't say that, does it?

17         A     First of all, Mr. Purcell, I'm not sure that

18    this is the only document, I would have to go back to my

19    files to see what else was happening.  I know that there was

20    some extensive -- I recall there being some extensive back

21    and forth about the terms of this, and I would have to look

22    to that to interpret this, but in an -- more direct answer to

23    your question, I did not believe that I was entitled to use

24    discovery that was produced in the TTAB under the terms of

25    this order directly in this case, at least not without the

Kim Landsman - Direct by Mr. Purcell                    165

1    explicit stipulation of the plaintiff to do that.

2              Q    The plaintiff meaning Mr. Haritatos?

3              A    Yes.

4              Q    Meaning me as his representative?

5              A    The plaintiff, yes.

6              Q    Do you recall ever specifically asking for

7    that type of permission?

8              A    Excuse me?

9              Q    Do you ever recall specifically asking for

10   that type of permission from the plaintiff in this lawsuit,

11   can we use the information, documents from the TTAB

12   proceeding in this lawsuit, do you have any objection to

13   that?

14             A    If you'll let me look at the exhibits,

15   Mr. Purcell, I could give you an answer to that question much

16   more specifically because --

17             Q    Do you have any recollection --

18             A    -- because --

19             THE COURT:  Hey, hold it, hold it, hold it,

20   stop.  When he's answering a question, let him finish; when

21   you're asking a question, he'll let you finish.

22             THE WITNESS:  I would like to be able to look

23   at the correspondence in order to give my best answer to that

24   question.

25             THE COURT:  All right, that's sufficient.

Kim Landsman - Direct by Mr. Purcell                166

1          Q    What is your best answer without looking at

2     the document?

3               MR. LANDSMAN:  Your Honor, I would not like to

4     speculate.  I know that there was correspondence in which

5     Mr. Purcell made that offer, I do not recall whether we had

6     asked for it beforehand or not.

7          Q    Do you recall there was an informal agreement

8     that we could use that or that Hasbro could use that

9     information in this lawsuit?

10         A    I recall your making that offer in a letter,

11    Mr. Purcell, and I recall our accepting it because we really

12    didn't have really much of any alternative other than to go

13    to the court and it seemed the best thing to do to accept

14    that.

15         Q    Do you recall instructing any associates in

16    your firm such as Michael Sant'Ambrogio that he could not use

17    the information or the documents from the Trademark Office

18    proceeding in this lawsuit?

19         A    I'm going to refuse to answer that on the

20    grounds of work product privilege.

21         Q    If Mr. Sant'Ambrogio had used --

22              MR. HUGHES:  Your Honor, you've already

23    overruled the work product objection.

24              THE COURT:  I'll allow that.  This is -- this

25    whole line of questioning is tangential, I'm doing it only as

1   a courtesy to Mr. Purcell, so I'm not going to allow it to

2   get out of hand.  Sorry.

3                    (Whereupon the question was read.)

4            A    If the judge orders me to answer, I will

5   answer.

6                    THE COURT:  I'm not going to do that.

7            Q    Oh, I thought you -- okay.  All right.  If

8   Mr. Sant'Ambrogio had used information or documents from the

9   TTAB proceeding in this lawsuit, would that in your opinion

10  be a violation of the TTAB order?

11                   MR. LANDSMAN:  Your Honor, I'm not here as a

12  legal expert.

13                   THE COURT:  Sustained, I'm not going to allow

14  that.  If you have any fact questions, ask them but I'm not

15  going to allow him to give legal opinions about other

16  documents and things like that, that's not the purpose of

17  this hearing.

18                   MR. PURCELL:  Should I try to say what was his

19  state of mind, Judge, if that would help out?

20                   THE COURT:  No, I don't think so.

21           Q    All right.  Mr. Landsman, you realize that the

22  protective order with TTAB relates at most to information and

23  documents that's been designated confidential, correct?

24           A    My recollection, Mr. Purcell, is that you

25  blanketly labeled everything confidential that you produced.

1    I may be wrong about some particulars but that was my

2    recollection.

3              Q    You may be very wrong about that, correct?

4              A    I may be very wrong?  The documents are here,

5    I haven't looked at them recently but that was my

6    recollection.

7              Q    So, contrary to what you told this court that

8    the TTAB protective order had a blanket prohibition of using

9    any information, documents in that lawsuit in this lawsuit,

10   you now are saying that at most the protective order of the

11   Trademark Office only pertained to information, documents

12   that a party had stamped as confidential, is that correct?

13             A    Mr. Purcell, I don't recall making that

14   statement to the court.  What I did state is that this says

15   that disclosure of information protected under the terms of

16   this order is intended to facilitate the prosecution or

17   defense of this action, and I interpreted that as I

18   previously told you.

19             Q    Did you --

20             A    This is all moot because, as you know, we did

21   eventually reach an agreement that we would use those

22   documents and those depositions in this case.

23             Q    Did you ever inform me as the plaintiff's

24   attorney words to the effect, don't use the information,

25   documents that Hasbro's already produced in the Trademark

1    Office proceeding in this instant litigation; did you ever

2    admonish me that?

3              A    I don't recall the subject ever coming up,

4    Mr. Purcell.

5                   MR. PURCELL:  All right.  No further

6    questions.

7                   MR. LANDSMAN:  I don't have any.

8                   THE COURT:  All right.  You're excused.

9                   (Whereupon the witness was excused.)

10                  THE COURT:  Okay.  Anything further from

11   plaintiff?

12                  MR. PURCELL:  Nothing further, your Honor.

13                  THE COURT:  Proof is closed on both sides.

14   Any rebuttal?

15                  MR. LANDSMAN:  Excuse me?

16                  THE COURT:  Anything further from the moving

17   party?

18                  MR. LANDSMAN:  No, but we could hand up the

19   demonstratives if that would be helpful.  I've given a copy

20   to counsel for plaintiff already.

21                  THE COURT:  What I tentatively intend to do is

22   review all these documents and portions of the testimony and

23   render an oral decision within two or three weeks.  I'll

24   issue it from the bench and you're invited to attend and

25   listen to it.  I would think that about three weeks, maybe

1    three weeks from today which would be Tuesday, the 25th.  Any

2    conflicts in your schedule that you know of?

3                    MR. LANDSMAN:  I don't have any conflicts,

4    your Honor.

5                    THE COURT:  Mr. Purcell?

6                    MR. PURCELL:  What date is that again, your

7    Honor?

8                    THE COURT:  Tuesday, the 25th, three weeks

9    from today.

10                   MR. PURCELL:  I think that's okay, Judge.

11                   THE COURT:  All right.  I'm not sure whether

12   it will be the morning or the afternoon, I would think the

13   afternoon, but that's when I'm going to issue the decision.

14   Anything further that either side needs to submit?

15                   MR. LANDSMAN:  I will need to go back and

16   check my file to see if the document about the protective

17   order TTAB is the whole thing or not and that would be the

18   only thing I would.

19                   THE COURT:  All right.  I'll allow a further

20   submission on that.

21                   MR. LANDSMAN:  And then --

22                   THE COURT:  You say there was some agreement

23   to use the documents?

24                   MR. LANDSMAN:  It's in the correspondence,

25   there's just some back and forth about it, and your Honor, if

1    the motion is granted, we would ask for leave to then submit

2    our attorney fee application.

3                      THE COURT:  I was wondering if we can shorten

4    that up.

5                      MR. LANDSMAN:  Do you want us to do it

6    beforehand?

7                      THE COURT:  I guess, let's just wait until the

8    25th, that would be --

9                      MR. LANDSMAN:  If it suits the court's

10   convenience, we could certainly do it well before then.

11                     THE COURT:  You have the material almost

12   assembled?

13                     MR. LANDSMAN:  I was starting to go through it

14   and try to filter it out and redact it.  It would take

15   another few days and I'm going to be out most of this week

16   but I could do it next week.

17                     THE COURT:  All right.  Let's just hold off on

18   that.  Anything further?

19                     MR. PURCELL:  Yes, your Honor.  Some attempt

20   to try to move things along, we're still willing to get the

21   invoices for the billings for the Trademark Office

22   proceeding, we can either do our best to redact what we

23   believe is attorney-client privileged information, give it to

24   the other side, if they have any problems with it, send the

25   originals in to your Honor for an in-camera inspection and

1    order.

2                    THE COURT:  I don't want any in-camera

3    inspection at this point.  As I said before, the discovery in

4    this case has been astronomically voluminous, and part of

5    the -- part of what I tried to do is keep the discovery

6    moving without getting into the nitty-gritty of the massive

7    amount of applications that had been made which is overly

8    contentious litigation, something we're not used to in the

9    Northern District.  But I'll deal with the motion in front of

10   me on the 25th.  Okay.  If there's nothing further, court's

11   adjourned.  The clerk -- my best estimate is that it will be

12   at 2:00 on the 25th, I'll render the decision on the

13   plaintiff's -- on Hasbro's motion for sanctions.  All right.

14                    MR. LANDSMAN:  Thank you.

15                    THE COURT:  All right.  Thank you.

16                    THE CLERK:  Court is adjourned.

17                    (Court Adjourned, 4:23 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3

4              I, JODI L. HIBBARD, RPR, CRR, CSR, Official

5    Court Reporter in and for the United States District Court,

6    Northern District of New York, DO HEREBY CERTIFY that I

7    attended the foregoing proceedings, took stenographic notes

8    of the same, and that the foregoing is a true and correct

9    transcript thereof.

10

11

12

13

14

15

16

17                            _____

18                            JODI L. HIBBARD, RPR, CRR, CSR
                              Official U.S. Court Reporter
19

20

21

22

23

24

25


                     JODI L. HIBBARD, RPR, CRR, CSR
                            (315) 234-8547