**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SPERO HARITATOS,
                            :

               Plaintiff,    :       05 Civ. 930 (DNH/GJD)

                            :

         - against -       :

                            :

HASBRO, INC. and
TOYS "R" US-NY LLC,
                            :

                            :

             Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**APPENDICES A - L TO**
**MEMORANDUM OF LAW OF DEFENDANT HASBRO, INC. IN**
**OPPOSITION TO PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S**
**MEMORANDUM DECISION AND ORDER ASSESSING SANCTIONS**

Kim J. Landsman, Esq.
(Bar Roll No. 513,364)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone: (212) 336-2980
Facsimile: (212) 336-2985

## Unpublished Cases Cited

| App. A | Thompson v. Keane, No. 95 Civ. 2442 (SHS), 1996 WL 229887 (S.D.N.Y. May 6, 1996) |
|--------|---|
| App. B | Glendora v. Press, No. 1:07-CV-0940, 2007 WL 3254242 (N.D.N.Y. Nov. 2, 2007) |
| App. C | JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc., No. 03-CV-5562, 2005 WL 1958361 (S.D.N.Y. Aug. 16, 2005) |
| App. D | Gore v. The RBA Group, Inc., No. 03-CV-9442, 2008 WL 857530 (S.D.N.Y. March 31, 2008) |
| App. E | Source Enterprises, Inc. v. Tanners Ave. Corp., No. 04-CV-1788, 2004 WL 2471536 (Nov. 3, 2004) |
| App. F | Brignoli v. Balch, Hardy & Scheinman, Inc., No. 86-CV-4103, 1989 WL 146767 (S.D.N.Y. Dec. 1, 1989) |
| App. G | Tse v. UBS Fin. Servs., Inc., No. 03-CV-6234, 2008 WL 463719 (S.D.N.Y. Feb. 19, 2008) |
| App. H | Dunbar v. Ballymore Co., No. 88-CV-108, 1991 WL 273302 (N.D.N.Y Dec. 18, 1991) |
| App. I | Zahran v. First Union Bank, No. 01 CV 8922, 2007 WL 2962651 (N.D. Ill. Oct. 4, 2007) |
| App. J | Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections, -- F. 3d. -- , 2008.2008 WL 961313 (2d Cir. Apr. 10, 2008) |
| App. K | Lewis v. City of Albany Police Dep't, --- F.Supp.2d ----, No. 1:04-CV-152, 2008 WL 1826326 (N.D.N.Y. April 24, 2008) |
| App. L | Bundy American Corp. v. K-Z Rental Leasing, Inc., No. 00 CV 260, 2001 WL 237218 (N.D.N.Y. Mar. 9, 2001) |

# APPENDIX A

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1996 WL 229887 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 229887)

**H**
Thompson v. Keane
S.D.N.Y.,1996.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Terry Lee THOMPSON, Plaintiff,
v.
John P. KEANE, Superintendent of Sing Sing Cor-
rectional Facility, et al., Defendants.
No. 95 Civ. 2442 (SHS) (AJP).

May 6, 1996.

OPINION AND ORDER

STEIN, District Judge.
**\*1** Defendants object to an order of Magistrate
Judge Peck dated March 19, 1996 directing them to
produce certain documents withheld pursuant to the
"informer's privilege." Discovery matters generally
are considered nondispositive of the litigation and,
as such, are reconsidered by the district court only
"where it has been shown that the magistrate's order
is clearly erroneous or contrary to law."28 U.S.C. §
636(b)(1)(A); Fed.R.Civ.P. 72(a); *see also Thomas
E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525
(2d Cir.), *cert. denied,*498 U.S. 846, 111 S. Ct. 132,
112 L.Ed.2d 100 (1990); *Palmer v. Reader's Digest
Assoc., Inc.,* No. 84 Civ. 8397, 1995 WL 686737, at
*1 (S.D.N.Y. Nov. 20, 1995); *Dayton Monetary As-
soc. v. Donaldson, Lufkin, Jenrette Secs. Corp.,* No.
91 Civ. 2050, 1996 WL 209930, at *1 (S.D.N.Y.
Apr. 30, 1996).

A ruling is "clearly erroneous" only when "the re-
viewing court on the entire evidence is left with the
definite and firm conviction that a mistake has been
committed."*Palmer,* 1995 WL 686737, at *1
(quoting *United States v. United States Gypsum
Co.,* 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92
L.Ed. 746 (1948))."An order is contrary to law
when it fails to apply or misapplies relevant stat-
utes, case law or rules of procedure."*Securities And*

*Exchange Comm'n v. Thrasher,* No. 92 Civ. 6987,
1995 WL 456402, at *12 (S.D.N.Y. Aug. 2, 1995).
Magistrate Judges are given broad latitude in
resolving discovery disputes, including questions of
privilege. *See Alpex Computer Corp. v. Nintendo
Co., Ltd.,* No. 86 Civ. 1749, 1992 WL 51534, at *1
(S.D.N.Y. Mar. 10, 1992).

After a review of defendants' objections, the relev-
ant documents and Magistrate Judge Peck's opinion
and order, this Court is unable to conclude that Ma-
gistrate Judge Peck's determination that the with-
held documents were not entitled to the protection
of an "informer's privilege" was either clearly erro-
neous or contrary to law. Accordingly, the discov-
ery order of Magistrate Judge Peck dated March 19,
1996 is affirmed.

SO ORDERED.

S.D.N.Y.,1996.
Thompson v. Keane
Not Reported in F.Supp., 1996 WL 229887
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX B

**Westlaw.**

Slip Copy                                                                                                           Page 1
Slip Copy, 2007 WL 3254242 (N.D.N.Y.)
**(Cite as: Slip Copy, 2007 WL 3254242)**

C
Glendora v. Press
N.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
GLENDORA, Plaintiff,
v.
Eric W. PRESS, Defendant.
**No. 1:07-CV-0940 (NAM)(RFT).**

Nov. 2, 2007.

Glendora, pro se.

**DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District
Judge.

**I. Background**

**\*1** Currently before the Court is a motion from
plaintiff Glendora (1) objecting to the Order signed
by Magistrate Judge Randolph F. Treece striking
plaintiff's motion for default judgment (Dkt. No. 5
at 1-25);(2) objecting to the return of certain papers
she submitted to the Clerk of the Court and seeking
a refund of the filing fee (*id.* at 26-32) and (3) for
reconsideration of this Court's Order dated October
9, 2007. *Id.* at 33-97.In addition to these requests,
plaintiff has included in her submission what ap-
pear to be discovery requests, or notices to admit,
addressed to Magistrate Judge Treece, the Clerk of
the Court, and the undersigned. *See*Dkt. No. 5 at
3-11, 18-23, 25-29, 37-61, and 67-97.

Plaintiff commenced this action by filing a *pro se*
Complaint against defendant Press, a City Court
Judge in the City of White Plains, New York, re-
garding plaintiff's dissatisfaction with court pro-
ceedings presided over by Judge Press in August
2007. *See*Dkt. No. 1. In its October 9, 2007 Order,
the Court found that:

With respect to Eric Press, the law in this Circuit

clearly provides that "[j]udges enjoy *absolute im-
munity* from personal liability for 'acts committed
within their judicial jurisdiction.' " *Young v. Selsky,*
41 F.3d 47, 51 (2d Cir.1994) (emphasis added)
(quoting *Pierson v. Ray,* 386 U.S. 547 (1967)).
"The absolute immunity of a judge applies however
erroneous the act may have been, and however in-
jurious in its consequences it may have proved to
the plaintiff." *Young,* 41 F .3d at 51 (internal quota-
tions omitted).

Dkt. No. 3 at 2. Accordingly, Judge Press was dis-
missed as a party to this action. *Id.* at 3. In light of
plaintiff's *pro se* status, and because it was unclear
whether plaintiff was attempting to assert claims
against other parties,[FN1] plaintiff was provided
with an opportunity to submit an amended com-
plaint to the Court. *Id.* After submitting her original
complaint, plaintiff also submitted to the Court for
filing a motion seeking default judgment against
defendant Press. By Order of Magistrate Judge
Randolph F. Treece filed on October 10, 2007,
plaintiff's motion for default judgment was stricken
from the docket as prematurely filed because de-
fendant Press had yet to be served with the sum-
mons and complaint. Dkt. No. 4. Plaintiff has now
submitted the present motion. Dkt. No. 5.

FN1. It appears that plaintiff does not in-
tend to name any other defendants. *See*Dkt.
No. 5 at 47.

**II. Discussion**

**A. Objection to Magistrate Judge Treece's Or-
der**

Plaintiff objects to the Order of Magistrate Judge
Treece filed on October 10, 2007, *see*Dkt. No. 4,
which directed that plaintiff's motion for default
judgment be stricken from the docket as premature.
Dkt. No. 5 at 5-23.Federal Rule of Civil Procedure
("Fed. R. Civ.P.") 72(a) states:

Within ten (10) days after being served with a copy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the magistrate judge's order [on a nondispositive issue], a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made. The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law.

*2 Fed.R.Civ.P. 72(a).

The Court has reviewed the Order dated October 10, 2007, and finds that it is not clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A). Plaintiff contends that her motion for a default judgment against defendant Press was not premature because she herself served defendant Press by first class mail on August 22, 2007, with a copy of her complaint and two copies of a waiver of service. Dkt. No. 5 at 18. Plaintiff's argument is wholly without merit. In the first instance, plaintiff's "service" was itself premature since plaintiff did not actually commence this action until September 9, 2007. Moreover, plaintiff does not allege that defendant Press actually **signed** and returned the waiver of service to plaintiff. While failure to sign and return a waiver of service may result in a defendant later incurring costs for personal service, such failure does not subject the recalcitrant defendant to the jurisdiction of the Court and does not constitute service. *See* Fed.R.Civ.P. 4(d)(2). In order to obtain jurisdiction over a defendant who has not signed a waiver of service, a plaintiff is required to actually serve the defendant **with a summons and complaint;** something that plaintiff in this case did not do. *See* Fed.R.Civ.P. 4.

Besides objecting to the terms of Magistrate Judge Treece's Order itself, plaintiff seems to object to Magistrate Judge Treece's jurisdiction to take action in this case. Plaintiff challenges Judge Treece's jurisdiction on the basis that she did not consent in writing to having a magistrate judge act in her case. Plaintiff's argument is misplaced. While it is true that a magistrate judge has no authority to deal with

dispositive matters in an action unless all of the parties to the action consent to such jurisdiction in writing, *see* 28 U.S.C. § 636(c), the same does not hold true as to non-dispositive matters. 28 U.S.C. § 636(b)(1)(A) states that, with certain exceptions not relevant to the present discussion, "a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court ...." Accordingly, Magistrate Judge Treece, as the magistrate judge assigned to this case, had full authority to issue the Order striking plaintiff's premature motion for default judgment.

Accordingly, plaintiff's objections to the Order dated October 10, 2007, are denied and the Order is affirmed.

**B. Objection to action by the Clerk and request for refund of filing fee**

Upon filing her complaint, plaintiff paid the statutory filing fee for this action. Plaintiff now seeks a refund of the filing fee. Dkt. No. 5 at 31. Plaintiff requests the refund because, among other things, she feels that the Clerk of the Court improperly returned papers to her which she wished to have filed in her action.[FN2] *See id.* at 26-27. Plaintiff contends that this action resulted in a "consumer fraud" and "false advertising" because "you [the court] are advertised as a 'court' (you are not) and [the clerk] as a 'clerk' (you are not) and as giving justice (you have not)." *Id.* at 31.

> FN2. Plaintiff also complains that her case was assigned to the undersigned, whose chambers are located in Syracuse, New York. Plaintiff says that she "did not file her case in Syracuse. She filed her case in Albany. She did not give [the Clerk] jurisdiction to move it to Syracuse. She has the right to chart her own litigation." Dkt. No. 5 at 29. Plaintiff is advised that cases filed in the Northern District of New York are randomly assigned to a District Judge and a Magistrate Judge. All of the judges in the

Northern District of New York have juris-diction to hear cases anywhere within the District.

**\*3** In the first instance, the papers which were pre-viously returned to plaintiff, which were captioned for Supreme Court, Westchester County, were un-derstandably and properly returned to the plaintiff as a courtesy since it appeared that plaintiff had mis-directed them. Plaintiff has now returned the papers to the Court and has clearly evinced her in-tent that they be filed as papers in support of her action. Dkt. No. 5 at 26.The Clerk has now filed the papers as supplemental papers in support of plaintiff's action.

Turning to plaintiff's request for a refund of the fil-ing fee, there is no basis upon which the Court can reasonably conclude that plaintiff is entitled to a re-fund of her filing fee. *See, e.g. Goins v. DeCaro,* 241 F.3d 260, 261 (2d Cir.2001) ("fee paying litig-ants have no opportunity to obtain a refund of their filing fees in the event that they withdraw their ap-peals"); *Lucien v. DeTalla,* 141 F.3d 773, 775 (7th Cir.1998) ("Filing fees are part of the costs of litig-ation"); *Bell v. Clark,* 194 F.3d 781, 782 (7th Cir.1999) ("no refund of filing fee just because an appellant, petitioner, or other seeker of judicial re-view is dissatisfied with the outcome of his quest."); *Bresette v. Buffalo-Reyes,* No. 06-C-338-C, 2006 WL 3017256, at \*1 (W.D.Wis. Aug. 7, 2006) ("There is no provision in the Federal Rules of Civil Procedure or in any statute enacted by Congress that authorizes a district court to re-fund a filing fee in instances where the case is closed following a ruling by the judge.") (citing *Bell,* 194 F.3d at 782)). Accordingly, plaintiff's re-quest that the filing fee be refunded is denied.

**C. Motion for reconsideration**

Plaintiff has also moved for reconsideration of this Court's Order dated October 9, 2007, which dis-missed defendant Press and granted plaintiff per-mission to submit an amended complaint should she wish to proceed with this action. Dkt. No. 5 at 33-97.

A court may justifiably reconsider its previous rul-ing if: (1) there is an intervening change in the con-trolling law; (2) new evidence not previously avail-able comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent manifest injustice. *Delaney v. Selsky,* 899 F.Supp. 923, 925 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Doe v. New York City Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir.), *cert. denied,*464 U.S. 864 (1983)).

The standard for granting a motion for reconsidera-tion is strict. *See Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995)."A motion for recon-sideration may not be used to advance new facts, is-sues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigat-ing issues already decided by the Court."*Davidson v. Scully,* 172 F.Supp.2d 458, 461 (S.D.N.Y.2001) (citing *Shrader,* 70 F.3d at 257). In other words, "[a] motion for reconsideration is not to be used as a means to reargue matters already argued and dis-posed of by prior rulings or to put forward addition-al arguments that a party could have made but neg-lected to make before judgment."*Brown v. Mid-daugh,* No. 96-CV-1097, 1999 WL 242662, \*1 (N.D.N.Y. Apr. 21, 1999) (citation omitted).

**\*4** Plaintiff has not indicated upon which justifica-tion she bases her motion for reconsideration. However, because plaintiff rehashes her previous arguments against Judge Press and does not suggest either that there has been an intervening change in the controlling law or that she has discovered new evidence, the Court assumes that plaintiff seeks to argue that reconsideration is necessary to remedy a clear error or law or to prevent manifest injustice. Based upon the Court's review of the relevant law and its application to the facts of this case, the Court concludes that its previous decision was leg-ally correct and did not work a manifest injustice on plaintiff. Accordingly, the Court denies plaintiff's motion for reconsideration of the Order dated October 9, 2007.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 4
Slip Copy, 2007 WL 3254242 (N.D.N.Y.)
**(Cite as: Slip Copy, 2007 WL 3254242)**

**D. Notices to admit**

With respect to plaintiff's questions directed to Magistrate Judge Treece, the Clerk of the Court, and the undersigned, the requests are wholly improper. None of the aforesaid parties are defendants to this lawsuit and are therefore not subject to discovery.

**E. Amended complaint**

By this Court's Order dated October 9, 2007, plaintiff was given permission to submit an amended complaint within thirty days of the filing date of that Order. Plaintiff's time to submit an amended complaint will expire on November 8, 2007. In light of plaintiff's *pro se* status, the Court will grant plaintiff an extension of time until **December 10, 2007,** to submit an amended complaint if she wishes to do so. **Failure of plaintiff to submit an amended complaint by December 10, 2007, will result in dismissal of this action without further order of this Court.**

In the event that plaintiff does submit an amended complaint, plaintiff is advised that the amended complaint **must comply with the Local Rules of Practice of the Northern District of New York, including Rule 10.1(a) which requires that all papers submitted to the Court be "single sided and double-spaced."** Rule 10.1(a) also states that "[d]ocuments that do not comply with [its] requirements may be rejected upon order of the Court."

WHEREFORE, after reviewing plaintiff's submissions and the applicable law, and for the reasons stated herein, it is hereby

ORDERED that plaintiff's objections to Magistrate Judge Treece's Order dated October 10, 2007, are **DENIED** and the Order dated October 10, 2007, is **AFFIRMED,** and it is further

ORDERED that plaintiff's request for a refund of the filing fee for this action is **DENIED;** and it is further

ORDERED that plaintiff's motion for reconsideration of the Order dated October 9, 2007, is **DENIED,** and it is further

ORDERED that plaintiff may file an amended complaint, if any, **on or before December 10, 2007,** and it is further

ORDERED that if plaintiff fails to file an amended complaint on or before December 10, 2007, the Clerk is directed to enter judgment dismissing this action **without further order of the Court,** and it is further

**\*5** ORDERED that, in view of this Court's findings on the insufficiency and/or deficiency of the complaint herein, plaintiff is directed **not** to file any other motion until an amended complaint is submitted to the Court and approved for filing, and it is further

ORDERED, that upon full compliance by plaintiff with this Order as directed above, the file in this matter be returned to the Court for further review, and it is further

ORDERED that the Clerk serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

N.D.N.Y.,2007.
Glendora v. Press
Slip Copy, 2007 WL 3254242 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX C

Westlaw.

Not Reported in F.Supp.2d                                                            Page 1
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

**H**

JSC Foreign Economic Association Technostroyexport v. International Development and Trade Services, Inc.
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
JSC FOREIGN ECONOMIC ASSOCIATION TECHNOSTROYEXPORT, Plaintiff,
v.
INTERNATIONAL DEVELOPMENT AND TRADE SERVICES, INC., et al., Defendants.
**No. 03Civ.5562JGKAJP.**

Aug. 16, 2005.

*OPINION AND ORDER*

PECK, Chief Magistrate J.
*1 Plaintiff JSC Foreign Economic Association Technostroyexport ("JSC") submitted Proposed Findings of Fact and Conclusions of Law to further support this Court's prior award from the bench of attorneys' fees against defendant Brigette R. Jossem ("Jossem") for failing to produce relevant documents in response to JSC's discovery requests. Defendant Jossem filed an Opposition to Plaintiff's Proposed Findings of Fact and Conclusions of Law. (Dkt. No. 427.)

For the reasons set forth below, the Court awards plaintiff JSC attorneys' fees of $108,946 against Jossem pursuant to Fed.R.Civ.P. 37 and, to the extent necessary, the Court's inherent power.

*FINDINGS OF FACT*

JSC seeks sanctions against Jossem for failing to produce documents concerning, *inter alia,* Jossem's involvement with Christie's, the famed auction house.

Jossem has been a regular customer of Christie's

since approximately 1993, when she began to make auction purchases with money that JSC alleges was looted by Jossem's mother, defendant Edith Reich, from defendant IDTS. (*See* JSC Findings of Fact ["FOF"] ¶ 1.)[FN1] In July 1996, four months after the arbitration awards in the underlying case between JSC and defendant IDTS became final, Jossem, who until that time maintained a Christie's account in her own name, directed Christie's to use the name Burnett Trading Ltd. for all future transactions. (JSC FOF ¶ 2; Tiska Aff. Ex. 2: Dep. Ex. Christie's 19.) Jossem told Christie's that the name change was an "extremely urgent matter" and directed that the name Jossem "should not be associated with any stock number whatsoever" in Christie's computerized files. (Tiska Aff. Ex. 2: 7/11/96 Christie's Message.) From 1996 until the end of 2003, Jossem, using the name Burnett Trading, sold items at Christie's for more than $9.1 million and made purchases of about $1.7 million. (JSC FOF ¶ 3 n. 2; Tiska Aff. Ex. 4: Christie's Sale Summaries.)

> FN1. The Court notes that although defendant Jossem was directed to submit counter-proposed Findings and Conclusions (*see*Dkt. No. 423: 12/6/04 Peck Order), Jossem did not submit any proposed Findings of Fact, but merely argued that plaintiff JSC was not entitled to sanctions as a matter of law. (*See*Dkt. No. 427: Jossem Opposition.)

On October 16, 2003, JSC served its first request for production of documents in this action. (JSC FOF ¶ 4; Tiska Aff. Ex. 7: JSC First Request for Production of Documents.) Among other things, JSC requested the following:

58. All documents concerning any purchase or sale by Reich, Jossem or Barnett Trading through Christie's or Sotheby's.

....

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

92. Documents sufficient to identify all artwork, jewelry or other items purchased or sold by Reich, Jossem or B[u]rnett Trading through Christie's or Sotheby's.

....

94. Documents sufficient to show the disposition of funds received by Reich, Jossem or B[u]rnett Trading for any sale of artwork, jewelry or other item through Christie's or Sotheby's.

(*Id.*)

On November 12, 2003, a little over a month after the first discovery request, Jossem stopped using the name Burnett in her dealings with Christie's and entered into a new consignment agreement under the name Hackney Group Limited ("Hackney"). (JSC FOF ¶¶ 5-6; Tiska Aff. Ex. 9: Hackney Consignment Agreement.) In December 2003, Jossem attempted to consign belongings from her East 72nd Street residence to Christie's under the Hackney name, with the help of one of her foreign attorneys, Michael Shine. (JSC FOF ¶ 7; Tiska Aff. Ex. 3: McGorry Dep. at 71-73.) In light of this lawsuit, however, Christie's declined to enter into the agreement with Hackney, and Jossem was forced to use her own name in the transaction. (*Id.* at 71-73, 75-76; Triska Aff. Ex. 12: 1/15/2004 Jossem Consignment Agreement.) In January 2004, Jossem met with Edward McGorry and Simon Teakle, executives at Christie's, and informed them that "she was going to be consigning property to Christie's over the course of the next few months, and would like an advance against those funds."(JSC FOF ¶ 9; Tiska Aff. Ex. 3: McGorry Dep. at 54, 66.) A few days after the meeting with McGorry and Teakle, Jossem met with Melissa Gagen, a Christie's representative, to show her the furniture that she wished to consign, as well as the receipts for the many pieces she had purchased at Sotheby's auctions in England in 1993. (JSC FOF ¶ 10; Tiska Aff. Ex. 3: McGorry Dep. at 104-05; Tiska Aff. Ex. 13: Gagen Aff. ¶ 4.) Gagen told Jossem in a January 24, 2004 letter that Christie's would include most of Jossem's

items in furniture auctions scheduled for April 8 and May 19, 2004. (Tiska Aff. Ex. 14: Gagen Letter.) [FN2]

> FN2. Jossem never produced any of the documents relating to any of her 2003-2004 dealings with Christie's or Sotheby's. (JSC FOF ¶ 11 .)

**\*2** Despite an Order to Show Cause for an attachment order signed by Judge Koeltl on February 3, 2004 and sent to counsel for Jossem that day, on February 4, 2004, Jossem arranged for another Christie's advance for $275,000 against twenty-one pieces of furniture. (JSC FOF ¶ 12; Tiska Aff. Ex. 15: 2/4/2004 Advance.) On February 10, 2004, Jossem's counsel Shine sent Christie's McGorry an e-mail providing him with "the bank co-ordinates for remitting the advance proceeds from time to time in the current situation," and directed Christie's to wire the funds to an account in the name of "Herzog, Fox Neeman" at the United Mizrahi Bank in London. (JSC FOF ¶ 13; Tiska Aff. Ex. 16: 2/10/2004 Shine e-mail; Tiska Aff. Ex. 3: McGorry Aff. at 158-60.) On February 12, 2004, Christie's wired $275,000 to the Herzog, Fox Neeman's London account. (JSC FOF P13; Tiska Aff. Ex. 17.) No documents concerning these transactions were produced to JSC by Jossem. (JSC FOF ¶ 13.) Herzog, Fox Neeman is defendants' Israeli law firm, which acted more as a banker than as counsel.

Over the next month, Jossem continued to dispose of her property through Christie's, receiving another advance of $165,000 which Christie's wired to the Herzog, Fox Neeman account. (JSC FOF ¶ 14; Tiska Aff. Ex. 17.) On March 13, Judge Koeltl issued the Attachment Order and notified counsel for Jossem. (JSC FOF ¶ 15; Tiska Aff. Ex. 21: 3/13/04 Attachment Order.) However, on March 17, 2004, Jossem ignored the order and consigned jewelry and art to Christie's and arranged for yet another advance of $180,000 from Christie's into the Herzog, Fox Neeman account. (JSC FOF ¶ 15; Tiska Aff. Ex. 3: McGorry Dep. at 139-40, 141-43; Tiska Aff. Ex. 22: 3/17/2004 Advance.) All told,

Not Reported in F.Supp.2d                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

Christie's paid Jossem $970,000 in advances under the January 15, 2004 Consignment Agreement, all of which Christie's wired overseas at Jossem's direction to accounts not in Jossem's name. (JSC FOF ¶ 15; Tiska Aff. Ex. 22.)

On April 2, 2004, the United States Marshal Service served Jossem with the Attachment Order. (JSC FOF ¶ 16; Tiska Aff. Ex. 23: 4/2/2004 Attachment Order.) On April 8, Jossem allowed Christie's auction of her furniture to go forward and two of her items were sold, although the funds remain at Christie's pursuant to an agreement among Christie's, JSC and defendants in connection with this suit. (JSC FOF ¶ 16; Tiska Aff. Ex. 26: 2d Am. Garnishee's Statement; Tiska Aff. Ex. 27, Ex. A: 4/16/2004 Christie's Agreement.)

After JSC had learned that Jossem had consigned property to Christie's, supplemental discovery requests were served on Christie's, which led to the production of approximately 3,000 documents relating to Christie's dealings with Jossem, Burnett, and Hackney. (JSC FOF ¶ 17.) On April 20, 2004, JSC served its second request for production of documents on Jossem. (JSC FOF ¶ 17; Tiska Aff. Ex. 28.)

JSC also filed an ex parte motion for a supplemental order in aid of the attachment order, which Judge Koeltl granted, authorizing JSC and the U.S. Marshal to seize Jossem's personal property at her East 72nd Street Manhattan apartment and her home in Amagansett. (JSC FOF ¶ 18.) During the seizure, JSC's counsel found "hundreds of documents relating to transactions between Ms. Jossem and various auctions houses, including Christie's and Sotheby's. Some of those documents involved or related to Burnett Trading.... Ms. Jossem has never produced any documents in this action regarding her transaction with Christie's, Sotheby's or any other auction house. No documents concerning Ms. Jossem's dealings or involvement with Christie's, Sotheby's or Burnett were produced to [JSC] in this action before Christie's April 2004 production."(Tiska Aff. Ex. 29: Dunn Aff. ¶ 19.) Defense counsel, however,

prevented JSC's counsel from taking the documents found in the apartment.

**\*3** On May 14, 2004, JSC moved for an order holding Jossem in contempt based on her violations of the attachment order and seeking sanctions for her failure to produce documents; Judge Koeltl referred that motion to this Court. (Tiska Aff. Ex. 1: 5/14/2004 Koeltl Conf. at 15-18.) At the May 21, 2004 conference before this Court, JSC raised Jossem and Reich's failure to produce the responsive documents found in defendants' Manhattan apartment-in essence, seeking to compel the production of the Apartment Documents. (Dkt. No. 197:5/21/2004 Peck Conf. Tr.; *see* JSC FOF ¶ 20.) During the conference, this Court ordered that (1) any assertion of the Fifth Amendment by defendants "needs to be a sufficiently asserted Fifth Amendment privilege that the court can rule on, not just a blanket, I assert the Fifth now, find me 6 weeks later ..."; and (2) to the extent any of the documents in the apartment were covered by JSC's first document request, all objections were "waived ... no new objections so to speak."(*Id.* at 11-12, 21;*see* JSC FOF ¶ 20.)

On June 14, 2004, however, Jossem's counsel (David Newman of the firm Sonnenschein Nath & Rosenthal) submitted a letter to the Court on behalf of Jossem and Reich, stating simply:

My clients object to the requests to the extent that they seek documents or information that might tend to incriminate them and whose required production would violate their constitutional rights pursuant to the Fifth Amendment of the United States Constitution.

In light of the foregoing, my clients will not be producing any documents at this time. (Tiska Aff. Ex. 31: 6/14/2004 Newman Letter; *see* JSC FOF ¶ 21.) The letter, obviously, did not comply with the Court's directive.

The issue was next raised at the June 28, 2004 conference with the Court. (*See* 6/28/04 Peck Conf.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

Tr.; *see also*Dkt. No. 378: Kawatra Aff. Ex. A: 6/24/04 Tiska Letter to Court.) Because JSC asserted that Jossem's predecessor counsel waived any Fifth Amendment privilege, the Court required Jossem to submit an affidavit from predecessor counsel as to whether the Fifth Amendment privilege was asserted or waived in conversations with JSC's counsel in response to the first document requests. (Dkt. No. 292: Delfin Aff. Ex. B: 6/28/04 Peck Conf. Tr. at 6-8.) Jossem's counsel also was directed to personally review the thousands of withheld Apartment Documents and put in further submissions supporting the Fifth Amendment assertion. (*Id.* at 10-12, 16-18.)The Court also specifically warned Jossem's counsel that if the Court had to review many documents to see if the privilege claim was valid and if Jossem lost on the issue, Rule 37 cost sanctions would be imposed. (*Id.* at 18.)After that conference, JSC submitted additional information which the Court required Jossem's counsel to respond to. (Delfin Aff. Ex. C: 7/2/04 Memo Endorsed Order.) The Court also directed Jossem to provide a formal privilege log and to provide the withheld Apartment Documents to the Court for *in camera* review. (Delfin Aff. Ex. D: 7/12/04 Memo Endorsed Order.)

**\*4** At the next conference, on July 15, 2004, this Court again took up the issue of the four boxes of Apartment Documents that defendant Jossem was declining to produce on Fifth Amendment grounds. (*See generally* Delfin Aff. Ex. E: 7/15/04 Peck Conf. Tr. at 17-28.) The Court noted that based on its review of one box of withheld documents, many of the documents appeared to be corporate documents, and corporations have no Fifth Amendment privilege.(*Id.* at 17-18.)The Court noted that Jossem's "privilege log" was not sufficient to support her Fifth Amendment claim. (*Id.* at 19.)When Jossem's counsel responded that while a "lot of these documents, as you are aware, appear to be corporate documents because of the letterhead.... But the fact of the matter is is that this is an alter ego case and possession-" (*id.* at 22-23), the Court responded that "[w]hat you are basically saying is if

I [order you to] produce any of these documents I may help prove the plaintiff's [alter ego] case," but that is not a basis to assert the Fifth Amendment.(*Id.* at 23.)Because Jossem's prior counsel, Williams & Connolly, had represented in response to the first document request that no documents were withheld on the basis of the Fifth Amendment privilege, the Court ruled that it needed an affidavit as to when Jossem obtained the Apartment Documents, and whether the subjects of the Apartment Documents were the same as any documents that Williams & Connolly actually provided:

THE COURT: Give me an affidavit from Ms. Reich or Ms. Jossem or anybody else with direct, personal knowledge as to when these documents came into their custody, as compared to the date that Williams and Connolly made their representation that they were not withholding any documents on the basis of the Fifth Amendment.

In addition, I want an affidavit from counsel stating that you have reviewed the prior document production and whether these documents are on any of the same subject matters or the same issues of fear of criminal prosecution. Because if so, then [the Fifth Amendment privilege is] waived.

(*Id.* at 25-26;*see also id.* at 27-28.)

On July 26, 2004, Jossem's counsel submitted an affidavit concluding "that of the 8,474 pages of documents that they initially claimed were privileged, close to 6,000 were, in fact, not privileged."(JSC FOF ¶ 27; *see* Delfin Aff. Ex. H: Akbar 7/26/04 Aff. ¶¶ 15-16; Kawatra Aff. Ex. C: Newman 7/26/04 Letter to Court.) Jossem, however, now claimed that some of the documents that were not protected by the Fifth Amendment were covered by the attorney-client privilege. (Akbar 7/26/04 Aff. ¶ 17; Newman 7/26/04 Letter to Court at 1.) Jossem's counsel also informed the Court that Jossem would not be providing an affidavit as to when she obtained possession of the Apartment Documents, but instead would be filing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

objections with Judge Koeltl. (JSC FOF ¶ 27; New-man 7/26/04 Letter to Court at 2.) In light of Jossem's objections, the Court issued a written order further explaining its reasoning, as follows:

**\*5** While Reich's and Jossem's prior counsel did not withdraw the general objection of Fifth Amendment privilege, he did represent to plaintiff's counsel that no responsive documents were being withheld on that basis. If defendants obtained possession of these documents at a later time, that withdrawal of the general objection, in fairness, should not apply to those documents. If, on the other hand, defendants possessed the documents now in issue, at that time, their counsel's representation that no documents were being withheld on Fifth Amendment grounds should apply to those documents and thus the documents would need to be produced. Counsel represents and speaks for the client, and if defendants withheld these documents from their counsel,[1] causing counsel to not assert the privilege, defendants should not obtain an advantage.

The Court notes moreover, that defendants and their current counsel were quite prepared to assert a blanket privilege as to all four boxes of documents, on an *ipsedixit* basis; only after the more careful review ordered by the Court were defendants forced to withdraw their privilege assertion as to 90% of the withheld documents. That, and other conduct by defendants, supports the Court's concern of "gamesmanship" by defendants Reich and Jossem.

The Court reiterates that absent some showing that defendants Reich and Jossem did not possess the withheld documents at the time their prior counsel represented to plaintiffs that no responsive documents were being withheld on Fifth Amendment privilege grounds, the documents need to be produced.[2]

[1] The "assuming *arguendo*" suggestion in defendants' objections that the earlier non-production was through "inadvertence" is totally unsupported by the record. It is as likely, if not more so, that defendants intentionally did not provide these docu-

ments to their counsel for review and production because the documents may be proof of plaintiff's alter ego claims.

[2] The affidavit need not come from Reich and Jossem. If, hypothetically, Professor Moriarty was holding these documents and turned them over to defendants after the document production by prior counsel, Professor Moriarty can provide an affidavit. Thus, the Court's requirement of an affidavit from someone with personal knowledge does not require defendants, who have generally asserted their Fifth Amendment rights, to provide an affidavit.

(Kawatra Aff. Ex. D: 7/27/04 Peck Order.)

Jossem (and Reich) declined to produce an affidavit as to when they obtained the Apartment Documents (Kawatra Aff. Ex. G: 8/2/04 Akbar Letter to Court), and the Court therefore found that any Fifth Amendment privilege in the remaining Apartment Documents was waived:

The Court finds waiver of the privilege as to these documents because prior counsel waived (or did not assert) the privilege for the original document production. In the absence of information to the contrary, the Court finds that defendants Reich & Jossem had "possession, custody or control" of the documents at that time and thus they should have been provided, or the privilege asserted, at that time.... (Since defense counsel knew defendants would/could not provide an affidavit, one wonders why counsel wasted my and Judge Koeltl's time with extensions and stays.)

**\*6** (Kawatra Aff. Ex. G: 8/3/04 Peck Memo Endorsed Order.) The Court now explicitly finds that Jossem and her counsel (the Sonnenschein firm) acted in bad faith in seeking stays of the time to provide an affidavit that they knew they would not provide. The Court finds that Jossem and her counsel engaged in a strategy of delay.

Jossem again sought a stay and filed objections

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                            Page 6
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)

with Judge Koeltl. (*See* JSC FOF ¶¶ 33-34.) After both sides briefed the issue, Jossem did an about face-she withdrew her objections and provided all of the documents formerly withheld on Fifth Amendment privilege grounds, only withholding from production documents she claimed were subject to the attorney-client privilege. (Kawatra Aff. Ex. K: Akbar 8/12/04 Letter to Judge Koeltl at 1; *see* JSC FOF ¶ 36.) The ostensible basis for Jossem's change of position was counsel's analysis of JSC's papers opposing Jossem's objections "and conferring with [Jossem's] prior counsel"(*id.*), the former of which merely repeated assertions previously made before this Court and the latter of which had allegedly occurred before.

In short, the Court finds that Jossem (and her counsel, the law firm of Sonnenschein Nath & Rosenthal) had interposed the Fifth Amendment claim purely for purposes of delay and acted in bad faith, resulting in considerable legal expenses for JSC.

On August 16, 2004, defendants produced a privilege log identifying 39 of the Apartment Documents as allegedly subject to the attorney-client privilege. (JSC FOF ¶ 37; Kawatra Aff. Ex. L: Newman 8/16/04 Aff. ¶ 5.) The Court rejected the privilege log at the August 16, 2004 conference, because "what this doesn't indicate is who is asserting the privilege, which is one of the things we had talked about before; in other words, some of these may be individual documents of Ms. Jossem [or] Reich, others appear to be corporate documents of corporations, who you do not represent and who are in default in the litigation."(Kawatra Aff. Ex. M: 8/16/04 Peck Conf. Tr. at 3.) On August 18, 2004, Jossem produced a revised privilege log, now claiming privilege as to only 23 documents. (JSC FOF ¶ 38; Kawatra Aff. Ex. N: Amended Privilege Log.) After further discussion among the parties, Jossem withdrew the claim of attorney-client privilege to all but six documents (which JSC did not challenge). (JSC FOF ¶ 39 & n. 16; Kawatra Aff. Ex. O: Tiska 8/26/04 Letter to Court.)

In short, of the more than 8,400 documents found in

the apartment, after months of litigation, at great expense to JSC (and extensive involvement by this Court and Judge Koeltl), Jossem was required to produce all but six documents.[FN3]

> FN3. As JSC points out, in addition to the documents finally produced, Jossem neither produced, nor explained why she did not previously produce or currently have, certain documents about Patricia, Inc., and documents about her dealings with Christie's in 2003-2004. (*See* JSC FOF ¶¶ 42-44.)

Not surprisingly, JSC moved for attorneys' fees in connection with the discovery disputes concerning the Apartment Documents. (Dkt. Nos. 364-65;*see also* JSC FOF ¶ 40.)

At a hearing on September 21, 2004, the Court heard oral argument on the attorneys' fees motion. (9/21/04 Peck Conf. Tr. at 21-42.) Jossem's counsel's only argument as to why the Court should not require Jossem to pay JSC's legal fees in connection with the applications to the Court that lead to production of the Apartment Documents is that JSC did not show "prejudice":

*7 THE COURT: ... Why shouldn't the court order attorney's fees of the nature that I have just described under the *Residential Funding* ruling, and then we'll go on to the more serious issue of why the court should not also order repatriation.

MR. AKBAR [Jossem's counsel]: Our argument as set forth in our papers, our primary argument is that you have to have a showing of prejudice in order to-

THE COURT: The prejudice is it costs them X thousands of dollars of attorney's fees to get documents that your clients under the rules were required to produce merely because they had a discovery request. So, focusing on the attorney's fees, are you really telling me that's not a showing of prejudice sufficient under your view of the law,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

whether that view of needing to show prejudice is correct or not?

MR. AKBAR: It's not a showing of prejudice because assuming hypothetically that these documents had been discovered in February and the same objections had been made, the same motion practice could have been made about it, they still would have had to go through the same-

THE COURT: *And under Rule 37 the loser pays if the court wishes to go that route on any discovery motion. Agreed?*

MR. AKBAR: *Agreed.*

THE COURT: OK. So you lost.

They made motions, the court ruled. The court held your feet to the fire. You went to Judge Koeltl and got stays. After all of that was said and done, you sat down and read the documents and said, Oh, half the documents are the same genre of what we previously produced. Here they are. And then in a subsequent wave, after further litigation, Oh, we are withdrawing the claims of privilege. And there was another wave in there.

So why on all of that isn't that a no-brainer that they get their attorney's fees on everything having to do with the document production of the documents that were discovered only through a combination of learning from Christie's that certain things exist and then tripping across documents when they were otherwise in the apartment for the asset seizure.

MR. AKBAR: I think what this comes back to is, the point we make in our papers was simply that when they moved for their order of attachment in early February there was no representation to them that all documents have been produced at that point.

THE COURT: Was such a representation made?

MR. AKBAR: Subsequently, I believe in February, Mr. Oldham from Williams & Connolly said that they had finished producing documents.

THE COURT: And yet these documents, some of which existed at that time, were not produced, existed in the sense of they came out of Christie's or other sources, and we don't know why your clients either didn't have them then or didn't produce them.

MR. AKBAR: That's correct. We don't know, and when they-

THE COURT: Whose burden is that?

MR. AKBAR: Well, I don't know what Mr. Zymelman and Mr. Oldman [predecessor counsel] did. I've spoken with them about this issue.

**\*8** THE COURT: You and they are the same person. I don't mean that in it's metaphysical sense. You are both counsel for Reich and Jossem.

MR. AKBAR: That is right.

THE COURT: If you don't know what they did, that's your problem. If the question is, as it appears, that either your clients didn't have these documents or they had them and didn't give them to their lawyer-and, because of the lack of information from your clients the court is and does assume the latter. Call that using an inference in a discovery, but that's what the court assumes, that your clients had these documents and for whatever reason, I think we can assume the reason has to do with their unwillingness to let the plaintiff know their assets, didn't give them to Williams & Connolly. So, again, coming back to all of this, whether-repatriation and the timing as such is a separate issue, and prejudice, and we'll come to that in a minute-is there anything that you can tell me that can prevent me from finalizing my tentative ruling, at least to the extent of ordering reimbursement of reasonable attorney's fees with that amount to be determined hopefully by a negotiation among the parties, but then, barring that-and I suggest it won't work just because that seems to be the nature of this case-a court order.

If the answer is you have nothing to add to what you have already said in your papers, I'm not trying

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

to torture you personally.

MR. AKBAR: I appreciate that, your Honor.

I would simply add that the record on this motion and before the court doesn't have any indication as to when those documents did come into their possession.

THE COURT: The court believes that you have that burden and the court is prepared, even if the plaintiffs have that burden, to believe that since there has been no information from you-and by "you" I mean your clients, who are the only ones who have possession of that information, that whether it's an inference from the Fifth Amendment assertion or just an inference from the lack of information from the person who has access to it, *the court assumes and rules that it is assuming that your clients had these documents and failed to give them to counsel. I can probably add willfully failed to give them to counsel.*

MR. AKBAR: Your Honor, on that I would simply say that we have our position laid out in our papers, and our primary argument rests on their lack of prejudice.

(9/21/04 Peck Conf. Tr. at 36-40, emphasis added.) At the conclusion of the oral argument on the attorneys' fee issue, the Court ruled that pursuant to Rule 37 and the *Residential Funding* case, JSC as the prevailing party on the discovery issues was entitled to its attorneys' fees, in an amount to be determined by submission of its contemporaneous time records. (*Id.* at 41-42.)The Court ruled:
THE COURT: The court rules that pursuant to Rule 37 and the court's inherent power under the *Residential Funding* case that *it is clear that the documents were produced to plaintiffs only as the result of at least three, if not more, motions or applications to this court in lieu of formal motions* asking the court to handle discovery, *that Rule 37 allows the winning party to be given attorney's fees in the court's discretion,* and that to the extent that any of this were to go beyond the literal wording of Rule

37, *Residential Funding* certainly gives the court, as I've already read into the record, broad discretion in fashioning an appropriate sanction, *certainly an appropriate sanction here is that Ms. Jossem pay reasonable attorney's fees incurred by plaintiff's counsel in all motions to get these documents produced,* including but not limited to this motion for sanctions and the costs of any subsequent briefing on attorney's fees applications, costs on costs as the saying goes....

***9** The only issue remaining is a determination of what is the exact dollar amount, and that is to be determined subsequently....

(*Id.* at 41, emphasis added.)

Based on the parties' submissions and agreement as to the amount of the fees (based on a 25% reduction of the fees initially sought by JSC) but not the imposition of fees, the Court awarded JSC $69,453 in reimbursement of attorneys' fees (and costs) for the Apartment Documents discovery applications. (Kawatra Aff. Ex. T: 10/21/04 Order; *accord,* Dkt. No. 393: 10/21/04 Order.)

Jossem filed objections with Judge Koeltl to my award of attorneys' fees to JSC. After briefing and argument, Judge Koeltl remanded the matter to me for further findings. (Dkt. No. 422: 12/4/04 Koeltl Order.) As a result of the remand, this Court directed JSC to submit proposed findings of fact and conclusions of law in support of the award of attorneys' fees sanctions, and directed Jossem "to provide counter-proposed findings ... indicating where it agrees and where it disagrees" with JSC's findings. (Dkt. No. 423:Peck 12/6/04 Order.) JSC submitted proposed Findings of Fact and Conclusions of Law, while Jossem's Opposition papers only dealt with the legal issues and, despite this Court's Order, did not address Findings of Fact. (*See* Jossem's Opp. to Plaintiff's Proposed Findings of Fact & Conclusions of Law.)

Finally, in a supplemental affidavit after submission of JSC's Findings of Fact, counsel for JSC doc-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

umented an additional $35,262 in legal fees spent in connection with the Apartment Documents discovery and sanction motions (including preparation of JSC's FOF) from September 30, 2004 to December 13, 2004. (Dunn 12/22/04 Aff.) JSC also sought $4,231 in additional costs, based on the methodology previously agreed on by the parties and approved by the Court.(*Id* .)

Thus, JSC's attorneys' fees motion seeks $69,453 plus $39,493, for a total of *$108,946*... For the reasons set forth below, the Court orders Jossem to reimburse JSC for that $108,946 in attorneys' fees.

*ANALYSIS*

I. *JOSSEM IS ORDERED TO REIMBURSE JSC $108,946 PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37(a) AND (b)*[FN4]

> FN4. Jossem's counsel argues in its opposition to JSC's proposed findings of fact that sanctions are not appropriate because JSC is seeking sanctions under Rule 37(a) and Rule 37(b), but "[r]ather, as Jossem has consistently maintained, Rule 37(c) governs."(Jossem Opp. Proposed Findings of Fact at 2.) Although Jossem fails to offer an explanation as to why Rule 37(c) governs, the Court suspects that Jossem is attempting to argue that the responsive documents found in Jossem's apartment are Rule 26(e)(1) documents. However, there is not a scintilla of evidence that Jossem did not have possession, custody or control of these documents at the time of JSC's first document request (indeed, the Court gave Jossem an opportunity to submit evidence as to when she obtained the Apartment Documents, but she declined to do so; *see* page 9 above). Moreover, Rule 37(c) explicitly states that "the court, on motion and after affording an opportunity to be heard, may impose other appropriate

sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A)." Thus, Jossem's contention that Rule 37(c) governs is not only incorrect but irrelevant, since the Court can impose attorneys' fees under Rule 37(c), just as under Rules 37(a) & (b).

A. *Rule 37 Sanctions: Overview*

"Rule 37 of The Federal Rules of Civil Procedure addresses the consequences of a party's failure to comply with discovery orders."*Quiles v. Beth Israel Med. Ctr.,* 168 F.R.D. 15, 17 (S.D.N.Y. June 24, 1996) (Koeltl, D.J.); *see also,e.g.,Residential Funding Corp. v. DeGeorge Financial Corp.,* 306 F.3d 99, 106 (2d Cir.2002); *Source Enter., Inc. v. Tanners Ave. Corp.,* 04 Civ. 1788, 2004 WL 2471536 at *4 (S.D.N.Y. Nov. 3, 2004) (" 'Federal Rule of Civil Procedure 37 provides for the imposition of sanctions, including attorneys fees and costs, for certain discovery abuses.' ") (citing *Cielo Creations, Inc. v. Gao Da Trading Co.,* 04 Civ.1952, 2004 WL 1460372 at *2 (S.D.N.Y. June 28, 2004)); *Creative Res. Group of New Jersey, Inc. v. Creative Res. Group, Inc.,* 212 F.R.D. 94, 102 (E.D.N.Y.2002) ("Federal Rule of Civil Procedure 37 specifically addresses discovery sanctions where, as here, a party fails to obey a discovery order.").

*10 Rule 37"provides a spectrum of sanctions. The mildest is an order to reimburse the opposing party for expenses caused by the failure to cooperate. More stringent are orders striking out portions of the pleadings, prohibiting the introduction of evidence on particular points and deeming disputed issues determined adversely to the position of the disobedient party. Harshest of all are orders of dismissal and default judgment."*Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1066 (2d Cir.1979); *accord,e.g.,New York Bay Co. v. State Bank of Pa-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)

Page 10

*tiala*, 93 Civ. 6075, 1995 WL 567357 at *4 (S.D.N.Y. Sept. 25, 1995) (Peck, M.J.)."The sanctions specified under Rule 37 are not exhaustive, and the Court may impose such sanctions as are just."*New York Bay Co. v. State Bank of Patiala*, 1995 WL 567357 at *4.

Rule 37 sanctions "serve a threefold purpose. Preclusionary orders ensure that a party will not be able to profit from its own failure to comply. Rule 37 strictures are also specific deterrents and, like civil contempt, they seek to secure compliance with the particular order at hand. Finally, although the most drastic sanctions may not be imposed as 'mere penalties,' courts are free to consider the general deterrent effect their orders may have on the instant case and on other litigation, provided that the party on whom they are imposed is, in some sense, at fault."*Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d at 1066 (citations omitted); *accord,e.g.,New York Bay Co. v. State Bank of Patiala,* 1995 WL 567357 at *4;*see,e.g.,* 2 Michael C. Silberberg & Edward M. Spiro, *Civil Practice in the Southern District of New York* § 26:2 at 26-8 (2d ed.2004) [hereafter, "Silberberg" ], & cases cited therein; *see also,e.g.,Cielo Creations, Inc. v. Gao Da Trading Co.,* 2004 WL 1460372 at *2 (" 'Rule 37 sanctions must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent." ') (quoting *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 763-64, 100 S.Ct. 2455, 2463 (1980)) (internal quotation omitted); *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* 96 Civ. 9721, 98 Civ. 0123, 2002 WL 54610 at *6 (S.D.N.Y. Jan. 15, 2002) (same); *Quiles v. Beth Israel Med. Ctr.,* 168 F.R.D. at 18 ("Sanctions provided under Rule 37 serve several purposes: to ensure that the parties comply with court orders in the particular case; to serve as a specific deterrent by penalizing those whose conduct warrants sanction; and to provide a general deterrent effect."); *see generally 7 Moore's Federal Practice* § 37.50[1] (3d ed.2005).

"Pursuant to these provisions [of Rule 37], the court may make awards on its own determination, and such awards do not require a finding of wilful or bad faith conduct on the part of counsel."*Brignoli v. Balch, Hardy & Scheinman, Inc.,* 86 Civ. 4103, 1989 WL 146767 at *8 (S.D.N.Y. Dec. 1, 1989).

*11 The Court has broad discretion in determining appropriate Rule 37 sanctions. *See,e.g.,* 2 Silberberg § 26:9 (citing cases); *New York Bay Co. v. Bank of Patiala,* 1995 WL 567357 at *5. "In view of the fact that the trial court has firsthand familiarity with all of the pertinent circumstances of the particular case, the decision of whether to impose sanctions, and the particular type of sanctions to be imposed, are matters generally entrusted to the trial court's broad discretion." 7 *Moore's Federal Practice* § 37.50[1][b] (3d ed.2005); *see,e.g.,Ashkinazi v. Sapir,* 02 Civ. 0002, 2005 WL 937597 at *4 (S.D.N.Y. Apr. 20, 2005) ("District courts have broad discretion in imposing discovery sanctions."); *Aetna Life Ins. Co. v. Lecht,* 03 Civ. 6764, 2005 WL 180873 at *1 (S.D.N.Y. Jan. 27, 2005) ("The District Court's imposition of sanctions pursuant to Rule 37 is reviewed for an abuse of discretion."); *Source Enter., Inc. v. Tanners Ave. Corp.,* 2004 WL 2471536 at *4 ("The Second Circuit has held that 'the imposition of sanctions under Rule 37 is within the discretion of the district court." ') (quoting *John B Hull, Inc., v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988)); *Alvarado v. Manhattan Worker Career Ctr.,* 01 Civ. 9288, 2003 WL 194203 at *1 (S.D.N.Y. Jan. 28, 2003) (" 'Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses." ') (quoting *Reilly v. Natwest Mkts. Group Inc.,* 181 F.3d 253, 267 (2d Cir.1999)), *cert. denied,*528 U.S. 1119, 120 S.Ct. 940 (2000); *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* 2002 WL 54610 at *7 ("The Court has wide discretion in imposing sanctions. As the Second Circuit has observed, '[w]hen a party seeks to frustrate [the purpose of the discovery provisions

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)

of the Federal Rules of Civil Procedure] by disobeying discovery orders, thereby preventing disclosure of facts essential to an adjudication on the merits, severe sanctions are appropriate.'' ') (quoting *Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1365 (2d Cir.1991)); *Quiles v. Beth Israel Med. Ctr .,* 168 F.R.D. at 18 ("The imposition of sanctions under Rule 37 lies within the broad discretion of the trial court."). "The Second Circuit has repeatedly stated the importance of following discovery orders of the Court, warning that '[a] party who flouts such orders does so at his peril.' ' *Intertec Contracting A/S v. Turner Steiner Int'l, S.A.,* 98 Civ. 9116, 2001 WL 812224 at *11 (S .D.N.Y. July 18, 2001).

Rule 37"places the burden on the disobedient party to avoid expenses [including attorneys' fees by showing that his failure is justified or that special circumstances make an award of expenses unjust." 1970 Advisory Committee Notes to Rule 37(b). Thus, "expenses should ordinarily be awarded unless a court finds that the losing party acted justifiably in carrying his point to court." 1970 Advisory Committee Notes to Rule 37(a)(4); *see also* discussion below.

B. *Under Rule 37(a)(4)(A), Jossem is Ordered to Reimburse JSC $8,843 in Attorney's Fees and Expenses for the First Discovery Motion*

**\*12** Rule 37(a) provides that a party "may apply for an order compelling disclosure or discovery" where "a party in response to a request for inspection submitted under Rule 34, fails to ... permit inspection as requested."Fed.R.Civ.P. 37(a)(2)(B).Rule 37(a)(3) further provides that "an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond."Fed.R.Civ.P. 37(a)(3).

"An award of reasonable fees incurred in bringing a motion to compel discovery is the least harsh of all the sanctions allowed under Rule 37."*Aetna Life Ins. Co. v. Licht,* 03 Civ. 6764, 2005 WL 180873 at

*1 (S.D.N.Y. Jan. 27, 2005); *see also,e.g.,* 7 *Moore's Federal Practice* § 37.23[6].

Rule 37(a)(4)(A), entitled "Expenses and Sanctions," provides that:

If the motion [to compel discovery] is granted or if the disclosure or requested discovery is provided after the motion was filed, *the court shall,* after affording an opportunity to be heard, *require the party* or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them *to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees,unless* the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that *the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.*

Fed.R.Civ.P. 37(a)(4)(A) (emphasis added).[FN5]

> FN5."Sanctions imposed pursuant to ...Rule 37(a) may be imposed upon either the attorney or the party or both."*Imperial Chem. Indus., PLC v. Barr Labs., Inc.,* 126 F.R.D. at 473;*seegenerally* 7 *Moore's Federal Practice* § 37.23[4][a] ("Expense shifting sanctions may be imposed on both counsel and client.... [C]lients who are responsible for providing clearly inadequate disclosures or discovery responses may not hide behind their attorneys."). Since JSC has not sought sanctions from Jossem's counsel, and Jossem has not argued that sanctions should be imposed on her counsel rather than her, the Court will not further address the issue of whether Jossem's counsel could or should be sanctioned.

Under Rule 37(a), a finding of bad faith or willful misconduct is not required before the Court can award attorneys' fees. *See,e.g.,Devaney v. Continental Am. Ins. Co.,* 989 F.2d 1154, 1162 (11th

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.1993); *Merritt v. International Bhd. of Boiler-makers,* 649 F.2d 1013, 1018-19 (5th Cir.1981); *Green v. Baca,* 225 F.R.D. 612, 614 (C.D.Cal.2005) ("Rule 37(a)(4)(A) does not require a finding of 'bad faith' as a prerequisite to an award of 'reasonable expenses' to the moving party."); *Messier v. Southbury Training Sch.,* No. 94-CV-1706, 1998 WL 841641 at *5 (D.Conn. Dec. 2, 1998); *Imperial Chem. Indus. PLC v. Barr Labs., Inc.,* 126 F.R.D. 467, 473 (S.D.N.Y.1989); *Boulos v. Cato,* 87 Civ. 2985, 1988 WL 70292 at *2 (S.D.N.Y. June 30, 1988) ("Rule 37(a)(4) does not require a finding of 'deliberate and wilful' misconduct before expenses may be imposed. Rather, assessment of expenses is mandatory unless opposition to the motion was substantially justified....").FN6

> FN6. In any event, the Court finds that Jossem's failure to produce the Apartment Documents in response to JSC's first document request and before numerous court orders was willful and in bad faith. The Court finds that Jossem did not originally produce the Apartment Documents so that she could continue to auction property through Christie's and send the money abroad to avoid possible attachment by JSC (or other creditors). The Court also finds that Jossem refused to produce the documents even after JSC's initial motion, and frivolously asserted Fifth Amendment claims, because the documents are extremely helpful to JSC, and harmful to Jossem, on JSC's alter ego claims.

The Advisory Committee Notes make clear that attorneys' fees *should* be awarded to the prevailing party:

Subdivision (a)(4). This subdivision amends the provisions for award of expenses, including reasonable attorney's fees, to the prevailing party or person when a motion is made for an order compelling discovery. At present, an award of expenses is made only if the losing party or person is found to

have acted without substantial justification. The change requires that expenses be awarded unless the conduct of the losing party or person is found to have been substantially justified. The test of "substantial justification" remains, but the change in language is intended to encourage judges to be more alert to abuses occurring in the discovery process.

*13 On may occasions, to be sure, the dispute over discovery between the parties is genuine, though ultimately resolved one way or the other by the court. In such cases, the losing party is substantially justified in carrying the matter to court. But the rules should deter the abuse implicit in carrying or forcing a discovery dispute to court when no genuine dispute exists. And the potential or actual imposition of expenses is virtually the sole formal sanction in the rules to deter a party from pressing to a court hearing frivolous requests for or objections to discovery.

....

*The proposed change provides in effect that expenses should ordinarily be awarded unless a court finds that the losing party acted justifiably in carrying his point to court.* At the same time, a necessary flexibility is maintained, since the court retains the power to find that other circumstances make an award of expenses unjust-as where the prevailing party also acted unjustifiably. The amendment does not significantly narrow the discretion of the court, but rather presses the court to address itself to abusive practices.

1970 Advisory Committee Note to Rule 37(a)(4) (emphasis added).

As a result, a "rebuttable presumption exists in favor of imposing expense shifting sanctions on the party against whom a motion to compel disclosures or discovery is resolved.... Expense shifting sanctions are defined as 'the reasonable expenses incurred in making the motion, including attorney's fees." ' 7 *Moore's Federal Practice* § 37.23[1] (3d

Not Reported in F.Supp.2d                                                Page 13
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

ed.2005) (quoting Fed.R.Civ.P. 37(a)(4)(A)). Indeed, "Rule 37 states that the court 'shall' award reasonable fees to the movant if the motion to compel is granted ..." *Aetna Life Ins. Co. v. Licht*, 2005 WL 180873 at *1. Numerous decisions note that Rule 37(a) "provides, in fact, that the losing party on a motion to compel *must* pay reasonable expenses, barring extenuating circumstances." *Creative Res. Group of New Jersey, Inc. v. Creative Res. Group, Inc.*, 212 F.R.D. at 103 (emphasis in original, citing cases); *see,e.g.,In re Omeprazole Patent Litig.*, No. M-21-81, No. MDL 1291, 2005 WL 818821 at *13 (S.D.N.Y. Feb. 18, 2005) (" 'Under Rule 37(a), Fed.R.Civ.P., when a party moves to compel disclosure or discovery and the court finds that the opposing party's position in opposing the motion was not "substantially justified," the judge *must* impose costs on the opposing party or on his attorney. *See*Rule 37(a), Fed.R.Civ.P. Advisory Committee Notes to 1970 Amendment (cost award is *mandatory* unless court finds that non-moving party acted justifiably)." ') (emphasis added, quoting *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 262 (S.D.N.Y.1995)), *aff'd*,227 F.R.D. 227 (S.D.N.Y.2005); *Creative Res. Group of New Jersey v. Creative Res. Group, Inc.*, 212 F.R.D. 94, 104 (E.D.N.Y.2002) ("Rule 37(a)(4)(A) expressly provides that parties are entitled to the expenses, including attorneys fees, incurred in making a motion to obtain a court order, unless the court finds that the adversary's position was substantially justified or that other circumstances make an award unjust. The rule provides, in fact, that the losing party on a motion to compel *must* pay reasonable expenses, barring extenuating circumstances."); *Envirosource, Inc. v. Horsehead Res. Dev. Co.*, 981 F.Supp. 876, 880 (S.D.N.Y.1998) ("Defendant ignores another critical fact, which is that the [Rule 37(a)(4)(A) ] essentially *mandate[s]* an award of attorney's fees under the instant circumstances.") (emphasis in original); *Fund Comm'n Serv ., II, Inc. v. Westpac Banking Co.*, 93 Civ. 8298, 1996 WL 469660 at *5 (S.D.N.Y. Aug. 16, 1996) ("Rule 37(a) provides that the losing party on that motion must pay reasonable expenses, includ-

ing attorney's fees, unless the court finds that the position was substantially justified or that other circumstances make an award unjust."); *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. at 262 ("Under Rule 37(a), F.R.Civ.P., when a party moves to compel disclosure or discovery and the court finds that the opposing party's position in opposing the motion was not 'substantially justified,' the judge must impose costs on the opposing party or on his attorney."); *Boulos v. Cato*, 1988 WL 70292 at *2;*seegenerally 7 Moore's Federal Practice* § 37.23[1] at 37-42 ("Moreover, a principal purpose of the presumption in favor of imposing expense shifting sanctions against a party who unsuccessfully litigates a motion to compel is to encourage judges to be more alert to abuses occurring in the discovery process. Courts did not often use the power they had been granted pursuant to the older formulation of the Rule to impose sanctions when a party's opposition to discovery was not substantially justified. The 1970 amendments, which established the present formulation of the rule, was intended to '[press] the court to address itself to abusive practices' and to 'utilize the most important available sanction to deter abusive resort to the judiciary.' ") (fn.omitted). 8A Charles Allan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure: Civil 2d* § 2288 at 664-66 (1994) (award of attorneys' fees "is mandatory unless one of the conditions for not making an award is found to exist ... [T]he burden of persuasion has since 1970 been on the losing party to avoid assessment of expenses and fees....").

**\*14** In sum, in the words of Professors Wright and Miller, "[t]he great operative principle of Rule 37(a)(4) is that the loser pays." 8A Charles Allan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure: Civil 2d* § 2288 at 657-58; *accord,e.g.,Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 265 (S.D.N.Y.1995) (quoting Wright & Miller).

Pursuant to Rule 37(a), Jossem is ordered to reimburse JSC $8,843 in attorneys' fees. During the

Not Reported in F.Supp.2d                                                Page 14
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)

seizure of personal property at Jossem and Reich's apartment, JSC's counsel found thousands of pages of documents that were responsive to their first (and second) Rule 34 document requests, but which Jossem had not produced. (*See* page 6 above.) On May 14, 2004, JSC moved for sanctions against Jossem for withholding the documents, which Judge Koeltl referred to this Court; during a conference before this Court on May 21, 2004, JSC raised Jossem's failure to produce the responsive Apartment Documents.[FN7] (*See* pages 6-7 above.) The Court granted JSC's application to compel Jossem to produce all non-privileged responsive documents. (*See* page 7 above.) Because JSC's request was granted and the discovery was, after much unjustifiable delay, provided after the application was made to this Court, and because Jossem's conduct necessitated the application, Jossem is required under Rule 37(a)(4)(A) to pay JSC's reasonable attorneys' fees for its first request for judicial intervention, which amounted to $8,843. (*See* JSC FOF ¶ 20 n. 12.) The Court finds that Jossem's failure to produce the responsive Apartment Documents was not substantially justified, and Jossem has not rebutted the presumption in favor of the fee shifting.[FN8] JSC thus is entitled to its attorneys' fees.[FN9]

> FN7. Pursuant to S.D.N.Y. Local Civil Rule 37.2, "no motions under Rules 26 through 37 inclusive of the Federal Rules of Civil Procedure shall be heard unless counsel for the moving party has first requested an informal conference with the court and such request has either been denied or the discovery dispute has not been resolved as a consequence of such a conference."JSC's application for judicial assistance with respect to Jossem's non-production of the Apartment Documents functioned as the equivalent of a motion to compel under Fed.R.Civ.P. 37(a).*See,e.g.,Penthouse Int'l, Ltd. v. Playboy Enter., Inc.,* 663 F.2d 371, 387-88 (2d Cir.1981) ("[T]he record is clear that Penthouse deliberately disobeyed Judge

Griesa's March 22, 1978, order to produce in full all of its financial statements for the relevant periods relating to gross income, net income and circulation revenue.... Equally clear was the relevance of the requested data.... The fact that the March 22 order was oral rather than written, and that it was not entered pursuant to a formal written Rule 37(a) motion, does not deprive it of any of its binding force and effect.... The 1977 Rule 34 demand was made in writing, and was followed by an oral application by Playboy's counsel for an order directing that the requested records be produced. The court acted only after a thorough due process hearing at which the relevance of the requested records was discussed. In addition Judge Griesa had heard extensive testimony on the issues and reviewed the pretrial depositions. His order was recorded by the court reporter."); *Kahn v. General Motors Corp.,* 88 Civ. 2982, 1992 WL 208286 at *2 (S.D.N.Y. Aug. 14, 1992) ("Since Hazeltine did not prevail on any of the claims of privilege raised in that letter or its subsequent motion for reconsideration, it is unfair to pass on to GM any portion of the cost of litigating that issue. This is the rule with respect to formal discovery motions, Rule 37(a)(4), Fed.R.Civ.P., and I perceive no reason, on this record, why a different result should obtain with respect to a dispute resolved by informal submission.").

While the informal procedure of Local Rule 37.2 often resolves discovery issues without much expenditure of lawyer (or court) time such that counsel do not even seek Rule 37(a)(4) fees (or if sought, the Court has the discretion to deny them under the "other circumstances" prong of Rule 37(a)(4)), in this case there were extensive proceedings before the Court before Jossem produced all but 6 of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 15
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

8,400 Apartment Documents that she initially withheld. (*See* page 12 above.) It would be unfair to JSC to deprive it of Rule 37's cost shifting protection because of the absence of a formal motion despite extensive judicial proceedings. Local Rule 37.2 should not have that effect in a case like this. Indeed, despite Jossem's vigorous opposition to this Court's award of attorneys' fees to JSC, Jossem has never argued that fees should be denied because of the absence of a *formal*Rule 37(a) motion.

FN8. Jossem's October 5, 2004 Objections to my September 21, 2004 award of attorneys' fees to JSC argued that this Court "failed to rule, as Rule 37 requires, that Reich and Jossem's assertion of Fifth Amendment and/or attorney client privilege was not substantially justified."(Dkt. No. 391: Jossem Objections to 9/21/04 Order at 3, 21.) As the Findings of Fact above attest, the fact that a mere *six of over eight thousand documents* Jossem were in fact privileged clearly show that Jossem's efforts to assert privilege were not only *not* substantially justified, but asserted in remarkably bad faith. But it is more than the number of documents withheld and eventually produced. Jossem and her counsel invoked the Fifth Amendment on a blanket basis as to *all* the documents, despite the Court's warning that that would not be sufficient. (*See* page 7 above.) Indeed, when the Court forced Jossem's counsel to actually review the documents (against the categories of documents Jossem previously produced without invoking her Fifth Amendment privilege), counsel produced more than half of the previously withheld documents. (*See* page 11 above.) And the Court's own review of a portion of the remaining documents found that few appeared to be privileged. (*See* page 10

above.) Finally, while Jossem's objections claimed that this Court did not make the appropriate findings of not substantially justified, Jossem has offered no argument that her position was substantially justified, other than claiming there was a "genuine dispute" involved. (*See* Jossem Objections to 9/21/04 Order at 21.) To the contrary, the conduct of Jossem throughout the dispute surrounding the Apartment Documents showed bad faith, not substantial justification.

FN9.*See,e.g.,Aetna Life Ins. Co. v. Licht,* 2005 WL 180873 at *2 ("Defendants have provided the Court with no explanation as to their failure to respond to plaintiff's interrogatories and document requests. Therefore, the only proper course is to grant plaintiff's instant motion and find that an award of fees and expenses incurred in bringing this motion is properly granted to plaintiff under Rule 37(a)(4)(A)."); *Pullen v. Arrow Fin. Servs., LLC,* 02 Civ. 647, 2002 WL 32864712 at *6 (D. Conn. Oct. 17 2002) (Court ordered payment of attorney's fees pursuant to Rule 37(a)(4)(A) where "[t]he court finds that the defendant has resisted plaintiff's discovery requests and that its resistance was without substantial justification. Defendant's actions have resulted in the unfair and unnecessary expenditure of the court's resources and those of the plaintiff."); *Pier v. Long Island Sav. Bank,* 97 Civ. 6295, 1998 WL 671442 at * (S.D.N.Y. Sept. 29, 1998) (Denying objections to magistrate judge's award of Rule 37(a) attorneys fees for "failure to comply with the Magistrate Judge's order to produce certain documents."); *Land Ocean Logistics, Inc. v. Aqua Gulf Corp.,* 181 F.R.D. 229, 242 (W.D.N.Y.1998) ( "Defendants' refusal [based upon lack of relevancy, confidentiality, and possession

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the documents by the plaintiff] to voluntarily produce the [requested] documents was not substantially justified" and plaintiff thus was entitled to Rule 37(a)(4)(A) expenses.).

C. *Under Rule 37(b) Jossem is Ordered to Reimburse JSC for $100,103, JSC's Remaining Attorneys' Fees Connected With the Apartment Documents Discovery Dispute*

Rule 37(b)(2) of the Federal Rules of Civil Procedure provides that if a party "fails to obey an order to provide or permit discovery," the Court "may make such orders in regard to the failure as are just," including imposing attorneys' fees. Fed.R.Civ.P. 37(b)(2).FN10 The sanctions specified under Rule 37 are not exhaustive, and the Court may impose such sanctions as are just. *New York Bay Co. v. State Bank of Patiala,* 93 Civ. 6075, 1995 WL 867357 at *4 (S.D.N.Y. Sept. 25, 1995) (Peck, M.J.) (citing *Miltope Corp. v. Hartford Casualty Ins. Co.,* 94 Civ. 4564, 1995 WL 456377 at *3 (S.D.N.Y. Aug. 2, 1995) (Peck, M.J.); *see also,e.g.,A.V. by Versace, Inc. v. Gianni Versace S.p.A.,* 96 Civ. 9721, 98 Civ. 0123, 2002 WL 54610 at *6 (S.D.N.Y. Jan. 15, 2002) ("Plaintiff's motion for sanctions is brought under Rule 37(b)(2) of the Federal Rules of Civil Procedure, which provides the framework for the imposition of sanctions for failure to comply with a court's discovery orders. The Rule provides that the court may make such orders in regard to a discovery failure 'as are just,' including (1) an order striking out pleadings or rendering a judgment by default; (2) an order of contempt; and (3) an order requiring the disobedient party to pay the reasonable expenses, including attorneys' fees, caused by the disobedient party's failure ."); *Intertec Contracting v. Turner Steiner Int'l, S.A.,* 98 Civ. 9116, 2001 WL 812224 at *7 (S.D.N.Y. July 18, 2001) ("Rule 37(b)(2), Fed.R.Civ.P., provides that a district court may impose sanctions, among them the imposition of expenses including attorney's fees, where a party fails to comply with an order of the Court directing such

party to 'provide or permit discovery." ').

> FN10. The order may, but need not be, a Rule 37(a) order, and the order disobeyed "does not have to be a formal, written order." 7 *Moore's Federal Practice* §§ 37.42[2], 37.42[3]; *see also,e.g.,* 8A Wright, Miller & Marcus, *Federal Practiace & Procedure: Civil 2d* § 2289 at 670 & n. 6 (citing cases).

**\*15** Rule 37(b)(2) specifically provides for the award of attorneys' fees to the prevailing party:

In lieu of any of the foregoing orders or in addition thereto, the court *shall* require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(b)(2) (emphasis added).

The Advisory Committee Notes make clear that the Court *should* award attorneys' fees pursuant to Rule 37(b)(2), as with Rule 37(a), to place the burden on the disobedient party to avoid expenses:

Subdivision (b)(2) is amplified to provide for payment of reasonable expenses caused by the failure to obey the order....*The provision places the burden on the disobedient party to avoid expenses by showing that his failure is justified* or that special circumstances make an award of expenses unjust. Allocating the burden in this way conforms to the changed provisions as to expenses in Rule 37(a), and is particularly appropriate when a court order is disobeyed.

1970 Advisory Committee Note to Rule 37(b) (emphasis added); *see,e.g.,John B. Hall, Inc. v. Waterbury Petroleum Prods ., Inc.,* 845 F.2d 1172, 1177 (2d Cir.1988) ("Rule 37(b)(2) mandates" the award of attorneys' fees unless disobedient party's action was substantially justified.); *Alvarado v.*

*Manhattan Worker Career Ctr.*, 01 Civ. 9288, 2003 WL 194203 at *1 (S.D.N.Y. Jan. 28, 2003) (Rule 37(b)(2)"places the burden on the disobedient party to avoid expenses by showing that his failure is justified or that special circumstances make an award of expenses unjust.") (internal quotations omitted); *Intertec Contracting v. Turner Steiner Int'l, S.A.*, 98 Civ. 9116, 2001 WL 812224 at *11 (S.D.N.Y. July 18, 2001) ("[F]ailure to comply with discovery orders justly allows the court to impose costs upon the failing party.... The Second Circuit has repeatedly stated the importance of following discovery orders of the Court, warning that '[a] party who flouts such orders does so at his peril." '); 2 *Silberberg* § 26:13 ("Fed.R.Civ.P. 37(b), (d)*requires* the court to impose the sanction [of awarding attorneys' fees] unless the court finds that the failure to obey a discovery order or to make discovery was substantially justified or that other circumstances make an award of expenses unjust."); 7 *Moore's Federal Practice* § 37.51[9] ("If a party disobeys a discovery order, the district court *must* require the disobedient party, or the attorney advising that party, or both, to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified, or that other circumstances make an award of expenses unjust.... The disobedient party bears the burden of proving that its failure was substantially justified, or that it would be unjust for some other reason to impose compensatory monetary sanctions.") (emphasis added); 8A Wright, Miller & Marcus, *Federal Practice & Procedure: Civil 2d* § 2289 at 672-74 (Attorneys' fee is "one sanction that must always be considered [under Rule 37(b)(2) ] no matter what action is taken under the five lettered paragraphs.... The 1970 amendment [to Rule 37(b)(2) ] made the award [of attorneys' fees] mandatory, regardless of what other sanctions may be imposed unless the delinquent party shows substantial justification for its failure or other circumstances making an award unjust. This provision is in most respects similar to the award of expenses and fees provided for in Rule 37(a)(4) and the discussion of that portion of the rule should be consul-

ted.") (fns. citing cases omitted).

**\*16** Pursuant to Rule 37(b)(2), Jossem is ordered to reimburse JSC the remaining $100,103 associated with judicial involvement in the discovery disputes over the Apartment Documents. As discussed in detail above, in response to JSC's application, the Court ordered the non-privileged Apartment Documents produced, and further ordered that any Fifth Amendment assertion must be "sufficiently asserted" and "not just a blanket, I assert the Fifth now, find me 6 weeks later" assertion. (*See* page 7 above.) Jossem, however, disobeyed this order, submitting a blanket Fifth Amendment assertion through her attorney. (*See* page 7 above.) As a result, JSC was forced to expend thousands of dollars to fight Jossem for the Apartment Documents, which, at the end of the day, comprised 8,400 non-privileged documents (only six documents were privileged, and that was based on the attorney-client, not Fifth Amendment, privilege). (*See* pages 12-13 above.) For the reasons stated above (*see* page 30 n. 8 above), Jossem was not substantially justified in failing to produce the documents in response to the Court's initial (and several follow-up) orders. The attorneys' fees sought by JSC is a just sanction that relates directly to the fees expended by JSC in connection with judicial proceedings necessary to get Jossem to obey the Court's orders to produce all of the non-privileged Apartment Documents. *See,e.g.,Daval Steel Prods v. M/V Fakredine,* 951 F.2d 1357, 1366 (2d Cir.1991) ("[W]e find that the district court's imposition of sanctions upon Ekco [under Fed.R.Civ.P. 37(b)(2) ] was wholly justified. Ekco was subject to an unequivocal order of the court requiring it to produce a witness for deposition, and to produce documents relating to that deposition. The court's order was issued at a hearing during which the scope of required discovery was fully discussed, and Ekco's objections to that discovery were explicitly rejected. The order itself was necessitated only by Ekco's inexcusable refusal to comply voluntarily with proper party-initiated discovery. The conduct of Ekco's counsel at the July 12, 1991 deposition, the repeated failure to pro-

Not Reported in F.Supp.2d                                                                                   Page 18
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

duce demanded documents subject to an explicit court order, and Ekco's unilateral refusal to continue the deposition following a largely aborted initial session evince a willful frustration of plaintiffs-appellees' efforts to discover the true facts concerning potential alter ego liability. The district court was accordingly justified in imposing severe sanctions for this failure to comply with court-ordered discovery."); *Knox v. Palestine Liberation Org .,* 03 Civ. 4466, 2005 WL 712003 at *1, 6-7 (S.D.N.Y. Mar. 21, 2005) ("Plaintiffs seek the award of the costs and attorneys' fees they incurred in attempting to secure responses to their discovery requests.... The Court ... concludes that Plaintiffs are entitled to recover the costs and attorneys' fees incurred in attempting to secure compliance with the Court's discovery Orders."); *Creative Res. Group of New Jersey, Inc. v. Creative Res. Group, Inc.,* 212 F .R.D. 94, 102 (E.D.N.Y.2002) ("Rule 37 allows for the imposition of sanctions in the form of reasonable fees and costs incurred by reason of a party's discovery failures. This court finds that the plaintiff was forced to expend wholly unnecessary time and effort in its unsuccessful attempts to get the defendants to comply with their discovery obligations. This waste of time and resources was caused by the defendants' bad conduct, which required the plaintiff to make motions to compel and motions for sanctions."); *A.V. by Versace, Inc. v. Gianni Versace S.p.A.,* 96 Civ. 9721, 98 Civ. 0123, 2002 WL 54610 at *8 (S.D.N.Y. Jan. 15, 2002) ("There is no question that plaintiff has expended substantial time and effort in attempting to secure responses to its document requests and compliance with this Court's Orders, over a period of over two years. Clearly, it is entitled to the attorneys' fees and costs it has incurred in these efforts" pursuant to Rule 37(b)(2).); *Bowne of New York City, Inc. v. AmBase Corp.,* 161 F.R.D. 258, 261, 265 (S.D.N.Y.1995) (Rule 37 attorneys' fees awarded where party "and its counsel refused to produce more than 1,500 documents or answer more than 100 deposition questions on the grounds of attorney-client privilege and work product protection" where defendant's opposition to production ignored

clear Second Circuit law.).[FN11]

> FN11. Were Jossem to argue that any of its actions after the first Court conference about the Apartment Documents were not in "violation" of a Court order, the sanction of attorneys' fees still would be proper pursuant to Fed.R.Civ.P. 37(a)-JSC was required to make numerous applications to the Court, and the Court was required to issue numerous orders and hold several conferences, in order to get Jossem to produce over eight thousand pages of documents that should have been produced without the need for any judicial involvement. *See,e.g.,Alvarado v. Manhattan Worker Career Ctr.,* 01 Civ. 9288, 2003 WL 194203 at *1 (S.D.N.Y. Jan. 28, 2003) (Rule 37(b)(2) sanction of attorneys' fees ordered: "After the October 8, 2002 hearing, this court found that plaintiff failed to establish that his repeated failures to abide by orders of this court were substantially justified.... Accordingly, pursuant to an exercise of its discretion in this area, the court awarded defendants attorneys' fees and costs incurred in addressing the extended discovery dispute."); *Creative Res. Group of New Jersey, Inc. v. Creative Res. Group, Inc.,* 212 F.R.D. at 102;*AFP Imaging Corp. v. Philips Medizin Sys.,* 92 Civ. 6211, 1994 WL 698322 at *1 (S.D.N.Y. Dec. 13, 1994) ("Defendant ... was entitled to reimbursement of its attorneys' fees and expenses pursuant to Rule 37(a)(4), Fed.R.Civ.P., as the prevailing party on various discovery motions as to which Plaintiff's opposition was not substantially justified. In addition to its repeated failure to meet its discovery obligations under the Federal Rules of Civil Procedure, Plaintiff violated two Court Orders requiring discovery production."); *Brignoli v. Balch, Hardy & Scheinman, Inc.,* 86 Civ. 4103, 1989 WL 146767 at *14 (S.D.N.Y. Dec. 1,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1989) ("Counsel's bad faith was illustrated by a course of conduct which consisted of routinely failing to produce ... documents ...; requiring defense counsel to bring the failure to the attention of the court for the setting of a hearing or conference, at which time counsel for plaintiff would agree or be ordered to produce documents within a fixed period of time, following which counsel for plaintiff would fail to produce the documents within the agreed or established period, requiring defense counsel to again seek the court's intervention. All told, the cycle was repeated across four court-ordered production deadlines, none of which was satisfied. The conduct set forth above is a paradigm of discovery abuse.").

**\*17** Indeed, Jossem's counsel acknowledged at the September 21, 2004 conference that generally the prevailing party is entitled to attorneys' fees under Rule 37:

THE COURT: And under Rule 37 the loser pays if the court wishes to go that route on any discovery motion?

MR. AKBAR

[Jossem's Counsel]: Agreed.

(9/21/04 Peck Conf. Tr. at 37, quoted more fully at pages 13-17 above.) Jossem's only argument for not imposing fees on her was that JSC did not show "prejudice." (9/21/04 Peck Conf. Tr. at 36-40, quoted at page 13 above; *see also,e.g.,*Dkt. No. 391: Jossem Objections to 9/21/04 Order, at 3, 18-21.) Jossem's argument that if she had the documents at the time of the first document demand, JSC would have had to make the same motions to compel production, and thus JSC had no additional expense from their "late" discovery is frivolous. (Jossem Objections to 9/21/04 Order at 3, 20-21.) If Jossem had required JSC to jump through the same hoops earlier, the Court could-and would-have im-

posed Rule 37(a)-(b) attorneys' fees sanctions at that earlier time.

Second, Jossem argues that JSC has not shown "prejudice." As the Court stated at the September 21, 2004 conference, at a minimum JSC's prejudice is that it spent over $100,000 in attorneys' fees. To the extent prejudice is necessary before imposing attorneys' fees as a sanction-which it is not-the expenditure of money in legal fees constitutes the prejudice. Moreover, while the Court may need to consider the issue of prejudice before imposing more severe sanctions (such as preclusion, dismissal, default judgment, etc.), it is not a factor for the award of attorneys' fees to the prevailing party. *See* 7 *Moore's Federal Practice* § 37.50[1][a] ("Prejudice, however, is not an essential prerequisite for the imposition of sanctions. It is important to the administration of justice for courts to respond to unexcused violations of their orders, even when it is not clear that the violations have adversely affected another party's substantive rights ... [A] court should not permit the moving party to suffer net economic losses as a result of another party's violation of a discovery order.") (fns. citing cases omitted); *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union,* 212 F.R.D. 178, 229 (S.D.N.Y.2003) ("[T]he Union's assertion that the Met must show prejudice before a sanction may be ordered under Rule 37 is without merit."); *Yeboah v. United States,* 99 Civ. 4923, 2000 WL 1576886 at \*4-5 (S.D.N.Y. Oct. 20, 2000) (attorneys' fees awarded, rejecting plaintiff's argument that defendant was not prejudiced because the documents ultimately were produced. "[T]his assertion is irrelevant to the imposition of Rule 37 [monetary] sanctions. Counsel simply ignores the fact that the required compliance with the discovery request only came about as the result of months of effort by defendant's counsel...."). None of the cases (and treatises) cited above awarding attorneys' fees under Rule 37(a) or 37(b) required (or even discussed) any need for prejudice (beyond the expense to the prevailing party) in order to award attorneys' fees.[FN12]

FN12. In contrast, Jossem cites to an opinion from the District of Kansas which states that "[f]ailure to comply with the mandate of [Rule 37(c)(1) ] is harmless when there is no prejudice to the party entitled to the disclosure."*Nguyen v. IBP, Inc.,* 162 F.R.D. 675, 680 (D.Kan.1995); *see also Kara Holding Corp. v. Getty Petroleum Mktg., Inc.,* 99 Civ. 0275, 2004 WL 1811427 at *24 (S.D.N.Y. May 12, 2004) (quoting *Nguyen* ). (See Dkt. No. 390:Akbar 10/5/04 Aff. Ex. Z: Jossem Opp. Br. at 3.) After citing to *Nguyen* and *Kara,* Jossem argues that JSC has not demonstrated that it was prejudiced by Jossem's conduct. (Jossem Opp. Br. at 4.) According to the cases that Jossem cited, whether the non-disclosure was harmless is Jossem's burden to prove. *See, e.g., Nguyen v. IBP, Inc.,* 162 F.R.D. at 680 ("The burden of establishing substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosure."). However, in both *Kara* and *Nguyen,* the issue was whether evidence should be precluded because of missing information in the expert's report. Preclusion is a far more severe sanction than attorneys' fees. The Court does not find *Kara* or *Nguyen* applicable to the issue of awarding attorneys' fees under Fed.R.Civ.P. 37(a)-(b); if it were, the Court declines to follow them.

**\*18** As the Court warned Jossem's counsel at the September 21, 2004 conference (*see* pages 16-17 above), JSC also is entitled to its fees for the sanctions motions. *See, e.g., Creative Res. Group of New Jersey, Inc. v. Creative Res. Group, Inc.,* 212 F.R.D. at 103 ("Here, the plaintiff is entitled to costs incurred both in making motions to compel and in seeking to have the orders that followed from these motions enforced ..."); 7 *Moore's Federal Practice* § 37.23[6] at 37-52 ("Attorneys' fees incurred in preparing a request for expense shifting

sanctions are also recoverable. Likewise, the costs of defending on appeal an award of expense shifting sanctions may be added to the original sanction award.") (fns. citing cases omitted); *Bowne of New York City, Inc. v. AmBase Corp.,* 161 F.R.D. 258, 263 (S.D.N.Y.1995) ("Judge Dolinger's finding that AmBase's positions on all three [Rule 37] motions were not substantially justified, and his ruling that AmBase must pay Bowne and Chemical's expenses in preparing all three motions, specifically applied to all three motions. It is true that because Judge Dolinger found that AmBase had largely waived its privilege claims he did not need to rule on each individual document or deposition question addressed by the testimony and document motions. However, it would be perverse to hold that the fact that AmBase lost on the waiver motion meant that its opposition to the other motions was justified or that Bowne and Chemical must therefore cover the costs of bringing the motions to compel. Therefore, AmBase will only be relieved of its obligation to pay expenses related to a specific motion if it can show that its position on that motion was substantially justified.... Therefore, Judge Dolinger's decision that AmBase's opposition to these two motions was not substantially justified was neither contrary to law nor clearly erroneous, and the ruling awarding Bowne and Chemical the costs of defending the testimony and document motions must stand .").

## II. *AS AN ALTERNATE GROUND, JOSSEM IS ORDERED TO REIMBURSE JSC $108,946 UNDER THE COURT'S INHERENT POWER TO IMPOSE SANCTIONS*

The Court finds that the sanction of requiring Jossem to pay JSC's attorneys' fees in connection with the discovery applications that-after several Court orders-led to Jossem's production of all but 6 of the 8,400 Apartment Documents is fully justified under Rule 37(a)-(b) of the Federal Rules of Civil Procedure. Nevertheless, if a reviewing court for some reason were to find the $108,946 sanction unavailable under Rules 37(a)-(b), the sanction would be appropriate pursuant to the Court's inherent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

power to impose sanctions for Jossem's discovery abuses.

"Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs.... Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction ..."*Residential Funding Corp. v. Degeorge Financial Corp.,* 306 F.3d 99, 106-07 (2d Cir.2002); *see also,e.g.,Blauinsel Stiftung v. Sumitomo Corp.,* No. 03-7636, 88 Fed. Appx. 443, 445 (2d Cir. Feb. 12, 2004) ("Although appellants take issue with the district court's authority under Fed.R.Civ.P. 37(b) to have sanctioned them to nearly the full amount of defendants' expenses, we need not reach that issue as we find the district court's 'inherent power to manage its own affairs'-on which the district court also expressly relied-provided the court with sufficient authority."); *Reilly v. Natwest Mkts. Group Inc.,* 181 F.3d 253, 267 (2d Cir.1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses."), *cert. denied,*528 U.S. 1119, 120 S.Ct. 940 (2000); *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 135-36 (2d Cir.1998); *Alaimo v. Trans World Airlines, Inc.,* 00 Civ. 3906, 2005 WL 267558 at *3 (S.D.N.Y. Feb. 3, 2005) ("Even in the absence of a discovery order, sanctions may be imposed pursuant to the Court's inherent power to manage its own affairs."); *Marathon Ashland Petroleum LLC v. Equili Co.,* 00 Civ.2935, 2004 WL 992196 at *3 (S.D.N.Y. May 5, 2004) (same); *Cielo Creations, Inc. v. Gao Da Trading Co.,* 04 Civ.1952, 2004 WL 1460372 at *3-4 (S.D.N.Y. June 28, 2004).

***19** "Because of the potency of the court's inherent power, courts must take pains to exercise restraint and discretion when wielding it. Accordingly, this court has required a finding of bad faith for the imposition of sanctions under the inherent power doctrine. That bad faith must be shown by (1) 'clear

evidence' or (2) 'harassment or delay or ... other improper purposes." ' *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d at 136. [FN13]

> FN13. Although *United States v. Seltzer,* 227 F.3d 36, 40-48 (2d Cir.2000), limited the *DLCMgmt. Corp.* holding that required a showing of bad faith in circumstances not applicable here, this Court must make a finding of bad faith in order to sanction Jossem using the Court's inherent powers. As explained in a recent decision in this District:
>
>> The Second Circuit has set out two different circumstances under which a district court may assess attorney's fees against counsel pursuant to its inherent authority. First, '[w]hen a district court invokes its inherent power to impose attorney's fees or to punish behavior by an attorney in the actions that led to the lawsuit or conduct of the litigation, which actions are taken on behalf of a client, the district court must make an explicit finding of bad faith.'*United States v. Seltzer,* 227 F.3d 36, 41-42 (2d Cir.2000) (internal quotation marks and citations omitted). Second, 'when the district court invokes its inherent power to sanction misconduct by an attorney that involves that attorney's violation of a court order or other misconduct that is not undertaken for the client's benefit, the district court need not find bad faith before imposing a sanction under its inherent power.'*Id.* at 42.
>
> *Rowe Entm't, Inc. v. William Morris Agency, Inc.,* 98 Civ. 8272, 2005 WL 1804233 at *3 (S.D.N.Y. Aug. 1, 2005).

This Court thus finds support for its award to JSC of $108,946 in attorneys' fees pursuant to the Court's inherent powers. As described on pages 11-12 above, Jossem clearly acted in bad faith

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

when she ceased to use her name in her Christie's dealings (which has never been explained to the Court), in her failure to produce the Apartment Documents when they were first requested (apparently to allow her to continue her Christie's dealings), in seeking stays of the time to provide an affidavit supporting her Fifth Amendment privilege claim where she then only asserted a blanket claim that the Court already held would be insufficient and, in any event, where no Fifth Amendment privilege existed for the documents, and in not producing the responsive Apartment Documents without Court intervention once they were discovered by JSC's counsel (solely because the documents appear to be devastating to Jossem concerning JSC's alter ego claims). (*See* pages 3-18 above; *see also* page 25 n. 6 above.) The Court itself had reviewed a large number of the withheld documents, and finds that there was no justification for Jossem's failure to produce them. Indeed, Jossem ultimately decided to withdraw its remaining Fifth Amendment claim after filing objections to one of my orders, belatedly being concerned by defendant JSC's arguments. (*See* page 14 above.) Jossem's bad faith is shown by clear evidence and because her failure to produce was for purpose of delay and other improper purposes. Sanctions of JSC's attorneys' fees clearly are justified under the case law as to the Court's inherent power to impose sanctions. *See,e.g.,Blauinsel Stiftung v. Sumitomo Corp.,* 88 Fed. Appx. at 445 ("The district court found that the appellants here engaged in a series of actions, orchestrated by counsel in bad faith, to evade their discovery obligations, and that appellants, with full knowledge that they were under a court order to produce the trustees for deposition, chose instead to voluntarily dismiss their suit for the purpose of evading that order. Further, although appellants' counsel represented otherwise to the district court, the court found that appellants then quickly filed the same lawsuit in state court under different plaintiffs' names. Because none of the foregoing findings are clearly erroneous, the district court 'was within [its] discretion to vindicate itself and compensate [defendants] by requiring [appellants]

to pay for all attorney's fees.' "); *DLC Mgm't Corp. v. Town of Hyde Park,* 163 F.3d at 136 (Finding of bad faith by magistrate judge upheld and deemed "sufficiently concise and based on clear evidence" where magistrate found that "defendants had acted in 'conscious disregard of their discovery obligations.' "); *D'Ascoli v. Roura & Melamed,* 02 Civ. 2684, 2003 WL 22019730 at *4 (S.D.N.Y. Aug. 6, 2003) (Default judgment recommended by magistrate judge using inherent powers where "Roura & Melamed did not file a response to D'Ascoli's sanctions motion, and Serrins ignored a telephone message from the Court inquiring as to their response. Such behavior shows a complete disregard for the judicial system, bad faith in the conduct of this litigation, willful disobedience of the Court's orders, and a vexatious delay of proceedings. Roura & Melamed and Serrins have failed to offer any justification for their noncompliance."), *modified,*2003 WL 22439648 at *1 (S.D.N.Y. Oct. 23, 2003); *Alvarado v. Manhattan Worker Career Ctr.,* 01 Civ. 9288, 2003 WL 194203 at *1 (S.D.N.Y. Jan. 28, 2003) (Attorney's fees awarded under Rule 37(b) and the court's inherent power where "[a]fter the ... hearing, this court found that plaintiff failed to establish that his repeated failures to abide by orders of this court were substantially justified. Specifically, the court found that plaintiff's failure to comply with provisions of three Orders 'was willful and that plaintiff and/or his attorney acted in bad faith.' "); *Murphy v. Board of Educ. of Rochester City School Dist.,* 196 F.R.D. 220, 228 (W.D.N.Y.2000) ( "[T]his Court finds that Logan-Baldwin's decision to issue the third-party subpoenas discussed herein without notice to opposing counsel was without any colorable basis and was undertaken in bad faith. Having so found, it is the decision of this Court that Logan-Baldwin should pay as a compensatory sanction the attorneys' fees and costs incurred by the School District defendants as a result of her conduct.").

*CONCLUSION*

**\*20** For the reasons set forth above, the Court or-

Not Reported in F.Supp.2d                                                                    Page 23
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1958361)**

ders Jossem to reimburse JSC for $108,946 in attorneys' fees pursuant to Rules 37(a)-(b) of the Federal Rules of Civil Procedure and, to the extent necessary, the Court's inherent power..

### *FILING OF OBJECTIONS TO THIS OPINION AND ORDER*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Opinion and Order to file written objections. *See also*Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable John G. Koeltl, 500 Pearl Street, Room 1030, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Koeltl. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,*513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,*506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

SO ORDERED.

S.D.N.Y.,2005.
JSC Foreign Economic Association Technostroyexport v. International Development and Trade Services, Inc.
Not Reported in F.Supp.2d, 2005 WL 1958361 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX D

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2008 WL 857530 (S.D.N.Y.)
**(Cite as: Slip Copy, 2008 WL 857530)**

Gore v. The RBA Group, Inc.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Charles E. GORE, Plaintiff,
v.
THE RBA GROUP, INC. and Haider Engineering,
Defendants.
**No. 03-CV-9442 (KMK)(JCF).**

March 31, 2008.

David M. Fish, Esq., New York, NY, for Plaintiff.
David M. Walsh, Esq., Simmons Jannace & Stagg,
E. Meadown, NY, for Defendant.
John M. Nolan, II, Esq., David Matthew Walsh,
Esq., Jackson Lewis LLP, Morristown, NJ, for Defendant.
Joseph B. Florenzo, Esq., Sokol, Behot & Fiorenzo,
Hackensack, NJ, for Defendant.

*ORDER ADOPTING REPORT & RECOMMENDATION*

KENNETH M. KARAS, District Judge.
**\*1** *Pro se* Plaintiff Charles Gore ("Plaintiff") filed a
Complaint and an Amended Complaint against Defendant The RBA Group, Inc. ("Defendant" or
"RBA") on November 20, 2003, and February 20,
2004, respectively. Subsequently, Plaintiff obtained
counsel and, on July 1, 2004, filed a Second
Amended Complaint against RBA and Haider Engineering ("Haider"), alleging unlawful racial harassment pursuant to Title VII of the Civil Rights
Act of 1964, 42 U.S.C. § 2000e, *et seq.,*42 U.S.C. §
1981, New York City Human Rights Law
("NYCHRL"), N.Y.C. Admin. Code § 8-101*et seq.,*
and New York State Human Rights Law
("NYSHRL"), N.Y. Exec. Law § 290 *et seq.,* stemming from events occurring in March 2002.[FN1]

> FN1. Plaintiff originally included claims of
> retaliation and disparate treatment, but
> later withdrew those claims. (Pl.'s Br. in

Opp'n to Def. RBA Group's Mot. for
Summ. J. 2 n. 4 ("Pl.'s Opp'n").) To this
date, Haider has not answered the Second
Amended Complaint and apparently is in
default.

On January 22, 2004, this case was referred to Magistrate Judge Francis for pretrial case management
and dispositive motions. The case was reassigned to
this Court on October 5, 2004. On April 27, 2005,
Defendant filed this Motion for Summary Judgment, and on August 29, 2005, Magistrate Judge
Francis issued a Report and Recommendation ("R
& R"), recommending that the Motion be denied.
For the reasons stated Magistrate Judge Francis's
thoughtful R & R and herein, Defendant's Motion
for Summary Judgment is denied in its entirety.

The relevant facts are thoroughly discussed in Magistrate Judge Francis's R & R, and the Parties' familiarity with them is assumed.

*I. Standard of Review*

*A. Summary Judgment*

"The judgment sought should be rendered if the
pleadings, the discovery and disclosure materials on
file, and any affidavits show that there is no genuine issue as to any material fact and that the movant
is entitled to judgment as a matter of
law."Fed.R.Civ.P. 56(c)."In determining whether a
genuine issue of material fact exists, a court must
examine the evidence in the light most favorable to,
and draw all inferences in favor of, the non-movant
.... " *Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d
243, 253-54 (2d Cir.2002). To defeat Defendant's
Motion for Summary Judgment, Plaintiff must
make a sufficient showing of proof on each element
of his claim for which he bears the burden of proof.
*See Celotex Corp. v. Catrett,* 477 U.S. 317, 325
(1986) (holding that the moving party is not required "to produce evidence showing the absence
of a genuine issue of material fact"); *Adorno v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Lord & Taylor,* No. 97-CV-4444, 1999 WL 759995, at *2 (S.D.N.Y. Sept. 27, 1999) (holding that plaintiff must prove "there is a reasonable amount of proof supporting the essential elements of his case which must be proved at trial").

*B. Reviewing a Magistrate Judge's Report and Recommendation*

A district court reviewing a report and recommendation " 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.' " *Donahue v. Global Home Loans & Fin., Inc.,* No. 05-CV-836, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007) (quoting 28 U.S.C. § 636(b)(1)(C)). Under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, parties may submit objections to a magistrate judge's report and recommendation. The objections must be "specific" and "written," and must be made "within 10 days after being served with a copy of the recommended disposition." Fed.R.Civ.P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Where a party does not submit an objection, " 'a district court need only satisfy itself that there is no clear error on the face of the record.' " *Donahue,* 2007 WL 831816, at *1 (quoting *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985)).

**\*2** If a party submits a timely objection to a report and recommendation, the district judge will review the parts of the report and recommendation to which the party objected under a *de novo* standard of review. *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); Fed.R.Civ.P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.").

The Parties' objections to the R & R were due September 19, 2005. Pursuant to Fed.R.Civ.P. 72, the ten-day period in which to file objections commences from the date the report and recommendation is served. Service by mail is "complete upon mailing." Fed.R.Civ.P. 5(b)(2)(C). A mailing occurs at the " 'instant the documents are placed into the hands of the United States Post Office or a Post Office Box.' " *Greene v. WCI Holdings Corp.,* 136 F.3d 313, 315 (2d Cir.1998) (quoting *United States v. Kennedy,* 133 F.3d 53, 59 (D.C.Cir.1998)).

On September 19, 2005, Defendant sent a letter to this Court seeking clarification regarding the time limit within which the Parties were required to file objections to the R & R. In its letter, Defendant calculated that its objections were due by September 23, 2005. Defendant's calculations were inaccurate. The R & R stated that copies were mailed to the Parties on August 29, 2005. (R & R 19.)However, the envelope containing Defendant's copy of the R & R was postmarked August 30, 2005. Therefore, Defendant had until September 19, 2005-ten days from August 30, not including weekends or holidays, and adding three days for mail service-to file its written objections.[FN2]

> FN2. In its September 22, 2005 Order, the Court initially stated that Defendant's objections were due on September 16, 2005 because the R & R stated that it had been mailed to the Parties on August 29. The Court was later informed by Defendant that the envelope in which its copy arrived was postmarked August 30. (Cert. of Joseph B. Fiorenzo, Esq., in Supp. of Def.'s Rule 6(b) Mot. to File Written Objections Out-of-Time ¶ 2 & Ex. A.) Pursuant to Rule 5(b), the determining moment for service is when the mail reaches the Post Office or a post office box, not when it is placed in an out-box or when it is postmarked by postal service employees. *See Greene,* 136 F.3d at 315; *Kennedy,* 133 F.3d at 59. Here, it appears that Magistrate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Judge Francis placed the R & R in the out-box on August 29 to be mailed. The mail in the Courthouse is picked up twice per day, postmarked by Courthouse personnel, and delivered to the United States Post Office the same day it is picked up. Because the mail is postmarked before it reaches the Post Office, and the envelope in question is postmarked August 30, it appears that the R & R did not reach the Post Office until August 30. Therefore, service was not completed until August 30.

On September 22, 2005, the Court ordered Defendant to submit a motion to file the objections out-of-time pursuant to Fed.R.Civ.P. 6(b), along with its objections, by September 23, 2005. At the time, the Court was under the impression that Defendant's time to file objections had expired on September 16, 2005. However, given that Defendant's time to file objections did not expire until September 19, 2005, the Court will construe its September 19, 2005 letter seeking clarification as a request for an enlargement of time under Fed.R.Civ.P. 6(b)(1). The Court grants Defendant's request. Because Defendant filed its objections on September 23, 2005, as ordered, its objections were timely filed. Therefore, the Court has conducted a *de novo* review of those portions of the R & R to which specific objections were made. *See United States v. Raddatz,* 447 U.S. 667, 673-74 (1980) (citing 28 U.S.C. § 636(b) (1)).

## II. Defendant's Objections

Defendant has moved for summary judgment on two grounds: (1) Plaintiff's Title VII claim fails because no employer-employee relationship existed between the Parties during the relevant time period; and (2) even if there was an employer-employee relationship between the Parties during the relevant time period, Plaintiff's hostile work environment claim fails because Plaintiff has not established vicarious liability on behalf of Defendant. Defendant objects to Magistrate Judge Francis's rejection of

these two claims. Additionally, Defendant objects to the R & R on the ground that Plaintiff did not suffer a tangible employment action. The Court addresses each of RBA's arguments in turn.[FN3]

FN3. Haider did not file a summary judgment motion, let alone answer the Complaint.

*A. Employer-Employee Relationship*

**\*3** Defendant has moved for summary judgment on the basis that no employer-employee relationship existed between RBA and Plaintiff at the time of the alleged harassment, as is required by Title VII. Title VII protects employees. *See* 42 U.S.C. § 2000e-2(a). An "employee" is "an individual employed by an employer." 42 U.S.C. § 2000e(f). Therefore, to be held liable under Title VII for unlawful practices, an employer-employee relationship must have existed between the Parties at the time of the alleged harassment.[FN4] *See Kern v. City of Rochester,* 93 F.3d 38, 44-45 (2d Cir.1996).

FN4. The same is not true for Section 1981, which does not require an employer-employee relationship for a plaintiff to recover. *See Lenoble v. Best Temps, Inc.,* 352 F.Supp.2d 237, 246 (D.Conn.2005) (noting that Section 1981 claims are not limited to employers); *Santiago v. City of Vineland,* 107 F.Supp.2d 512, 541 (D.N.J.2000) (same). Here, Plaintiff was supervised daily by Julius Giarraputo ("Giarraputo"), an RBA Group employee. Therefore, Plaintiff can maintain his harassment claim against Defendant under Section 1981.

Additionally, Plaintiff can maintain his harassment claim against Defendant under New York City and State Human Rights Laws. As discussed *infra,* although Defendant RBA Group did not pay Plaintiff, its employees supervised him on a day-to-day basis. Such supervision is sufficient to establish a claim for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

harassment under New York City and State Human Rights Laws. *See Dunson v. Tri-Maint. & Contractors, Inc.,* 171 F.Supp.2d 103, 113 (E.D.N.Y.2001) (holding that NYCHRL is subject to same analysis as NYSHRL); *O'Gorman v. Holland,* No. 97-CV-0842, 2000 WL 134514, at *6-7 (S.D.N.Y. Feb. 3, 2000) (denying summary judgment under NY-SHRL where evidence that defendant "person" aided and abetted unlawful acts); *Sanchez v. Brown, Harris, Stevens, Inc.,* 651 N.Y.S.2d 477, 478 (App.Div.1996) (affirming denial of summary judgment under NYSHRL where there was factual question of individual defendant's aiding and abetting of harassment of plaintiff).

Plaintiff argues that RBA and Haider jointly employed him. The joint employer doctrine "construe[s] the term 'employer' functionally, 'to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an employee's compensation or terms, conditions, or privileges of employment.' " *Laurin v. Pokoik,* No. 02-CV-1938, 2004 WL 513999, at *8 (S.D.N.Y. Mar. 15, 2004) (quoting *Equal Employment Opportunity Comm'n v. Sage Realty Corp.,* 507 F.Supp. 599, 611 (S.D.N.Y.1981)). Employers may have "joint" status even though they are separate legal entities if they have "chosen to handle certain aspects of their employer-employee relationships jointly." *Id.* (internal quotation marks omitted). In determining whether employers have "joint" status, the courts consider "commonality of hiring, firing, discipline, pay, insurance, records, and supervision." *N.L.R.B. v. Solid Waste Servs., Inc.,* 38 F.3d 93, 94 (2d Cir.1994).

Defendant objects to Magistrate Judge Francis's treatment of the joint employer doctrine. According to Defendant, Judge Francis's error was in relying on, with one exception, "mostly older [Second Circuit] cases." (Written Objections of Def. RBA

Group to R & R of Hon. James C. Francis, IV, U.S.M.J., in Connection with Def.'s Mot. for Summ. J. 2-3 ("Def.'s Obj.").) A review of the more recent Second Circuit cases, Defendant contends, shows that an entity cannot be liable under Title VI unless it is "the employer of the plaintiff at the time that the alleged discriminatory conduct occurred."(*Id.* 3.) Defendant's position begins with the Second Circuit's decision in *O'Connor v. Davis,* 126 F.3d 112 (2d Cir.1997). In *O'Connor,* the Second Circuit held that "a prerequisite to considering whether an individual is [an employee] is that the individual have been hired in the first instance."*Id* . at 115.The *O'Connor* court also emphasized that remuneration was an "essential condition" in ascertaining an employeremployee relationship. *Id.* at 116.These points were echoed in the slightly more recent decision of *York v. Ass'n of the Bar of the City of New York,* 286 F.3d 122, 125 (2d Cir.2002) (rejecting claim that defendant employed an unpaid volunteer). The anchor of Defendant's position, however, is *Scaglione v. Chappaqua Central School District,* 209 F.Supp.2d 311 (S.D.N.Y.2002). In *Scaglione,* the court claimed that there was a contradiction between *O'Connor* and *York* and, *Spirt v. Teachers Insurance and Annuity Ass'n,* 691 F.2d 1054, 1063 (2d Cir.1982), vacated on other grounds, 463 U.S. 1223 (1983), an earlier Second Circuit decision which had recognized that joint employers were covered by Title VII. *See Scaglione,* 209 F.Supp.2d at 315, n. 5. The *Scaglione* court determined that it was appropriate to go with the more recent cases, thereby concluding that "a direct employment relationship is a necessary trait of a Title VII 'employer.' " *Id.*

**\*4** Defendant's position crumbles from a closer reading of the relevant caselaw. For example, the basis for the joint employer doctrine is not limited to *Spirt,* but in fact is grounded in several Second Circuit decisions, including some post-dating the decisions relied upon by Defendant. For example, in *Solid Waste Services,* the Second Circuit held that a "joint employer relationship may be found to exist where there is sufficient evidence that [one

Slip Copy                                                                                                         Page 5
Slip Copy, 2008 WL 857530 (S.D.N.Y.)
(Cite as: Slip Copy, 2008 WL 857530)

entity] had immediate control over the other company's employees," identifying "commonality of hiring, firing, discipline, pay, insurance, records, and supervision" as "relevant factors." 38 F.3d at 94 (citing *Clinton's Ditch Coop. Co. v. NLRB,* 778 F.2d 132, 138 (2d Cir.1985)). And, the Second Circuit has repeatedly recognized both the joint employer concept and the same factors cited in *Solid Waste* Services in analyzing a claim of joint employment. *See, e.g., Arculeo v. On-Site Sales & Mktg., LLC,* 425 F.3d 193, 198 (2d Cir.2005) (citing *Clinton's Ditch* );*Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 89 (2d Cir.2005) (citing *Solid Waste Servs.* and *Clinton's Ditch* ).[FN5] Not surprisingly, the lower courts within the Second Circuit have followed suit. *See, e.g., Niland v. Buffalo Laborers Welfare Fund,* No. 04-CV-0187, 2007 WL 3047099, at *9 (W.D.N.Y. Oct. 18, 2007) (recognizing joint employer doctrine in Title VII context); *Shehab v. N.Y. State Dep't of Transp.,* No. 03-CV-5730, 2005 WL 659146, at *3 (S.D.N.Y. Mar. 10, 2005) (same); *Nelson v. Beechwood Org.,* No. 03-CV-4441, 2004 WL 2978278, at *4 (S.D.N.Y. Dec. 21, 2004) (same).

> FN5. Defendant attempts to evade the import of *Woodman,* claiming that it only applied the joint employer concept in the ADEA context. While true, the courts are unpersuaded that such a distinction makes a difference. *See Laurin,* 2004 WL 513999, at *4 ("The term [employer] is construed under Title VII and the ADEA in the same way."); *Schade v. Coty, Inc.,* No. 00-CV-1568, 2001 WL 709258, at *6 n. 5 (S.D.N.Y. June 25, 2001) (same); *Pemrick v. Stracher,* 67 F.Supp.2d 149, 169 n. 15 (E.D.N.Y.1999) ("The statutory definition of 'employer' under the ADEA is almost identical to that found in Title VII.").

This overwhelming weight of authority directly undercuts Defendant's position that there must be a direct relationship between the employer and the employee. *See Laurin,* 2004 WL 513999, at *4

("The term 'employer' has been construed liberally under Title VII, and does not require a direct employer/employee relationship."). And, while the factors the Second Circuit has identified should be considered, the term employer is to be viewed "functionally, to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an employee's compensation or terms, conditions, or privileges of employment."*Nelson,* 2004 WL 2978278, at *4 (internal quotation marks omitted). Or, in words that the Second Circuit could have used to describe this case:

> Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer.

*Arculeo,* 425 F.3d at 198. Simply put, the courts may look, among other things, at the control that the joint employers exercise over the employee in setting the terms and conditions of that employee's work.

**\*5** Here, Plaintiff presents numerous examples of the manner in which RBA controlled the terms and conditions of his employment during the time period in question. For example, "[Mr.] Giarraputo, the RBA employee in charge of the Route 231 project, admitted that he (a) supervised Mr. Gore on a day-to-day basis, (b) had the authority to discipline Mr. Gore, (c) assigned Mr. Gore work (as did other RBA employees), (d) set Mr. Gore's schedule, (e) decided if Mr. Gore got overtime or night work, and (f) could decide to transfer Mr. Gore."(Pl.'s Opp'n 15.) Additionally, "[a]n RBA supervisor ... assigned Mr. Gore to the Route 231 project ..., Mr. Gore supervised an RBA employee ... on the project ..., [and] RBA was involved in keeping records of Mr. Gore's hours worked."(*Id* . 15.)Moreover, after Plaintiff filed his complaint

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6
Slip Copy, 2008 WL 857530 (S.D.N.Y.)
**(Cite as: Slip Copy, 2008 WL 857530)**

with the New York State Department of Transportation ("DOT"), it was Ms. Sohn and Mr. Mavis, RBA employees, who conducted the internal investigation regarding Plaintiff's complaint and who inquired as to why Plaintiff had not followed the complaint procedures outlined in RBA's Employee Handbook. (Def.'s Statement of Material Facts Pursuant to Local Civil Rule 56.1 ¶¶ 30-34 ("Def's 56.1 Stmt."); R & R 5-6.) Additionally, Plaintiff was the only employee on the Route 231 project who was paid by Haider. (Dep. of Julius Giarraputo 12-13, 22 ("Giarraputo Dep.").) Given this evidence, it is not difficult to imagine a jury finding that Defendant completely controlled the terms and conditions of Plaintiff's work during the relevant time period.

The other factors used by courts to evaluate a claim of joint employment also demonstrate that there is work for a jury to do here. For example, Plaintiff has presented evidence demonstrating that Defendant had hired Plaintiff. Indeed, Defendant hired Plaintiff twice; first in November 1999, and again in March 2003, after Plaintiff was laid off by Haider. Certainly, from the sequence of these events, a reasonable jury could infer that Defendant lent Plaintiff to Haider merely to work on the Route 231 project and to get around state regulations that would have barred Defendant from employing Plaintiff and the other RBA employees working on the Route 231 project. Moreover, there can be no claim by Defendant that it did not compensate, either directly or indirectly, Plaintiff for the work he performed, as there is ample evidence that Plaintiff received a salary for his work. In other words, Plaintiff is nothing like the unpaid volunteer in *York.* *See Equal Employment Opportunity Comm'n v. Everdry Mktg. and Mgmt., Inc.,* 01-CV-6329, 2005 WL 231056, at *7 n. 7 (W.D.N.Y. Jan. 31, 2005) (distinguishing *York* on similar grounds). Given the weight of evidence suggesting that, although Haider nominally remunerated Plaintiff for some of the relevant time period, RBA controlled most aspects of Plaintiff's employment, summary judgment for Defendant is not ap-

propriate. *See Nelson,* 2004 WL 2978278, at *4 (denying summary judgment where plaintiff alleged that defendant was joint employer because it supervised and coordinated his day-to-day work).

*B. Hostile Work Environment*

**\*6** "In order to prevail on a hostile work environment claim, a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.... Second, the plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer."*Feingold v. New York,* 366 F.3d 138, 149-50 (2d Cir.2004) (internal quotation marks omitted). Third, Plaintiff must prove that the hostile conduct occurred because of his membership in a protected class. To make such a showing, a plaintiff must introduce evidence of hostile conduct that a reasonable juror could find was a result of the plaintiff's membership in a protected class. *See Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999).

"The first element of a hostile work environment claim has both an objective and subjective component: 'the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.' " *Petrosino v. Bell Atl.,* 385 F.3d 210, 221 (2d Cir.2004) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir.2003)). To maintain a hostile work environment claim, Plaintiff " 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment.' " *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir.2002) (quoting *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000)).

Defendant did not object to Magistrate Judge Francis's findings on the first and third elements,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

namely that Plaintiff provided sufficient proof "that the conditions of [Plaintiff's] employment were altered because of the racially hostile work environment on the Route 231 project," and that such hostility was based on Plaintiff's membership in a protected class (indeed, objecting to either would have been pointless on this record). (R & R 15.)Therefore, the Court reviews those recommendations for clear error and finds that Plaintiff has tendered enough evidence to substantiate the first and third elements of a hostile work environment. *See Reyes v. Mantello,* No. 00-CV-8936, 2003 WL 76997, at *1 (S.D.N.Y. Jan. 9, 2003) (holding that, where no objections are made, " 'a district court need only satisfy itself that there is no clear error on the face of the record' " (quoting *Smith,* 618 F.Supp. at 1189)). As to the first element, Plaintiff asserted that he subjectively found his work environment to be abusive as a result of Mr. Giarraputo's treatment over one and a half years. (R & R 15.)Additionally, Plaintiff's work environment was objectively abusive, as he allegedly was required to endure shockingly derogatory racial remarks from Mr. Giarraputo on a weekly basis, including being called a "nigger," a "piece of shit," and a "fat dumb black ass." (*Id.*) Indeed, Defendant's internal investigation into Plaintiff's allegations confirmed that Mr. Giarraputo had made racially derogatory comments directly to Plaintiff and to other RBA employees, and Mr. Giarraputo later admitted to referring to Plaintiff as "nigger" to his co-workers. (*Id.* 4, 6.) Additionally, after Plaintiff complained, Mr. Giarraputo allegedly made retaliatory comments to Plaintiff and sabotaged his performance by giving him false instructions. (*Id.* 15.)As to the third element, the slurs were clearly directed at Plaintiff by Mr. Giarraputo because of Plaintiff's race.

*7 Defendant objects to Magistrate Judge Francis's recommendation that the second element-imputing the abusive work environment to Plaintiff's employer-is satisfied by Plaintiff's proof of a tangible employment action. Defendant argues, as it did before Magistrate Judge Francis, that it should be permitted to present the so-called *Faragher/Ellerth* af-

firmative defense to rebut any finding of vicarious liability on its behalf. Indeed, when faced with a hostile work environment claim, an employer may be permitted to raise the *Faragher/Ellerth* affirmative defense, which is comprised of two elements: (1) "the employer exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."*Faragher v.. City of Boca Raton,* 524 U.S. 775, 807 (1998); *Burlington Indust ., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998). However, the employer may raise the defense "only if one of two further elements is met: either (1) the employee's supervisor took no 'tangible employment action,' which involves an official company act, against the employee; or (2) any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment."*Ferraro v. Kellwood Co.,* 440 F.3d 96, 101 (2d Cir.2006).

Therefore, before Defendant can successfully rely on the *Faragher/Ellerth* defense, the Court must first determine "whether the supervisor's behavior culminate[d] in a tangible employment action against the employee."*Fairbrother v. Morrison,* 412 F.3d 39, 49 (2d Cir.2005) (internal quotation marks omitted) (alteration in original), *abrogated on other grounds by Burlington N. and Sante Fe Ry. Co. v. White,* 548 U.S. 53 (2006)."If it did, 'the employer will, *ipso facto,* be vicariously liable.' " *Id.* (quoting *Mack v. Otis Elevator Co.,* 326 F.3d 116, 124 (2d Cir.2003)). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761.

Here, Plaintiff has proffered sufficient evidence for a reasonable juror to conclude that he suffered a significant change in employment status after he initially complained about Mr. Giarraputo's dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

criminatory treatment. In particular, Plaintiff has presented evidence that Giarraputo denied him night work assignments, which paid higher wages (Dep. of Charles Gore, vol. I, 205-06 ("Gore Dep. I")), gave him less substantial duties (*id.* 205), continued to call him racially derogatory names (Dep. of Charles Gore, vol. II, 287-88 ("Gore Dep. II")), and ultimately removed him from the Route 231 project (*id.* 290). Although these incidents occurred after Plaintiff initially complained to the DOT, they constituted retaliatory harassment by Mr. Giarraputo, which allegedly went unchecked by Defendant, and which can form the basis for a tangible employment action. *See Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999) (finding unchecked retaliatory harassment by coworkers constituted tangible employment action), *abrogated on other grounds by White, supra.* Because Plaintiff has established a genuine issue of fact regarding whether he suffered a tangible employment action, Defendant cannot rely on the *Faragher/Ellerth* affirmative defense to avoid a jury trial here. Therefore, the Court adopts Magistrate Judge Francis's R & R, and concludes that summary judgment is denied.

### III. Plaintiff's Cross-Claim for Costs and Attorneys' Fees

**\*8** Claiming that Defendant's objections to Magistrate Judge Francis's R & R were frivolous, Plaintiff seeks attorneys' fees and costs incurred in responding to these objections under 28 U.S.C. § 1927. Under this provision, an attorney may be required to pay costs and fees when that attorney engages in unreasonable and vexatious conduct. *See Baker v. Urban Outfitters, Inc.,* 431 F.Supp.2d 351, 362 (S.D.N.Y.2006)."It is well established that the imposition of sanctions under § 1927 requires 'a clear showing of bad faith on the part of an attorney,' and that bad faith may be inferred 'only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.' " *Salovaara v. Eckert,* 222 F.3d 19, 35 (2d Cir.2000) (quoting

*Shafii v. British Airways, PLC,* 83 F.3d 566, 571 (2d Cir.1996)).

Plaintiff argues that he has met his burden here because he has established that Defendant's objections "rely on misapplication and/or misunderstanding of the law, as well as selective citation to a portion of the relevant facts."(Pl.'s Reply to Def.'s Objections to the Magistrate's R & R 14 ("Pl.'s Reply").) Indeed, Defendant did not have the better of the argument here, but the Court cannot say that there has been a clear showing of bad faith on the part of Defendant's counsel. In fact, at least some of Defendant's positions arguably found some support in the caselaw. The Court is not prepared to say that bad arguments themselves justify Section 1927 awards, as such would trigger an avalanche of fees awarded in other cases. *Cf. Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 340 (2d Cir.1999) (reversing award of section 1927 fees when attorney's conduct was nothing more than "the result of poor legal judgment"). However, the Court will deny the application without prejudice for Plaintiff to renew it at a later date if circumstances warrant such an application. Vexatiousness is not conduct that necessarily can be captured in a snap-shot, but instead may in some circumstances be discovered only over the life of a case. Because this case lives beyond today, Plaintiff is not barred from making a similar claim at a later date.

### IV. Conclusion

For the reasons stated above, Defendant's Motion to File Out-of-Time Written Objections is GRANTED. Defendant's Motion for Summary Judgment is DENIED in its entirety. Plaintiff's cross-claim for costs and attorneys' fees pursuant to 28 U.S.C. § 1927 is DENIED without prejudice. The Clerk of Court is respectfully directed to terminate the pending motions (Dkt.Nos.19, 37).

SO ORDERED.

S.D.N.Y.,2008.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 857530 (S.D.N.Y.)
**(Cite as: Slip Copy, 2008 WL 857530)**

Gore v. The RBA Group, Inc.
Slip Copy, 2008 WL 857530 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX E

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2471536 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2471536)**

Page 1

C

Source Enterprises, Inc. v. Tanners Ave. Corp.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
    United States District Court,S.D. New York.
SOURCE ENTERPRISES, INC., Source Magazine,
    LLC, and Wissam Exclusive Plaintiffs,
                        v.
TANNERS AVENUE CORP.; Ballers USA, Inc.; X
Kore, LLC; The Spot on 149th St. Inc.; Hani
Baidoun; Moslem Ali Baidoun; and Various John
Does, Jane Does, and ABC Companies, Defend-
                      ants.
                No. 04 Civ. 1788(HB).

                  Nov. 3, 2004.

                OPINION & ORDER

BAER, J.[FN1]

> FN1. Gabriela Leal, a Fall 2004 intern in
> my Chambers and a second-year law stu-
> dent at CUNY Law School, provided sub-
> stantial assistance in the research and
> drafting of this Opinion.

*1 Plaintiffs Source Enterprises, Inc., Source
Magazine, LLC (collectively, "the Source") and
Wissam Exclusive ("Wissam") (collectively, "the
plaintiffs") filed suit against defendants Tanners
Avenue Corp. ("Tanners"), Ballers USA, Inc.
("Ballers"), X Kore, LLC ("X Kore"), The Spot on
149th Street ("The Spot"), and various John Does,
Jane Does and ABC Companies, in which the
plaintiffs alleged violations of the Lanham Act, 15
U.S.C. § 1051, *etseq.,* common law trade name in-
fringement, and state law unfair competition, and
sought monetary damages and equitable relief. The
plaintiffs moved by order to show cause for a pre-
liminary injunction. A hearing was not held on this
matter because all of the defendants entered into a
preliminary injunction on consent, which this Court
"So Ordered" on March 9, 2004. Thereafter, the

Source and Wissam reached a settlement agreement
with Ballers and The Spot, which the Court "So
Ordered" on May 27, 2004. Also on May 27, 2004,
this Court granted the Source's and Wissam's mo-
tion for a default judgment and permanent injunc-
tion with respect to X Kore.

A bench trial was held on May 19, 2004 and May
27, 2004 on the plaintiffs' claims against Tanners,
the only remaining identified defendant. At the con-
clusion of trial, Tanners consented to a permanent
injunction and I dismissed the plaintiffs' claims for
the reasons stated on the record.[FN2] Thus, the only
remaining issues are the plaintiffs' applications for
an award of attorney's fees pursuant to section 35 of
the Lanham Act, 15 U.S.C. § 1117 and sanctions
for Tanners' alleged violation of various discovery
orders. It is these issues that I turn to now.

> FN2. As stated on the record and later con-
> firmed in correspondence to and from the
> Court, the parties waived the entry of find-
> ings of fact and conclusions of law with re-
> spect to plaintiffs' trademark infringement
> and unfair competition claims.

                I. FINDINGS OF FACT

The Source has for many years published
magazines pertaining to hip-hop culture and music
under THE SOURCE trademark. Over the last few
years, the Source has begun a line of licensed
products carrying its name. In August 2003, the
Source authorized Wissam to manufacture a series
of leather jackets to honor deceased rap stars, de-
nominated the "fallen legends" series. These jackets
were embossed with covers of THE SOURCE
magazine that depict deceased rhythm and blues
and hip-hop artists, such as Tupac Shakur, Aaliyah,
and Lisa "Left Eye" Lopes. The plaintiffs brought
this suit after it discovered that these jackets were
being counterfeited and sold at retail stores in the
New York City area, as well as a trade show in Las
Vegas, Nevada.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 2471536 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2471536)**

The March 5, 2004 Order to Show Cause permitted the plaintiffs to inspect and copy the defendants' records regarding the allegedly infringing merchandise, and following the hearing scheduled for March 10, 2004, to take the defendants' depositions upon twenty-four hours notice. As mentioned, the scheduled hearing did not occur because all defendants entered into a preliminary injunction on consent. The Court held pre-trial conferences with the parties on March 18, 2004, April 15, 2004, and May 6, 2004. After the first pre-trial conference, it was agreed that the parties would continue to undertake discovery. Pursuant to this, the plaintiffs noticed depositions of Tanners representatives, Sangkoo Han ("Mr.Han")[FN3] and his daughter, Sandy Taeyoun Han ("Ms.Han")[FN4] for April 5, 2004. Neither Mr. Han, Ms. Han, nor their counsel, Matthew Jeon ("Jeon") appeared on the scheduled date. Ultimately, these depositions were conducted two days later on April 7, 2004. The next day, the plaintiffs provided Tanners with a letter that summarized the documents requested during depositions. These included documents relating to any orders taken or catalogues displayed during the MAGIC trade show in February 2004 and any communications or orders placed with a suspected manufacturer of the counterfeit jackets. Tanners did not respond to these requests.

> FN3. Plaintiffs' counsel referred to Mr. Han as "Steven Han" in his April 5, 2004 letter to Tanners' counsel. At trial, Mr. Han identified himself as Sangkoo Han.

> FN4. Plaintiffs' counsel referred to Ms. Han as "Sandy Shin" in his April 5, 2004 letter to Tanners' counsel. Testimony at trial revealed that the individual deposed was Sandy Taeyoun Han.

**\*2** At the April 15, 2004 pre-trial conference, the plaintiffs informed the Court of Tanners' lack of cooperation and, accordingly, the Court ordered that all documents be produced by April 25, 2004. The Court was again informed at the May 6, 2004 pre-trial conference that Tanners had not produced any

documents. The Court then ordered Tanners to respond to the plaintiffs' document requests by May 10, 2004 and scheduled trial for May 19, 2004. By letter dated May 11, 2004, plaintiffs informed the Court that the discovery requests were still outstanding and requested that sanctions be imposed, including that: "(1) defendant Tanners be precluded from asserting defenses to this action; (2) damages against defendant be established at $25,000 due to Tanners' refusal to provide sales information; and (3) $5,000.00 in attorneys fees."Letter from Gabriel to the Court of 5/11/04. In response, the Court informed the parties that if Tanners appeared in court on May 19, 2004 without having complied with discovery, the Court would enter a default and impose sanctions.

Notwithstanding this string of court orders, Tanners persistently failed to respond to the plaintiffs' discovery requests, and, as a result, the plaintiffs were unable to effectively prepare for trial. Indeed, the trial was ultimately adjourned from May 19, 2004 until May 25, 2004 because defense counsel did not have all of his witnesses available. Before concluding the proceedings for the day, the Court had the plaintiffs' April 8, 2004 discovery request read into the record and, again, ordered that Tanners respond by May 21, 2004. When Tanners finally did produce documents on the very day of the deadline, its production was incomplete. Tanners did not produce all documents until May 24, 2004, the day before the scheduled second day of trial.

Moreover, Tanners did not file an answer in this matter. The Court, however, denied the plaintiffs' motion for default, because, *inter alia*, Tanners was present on the date of trial and ready to go forward on the case, at least that was what Tanners represented. As it turns out, Jeon also neglected to inform his client, Mr. Han, that trial was scheduled to commence on May 19, 2004. However, Ms. Han, an employee of Tanners, eventually arrived in Court. According to Jeon, Ms. Han was present in his office at 8:30 AM, but she had to take a detour to Secaucus, New Jersey prior to her court appearance to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

retrieve some documents that Jeon had apparently only requested she obtain that morning.

At the conclusion of trial, the plaintiffs' conceded that they were unable to prove damages and instead requested an award of attorneys' fees and sanctions because of Tanners' alleged willful infringement and failure to abide by numerous discovery orders. As mentioned, Tanners consented to a permanent injunction and I dismissed the plaintiffs' claims against Tanners. The parties were instructed to submit post-trial briefs on the issues of attorneys' fees and sanctions.

## II. CONCLUSIONS OF LAW

### A. Lanham Act Attorney's Fees

*3 Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), provides, in pertinent part, that "[t]he court in exceptional cases may award reasonable attorneys fees to the prevailing party."Typically, courts have found that "exceptional cases" within the meaning of the statute are those where the cases involve "fraud or bad faith," *Twin Peaks Prods. V. Publications Int'l Ltd.,* 996 F.2d 1366, 1383 (2d Cir.1993), or "intentional, deliberate, or willful infringement," *Guess?, Inc. v. Gold Ctr. Jewelry,* 997 F.Supp. 409, 412 (S.D.N.Y.1998). I have already concluded that there was no evidence of willful infringement on the part of Tanners and to the extent there remains any doubt on this score, I reiterate my finding here. Nevertheless, the Second Circuit has found that attorneys' fees may be awarded in the absence of willful infringement, where there was "fraudulent conduct in the course of conducting trademark litigation."*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* 317 F.3d 209, 222 (2d Cir.2003) (affirming the district court's award of attorneys' fees pursuant to 15 U.S.C. § 1117(a) where the defendant submitted false evidence at trial). The plaintiffs argue that an award of attorneys' fees for misconduct during the course of the litigation is warranted under this Second Circuit holding.

However, upon closer inspection, it is evident that there are very few instances of an award of attorneys' fees under the Lanham Act where there was no willful infringement. Indeed, the only two courts that have relied upon *Patsy's Brand, Inc.* to support for an award of attorneys' fees under the Lanham Act for misconduct involved willful Lanham Act violations. *E.g.,De La Torre Bueno v. Dance Perspectives Found., Inc.,* No. 02 Civ. 8542, 2004 WL 1724950, at *2 (S.D.N.Y. July 30, 2004); *Ramada Franchise Sys., Inc. v. Boychuk,* 283 F.Supp.2d 777, 792-93 (N.D.N.Y.2003).

Moreover, these cases involve misconduct of a fraudulent nature, not mere non-compliance. For example, in *Patsy's Brand, Inc.,* the district court ruled that the defendant's reliance on a fabricated document and false assertions via counsel and its principle was "more tha[n] sufficient to establish the bad faith necessary to justify an award to Plaintiff of the full amount of its attorneys' fees and costs."No. 99 Civ. 10175, 2001 WL 1154669, at *1 (S.D.N.Y. Oct. 1, 2001), *aff'd as modified,*317 F.3d 209, 222 (2d Cir.2003); *see alsoDe La Torre Bueno,* 2004 WL 1724950, at *2 (awarding attorneys' fees based on a jury finding of willful trademark infringement and false assertions by the defendant's principle, which were contradicted by documentary evidence). Here there is no similar claim of spurious documents or perjured testimony. Instead, defense counsel simply failed, albeit repeatedly, to provide discovery. This, I believe, is better addressed via the applicable discovery sanctions and the Court's inherent power to sanction and not under the Lanham Act.

### B. Sanctions

*4 There are three alternate grounds for the imposition of sanctions in this case. First, "Federal Rule of Civil Procedure [ ("Fed. R. Civ.P.") ] 37 provides for the imposition of sanctions, including attorneys fees and costs, for certain discovery abuses."*Cielo Creations, Inc. v. Goa Da Trading Co., Ltd.,* No. A 04 Civ.1952, 2004 WL 1460372, at *2 (S.D.N.Y.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 2471536 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2471536)**

June 28, 2004) (citing Fed.R.Civ.P. 37 and *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 763 (1980)). Specifically, Fed.R.Civ.P. 37(b)(2) provides, in pertinent part, that when "a party fails to obey an order to provide or permit discovery," the court may sanction that party by requiring "that party failing to obey the order ... pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."The Second Circuit has held that "the imposition of sanctions under Rule 37 is within the discretion of the district court."*John B Hull, Inc., v. Waterbury Petroleum Prods., Inc.,* 845 F.2d 1172, 1176 (2d Cir.1988). Such sanctions may be awarded against counsel. *E.g.,Yeboah v. United States,* No. 99 Civ. 4923, 2000 WL 1576886, at *4 (S.D.N.Y. Oct. 20, 2000).

Second, sanctions may also be imposed upon counsel pursuant to 28 U.S.C. § 1927, which provides that "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."As another court in this District has observed, "[s]ection 1927 sanctions may be awarded against an attorney for discovery abuses."*Cielo Creations, Inc.,* 2004 WL 1460372, at *3 (citing *Apex Oil Co. v. Belcher Co. of N.Y., Inc.,* 855 F.2d 1009, 1019-20 (2d Cir.1988)).

Third, the Court may impose sanctions pursuant to its inherent power, which derives from "the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."*Link v. Wabash R. Co.,* 370 U.S. 626,630-31 (1962). This inherent power permits the Court to sanction a wide range of contempt and disobedience of court orders. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991). Such sanctions may also be levied directly against counsel. *Id.* at 45 (explaining that "[t]here are ample grounds for recognizing ... that in narrowly defined circumstances

federal courts have inherent power to assess attorney's fees against counsel, even though the so-called 'American Rule' prohibits fee shifting in most cases.") (alteration in original) (quoting *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980)).

Sanctions here are warranted because of Tanners' repeated failure to comply with discovery orders, which thwarted an expeditious resolution of this case and hindered the plaintiffs' ability to prosecute this action. Tanners contends that "documents requested by the plaintiff [were] provided as [they] became available."Def. Mem. in Opp. at 3. However, at trial I discovered that this was simply not the case. The plaintiffs made several requests for various documents and Tanners ignored those requests. For example, the plaintiffs requested a Tanners catalogue "[a]t the deposition and then immediately after."Transcript ("Tr.") at 83:16-17. Jeon admitted, "There was a request made at the deposition. I remember this came up at deposition."Tr. at 83:18-19. But Jeon "[n]ever got one." Tr. at 83:21. What is even more troubling is that Ms. Han, Jeon's first witness and one of Tanner's three employees, testified that she "[could] definitely get ... one," Tr. at 83:10, but that she had not given a catalogue to Jeon" because she "didn't know that one was requested," Tr. at 84:1-2. Gabriel was forced to demand production of several previously requested documents at trial. As this exchange made clear, much of the difficulty in discovery was the result of counsel's errors and should not therefore be borne by Tanners. Indeed, as noted, Jeon apparently neglected to even inform his client, Mr. Han, of the May 19, 2004 scheduled trial date. When pressed for an explanation of his conduct, Jeon replied, "this is the first time I have ever gone to trial within a month after the conference."Tr. at 145:24-25. Jeon will therefore be liable for $5,000, no part of which should be paid by his client, Tanners.

*5 Any three of these sources provide ample authority for this Court to impose sanctions on Tan-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 2471536 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2471536)**

ners for its unashamed violations of numerous discovery orders. Nonetheless, 28 U.S.C. § 1927 requires that the Court provide specific notice of the authority pursuant to which sanctions are being imposed, *Lapidus, S.A. v. Vann,* 112 F.3d 91, 97 (2d Cir.1997) (holding that due process requires that "[a]n attorney ... be forewarned of the authority under which sanctions are being considered"). Here, counsel was informed of plaintiffs' application for attorneys' fees and sanctions, although no specific authority, other than the Lanham Act, was cited at the conclusion of trial or in plaintiffs' memoranda. Thus, in an abundance of caution, I rely solely on this Courts' inherent authority and Fed.R.Civ.P. 37.

### III. CONCLUSION

For the foregoing reasons, Tanners' defense counsel, Matthew Jeon, is sanctioned in the amount of $5,000. The Clerk of the Court is instructed to close any pending motions and remove this case from my docket.

THIS CONSTITUTES THE OPINION AND ORDER OF THE COURT.

S.D.N.Y.,2004.
Source Enterprises, Inc. v. Tanners Ave. Corp.
Not Reported in F.Supp.2d, 2004 WL 2471536 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX F

Westlaw.

Not Reported in F.Supp.                                                                            Page 1
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1989 WL 146767)

▷

Brignoli v. Balch, Hardy & Scheinman, Inc.
S.D.N.Y.,1989.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Richard J. BRIGNOLI, Plaintiff,
v.
BALCH, HARDY & SCHEINMAN, INC., Defend-
ant.
No. 86 CIV. 4103 (RWS).

Dec. 1, 1989.

Arie E. David, New York City, for plaintiff; Arie
David, Michael E. Plank, Anne M. Nichter, of
counsel.
Jacobson & Triggs, New York City, for defendant;
John F. Triggs, Kristine M. Reddington, of counsel.
Scheffler Karlinsky & Stein, New York City, for
plaintiff; Martin Karlinsky, of counsel.

*OPINION*

Sweet, District Judge.
**\*1** Arie E. David ("David"), attorney of record for
plaintiff Richard J. Brignoli ("Brignoli")
throughout much of this action and the managing
and name partner of a law firm practicing at several
Manhattan addresses under the name Law Offices
of Arie E. David ("David Law Offices"), has
moved pursuant to Rule 60(b), Fed.R.Civ.P., to set
aside a portion of the opinion of this court entered
May 31, 1989, 126 F.R.D. 462, sanctioning David
under 28 U.S.C. § 1927. The principal ground for
the motion is that the decision to award sanctions
rests upon erroneous factual findings. For the reas-
ons set forth below, the motion is denied and sanc-
tions shall be awarded pursuant to 28 U.S.C. § 1927
in the amount of $17,500.

*Prior Proceedings*

By opinion dated October 3, 1988, the motion of
defendant Balch, Hardy, Scheinman, Inc. ("Balch")

to dismiss the complaint in this action for lack of
subject matter jurisdiction was granted on the
ground that plaintiff Richard J. Brignoli
("Brignoli") had failed to establish diversity of cit-
izenship. *Brignoli v. Balch Hardy and Scheinman,
Inc.,* 696 F.Supp. 37 (S.D.N.Y.1988). Thereafter,
on November 22, 1988, defendant brought a motion
for sanctions against Brignoli and against his prior
counsel, David and the David Law Offices.

The Balch sanctions motion was argued in January
of 1989, following which a cross-motion for sanc-
tions against Balch, Balch's former counsel Char-
lotte M. Fischman ("Fischman") of Kramer, Levin,
Nessen, Kamin & Frankel, and Balch's then counsel
John F. Triggs of Jacobson and Triggs was brought
on by David and Brignoli on February 14, 1989.
Further argument and extensive briefing were per-
mitted.

By opinion dated May 31, 1989 (the "May 31 Opin-
ion") the court denied defendant's motion insofar as
it sought sanctions against Brignoli and David un-
der Rule 11 and § 487 of New York State Judiciary
Law, granted the motion for sanctions against Dav-
id under 28 U.S.C. § 1927, and denied Brignoli's
and David's motion for sanctions.

On July 3, 1989, David filed the instant Rule 60(b)
motion to set aside the portion of the May 31 Opin-
ion sanctioning him under 28 U.S.C. § 1927. Fol-
lowing further extensive briefing by the David Law
Offices the motion was submitted as of July 21,
1989.

*Facts*

The court has reviewed again the extensive record
relating to the conduct of discovery in this proceed-
ing, including the affidavits and exhibits submitted
to the court with respect to the instant motion, the
preceding motions which were the subject of the
May 31 Opinion, and prior related discovery mo-
tions and requests that concern the discovery mat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1989 WL 146767)**

ters in question. The court has also reviewed transcriptions of the numerous hearings and conferences conducted in connection with these discovery and sanctions motions. In view of plaintiff's counsel's statements that the May 31 Opinion is grounded upon factual errors lacking any foundation in the record, a detailed chronology of the events relating to the subject matter of this controversy is here set forth.

**\*2** The facts in question relate almost entirely to discovery sought by Balch in connection with its motion to dismiss the complaint for lack of subject matter jurisdiction. That motion, premised on the claim that Brignoli was a citizen of New York, not Connecticut, and hence not entitled to invoke federal diversity jurisdiction, was brought on by order to show cause of December 3, 1987. That same date, Balch served on plaintiff's counsel interrogatories and document requests bearing on the question of Brignoli's citizenship.

At the order to show cause hearing on December 11, 1987, the court declined to consider the motion to dismiss but granted Balch's alternate request for leave to conduct expedited discovery on the diversity jurisdiction issue. Brignoli was directed to respond to the diversity jurisdiction discovery requests by January 4, 1988. A hearing date of January 29, 1988 was set for argument of the motion to dismiss, to allow adequate time for briefing following discovery.

On January 7, 1988, counsel for Balch advised the court by letter that Brignoli had failed to serve answers or provide documents by January 4 in accordance with the court's December 11 direction, nor had Brignoli submitted a statement of objections to the discovery requests as required by Rule 33(a) and 34(b), Fed.R.Civ.P. As these materials were needed for proper conduct of depositions scheduled for the next week, Balch's counsel Fischman requested a conference before the court.

On January 11, 1988, Fischman further advised the court by letter that an associate of David's law office [FN1] had told defense counsel that pursuant to David's instruction, no documents would be produced until further conference with the court, and that depositions scheduled to commence on January 11 would not take place unless counsel agreed in writing not to recall any witness with respect to the topic of subject matter jurisdiction.

A hearing was set for January 15, 1988, to address Brignoli's alleged failure to produce documents in accordance with the court's prior direction. In connection with that hearing, counsel for plaintiff submitted an affidavit dated January 14, 1988, of David M. Rosen, an associate working under David's supervision. The affidavit stated that the parties had now resolved the vast majority of their differences yet requested that discovery of documents concerning taxes, bank accounts and various other records be stayed until a confidentiality order was in place. No motion for a protective order was submitted, however, nor was any proposed confidentiality agreement (although reference was made to a comprehensive confidentiality agreement under consideration in a related action). The affidavit did not contest that counsel for plaintiff had not produced documents by the January 4 deadline set by the court nor filed a written response to the requests by then as required by the Federal Rules.

At the January 15, 1988 conference, the court directed that the documents (with certain stated exceptions and with certain documents subject to redaction) be produced within two week's time, i.e., by January 29, 1989, and that depositions of Brignoli, his wife, and his ex-wife be rescheduled for the week following the document production deadline. The subject of disclosure of tax returns was specifically addressed, counsel for Balch agreeing to receive production of those documents with numbers redacted, access to which would be restricted to the attorneys involved in the action and only for use in the litigation. In view of this apparent resolution, the court refrained from adopting the comprehensive confidentiality order that was undergoing consideration in a related action, which concerned

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 3
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1989 WL 146767)

trade secrets of a Brignoli company, to govern jurisdictional discovery in this proceeding.

*3 As of the January 29, 1988, no documents or answers to interrogatories had been received by Balch's counsel, nor had Brignoli's counsel sought any modification of the court's order. The depositions scheduled for the first week of February also did not go forward, absent the documents.

On February 5 or 6, 1988, the first of any documents responsive to Balch's request of December 4, 1987 were produced under cover letter from Brignoli's counsel acknowledging Fischman's agreement that these documents were to be kept confidential. The letter further stated that tax records would not be produced without an order of confidentiality, a proposed version of which Brignoli's counsel indicated was being filed with the court. The letter to opposing counsel did not address the status of the outstanding interrogatories. Nor did plaintiff's counsel object to or otherwise respond to numerous numbered requests for documents for which no documents were provided, other than to specify that Brignoli was searching for his passport which would be produced at his deposition now scheduled for February 17, 1988.

Brignoli's deposition, which according to Fischman had been set for a full day on February 17, began that morning. The deposition transcript reveals that David refused to produce the promised passport for inspection at the deposition, notwithstanding David's recorded statement that he had personally inspected the passport just prior to the inception of the deposition (Tr. 88). According to affidavit of Fischman, at the lunch break David advised Balch's counsel that Brignoli could not return for the afternoon, and further refused to produce Brignoli's wife and one of his former wives, as scheduled for February 18 and 19, absent a confidentiality order and an agreement that the witnesses would not be recalled. As discussed below, the deposition transcript indicates several additional ways David's conduct at the deposition was obstructive.

On February 23, 1988, Brignoli's counsel filed with the clerk and court a motion for a confidentiality order returnable on March 4, 1988. (This apparently was the contemplated motion Brignoli's counsel had referred to in their letter of February 5 to Balch's counsel.) Three days later, on February 26, 1988, Balch's counsel filed a cross-motion to compel discovery in accordance with the court's previous directions and for sanctions under Rule 37 for plaintiff's failure to comply with prior orders of the court governing the diversity jurisdiction discovery.

Fischman's affidavit in support of the motion to compel indicated that plaintiff still had not answered any of the diversity interrogatories nor filed a formal response stating objections to either the diversity document or interrogatory requests; that in numerous respects, plaintiff had not supplied documents called for by the document requests, including the tax returns; [FN2] and that plaintiff's counsel had delayed or otherwise obstructed depositions noticed and scheduled by defense counsel.

*4 On March 2, 1988, Brignoli's counsel followed suit by filing a motion for an order compelling accelerated discovery and for sanctions under Rule 37. The basis for the motion was discovery initiated by Brignoli over a year prior. The affidavit in support of the motion failed to describe what steps, if any, plaintiff had taken in the past several months since substitution of new defense counsel to obtain the discovery it sought. [FN3]

The motions were set for argument on March 11, 1988, at which time David appeared on behalf of plaintiff. At the argument, David agreed to proceed with depositions on the next Monday, subject to an appropriate provision for confidentiality with respect to certain areas of information. (Tr. 5) Accordingly, it was ordered that responses relating to trade secrets, tax returns, and any assets of Brignoli kept at home would be treated as confidential information disclosable only to attorneys working on the litigation, but that all other subjects of inquiry would be open. (Tr. 5-6) In view of the difficulties encountered at the first Brignoli deposition, the

Not Reported in F.Supp.                                                                                          Page 4
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1989 WL 146767)**

court further directed that at the forthcoming Brignoli deposition (as well as the depositions of his wife and ex-wife), counsel refrain from making any objections or providing advice of counsel, other than to preserve a privilege, and instructed counsel that any such deferred objections could be made by later motion to exclude evidence should such need arise. (Tr. 5-6)

Regarding the outstanding document requests previously ordered produced by the dates of January 4 and then January 29, David stated "I can produce the documents in a week's time, there is no problem. We have produced most of the documents except for the tax return and one more." (Tr. at 7).FN4 David was directed to produce the documents within a week-i.e. by March 18, 1988-and the tax returns were ruled to be for "counsel's eyes only" (a condition that had been agreed to by Balch's counsel without court order on several previous occasions, including in court on January 15, 1988).

Following this ruling, Balch's counsel asked for imposition of sanctions, noting it was the third time counsel for Balch had come before the court for an order of production in connection with the diversity jurisdiction discovery. The court stated: "I understand that and you can make ... whatever sanction applications you want to make at some other time. Maybe at the end of the case ... but I understand." (Tr. at 8) FN5

Less than a week later, on March 16, 1988, the parties again appeared for a scheduled pre-trial conference to address the proposed confidentiality orders. David attended on behalf of Brignoli. Following discussion of the confidentiality order, counsel for Balch indicated that the Brignoli deposition, which the parties had agreed to resume the prior Monday, had not taken place. Brignoli and his former and present wife were ordered to appear for their depositions in the last week of March without fail. (Tr. 14-16).

**\*5** Counsel for Brignoli objected orally at the con-

ference to two non-party subpoenas noticed by Balch. (Tr. 18-20). The court ruled that the subpoena duces tecum of American Express ("AMEX") be limited to documents relating to purchases made on AMEX credit cards by Brignoli in New York, and exclude documentation of purchases made by persons, other than Brignoli, who as corporate officers had been issued cards in the name of Brignoli Models, Inc. David's oral request to suppress the Citibank subpoena was denied insofar as that subpoena sought records relating to Brignoli's purchase of a New York City apartment.FN6

At the March 16 conference, there was no discussion of the outstanding jurisdictional document discovery and David made no request for an extension of the impending March 18 document production deadline. On March 23, 1988, the court was advised by letter from Balch's counsel that the documents David had been ordered to produce by March 18 had not been produced. The letter further stated that a member of the David Law Offices had made efforts to interfere with the non-party depositions of Citibank and of American Express by advising Citibank and AMEX by letter (copies of which had not been provided to Balch's counsel) that the court had barred production of confidential materials.

At the court's direction, a hearing on these matters was scheduled for the next motion day, April 1, 1988. That date was adjourned a further week at Brignoli's counsel's request. David and his colleagues, Anne Nichter and Michael Plank, attended the April 7 hearing on behalf of Brignoli, at which they produced copies of the March 21 letters to the court. The letters revealed that one or two days before the subpoenaed depositions, Nichter had corresponded with non-parties Citibank and AMEX, without copying Balch's counsel, and that the correspondence did not accurately represent the court's ruling of March 16, 1988 addressing the proper scope of the subpoenas. Accordingly, the court clarified its prior rulings, denied plaintiff's counsel's renewed effort to further narrow the scope of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 5
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1989 WL 146767)**

subpoenas, and directed that the subpoenas be enforced. (Tr. 5-12; 12-15).

The court also found it necessary to again order Brignoli's counsel to produce the documents called for by Balch's jurisdictional discovery request, in furtherance of previously ignored court orders setting production deadlines of January 4, January 29, and March 18, 1989. Despite David's asserted willingness at the hearing of March 11 to produce all remaining documents within one week, including the tax returns, Balch's counsel indicated that as of mid-morning of the April 7 hearing, no outstanding documents, including the tax returns, had been produced since the original, incomplete production on February 6.[FN7] Plaintiff's counsel Nichter did not specifically address the status of the missing tax returns, but assured the court that "as late as this morning, we delivered" 280 documents called for by the production and professed that "we are complying" (Tr. at 17). The court directed that within a week's time (April 15, 1988), all outstanding documents be produced. (Tr. 18). A written order to that effect was subsequently entered by the court.

**\*6** On April 12, 1988, Brignoli's counsel David sought a temporary restraining order to prevent enforcement of the AMEX subpoena. Interrupting a trial in progress, the court heard from counsel and denied the application from the bench.

On April 22, 1988, another hearing was held on a motion brought by Brignoli's counsel to quash certain additional non-party subpoenas duces tecum Balch had served to fill holes in its jurisdictional discovery. At that hearing, at which David was present, the motion to quash was denied. In opposing the motion to quash, Balch's counsel indicated that the tax documents and other documents covered by its discovery requests still had not been produced by Brignoli, despite the court's repeated prior orders.[FN8] Counsel for plaintiff did not then deny the truth of that statement.

Five days later, on April 27, 1989, Balch renewed its motion for dismissal on jurisdictional grounds.

In an affidavit filed in support of the motion, Fischman affirmed that plaintiff had produced no further documents on April 15, 1988, in violation of the court's direction of April 7, 1988, and stated that as of April 26, 1988, numerous documents covered by the jurisdictional discovery requests of Brignoli, including the tax returns, loan application materials, and telephone records, still had not been produced nor had plaintiff's counsel ever filed any formal response to such requests, as required by the Federal Rules and the court's order. Counsel for Balch therefore urged that plaintiff be barred from relying on any such documents to oppose the motion and further requested that the court infer from plaintiff's failure to produce the tax returns and other documents that, had such documents been produced, they would have supported Balch's claim that Brignoli was a resident and citizen of New York.

The motion to dismiss, originally set for argument on May 11, 1988, was adjourned at plaintiff's request to May 20, 1988, in view of a sudden death or sickness of a relative of David.[FN9] Argument was finally heard on May 27.

The papers submitted in opposition to the motion to dismiss on May 18, 1988 were prepared by lawyers of the David Law Office. Those papers contained no explanation for Brignoli's repeated failure to produce the New York tax returns although they did contain the observation that defense counsel had "ignore[d] their own role in the confidentiality-order-fiasco, which greatly impeded all discovery, of any type...." (Brignoli Memorandum at ¶ 94.) Counsel, while withholding Brignoli's New York returns, did however see fit to attach Brignoli's Connecticut returns and federal returns to its opposition papers and relied upon those returns in part to argue that Brignoli was a Connecticut resident. (Plaintiff's Memorandum ¶ 38 and Exhibit H.)

At the hearing on May 26, 1988, counsel for Balch again argued that the court should draw an inference that Brignoli had filed New York State Resident Tax Returns for the period of time in question, in light of the failure of plaintiff ever to produce

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1989 WL 146767)**

Brignoli's New York State tax returns. The court indicated it would take that request under submission, and at request of plaintiff's new counsel of record, Martin E. Karlinsky, provided counsel an additional week to make a submission addressing the subject of the missing tax returns. No such submission was made. (Affidavit of Karlinsky, ¶ 6, sworn to March 10, 1989).[FN10]

**\*7** There followed the court's opinion of October 3, 1988, dismissing the complaint for lack of jurisdiction, on grounds that plaintiff had failed to establish that Brignoli was a citizen. The sanctions motions followed.

Notable among the submissions made in connection with the sanctions motions were the 1985 and 1986 New York tax returns, which, it turned out, Brignoli had first filed as a New York resident, prior to the filing in December 1987 of Balch's motion to dismiss for lack of diversity. The record also discloses that on February 5, 1988, during the pendency of discovery on the diversity jurisdiction motion (and, as it happens, on the same date as plaintiff's counsel advised Balch's attorneys in writing that tax returns sought in connection with the motion to dismiss would not be produced absent a court order of confidentiality), Brignoli signed an amended 1985 New York return on a non-resident form.

*Standards for Awards Under 28 U.S.C. § 1927 and rule 37*

28 U.S.C. § 1927 provides that

[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

As noted by the Supreme Court, the "statute is indifferent to the equities of a dispute and to the values advanced by the substantive law. It is concerned only with limiting the abuse of court processes. Dilatory practices of ... plaintiffs are as ob-

jectionable as those of defendants." *Roadway Express v. Piper,* 447 U.S. 752, 762 (1980) (addressing sanctions imposed upon lawyers for plaintiff who failed to respond to interrogatories properly served by defense counsel after court order granting defendant's motion to compel, and who failed timely to file brief assessing impact of a recent decision after court's instruction that counsel for both sides make such a submission).

As construed in this circuit, imposition of a sanction under § 1927 requires a showing of bad faith, such as may presumed to be present "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986).

A recent example of bad faith discovery conduct found sanctionable under this provision was reviewed and affirmed by the Court of Appeals in *Apex Oil Co. v. Belcher Co. of New York, Inc.,* 855 F.2d 1009, 1019-20 (1988). *Apex* involved a law firm that on three separate occasions had failed to comply with plaintiff's reasonable discovery requests (for admissions, document production and expert identification), causing plaintiff's counsel to move to compel responses. After the making of such motions, defense counsel would then agree to comply, rendering the motions superfluous. The Second Circuit affirmed the district court's finding, made upon examination of the record, that the law firm had engaged in a " 'practice that establishe[d] the bad faith' required under Section 1927 [ ] ... [by] 'putting plaintiff to the expense of making a motion and then agreeing to the request....' " *Id.* at 1020.

**\*8** In awarding sanctions under § 1927 courts must of course be "sensitive to the impact of sanctions on attorneys. They can be economically punishing, as well as professionally harmful; due process must be afforded." *Oliveri,* 803 F.2d at 1280. This "does not mean, necessarily, that an evidentiary hearing must be held.... [H]owever, notice and an opportun-

Not Reported in F.Supp.                                                    Page 7
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1989 WL 146767)**

ity to be heard is required." *Id.*[FN11]

Sanctions for discovery abuses are also available under Rule 37, Fed.R.Civ.P. Subsection (a)(4) of Rule 37 provides that a court, after compelling discovery, may require the attorney advising the party whose conduct necessitated the motion to compel to pay to the other party the reasonable expenses involved in obtaining the order, including attorneys' fees. Rule 37(b)(2) further provides for a sanction award of expenses and attorneys fees' caused by the failure of the party to "obey an order to provide or permit discovery," which sanction may be made payable by the attorney advising that party. Finally, Rule 37(d) similarly empowers a court to order payment of expenses and attorneys fees caused by the failure of a party to serve a written response to a request under Rule 34.

Pursuant to these provisions, the court may make awards on its own determination, and such awards do not require a finding of wilful or bad faith conduct on the part of counsel. *See* Notes of Advisory Committee on Rules, 1970 Amendment to Rule 37 (sanctions may be imposed for "simply a failure to comply").

*Appropriateness of the Prior Determination to Sanction David*

The court's decision to sanction David under 18 U.S.C. § 1927 was predicated upon conduct engaged in by David, as counsel of record, and other lawyers he associated with for purposes of the action, that unnecessarily prolonged and interfered with the discovery process as described above. The May 31 Opinion addressed three aspects of such conduct: Brignoli's counsel's behavior with respect to non-party discovery, counsel's conduct at depositions, and counsel's failure to produce documents the court had repeatedly ordered be produced. With respect to each of these areas of concern, Brignoli's counsel now alleges factual errors in the Opinion sufficient to warrant a contrary result.

Thorough review and consideration of the prior record, the motion for reconsideration, and the affidavits which have been submitted in its support and in opposition, disclose that although certain factual errors do appear within the May 31 Opinion, there is no infirmity in the Opinion's conclusion that plaintiff's counsel committed sanctionable acts.

1. *Non-party Discovery*

The May 31 Opinion stated that David and others in his office scheduled depositions of non-parties without providing notice to Balch's counsel, and aborted non-party discovery initiated by Balch against American Express, by advising American Express that it need not comply with Balch's subpoena.

The former finding relates to the deposition of Dean Witter, which was originally to take place on July 27, 1987 at 1:00 p.m., pursuant to a subpoena duces tecum issued by the clerk of court on July 17, 1987. The deposition date of July 27 was postponed on consent. The claimed misconduct was Brignoli's counsel's alleged effort to go forward with that deposition on September 29, 1987, at 3:00 p.m., without providing notice to defense counsel.

**\*9** Counsel for Brignoli do not deny attempting to conduct the deposition on that subsequent date nor establish that advance notice to defense counsel of the adjourned date was provided. While counsel recounts that the original (but adjourned) Dean Witter deposition date was properly noticed by service upon then defense counsel Fink Weinberger of a notice of deposition on July 15, 1987, that is obviously not responsive to the allegation that Balch's counsel was not advised of the date to which the Dean Witter deposition was adjourned. That allegation is supported by a contemporaneous letter (dated September 30, 1987) to counsel for Brignoli from the lawyer representing Dean Witter (courtesy copies of which were sent at the time to the court and defense counsel), responding to a threat made by Brignoli's counsel to have Dean Witter held in contempt for failing to appear at the deposition as

Not Reported in F.Supp.                                                                          Page 8
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1989 WL 146767)

scheduled. [FN12]

Based upon the Dean Witter letter, and the lack of any rebuttal to it, grounds appear to exist for the finding in the May 31 Opinion. However, David correctly notes that the letter is hearsay testimony, and no affidavits have been furnished by any of the law firms then representing defendant which confirm that they did not receive notice of the adjourned date. Moreover, this incident occurred in an earlier phase of the litigation, unrelated to jurisdictional discovery, and did not inspire an application of any kind when it arose. Accordingly, upon reconsideration, the matter of the Dean Witter deposition does not constitute a basis for sanctions.

Review of the record does confirm the conclusion that the David Law Office tried to interfere with defense counsel's non-party discovery. The record establishes that David's colleague, Anne Nichter, advised both AMEX and Citibank that they did not need to comply with defense counsel's subpoenas, and misrepresented rulings of the court in doing so.

The AMEX subpoena was a subject of discussion at the March 16, 1988 hearing. There, David objected to its scope to the extent the subpoena called for disclosure of purchases made on any and all Brignoli Model, Inc. company cards, as this would encompass purchases by shareholders other than Brignoli and might reveal to a competitor purchases made for corporate purposes. Upon defense counsel's statement that Balch did not seek records of purchases made on the corporate account by persons other than Brignoli, the court directed that the subpoena be limited to American Express documentation of such purchases as were made by Brignoli. (Tr. 18-19.)

On March 21, 1988-a day or two before the scheduled date of the AMEX deposition at which the subpoenaed documents were to be produced had been noticed-Nichter sent a letter to AMEX without copying defense counsel. That letter, addressed to the AMEX Custodian of Records, purported "to put [AMEX] on notice that the court has limited discovery in this matter to documents relating only to ... Richard J. Brignoli's *personal acccount* "(emphasis in original) and further stated that "[a]ll other information specifically has been suppressed by the court."

*10 The letter was materially false. At the hearing in court five days before, the appropriate scope of the subpoena had been specifically argued and determined. The court's direction then, although not as clearly worded as it might have been, was fully understood by Brignoli's counsel David at the time. That much is revealed by the contemporaneous affidavit of David, which indicated the court had ruled on March 16 that the subpoena extended not simply to Brignoli's personal account but as well to purchases made by Brignoli on "accounts maintained in the name[ ] of ... Brignoli Models, Inc...." (Affidavit of David, sworn to on April 5, 1988 before Nichter.). [FN13]

Thus, the David Law Office's letter to AMEX on March 21, 1988 was either a wilful misrepresentation of the court's March 16, 1988 ruling or a recklessly negligent representation of that ruling made without notice to opposing counsel. The same must be said of the letter David's firm sent that same date to another subpoenaed non-party, Citibank, again without providing any copy of the correspondence to defense counsel.

Balch's Citibank subpoena sought documents relating to Brignoli's purchase and financing of an apartment located in New York City. The David Law Office letter to Citibank stated that "all information relative to Mr. Brignoli's finances has been and is specifically excluded from discovery," and that "[d]isclosure is not permitted of the 'loan application' as this document evidences the full financial status of the applicant and therefore is confidential and privileged information." Those statements were directly contrary to the hearing of March 16, 1988, at which David's oral application to suppress the Citibank subpoena had been denied "with respect to any records relating to the apartment," following colloquy in which the loan application was specific-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 9
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1989 WL 146767)**

ally mentioned as one such document.[FN14]

The Citibank and AMEX letters, which plaintiff's counsel delivered to non-parties without notice to defense counsel of their content, flouted the rulings of the court five days earlier and appear to have been intended to obstruct the discovery efforts of Balch undertaken after efforts by defense counsel to obtain copies of the same or related documents directly from Brignoli had gone largely or wholly unfulfilled. Such conduct constitutes bad faith and is sanctionable under 18 U.S.C. § 1927.

Brignoli's counsel notes that a great number of documents were eventually produced pursuant to these subpoenas, which is true. The May 31 Opinion is corrected to the extent it implies or states that this discovery was successfully "aborted." That wrongful efforts at obstruction of discovery ultimately fail is not, however, the standard that governs whether such conduct is sanctionable. The record establishes that the David Law Offices unnecessarily and vexatiously interfered with proper non-party discovery initiated by its adversary.

### 2. *Prolonging and Obstructing of Depositions*

**\*11** With respect to depositions, the May 31 Opinion stated as follows:

]

Plaintiff's counsel correctly observes that the reference to the asking of repetitive questions in the May 31 Opinion is inappropriate insofar as it refers to David's conduct rather than to that of lawyers associated with his practice. David, unlike his colleagues, did not take (as opposed to defend) any of the depositions in the case and so could not himself have prolonged any of these depositions. Moreover, while it appears that the eight day deposition of Mr. Balch was prolonged by repetitive questioning engaged in by a lawyer associated with David, upon this motion for reconsideration the conduct of that deposition does not constitute a ground for sanctions against the David Law Offices. As counsel

notes, no relief with respect to that deposition was sought at the time it was being conducted, and no court order governed the manner of its conduct.

The record does support the finding that David and his colleagues unnecessarily prolonged and obstructed depositions taken by defendant. At the first day of the deposition of Brignoli conducted on February 17, 1988, David, as counsel defending the deposition, repeatedly interfered with the proceedings by directing the witness not to answer, interrupting or interfering with answers of the witness, engaging in excessive coaching of the witness (on occasion to the extent of testifying for the witness or questioning the witness' testimony) or making statements of similar impeding effect (*See* Tr. 5, 14, 16, 18, 22, 25, 26-27, 30-31, 38, 41-42, 45, 50-51, 56, 60-61, 66-67, 67, 68-70, 78-79, 85, 96-97, 98-101, 103, 112-114).

Plaintiff contends David's conduct was largely grounded on expressed concerns for confidentiality, but the instances cited above exclude references to many additional times the record shows David offered objections to questioning on that ground. In any event, at the hearing of March 11, 1988, the court addressed these asserted confidentiality concerns, ruling "everything ... is on the table" except for questioning regarding trade secret information, tax returns and assets of Brignoli kept at home, responses to which matters would be for attorney's eyes only. (Tr. 5-7.) To prevent further interference with the deposition, the parties' were also instructed that no advice of counsel, colloquy or objections were to be permitted at the Brignoli deposition other than in connection with the assertion of privilege.[FN15] Those same limitations were ruled applicable to the depositions of Brignoli's wife and former wife.

**\*12** Notwithstanding that order, from the inception of the resumed Brignoli deposition on March 30, 1988, the lawyer defending Brignoli (whom appeared as "of counsel" to the firm of Arie E. David, Esq., according to the deposition transcript) routinely violated the court's ruling by interrupting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 10
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1989 WL 146767)

the proceeding for expressed reasons that were not based on privilege (Tr. 1136-37; 138-39; 139-40; 141; 144; 145; 147; 152; 163; 165; 166, 185; 190-191; 192; 203; 211) and asserting privilege without apparent basis as to matters into which the court had authorized inquiry (*e.g.* Tr. at 204-207).

At the deposition of Brignoli's ex-wife, Evelyn Thayer Brignoli ("Thayer") on April 4, 1988, the court's ruling was again flouted, this time by David personally, appearing as counsel for Brignoli and Thayer. David instructed the witness not to answer questions, interposed objections or otherwise interrupted questioning for reasons unrelated to privilege (*see* Tr. 9, 21, 22, 15, 18-19, 22-23, 25, 31, 44, 52), coached or interrupted the witness' answers (Tr. 33, 22-23, 40, 63, 75-76) and relied upon privilege as an objection to questions bearing on subjects the court had stated at the March hearing were proper subjects of inquiry (Tr. 35-36, 38-39).

This deposition conduct apparently was undertaken in an effort at zealous representation of the interests of the David Law Office's client, Brignoli. It may well have been in Brignoli's interest to foreclose or forestall an adversary's lawful efforts to discover facts in connection with the adversary's preparation of a dispositive motion on the question of diversity jurisdiction. A lawyer must recognize, however, that zealous representation has its limits. The wilful and improper efforts of David and his colleague to hinder deposition discovery, both before and after the court's directions, exceeded them. Their conduct, which unnecessarily prolonged the proceedings, demonstrated bad faith sanctionable under 18 U.S.C. § 1927.

3. *Counsel's Violation of Rulings of the Court that the Tax Returns and Other Documents Be Produced.*

The May 31 Opinion stated that David refused to produce documents, including New York State tax returns, after the court directed David to do so, resulting in otherwise unnecessary motions to compel such production. That factual finding is fully sup-

ported by the record and has been detailed at length above. Because counsel for plaintiff continue to express uncertainty as to what the May 31 Opinion might possibly be referring to, again the matter is summarized:

1. On December 11, 1987, the court granted Balch's application for expedited discovery in connection with the issue of diversity jurisdiction was granted. Responses to discovery, which included document requests served on plaintiff's counsel on December 3, 1987, were directed to be completed by January 4, 1988.

2. As of January 15, 1988, no documents had been produced pursuant to Balch's request nor any formal objections or written responses made with respect to each of the enumerated categories of the request. At hearing on that date on defendant's motion to compel, Brignoli was ordered to produce the documents by January 29, 1988, including the tax returns (which counsel for Balch had agreed at the hearing would be for attorney's eyes only, restricted to use in this litigation).

**\*13** 3. Much as with the first deadline, January 29 passed without any production. A few documents were produced on February 5 or 6, 1988, but numerous categories of documents were not provided, including the tax returns, a fact clearly indicated in the letter an associate of David sent to Balch's counsel at that time, forwarding the few documents that were produced. The stated reason for non-production of the tax returns was the absence of a confidentiality order, although the letter acknowledged the agreement of Balch's counsel to keep the documents secret.

4. Brignoli's deposition was taken on February 17, 1988, at which he testified that he had filed tax returns in New York. David, who defended the deposition, stated (Tr. at 104) that the tax returns would be supplied to defense counsel "after the issue of confidentiality is resolved." Counsel for Balch had previously indicated, at that deposition (Tr. at 12) and before then, her agreement that tax

Not Reported in F.Supp.                                          Page 11
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1989 WL 146767)**

returns were for attorneys' eyes only and would be used for purposes of the litigation only.

5. Defense counsel's affidavit of February 26, 1988, in support of its second motion to compel production, indicated that the tax returns and numerous other documents still had not been produced as of that date.

6. At the March 11, 1988 hearing on that motion, which David attended, David was directly ordered to produce the outstanding documents, including the tax returns, by March 18, 1988, the third court-established deadline. The court expressly addressed the issue of confidentiality, ordering that the tax returns would be produced for counsel's eyes only. As noted, Balch's counsel had expressed its willingness to that condition on numerous prior occasions. David agreed to produce the returns by March 18, 1988 and acknowledged that they had not yet been produced.

7. The March 18, 1988 deadline passed. On March 23, 1988 the court was advised by letter from Balch's counsel that no documents had been produced by that date. The court accordingly set down a hearing for April 1, 1988, which was adjourned at plaintiff's counsel's request to the following week.

8. At the April 7 hearing, at which David was present, his colleague Nichter stated that 280 documents were delivered to defense counsel's office that very day. Nichter did not state that the tax returns had been produced. Counsel was ordered to produce all remaining documents by April 15, 1988, the fourth production deadline. In addition, a written order was entered on April 21, 1988 confirming the oral hearing order requiring production of documents and requiring as well the filing of formal responses to the document requests.

9. At an April 22 hearing, at which David was present, Balch's counsel stated that plaintiff still had not produced the tax return and other documents, in violation of the April 15 deadline.

10. Defense counsel Fischman's affidavit of April 26, 1988, affirmed that no further documents were produced on April 15, 1988, and that as of April 26, 1988, several categories of documents remained outstanding, including Brignoli's tax returns. Defendant moved to preclude Brignoli from relying on such documents in opposing the motion to dismiss and to draw inferences against Brignoli that documents he had refused to produce supported his domicile in New York, not Connecticut.

*14 11. Despite defense counsel's application to exclude and to draw an inference that Brignoli had filed New York tax returns as a New York resident, counsel for plaintiff still did not submit the New York tax returns nor did their papers opposing the motion to dismiss for lack of diversity explain what lawful ground supported nonproduction of the tax documents or assert that the tax returns had in fact been produced previously.

12. At the oral argument on the motion to dismiss held on May 26, 1988, the court allowed plaintiff, at the request of newly substituted counsel Karlinsky, one additional week to make a submission addressing the question of nonproduction of the tax returns. No submission was filed with the court.

13. The failure to produce the returns gave rise to an unfavorable inference that Brignoli had filed New York State tax returns as a New York resident, which was one of many factors leading to the dismissal of the complaint for lack of subject matter jurisdiction on the grounds that there was no diversity of citizenship. *See Brignoli v. Balch Hardy and Scheinman, Inc.,* 696 F.Supp. 37 (S.D.N.Y.1988).

14. That inference subsequently proved to be true.

In the face of this extensive contemporaneous evidence of document nonproduction in violation of court rulings or orders of December 11, January 15, March 11, April 15 and April 21, Brignoli's counsel expresses mystery over what the document nonproduction claim is about, and contends the documents

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 12
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1989 WL 146767)

were not withheld intentionally. The basis for this contention are affidavits of David and Nichter, submitted months after the events in question transpired, stating their belief that the tax returns were in fact produced, and even if they were not, that they believed they had been produced. The court previously found, and continues to find, not a shred of convincing evidence in the record to establish that the returns were produced in compliance with its orders. The repeated failure to produce the tax returns and other documents constituted bad faith on the part of plaintiff's counsel.

The asserted belief of Nichter and David that the tax returns were produced is not well-founded. That belief was never stated at the time the events in question transpired; given the context of those events, its assertion now appears unworthy of belief.[FN16] Moreover, the affiant associated with the David Law Offices who appears to directly recall the culling of the tax return documents has submitted an affidavit indicating that to his knowledge, the tax documents were *not* produced in February nor in early March when he was last involved in the case.[FN17]

The motion for reconsideration and the affidavits which have been submitted in its support fail to demonstrate any infirmity in the court's finding that counsel for Brignoli, including David, violated repeated directions of the court to produce documents pursuant to defendant's discovery requests, including the tax returns. Counsel's bad faith was illustrated by a course of conduct which consisted of routinely failing to produce (as well as failing to object to production of) documents in accordance with the requirements of the Federal Rules of Civil Procedure; requiring defense counsel to bring the failure to the attention of the court for the setting of a hearing or conference, at which time counsel for plaintiff would agree or be ordered to produce documents within a fixed period of time, following which counsel for plaintiff would fail to produce the documents within the agreed or established period, requiring defense counsel to again seek the

court's intervention. All told, the cycle was repeated across four court-ordered production deadlines, none of which was satisfied. The conduct set forth above is a paradigm of discovery abuse. As in the *Apex* case, such repeated misconduct during discovery constitutes bad faith.

**15** Counsel for plaintiff's papers focus at some length on several other issues, which deserve brief attention:

(a) Counsel argues that David, who was replaced as counsel on or around May 19, 1988, was not present at the May 27, 1988 hearing at which the court offered plaintiff a further opportunity to explain the absence of the tax documents. That absence is in no way obviates the failure of David and his associates to produce the tax returns to Balch in response to the court's repeated, prior directions, to which David and his colleagues routinely acceded but never complied. Judicial orders requiring production of documents are no less entitled to observance when production is ordered to one's adversary and not directly to the court.[FN18]

(b) Counsel says it was tricked into violating the court's orders by Balch's counsel, because Balch's counsel adjourned a discovery conference scheduled for May 6, 1988, at which the tax returns and other documents would have been produced (or their non-production discussed). The conference in question was, however, scheduled for the purpose of discussing the manner in which general discovery on the merits would proceed, and was not intended to concern discovery taken, or attempted, in connection with the jurisdictional motion, which by then was to have been already concluded.[FN19] Whatever the purpose of the conference, there is no reason to believe the documents would have then been produced, as the several orders requiring counsel to produce tax and other documents prior to May 6 had occasioned no such response. Counsel fails to indicate how cancellation of the May 6, 1988 conference possibly prevented production of the returns, something counsel might have accomplished-had it desired to comply with the court's or-

ders-on any day prior to May 6 or thereafter in connection with the argument of the motion to dismiss. The allegation of plans to produce them on May 6 plainly does not establish good faith on the part of David and his colleagues.

(c) Plaintiff argues Balch's counsel induced plaintiff's failure to produce the tax returns by refusing to settle upon a comprehensive confidentiality order. Such "excuse" of course cannot justify withholding the returns in the face of the court's repeated orders that they and other documents be produced. It does, however, further illuminate counsel's bad faith. David's oral application that tax returns be produced for "attorney's eyes only" had been granted at the hearing of March 11, 1988. That protective condition was something which Balch's counsel previously had several times agreed to. Counsel for Brignoli nevertheless refrained thereafter from complying with the court's orders that the documents be produced. That conduct strongly demonstrates that confidentiality concerns were not the principal motivation for withholding the New York resident tax returns (which, after all, could have been redacted). No adequate contemporaneous explanation for the non-production of the tax returns having ever been advanced, the pattern of non-production in the face of court order here conclusively constitutes bad faith.

**\*16** For the above reasons, the conclusion of the May 31 Opinion that sanctions under § 1927 should be awarded against David, personally, will not be altered. The facts in the record disclose that David, who was attorney of record for Brignoli until a few days prior to the final argument on the jurisdiction motion, participated directly in the jurisdictional discovery phase of the action, participation which included appearances before the court on numerous occasions at which discovery rulings and directives were issued to his client or his firm. Notwithstanding those directives, David willfully failed to comply or to ensure his fellow lawyers' and client's compliance with repeated discovery orders of the court.

Plaintiff's counsel correctly observes that conduct the court has found to be sanctionable was participated in by attorneys in addition to David. The record reveals that those participating attorneys all were associated in some fashion with the David Law Offices (of which David is name and managing partner) or with a predecessor firm bearing David's name. The involvement of these lawyers will be appropriately reflected by modifying the May 31 Opinion to award sanctions jointly and severally against David and the David Law Offices.

While the matter of law firm (as opposed to individual attorney) sanctions under § 1927 appears not to have been specifically addressed, in *Apex Oil* the Second Circuit implicitly approved the practice by affirming the district court's sanction award against Shea & Gould under that section. *See also Calloway v. Marvel Entertainment Group*, 854 F.2d 1452 (2d Cir.1988) (approving of Rule 11 award against law firm rather than just signer of pleading, and reversing, on grounds unrelated to the sanctioned entity's status as law firm and without questioning propriety of law firm sanctions, a § 1927 award against the same firm), *cert. granted,* 109 S.Ct. 1116, 103 L.Ed.2d 179,*argued,* 58 U.S.L.W. 3251 (Oct. 17, 1989). Many of the same reasons advanced by the Court of Appeals in *Calloway* for favoring awards against the law firm entity rather than individual attorney appear equally to support § 1927 sanctions against firms in cases where the course of conduct undertaken by the participating lawyers of the firm evinces bad faith, such as here.

Of course, under Rule 37 there appears to be no real issue that sanctions may be awarded against law firms and under that Rule an award does not require a finding of bad faith or willful conduct. The discovery behavior of plaintiff's counsel plainly warrants sanction under that Rule for counsel's failure to comply with the requirements of Rules 33 and 34 as well as with the repeated discovery orders of the court. Because the court still finds, upon this motion for reconsideration, that the discovery conduct of David and the David Law Offices was so will-

fully, vexatiously and unreasonably undertaken as to be "stamped by bad faith," *Colucci v. New York Times Co.,* 533 F.Supp. 1011, 1014 (S.D.N.Y.1982), an award under Rule 37 at this point would be duplicative of the award to be made under § 1927. Accordingly, no Rule 37 award is set forth herein.

*The Measure of the Award*

**\*17** Balch has submitted affidavits detailing legal fees and disbursements for the defense of this entire case totaling $415,194.92. It seeks recovery of $172,045.25 of this total amount, which portion Balch attributes to conduct the court deemed sanctionable in the May 31 Opinion. That sum represents 80% of some $53,000 (about $43,000) in fees and expenses that were billed for work from April 1986 to September 1987 on discovery motions and depositions by the first defense law firm on this case; 80% of the $113,000 (about $90,000) in billings that have been allocated to work from September 1987 through April 1988 on the subject matter jurisdiction motion by the Kramer, Levin firm; and 100% of the $40,000 in billings from April 1988 to April 1989 associated principally with the sanctions motions themselves.

Balch's blanket percentage method of attribution fails fairly to tie its incurred fees and expenses to the disapproved actions of Brignoli's counsel. 18 U.S.C. § 1927 is not a mechanism for wholesale reimbursement of a vindicated party's fees and expenses associated with a proceeding. Rather, the statutory provision permits a court to tax counsel who have conducted themselves unreasonably and vexatiously in respect to identified matters with the excess costs, expenses, and fees incurred by their adversary as a result of that conduct in the proceeding.

Approximately $43,000 of the attributed sum, as noted, represents fees paid to a law firm that concluded its engagement on the case prior to the inception of the jurisdictional motion phase of the action. As the court upon reconsideration has not considered as sanctionable any conduct relating to this earlier phase of the case (including the Balch deposition and Dean Witter deposition), this portion of the requested recovery shall not be taken into account in calculating an appropriate award.

Moreover, it is not correct to accredit a blanket 80% or 100% of the billings associated with Balch's prosecution and discovery on the subject matter jurisdiction motion, or of the sanctions motion, to "excess" costs and fees resulting from Brignoli's counsel's misconduct. The scrutiny of the record described above and of the submitted time sheets suggests that approximately $17,500 in fees and expenses can fairly be attributed to the sanctioned misconduct. The bulk of the fees and expenses incurred by Balch are appropriately attributed to diligent but costly efforts of its attorneys to establish a case supporting a jurisdictional motion that proved to rest on propositions much more difficult to establish than perhaps defense counsel expected,[20] and, thereafter, to the prosecution of a sanctions motion that was in several respects denied.[21] Thus, a total award of $17,500 shall be imposed against David and the David Law Offices.

*Conclusion*

For the reasons set forth above, the May 31 Opinion is modified in accordance with the findings set forth above and in all other respects the motion of plaintiff's counsel is denied. David and the David Law Offices shall pay to Balch the sum of $17,500 representing excess costs, expenses and fees incurred by Balch as a result of the unreasonable and vexatious conduct of David and the David Law Offices, which conduct unnecessarily multiplied these proceedings. David and David Law Offices shall be jointly and severally liable for the full amount of the award.

**\*18** It is so ordered.

    FN1. Attorneys working at David's law of-

Not Reported in F.Supp.                                                                                                          Page 15
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1989 WL 146767)

fice at this time used the firm name Arie E. David, Esq. or otherwise indicated their association with Arie E. David, Esq, counsel of record for Brignoli, in correspondence and motion papers in this matter. Sometime in February 1988 and thereafter, Brignoli's lawyers began to use stationary bearing the name Law Offices of Arie E. David, to place that name on Brignoli motion papers, and to indicate their status as associates or members of that firm.

FN2. In addition to the passport, which had been called for by Balch's Request No. 1, Fischman's affidavit in support of the motion to compel stated that tax materials (responsive to Requests Nos. 2 and 3) were not produced and that at deposition Brignoli was not permitted by David to answer questions concerning whether he had filed returns or paid taxes in Connecticut. (Tr. 104-05.) (At a subsequent deposition (Tr. 194-96), Brignoli stated he did not know the name of the accountants who might have prepared state tax returns that were filed.) Balch's Request No. 4 concerned Brignoli's residences in New York. Fischman's affidavit stated no documents were produced responsive to that request prior to its motion, although deposition testimony reflected that Brignoli owned a condominium at 100 West 89th Street. Balch's Request No. 10 requested documents relating to Brignoli's checking accounts. The Fischman affidavit stated that Brignoli had testified to accounts with at least four banks but had produced only 35 checks relating to two of those accounts. Another Balch request (No. 16 and 17) concerned telephone records, none of which were produced by Brignoli, according to Fischman, but some of which were eventually obtained by third party subpoena from New York Telephone. The above exemplifies, but does not exhaust,

the requests that Balch's counsel stated were not complied with by plaintiff.

FN3. Fischman's affidavit in opposition to plaintiff's motion to accelerate and to impose sanctions stated (and plaintiff failed to rebut): that Balch had filed a detailed response to plaintiff's informal request for documents on July 2, 1987, in which it offered to permit plaintiff to inspect documents that month; that plaintiff had not arranged to inspect those documents in the eight ensuing months nor had plaintiff ever responded to substituted counsel's written request for clarifications regarding the purported outstanding items; that Balch also had replied to plaintiff's requests for admissions on July 2, 1987, yet plaintiff took no action thereafter for eight months to question the adequacy of those replies; that substituted counsel for Balch had in October offered to schedule any outstanding depositions; and that Balch had responded to interrogatories in a form that had been previously authorized by the court.

FN4. The latter representation to the court—that plaintiff's counsel already had produced the documents with the exception of the tax returns and one other category—was contrary to the Fischman affidavit in support of the motion to compel, which detailed substantial non-production. David's representation to the court was later proved false by plaintiff's subsequent production of some 280 responsive documents almost a month later, on April 7, 1989.

FN5. Discussion of plaintiff's motion to accelerate its discovery (and for sanctions) was postponed because David was unequipped to identify which of the documents that Brignoli had requested over a year ago remained outstanding. Accordingly, the court ordered that this dispute be taken up at the pre-trial conference sched-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

uled for March 16, 1988, prior to which papers could be prepared that would present the dispute in a form susceptible to the court's review. Consideration of proposed comprehensive confidentiality orders, which were handed up to the bench at the hearing, was also deferred to a future date, although, as noted, the court did address and resolve at this hearing the particular confidentiality concerns arising with respect to the diversity jurisdiction discovery by ordering confidential treatment of the tax, asset and trade secret matters.

FN6. The subject of substantive (nonjurisdictional) discovery requests also was again addressed. The parties agreed to resolve their differences by scheduling a mutual production date in mid-April. (Tr. 24-30).

FN7. As Balch's counsel stated: "[We] are here now on the fourth application seeking the documents from this party and from his companies. And I would note by the way, that among the stuff we never got [ ] were the tax returns which we've talked about at about four hearings, they were never produced." (Tr. at 16). "The only documents produced to us, and I have them with me, ... [are the documents produced on] February 6th. There is a list of six categories [set forth in plaintiff's February 5 cover letter forwarding those documents], nothing else has been produced." (Tr. at 17).

FN8. Defense counsel explained the need for additional non-party discovery as follows:

If [Brignoli] is embarrassed by our serving papers on non-parties, he can save it by producing the documents which he has been ordered to produce, and which he has not produced. We have not received the tax document ordered

produced by the Court, nor have we received the telephone records ordered produced by the Court. We have received [telephone records] from a non-party, but Mr. Brignoli understands those records were incomplete.... [W]e have not received any information regarding an apartment in New York which the Court ordered provided. We have not received from Mr. Brignoli records from taxi companies.

(Tr. at 2-3).

FN9. The letter requesting an adjournment of argument was submitted to the court on May 9, 1988, the day that Brignoli's reply papers were due and two days before the scheduled argument. The extension was granted and argument was rescheduled for May 20. Two days before that scheduled argument, on May 18, an associate of David Law Offices wrote the court stating that at David's direction, he was requesting that argument be cancelled entirely and the matter taken on submission as David had been out of the country since May 7, 1988 and other David Law Office counsel either were unavailable to argue or could not adequately represent Brignoli at the argument. The argument was further adjourned and new counsel, which had been substituted for David as counsel of record in respect to the rest of the action although not for purposes of the pending motion, assumed responsibility for argument of the motion.

FN10. It is the court's recollection that at the May 26 hearing, counsel for plaintiff was advised to produce the New York State tax returns within one week or suffer the consequences, including the negative inference that the returns filed were as a New York State resident. The May 31 Opinion reflects this in stating that at the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 17
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1989 WL 146767)

oral argument, "Brignoli was given one more week to produce New York State tax returns...." As no transcript of that argument is available, for present purposes, the court accepts plaintiff's characterization of the court's direction as simply granting plaintiff's counsel's request for an additional week to file a submission with the court addressing the tax return issue, rather than as a further order directing production of the tax documents.

FN11. No need for an evidentiary hearing was established here since the record contained affidavits from the attorneys involved in the proceedings, transcripts of discovery-related conferences and hearings, and the extensive pleadings and letters filed in connection with the too-numerous disputes between the parties over discovery matters. In addition, the court's participation in the proceedings provided direct knowledge of many of the relevant facts. *See Oliveri,* 803 F.2d at 1280.

FN12. According to the Dean Witter lawyer, Dean Witter's witness was not produced on September 29, 1987 because (as Brignoli's lawyer had been advised prior to the scheduled deposition) Dean Witter's lawyer had contacted defense counsel on September 28 and again on September 29th, and been told by each of several defense counsel that they had received no prior notice from Brignoli's lawyer of the rescheduled September 29, 1987 deposition date.

FN13. The distinction was not without significance because as it developed, Brignoli apparently made relatively few purchases on the account maintained in his own name but did make many purchases on the card issued to him under the account of Brignoli Models. (Hearing Transcript of April 7,

1988, p. 10).

FN14. The letter also advised Citibank that the only documents that fell within the court-set discovery limitations "were already given to the defendants" by plaintiff. Even were that statement true (something which defense counsel denied at the hearing of April 7, 1988, and which subsequent statements by plaintiff's counsel contradict, *see* Plaintiff's Memorandum of May 18 Opposing Motion to Dismiss, ¶ 91), plaintiff's counsel's reasons for mentioning this in a letter to a non-party subject to a subpoena of documents in its (rather than plaintiff's) possession are unclear, since the fact that Brignoli already theoretically produced certain documents to Balch could not by itself alter the duties of the subpoenaed party to respond to a subpoena seeking documents that are in the non-party's possession.

FN15. The ruling expressly took into consideration David's expressed concern that the questions being asked were confusing and inappropriately posed by ordering that plaintiff could move for suppression after the deposition to the extent questions were improperly phrased, but that during the depositions there was to be "no objections [other than for privilege], no colloquy, no disputes." Tr. at 6-7.

FN16. Counsel wrongly represents that there was one contemporaneous assertion of tax return production. The Affidavit of Michael Plank dated February 9, 1989, at ¶ 19, states that "confusion had crept in on this point, as we asserted in the April 7th [1988] hearing that we had already provided defendant with redacted copies of plaintiff's tax returns." See also the Affidavit of Nichter dated March 3, 1989, which at paragraph 11 makes the same claim. Examination of pages 16 and 17 of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                   Page 18
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1989 WL 146767)

the April 7, 1988 transcript, to which affiant Plank cites, reveals no such contemporaneous assertion by plaintiff's counsel that the tax returns had been produced, notwithstanding that Balch's counsel had specifically mentioned that the returns had not been produced. Rather, at that hearing Nichter indicated only that some 280 unspecified documents were being produced that day and she was ordered to produce the outstanding documents by April 15.

Statements of defense counsel made in open court on April 22, 1988 and by affidavit of April 26, 1988, confirm that the tax returns were not part of that document production of April 7, nor produced on or after April 15. On April 27, 1988, Balch filed its motion to dismiss, to preclude and to draw negative inferences, to which Brignoli responded on May 18, 1988.

Nichter, by affidavit of January 18, 1989, states she:

"personally prepared the factual portion of [the May 18] brief, which dealt with, among other things, the subject of plaintiff Brignoli's tax returns....

I believed then, and I still believe, that our firm had turned over redacted copies of Brignoli's personal income tax returns, as ordered by the Court, in February of 1988. My arguments on motions, in hearings, and in our final brief were based upon that belief."

However, the May 18 brief emphatically does not indicate a belief that copies of Brignoli's tax returns were turned over to Balch's counsel in February, although such a fact, were it true, would have been determinative of the issue then before the Court of whether it ought to be

presumed that the New York tax returns were filed by Brignoli as a New York resident. In fact, Brignoli's counsel failed to express this belief in numerous appearances and filings with the court prior to May 18, 1988. In a letter of February 4, 1988 to Balch's counsel, plaintiff's lawyers stated that they were expressly withholding the tax returns and repeated that statement again at the deposition conducted on February 17, 1988. At a hearing on March 11, 1988, Brignoli's counsel stated that the tax returns had not been produced but would be within a week. Finally, Brignoli's counsel did not contemporaneously contradict the assertions of non-production made by defense counsel on March 23, April 7, April 22 and April 26.

FN17. Rosen's Affidavit of February 9, 1989 states, in pertinent part:

2.... I prepared certain discovery materials which were sent to defendant's then-attorneys, Kramer, Levin, Nessen, Kamin & Frankel, Charlotte M. Fischman, Esq., in February of 1988. At the time I collated, but did not send, copies of plaintiff's tax returns. I had discussions at that time with Arie E. David, managing partner [of the Law Offices of Arie E. David], as to whether we should send the tax returns, in light of our concerns about confidentiality. We discussed whether we should send them, wait for the Court to sign a confidentiality order, or send redacted copies on our own. I went to Israel in early March, and was out of contact with Mr. David from March 11th until April 11th, and I do not know what happened to the tax materials thereafter. To my knowledge, no decision was reached as to how to handle the tax matter at the time that I left.

Not Reported in F.Supp.                                                                                    Page 19
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1989 WL 146767)**

3. Just before I left, I turned over all current work in this action to Mr. David's new associate, Michael E. Plank. After I came back, I did not deal with this case at all.

Plank's affidavit of February 9, 1989 states, at ¶ 24, that he "never dealt with tax returns, which were not included in our second diversity discovery production on March 31, 1988." David himself stated, first at Brignoli's deposition of February 17, 1988, and then at the hearing of March 11, 1988, that the tax returns had not been produced. Thus, there is no apparent explanation or contemporary record of how David and Nichter formed their asserted belief that the returns were turned over in February (or, as David imagines, in the Spring). Nor is there an explanation, if they thought the returns already had been turned over, why they did not simply respond to defendant's contrary assertions by producing the returns again.

FN18. *See* Affidavit of Nichter dated June 30, 1989, ¶ 15:

"The final issue is the claim that documents supposedly were not produced after the Court so directed. *We ask again*-what documents? And *we ask again,* when did the Court make this request? Insofar as we can tell, this ... relates to the Court's belief that it requested Brignoli's tax returns at the oral argument on the Diversity Motion." (Emphasis in original.)

FN19. David's statement that "confidentiality of tax returns" was one of the matters the court had placed on the agenda for the May 6 discovery conference (*see* March 10, 1989 hearing transcript, at 14) and Nichter's statement that "at that time [May 6] we were supposed to produce the tax return"(*id.* at 18) contradict these attorneys' professed belief, discussed above, that they already had produced the tax returns. Moreover, the transcript of the April 12, 1988 hearing at which the court proposed the May 6 conference, reveals that there was then no discussion of the tax returns or their confidentiality. Of course, the court had previously addressed and specifically ruled upon the confidentiality of tax returns at the hearing of March 11, 1988, which David attended (Tr. 5-6), and on several additional occasions the court had ordered that jurisdictional discovery documents, including the tax returns, be produced, well prior to May 6.

FN20. For example, Balch took numerous depositions in aid of its jurisdiction motion yet conduct that was found sanctionable arose in just two of these. Similarly, while much of the discovery motion practice during this phase was brought on as a result of vexatious and unreasonable conduct on the part of David and his colleagues, the substantial costs associated with preparing the original order to show cause, and of preparing the final motion to dismiss diversity papers cannot fairly be attributed in any significant degree to the vexatious actions of plaintiff's counsel.

FN21. The May 31 Opinion denied Balch's motion for sanctions under each of the several grounds Balch advanced for an award under Rule 11, and denied as well the request for an award under § 487 of New York's Judiciary Law.

S.D.N.Y.,1989.
Brignoli v. Balch, Hardy & Scheinman, Inc.
Not Reported in F.Supp., 1989 WL 146767 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX G

Westlaw.

Slip Copy                                                                              Page 1
Slip Copy, 2008 WL 463719 (S.D.N.Y.)
**(Cite as: Slip Copy, 2008 WL 463719)**

**H**
Tse v. UBS Financial Services, Inc.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Roberta C. TSE, Plaintiff,
v.
UBS FINANCIAL SERVICES, INC., Defendant.
No. 03 Civ. 6234(GEL).

Feb. 19, 2008.

John Beranbaum, Jason J. Rozger, and Kristen E.
Finlon, Beranbaum Menken Ben-Asher & Bierman
LLP, New York, NY, for plaintiff.
Kenneth J. Kelly, Mary Gambardella, Jennifer M.
Horowitz, and Erin M. Carney, Epstein Becker &
Green, P.C., New York, NY, for defendant.

### OPINION AND ORDER

GERARD E. LYNCH, District Judge.
**\*1** Plaintiff Roberta C. Tse sued defendant UBS
Financial Services, Inc. ("UBS"), alleging that UBS
discriminated against her on the basis of her race
and gender by placing her on a business develop-
ment plan ("the Plan")-a kind of probationary re-
strictive duty-and eventually terminating her em-
ployment. After a nine-day trial, a jury returned a
verdict for plaintiff on her gender discrimination
claim insofar as it was predicated on her placement
on the Plan, and rejected her remaining claims, in-
cluding her claim of discriminatory termination.
The jury awarded plaintiff $56,000 in emotional
distress damages, $500,000 in economic damages,
and $3,000,000 in punitive damages. Defendant
now moves for judgment pursuant to Fed.R.Civ.P.
50(b), or, in the alternative, for a new trial or re-
mittitur pursuant to Fed.R.Civ.P. 59. Defendant
also moves for sanctions for plaintiff's alleged dis-
covery abuses.

Defendant's motion for judgment as a matter of law
will be denied in its entirety, and defendant's mo-

tion for a new trial will be granted in part; the Court
will order a remittitur to $45,000 on the economic
damages award, and to $300,000 on the punitive
damages award. Defendant's motion for sanctions
will be granted in part and denied in part.

### BACKGROUND

A short recounting of the background facts and pro-
ceedings at trial will be provided here at the outset.
Additional facts will be discussed in later portions
of this opinion as they relate to the post-trial mo-
tions. To the extent relevant to defendant's motion
for judgment as a matter of law, the primary factual
narrative will describe events taking the evidence in
the light most favorable to the plaintiff. Where rel-
evant, however, in the interest of explaining the de-
velopment of the record, or in connection with de-
fendant's other motions, disputed issues of fact and
conflicting evidence will be discussed.

In 1998, Roberta Tse, an Asian woman, was hired
by UBS as a Financial Advisor ("FA") for UBS's
Madison Avenue Branch. (Tr. 80, 85.) Tse was
hired by David Zoll, the Branch Manager of the
Madison Avenue Branch. Tse was moderately suc-
cessful during her first few years at UBS, ranking
neither at the top nor the bottom of the FAs on
UBS's evaluation criteria. (*Id.* 121-23;*see* Pl.Ex.
47.) However, Tse's production took a downturn in
2001, due in part to the transfer of one of her
largest accounts to a different UBS analyst and to
the declining economy. (Tr. 696-97.) By early
2002, Tse was one of the lowest-producing FAs in
the Madison Avenue Branch. (Pl.Ex. 47.)

In February 2002, Tse met with Jason Chandler,
who had replaced Zoll in January 2001 as Branch
Manager of the Madison Avenue Branch, to discuss
the downward trend in Tse's production levels. (Tr.
137.) Also as a result of that downward trend, in
March 2002, Chandler moved Tse from her office
to a cubicle (*id.*), and in May 2002, Chandler

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 463719 (S.D.N.Y.)
(Cite as: Slip Copy, 2008 WL 463719)

placed Tse on a business development plan.(*Id* . 710.)According to Chandler, the general goal of a business development plan was to provide "coaching" to struggling FAs in order to "aid [ ] [an FA's] development with their own understanding of their business."(*Id.* 708.)In Tse's case, Chandler claimed that the Plan was specifically directed towards "increas[ing][her] assets and therefore increas[ing] new clients."(*Id.* 837.)Although several other FAs had also experienced a recent decline in their production levels, none of the other low-producing FAs-almost all of whom were male-was also placed on a business development plan at that time.

**\*2** Chandler revised the Plan twice to reflect certain concerns expressed by Tse about its duration and terms. (*Id.* 534-35;*see* Pl.Ex. 12.) Under the final terms of the Plan, Tse was required (1) to be in the office between 9 a.m. and 5 p.m. on weekdays; and (2) to increase her assets under management by $6 million over the following six months, equivalent to $1 million a month. (Pl.Ex. 13.) The Plan thereby mandated a 40% increase in her client asset base over six months. (Tr. 159, 730.) The Plan stated that Tse could be subject to disciplinary action, up to and including termination, if she failed to meet its requirements. (Pl.Ex. 13.) If Tse failed to meet the requirements the plan provided, Chandler would "then set new goals to be accomplished over the subsequent 120-day period."(*Id.*)

Chandler met with Tse twice during the term of the Plan to discuss her job performance, and revised the Plan twice more to reflect her new goals. (Tr. 712.) On December 2, 2002, Chandler again met with Tse and told her that she had failed to meet the requirements of the Plan. (*See id.* 177, 560-61, 566;*see also id.* 234 (describing Tse's production in 2002 as "[l]ousy").) At that meeting, Chandler and Tse also discussed the internal grievance Tse filed with UBS's Human Resources Department on November 8, 2002, regarding her placement on the Plan, as well as the discrimination claim she had filed against UBS with the New York State Division of Human Rights on November 13, 2002. (*Id.* 206-07.)The meeting was adjourned for a day to give Chandler the opportunity to "think about [the] things that [Tse and Chandler] discussed" at the meeting. (*Id.* 879.)

Tse and Chandler met again on December 3. (*Id.* 563.)At the December 3 meeting, Chandler and Tse again discussed her pending discrimination claim.(*Id.*) Chandler also asked Tse what her plan was with respect to her future at UBS. (*Id.* 880.)Tse replied that she still "wanted to be successful," and that she wanted to continue working at UBS and improve her performance, despite her failure to meet the Plan's goals. (*Id.* 882;*see id.* 887 (testifying that plaintiff told Chandler at the December 3 meeting that she "wanted to have a go at" her job); Pl.Ex. 68.) In response, Chandler told Tse to continue the job "as best as" she could and to continue to "serve [her] clients." (Tr. 219.) No disciplinary action was taken against Tse at that time, nor was Tse placed on another business development plan. (*See id.* 565 (testifying that Tse believed, and Chandler said, that Tse "could continue to do business as [she] had been doing" after the Plan expired).) However, on January 29, 2003, UBS sent Tse a termination letter. (Pl.Ex. 36.) The termination letter informed Tse that she had "been absent from work without excuse for 35 of the last 37 days," and stated the reason for her termination as job abandonment. (*Id.*)

On August 19, 2003, Tse initiated this action, contending that her placement on the Plan and her termination were motivated by a discriminatory animus on the basis of her race and gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et seq.* ("SHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107*et seq.* ("CHRL"). On June 16, 2005, defendant moved for summary judgment on Tse's gender and race discrimination claims insofar as they were predicated on her placement on the Plan, contending that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plan did not constitute an adverse employment action as a matter of law. On December 13, 2005, the Court denied that motion, finding that whether the Plan created a "materially significant disadvantage" to plaintiff's employment was a genuine issue of fact. (12/13/05 Tr. 5-6.)

**\*3** Trial was held from April 2-13, 2007. At trial, plaintiff did not attempt to dispute that her measurable job performance was weak in comparison to the full range of other FAs. Rather, she compared her treatment primarily to that of other low-performing FAs who were male, and adduced evidence showing that, although the performance of several male FAs was also declining in early 2002, none of them was placed on a business development plan, nor did any of them suffer any disciplinary measure for their low production (*See, e.g.,* Tr. 714-27.) Indeed, one low-producing male FA, Neal Cooper, was promoted despite consistently being ranked in the lowest quartile. (*See id.* 701-02; Pl.Ex. 47.) Chandler testified, however, that plaintiff's alleged comparators were not similarly situated to her for various reasons, including that, out of all the low-producing FAs, plaintiff had exhibited the most "severe decline" in production during the period that Chandler was Branch Manager. (Tr. 827.)

Another matter disputed at trial was whether Tse had voluntarily abandoned her job, or whether UBS had terminated her, either for legitimate or for discriminatory reasons. Although Tse's termination letter charged that she had not shown up for work on 35 out of the 37 days prior to her termination, Tse vigorously disputed that she abandoned her job, claiming that she had been in the office several times during that period (*id.* 1358), that when not in the office she had been working from home and meeting clients (*id.* 236), and that Chandler had planned to terminate her since the end of November 2002 but had not done so due to her pending discrimination claims (*see* Beranbaum Decl. Ex. 2). In response, Chandler testified that he never saw Tse again in the office after their December 3 meeting

(Tr. 883), and defendant submitted testimony and documentary evidence indicating that Tse had not used the UBS computer system nor responded to attempts by UBS employees to contact her since early December 2002. (*See* Def. Exs. 36-38, 45-46.)

Also hotly disputed at trial was Tse's post-employment economic damages calculation. In support of her claim for post-employment economic damages, Tse submitted a chart purporting to show that she had suffered a loss of approximately $1.65 million in pay due to her alleged discriminatory termination. (Pl.Ex. 110.) Defendant objected to admission of the chart, arguing that it was seriously misleading because of various omissions and miscalculations (Tr. 305), including the fact that it significantly overestimated Tse's yearly earnings at UBS (*see id.* 1274-78; Def. Ex. 77). Although the Court expressed serious doubts about the accuracy of the chart at that time, characterizing it as "remarkably misleading" (Tr. 1303), and noted that Tse's failure to disclose her calculation prior to trial might have prejudiced defendant (*id.* 1304-06), the Court nevertheless found that defendant could address the chart's inaccuracies and omissions during cross-examination, and that defendant's objections would be better addressed by post-trial motions, "where there [could] be a better analysis of prejudice."(*Id.* 319;*see id.* 1435 (noting that plaintiff's economic damages calculation had been "cross-examined to death").) Accordingly, the Court admitted the chart into evidence.[FN1] (*Id .* 1304.)However, the Court also noted that "if there is a verdict for the plaintiff in any amount that looks like the amount on the chart, [the Court] would have to seriously consider any new trial motion that was made on the grounds that information was presented to the jury that is just plain inaccurate."(*Id.*)

> FN1. Plaintiff revised the chart somewhat to simplify her damages calculation (Tr. 631-33; Pl.Ex. 110), but most of the inaccuracies and omissions remained in the revised chart (Tr. 1287 ("[T]here's absolutely

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

no reflection of any corrections in [the revised chart] except a net new asset bonus and one other minor item."); *see* Def. Reply 20 (characterizing the revised chart as "still inaccurate and prejudicial")).

**\*4** After the close of plaintiff's case, defendant moved for a directed verdict on all of plaintiff's claims pursuant to Fed.R.Civ.P. 50(a), contending that plaintiff had not adduced sufficient evidence to permit a reasonable jury to find that either her placement on the Plan or her termination were motivated by a discriminatory animus. (*Id.* 1307.)The Court denied defendant's motion, finding that "there [was] adequate information on which a jury could reach a conclusion that there was different treatment, that among the poorly producing financial advisors at this branch ... Ms. Tse was the one who was singled out to be put on a business development plan."(*Id.* 1308.)The Court noted that Tse's success would depend on the jury's "credibility determinations" as to whether "males who were arguably comparable were allowed to slide," while Tse was placed on the Plan. (*Id.*)

On April 12, 2007, the jury returned its verdict, finding that defendant had unlawfully placed Tse on the Plan because of her gender, but rejecting her other claims of race and gender discrimination, including her claims of discriminatory termination. The jury awarded Tse $56,000 in damages for emotional distress, $500,000 in economic damages, and $3,000,000 in punitive damages.

On May 14, 2007, defendant moved for judgment as a matter of law or a new trial, contending, inter alia, that (1) the Plan did not constitute an adverse employment action as a matter of law; (2) plaintiff was not similarly situated to low-producing male FAs who had not been placed on a business development plan; (3) plaintiff failed to establish any economic loss as a result of being placed on the Plan; and (4) the punitive damages award was unwarranted and grossly excessive. Defendant simultaneously moved for sanctions for plaintiff's alleged discovery abuses and for her failure to disclose the damages chart prior to trial. Plaintiff responded to both motions on June 13, 2007; the motions were fully briefed as of June 27, 2007.

## DISCUSSION

Sufficient evidence was adduced at trial to support the jury's finding that plaintiff's placement on the Plan was discriminatory, and the Court will not disturb that finding. However, the jury's calculation of economic and punitive damages was erroneous; therefore, the Court will order a remittitur to $45,000 in economic damages and to $300,000 in punitive damages.[FN2] If plaintiff does not accept the remitted amount, defendant is entitled to a new trial on the issue of economic and punitive damages.

> FN2. Defendant does not challenge the jury's award of emotional damages, which accordingly will remain in place.

### I. Legal Standards

Federal Rule of Civil Procedure 50(a) provides that where there is no "legally sufficient evidentiary basis" for a reasonable jury to find for a party on a particular issue, the court may resolve the issue against that party and may "grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."Under Rule 50(b), if the court does not grant a motion for judgment as a matter of law at the close of all the evidence, "[t]he movant may renew its request ... by filing a motion no later than 10 days after entry of judgment-and may alternatively request a new trial or join a motion for a new trial under [Fed.R.Civ.P.] 59."Fed.R.Civ.P. 50(b).

**\*5** A movant seeking to set aside a jury verdict faces a "high bar." *Lavin-McEleney v. Marist Coll.,* 239 F.3d 476, 479 (2d Cir.2001). A jury verdict should be set aside under Rule 50 only where there is "such a complete absence of evidence supporting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or where there is "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him."*Kosmynka v. Polaris Indus., Inc.,* 462 F.3d 74, 79 (2d Cir.2006) (citation and internal quotation marks omitted). In applying this standard, a court must not make credibility assessments and must view the evidence in the light most favorable to the non-moving party. *See Gordon v. Matthew Bender & Co.,* 186 F.3d 183, 184 (2d Cir.1999).

Pursuant to Federal Rule of Civil Procedure 59(a)(1), a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court."The standard for granting a new trial differs in two ways from that governing Rule 50 motions: (1) a new trial may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 133-34 (2d Cir.1998) (citation omitted). Although a trial court is afforded considerable discretion under Rule 59(a), a motion for a new trial should be granted only when, in the opinion of the district court, "the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice."*Id.* at 133, quoting *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992) (alteration in original). Accordingly, a court should rarely disturb a jury's evaluation of witness credibility. *Id.* at 134.Moreover, the mere fact that the trial judge disagrees with the jury's verdict is not a sufficient basis to grant a new trial. *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 691 (2d Cir.1983).

In some cases, a remittitur provides an appropriate alternative to granting a new trial. "Remittitur is the process by which a court compels [the party that prevailed at trial] to choose between reduction of an excessive verdict and a new trial."*Cross v. N.Y. City Transit Auth.,* 417 F.3d 241, 258 (2d Cir.2005)

(citation and internal quotation marks omitted). Depending on the grounds for the remittitur, the new trial may be either on the underlying claims generally or limited to the issue of damages only. *See Tingley Sys ., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir.1995). The court may require a choice between a new trial and reduction of a verdict "where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken," or "where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error."*Trademark Research Corp. v. Maxwell Online, Inc.,* 995 F.2d 326, 337 (2d Cir.1993) (citation and internal quotation marks omitted). Remittitur may also be warranted where it can be demonstrated that the jury awarded specific amounts of damages that were not supported by the record. *Id.* (explaining that "[i]f it could be demonstrated that the verdict included any of [plaintiff's] unsubstantiated damages claims, the award would be by definition excessive," and remittitur would be appropriate).

## II. Gender Discrimination

**\*6** Defendant's motion for judgment as a matter of law with respect to the jury's liability determination is unavailing. Based on the evidence adduced at trial, the jury reasonably found both that the Plan was an adverse employment action, and that plaintiff was treated less favorably than similarly situated male FAs. Therefore, the Court may not disturb the jury's liability determination in this case.

### A. Adverse Employment Action

In order to establish liability for gender discrimination, plaintiff must show that she suffered a material adverse employment action because of her gender. "[M]aterially adverse change[s]" in the terms and conditions of employment include, but are not limited to, discharge, refusal to hire, denial

of promotion, decrease in wages, salary or benefits, or significantly diminished responsibilities. *See Galabaya v. N.Y. City Bd. of Educ.,* 202 F .3d 636, 640 (2d Cir.2000). Although "[a] 'materially adverse' change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities,"*id.,* an adverse employment action may be found where the action affects the employee's future employment "opportunities," *Pimentel v. City of New York,* No. 00 Civ. 326, 2002 WL 977535, at *4 (S.D.N.Y. May 14, 2002).*See Bernheim v. Litt,* 79 F.3d 318, 325 (2d Cir.1996) (holding that a change that harms a plaintiff's reputation, opportunities for advancement, and earning potential may constitute adverse employment action); *see, e.g., Casale v. Reo,* No. 1:04-CV-1013, 2007 WL 3353217, at *6 (N.D.N.Y. Nov. 7, 2007) (holding that an adverse employment action has occurred even where it is "likely" that the action will have a "material impact" on the employee)."[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination."*Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 226 (2d Cir.2006), quoting *Hoyt v. Andreucci,* 433 F.3d 320, 328 (2d Cir.2006)."Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.' " *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997).

Defendant argues that, as a matter of law, plaintiff's placement on the Plan was not an adverse employment action. First, according to defendant, "[b]eing placed on a performance plan, standing alone, is not an adverse employment action."(Def. Mem. 6, citing *Weeks v. N.Y. State (Div. of Parole),* 273 F.3d 76, 86 (2d Cir.2001).) Specifically, defendant argues that "criticism of an employee" is not an adverse employment action, and cites case law in support of that argument. However, even assuming that "criticism of an employee" alone cannot constitute an adverse employment action as a matter of law, *see Weeks,* 273 F.3d at 86, the jury could easily have found that the performance plan at issue here

was not simply a negative evaluation of plaintiff's job performance, but instead also imposed certain new requirements on the terms and conditions of her employment. Thus, the cases cited by defendant are inapposite, as they all involved situations in which the only undisputed employment action was a negative performance evaluation, without any attendant consequences or alterations in the terms of employment.[FN3]

FN3.*See Weeks,* 273 F.3d at 86 (finding a negative evaluation not to be an adverse employment action where the evidence did not "describe its effect or ramifications, how or why the effect would be serious, whether it went into any file, or even whether it was in writing"); *Young v. Pitney Bowes, Inc.,* No. 3:03 CV 1161, 2006 WL 726685, at *28 (D.Conn. Mar. 21, 2006) ("[C]riticism of an employee [alone] ... is not an adverse employment action."); *Chamberlin v. Principi,* No. 02 Civ. 8357, 2005 WL 1963942, at *5 (S.D.N.Y. Aug. 16, 2005) (finding that plaintiff had not shown an adverse employment action where there was no evidence that "his career opportunities within or without [his place of employment] were damaged as a result of [a] lowered [performance] evaluation"); *Weisman v. N.Y. City Dep't of Educ.,* No. 03 Civ. 9299, 2005 WL 1813030, at *6 (S.D.N.Y. Aug. 1, 2005) ("[A]n unsatisfactory rating itself may not constitute an adverse employment action."); *Knight v. City of New York,* 303 F.Supp.2d 485, 497 (S.D.N.Y.2004) (An "unsatisfactory rating" does not constitute an adverse employment action where there is no "accompanying diminution" in the terms of employment.); *Gurry v. Merck & Co.,* No. 01 Civ. 5659, 2003 WL 1878414, at *5 (S.D.N.Y. Apr. 14, 2003) (no adverse employment action where "Performance Improvement" memo had no "material ramifications" on plaintiff's employment);

*Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 284 (S.D.N.Y.1999) (no adverse employment action where negative evaluation did not "mark[ ] [plaintiff] as a less capable analyst").

*7 Next, defendant argues that to the extent that the Plan did impose new requirements on the terms and conditions of plaintiff's employment, the Plan still did not constitute an adverse employment action, because those new requirements could not reasonably be characterized as "adverse" to her employment. The Court has already rejected this same argument in ruling on defendant's motion for summary judgment, and nothing that transpired during trial undermines the correctness of that ruling.

First, under the Plan, plaintiff was required to be in the office between 9 a.m. and 5 p.m. each day. This requirement in itself restricted Tse's freedom of action, in contrast with her previous circumstances. Moreover, the jury was entitled to credit plaintiff's testimony that forcing her to be in the office during those hours negatively impacted her job performance, for example, because she did not have the necessary resources in the office to do her job efficiently, and/or because she could not meet clients without prior approval from Chandler. Although defendant correctly notes that "[s]howing up for work ... is a basic requirement of employment" (Def.Mem.8), such a general, conclusory assertion misses the point of plaintiff's unrebutted testimony, which the jury was entitled to accept, that the requirement of showing up *during specific hours* was explicitly imposed only on her, and not on any other FA in the Madison Avenue Branch. It is hardly unusual for professional employees to have discretion to allocate their time, including to meet with clients or business prospects outside the office during ordinary business hours, and the jury could reasonably have accepted Tse's testimony that this privilege was extended to UBS FAs, and that limiting this discretion not only reduced Tse's job status, but also harmed her productivity. Thus, the jury was entitled to find that, even if being in the office

from 9 a.m. to 5 p.m. on weekdays is in many contexts an ordinary term of employment, its imposition on Tse was a materially adverse change of employment terms with respect to her job in particular.

Second, under the Plan, plaintiff was required to increase her assets under management by $6,000,000 in six months. The jury was entitled to credit plaintiff's testimony that increasing her assets by $6,000,000 in such a short period of time was an onerous burden which had materially adverse consequences on her employment. The Plan required plaintiff to increase her assets under management by $1 million a month, thus mandating a 40% increase in her assets in just six months. (Tr. 159, 730.) However, in 2001, only three of the FAs in the Madison Avenue Branch had increased their assets by $1 million a month (*id.* 944), and in 2002, only four out of forty FAs in the Madison Avenue Branch reached that goal (Pl.Ex. 47). Thus, 36 of the 40 FAs in the Madison Avenue Branch would not have reached the goal imposed on Tse under the Plan. Moreover, Chandler admitted that he placed Tse on the Plan in the midst of a severe market downturn, making compliance with the Plan even more difficult. (Tr. 731.) Although defendant argues that plaintiff "concede[d]" during trial that increasing her assets by $6,000,000 in six months was "difficult" but "doable" (*id.* 159), a change in the conditions of employment need not be intolerable or completely impractical in order to constitute an adverse employment action; it need only be materially adverse to the conditions of employment. The jury reasonably could have found that the imposition of such a high production goal, combined with the poor market conditions at the time of the Plan, created a materially adverse term of plaintiff's employment, by imposing a demand, unique to Tse, that would be extremely difficult to meet.[FN4]

> FN4. Of course, the jury could also reasonably have concluded that such a demand was reasonable in light of Tse's otherwise low productivity, or that the burden, however onerous or even unfair, was im-

posed for non-discriminatory reasons. But these were issues for the jury to resolve.

**\*8** Third, defendant argues that "the fact that the Plan indicated that 'failure to follow' the Plan may potentially lead to" her termination "does not make the Plan itself an adverse action" because the jury found that she was not actually terminated due to her placement on the Plan, and thus, the threat to terminate her was merely inchoate. (Def. Mem. 10, citing Tr. 159, 534-35.) Even assuming arguendo that a threat of termination alone is not sufficient to constitute an adverse employment action, *see Brightman v. Prison Health Serv., Inc.,* No. 05 Civ. 3820, 2007 WL 1029031, at \*7 n. 4 (S.D.N.Y. Mar. 30, 2007), the jury was entitled to find that the threat of termination *combined with* the Plan's imposition of new, burdensome conditions of employment was sufficient to constitute an adverse employment action. When an employer imposes new conditions of employment and combines those conditions with a threat of termination for non-compliance, such a combination may give rise to a constructive demotion, thereby creating an adverse employment action. *See, e.g., Kelly v. Metro-North Commuter R.R.,* No. 87 Civ. 5817, 1989 WL 156298, at \*8 (S.D.N.Y. Dec. 18, 1989) (finding that "forcing a choice" between discharge and a longer workday constituted a constructive demotion), citing *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561-62 (1st Cir.1986). Here, when plaintiff was placed on the Plan, she was required to choose between complying with the terms of the Plan-which themselves were adverse to plaintiff's employment-or facing possible termination. (*See* Tr. 1047 (testimony of Zoll, agreeing that the Plan was a "disciplinary measure"); *id.*(Zoll: "[I]t's implicit that [a business development plan is] the first step towards ... exiting the firm, at [UBS's] behest.").) That Tse ultimately was fired for other, non-discriminatory reasons and not because of the Plan does not retrospectively render the imposition of the Plan itself non-adverse."[A]n employment decision need not result in discharge to fall within the Title VII protection" as long as there is "a cog-

nizable or material impact on the terms or conditions of ... employment"*Sternbridge v. City of New York,* 88 F.Supp.2d 276, 283 (S.D.N.Y.2000).

A comparison between the two business development plans submitted into evidence in this case further supports the reasonableness of the jury's finding that plaintiff's plan was an adverse employment action. The only other UBS employee who was subjected to a business development plan by either Zoll or Chandler was Michael Kosik, a male FA who was placed on a plan in 1999. Whereas plaintiff's plan threatened her with "disciplinary action, up to and including termination" for non-compliance, Kosik's plan included no comparable language. Instead, Kosik's plan informed Kosik that Zoll-the Branch Manager at the time-"look[ed] forward to many more prosperous years at [UBS] with you."(Beranbaum Decl. Ex. 5.) Moreover, whereas plaintiff's plan was copied to senior members of UBS's management and UBS's legal counsel (Tr. 836), Kosik's plan was not sent to anyone except Kosik himself (*see id.* 533 (perceiving the copying of the Plan to other members of UBS management as a sign that the Plan was a set-up to terminate plaintiff)). Finally, while Tse's plan absolutely required her to increase her assets under management by 40% in six months, Kosik's plan only gave him a general guideline for improvement. (Beranbaum Decl. Ex. 5 (advising Kosik to increase the number of his accounts by "20-40").) The jury could reasonably have found from a side-by-side analysis of the two plans that, while the intent and effect of Kosik's plan was to help him improve his performance, the intent and effect of Tse's plan was to constructively demote her, and place her under a direct threat of termination, and therefore constituted an adverse employment action.[FN5]

> FN5. Indeed, the jury apparently did perform just such a comparison, as it specifically requested Kosik's plan during deliberations. (Tr. 1437.)

**\*9** Finally, defendant argues that, because the jury did not find that plaintiff's termination itself was

Slip Copy
Slip Copy, 2008 WL 463719 (S.D.N.Y.)
(Cite as: Slip Copy, 2008 WL 463719)

discriminatory, the jury could not reasonably have found that her placement on the Plan was an adverse employment action. But the facts established during trial do not require that conclusion. Even if, during trial, plaintiff primarily focused on her termination as the principal adverse consequence resulting from her placement on the Plan, the jury was not constrained to base its findings solely on plaintiff's primary argument; instead, the jury was entitled to credit plaintiff's testimony that the terms of the Plan were a materially adverse change to her employment, while rejecting her testimony that she did not voluntarily abandon her job. The mixed nature of the verdict does not impugn the reasonableness of the jury's liability finding.

In sum, defendant's motion simply asks the Court to substitute its assessment of the evidence for that of the jury, something it is not permitted to do. The jury reasonably concluded that plaintiff's placement on the Plan was an adverse employment action.

B. Similarly Situated Male FAs

Defendant also argues that there was no evidence from which a reasonable jury could conclude that Chandler placed plaintiff on the Plan because of her gender. Defendant attacks the jury's finding piecemeal. First, defendant argues that plaintiff did not offer any evidence of gender-based derogatory comments by Chandler. (Def. Mem. 14 n. 5.) But such direct evidence of discrimination is unnecessary to establish a discriminatory animus. Instead, it is well established that a discriminatory animus may be proven both by direct and by indirect evidence, for example, by showing that similarly-situated male FAs were treated more favorably than plaintiff. *Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir.2000); *see Zimmerman v. Assocs. First Capital Corp.,* 251 F.3d 376, 384 (2d Cir.2001) ("Demonstrating disparate treatment by comparing one's treatment to that of other similarly situated employees is one of the principal means of showing a Title VII violation."). Thus, the absence of direct evidence of bias does not establish the absence of a

discriminatory animus.

Second, defendant claims that plaintiff did not show that Chandler generally treated other female FAs less favorably than male FAs. Specifically, defendant claims that the evidence established that Chandler "actively recruited female FAs," took them out to lunch, and promoted other high-performing female employees, and therefore, that the jury could not reasonably have found that Chandler was motivated by a discriminatory animus. (Def.Mem.13.) Defendant's argument is unavailing. Even if Chandler treated high-performing females as well as high-performing males, the jury could reasonably have found that he treated low-performing females, and specifically plaintiff, differently than he treated low-performing males. For example, the jury could reasonably have found that Chandler provided all high-performing FAs with the same opportunities, but that when an FA's production declined, he assisted male FAs to improve their performance through informal discussions and coaching (*see, e.g.,* Tr. 725-26 (testimony of Chandler, agreeing that he took one low-performing FA out to lunch "seven times" during 2001 and 2002 "on [Chandler's] expense account," to "suggest[ ] ways that [the FA] could improve his business")), while he subjected poorly-performing female FAs, and specifically plaintiff, to harsh and demanding production goals. Of course, the jury was entitled to consider evidence of Chandler's treatment of other women employees in assessing the reasons for his disciplining of Tse. But an employer cannot escape liability for discriminating against an employee on the basis of a protected status simply because it can show that it treated other members of the employee's group-especially members who were not themselves appropriate comparators to the victim of discrimination[FN6] favorably. *See Connecticut v. Teal,* 457 U.S. 440, 453-55 (1982).

> FN6. For example, defendant argues that the evidence at trial established that Andreanna Davis was also a low-performing

Slip Copy                                                                                                Page 10
Slip Copy, 2008 WL 463719 (S.D.N.Y.)
(Cite as: Slip Copy, 2008 WL 463719)

female FA who Chandler treated favorably by absorbing the cost of a loan given to her by UBS and "taking her to lunch more than once."(Def. Mem. 13-14, citing Tr. 1081-82, 1084.) Even assuming arguendo that Chandler did not treat Davis less favorably than similarly-situated male FAs, the jury reasonably could have found that Davis was not an appropriate comparator to plaintiff-while plaintiff wanted to remain in her job and improve her performance when she experienced a decline in her production levels, Davis was ready, willing, and eager to terminate her employment. (*See* Tr. 1081 ("I was ready to go .... I was thrilled to be released [from UBS].").) The weight to be given to evidence of this kind is quintessentially a matter for the jury.

*10 Third, defendant argues that the other low-producing male FAs to which plaintiff compared herself at trial were not situated similarly to plaintiff for a variety of reasons, including the fact that plaintiff "had the most negative trend" in production out of any of the low-producing FAs when she was placed on the Plan. (Def.Mem.12.) Thus, defendant argues that a reasonable jury could not have found that the low-producing male FAs were treated more favorably than plaintiff because plaintiff had the worst performance of any of the FAs, and that Chandler's decision to place plaintiff on the Plan was therefore a legitimate business decision and not motivated by a discriminatory animus. (*See* Def. Mem. 16-17 ("Plaintiff's arguments amount to an impermissible request to have the jury substitute its judgment for Chandler's judgment as to how to manage the Branch."), citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir.2001).)

This argument is unpersuasive. It is unnecessary to discuss in detail the alleged distinctions between plaintiff and the low-producing male FAs set forth by defendant. It is sufficient to note only that, not-

withstanding any differences in the production trends between plaintiff and those male FAs to whom she compared herself at trial, there is sufficient evidence in the record from which a jury could reasonably find that plaintiff was similarly situated to those male FAs. It is undisputed that those male FAs were (before the imposition of the Plan) subject to the same workplace standards as Tse (Tr. 791-93), were all supervised by Chandler, and all had "negative trends" in their production and assets, as did Tse (*id.* 711-12). Moreover, at trial, plaintiff showed that at least one low-producing male FA had been ranked lower than Tse for each of the three years preceding Tse's placement on the Plan.(*Id.* 716-17; Pl.Ex. 47.) In addition, plaintiff submitted evidence at trial showing that three other low-producing male FAs had experienced a severe decline in production during the same time period, but Chandler never considered putting them on a business development plan. (*See* Tr. 722-27; Pl.Ex. 47.) Indeed, it is undisputed that, the very month that Chandler decided to place Tse on the Plan, another FA-Neal Cooper-was actually the lowest performer. (Tr. 701.)[FN7]Various performance factors could reasonably be taken into account, and weighed differently by different evaluators, to arrive at an overall ranking of employee performances. The jury was entitled to take the totality of the evidence into account, and to make its own assessment of Tse's and Chandler's respective self-serving claims about the comparability of the various male FAs, and of defendant's argument that Chandler had in good faith concluded that Tse was in fact the worst performer in the group.

> FN7. Defendant attempts to draw distinctions between Tse and Cooper by arguing that Cooper was on a different employment track from Tse, but the jury was entitled to disregard that distinction, especially considering Chandler's inconsistent testimony concerning their allegedly different duties. (*Compare* Tr. 701 (testifying that Cooper spent 50% of his time on tasks that were unrelated to the FA rankings), *with id.*

958-59 (testifying that Cooper spent 20% to 50% of his times on those tasks).)

Although defendant argues that there are material distinctions between Tse and those low-producing male FAs (Def.Mem.14-17), the jury could reasonably have rejected those distinctions as irrelevant, especially considering the undisputed evidence that Tse's low ranking was due in large part to circumstances beyond her control, such as her loss of a major account to another UBS broker (Tr. 132-33, 696), and the declining market (*id.* 697). The reasonableness of the jury's finding is supported further by evidence submitted at trial showing that Chandler coached male low-performing male FAs more frequently than Tse (*id.* 1022-23), and that while Tse was placed in a cubicle as a result of her low ranking, low-performing male FAs were not. *See Lane v. Collins & Aikman Floorcoverings, Inc.,* No. 00 Civ. 3241, 2002 WL 1870283 (S.D.N.Y. Aug. 14, 2002) (denying motion for judgment as a matter of law where defendant claimed that regional sales manager was fired because of poor sales performance but other regional sales managers also failed to meet their sales goals). Of course, the jury could reasonably have accepted defendant's arguments; however, it did not.

**\*11** Thus, as the Court found when it initially denied defendant's Rule 50 motion at trial (Tr. 1308), there was ample evidence that Tse was subjected to disparate treatment on account of her gender in this case. *See Graham,* 230 F.3d at 39 (deeming the question whether employees are similarly situated to be a question of fact for the jury); *Taylor v. Brentwood Union Free Sch. Dist.,* 143 F.3d 679, 684 (2d Cir.1998) (explaining that jury was asked to decide whether the plaintiff was treated differently than similarly-situated white employees); *Hargett v. Nat'l Westminster Bank, USA,* 78 F.3d 836, 839-40 (2d Cir.1996) (noting that jury was asked to decide "similarly situated" issue); *cf. Tomka v. Seiler Corp.,* 66 F.3d 1295, 1312 n. 11 (2d Cir.1995) (whether two positions are "substantially equal" for Equal Pay Act claim is a

question of fact). Accordingly, the jury's liability determination was reasonable, and defendant's motion for judgment as a matter of law on that basis is denied.

**III. Economic Damages**

Next, defendant challenges the $500,000 economic damages award. Defendant argues that plaintiff "failed to establish any economic loss as a result of the Plan" at trial. (Def.Mem.18.) Specifically, defendant claims that "plaintiff did not present any evidence of economic damages [directly] arising from [her] placement on the Plan"(*id.* 19), and that plaintiff cannot receive economic damages for any harm incurred after her termination because the jury found her termination to be non-discriminatory. In fact, plaintiff provided sufficient evidence for the jury to find direct economic damage to her from being placed on the Plan, albeit in a lesser amount than the jury awarded, as plaintiff did not establish that economic damages suffered following her termination were fairly traceable to her placement on the Plan.

A. Jury Trial

As an initial matter, defendant argues that the issue of economic damages should not have been submitted to the jury at all. Specifically, defendant argues that economic damages constitute equitable relief, and therefore, that plaintiff was not entitled to a jury determination of back pay over defendant's pre-trial objection. Therefore, defendant claims that the entire economic damages award should be vacated by the Court and a new trial ordered on this issue.[FN8] Defendant's argument is unpersuasive.

> FN8. Were defendant correct that this issue of economic damages should have been decided by the Court, a new trial would not necessarily be required. The Court could presumably make the necessary findings based on the evidence presented at trial, which would supercede the findings made

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by the jury.

Under *Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147 (2d Cir.2001), parties in a Title VII employment discrimination case are not entitled to a jury trial on the issue of back pay, which has "historically been recognized as equitable relief under Title VII."*Id.* at 157.In *Broadnax v. City of New Haven,* 415 F.3d 265 (2d Cir.2005), the Second Circuit considered whether "where one party requests a jury trial on the lost wages issue and the party's opponents fail to object, the court is permitted, because the opponents may be deemed to have consented, to submit the issue for a non-advisory jury determination."415 F.3d at 271. The *Broadnax* court held that "when a party demands jury consideration of lost wages under Title VII and the party's opponent fails to object, ... the district court [may] submit the lost wages issue for a nonadvisory jury determination."*Id.* at 272.Thus, under *Broadnax,* where a party "d[oes] not object to the jury's consideration of front or back pay as outside the scope of [the court's] authority," the party "may be viewed as having consented to the jury trial on these issues."*Howell v. New Haven Bd. of Educ.,* No. 3:02CV736, 2005 WL 2179582, at *6 (D.Conn. Sept. 8, 2005). Similarly, under Fed.R.Civ.P. 39(c), "[i]n an action not triable of right by a jury, the court ... may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right."Accordingly, the relevant inquiry here is whether defendant "may be viewed has having consented" to the jury determination of plaintiff's back pay claim.

**\*12** Defendant claims that it objected to a jury determination of plaintiff's economic damages prior to trial. Defendant points to a motion in limine in which it argued that, because plaintiff's discrimination claim was asserted only under Title VII, "it is clear that the issues of back pay and front pay ... should not be presented to the jury."(Def. Mem. of Law in Support of its Mot. in Limine Concerning Evidence of Back Pay and Front Pay Damages, at 2 (citations omitted).) Plaintiff did not dispute de-

fendant's reading of Title VII. Rather, she proposed to cure defendant's objection by seeking leave to amend the pre-trial order to permit her to add causes of action for her discrimination claims under the SHRL and CHRL. (*See* Letter from Jason Rozger to the Court, Mar. 7, 2007.) Defendant objected to plaintiff's request, not on the ground that economic damages under the SHRL and CHRL are also to be determined by the Court without a jury, but rather on the ground that allowing plaintiff to amend her claims on the "eve of trial" would unfairly prejudice defendant. (Letter from Mary A. Gambardella to the Court, Mar. 8, 2007.) Because the state and city claims were substantially identical to the Title VII claims, however, defendant was unable to point to any way in which the presence or absence of such claims would alter defendant's trial preparation, or otherwise prejudice it. Both parties argued on the assumption that if plaintiff's application was granted, and the SHRL and CHRL claims were added, the problem would indeed be "cured" and plaintiff's right to a jury trial would be restored. Indeed, defendant's assertion of prejudice was apparently based in large part on the understanding that the amendment of the pretrial order would subject it to an unanticipated jury trial.

On March 23, 2007, the Court granted plaintiff's motion to amend over defendant's objection. Plaintiff immediately amended the pre-trial order to include causes of action under the SHRL and CHRL. Accordingly, the jury was permitted to determine economic damages on plaintiff's discrimination claims. Defendant did not register any further objection to the Court's ruling before trial, nor did defendant raise the issue again in its post-trial motions. Rather, the issue was first raised only by way of a letter to the Court, submitted three months after the post-trial motions were fully briefed, apparently as a result of the Court's ruling in another case.[FN9] (Letter from Mary A. Gambardella to the Court, Sept. 24, 2007.)

> FN9.*See* note 10 below.

Defendant argues that its motion in limine was suf-

ficient to preserve its objection to a jury trial on plaintiff's economic damages with respect to her SHRL and CHRL claims. Defendant is incorrect. Although defendant did not consent to a jury trial on plaintiff's back pay claim insofar as that claim was predicated on a violation of Title VII, defendant never objected to a jury trial on plaintiff's SHRL and CHRL claims. Because defendant never "object[ed] to the jury's consideration of front or back pay" under the SHRL and CHRL "as outside the scope of [the jury's] authority" prior to trial, defendant is viewed as "having consented to the jury trial on these issues." *Howell,* 2005 WL 2179582, at *6. Thus, even if the SHRL and CHRL claims are not "action [s] ... triable of right by a jury," defendant's silence in the face of plaintiff's proposed cure gave rise to a constructive consent to try the claims to the jury. Accordingly, defendant waived any objection to having a jury determine plaintiff's economic damages.

*13 In support of its argument that its right to object to a jury trial on economic damages for claims brought pursuant to Title VII also extends to claims brought pursuant to the SHRL and CHRL, defendant points to this Court's unpublished order in *Browne Sanders v. Madison Square Garden, L.P.,* 06 Civ. 589 (S.D.N.Y.2007), in which the Court ruled that, because the SHRL and CHRL "are virtually identical to the Title VII scheme at issue in *Broadnax,"* a party's right to object to a jury determination of economic damages under Title VII applies equally under the SHRL and CHRL. (Order of Sept. 4, 2007, at 3.) [FN10] According to defendant, therefore, the Court's decision to allow the jury to determine plaintiff's economic damages under the SHRL and CHRL in this case was erroneous. But the Court never actually made any such decision in this case, because, unlike the defendants in *Browne Sanders,* UBS never presented that issue to the Court prior to trial. Had defendant raised this issue prior to trial, the Court presumably would have agreed with defendant at that time and held that plaintiff was not entitled to a jury trial on any of her claims, including her SHRL and CHRL claims, as it

later ruled when this argument *was* advanced by the defendants in *Browne Sanders* .Indeed, the contrasting outcomes in this case and in *Browne Sanders* illustrate precisely why parties must raise such issues prior to trial in order to preserve them for later review. By acquiescing in plaintiff's proposed cure, defendant did not provide the Court with the opportunity to address the issue before the back pay issue was tried to the jury. *See Wright v. Wilburn,* 194 F.R .D. 54, 59 (N.D.N.Y.2000).

> FN10. Indeed, it was apparently the Court's unpublished, in limine ruling in *Browne Sanders* that first alerted defendants to the argument that it had a right to a non-jury trial on plaintiff's back pay claim under SHRL and CHRL as well as under Title VII. Defendant made that argument for the first time more than five months after trial, and about three months after its post-trial motions were fully briefed, but within three weeks after the Court's unpublished order in *Browne Sanders,* in which different lawyers from the same firm that represents UBS in this case represented defendant Madison Square Garden.

Finally, defendant argues that, regardless of whether it consented to a jury trial on plaintiff's SHRL and CHRL claims, allowing the jury to determine plaintiff's economic damages in this case was "plain error," because such a determination was not "within [the jury's] purview in the first instance."(Letter from Mary A. Gambardella to the Court, dated Sept. 24, 2007, at 2.) Under the "plain error" doctrine, a party's failure to object to a court ruling will not preclude review of that error, where there is "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights,' " and then only if "(4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Johnson v. United States,* 520 U.S. 461, 467 (1997) (alteration in original), quoting *United States v. Olano,* 507 U.S. 725, 732 (1993).

The plain error standard is not met here. First, with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 14
Slip Copy, 2008 WL 463719 (S.D.N.Y.)
**(Cite as: Slip Copy, 2008 WL 463719)**

the exception of the Court's ruling in *Browne Sanders,* it appears that the issue of a plaintiff's right to a jury trial on economic damages under New York State and New York City anti-discrimination statutes has not been ruled on by any other court, including the Second Circuit. Thus, it cannot be said that the law was so "plain" that the Court should have sua sponte recognized, absent any objection from defendant, that plaintiff's proposal to add SHRL and CHRL claims would not restore her right to a jury trial. Second, this specific issue has rarely, if ever, been presented to another court presumably because the majority of parties consent, either impliedly or expressly, to a jury determination of economic damages under Title VII, SHRL, and CHRL. *See, e.g., Kaufmann v. Maxim Healthcare Servs., Inc.,* 509 F.Supp.2d 210, 213 (E.D.N.Y.2007) (jury determined economic damages under Title VII and the SHRL); *McGrory v. City of New York,* No. 99 Civ. 4062, 2004 WL 2290898, at *1 (S.D.N.Y. Oct. 8, 2004) (same). If juries have consistently been granted, without objection, the authority to determine such damages, it can hardly be claimed that jury resolution of such issues raises "serious[ ]" doubts about the fundamental fairness of the proceedings, such as to call into question the "fairness, integrity, or public reputation of the courts."*Johnson,* 520 U.S. at 467.[FN11] Thus, the plain error doctrine does not apply in this case.

> FN11. Moreover, even if the Court had not submitted plaintiff's request for economic damages to the jury for a non-advisory verdict, it is well settled that the Court has the authority to request that the jury enter an advisory verdict on plaintiff's economic damages, which the Court could then take into account when making a final determination on damages. Allowing juries to make such an important contribution to a judicial decision is inconsistent with any claim that permitting the jury to determine the issue would adversely "affect the ... public reputation of judicial

*Id.*

**\*14** Accordingly, submission of plaintiff's request for economic damages to the jury was not erroneous, and therefore, the economic damages award will not be vacated on that ground.[FN12]

> FN12. As the jury's award of economic damages must be remitted in any case, should plaintiff elect a new trial rather than accept remittitur, the issue of the appropriate finder of fact will presumably be reopened, and defendant will have another opportunity to address it.

**B. Amount of Economic Damages**

Title VII provides that a court finding unlawful discrimination "may enjoin [the discrimination] ... and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement ... with or without back pay or any equitable relief as the court deems appropriate."42 U.S.C. § 2000e-5(g). Under Title VII, the courts have broad equitable powers to remedy employment discrimination. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415-18 (1975). The presumption that an employee is entitled to back pay is seldom overcome. *See L.A. Dep't of Water & Power v. Manhart,* 435 U.S. 702, 719-20 (1978), citing *Albemarle,* 435 U.S. at 421;*see also Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1157 (2d Cir.1994). Although back pay should not be "awarded automatically in every case," *Manhart,* 435 U.S. at 719, it should only be denied "for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination."*Albemarle,* 422 U.S. at 421.

Defendant is incorrect that plaintiff failed to offer sufficient proof that she suffered any economic damages from being placed on the Plan. Plaintiff was economically harmed by defendant's discrimin-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

atory actions, and is entitled to a sum that would reasonably compensate her for that harm. *See Saulpaugh v. Monroe Cmty. Hosp.,* 4 F.3d 134, 144-45 (2d Cir.1993) ("The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination.") (internal quotation marks omitted). Plaintiff offered substantial evidence from which the jury could have found that being placed on the Plan limited her ability to earn commissions in 2002. The relevant inquiry, then, is not whether plaintiff is entitled to economic damages in this case, but whether plaintiff sufficiently established during trial that a $500,000 award is reasonable compensation for the harm she suffered as a result of being placed on the Plan. *See Bracey v. Bd. of Educ. of City of Bridgeport,* 368 F.3d 109, 119 (2d Cir.2004) (Burden of proving damages is on plaintiff.).

### 1. Economic Damages While On The Plan

First, plaintiff offered evidence during trial from which the jury reasonably could have inferred that she suffered economic harm during the six months that she was on the Plan. Plaintiff testified repeatedly that, as a result of being placed on the Plan, she suffered distress which "contribute[d]" to the decline in her productivity. (Tr. 505.) For example, plaintiff testified that the effect of being placed on the Plan was that she was forced to "start all over again" as an FA. (*Id.* 514;*see id.* 164 (The requirements of the plan were "overly aggressive and arbitrary ."); *id.* 175 ("I thought it was setting me up [to fail].");*id.* 533 (testifying that UBS was creating a "paper trail-to fire me").) The jury also heard testimony regarding plaintiff's visits to her therapist during the six months that she was on the Plan, which she testified were due to her placement on the Plan. (*Id.* 334.)*See, e.g., Robinson v. Jacksonville Shipyards, Inc.,* 118 F.R.D. 525, 531 (M.D.Fla.1988) (considering plaintiff's claim for back pay where economic injury was due to the stress of working in a discriminatory environment).

*\*15 Moreover, plaintiff offered evidence that the

Plan created pragmatic as well as psychological obstacles to her success. For example, plaintiff testified that the rigid work hour requirement, which required her to check with Chandler whenever she needed to be out of the office, hampered her ability to meet with clients and exercise her independent discretion in managing her portfolio. (Tr. 164.) Since plaintiff's entire compensation was contingent on her ability to produce and not on a steady salary, a jury that accepted plaintiff's testimony (as the jury was entitled to do) reasonably could have found that plaintiff's discriminatory conduct caused a decline in her production, and in turn, her earnings. *See EEOC v. Yellow Freight Sys., Inc.,* No. 98 Civ. 2270, 2002 WL 31011859, at \*32 (S.D.N.Y. Sept. 9, 2002) (the purpose of back pay "is to make the plaintiff whole").

The jury did not need to resort to "speculation or guesswork" to estimate the amount of plaintiff's damages while on the Plan. *See Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1038 (2d Cir.1992). Plaintiff presented evidence from which the jury could ascertain those damages. For example, plaintiff established that her production and earnings declined dramatically from 2001 to 2002. (Tr. 540; *see, e.g., id.* 1272-82.)In 2001, plaintiff earned $109,383 in commission and draw. In 2002, the year she was placed on the Plan, her earnings dropped to $28,061, a loss of $81,322. (Def. Ex. 77; Tr. 898.) The jury reasonably could have attributed plaintiff's 2002 decline in commissions to her placement on the Plan, and awarded her damages for the equivalent of six months' drop in income, or $40,661. Similarly, in 2002, plaintiff's pre-tax 401(k) contribution dropped from $10,500 to approximately $4,500 (Def.Ex. 77), a loss of $3,000 prorated over six months. Thus, the jury could reasonably have found that in 2002 plaintiff suffered losses approximating $45,000 because of her six months' placement on the Plan. The cases cited by defendant are inapposite, as the economic damages award in those cases were based on sheer speculation, and there was a complete lack of evidence supporting the jury's damages verdict.[FN13]

FN13.*See Bracey,* 368 F.3d at 118-19 (finding the economic damages award to be "clearly excessive" where plaintiff submitted "no evidence" that would support the award); *Exodus Partners, LLC v. Cooke,* No. 04 Civ. 10239, 2007 WL 120053, at \*14 (S.D.N.Y. Jan. 17, 2007) (finding that the jury's verdict was based on "rank speculation"); *Jones v. Spentonbush-Red Star Co.,* No. 96 Civ. 4325, 1997 WL 736724, at \*1 (S.D.N.Y. Nov. 25, 1997) (granting judgment as a matter of law where plaintiff was "unable to point to any piece of evidence in the record which supports a finding that plaintiff's lost earnings were the result of his injuries, and the Court-after listening to the testimony and reviewing the transcript of the trial-is similarly unable to locate any such evidence").

Although defendant repeatedly argues that the jury should have found that plaintiff's decline in production during 2002 was attributed to factors other than her placement on the Plan, these arguments merely repeat issues of fact previously raised at trial. The jury's disagreement with defendant's interpretation of the record is not grounds for setting aside the economic damages award insofar as it can be attributed to plaintiff's actual economic loss while on the Plan. Nor is defendant correct that if plaintiff's decline in production was attributable, not to the Plan itself, but to a "dysthymic disorder," which in turn resulted from plaintiff's placement on the Plan, she could only recover for such harm through an emotional distress damages award and not an economic damages award. (Def. Reply 13.) Both forms of damages are separately compensable where the emotional distress caused by the discriminatory conduct also damaged plaintiff's earning capacity. It is well settled that an economic damages award should "restore[ ]" the victims of discrimination "to a position where they would have been were it not for the unlawful discrimination."*Albemarle,* 422 U.S. at 321. The jury was entitled to find that, had Chandler not placed plaintiff on a business develop-

ment plan, she would neither have suffered emotional distress in 2002, nor would she have experienced a decline in production and income.

2. Post-Employment Economic Damages

\*16 Accordingly, plaintiff was entitled to back pay for the economic harm she incurred while on the Plan. However, it is undisputed that the economic damages award in this case-$500,000-exceeded any reasonable calculation of her economic damages while she was on the Plan. Indeed, plaintiff effectively concedes that only $45,000 of that award could reasonably be attributed to the decline in her production during 2002. (*See* Pl. Mem. 18-19.) Presumably, the jury attributed the remaining $455,000 to economic harm plaintiff incurred after her employment ended.[FN14] However, the jury could not properly have awarded plaintiff post-employment damages on the record in this case, nor could the jury have reasonably determined such damages based on the evidence adduced at trial.[FN15] Thus, plaintiff's damages award will be remitted to $45,000, compensating plaintiff only for the economic harm she suffered as a direct result of being placed on the Plan.

FN14. The only other "plausible explanation" for the $500,000 economic damages award in this case is that the jurors settled on this amount "by means of an illegitimate compromise verdict, meaning that 'jurors with different views on whether defendant was liable' compromised by agreeing" not to find liability on the discriminatory discharge claim, "but also to award" excessive damages on the claim that plaintiff's placement on the Plan was discriminatory. *Exodus Partners,* 2007 WL 120053, at \*15, quoting *Fox v. City Univ. of N.Y.,* 187 F.R.D. 83, 93 (S.D.N.Y.1999). However, such "illegitimate compromise" damages awards are prohibited under both New York and federal law. *Id.* at \*15-16 (citing cases). Thus, the relevant inquiry

remains whether the evidence has "provided any reasonable basis for the amount awarded."*Id.* at *15.

FN15. This was not the fault of the jury. Neither party requested an instruction specifically advising the jury as to the extent of permissible damages if they found liability only with respect to putting Tse on the Plan but not with respect to the termination of her employment. At trial, plaintiff argued that both actions were discriminatory, and defendants that neither was. Neither side appears to have anticipated the possibility that the jury would find liability only as to the earlier action. Thus, the primary focus of the parties' presentations on damages was on the plaintiff's claims of post-employment losses. Neither party, nor the Court, addressed the jury regarding how if at all those losses could be linked to plaintiff's placement on the Plan, if the actual loss of plaintiff's employment was found not to result from unlawful discrimination.

a. Mitigation of Damages

Defendant argues that, because the jury found that plaintiff was not illegally fired on account of her sex, as a matter of law plaintiff can recover only economic damages suffered during the six months that she was on the Plan, and that any economic losses she incurred after her employment ended are not compensable. In contrast, plaintiff claims that the jury was permitted to award her post-employment damages even though it found that she was not discriminatorily terminated, because, "but for" defendant's prior discriminatory conduct, her employment would not have ended. (Pl. Mem. 21, citing *Saulpaugh,* 4 F.3d at 145.) Accordingly, the relevant question is whether (and if so under what circumstances) a plaintiff who has been subjected to discriminatory conditions on the job, and thereafter either is terminated for lawful reasons or resigns her employment, may nevertheless receive

post-employment economic damages.

The Second Circuit has not yet addressed this issue. *Brady v. Wal-Mart Stores, Inc.,* No. CV 03-3843, 2005 WL 1521407, at *6 (S.D .N.Y. June 21, 2005). However, other circuits have done so, as have several district courts within this Circuit. *See Townsend v. Exch. Ins. Co.,* 196 F.Supp.2d 300, 308-10 (W.D.N.Y.2002) (surveying relevant case law). The prevailing view of the appellate courts that have addressed the issue is that "in order for an employee to recover back pay for lost wages beyond the date of his [employment], the evidence must establish that the employer constructively discharged the employee."*Jurgens v. EEOC,* 903 F.2d 386, 389 (5th Cir.1990).*See also Maney v. Brinkley Mun. Waterworks & Sewer Dep't,* 802 F.2d 1073, 1075 (8th Cir.1986); *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 342 (10th Cir.1986); *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65-66 & n. 8 (5th Cir.1980); *Muller v. U.S. Steel Co.,* 509 F.2d 923, 930 (10th Cir.1975). The Fifth Circuit's decision in *Jurgens* well illustrates the concerns of courts adopting this rule.

*17 The plaintiffs in *Jurgens* established that the defendant EEOC had engaged in a pattern or practice of discrimination in making promotions. Gordon, one of the plaintiffs, was denied a promotion because of his ethnicity, and remained in a lower-ranking position. A few years later, however, that position was slated for elimination due to a non-discriminatory reorganization and reduction in force. Gordon was offered the choice of accepting demotion to a still lower position, or taking early retirement. 903 F.3d at 388. He took the latter course, and later argued that the damages for the discriminatory refusal of promotion he had suffered should include back pay for the period after his retirement, on the ground that " 'but for' the EEOC's discriminatory denial of his promotion ... in 1975, he would not have been compelled to retire in 1979."*Id.* at 389.

The Fifth Circuit rejected the argument, concluding that at least in cases of discriminatory failures to

Slip Copy                                                                                                    Page 18
Slip Copy, 2008 WL 463719 (S.D.N.Y.)
**(Cite as: Slip Copy, 2008 WL 463719)**

promote, "the employee's duty to mitigate damages encompasses remaining on the job."*Id.* This duty, "rooted in an ancient principle of law,"*Ford Motor Co. v. EEOC,* 458 U.S. 219, 231 (1982), requires an employee to minimize, where possible, the damages caused by discrimination by accepting suitable alternative employment. If the losses due to the discrimination experienced by an employee would be reduced by staying on the job, the employee is required to do that, and may not quit and attribute the damages from quitting to the earlier discrimination on the job. This principle gains special support, the Fifth Circuit has noted, in the specific context of employment discrimination law: "[B]ecause Title VII itself accords legal protection to employees who oppose unlawful discrimination ..., we believe that society and the policies underlying Title VII will be best served if, whenever possible, unlawful discrimination is attacked within the context of existing employment relationships."*Bourque,* 617 F.2d at 66.[FN16]Of course, where there *is* a constructive discharge, that is, where the discriminatory conditions of employment are "so intolerable that the employee is forced into an involuntary resignation,"*Morris v. Schroder Capital Mgmt. Int'l,* 481 F.3d 86, 88 (2d Cir.2007), the damage stemming from the loss of employment results directly from the discriminatory conduct, and may be compensated.

> FN16. While the Second Circuit has not directly addressed the particular circumstance of an employee whose employment terminates for non-discriminatory reasons at some point after she was harmed by discrimination on the job, it has recognized that federal anti-discrimination law embodies "a premeditated policy choice to encourage employees to stay in the employment relationship as long as possible and try to work out their discrimination claims within the work setting and through administrative processes," quoting with approval district court recitations of that principle. *Morris v. Schroder Capital Mgmt. Int'l,*

445 F.3d 525, 531 (2d Cir.2006).

Other courts, however, have identified exceptions to this seemingly firm rule against post-termination damages absent actual or constructive discriminatory discharge. In *Wells v. North Carolina Bd. of Alcohol Control,* 714 F.2d 340, 342 (4th Cir.1983), the court affirmed an award of post-termination damages, without a finding of constructive discharge, where the employee wrongfully denied a promotion later developed a disabling condition that prevented his remaining in his original job classification. Similarly, the Ninth Circuit has refused to apply the constructive discharge rule in a case where the plaintiff, a civilian clerk-typist employed by a police department, was denied appointment as a police officer because of her sex. *Thorne v. City of El Segundo,* 802 F.2d 1131 (9th Cir.1986). The court endorsed the rule as a general principle:

> **\*18** The purposes of Title VII are best served when parties, *where possible,* attack discrimination within the context of their existing employment relationships. An employee, faced with an obstacle in the logical progression and development of a career, should not quit at the first sign of institutional discrimination. Restricting back-pay awards encourages the employee to work with supervisors in the existing job setting and employment relationship in an effort to overcome resistance within that workplace and to eradicate discrimination.

*Id.* at 1134 (citations omitted; emphasis in original). The court noted, however, that the plaintiff there was not simply discriminated against in her existing job or denied a promotion. Rather, she was denied entrance to an entirely different career as a police officer. She was thus situated no differently from any other job applicant discriminatorily refused employment: "The mere fortuity that Thorne had a preexisting employment relationship with the employer who was then hiring police officers does not bring her case within the scope of promotion or demotion cases that apply the doctrine of constructive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                      Page 19
Slip Copy, 2008 WL 463719 (S.D.N.Y.)
(Cite as: Slip Copy, 2008 WL 463719)

discharge."*Id.*

These exceptions and distinctions do not necessarily reflect different underlying theories regarding the proper scope of compensation of victims of discrimination, but may simply reflect the fact-specific nature of back pay determinations: "Because the termination date for backpay awards in Title VII cases is peculiarly dependent upon each case's unique facts, ... courts do not apply the backpay limitation rotely."*Thorne,* 802 F.2d at 1136 n. 4 (citation omitted). The appellate cases finding exceptions to the back pay restriction do not dispute the general, well-established principle that an employee may not receive back pay damages where she could have mitigated her economic harm. *Id.* at 1136 (finding the "relevant inquiry" to be "mitigation of damages"). All of these cases appear to agree that a Title VII plaintiff is not entitled to back pay damages where she could have mitigated those damages through her own conduct, either because she could have remained in her job while "attacking" the prior conduct, or because remaining in the job after the discriminatory act occurred would not have caused her further economic harm.

In this case, that principle strongly suggests that Tse is not entitled to back pay extending beyond her January 2003 termination date. Under the strong version of the "constructive discharge" rule, plaintiff would simply be barred as a matter of law from recovering post-employment damages. The discrimination that Tse suffered did not amount to a constructive discharge. Indeed, Tse did not even assert a claim of constructive discharge at any time during this litigation.[FN17] Tse clearly could have mitigated her damages by remaining on the job. Although the jury was not asked to decide whether Tse quit or was fired for job abandonment, it concluded that she was not terminated for discriminatory reasons. Any remaining ambiguity makes little difference to the mitigation issue: whether Tse deliberately resigned or simply stopped coming to work, her loss of employment was found by the jury to be the result of her own effective abandonment of the job. Such actions are inconsistent with mitigation. Had Tse not abandoned her job or voluntarily resigned, she could have "attacked" the prior discrimination from within the employment relationship.[FN18]

> FN17. As defendant notes, asserting such a claim would have undermined Tse's consistent position that she never voluntarily resigned her employment, but instead was discriminatorily discharged. *See, e.g., Meder v. City of New York,* No. 05 Civ. 919, 2007 WL 1231626, at *5 (E.D.N.Y. Apr. 27, 2007) ("The constructive discharge doctrine permits the employee to recharacterize an ostensibly voluntary resignation.")

> FN18. Indeed, it is undisputed that plaintiff had begun that attack before the Plan even ended by filing an internal grievance with UBS on November 8, 2002, as well as a complaint with the New York State Division of Human Rights on November 13, 2002. (Tr. 758.) There is no indication that defendant would not have investigated plaintiff's discrimination complaint; in fact, the evidence adduced at trial shows that defendant was indeed taking her complaints seriously. (Pl.Ex. 38 (stating that UBS's counsel recommended against terminating plaintiff while a discrimination investigation was pending; Tr. 758-60.) Even if defendant itself had not addressed her concerns, her remedies through the administrative and litigation processes remained available, and could have been pursued without leaving her job.

*19 Some courts have permitted awards of back pay absent mitigation where "recognized opportunities for career advancement are closed off by reason of [the employer's] discrimination,"*Townsend,* 196 F.Supp.2d at 309, but such circumstances were not established by plaintiff here. Although plaintiff was economically harmed by being placed on the

Plan, she nevertheless might have mitigated her damages by continuing to work at UBS after the Plan ended on December 1, 2002, or by not walking away from her job at that time. The evidence adduced at trial established that, even after plaintiff failed to comply with the terms of the Plan, UBS did not immediately terminate her employment, nor did it even renew the terms of the Plan. Chandler met with Tse twice after the term of the Plan ended; it is undisputed that during those meetings Tse told Chandler that she fully intended to remain in her job and improve her performance, and that Chandler did not object to her remaining in her job despite her failure to comply with the terms of the Plan. Tse was not fired until almost two months after the Plan ended, after numerous attempts by defendant to contact plaintiff to ascertain the status of her employment, and after it became clear that plaintiff would not return to work. Moreover, it is undisputed that the Plan was only a temporary measure, and that once it was over the terms of plaintiff's employment returned to their pre-Plan state. Thus, the situation here is unlike that presented to the *Townsend* and *Thorne* courts, in which the defendant-employer's prior discriminatory conduct effectively placed a permanent "obstacle in the career progression of" the plaintiff-employee's job. *Townsend,* 196 F.Supp.2d at 310.

It is impossible in hindsight to determine whether and to what extent plaintiff's income would have increased had she attempted to mitigate her damages by remaining on the job. It is of course possible that, had plaintiff continued coming to work, she would have continued to be hampered to some degree by the residual effects of having been placed on the Plan, or eventually have been terminated unfairly because her production, hobbled by discriminatory conditions, continued to be weak. But plaintiff's decision to take the situation into her own hands-either by voluntarily resigning or by walking away from the job-undermined the goal of anti-discrimination law of encouraging employees to address discriminatory conduct from within the employment relationship while ensuring that employ-

ees do not suffer further damage as a result of remaining within that relationship. Plaintiff's abandonment of her job made it impossible to determine to what extent she could have mitigated her damages had she remained on the job without resorting to speculation and guesswork.

If a working environment becomes so intolerable that a reasonable person would feel compelled to terminate her employment, then the plaintiff may assert a cause of action for constructive discharge. If the working environment is not so intolerable that continued employment is impractical, but continued employment nonetheless would not fully compensate plaintiff for the harm incurred due to prior discriminatory activity, then the plaintiff may under some circumstances establish liability for post-employment economic damages. In this case, plaintiff neither asserted a cause of action for constructive discharge, nor showed that she could not remain in the same job after the Plan ended, without further diminution in the terms or conditions of her employment, and thereby "attack" the prior employment discrimination from within the context of the employment relationship. To hold otherwise would at best permit a purely speculative award of damages based on what might have occurred had the plaintiff not abandoned her employment, or at worst allow Title VII plaintiffs to increase rather than mitigate damages by their own actions.[FN19]

> FN19. Plaintiff relies on two cases from this district as support for her argument that she is entitled to post-employment economic damages here. *Nobler v. Beth Israel Med. Ctr.,* 715 F.Supp. 570 (S.D.N.Y.1989), is entirely distinguishable. Nobler was discriminatorily denied a promotion. Upon learning he was not promoted, he left for another hospital, where he took a job similar to his previous employment at the same salary. Unlike Tse, Nobler did not seek to hold his prior employer liable for damages resulting from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

later unemployment; he simply sought compensation for the losses resulting from denial of the promotion. Whether he stayed with the original employer or went elsewhere made no difference to his ability to mitigate damages; the damage from the failure to promote could only be compensated by a back pay award.

In *Clarke v. One Source, Inc.*, No. 99 Civ. 2323(RPP), 2002 WL 31458238 (S.D.N.Y. Nov. 1, 2002), is more comparable to the present case. Clarke, a building superintendent, was suspended for three days after complaining of race discrimination. Six days later, plaintiff was fired for requesting a recommendation letter from a tenant in hopes of finding a new job, in violation of company rules. At trial, plaintiff claimed that both his suspension and his firing were motivated by unlawful retaliation. The jury found defendant liable for the suspension, but found that the firing was not retaliatory. *Id.* at *1. Defendant moved to reduce the back pay award to reflect only "the actual loss of pay arising from [plaintiff's] missed three days of work relating to the suspension," arguing that "[p]laintiff's own misconduct following his suspension by violating the company rule about approaching tenants was an intervening factor resulting in [p]laintiff's termination."*Id.* at *5. The court rejected defendant's argument, finding that "but for the improper suspension by [d]efendant of [p]laintiff in violation of Title VII, [p]laintiff would not have solicited a work recommendation from a tenant and would not have been lawfully terminated."*Id.* In *Clarke,* unlike this case, plaintiff did not walk away from his job, and was fired so soon after the discriminatory action that he had little opportunity to remain on the job either to mitigate his damages or to attempt to resolve his discrimination complaints within the context of the employment relationship. But to the extent the case cannot fairly be distinguished, this Court is unpersuaded by its reasoning, which may have been strained by the extremely sympathetic facts, in which the damages awarded were small and the plaintiff's firing was based on a less than compelling reason.

**\*20** Accordingly, the economic damages award will be reduced to $45,000, to reflect the maximum amount of economic damages that the jury reasonably could have found plaintiff incurred during her placement on the Plan.[FN20]

> FN20. Plaintiff also argues that a remittitur of her economic damages is inconsistent with the Court's remarks directly following the jury's verdict. (Pl.Mem.20-21.) To the extent that the Court's contemporaneous remarks on the issue are even relevant at this stage in the litigation, plaintiff's argument is based on selective and misleading quotation. The Court made absolutely clear that it was not "making any definitive ruling" (Tr. 1435), articulated the view that the jury's liability finding was reasonable, and then noted that "[s]ince neither side anticipated or advocated" the jury's liability conclusion, "neither side presented the jury with any specific analysis of how they might go about deciding damages" if they found discrimination only with respect to the business development plan, but not with respect to Tse's termination. (*Id.* 1437.)The Court sketched possible theories of damages, only to conclude that the issue would require further thought: "I don't know how you [would determine damages].... Ms. Tse suffered some damage ... including lesser economic performance while she was there. And then the question

would be: Can the jury also somehow attribute some future loss of income to the chain of events. Now, that's something I think the parties will need to address if there is future litigation of these issues."(*Id.* 1437-38.)The Court, in other words, simply noted the existence of the issue and invited the parties to address it in post-trial motions.

b. The Damages Chart

Thus, plaintiff was not entitled to post-employment economic damages in this case as a matter of law. However, even if plaintiff could receive such damages, a new trial would be required because on the record in this case the jury could not have reasonably quantified those damages. Although a jury verdict "need not reflect mathematical precision," *Exodus Partners,* 2007 WL 120053, at *14, as discussed above, it is also well settled that a jury award that is "overly speculative" may be vacated by the court on a Rule 50 motion, *see Cruz,* 34 F.3d at 1156. "A plaintiff is not permitted to throw [her]self on the generosity of the jury. If [s]he wants damages, [s]he must prove them."*Bracey,* 368 F.3d at 119. Here, the amount of postemployment economic damages requested by plaintiff was based on such speculative and unreliable evidence as to render any post-employment damages award in this case invalid.

Plaintiff requested approximately $1.65 million in post-employment economic damages. Plaintiff's principal documentary evidence supporting that request was a chart she herself had prepared, which she claimed accurately summarized those damages. However, that chart (and indeed the details of plaintiff's damages calculations) had never been disclosed to defendant. Moreover, as the Court noted during trial and as plaintiff's counsel conceded during summation (Tr. 1365 ("apologiz[ing]" to the jury for plaintiff's erroneous calculation of her economic damages), the chart itself was "remarkably misleading" (Tr. 1304), and grossly overstated and misrepresented plaintiff's true income while at UBS.

The sudden appearance of plaintiff's distorted exhibit presented the Court with a dilemma. On the one hand, as the chart was previously undisclosed and on its face included confusing and inaccurate calculations, its use could be expected to prejudice defendant. On the other hand, to exclude plaintiff's damage calculation would prevent plaintiff from proving any damages at all on her claim of wrongful termination. Since it was very likely that plaintiff did in fact suffer economic losses as a result of leaving UBS, had the jury found that she was fired as a result of unlawful sex or race discrimination, but been precluded by an evidentiary ruling from finding any damages, justice would not have been done. Seeking to avoid a mistrial or an unjust outcome, the Court chose to permit plaintiff to utilize her chart and explain her calculations, and to trust to cross-examination to clarify the errors in plaintiff's assertions.[FN21] But the Court warned that the issue might need to be revisited after trial:

> FN21. Moreover, the Court assumed that the issue would be mooted if the jury rejected plaintiff's principal claim of discriminatory termination-as indeed it did. Like the parties, the Court did not anticipate the possibility that the trial would not be fully resolved based on the jury's views on this issue, but that the jury would find discrimination only in the subsidiary action of placing plaintiff temporarily on the business development plan.

The damage calculation that was presented to the jury by the plaintiff, in my estimation, is remarkable misleading.... I suspect that it is so misleading that if there is a verdict for the plaintiff in any amount that looks like the amount on this chart, I would have to seriously consider any new trial motion that was made on the grounds that information was presented to the jury that is just plain inaccurate.... [T]here's a strong possibility that any damage number would be infected by this, and it's something that I would definitely

have to revisit if there is a motion made follow-
ing a plaintiff's verdict.... [T]his is one of those
rare examples where, with respect to numbers, I
don't have confidence that the jury has a fair pic-
ture in front of them.

**\*21** (Tr. 1304-06.)

It is unnecessary here to detail all of the reasons
why the chart was misleading; it is merely suffi-
cient to note three significant errors in the chart.
First, plaintiff based her median salary calculation
on her W-2s while she was employed at UBS (with
the exception of her 2002 W-2, which plaintiff re-
garded as-and the jury reasonably found to be-
artificially depressed due to her placement on the
Plan). However, as plaintiff conceded at trial, part
of the W-2 earnings included income properly at-
tributed to forgiveness of her five-year employee
forgivable loan, a difference of approximately
$50,000 per year, or $600,000 over the 12 years in-
cluded on the chart. (Pl. Mem. 24; *id.* 27 n. 12; Tr.
1264; Def. Ex. 77.) These amounts therefore resul-
ted from a non-recurring "signing bonus," and did
not reflect actual earnings that could be expected to
continue had Tse remained at UBS. Second,
plaintiff similarly improperly included a one-time
length of service bonus into her post-employment
economic damages. (Pl.Mem.27.) Third, plaintiff
improperly failed to account for certain one-time
exercises of stock options, thereby double-counting
those amounts in her post-employment economic
damages calculation; in 2001 alone, this error
amounted to an overestimation of her earnings by
$21,334.34. (Def. Reply Mem. 23 n. 12; *see* Def.
Ex. 77.)

These were not the only errors in plaintiff's eco-
nomic damages chart. (*See* Def. Mem. 24; *see, e.g.,*
Pl. Mem. 27 n. 12 (noting an additional error that
defendant failed to consider in its post-trial brief).)
Although several of the errors might have been
"relatively minor" (Pl.Mem.27), the aggregate con-
sequence of all of the errors rendered the chart
totally misleading, as well as extremely difficult to
follow.[FN22] Thus, the chart undermined the jury's

ability to "ascertain what portions of" plaintiff's
economic damages request were valid, and which
were improper. *Annis v. County of Westchester,* 136
F.3d 239, 245 (2d Cir.1998).

> FN22. Indeed, plaintiff conceded at trial
> that even she did not understand the evid-
> ence underlying her own chart; when asked
> about the components of her purported W-
> 2 income on which she relied to compute
> her post-employment damages, she respon-
> ded, "I'm not an expert." (Tr. 1264.)

Ordinarily, our system of justice relies on the ad-
versarial process of cross-examination and the sub-
mission of contrasting evidence by the opposing
party to ferret out false or misleading testimony.
But that process only works effectively if the rules
of discovery that permit an adversary an adequate
opportunity to prepare are scrupulously followed.
Here, defendant's opportunity to rebut plaintiff's
misleading evidence was gravely handicapped by
plaintiff's failure to disclose her calculations in ad-
vance of trial. Under Rule 26(a)(1)(C),
Fed.R.Civ.P., plaintiff was required to disclose her
damage calculation as part of her initial disclosures
at the outset of the case. Where a party "without
substantial justification fails to disclose information
required by Rule 26(a)," she "is not, unless such
failure is harmless, permitted to use as evidence at
trial" the information not disclosed. Rule 37(c),
Fed.R.Civ.P. The sanction of exclusion is "near
automatic," *Wilson v. Bradlees of New England,
Inc.,* 250 F.3d 10, 20 (1st Cir.2001), quoted with
approval in *Design Strategy, Inc. v. Davis,* 469 F.3d
284, 297 (2d Cir.2006).

**\*22** It cannot be concluded that the error here was
harmless. Had the plaintiff properly disclosed the
calculation and chart before trial, let alone during
discovery, the chart almost certainly would not
have been presented to the jury in the form that it
was. The errors and overstatements in the chart
would likely have been uncovered during plaintiff's
deposition, and a modified, more accurate calcula-
tion would likely have been produced. Moreover,

defendant would surely have moved in limine for the exclusion of the chart, as it promptly did when the chart was first offered (Tr. 304), again likely leading to a refinement of the exhibit and the presentation of a very different damages demand by plaintiff.

Plaintiff argues that, even if the chart was so misleading as to render any economic damages number based on the chart inherently erroneous, the cross-examination of Tse cured those defects, as reflected by the fact that the jury awarded plaintiff only approximately one-third of her requested post-employment economic damages. (Pl.Mem.28.) According to plaintiff, the reduced award reflected the jury's "deep discounts from the economic damages claimed in [plaintiff's] chart"(*id.*), and shows that the jury calculated its award, not based on the damages chart, but based on other evidence in the record. In the first place, this argument discounts the realities of trial. Defendant was required to cross-examine on the fly, without adequate preparation; defendant's presentation to the jury would likely have been far more effective with adequate disclosure. Moreover, the details of the plaintiff's calculations, the complex relationship between the imputed income reflected on the W-2 and plaintiff's actual earnings, and arguments over the estimated value of fringe benefits and the possibility of double-counting of various amounts, were highly arcane and confusing. Under the circumstances, there is a significant likelihood that the jury's "discounting" reflected some speculative slashing of an opening bid by plaintiff that should never have been on the table, rather than a rational estimate of damages informed by the actual evidence. Finally, the jury's decision to award less than the damages requested may well have reflected a conclusion that not all of plaintiff's post-employment loss was attributable to being placed on the Plan, rather than a rejection of plaintiff's calculation of the extent of that loss. It is thus impossible to disentangle the consequences of plaintiff's failure to make appropriate discovery.

In any event, even taking plaintiff's argument on its own terms, the relevant inquiry is whether plaintiff presented the jury with any other credible evidence by which it could reasonably ascertain her post-employment economic damages. Upon searching examination of the testimony and record in this case, the Court finds that there was no other reasonable basis upon which the jury reasonably could have determined plaintiff's post-employment economic damages. Although plaintiff did submit some of her pre- and post-employment W-2s and tax returns (Tr. 304), as previously noted, those documents themselves were potentially confusing insofar as they significantly overestimated plaintiff's actual annual earned income, and thus her post-employment damages. Therefore, the jury was relegated to estimating plaintiff's postemployment damages by comparing misleading documentary evidence with significantly confusing and complicated examination and cross-examination on the issue. (*See* Tr. 305 (noting that the jurors eyes were "glazing over" during the cross-examination of plaintiff on her post-employment economic damages).)

**\*23** Plaintiff relies primarily on that cross-examination to cure her defective damages chart, but it is plaintiff's burden to present a non-speculative basis for determining economic damages. That burden is not met where plaintiff's evidence consisted of her own misleading testimony, especially where that testimony is directly contradicted by her documentary evidence. *See, e.g., Wang v. Yum! Brands, Inc.,* No. 05-CV-1783, 2007 WL 1521496, at \*6 (E.D.N.Y. May 22, 2007) (precluding plaintiffs from offering evidence on the issue of economic damages where "plaintiffs' sole evidence as to the amount of ... lost wages [was] ... unsubstantiated testimony").*Cf. Del Valle v. White Castle Sys., Inc.,* 715 N.Y .S.2d 57, 57 (1st Dep't 2000) (vacating jury award of damages for lost wages based solely on plaintiff's testimony); *Nelson v. 1683 Unico, Inc.,* 668 N.Y.S.2d 375, 376 (1st Dep't 1998) ("[The] plaintiff's testimony ... without supporting documentation failed to establish loss of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

any actual past earnings."). This combination was fatal to plaintiff's post-employment economic damages request, regardless of how much of her requested damages was awarded by the jury. *See Kramer v. Showa Denko K.K.,* 929 F.Supp. 733, 743 (S.D.N.Y.1996) ("The basic rule is that loss of earnings must be established with reasonable certainty ...."). (*See* Tr. 1306 (noting that "this is one of those rare examples where, with respect to the numbers, [the Court doesn't] have confidence that the jury has a fair picture [of plaintiff's post-employment economic damages] in front of them").) [FN23]

> FN23. Plaintiff also argues that the erroneous and misleading information included in the chart was cured by Chandler's testimony and by defendant's submission of an exhibit "in refutation of [plaintiff's] damages calculation."(Pl. Mem. 28, citing Def. Ex. 77.) But again, it was plaintiff's burden to prove those damages with reasonable certainty in the first instance. Although defendant might have succeeded in showing that plaintiff's damages calculation was erroneous, plaintiff did not then submit any evidence by which the jury could have reasonably calculated her post-employment damages after those errors were revealed.

Accordingly, to whatever extent plaintiff might have been entitled to recover for post-employment economic losses arguably attributable in some fashion to the pre-termination discrimination she experienced, her failure to prove her post-employment economic damages with any degree of reasonable certainty at trial, and the presentation of misleading and non-disclosed evidence, fatally infected any possibility that the jury could have adequately calculated any such damages. A new trial on damages would therefore be required in any event.

## IV. Punitive Damages

Defendant next argues that the $3,000,000 punitive

damages award should be vacated. Specifically, defendant argues (1) that plaintiff failed to show that defendant "acted with malice or reckless disregard of plaintiff's rights ... or engaged in any egregious or outrageous conduct" (Def.Mem.30), and (2) that the punitive damages award was grossly excessive. Although plaintiff may recover punitive damages because the jury could reasonably have found that defendant acted with "reckless disregard of plaintiff's rights," the amount of the award in this case far exceeds any discernable reprehensibility and is therefore excessive. The punitive damages award will be remitted to $300,000.

### A. Malice or Reckless Disregard

First, the Court must consider whether, based on the evidence at trial, the jury reasonably found that plaintiff is entitled to any punitive damages at all. In order to award punitive damages under either the CHRL or Title VII, [FN24] a jury must find by a preponderance of the evidence that a defendant's conduct is not only actionable, but also exhibits either "malice" or a "reckless indifference to the federally protected rights of an aggrieved individual."42 U.S.C. § 1981a(b)(1); *see Farias v. Instructional Sys., Inc.* 259 F.3d 91, 101-02 (noting that the same standard applies to claims for punitive damages under both Title VII and the CHRL). These standards "require, for an award of punitive damages, that a defendant not only intentionally discriminate but do so in the face of a perceived risk that these actions are prohibited by law."*Id.* at 102.*See Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 529-30 (1999).

> FN24. Punitive damages are not awardable under the SHRL. *See Thoreson v. Penthouse, Int'l, Ltd.,* 80 N.Y.2d 490, 494 (1992)

**\*24** While "[e]gregious or outrageous acts may serve as evidence supporting the [requisite intent],"*Robinson v. Instructional Sys ., Inc.,* 80 F.Supp.2d 203, 210 (S.D.N.Y.2000), quoting *Kolstad,* 527 U.S. at 538, a plaintiff need not show

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such acts in order to recover punitive damages. *See Payne v. Mount Hope Housing Co.,* No. 04 CV 2897, 2007 WL 900034, at *3 (E.D.N.Y. Mar. 25, 2007), citing *Cush-Crawford v. Adchem Corp.,* 271 F.3d 352, 356 (2d Cir.2001), quoting in turn *Kolstad,* 527 U.S. at 538. In order to recover punitive damages, plaintiff must prove only that the employer intentionally acted with the knowledge that it may be acting "in violation of" the law, even if it did not know it was "engaging in discrimination." *Farias,* 259 F.3d at 101 (internal quotation marks and citation omitted). Evidence that the employer was generally familiar with anti-discrimination law when it committed the discriminatory act is sufficient to permit the inference that it acted with the requisite state of mind to justify an award of punitive damages. *See Zimmerman,* 251 F.3d at 385 (finding that supervisor's training in equal employment opportunity permitted the jury to infer the requisite state of mind); *Parrish v. Sollecito,* 280 F.Supp.2d 145, 152-53 (S.D.N.Y.2003).

It is undisputed that Tse was intentionally placed on the Plan. Thus, the remaining inquiry is whether the jury reasonably could have found that Chandler acted with the intent required to justify a punitive damages award, that is, that he placed Tse on the Plan either out of malice or in reckless disregard of plaintiff's rights. Although plaintiff submitted scant evidence that Chandler acted out of malice, *see* Part IV.B, *infra,* the evidence was sufficient for the jury reasonably to conclude that he acted with reckless disregard for plaintiff's rights. Plaintiff presented direct evidence of Chandler's awareness of Title VII's requirements. Chandler testified that it was "common knowledge" that an employer could not retaliate against an employee for filing a discrimination complaint (Tr. 759), and that he knew the importance of assessing employees in non-discriminatory performance appraisals (*id.* 704). In addition, UBS distributed to all employees its Code of Conduct, which states, "[a]ll employment policies, procedures and actions must be applied in a non-discriminatory manner."(Def. Ex. 61 at 25.) "[G]eneral training in equal opportunity protocol

and hiring practices is sufficient to infer awareness of Title VII requirements,"*Parrish,* 280 F.Supp.2d at 152-53, and thus permits a jury to infer reckless disregard of those rights when they are violated. Thus, the jury reasonably found that Chandler acted with the requisite intent, and plaintiff was entitled to punitive damages here.

Defendant attempts to heighten the showing required for a punitive damages award by arguing that plaintiff was required to establish at trial, not just that Chandler knew the general tenets of anti-discrimination law, but that Chandler knew specifically that the discriminatory placement of an employee on a business development plan could violate the employee's rights. This heightened standard is unsupported by the case law,[FN25] would subject Title VII plaintiffs to an overly onerous evidentiary burden,[FN26] and would blur the line between reckless indifference to whether the employer "may be acting in violation of federal law," which is required, and certain knowledge that the employer "is engaging in discrimination," which is not. *See Kolstad,* 527 U.S. at 535.

> FN25.*See Hill v. Airborne Freight Corp.,* 212 F.Supp.2d 59, 76 (E.D.N.Y.2003) (holding jury could reasonably infer that defendant's managers knew their actions violated federal law by virtue of well-established Supreme Court case law on discrimination, long standing statutory prohibition against such conduct, the company's size, and "the common knowledge in today's society that employment discrimination is impermissible").

> FN26.*See Parrish,* 280 F.Supp.2d at 152 ("Direct evidence that an employer acted with knowledge that the [discriminatory act] found by a jury violated federal law is not necessary to prove the requisite state of mind of the employer to justify an award of punitive damages.").

**\*25** Defendant next argues that Chandler did not

engage in any malicious or reckless conduct because the Plan did not violate plaintiff's rights, and specifically, because the Plan was merely a "reasonable" business decision by Chandler that was just a form of "constructive coaching." (Def.Mem.31-32.) This is merely a rehash of defendant's argument that the Plan was not an adverse employment action, and as previously established, is not supported by the record.

Finally, defendant argues that, even assuming the Plan did have negative consequences for plaintiff's employment, it was not an "egregious" or "malicious" violation of her rights for various reasons, including that the Plan itself was "based on a template provided to Chandler by [defendant's] legal department," and that plaintiff's counsel "conceded that Chandler did not ... engage in any egregious or outrageous conduct" when he pointed to Chandler during his summation and stated, "I am not saying that this man is evil or anything like that."(*Id.* 32, quoting Tr. 1340.) Even assuming arguendo that the facts weigh against a finding that Chandler acted with a malicious intent or that the Plan itself was an egregious violation of plaintiff's rights, plaintiff was not required to show that Chandler acted maliciously or egregiously in order to recover punitive damages. Instead, plaintiff was only required to show that Chandler acted intentionally and with reckless indifference to the perceived risk that his actions might violate the law. Because the jury could reasonably have found that plaintiff made that showing, its decision to award punitive damages may not be disturbed.

B. Excessiveness

Next, the Court must determine whether the punitive damages award in this case was excessive. Punitive damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition."*Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21 (1991). An award of punitive damages should be reversed only if it is "so high as to shock the judicial conscience and constitute a denial of justice."*Hughes v. Patrolmen's Benevolent Ass'n,* 850 F.2d 876, 883 (2d Cir.1988), quoting *Zarcone v. Perry,* 572 F.2d 52, 56-57 (2d Cir.1978). In *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996), the Supreme Court identified three "guideposts" for determining whether a punitive damage award is excessive: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm and the punitive damages award, or in other words, the proportion or ratio of punitive damages to compensatory damages; and (3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases. *Id.* at 574-75.

As an initial matter, plaintiff argues that *Gore* is not controlling here because the bulk of the punitive damages award is attributable, not to Title VII, but to the CHRL. The jury awarded $3 million in punitive damages; however, Title VII imposes a $300,000 cap on compensatory and punitive damages for employers as large as UBS. *See*42 U.S.C. § 1981a(b)(3)(D). As a result, only $244,000 of the punitive damages award may be attributed to plaintiff's Title VII claim,[FN27] and the remainder of the award must be attributed to plaintiff's CHRL claim. Thus, plaintiff argues that *Gore* is inapposite, and New York law governs the determination of whether her punitive damages were excessive. (Pl. Mem. 39, citing *Greenbaum v. Handelsbanken, NY,* 67 F.Supp.2d 228 (S.D.N.Y.1999).)

> FN27. Plaintiff's emotional distress award is subject to the cap, but her back pay award is not. *See*42 U.S.C. § 1981a(b)(2); *Kuper v. Empire Blue Cross & Blue Shield,* No. 99 Civ. 1190, 2003 WL 359462, at *11 (S.D.N.Y. Feb. 18, 2003).

**\*26** Plaintiff completely misapprehends *Gore. Gore* is not a Title VII case, nor did it arise under federal law. Rather, it was a state common-law tort case arising under the law of Alabama. The limitations on punitive damages announced by the Supreme Court in *Gore* were based on the federal constitu-

tional requirement of due process of law. Punitive damages under New York law must comport with those federal constitutional requirements, which "prohibit[ ] a State from imposing a 'grossly excessive' punishment on a tortfeasor."*Gore,* 517 U.S. at 562 (citation omitted). Thus, *Gore* is a ceiling for all punitive damages awards: while a state may impose stricter standards on punitive damages than those imposed by *Gore,* if a punitive damages award does not satisfy the *Gore* standards, then it cannot be legitimated by state law.

Moreover, there is no basis in the case law for plaintiff's argument that the Court should perform two separate punitive damages determinations for plaintiff's CHRL and Title VII claims; indeed, federal courts that have considered punitive damages awards under both Title VII and the CHRL have consistently applied the *Gore* standards, without reference to New York law, *see Thomas v. iStar Fin., Inc.,* 508 F.Supp.2d 252 (S.D.N.Y.2007); *Watson v. E.S. Sutton, Inc.,* No. 02 Civ. 2739, 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005). Even those New York state court cases cited by plaintiff applied the *Gore* standards to their punitive damages determination. *See, e.g., McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.,* 682 N.Y.S.2d 167, 169 (1st Dep't 1998). Finally, even if New York law governed this issue, New York courts have recognized that "[i]n analyzing whether to sustain an award of punitive damages under [the CHRL], state courts apply the same framework" as that applied under Title VII, *Jordan v. Bates Adver. Holdings, Inc.,* 816 N.Y.S.2d 310, 322 (N.Y. County Sup.Ct.2006), and that the standard imposed by New York on punitive damage awards in discrimination cases is "virtually identical" to that imposed by *Gore, see Greenbaum,* 67 F.Supp.2d at 262.

Accordingly, the punitive damages award must be analyzed under the *Gore* standards.

1. Reprehensibility

First, upon independent examination of the evid-

ence adduced at trial, the Court finds that the evidence did not warrant a finding that defendant's discriminatory act was sufficiently reprehensible to justify a $3 million punitive damages award. To assess the degree of reprehensibility of a discriminatory act, consideration should be given to (1) whether the act was violent or presented a threat of violence; (2) whether the act was undertaken with deceit or malice as opposed to mere negligence; and (3) whether defendant has engaged in repeated instances of discriminatory conduct. *Fernandez v. North Shore Orthopedic Surgery & Sports Med., P.C.,* 79 F.Supp.2d 197, 207 (E.D.N.Y.2000), citing *Lee v. Edwards,* 101 F.3d 805, 809 (2d Cir.1996).*See also State Farm Mut. Auto Ins. Co. v. Campbell,* 538 U.S. 408, 419 (2003).

**\*27** In this case, there is no evidence that defendant's actions were violent or presented a threat of violence. Furthermore, there was little evidence that Chandler acted out of malice in placing plaintiff on the Plan, and no evidence that the discriminatory act was deceitful. The only evidence that might reasonably be interpreted as showing a malicious intent was the testimony of Esdras Vera, a UBS employee based in Puerto Rico, who claimed that Chandler once told him during a job interview that "th[e Madison Avenue] office is not culturally diversified and [Chandler didn't] intend to make it culturally diversified."(Tr. 577-78.) However, that statement has limited application here; even assuming that the statement was made, Chandler was referring to the office's "cultural[ ]," and not gender, diversity, and the jury specifically found that plaintiff's placement on the plan was not based on racially discriminatory animus. Apart from that one statement, plaintiff adduced no direct evidence at trial indicating that Chandler was motivated by a discriminatory bias in placing her on the Plan; indeed, plaintiff's entire case was built on indirect evidence of discrimination, which, though sufficient to uphold a finding of liability, was insufficient to show that Chandler's actions were motivated by a malicious intent.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiff also did not adduce evidence that the discriminatory act here was deceitful. Although the jury found that Chandler treated plaintiff less favorably than he did other low-producing male FAs, his expectations and intentions were never hidden from plaintiff. Rather, Chandler alerted plaintiff to his concerns about her performance several months before the Plan was instituted. The Plan was instituted openly and did not involve any measure of deceit-plaintiff was even given the opportunity to amend the terms of the Plan before it was instituted.[FN28]

> FN28. Plaintiff points to Chandler's "lie[s]" at trial as evidence of his deceit in placing her on the Plan. (Pl.Mem.43-44.) Plaintiff claims that the jury must have found that Chandler lied at trial because it found for plaintiff on one of her claims. But that is an unreasonable interpretation of the record-what plaintiff characterizes as "lie[s]" are more accurately characterized, at most, as prior inconsistent statements. Simply because the jury found plaintiff's testimony more credible than Chandler's does not lead to the conclusion that Chandler committed perjury. Moreover, the relevant inquiry here is whether Chandler was deceitful in placing plaintiff on the Plan, which does not call for an analysis of his credibility at trial on issues which were for the most part unrelated to whether he lied to plaintiff during the course of her employment.

But most significantly, plaintiff provided no evidence that defendant has engaged in repeated instances of misconduct to other female employees, or towards herself. Indeed, in finding that there was a low degree of reprehensibility in this case, the Court is particularly guided by the jury's finding that plaintiff's termination was not discriminatory, thereby showing that her placement on the Plan was an isolated, discrete event. Moreover, plaintiff presented no evidence showing that any other female FA was placed on a business development

plan, or that Chandler discriminated against any other female employee. Indeed, the only other low-producing female FA called by plaintiff, Andreanna Davis, actually testified that Chandler treated her favorably and that she was happy with her employment at UBS. (See Tr. 1081.)[FN29]

> FN29. Even if Davis was not an appropriate comparator for plaintiff because Davis wanted to leave her employment whereas plaintiff wanted to stay, the fact that she testified that Chandler did not discriminate against her undermines any claim that Chandler engaged in repeated and continuous discriminatory conduct towards female FAs in the Madison Avenue Branch.

Plaintiff's remaining arguments that defendant's conduct was sufficiently reprehensible to justify a $3 million punitive damages award in this case are inapposite. For example, plaintiff argues that "[c]ourts consistently find intentional discrimination to be reprehensible under *Gore.*"(Pl.Mem.42.) The argument is beside the point-in order to determine whether this case warrants a punitive damages award, the *degree* of reprehensibility must be assessed. *See Kolstad,* 527 U.S. at 534;*D'Ascoli v. Roura & Melamed,* No. 02 Civ. 2684, 2005 WL 1655073, at *2 (S.D.N.Y. July 13, 2005) (noting that Congress established a higher standard that a plaintiff must satisfy to receive a punitive damages award).

**\*28** Plaintiff also claims that her placement on the Plan should be considered "reprehensible" because she is "probably ... not as trusting" due to Chandler's discriminatory conduct, and that "there's a lot less joy in [her] life" as a result. (Pl. Mem. 43, quoting Tr. 340.) But, although "punitive damages may duplicate aspects of compensatory recovery included in the same verdict,"*TVT Records v. Island Def Jam Music Group,* 279 F.Supp.2d 413, 429 (S.D.N.Y.2003), plaintiff's testimony about her "distrust" of people is most relevant, not to punitive damages, but to her emotional distress, for which she received a separate emotional distress award.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Unlike emotional distress damages, which are intended to compensate plaintiff for mental and emotional anguish as a result of being placed on the Plan, the goal of punitive damages is to punish the defendant and to deter future discriminatory conduct.

Finally, plaintiff claims that the sex discrimination at UBS was "flagrant" because most of the employees were male. (Pl. Mem. 44, 45 n. 17.) But this evidence has limited utility in deciding the degree of reprehensibility of the discriminatory act in this case. The jury did not find that plaintiff's termination was discriminatory, nor did plaintiff assert a cause of action for discrimination in any other employment practice at UBS. Plaintiff offered no evidence of sex discrimination in hiring at UBS; indeed, she herself had been aggressively recruited by defendant. (Tr. 350-57.) The only discriminatory act in this case was plaintiff's placement on the Plan. Thus, the jury was only entitled to award an amount that would punish and deter UBS from treating its low-performing female FAs less favorably than its low-performing male FAs. But plaintiff adduced no evidence that her placement on the Plan was part of a larger, systemic discriminatory policy whereby all low-producing female FAs were treated less favorably than all low-producing male FAs, nor any evidence that *any* other female FA, other than herself, was treated discriminatorily.

Thus, the $3 million punitive damages award was not reasonably tailored to the degree of reprehensibility exhibited by defendant's conduct in this case. In awarding punitive damages, juries are required to act within "reasonable constraints" such that the award affords a proper punishment for the particular discriminatory act found in the case. *TVT Records,* 279 F.Supp.2d at 429. The "exorbitan[t]" $3 million punitive damages award in this case suggests that the jury's verdict went beyond the need to punish and deter this particular discriminatory act-which was discrete and not motivated by a malicious or "evil" intent-and was influenced by "passion" against discrimination in general.

*Thomas v. iStar Fin ., Inc.,* No. 05 Civ. 606,-F.Supp.2d-, 2007 WL 2935640, at *2 (S .D.N.Y. Oct. 4, 2007)."[I]n cases where a punitive award is the product of jury passion, bias or unlimited discretion, that punitive award may embody such an extreme result that it shocks the judicial conscience."*Bisignano v. Korff,* No. 00 Civ. 5640, 2001 WL 1772172, at *1 (S.D.N.Y. Mar. 21, 2001). Thus, because "the jury's discretion" in this case was "not exercised within reasonable constraints, but [wa]s instead the product of passion or bias, it is the duty of this Court to set aside the award."*Id.* See *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992) (holding that punitive damages awards may not be "oppressive or patently excessive").

2. Ratio

**\*29** The second factor to be assessed is whether the punitive damages award was "proportion[ate]" to the "harm actually incurred" by plaintiff. In order to make that determination, *Gore* instructs that the Court should first consider the ratio of the punitive damages award to compensatory damages, including back pay.

In this case, plaintiff was awarded $500,000 in economic damages and $56,000 in emotional distress damages. However, as previously discussed, the $500,000 economic damages award was improper, and plaintiff was only entitled to $45,000 in economic damages. Thus, plaintiff's properly-awarded compensatory damages amounted to $101,000. Accordingly, the $3 million punitive damages award bears approximately a 30:1 ratio to the compensatory damages. See *Ortiz-Del Valle v. Nat'l Basketball Ass'n,* 42 F.Supp.2d 334, 345 (S.D.N.Y.1999) (comparing punitive damages award to remitted compensatory damages award); *Kim v. Dial Serv. Int'l, Inc.,* No. 96 Civ. 3327, 1997 WL 458783, at *15 (S.D.N.Y. Aug. 11, 1997) (noting that it is appropriate to measure punitive damages against the "far smaller figure" for compensatory damages after remittitur).

The ratio of punitive damages to compensatory damages in this case is clearly excessive. Although "low awards of compensatory damages may properly support a higher ratio than high compensatory awards,"*State Farm*, 538 U.S. at 425, such a result is only proper if the act that caused the low amount of economic damages was "particularly egregious" or malicious. *Gore*, 517 U.S. at 582. As previously established, the discriminatory conduct in this case was not egregious or malicious. Moreover, "[i]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process ... [and] an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety."*State Farm*, 538 U.S. at 406. *See also Phillip Morris USA v. Williams*, 127 S.Ct. 1057, 1061-62 (2007) (noting that the longstanding practice of setting punitive damages at two, three or four times the compensatory damage is instructive and serves as guidance as to whether a punitive damage award is grossly excessive); *Gore*, 517 U.S. at 581 (noting that a punitive damage award of more than four times the amount of compensatory damages "might be close to the line" of excessiveness) (internal quotation marks omitted).*See, e.g., Cioffi v. N.Y. Cmty. Bank*, 465 F.Supp.2d 202, 215 (E.D.N.Y.2006) (upholding punitive damages award based on jury's finding of sexual harassment and retaliation because ratio between punitive and compensatory damages was less than 2:1); *Lamberson v. Six West Retail Acquisition, Inc.*, No. 98 Civ. 8053, 2002 WL 59424, at *7 (S.D.N.Y. Jan. 16, 2002) ($400,000 punitive damages award excessive when compared to compensatory damage award of $15,000; ratio of 27:1 is grossly excessive especially when compensatory damages award is on the high end of what would be reasonable); *Ortiz-Del Valle*, 42 F.Supp.2d at 345 ($7 million punitive damages excessive in that it was 55 times the remitted amount of compensatory damages); *Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 415 (S.D.N.Y.1996) ( $250,000 punitive damage award excessive when compared to remitted $23,000 compensatory damages award; finding that a 2:1 ratio of punitive to compensatory damages is appropriate where the employer's conduct was serious but not "repugnant" and involved a single incident of discrimination).

3. Civil Penalties and Comparable Cases

**\*30** The $3 million punitive damages award was also grossly excessive when compared to punitive damages awards imposed in other employment discrimination cases. Not only do juries rarely make such exorbitant awards in employment discrimination cases that involve far more egregious actions and systemic discrimination than that in this case, *see Rivera v. Baccarat, Inc.*, 10 F.Supp.2d 318, 332 (S.D.N.Y.1998) (remitting a $375,000 award of punitive damages in a Title VII and ADEA termination case to $40,000, after finding that "[b]oth the overt and direct nature of the discrimination and the harshness with which it was manifested ... justify an award of punitive damages"); *Kim*, 1997 WL 458783, at *16 (national origin discrimination case in which plaintiff established wrongful termination; remitting punitive damages from $750,000 to $25,000), but even when such large amounts are awarded, they are usually remitted. For example, in *Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir.1997), the Second Circuit affirmed the district court's remittitur of a $5,000,002 punitive damages award to the applicable Title VII statutory cap of $300,000, even though there was "ample evidence to support a finding that [defendant] acted with malice or reckless indifference to [plaintiff's] rights with respect to gender discrimination," including, among other evidence, "testimony ... that Olsten's Chief EEOC officer and Human Resources Director ... called [plaintiff] a 'bitch' at an official business function."*Id.* at 221.*See*, 2005 WL 2170659, at *18 ("Although jury verdicts in excess of $300,000 occur in New York, only in very few cases can such verdicts ... be affirmed.").

Indeed, courts have not hesitated to remit much lower amounts where the discriminatory conduct was not sufficiently reprehensible or egregious to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

warrant the higher amount. *See Iannone,* 941 F.Supp. at 414 (remitting a $250,000 punitive damages award to $50,000 where the court found that "[t]he defendant's conduct ... was by no means as reprehensible as that in many other gender discrimination, sex harassment, and retaliation cases"); *Ettinger v. State Univ. of N.Y. State Coll. of Optometry,* No. 95 Civ. 9893, 1998 WL 91089, at *11 (S.D.N.Y. Mar. 2, 1998) (remitting a $450,000 punitive damages award to $6,000 where the defendant's "degree of retaliation was not extreme"); *Ortiz-Del Valle,* 42 F.Supp.2d at 345 (conditioning denial of new trial on plaintiff accepting reduction of $7 million punitive damages award to $250,000 in gender discrimination action even though there was "evidence from which the jury could have found deceitfulness and a continuing violation"); *Lamberson,* 2002 WL 59424, at *8 (ordering new trial in retaliatory treatment and discharge action regarding appropriate punitive damages award where jury imposed punitive damages of $250,000 against employer and $125,999 against individual defendant unless plaintiff agreed to a reduction of award to a total of $30,000).

**\*31** The cases cited by plaintiff in which similarly high punitive damages awards were upheld are inapposite. In those cases, the courts specifically found that the employer's actions were so egregious or significantly reprehensible as to warrant such severe punishment. *See Greenbaum,* 67 F.Supp.2d 228 (finding that defendant's conduct was so reprehensible that the $1.25 million punitive damages award was appropriate; defendant had repeatedly refused to promote the plaintiff because of her sex, subjected her to a six-year pattern of discrimination, attempted to hide its adverse actions from plaintiff, and eventually terminated her in retaliation for complaining about discrimination); *Watson,* 2005 WL 2170659 (remitting a $2.5 million punitive damages award to $717,000, approximately 50% of the compensatory damages award, where defendant systematically failed to take complaints of sexual misconduct seriously, maliciously terminated plaintiff for complaining of sexual har-

assment, filed false affidavits in response to her EEOC charge, and falsely accused her of committing a federal crime); *McIntyre,* 682 N.Y.S.2d 167 (remitting $2.5 million punitive damages award to $1.5 million where conduct was so egregious that the jury also returned a verdict for plaintiff on her intentional infliction of emotional distress claim); *Jordan,* 816 N.Y.S.2d 310 (finding a $500,000 punitive damages award appropriate where defendant, including its President, harassed plaintiff about the use of her cane, knocked over her cane, reduced her responsibilities, turned her office into a storage room, called her a "cripple," and eventually terminated her on account of her perceived disability). Moreover, several of those cases, unlike this one, involved a finding of discriminatory or retaliatory termination. *See Greenbaum,* 67 F.Supp.2d 228;*Watson,* 2005 WL 2170659;*Jordan,* 816 N.Y.S.2d 310.

Indeed, the number of courts in this Circuit that have either awarded or upheld such a high punitive damages award is so scant that plaintiff is relegated to citing cases from other circuits for support (Pl.Mem.47-48), but even those cases are inapposite, as they all involved conduct that was much more reprehensible and egregious than that present here. *See Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020 (9th Cir.2003) ($2.6 million punitive damages award was not excessive under *Gore* factors where, inter alia, plaintiff's manager made derogatory comments about plaintiff's national origin, plaintiff was demoted, excluded from management meetings, taken off the list of managers, denied a contractual bonus, had his car and keys confiscated, publicly terminated, and then denied a severance package given to white employees); *Swinton v. Potomac Corp.,* 270 F.3d 794 (9th Cir.2001) ($1 million punitive damages award found justified where plaintiff was subjected to daily highly offensive racial harassment, and his supervisor heard the racial slurs and laughed along with them); *Hampton v. Dillard Dep't Stores, Inc.,* 247 F.3d 1091 (10th Cir.2001) ($1.1 million punitive damages award under § 1981 was justified

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

where the court found that the store's racial dis-crimination was particularly reprehensible where it had "race codes" for customers, tracked African-Americans upon entering the store, highlighted and singled out African-American shoppers as "suspicious," segregated its store incident reports by race, and mentioned race numerous times in its incident reports.

**\*32** Plaintiff attempts to distinguish her case from the multitude of cases in which similarly high pun-itive damages awards were remitted post-trial by ar-guing that "[n]one of [those] cases applied the New York punitive damages standard applicable to this case."(Pl.Mem.47.) Whatever the underlying cause of action in those cases, however, the courts in each of them reduced the punitive damages award be-cause the award violated due process. Regardless of the outcome under New York law, plaintiff's punit-ive damages award is subject to the same due pro-cess standards. Because the award violates those standards, it must be remitted.

In sum, the award in this case must be reduced so that it is reasonably related to the reprehensibility of defendant's conduct, and so that it is consistent with other punitive damages awards given in simil-ar cases. However, although the reprehensibility of Chandler's conduct was low and does not support a $3 million punitive damages award, the discrimin-atory act was significantly detrimental to plaintiff's employment in that it placed her in a worse position than similarly low-performing male FAs, and in-deed, if such discrimination continued in the future, it could have a substantial effect on the advance-ment of women at UBS. Although plaintiff did not establish that defendant discriminates against wo-men in terms of hiring, promotion, or termination, it was reasonable for the jury to find that defendant should be punished for, and deterred from, treating its struggling female employees less favorably than its struggling male employees. Clearly, where an employer favors one group of poor performing em-ployees over another group, the former will be more likely to progress in the job, and the latter,

more likely to fail. Thus, a reasonable amount of punitive damages is justified in this case to prevent defendant from repeating its discriminatory conduct again in the future, and to ensure that the same standards of employment apply equally to all UBS employees, regardless of gender.

Accordingly, the Court will remit the punitive dam-ages award to $300,000. This amount is guided in part by the Title VII statutory cap of $300,000.FN30Although, as previously noted, the CHRL does not impose a cap on damages, courts in the Second Circuit have found that the legislative determination to impose a $300,000 cap on com-pensatory and punitive damages awards under Title VII reflects that this is a "suitable" amount "to sup-port the objectives of deterrence and punishment" of discriminatory conduct. *Luciano v. Olsten Corp.,* 912 F.Supp. 663, 672 (E.D.N.Y.1996).*See Kuper v. Empire Blue Cross & Blue Shield,* No. 99 Civ. 1190, 2003 WL 359462, at \*10 (S.D.N.Y. Feb. 18, 2003) (same); *see also Thomas,* 508 F.Supp.2d at 263 (noting that, although there is no cap on punit-ive damages award under the CHRL, "the federal cap nonetheless provides guidance on what is con-sidered an appropriate civil penalty for comparable misconduct").

> FN30. The Court recognizes that the Title VII cap, if applicable, would limit the pun-itive award to $244,000, since the cap ap-plies to the total of punitive and non-economic compensatory damages, and plaintiff has already been awarded $56,000 in damages for emotional distress. However, the New York City statute does not contain such a cap. The $300,000 amount thus is selected as reflecting an ap-propriate order of magnitude for punitive awards, and not in an (unjustifiable) at-tempt to conform the CHRL precisely to federal law.

**\*33** The award is designedly generous. The Court's role in assessing the constitutionality of a punitive damages award is not to substitute its judgment for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the jury's, or to make the award that the Court would find appropriate were it the finder of fact. Rather, the Court's role is to remit the award to a figure that would not be excessive. While the Court as fact-finder might well select a lower figure, or decline to award punitive damages at all, the jury's verdict clearly reflects its view that the defendant's conduct warranted a substantial award of punitive damages, a view that the Court must respect even while finding that they jury's specific award was excessive. The Court thus seeks an amount that would be "maximally sufficient to serve the retributive and deterrent purposes of civil penalties without violating due process principles."*TVT Records,* 279 F.Supp.2d at 461. While a larger amount would be out of proportion to the reprehensibility of the discriminatory act in this case, a lesser amount might not be a significant enough penalty to such a large entity as UBS as to make it an effective tool for deterrence of future discrimination. *See Kuper,* 2003 WL 359462, at *10 ("[T]he court may consider the defendant's size in evaluating the punitive to compensatory damage ratio."); *Iannone,* 941 F.Supp. at 415 (noting that a defendant's wealth is one factor to consider in evaluating an appropriate punitive damage ratio). Finally, this sanction bears approximately a 3:1 ratio to the compensatory damages awarded in this case, and is therefore within the range of ratios that courts have found to be constitutional.[FN31]

> FN31. Defendant also argues that any punitive damages award exceeding the Title VII cap must be vacated because, under New York law, Chandler was not a "superior officer" at UBS. Specifically, defendant argues that, under New York law, punitive damages "may only be awarded against an employer when one of its 'superior officers' orders, participates in or ratifies the outrageous conduct warranting punitive damages."(Def. Mem. 40, citing *Orange & Rockland Utils., Inc. v. Muggs Pub, Inc.,* 739 N.Y.S.2d 610 (2d Dep't 2002).) As defendant concedes, the jury

was properly instructed that in order to award punitive damages, it had to find that Chandler was a superior officer of UBS, a term that encompasses only "relatively important managerial personnel, with a high level of general managerial authority in relation to the nature and operation of the corporation's business."(Tr. 1398.) Whether a manager is a "superior officer" is a highly fact-intensive question, suitable for jury resolution, because superior officers under New York law are not to be found "only ... in the executive suite or topmost reaches of corporate government."*Loughry v. Lincoln First Bank, N.A.,* 67 N.Y.2d 369, 380 (1986). The jury heard evidence that Chandler was the branch manager, supervised "several hundred" FAs, and had the authority to hire, fire and promote. A reasonable jury could find him to be a superior officer. *See, e.g., Thompson v. American Eagle Airlines,* No. 99 Civ 4529(JGK), 2000 WL 1505972 (S.D.N.Y. October 6, 2000) (shift supervisor with power to fire reasonably held a superior officer); *O'Donnell v. K-Mart Corp.,* 474 N.Y.S.2d 344, 347 (4th Dep't 1984) (assistant manager of K-Mart store reasonably found a superior officer).

**V. Discovery Sanctions**

Finally, defendant requests that the Court impose monetary sanctions on plaintiff as a result of "plaintiff's misrepresentations and complete disregard for her discovery obligations," which defendant claims caused it "to incur excessive attorneys' fees and costs that would have been avoided had [plaintiff] complied with those clear obligations."(Def. Am. Mem. of Law in Support of its Mot. for Sanctions for Pl.'s Disc. Abuses ("Def. Sanctions Mem.") at 1.) Defendant requests complete reimbursement for those fees and costs. Plaintiff argues that none of her conduct was sanctionable, but involved, at most, "innocent" errors

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that "resulted in no prejudice to the [d]efendant whatsoever ."(Pl. Mem. of Law in Opp'n to Def.'s Mot. for Disc. Sanctions ("Pl. Sanctions Mem.") at 1.) Although plaintiff's conduct was sanctionable, defendant has not established that it is entitled to all of its requested fees and costs. Therefore, defendant's request will be granted in part and denied in part.

A. The Getz Claim

First, defendant requests fees and costs it incurred in its attempts to locate Steven Getz, a potential witness with respect to plaintiff's post-employment attempt to mitigate damages. In responding to UBS's interrogatories regarding her mitigation efforts, plaintiff identified Getz as someone from whom she sought assistance in finding employment. (Carney Decl. Ex. A.) Although Local Civil Rule 26.3(c) requires parties to provide the current or last known address and place of employment of potential witnesses, plaintiff provided in her initial disclosures only Getz's former work e-mail address.(*Id.*) By letter of June 25, 2004, defendant asked plaintiff to provide further identifying information for Getz. (Carney Decl. Ex. C at 1.) Plaintiff responded that she would provide such information (Carney Decl. Ex. D), but she did not.

*34 Defendant attempted to contact Getz at the e-mail address provided, but was informed that Getz was no longer employed there. (Carney Decl. Exs. E, F.) As a result, on February 16, 2005, defendant again demanded that plaintiff provide complete and current contact information for Getz. (Carney Decl. Ex. F.) Plaintiff's counsel informed defendant that he would ask his client for further identifying information. (Carney Decl. Ex. G.) Once again, however, plaintiff failed to provide any further contact information.

Thereafter, plaintiff testified at her March 22, 2005, deposition that she had been in recent contact with Getz and that she had "a few numbers for him." (Carney Decl. Ex. H at 812-13, 815.) Significantly,

though apparently unacknowledged at the deposition by either party, plaintiff had already provided one such valid number to defendant during discovery, when she disclosed an e-mail from Getz to her which included his current cell phone number. (Rozger Decl. Ex. 4.) It is undisputed that defendant was aware of the existence of that e-mail, as defendant used it as an exhibit, and plaintiff specifically referred to it, during plaintiff's deposition. At that time, however, apparently unaware that the cell phone number on the e-mail was current, counsel for defendant again requested production of Getz's current contact information. (Carney Decl. Ex. H at 814.) Once again, however, plaintiff failed to provide defendant with Getz's telephone numbers, current or last known address, or any other contact information.

On August 29, 2005, plaintiff submitted an affidavit from Getz in opposition to defendant's summary judgment motion. By letter of September 8, 2005, defendant requested that the Court strike Getz's affidavit and prohibit plaintiff from using any evidence or testimony obtained from Getz in this litigation pursuant to Fed.R.Civ.P. 37(c)(1), arguing that plaintiff's ability to obtain an affidavit from Getz showed that she had effective contact information for Getz, but had failed to produce it. (Carney Decl. Ex. I.) In response, plaintiff submitted an affidavit stating that she had not had any contact information for Getz, other than this outdated work e-mail address, until Getz contacted her in August 2005. (Carney Decl. Ex. J.) Shortly thereafter, plaintiff provided defendant with Getz's cell phone number, which, as previously noted, had been provided earlier but apparently without either party realizing it, in preparation for plaintiff's March 22, 2005, deposition.

On September 28, 2005, during a telephone conference with counsel for both parties, the Court questioned whether plaintiff had committed perjury, either in her affidavit or in her deposition, in denying that she had current contact information for Getz. (Carney Decl. ¶ 3.) A perjury hearing was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

scheduled for March 10, 2006, to address the issue. (*Id.*) In preparation for that hearing, defendant subpoenaed plaintiff's telephone records and investigated the telephone numbers on plaintiff's telephone bills. (Carney Decl. Ex. L.) The records reflected that, between September 19, 2003, and February 12, 2005, plaintiff called Getz's cell phone several times. Defendant also deposed Getz on October 24, 2005. (Def. Sanctions Mem. 4.) At the deposition, Getz produced e-mail correspondence between himself and plaintiff, which contained both his home and cellular telephone numbers in his signature block. (Carney Decl. Ex. M.) Although plaintiff's affidavit asserted that she had not heard from Getz again until August 2005, the e-mail produced by Getz was dated June 27, 2005.(*Id.*)

\*35 Due to scheduling conflicts, the perjury hearing was not held prior to trial. (Rozger Decl. Ex. 11.) At trial, plaintiff testified that her prior affirmations were correct in that she did not have any additional contact information at the time she was asked for it. She explained that her phone bill, at the time of Getz's incoming calls to her, did not show the numbers of the incoming calls, so she did not have access to his number by that route. (Tr. 277-79, 602.) In addition, plaintiff's phone bills did not show the phone numbers she called during the relevant period, pursuant to the policy of the phone company, and thus, plaintiff testified that she could not have ascertained his number by examining those records.FN32(*See* Rozger Decl. Exs. 12, 13.)

> FN32. The records do reflect that Tse called Getz several times during the period when defendant was seeking his number, and Tse was failing to provide it. Plaintiff speculated that perhaps her calls simply responded to calls from Getz, which would not necessarily require that she have Getz's number on record. That, of course, would still not explain why, knowing that she was required to provide Getz's contact information to defendant, plaintiff did not obtain and record his number during any of her

conversations with him.

At the conclusion of trial, the Court found that plaintiff had not committed perjury in connection with her failure to provide Getz's contact information. The Court found that, while plaintiff's "culpable sloppiness [as to] compliance with discovery sanctions" reflected "a kind of casualness and a kind of lack of appreciation on the part of plaintiff of just how serious [her discovery] obligations were" (Tr. 1302-03), her actions were not intentional (*id.* 1299). Moreover, the Court found that her failure to provide Getz's contact information turned out not to be significant by the time of trial, as neither party called Getz as a trial witness, and the evidence offered by Tse at trial relating to her post-employment mitigation efforts was "minimal and undisputed." (*Id.* 1300.)The Court also found that Getz's contact information may not have been "sufficiently prominent in [plaintiff's] mind at the time of her testimony and various affirmations" to warrant a finding of intentional falsehood. (*Id.*)

Although the Court found that plaintiff did not perjure herself in either her deposition or her affidavit, defendant now requests that the Court nevertheless impose sanctions against plaintiff for her conduct with respect to Getz's contact information. Defendant argues that "a failure to sanction plaintiff would send a message that a party, during discovery, can flout the truth and its discovery obligations and cause the adverse party to exert efforts and incur fees that otherwise would have been wholly unnecessary."(Def. Sanctions Mem. 11.) According to defendant, "sanctions for such conduct provides a strong deterrence to the non-compliant party and to others in the public."(*Id.,* citing *Legrande v. Adecco,* 233 F.R.D. 253, 257 (N.D.N.Y.2005).)

The Court's finding that plaintiff's failure to disclose Getz's contact information was not intentional does not preclude the entry of sanctions against her for failing to that information. It is well settled that "grossly negligent" conduct may be sanctioned under both Fed.R.Civ.P. 37 and the Court's inherent powers. *Penthouse Int'l, Ltd. v. Playboy Entm't,*

*Inc.,* 663 F.2d 371, 387 (2d Cir.1981); *see Metro. Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Int'l Union,* 212 F.R.D. 178, 219 (S.D.N.Y.2003). Indeed, the Court has "broad discretion" to determine whether plaintiff's conduct was sanctionable, "[i]n view of the fact that the trial court has firsthand familiarity with all of the pertinent circumstances of the particular case."*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.,* No. 03 Civ. 5562, 2005 WL 1958361, at *11 (S.D.N.Y. Aug. 16, 2005) (internal quotation marks and citation omitted). Sanctions are appropriate "[w]hen a party seeks to frustrate [discovery] by ... preventing disclosure of facts essential to an adjudication on the merits."*Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1365 (2d Cir.1991)."[A] party who flouts [her discovery obligations] does so at h[er] peril."*Intertec Contracting A/S v. Turner Steiner Int'l, S.A.,* No. 98 Civ. 9116, 2001 WL 812224, at *11 (S.D.N.Y. July 18, 2001) (internal quotation marks and citation omitted).

**\*36** In addition to the Court's inherent authority to impose sanctions, Fed.R.Civ.P. 37(c)(1) provides that the court "may impose" appropriate sanctions, including "reasonable expenses" and "attorney's fees" for a party's failure to "disclose information required by [Fed.R.Civ.P.] 26(a) or (e)" without "substantial[ ]" justification. Rule 37 " 'places the burden on the disobedient party to avoid expenses [including attorneys' fees] by showing that his failure is justified or that special circumstances make an award of expenses unjust.' " *JSC Foreign Econ.,* 2005 WL 1953861, at *11 (alteration in original), quoting 1970 Advisory Comm. Notes to Rule 37(b).

Courts in this circuit have often awarded attorneys' fees to sanction a party who disregards her discovery obligations. *See Interscope Records v. Barbosa,* No. 05 Civ. 5864, 2007 WL 14332 (E.D.N.Y. Jan. 3, 2007) (awarding attorneys' fees under Rule 37(c) (1) and the Court's inherent powers for providing false and misleading discovery responses); *Legrande,* 233 F.R.D. at 258 (awarding deposition

costs under Rule 37(c)(1) and the Court's inherent power after concluding there was no justification for pro se plaintiff's "laissez-faire compliance with discovery"); *Brick v. HSBC Bank USA,* No. 04 CV 0129E, 2004 WL 1811430 (W.D.N.Y. Aug. 11, 2004) (awarding attorneys' fees and expenses in the amount of $147,635.74 under the Court's inherent powers for evasive and incomplete disclosure); *Nike, Inc. v. Top Brand Co. Ltd.,* 216 F.R.D. 259 (S.D.N.Y.2003) (awarding reasonable attorneys' fees, inter alia, as a sanction for Rule 37(c)(1) violations); *Monaghan v. SZS 33 Assocs., L.P.,* 154 F.R.D. 78 (S.D.N.Y.1994) (awarding plaintiff attorneys' fees under Rule 37(c)(1) for defendant's negligent discovery abuses). Such an award is considered the mildest form of sanction under Rule 37. *See Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1066 (2d Cir.1979); *Legrande,* 233 F.R.D. at 256 n. 1 ("There is a spectrum of sanctions ranging from the mildest of reimbursing for expenses to the harshest, order of dismissal or default.").

In this case, the Court has already found that plaintiff's failure to disclose Getz's full contact information was grossly negligent and reflected a lack of concern for the seriousness of her discovery obligations. (*See* Tr. 1301-02.) Plaintiff was aware that defendant appropriately and repeatedly demanded contact information for Getz, and she failed to provide it, or to seek to uncover it, even at a time when she was in contact with him. As previously noted, such neglectful conduct is sufficient to warrant sanctions. *See Cine Forty-Second Street,* 602 F.2d at 1066 (applying "deliberate tactical intransigence" or "gross ... incompetence" standard); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 113 (2d Cir.2002) (applying ordinary negligence standard). Thus, plaintiff's conduct was sanctionable. The only remaining inquiry, therefore, is the appropriate sanction under these circumstances. In making that determination, the Court may consider a variety of factors, including whether defendant was aware of the sanctionable conduct, the prejudice to defendant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

caused by the conduct, and the extent of plaintiff's personal responsibility for the conduct. *See, e.g., Bambu Sales, Inc. v. Ozak Trading Inc.,* 58 F.3d 849, 852-54 (2d Cir.1995).

**\*37** Plaintiff argues that any sanction imposed here should be minor, because "the sum of [p]laintiff's negligence with regard to Getz is that she only informally pointed out his phone number on a document at her deposition, rather than taking the time to send a follow-up letter with the number to [d]efendant's counsel, and that she signed a certification that she did not have additional contact information for him, when in fact she had already produced his phone number, and had pointed it out at her deposition."(Pl. Sanctions Mem. 6.) Plaintiff is incorrect; her negligence went far beyond these two acts. For example, in her initial response to defendant's interrogatories, she provided only Getz's e-mail address, although she was clearly required to provide his full contact information pursuant to Local Civil Rule 26.3(c), and although, had she done a reasonable examination of her own records, she would have been able to provide at least his cellular phone number in her initial disclosures. In fact, the parties would have avoided this entire dispute had plaintiff at least partially complied with her discovery obligation in the first instance by performing a reasonable examination of the documents she disclosed to defendant; such an examination would have revealed Getz's current cellular phone number, and thus, plaintiff would have been able to provide that number along with his work e-mail in her initial disclosures.

In addition, plaintiff's disregard for her continuing discovery obligations under Rule 26(e)(1) alone deserves more than a "minor" sanction. In June 2004, defendant advised plaintiff that it was not able to reach Getz at the e-mail address provided. It was plaintiff's responsibility at that point, if not actively to search for Getz, then at least to keep defendant's search in mind when she did speak to him. It is undisputed that plaintiff spoke to Getz after June 2004, and at the latest, in February 2005. Because it

is clear that plaintiff spoke to Getz at a time when she knew that defendant was actively searching for him, she was obligated at that time to save his number and provide it to defendant. Even if her failure to do so was not intentional, and even if, by the time her deposition occurred, she no longer had his number saved in her cell phone, that does not excuse her earlier failure to disclose his number when she knew that defendant was searching for it.

Moreover, plaintiff again ignored her continuing obligation to supplement her disclosures in June 2005, when Getz e-mailed her, again providing her with his full contact information. Instead of passing that information along to defendant, she procured an affidavit from Getz without providing defendant with the opportunity to depose him, and she proceeded to file an erroneous affidavit stating that Getz had re-contacted her in August 2005 instead of June 2005. Regardless of that error, however, as plaintiff knew that defendant was still searching for Getz's contact information in June 2005, it was her responsibility at that time to disclose his contact information, and not wait for the Court's intervention to do so.

**\*38** Thus, the sanction for plaintiff's discovery abuse should be more than "minor." Defendant requests full reimbursement for the fees and costs it incurred in its search for Getz's contact information. However, although defendant is entitled to some of its fees and costs associated with its search for Getz's information, defendant is not entitled to a full reimbursement of those fees and costs, for three reasons. First, any prejudice that resulted from defendant's belated deposition of Getz was caused partially by defendant's own conduct during discovery. Specifically, it is undisputed that plaintiff disclosed to defendant during discovery an e-mail that contained Getz's prior work contact information as well as his current cellular phone number. Defendant argues that it should not be held accountable for not locating that number among the voluminous discovery provided to it by plaintiff (Def. Sanctions Reply 3); however, it is also undisputed that de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fendant knew about that e-mail at the time of plaintiff's deposition when she was asked to identify Getz's contact information on the e-mail. Although apparently neither party noticed that Getz's current cellular phone number was also listed on the e-mail, had defendant reasonably examined the document, it would have found the number and none of the subsequent efforts to cure plaintiff's negligent conduct would have been necessary. While this disclosure cannot excuse plaintiff's later negligent conduct nor her earlier failure to include Getz's number in her initial disclosures, defendant is not entitled to receive fees and costs for expenses it could have avoided had it properly reviewed the e-mail in the first instance.

Second, plaintiff's failure to disclose Getz's contact information caused little if any prejudice to defendant. Getz was not called as a witness at trial, and defendant was given the opportunity to depose him, albeit belatedly. And third, although plaintiff should be held responsible for her grossly negligent conduct, her failure to save Getz's phone numbers in her phone, or write them down and pass them to her attorney, do not constitute the sort of deliberate bad faith conduct that calls for the imposition of an excessively harsh monetary sanction here.

Thus, defendant is entitled to a reasonable portion of its attorneys' fees and costs incurred in searching for Getz, as it was plaintiff's inadequate initial disclosure that first created the situation, and as plaintiff was aware that defendant was having trouble locating Getz and did nothing to cure her previously inadequate disclosure, even though she was provided with that opportunity several times prior to October 2005, when that information was finally provided after the Court's intervention. Accordingly, the Court finds that defendant is entitled to $13,807.75 in sanctions here, which corresponds to half of the fees and costs associated with defendant's search for Getz's contact information. (Def. Sanctions Mem. 15.) This sum reflects the fact that both parties bear some responsibility for the harm incurred here, and the fact that the conduct caused

little if any prejudice to defendant at trial, while ensuring that future litigants do not exhibit such casual disregard for their discovery obligations.

B. The Laptop Claim

*39 Next, plaintiff requests fees and costs for plaintiff's negligent conduct with respect to her laptop computer. During plaintiff's March 22, 2005, deposition, plaintiff testified that she possessed a laptop computer which contained information specific to her employment, and that the computer's log-on data would establish the dates that she was physically present at work, but that the computer had crashed since the time she was employed at UBS. (Carney Decl. Ex. H at 796-98.) Plaintiff testified at her deposition that before the computer crashed she was able to create notes from the information stored on the hard drive reflecting the exact dates on which she had reported to work.(*Id.*) Plaintiff produced those notes during discovery in support of her contention that she did not abandon her job. (*Id.*) However, plaintiff did not produce the computer itself at that time-instead, she testified that she had discarded the computer after it crashed in 2003. (*Id.* 114, 724, 796-98.)Plaintiff also submitted an affidavit in opposition to defendant's motion for summary judgment in which she claimed that she had discarded the computer after she created the handwritten notes reflecting the dates she was physically present at the Madison Avenue Branch. (Carney Decl. Ex. N ¶¶ 101-102.)

Approximately two years later, in February 2007, shortly before trial and only a few days before the parties' Joint Pre-Trial Order was due to be filed, plaintiff's counsel informed defendant that plaintiff had recently discovered the laptop computer at her parents' home. (Carney Decl. Ex. O.) Plaintiff's only explanation for the sudden discovery was that she had "re[thought]" her prior representations during a recent court conference. (Tr. 386.) The parties immediately sent the computer's hard drive to a forensic data recovery firm in an attempt to retrieve any relevant data. (Rozger Decl. Exs. 17-18.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                         Page 40
Slip Copy, 2008 WL 463719 (S.D.N.Y.)
**(Cite as: Slip Copy, 2008 WL 463719)**

Plaintiff paid for the data retrieval. (Rozger Decl. Ex. 19.) Defendant received the results of a limited keyword search on March 21, 2007, two business days before the trial was scheduled to begin. (Carney Decl. ¶¶ 5-7.)

Defendant reviewed approximately three boxes worth of documents obtained from the limited search of the computer's contents in the short time before trial.(*Id.* ¶ 7.) Although most of the documents recovered were not relevant to the lawsuit, some of those documents were relevant to plaintiff's claims. For example, the computer contained plaintiff's typed narratives regarding her claims; pages of timelines and chronologies reflecting events during her employment at UBS; references to daily notes plaintiff created and maintained regarding her employment at UBS; and a letter to a Chinese-American organization concerning plaintiff's discrimination claims. (*Id.* ¶ 8.) However, contrary to plaintiff's deposition testimony, the search did not uncover any documents indicating which dates plaintiff was physically present at work. (*Id.* ¶ 9.)

**\*40** Defendant now requests reimbursement for fees and costs associated with plaintiff's negligent withholding of the laptop computer. Specifically, defendant requests reimbursement for expenses defendant "needlessly" incurred in (1) drafting a pre-trial spoliation motion concerning plaintiff's laptop computer; (2) addressing plaintiff's last-minute discovery of the computer with the Court and plaintiff's counsel; (3) addressing data retrieval issues with plaintiff's counsel and an outside vendor; (4) making submissions to the Court concerning data retrieval issues and how its pre-trial spoliation motion was affected; (5) drafting a new motion for sanctions based on plaintiff's misconduct with respect to the laptop computer and prejudice to defendant; (6) printing voluminous documents retrieved from the laptop computer; and (7) analyzing the documents retrieved from the laptop computer for relevancy. (Def. Sanctions Mem. 16.)

Defendant is clearly entitled to some of its fees and costs associated with plaintiff's withholding of the laptop computer. Plaintiff offered no reasonable explanation for her failure to produce the computer at an earlier date, and even if her failure to produce it earlier was not intentional, it was surely grossly negligent.[FN33] It is undisputed that the computer was at plaintiff's parents' home the entire time the litigation was pending, and there is no reasonable explanation why plaintiff could not have discovered it earlier had she been reasonably diligent in fulfilling her discovery obligations. Moreover, plaintiff claimed that she discarded the computer in 2003, *after* she instituted this lawsuit. Although it was later discovered that plaintiff actually left the computer at her parents' home and did not discard it, neither action was justified here-after plaintiff commenced this litigation, she should have retained the laptop computer as containing potentially relevant information to her lawsuit. Regardless of the reason why the computer was lost for two years, the original act that led to its loss was grossly negligent, and once again reflects plaintiff's blatant disregard for her discovery obligations.

> FN33. The production of notes favoring the plaintiff's case, coupled with the disappearance of the computer that contained the data that purportedly supported the notes, warrants some suspicion of plaintiff's motives, as does the fact that the computer, when belatedly found, apparently did not contain the data in question. On the other hand, a party intent on obstructing justice presumably would have allowed the computer to remain "lost." In any event, it is unnecessary to make a finding regarding plaintiff's intent. At a minimum, the failure to locate the computer was a gross dereliction of plaintiff's discovery obligations, particularly given the obvious importance of the data allegedly verifying the plaintiff's disputed attendance at work.

Plaintiff argues that she should not be required to reimburse defendant for her culpable neglect,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

primarily because the documents retrieved from the computed proved to be only "ancillary" at trial, and therefore, did not cause much prejudice to defendant. Plaintiff's argument is unpersuasive. First, defendant introduced two documents at trial from the crashed hard drive that it would have otherwise not been able to introduce, one of which went directly to the issue of whether plaintiff was "afforded equitable access" to accounts at UBS (Pl. Sanctions Mem. 8), and the other which shed light directly on plaintiff's race discrimination claim. Moreover, even if those documents were only ancillary to defendant's case, the documents retrieved (or not retrieved) from the computer were highly relevant to plaintiff's credibility, as plaintiff testified during her deposition that she had kept notes on the computer reflecting her attendance at work but no such notes were recovered. Furthermore, it is undisputed that, due to plaintiff's negligent conduct, defendant only had enough time to perform a limited keyword search on the computer; had plaintiff not been negligent, defendant would have been able to perform a full search of the computer, and other, more relevant documents might have been uncovered, and the inherent distraction, and increased cost, of conducting computer searches during trial would have been avoided.

**\*41** In addition, regardless of whether the computer actually produced documents relevant to the litigation, prejudice is only one factor to be considered in determining whether to award sanctions. For example, in *DLC Management,* 163 F.3d 124, the Second Circuit affirmed an award of attorneys' fees in the amount of $39,905 under the district court's inherent powers as a sanction for the late production of documents. In that case, after the close of discovery, defendants produced a box of documents that plaintiffs had been requesting, after finding it in a "closet that defendants apparently had never bothered to search."163 F.3d at 135. The district court sanctioned defendants' conduct, not just because it resulted in the withholding of relevant documents, but because defendants had exhibited a "conscious disregard" for their discovery obliga-

tions. *Id.* at 136.In affirming the sanction, the Second Circuit noted that the district court was authorized to impose this sanction under its "power to impose ... submission to [the court's] lawful mandates," including discovery orders. *Id.* The Court of Appeals also recognized that a party's conduct may be sanctioned, not only if it was undertaken in "bad faith," but also if it was "vexatious[ ]" or "wanton [ ]." *Id .,* quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45 (1991). Indeed, as defendant notes, accepting plaintiff's argument that she should not be held accountable for her grossly negligent conduct would be tantamount to permitting parties to engage in vexatious and wanton conduct during discovery, as long as the withheld evidence did not turn out to be the "smoking gun" in the case. (Def. Sanctions Reply 4.) Such a permissive policy would undermine the discovery process and give parties an incentive to roll the proverbial dice by withholding potentially relevant information and hoping that it does not turn out to be relevant at trial. *See Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 643 (1976) (noting that Rule 37 sanctions may be applied "to deter those who might be tempted to such conduct in the absence of such a deterrent").

Plaintiff also attempts to distinguish cases in which sanctions were imposed for negligent withholding of evidence by claiming that her conduct did not rise to the same level of culpability as the conduct of the parties in those cases. (Pl. Sanctions Mem. 9-12.) This argument is similarly unpersuasive. Even if the withholding of the laptop did not "rise to [the level of] intentional misconduct,"*Metro. Opera,* 212 F.R.D. at 222, the combination of plaintiff's withholding of the laptop, her failure to disclose Getz's contact information, and the failure to provide a damage calculation or disclose the damages chart before trial, reflects that her "disobe[dience]" of her discovery obligations was not a discrete, isolated event, but instead a pattern of "prolonged and vexatious obstruction of discovery."*Penthouse,* 663 F.2d at 388;*see Metro. Opera,* 212 F.R.D. at 227 (listing "[t]he [h]istory ... of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[n]on-[c]ompliance" with discovery obligations as one factor to consider in deciding whether to award sanctions). Moreover, in those cases in which the obstructionist conduct was undertaken in bad faith or intentionally, the courts often imposed much harsher sanctions than those sought here, for example, by ordering a default judgment in favor of the non-offending party, *see, e.g., Metro. Opera,* 212 F.R.D. at 231 (ordering judgment for plaintiff on the issue of liability as sanction for union's discovery abuses), or by entering an adverse inference against the offending party with respect to the improperly withheld evidence, *see Reilly v. Natwest Markets Group Inc.,* 181 F.3d 253 (2d Cir.1999). That plaintiff's conduct may not have been sufficiently egregious to require such harsh consequences does not mean that her actions can be ignored.

**\*42** Nevertheless, defendant is not entitled to all of the fees and costs it incurred with respect to the laptop computer. As plaintiff correctly notes, some of these costs "would have been incurred even if [plaintiff] had produced the laptop on time."(Pl. Sanctions Mem. 15.) For example, defendant would have spent time reviewing the documents recovered from the laptop regardless of when the laptop was produced-indeed, had plaintiff produced the computer earlier, defendant might have spent *more* time reviewing its contents, as more documents might have been recovered. In addition, even if plaintiff had not withheld the laptop, it is undisputed that the computer crashed before it was transferred to her parents' home. Therefore, even had it been produced in 2003, defendant likely still would have been required to review voluminous documents obtained in the course of the data retrieval, as the retrieval method is based on keyword searches and thus generates both irrelevant and relevant documents. Moreover, defendant's decision to print "three boxes" of mostly irrelevant documents, simply to make a point to the Court at a conference held prior to trial that plaintiff's withholding of the laptop caused it prejudice, was a tactical decision that was unnecessary to cure the prejudice caused

by plaintiff's conduct, and indeed, did not result in sanctions being imposed at that time. Finally, as it is undisputed that plaintiff paid for the data retrieval herself, defendant is not entitled to any costs associated with the actual data retrieval, including any costs it would have incurred in conferring with plaintiff about the proper method of retrieval, as defendant would have been required to incur those costs regardless of plaintiff's negligent conduct.

Thus, defendant is not entitled to reimbursement for the fees and costs it would have incurred in the normal course of litigation, nor is it entitled to those which were not directly caused by plaintiff's sanctionable conduct. Accordingly, defendant is entitled to fees and costs for the following expenses: (1) drafting a pre-trial spoliation motion concerning plaintiff's laptop computer;[FN34] (2) addressing plaintiff's last-minute discovery of the computer with the Court and plaintiff's counsel; (3) submissions to the Court concerning data retrieval issues and how its pretrial spoliation motion is affected; and (4) drafting a new motion for sanctions based on plaintiff's misconduct with respect to the laptop computer and prejudice to defendant.

> FN34. Plaintiff boldly argues that it should not be held accountable for the fees and costs associated with defendant's pre-trial motion for spoliation because that motion was denied by the Court. (Pl. Sanctions Mem. 16.) Plaintiff's argument is misplaced. Defendant's motion was not denied on its merits, but instead was withdrawn by defendant after plaintiff belatedly produced the laptop. (Carney Supp. Decl. ¶ 3.) Although defendant filed another pre-trial motion to sanction plaintiff for her discovery abuses (*id.*), that motion also was not denied, but instead was the basis for the Court's prior ruling that plaintiff had engaged in negligent conduct with respect to her computer (Tr. 1299). While the Court did not order sanctions at that time, defendant was permitted to brief the issue of

possible sanctions after trial (*id.* 1302-03), which defendant has now done. (*See id.* 1303 ("[I]t seems to me that the kind of sanction that strikes me as prima facie appealing has to do with additional attorney's fees that were incurred in trying to track these things down.").) Defendant is entitled to all of the fees and costs associated with these respective motions, which were the direct result of plaintiff's conduct.

## C. The Damages Chart

Defendant also requests that the Court sanction plaintiff for her late production of the damages chart, and for her failure to disclose her back pay damages computation prior to trial. Specifically, defendant requests that, because "plaintiff did not disclose her calculations of damages to [defendant], either in her mandatory initial disclosures or in her discovery responses," the damages chart "should have been precluded pursuant to Federal Rule of Civil Procedure 37(c)." (Def. Sanctions Mem. 17.) Accordingly, defendant requests that the Court now vacate the economic damages award.[FN35] Defendant's request has, for the most part, been rendered moot by the Court's prior determination that, regardless of whether the chart should have been admitted into evidence during trial, plaintiff was not entitled to post-employment back pay. Thus, that portion of the economic damages award has already been vacated, and there is no need for an additional sanction.

> FN35. Defendant does not request any fees and costs associated with this claim.

**\*43** In addition, to the extent that defendant also argues that plaintiff's testimony regarding her economic damages while she was actually on the Plan should similarly be excluded as a result of her failure to disclose her damages calculation prior to trial, that argument is unpersuasive, as the calculation of plaintiff's damages while she was on the Plan was based, not on her damages chart or on any other belatedly disclosed evidence, but on her W-2s,

tax returns, and other evidence that was previously disclosed to defendant prior to trial. Indeed, defendant concedes that plaintiff's "damages calculation" as reflected by the damages chart "had nothing whatsoever to do with any damages arising from her placement on the [P]lan, the only claim on which plaintiff was successful."(Def. Sanctions Reply 6; *see* Def. Mem. 23 (stating that the chart had "no relevance to damages from placement on the Plan" and related "solely to loss of employment damages in the form of back and future pay")).) Moreover, the jury could have calculated plaintiff's economic damages resulting from her placement on the Plan on defendant's exhibit alone, and did not need to resort to plaintiff's testimony or evidence to make that calculation. (*See* Def. Ex. 77.) Therefore, any prejudice caused by the damages chart was harmless with respect to plaintiff's economic damages while on the Plan, and those damages were otherwise adequately supported by plaintiff's testimony and the documentary evidence submitted at trial. *See Atkins v. County of Orange,* 372 F.Supp.2d 377, 395 (S.D.N.Y.2005) (noting that, while courts have broad discretion to order relief for sanctionable conduct, "preclusion [of evidence] is not generally ordered"), citing *Semi-Tech Litig. LLC v. Bankers Trust Co.,* 219 F.R.D. 324, 324 (S.D.N.Y.2004); *see also Babcock v. Rezak,* No. 96-CV-0394E, 2002 WL 31654995, at *1 (W.D.N.Y. Nov. 6, 2002) (noting that the preclusion of testimony is "a drastic remedy and should only be applied in ... rare cases").

## D. Sanctions Motion

Finally, defendant requests that plaintiff reimburse it for the fees and costs associated with the filing of its sanctions motion. Such fees and costs are properly reimbursable where a party succeeds on a motion for sanctions. *See Pastorello v. City of New York,* No. 95 Civ. 470, 2003 WL 1740606, at *13 (S.D.N.Y. Apr. 1, 2003); *Monaghan,* 148 F.R.D. at 511. However, because defendant only succeeded on approximately half of the claims in this motion, defendant is only entitled to half of its fees and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 44
Slip Copy, 2008 WL 463719 (S.D.N.Y.)
(Cite as: Slip Copy, 2008 WL 463719)

costs associated with the filing of this motion. Accordingly, defendant is awarded $16,666.75 in connection with the preparation of the sanctions motion. (*See* Carney Supp. Decl. ¶¶ 6-7.)

## CONCLUSION

Accordingly, for the reasons set forth above, defendant's motion for judgment as a matter of law, or in the alternative, a new trial, with respect to liability, is hereby denied. With respect to damages, the Court's denial of defendant's motion for a new trial is conditioned upon the acceptance by plaintiff of a remittitur of the punitive damages award to $300,000 and the economic damages award to $45,000, along with an unreduced award of non-economic compensatory damages in the amount of $56,000, for a total judgment of $401,000. Plaintiff shall elect in writing either a remittitur or a new trial on economic and punitive damages within 21 days of the filing of this Opinion and Order.

**\*44** Defendant's motion for sanctions is granted in part and denied in part. Plaintiff is directed to pay defendant $13,307.75 in connection with her failure to disclose Getz's contact information, and $16,666.75 in connection with the filing of this sanctions motion. Finally, plaintiff is directed to pay defendant a sum in connection with the improper withholding of the laptop computer, to be determined upon defendant's submission of documentation of the fees and costs identified as recoverable in the Court's Opinion. Defendant shall submit the relevant documents reflecting its fees and costs within 21 days of the filing of this Opinion and Order.

SO ORDERED.

S.D.N.Y.,2008.
Tse v. UBS Financial Services, Inc.
Slip Copy, 2008 WL 463719 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX H

Westlaw.

Not Reported in F.Supp.                                           Page 1
Not Reported in F.Supp., 1991 WL 273302 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1991 WL 273302)**

C
Dunbar v. Ballymore Co.
N.D.N.Y.,1991.
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
Judy H. DUNBAR and Warren Dunbar, Plaintiffs,
v.
BALLYMORE COMPANY, Defendant.
BALLYMORE COMPANY, Third Party Plaintiff
v.
ONEIDA LTD., Third Party Defendant.
**No. 88-CV-108.**

Dec. 19, 1991.

Anthony P. Endieveri, Camillus, N.Y., for
plaintiffs.
Saperston & Day, P.C., Rochester, N.Y. (William
G. Gandy, of counsel), for defendant/third party
plaintiff.
Bond, Schoeneck & King, Syracuse, N.Y. (John H.
Callahan, of counsel), for third party defendant.

*MEMORANDUM-DECISION & ORDER*

MUNSON, Senior District Judge.
**\*1** Pursuant to Rule 37 of the Federal Rules of Civil
Procedure, defendant/third party plaintiff moves for
sanctions in the form of the exclusion of all expert
testimony on plaintiffs' behalf and reasonable costs,
including attorney's fees, based on plaintiffs' failure
to obey a discovery order. For the reasons stated
below, the court denies the motion to the extent that
it seeks exclusion of expert testimony at trial, but
grants defendant reasonable costs, including attor-
ney's fees, associated with bringing the motion. The
court further orders plaintiffs to pay defendant's
reasonable costs incurred in deposing plaintiffs' ex-
pert witness.

I. FACTS

This is a products liability case. On March 16,
1987, plaintiff Judy Dunbar allegedly injured her

left knee when she fell off a four-step, rolling, met-
al stepladder which was designed, manufactured,
and sold by defendant Ballymore.

The present dispute focuses on Question 17 of de-
fendant's second set of interrogatories, served on
plaintiffs on June 22, 1990. Question 17 sought the
identity of plaintiffs' expert witness, as well as rel-
evant facts known, and opinions held, by the expert.
Exhibit ("Exh.") A attached to Document ("Doc.")
30, at 14-15. Plaintiffs failed to respond to Question
17, which compelled defendant to obtain a court or-
der directing, *inter alia,* plaintiffs to furnish their
expert disclosure by August 12, 1991. Defendant's
Motion for Sanctions, Attached to Doc. 30, at ¶ 4.
Paragraph three of the June 11, 1991 Order states
that "[t]he plaintiff shall furnish her expert disclos-
ure to the defendant within 60 days of the entry of
this order." Exh. C attached to Doc. 30, at 2. Upon
the request of plaintiffs, the parties agreed to a one
month extension of the deadline until September
11, 1991. On that date, defendant received a letter
from plaintiffs' counsel stating that he intended to
use Paul F. Youngdahl as his liability expert, and
that he would send supplemental answers to de-
fendant's interrogatories forthwith. Exh. F attached
to Doc. 30. In response to this letter, defendant's
counsel notified plaintiffs on September 12, 1991
that the mere disclosure of the proposed expert's
name did not comply with the court's June 11, 1991
Order and asked when the supplemental answers
could be expected. Exh. G attached to Doc. 30. On
September 27, 1991, plaintiffs' counsel told defend-
ant's counsel by telephone that the expert disclosure
would be forthcoming, to which defendant stated
that he would not agree to an extension of time. De-
fendant's Motion for Sanctions, Attached to Doc.
30, at ¶ 9. After plaintiffs' counsel again failed to
produce the expert disclosure, defendant filed the
present motion pursuant to Fed.R.Civ.P. 37 on Oc-
tober 4, 1991. Defendant seeks an order excluding
the introduction of any and all expert testimony on
plaintiffs' behalf, and also seeks attorney's fees and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

costs incurred by defendant in bringing the motion.

On October 10, 1991, six days after defendant's motion for sanctions and costs was filed, plaintiffs filed a supplemental answer to the defendant's interrogatories, outlining the topics Mr. Youngdahl would address at trial. *See* Doc. 32. On October 29, 1991, plaintiffs filed a response to defendant's motion for sanctions, arguing that exclusion of all expert testimony would be unduly prejudicial, especially in light of the fact that the discovery deadline has been extended to December 31, 1991, and that no dates have been set for the final pretrial conference or trial. Furthermore, plaintiffs argue that the court order mandating "expert disclosure" was ambiguous, and that their action in submitting the name of the expert on September 11, 1991 was sufficient to comply with the order.

## II. DISCUSSION

*2 Federal Rule of Civil Procedure 37(b)(2)(B) states that:

If a party ... fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule ..., the court in which the action is pending may make such orders in regard to the failure as are just, [including] an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence.

Failure to comply with a court's discovery order clearly provides a basis for precluding certain evidence, including expert testimony. *Geiserman v. MacDonald,* 893 F.2d 787, 792 (5th Cir.1990) (district court's decision to exclude expert witness testimony in legal malpractice case based on plaintiff's failure to designate experts until two weeks after deadline was not abuse of discretion); *Hagans v. Henry Weber Aircraft Distribs., Inc.,* 852 F.2d 60, 64-66 (3d Cir.1988) (precluding use of substitute pilot expert, in litigation arising from air-

plane crash, as sanction for plaintiff's failure to disclose that original pilot expert conducted flight test was proper); *Sexton v. Gulf Oil Corp.,* 809 F.2d 167, 170 (1st Cir.1987) (trial court properly refused to modify scheduling order to allow plaintiff's late identification of experts). However, this court is of the opinion that where both parties concede that the evidence sought to be excluded is critical to the case and disclosure of the evidence, although untimely, ultimately is achieved in advance of trial, exclusion is an unduly harsh sanction. Plainly, the expert testimony in this products liability case is crucial to plaintiffs' claims. The court does not take lightly plaintiffs' delinquency in complying with the June 11, 1991 discovery order, nor does it credit plaintiffs' assertion that the discovery order was ambiguous.[FN1] Nevertheless, in view of the fact that plaintiffs have now fully complied with expert disclosure, the court denies defendant's motion to exclude all expert testimony on behalf of plaintiffs in this lawsuit.

The court does, however, grant defendant's motion to the extent that it seeks reasonable costs and attorney's fees associated with bringing the instant motion. The court further orders plaintiffs to pay the reasonable costs defendant incurs in deposing plaintiffs' expert witness. Within the "wide discretion" this court has under Rule 37(b)(2) to impose reasonable expenses, including attorney's fees, on the party failing to obey a discovery order when no reasonable justification is presented, the imposition of these costs is a just method of addressing plaintiffs failure without the prejudicial effect exclusion of expert testimony would have on plaintiffs' case.

## III. CONCLUSION

In summary, defendant's motion is denied to the extent that it seeks exclusion of all expert testimony on behalf of plaintiffs at trial, but granted as to the attorney's fees, cost of bringing the motion, and cost of deposing the expert. Defendant is directed to submit to the court and to plaintiffs' counsel a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1991 WL 273302 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1991 WL 273302)**

summary of the reasonable costs, including attor-
ney's fees, it incurred in filing the present motion.
Upon receipt, the court will review the summary
and issue an order setting forth the appropriate
amount and directing plaintiffs to make the required
payment. With regard to the deposition of Mr.
Youngdahl, plaintiffs' expert witness, the parties
are directed to negotiate an acceptable arrangement
for payment of defendant's costs in accordance with
this Order.

**\*3** It is So Ordered.

> FN1. The court notes that plaintiffs never
> sought clarification of the June 11, 1991
> Order. If they believed the order was am-
> biguous, plaintiffs immediately should
> have sought further instruction from the
> court, rather than pursuing the course of
> delay revealed in the record on the present
> motion. Moreover, even a cursory review
> of the proceedings which resulted in the
> June 11, 1991 discovery order makes clear
> that the court was addressing plaintiffs'
> failure to answer Question 17 of defend-
> ant's second set of interrogatories when the
> court directed "expert disclosure" to take
> place. Because Question 17 requested not
> only the name of the proposed expert, but
> also facts known and opinions held by the
> expert relevant to the instant lawsuit, it is
> ludicrous to argue that the June 11, 1991
> Order directed anything less than full com-
> pliance with defendant's expert discovery
> request.

N.D.N.Y.,1991.
Dunbar v. Ballymore Co.
Not Reported in F.Supp., 1991 WL 273302
(N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX I

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 2962651 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2962651)

Zahran v. First Union Bank
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Robin ZAHRAN and Karen Zahran, Plaintiffs,
v.
FIRST UNION BANK, Interbay Funding, LLC and
the Officers and Directors of Interbay Funding, and
M & T Mortgage Corporation, and Ira Nevel, a
private attorney, Defendants.
**No. 01 C 8922.**

Oct. 4, 2007.

Robin Zahran, Oakbrook, IL, pro se.
Karen Zahran, Oakbrook, IL, pro se.
James V. Noonan, Mitchell Aaron Lieberman,
Noonan & Lieberman, Michael J. Weik, Smith
Weik & Wutscher, Ltd., Chicago, IL, Christine
Marie Andrie, Stephens & Schrauth, Winnetka, IL,
for Defendants.

### MEMORANDUM OPINION AND ORDER

JOHN A. NORDBERG, Senior United States Dis-
trict Court Judge.
**\*1** Plaintiffs Robin and Karen Zahran, proceeding
*pro se*, have asserted numerous state and federal
claims arising out of a $350,000 mortgage they ob-
tained in 1986 on their Oak Brook home. Defend-
ants have complained throughout this lawsuit that
these claims lack merit and have suggested that
plaintiffs are only trying to force them to settle by
turning the litigation process into a never-ending
headache. After a lengthy period dealing with pre-
discovery motions and after a year of discovery, de-
fendants eventually concluded that they could not
develop the facts necessary to defend against these
claims. They allege that plaintiffs have violated
court orders and played games in discovery. Before
the Court is defendants' motion for sanctions. They
ask that we dismiss all of plaintiffs' claims with

prejudice. Plaintiffs oppose the motion, arguing that
they have done anything wrong and that, in fact, de-
fendants are the ones who have made false state-
ments and stonewalled discovery.

### I. Background.

The following facts provide an overview of what
has gone on so far in this case. Before moving to
dismiss the complaint, defendants filed a motion to
strike under Rule 8 because they believed that the
complaint was a "pleading labyrinth"-confusing,
rambling, repetitive, and poorly organized. Al-
though we largely agreed with this assessment, we
denied the motion, in part out of deference to
plaintiffs' *pro se* status, and encouraged defendants
to file a dispositive motion instead. Heeding our
suggestion, defendants filed a motion to dismiss
pursuant to Rule 12(b)(6) and for summary judg-
ment, seeking dismissal of all 17 counts. Even then,
defendants still complained that they had to spend
an inordinate amount of time "deciphering" the
complaint. After analyzing the lengthy briefs, con-
sisting of a 40-page opening brief, a 63-page re-
sponse, and a 33-page reply, we granted the motion
in part and denied it in part, dismissing 9 of the 17
counts. In doing so, we were sympathetic to the de-
fendants' objection about the unwieldy complaint (it
was 33 pages with 96 pages of exhibits) but con-
cluded that the liberal notice pleading rules and
plaintiffs' *pro se* status cautioned against premature
dismissal. We again decided that it was better to
keep the case moving because the claims could be
sorted out and pinned down during the discovery
process at which point the defendants could file (if
appropriate) a motion for summary judgment.

After peripheral issues were resolved, discovery
began in earnest in January 2006, In December, the
defendants essentially concluded that discovery had
been a total failure and filed their motion for sanc-
tions pursuant to Rule 37(b)(2) and (d). After re-
ceiving several extensions of time, plaintiffs filed a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 2962651 (N.D.Ill.)
(Cite as: Slip Copy, 2007 WL 2962651)

lengthy response brief along with a stack of 44 exhibits.

The disputes raised in the briefs center almost exclusively on the interactions between two men-plaintiff Robin Zahran, who has been making the litigation decisions for his wife, and attorney Michael Weik, who is the attorney handling discovery for defendants. (For convenience, we will sometimes refer to Zahran and Weik as surrogate terms for plaintiffs and defendants.) Each man accuses the other of egregious conduct-lying, name-calling, and manipulation. Not only do the two men disagree on who is at fault generally, they also disagree on numerous mundane facts about what has gone on in discovery.

*2 Although defendants complain about Zahran's conduct throughout the case, their motion initially focuses on Zahran's failure to answer interrogatories and document requests. To recap the facts relevant to this issue, plaintiffs were ordered to respond to both requests by April 30, 2006. Although Zahran responded to the document request by that date, he did not serve his interrogatories until early June. Both responses were patently inadequate, according to Weik, and contained only boilerplate objections. Weik requested a Rule 37 conference. After some wrangling over a suitable date and whether the meeting would be recorded, itself one of the many disputes in this case, the parties met for two days-on July 6th and 11th-with a court reporter present.[FN1] At the conference, Zahran and Weik appeared to resolve a few of their discovery disputes and, with regard to many others, Zahran stated that he needed to do more research and would either make a more specific objection within 10 days or would submit an updated answer within 21 days. But Zahran failed to respond as promised. And so, on August 29th, Weik filed a motion to compel. After briefing, including *two* response briefs filed by Zahran, Judge Mason granted (with a few minor exceptions) the motion in a minute order dated October 17th. The 10/17 Order is a focal point of defendants' present motion because defend-

ants complain that now, even after being directly ordered to respond to the outstanding discovery requests, Zahran has still not complied.

> FN1. This transcript is plaintiffs' Ex. 13a and 13b and will be referred to as "Tr. at _____."

Each side has submitted documents and affidavits, and neither side has requested an evidentiary hearing. We therefore must attempt to resolve these disputes from the materials submitted. Given the significance of the sanction being requested, we have reviewed not only the materials submitted by the parties, but have also looked at the case from a broader perspective by reviewing the docket sheet and the filings made by both parties since the beginning of this litigation.

## II. Plaintiffs' *Pro Se* Status.

Before turning to the merits, we must address upfront one issue that lurks in the background: whether plaintiffs' behavior is attributable to, or should be excused as a result of, their *pro se* status. Defendants argue that plaintiffs are sophisticated litigators who have strategically invoked their *pro se* status to avoid rules and obligations. Based on the three reasons set forth below, we agree that plaintiffs should not receive any special deference.

*First,* Zahran is a frequent litigator. According to public records obtained by defendants, Zahran and his wife have been a party in 30 federal cases, 20 cases in the Circuit Court of Cook County, and 25 in DuPage County. (Defs. Reply., Exs. 1 & 2.) Most of these lawsuits, insofar as we can tell, were filed by Zahran and litigated *pro se,* although in a few instances he chose to hire a lawyer. (Zahran did not file an *in forma pauperis* application in this case seeking appointment of counsel.) Statistically, the odds that Zahran would be the unlucky victim in 75 litigation disputes are extremely low, which raises a concern about whether this lawsuit was filed in good faith. For purposes of this motion,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

however, we need not rely on any such conclusion, but we can fairly assume from Zahran's extensive experience that he knows how the discovery process works and is aware of the applicable rules, procedures, deadlines, and discovery practices. In fact, this conclusion was drawn back in 1994 by Judge Zagel who then observed that Zahran and his wife "litigate often" and show "a reasonable degree of legal sophistication."*Zahran v. Al Baraka Bankcorp.,* 1994 WL 323075, *1 (June 28, 1994) (ordering Zahran to pay $1,500 in sanctions).

**\*3** *Second,* Zahran has been warned about this type of conduct and has been sanctioned by several courts. In *Zahran v. Frankenmuth Mut. Ins.,* 175 F.3d 1022, 1998 WL 975094 (7th Cir.1998), the Seventh Circuit ordered the Zahrans to submit a list of all the times they had been sanctioned by district courts in this circuit. As of that date, *i.e.* 1998, the Zahrans had been sanctioned in four cases and had failed to pay the fines in three of the four cases and had paid the other one four years later. *Id.* at *1. In *Predentin v. Zahran,* 530 N.W.2d 69, 1995 WL 17687 (Wisc.App.Ct.1995), the Wisconsin Appellate Court struck Zahran's opening appellate brief, thus ending his appeal, because it concluded that his excuse for filing his brief late (*i.e.* that his photocopier broke down) was not credible given that he had already received two extensions of time. The Court recognized that Zahran was *pro se* but still felt that sanctions were appropriate because he had shown a "casual disregard for the rules of appellate process."*Id* at *1, Judge Mason reached a similar conclusion here. After supervising discovery for several months, during which time he gave Zahran leeway based on his *pro se* status, Judge Mason eventually concluded that this deference was no longer justified due to Zahran's repeated rule violations. Judge Mason specifically warned Zahran, in a July 2006 minute order, that he was "on notice that this Court will not tolerate any future failure to comply with discovery deadlines, with Federal Rules of Civil Procedure or with this Court's standing orders and case management procedures."

*Third,* Zahran has frequently accused his opponents of violating court rules. In several instances, he has cited to rules that the typical *pro se* filer would not be aware of. For example, Zahran has accused defendants of violating page-limitation rules, even arguing that Weik skirted them by using single-line spacing and footnotes. *See* Docket # 115 at p. 2. (This accusation, like many others, is ironic given that Zahran has violated these rules more often than defendants.) Zahran also objected that the requests to admit by defendants were improper because the person signing them was not acting in the proper capacity for the corporation. In the Rule 37 conference, which was being transcribed by a court reporter, Zahran objected that Weik failed to put a request in writing. *See* Tr. at 45 ("MR. ZAHRAN: Your new request [is made] now verbally, the rule says it has to be in writing."). These are just a few examples of Zahran's many one-sided invocation of the rules. It would be unfair if he could accuse his opponents of violating court rules but then be allowed to "cry uncle" by invoking his *pro se* status when his opponents complain about the same thing.

**III. The Merits.**

In reviewing a motion for sanctions under Rule 37, we may issue a range of sanctions including dismissal with prejudice. Dismissal may be ordered, without first imposing a less severe sanction, if we find that there has been a "pattern of noncompliance with the court's discovery orders."*Newman v. Metropolitan Pier & Exposition Authority,* 962 F.2d 589, 591 (7th Cir.1992) (affirming dismissal with prejudice under Rule 37 for failure to cooperate in pretrial discovery: "The cases in this circuit [ ] do not set up a row of artificial hoops labeled 'bad faith' and 'egregious conduct' and 'no less severe alternative' through which a judge must jump in order to be permitted by us appellate judges to dismiss a suit."). We also have inherent authority to sanction a party who acts "in bad faith, vexatiously, wantonly, or for oppressive reasons."*Chambers v. NASCO, Inc.,* 502 U.S. 32, 45-46, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991). Dismissal with prejudice

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 4
Slip Copy, 2007 WL 2962651 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 2962651)**

is also one option under this source of authority. *Id.* The parties do not disagree about these legal standards. In fact, Zahran in his response brief has invited us to review the "full record" and stated that we should impose sanction if we find that he has engaged in-to quote from his brief-"[r]epetitive obstructive tactics, capricious arguments and statements designed to stymie discovery."(Resp. at 29.)

**\*4** We begin by summarizing the arguments. As noted above, defendants focus both on Zahran's failure to comply with Judge Mason's 10/17 Order, which required him to supplement discovery answers, and on his overall approach to discovery, Zahran responds with several global arguments: (i) he alleges that defendants are unreasonably seeking documents that they know don't exist or were disposed of long ago; (ii) he complains that defendants refused to participate in settlement conferences; and (iii) he alleges that defendants have not entered into a confidentiality agreement. Zahran also defends his discovery responses on an item-by-item basis,

After reviewing the submitted materials, it is clear that the parties' disagreement runs deep and that there are so many factual disputes that we cannot resolve every single one of them here. For some of them, the only evidence we have to rely on is Zahran's word versus Weik's word as set forth in dueling affidavits. Another impediment to our review is Zahran's brief. Like his complaint, it is disorganized, repetitive, and lengthy. (It is also, as described below, misleading and evasive.) Despite these problems, after a careful but unnecessarily time-consuming review of the record, we have been able to resolve a sufficient number of these disputes with a high degree of confidence. Of particular help has been the Rule 37 transcript where we have indisputable proof of what each man said and which we have been able to use as a way to test the claims they now make in their briefs.

From this review, a clear and one-sided picture has emerged. Zahran has violated court orders, misrepresented the factual record, and engaged in numerous evasive tactics that have needlessly prolonged

these proceedings. We describe some examples below.

*First,* as one of many examples of Zahran's "bad faith and deception," defendants allege that Zahran failed to attach documents to the supplementary interrogatory answers he gave in response to Judge Mason's 10/17 Order. Zahran stated in several places that he was attaching documents as part of his interrogatory answers. (Defs. Mot. Ex. D at p. 1, 11.)But, according to Weik, no documents were attached. Proceeding on the reasonable assumption that this omission could have been an innocent mistake, Weik contacted Zahran several times in November, by email and letter, asking that he Fed Ex Weik the missing exhibits. *See* Defs. Reply Ex. 5. Zahran didn't respond, but he did ask his secretary to tell Weik that he would give him the documents at the document production set to begin in Zahran's office on December 5th. According to Weik, when he showed up on the 5th, Zahran did not have the documents set aside for him. (Defs. Mot ¶ 14.)

Before addressing Zahran's counter-explanation, we note that this dispute is not trivial. One of defendants' long-running complaints has been that Zahran has never given specific answers to interrogatories. In the 10/17 Order, Judge Mason agreed with defendants and explicitly told Zahran that, if he wanted to answer an interrogatory by relying on a document, he "must" refer to those documents by Bates numbers.

**\*5** Now to Zahran's response brief. Zahran begins with the blanket assertion that *all* of the allegations are "simply false." (Resp. at 15.) Why? Because, he explains, the exhibits "were *produced* to Mr. Weik when he came to Zahran's office as these documents were voluminous."(*Id.;* emphasis added.) Zahran further asserts that he has proof to back up this claim in the form of his own affidavit and the affidavits of his wife and secretary. Zahran believes that this proof is so strong that Weik should be sanctioned for even suggesting that Zahran did not produce the documents.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This explanation, like many others given by Zahran, falls apart upon modest scrutiny. The initial issue, we should not forget, was whether Zahran initially *attached* the documents. Zahran doesn't respond to this allegation in his brief except, of course, in his blanket denial of any wrongdoing. Nor did he object in November when Weik brought up the issue and requested that copies be sent by Fed Ex. So, Zahran has implicitly conceded that he did not attach the documents with his original filing on November 14th. Instead, he changed the subject, arguing that he *produced* the documents. But even on this question, the evidence favors Weik. Although Zahran claims that he has affidavits to show that he produced the documents in person, we could find no such support in the cited documents. As for Zahran's own affidavit, it confusingly states (¶ 4): "That I, Robin Zahran made my office accessible for 4 days starting December 4, 2006 and I extended the time for an additional one week pursuant to his request and Attorney Weik *never showed up* and all the documents were available for his inspection and copying."(Emphasis added.) Defendants interpret this statement as claiming that Weik never showed up at all, which of course would mean that Zahran could not have "given [the documents] to Weik" as he claims in his response that he did. Although we interpret the statement the same way as defendants, which would mean that his affidavit contains a false statement, we will give him the benefit of the doubt and assume that he was confused or perhaps meant to say only that Weik did not show up later in December. Finding no support in his own affidavit, we then turned to the affidavits of his wife and secretary.[FN2] Contrary to Zahran's claim in his brief, these affidavits do not state that he gave to Weik the specific documents that were supposed to be attached to his supplemental interrogatories. We thus find that Zahran did not produce the documents in person, a conclusion that is bolstered by the fact that Zahran attached a copy of his interrogatory answers to his response brief but did not include, as he easily could have done, a copy of the documents he supposedly produced in person. *See* Pls. Ex. 12 (attaching a copy of the dis-

covery response still without exhibits). To summarize, after many months and much hassle, Zahran still has not provided the documents. Of course, we should not forget in all this discussion about whether Zahran first failed to *attach* the documents or about whether he later failed to *produce* them is that he was specifically told in the 10/17 Order to refer to the documents *by their Bates numbers.*It is undisputed that he did not comply with this straightforward order.

> FN2. To be more precise, we ruffled through the large stack of un-tabbed exhibits until we eventually found them at the bottom in exhibits 34 and 36. Zahran did not tell us the numbers of these exhibits in his response brief.

*6 *Second,* one of Zahran's general arguments in his response brief is that Weik unreasonably has been asking him to produce documents he doesn't have or discarded long ago. *See, e.g.,*Zahran Aff. at ¶ 3 (alleging that Weik has "constantly asked for documents that do not exist in my possession such as tax returns"). Weik denies the claim. In assessing this dispute, we find that the Rule 37 transcript provides clear evidence in support of Weik. It shows that Weik was merely seeking to *either* get the documents at issue *or confirm* that Zahran did not have them. At page 14 of the transcript, for example, Weik told Zahran: "You may have already produced everything that you would otherwise produce. I'm just asking. If that's the case, let me know. If not, I'm asking you to produce any other records."Yet, Zahran would not give a clear answer, Zahran's attempt now in his response brief to suggest that Weik was being unreasonable is itself disingenuous and misleading to this Court.

Consider, in this regard, the issue of tax returns. In written discovery, Weik asked Zahran for returns going back to 1994, Zahran responded with boilerplate objections, stating only that the request was irrelevant and burdensome, (Pls.Ex. 5.) At the Rule 37 conference, Weik explained why he thought the returns were relevant-to show how plaintiffs sched-

Slip Copy                                                                                                                  Page 6
Slip Copy, 2007 WL 2962651 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 2962651)**

uled the loan, what interest deductions they may have taken, and to shed light on damages. (Tr. at 29.) Zahran still objected but said that he would give Weik Schedule B of Zahran's tax returns going back to year 2000. After the conference, Weik waited for the Schedule B returns back to 2000 that Zahran said he would produce. He did not. Weik filed his motion to compel in which he argued (among other things) that Zahran failed to produce the promised returns and argued that defendants had a right to the full returns back to 1994, *See* Mot. ¶ 17(b). Judge Mason agreed with defendants and ordered Zahran to produce all the tax returns as well as many other documents. Zahran still didn't produce them. Defendants have raised this issue again in the current sanctions motion. After all that effort, Zahran now explains that the tax returns back to 1994 all "were discarded" and accuses Weik of being unreasonable in seeking them, again asking for sanctions. (Resp. at 11.) But the record is clear. Zahran acted unreasonably and then later misleadingly described what had happened to cover up this fact.

*Third,* another general defense raised by Zahran is to accuse Weik of failing to participate in settlement discussions. (He again asks for sanctions.) This issue is, first of all, irrelevant to and distracting from the central question of whether Zahran has complied with the outstanding discovery requests, Zahran's claim is also undermined by the Rule 37 transcript. During this conference, Weik stated several times that he was willing to discuss settlement, as the following exchanges shows:

*7 MR. ZAHRAN: [ ] Judge Nordberg said, Go and have a settlement conference. And my understanding is you do not want to settle, correct?

MR. WEIK: *If you want to have a conference regarding settlement, I will have it.* That is certainly is not something that you put on the record for any number of reasons, including the fact that settlement negotiations are privileged and confidential. So I would be happy to-

MR. ZAHRAN: *No. I'm not interested in that.* That's not what I said.

(Tr. at 193-94; emphasis added). The fact that Zahran, in his response brief, raises this issue and unfairly accuses Weik of not cooperating despite these clear statements to the contrary again leads us to conclude that Zahran is misrepresenting the factual record.

*Fourth,* a similarly distracting and misleading argument is Zahran's claim that defendants would not enter into a confidentiality agreement. Here again, the Rule 37 transcript comes to the rescue. It shows that Weik stated, subject to a few minor qualifications, that his clients would be willing to enter into a confidentiality agreement. *See* Tr. at 20. There is no evidence that Zahran followed up on this issue after the conference, as it would have been his responsibility to do as the party seeking the agreement, nor is there any evidence that Weik ever changed his position or refused to enter into an agreement presented to him.

The misleading factual claims in Zahran's response brief are not isolated occurrences. He has made false statements in other court-filed documents. For example, in his (second) response brief to defendants' motion to compel, Zahran made this factual claim about whether his wife was present at the two days of the Rule 37 conference:

Robin Zahran met with Mr. Weik on July 6th and 11th of 2006, as Karen Zahran was not available since she had planned her summer vacation earlier and could not change timing. Attorney Weik's statements that Mrs. Zahran "agreed" is again erroneous.

(Docket # 117 at p. 3.) But this claim is easily proven as false. Mrs. Zahran, although not present the second day, was indisputably present the first day as is evident from the transcript. More importantly, at the end of the first day, she stated on the record that her husband could speak on her behalf in the second day of the conference. *See* Tr. at 134

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2962651 (N.D.Ill.)

**(Cite as: Slip Copy, 2007 WL 2962651)**

(Mrs. Zahran: "I will allow him to speak on my behalf."). Thus, Zahran's argument-that Weik falsely stated that Mrs. Zahran "agreed" to things at the Rule 37 conference-is itself a false statement. It is one that is either intentionally misleading or was made with an extreme lack of care and thus amounts to the same thing.

We have summarized only some of the disputes between the parties. There are many others, but we will not spend further time going through them because, after a careful review of the entire record, we have come to a broader conclusion that Zahran's word cannot be trusted as he has repeatedly misrepresented the record and wrongfully accused Weik of wrongdoing when Weik has done nothing wrong. We no longer have confidence that what Zahran is saying is true and this lack of confidence undermines the integrity and further viability of these legal proceedings.

**\*8** But misleading and false statements are not the only problem. Defendants also complain about Zahran's disregard for court rules and procedures; his rude and unprofessional comments; and his general lack of preparation for and knowledge of his case. After reviewing the materials submitted to us, we again agree with the defendants' assessment. Some of these problems have already been discussed above, but we set forth a few more below.

**Ignoring court rules.**Zahran has repeatedly and unjustifiably ignored court rules and deadlines and has typically tried to explain away these failure by coming up with one excuse after another. Judge Mason described various violations of court rules. *See* 7/24/06 Order (listing problems).

One example is Zahran's responses to the interrogatories now at issue. In his initial response, he gave vague objections. In the Rule 37 conference he asserted different objections. After that conference, he did some research and raised a new argument, claiming for the first time that defendants' interrogatories exceeded the allowable number. (Docket # 117 at 3-4.) In granting the motion to compel,

Judge Mason implicitly rejected this argument. (10/17/06 Order.) But now in his response brief, at page 19, he again raises the argument about the number of interrogatories and misleadingly suggests to this Court that Judge Mason agreed with him on this point. *See* Resp. at 19 (stating that the amount of defendants' interrogatories is not what "Judge Mason or the federal rules intended to occur"). The end result is that Zahran has parceled out these objections over a six-month period causing unnecessary delay and expense.

**Making unprofessional comments.**Zahran claims in his response brief (and in his affidavit) that he has *never* made any personal attacks against opposing counsel. But the Rule 37 transcript suggests otherwise. Throughout the two-day conference, Zahran made snide comments and personal remarks to Weik. Zahran was rude, frequently interrupting Weik to cut off legitimate questions and then ordering him to "move on" to another topic. For example, in the middle of a seemingly straightforward discussion of discovery issues, Zahran blurted out to Weik: "You should be sued for debt collection. Honest to God, I should really do that."At another point, Zahran stated: "I'm very disappointed in you, Mr. Weik. I thought you were a much better man; I really did."(Tr. at 120.) The transcript is filled with these kinds of statements. *See, e.g.,* at 77 ("How in the world could you lie?"); at 67 ("You play a game, and you are a master at it."); at 80 ("Be honest for a change, okay?"); at 98 ("And you agree, don't you not, Mr. Weik, that [these] interrogatories are frivolous and made for harassment?"); at 102 ("I'm not intelligent like you. I don't have it memorized."); at 116 ("instead of you screwing around, admit it. It would be much easier. Then you pay the thousand bucks and get them out"); at 131 ("You're silly. Are you done?"); at 184 ("You have been doing nothing but harassing me."). He also made the following unnecessary and unsolicited comment about one individual defendant, Ira Nevel: "He [Nevel] committed perjury, okay. He's the lawyer now, and he's the one who made the racial remarks. The guy should go back to where he came from,

Palestine."(Tr. at 96-97.) We recognize that Zahran has alleged that Nevel earlier made a racist comment to Zahran, but this still does not justify this unprovoked comment to Weik in the middle of the Rule 37 conference. Even though Zahran constantly badgered Weik with these comments, Weik ignored them and continued to focus on the specific discovery disputes at hand.[FN3]

> FN3. We note for the record that Mrs. Zahran did not make such comments during the conference and, insofar as we can tell, generally acted in a cordial and professional manner in this litigation. At the same time, she agreed to allow her husband to make these various representations on her behalf and is therefore equally bound by this ruling.

**\*9 Failing to Prepare.**Zahran also has been unprepared and disorganized throughout the discovery process, further wasting time and driving up costs. Zahran knew before the Rule 37 conference that Weik would be asking about Zahran's discovery objections. Yet, at the conference, it was clear that Zahran had not given any thought to the issues. He gave inconsistent answers, and tried to shift the discussion to irrelevant side issues and then stated that he needed to do more research. *See, e.g.* Tr. at 55: "I will read the law again and see if you are entitled for me to go and spend my time to figure that amount."Zahran also didn't have copies of the relevant documents and didn't know basic facts about his own case. *See, e.g.,* Tr. at 138. For instance, when asked which term of the mortgage he believed the defendants violated, he gave vague and inconsistent answers, first stating that defendants violated "every term" on the mortgage, then asserting that he would not speculate about the question. (Tr. at 86-88.) When asked what his counts were against defendant Nevel, he said he didn't know. (Tr. at 95.) When asked about his count against defendant Bayview, he also said that he did not know what it was and asked Weik: "What is my count against Bayview?"(Tr. at 112.) When Weik told him that he

had only one count, he was surprised and said: "That's it." (*Id.*) On important issues such as the rate of interest, he responded: "The amount is not calculated as of yet. We'll supply it to you when I calculate it."(Tr. at 150.) As defendants persuasively point out, the fact that Zahran didn't know the answer to defendants' interrogatories or that he had to wait to see defendants' documents before answering them raises suspicion, especially when he was the president of a mortgage company and owns or has owned a number of properties in Illinois, Wisconsin, and Georgia. In this regard, we agree with the following assessment set forth on page 14 of defendants' reply brief:

[T]he idea that [plaintiffs] can allege that Defendants breached the terms of the note and mortgage or violated a statute without identifying the provision breached or sections violated is not credible. The notion that they can allege that they discovered "accounting and bookkeeping irregularities," illegal charges" and misapplied payments" without being able to describe those specific irregularities, charges and misapplied payments they claim they discovered does not make sense. The concept that they can allege that they discovered the principal balance was wrong but cannot describe what it should be or how they calculated the correct balance is illogical,

Zahran's lack of preparation for and knowledge about his case raise grave doubts that he could ever prosecute this case to a successful conclusion. His approach suggests that he does not have a coherent larger strategy but is just "winging it" from one moment to the next. Perhaps he is hoping for a settlement as defendants suggest, a view that would explain why he has spent so much time in his response brief focusing on the defendants' alleged failure to participate in settlement discussions.

**\*10** Another issue that relates both to violation of court orders and to the lack of preparation is Zahran's habit of filing briefs late. As with many of the issues we have discussed, this one would not be as significant if it occurred only on isolated occa-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sions. A simple review of the docket sheet provides clear evidence on this point. To provide one illustration of Zahran's casual regard for briefing deadlines, we will recount the history of the filing of his response brief on the current sanctions motion. The details are again tedious but necessary to show a pattern that only emerges in clear focus when one reviews the record from a wider perspective.

To recap, defendants' sanction motion was originally filed by defendants on December 15, 2006, and noticed up before Judge Mason on December 21st-six days later. (It is worth remembering, as we discuss this issue, that Zahran received a copy of this motion by December 18th.) On December 19th, Judge Mason issued a minute order directing defendants to re-notice the motion before this Court because it was a dispositive motion. That same day, complying with Judge Mason's request, defendants re-noticed the motion before this Court for next day, December 20th. Zahran did not show up on the 20th but this Court set a briefing schedule directing him to file a response brief by January 3rd and then set a status date for January 4th.

On January 3rd, Zahran faxed to opposing counsel a motion for extension of time to file his response brief. He presented the motion the next day and gave numerous reasons for why he could not meet the deadline. The first was to complain that Weik, when he noticed up the motion before this Court on December 20th, only gave Zahran one day's notice in violation of the rules. He further explained that his wife had to attend a Christmas party for her students; that he had four daughters in college and hadn't seen them since the previous summer; and that he and his family spent most of their time visiting relatives in Wisconsin. (Zahran did not mention, however, that during this same time he was filing other briefs in this case and also was responding to a document request in a separate case he is prosecuting in the Circuit Court of Cook County. *See* Docket # 137.) Zahran asked for 21 days to file his response brief. In an effort to move this case along, this Court granted the motion and even gave

Zahran an extra week beyond what he asked for, setting the new date for filing his response as February 2nd.

On February 1st, the day before the brief was due, Zahran filed an emergency motion asking for ten more days from February 1, 2007. His explanation this time was that he and his wife work full-time and that he was running a company in Georgia that requires heavy travel on his part. (Mot. at ¶ 2.) He also added that he and his wife were proceeding *pro se* and had other interferences that included Zahran's need to prepare tax forms such as W2's for Zahran's clients; the need to spend time with their daughters; a family reunion he had to attend in Wisconsin; and the fact that Zahran "also experienced medical difficulty with gout and could not be on his feet for a few days."(*Id.* at ¶¶ 3-7.)Zahran again did not include in these explanations that he had spent some portion of this time filing other briefs in this case. *See* Docket # 144. This time, we gave him 14 more days, ordering that his response be filed by February 16th.

**\*11** Zahran also missed this deadline. Five days later, he filed a motion for leave to file his brief instanter because, he explained, he had been stuck in a snowstorm the "prior week." Although this excuse was questionable, we allowed him to file his response brief in part due to the significance of the motion filed against him. As this summary shows, Zahran has missed several deadlines and offered questionable excuses at the last-minute even when, for many of these excuses, he would have known ahead of time about the problem such as his need to prepare regularly-scheduled tax filings. As noted above, the Wisconsin appellate court did not allow Zahran to file his appellate brief because it came to a similar conclusion, questioning Zahran's excuse that his photocopier machine broke down. We emphasize that this is not a one-time occurrence due to an unforeseen problem. It is a *modus operandi.*

For all the above reasons, we find that the plaintiffs' conduct in this litigation has been serious, repeated, willful, costly, and unjustified. Serious sanctions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are warranted. Opposing counsel, Judge Mason, and this Court have spent unnecessary time sifting through Zahran's confusing, misleading, false, repetitive, and incomplete statements throughout the course of this litigation. Weik in particular has had to constantly badger Zahran, calling him, emailing him, getting vague answers, waiting for further responses that were late and still incomplete, then receiving new and different responses, and finally going to court and having to respond to misleading descriptions of what happened. Contrary to Zahran's assertions, this is not a case where both sides have engaged in the same unprofessional behavior. It is a one-sided affair. This point is demonstrated by, among other things, the Rule 37 conference where Weik showed commendable restraint in the face of distracting and unprofessional comments by Zahran.

Having found that plaintiffs' conduct justifies the imposition of sanctions, the only remaining question is what sanctions are appropriate. Defendants ask for what is usually considered the most severe sanction of dismissal of all of plaintiffs' claims. Defendants alternatively suggest that we limit damages on certain claims to the statutory amount of $1,000 or that we impose monetary sanctions or even some combination of the above.

Although a monetary sanction is usually considered a lesser sanction and one that is often imposed first, we find that it would be inadequate here for several reasons. One is that there is doubt as to whether such a sanction would work. As noted above, plaintiffs have been ordered to pay monetary sanctions before and have not paid them. Another problem is that this Court has serious doubts that plaintiffs would ever be able to effectively bring their case to trial or that they will be able to provide adequate discovery responses to allow defendants to have a fair trial. We also believe that continued efforts to move forward will only lead to the expenditure of more unnecessary fees. And perhaps most significant of all, as noted above, we can no longer trust plaintiffs' word. *See, e.g., Ridge*

*Chrysler Jeep, LLC v. Daimler Chrysler Services North Am., LLC,* 2006 WL 2808158, *8 (N.D.Ill. Sept.6, 2006) (dismissing case as a sanction: "When discovery non-compliance [ ] is coupled with lies to both an adversary and the Court in order to. gain an advantage in the litigation, the Court must step in and impose the ultimate sanction in order to preserve the integrity of the federal judicial system."). We thus find that dismissal with prejudice is an appropriate and justified sanction.

## CONCLUSION

*12 For the reasons set forth above, defendants' motion for sanctions is granted and plaintiffs' remaining claims are dismissed with prejudice. The parties are directed to appear at a status hearing on November 14, 2007 to discuss how to proceed on defendants' remaining counterclaims.

N.D.Ill.,2007.
Zahran v. First Union Bank
Slip Copy, 2007 WL 2962651 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX J

Westlaw.

--- F.3d ----
--- F.3d ----, 2008 WL 961313 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----, 2008 WL 961313)**

Page 1

**H**
Arbor Hill Concerned Citizens Neighborhood Ass'n
v. County of Albany and Albany County Bd. of
Elections
C.A.2 (N.Y.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Second Circuit.
ARBOR HILL CONCERNED CITIZENS NEIGH-
BORHOOD ASSOCIATION, Albany County
Branch of the National Association for the Ad-
vancement of Colored People, Aaron Mair,
Maryam Mair, and Mildred Chang, Plaintiffs-Ap-
pellants,
v.
COUNTY OF ALBANY AND ALBANY
COUNTY BOARD OF ELECTIONS, Defendants-
Appellees,
andThe Republican Caucus of the Albany County
Legislature, Intervenors.
**Docket No. 06-0086-cv.**

Argued: Oct. 11, 2006.
Decided: April 24, 2007.
Amended: April 10, 2008.

**Background:** Voters and organizations sued county
and county board of elections, alleging that county
legislature redistricting plan violated Voting Rights
Act (VRA). After special primary election and spe-
cial general election for county legislators occurred
under new redistricting plan, and parties resolved
remaining issues by way of consent decree, the
United States District Court for the Northern Dis-
trict of New York, 419 F.Supp.2d 206,Norman A.
Mordue, J., granted plaintiffs' motion for attorney
fee award. The Court of Appeals, affirmed.

**Holdings:** On petition for rehearing, the Court of
Appeals, John M. Walker, Jr., Circuit Judge, held
that:
(1) district court may use out-of-district hourly rate
in calculating presumptively reasonable/lodestar
amount if it is clear that reasonable, paying client
would have paid higher rate, but

(2) District Court in instant case did not abuse its
discretion by using lower in-district rate for its cal-
culation.

Affirmed.

Opinion, 493 F.3d 110, superseded.

**[1] Federal Civil Procedure 170A 2737.4**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2737 Attorneys' Fees
            170Ak2737.4 k. Amount and Elements.
Most Cited Cases
Factors in determining what reasonable paying cli-
ent would be willing to pay, and in turn reasonable
hourly rate for calculation of presumptively reason-
able attorney fee award, i.e. lodestar amount, in-
clude complexity and difficulty of case, available
expertise and capacity of client's other counsel, re-
sources required to prosecute case effectively, tim-
ing demands of case, whether attorney had interest
independent of client's in achieving ends of litiga-
tion or initiated representation himself, whether at-
torney was initially acting pro bono, and other re-
turns attorney expected from representation.

**[2] Federal Civil Procedure 170A 2737.4**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2737 Attorneys' Fees
            170Ak2737.4 k. Amount and Elements.
Most Cited Cases
Relevant "community," for purposes of calculation
of presumptively reasonable attorney fee award, i.e.
lodestar amount, is district where district court sits.

**[3] Federal Civil Procedure 170A 2737.4**

170A Federal Civil Procedure
    170AXIX Fees and Costs
        170Ak2737 Attorneys' Fees

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

Page 2

--- F.3d ----, 2008 WL 961313 (C.A.2 (N.Y.))

**(Cite as: --- F.3d ----, 2008 WL 961313)**

170Ak2737.4 k. Amount and Elements. Most Cited Cases

District court may use out-of-district hourly rate, or some rate between out-of-district rate sought and rates charged by local attorneys, in calculating presumptively reasonable attorney fee award, i.e. lodestar amount, if it is clear that reasonable, paying client would have paid those higher rates.

**[4] Federal Civil Procedure 170A ☞2737.4**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2737 Attorneys' Fees
         170Ak2737.4 k. Amount and Elements. Most Cited Cases

On motion for attorney fee award, presumption that reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally, may be rebutted, albeit only in unusual cases, if party wishing district court to use higher rate demonstrates that his or her retention of out-of-district attorney was reasonable under circumstances, as they would be reckoned by client paying attorney's bill.

**[5] Federal Civil Procedure 170A ☞2737.4**

170A Federal Civil Procedure
   170AXIX Fees and Costs
      170Ak2737 Attorneys' Fees
         170Ak2737.4 k. Amount and Elements. Most Cited Cases

On motion for attorney fee award, district court's assessment of reasonableness of prevailing party's decision to retain out-of-district counsel is best considered in setting hourly rate, rather than in deciding whether to adjust presumptively reasonable fee.

**[6] Elections 144 ☞12(10)**

144 Elections
   144I Right of Suffrage and Regulation Thereof in General
      144k12 Denial or Abridgment on Account of

Race
   144k12(9) Judicial Review or Intervention; Injunction
      144k12(10) k. Costs and Attorney Fees. Most Cited Cases

In Voting Rights Act challenge to county legislature redistricting plan, federal district court did not abuse its discretion, on prevailing plaintiffs' motion for attorney fee award, by using, for calculation of presumptively reasonable award, rate charged by in-district counsel, rather than out-of-district counsel's higher rate; although court may have applied forum rule too strictly, reasonable paying client would have known that firms undertaking similar representations often obtain considerable non-monetary returns, and would have insisted on paying rate no higher than that of in-district attorneys. Voting Rights Act of 1965, §§ 2, 14(e), 42 U.S.C.A. §§ 1973, 1973l(e).

Mitchell A. Karlan (Mark E. Bini and Michelle Craven, on the brief), Gibson, Dunn & Crutcher, LLP, New York, NY, for Plaintiffs-Appellants.
Thomas J. O'Connor, Napierski, Vandenburgh & Napierski, LLP, Albany, NY, for Defendants-Appellees.

Before: JACOBS, Chief Judge, WALKER, Circuit Judge, O'CONNOR, Associate Justice Retired.[FN*]

**AMENDED OPINION[FN1]**

JOHN M. WALKER, JR., Circuit Judge:

**\*1** In this appeal from the district court's disposition of their motion for an award of attorney's fees, plaintiffs-appellants ("plaintiffs"), who prevailed in a suit brought under the Voting Rights Act of 1965 ("VRA"), seek a recalculation of the amount that they may recoup. The fee-historically known as the "lodestar"-to which their attorneys are presumptively entitled is the product of hours worked and an hourly rate. Plaintiffs argue that the district court applied an unnecessarily strict "forum rule": The district court, they contend, required them to show extraordinary special circumstances before it

would use in its "lodestar" calculation an hourly rate greater than the hourly rate charged by attorneys in the district where the district court sits.

We agree that the district court may have applied the forum rule in too unyielding a fashion. We therefore clarify its proper application in this circuit: While the district court should generally use the prevailing hourly rate in the district where it sits to calculate what has been called the "lodestar"-what we think is more aptly termed the "presumptively reasonable fee"-the district court may adjust this base hourly rate to account for a plaintiff's reasonable decision to retain out-of-district counsel, just as it may adjust the base hourly rate to account for other case-specific variables.

Moreover, this dispute concerning the "forum rule" is but a symptom of a more serious illness: Our fee-setting jurisprudence has become needlessly confused-it has come untethered from the free market it is meant to approximate. We therefore suggest that the district court consider, in setting the reasonable hourly rate it uses to calculate the "lodestar," what a reasonable, paying client would be willing to pay, not just in deciding whether to use an out-of-district hourly rate in its fee calculation. A plaintiff bringing suit under the Voting Rights Act, pursuant to which fees can be recovered from the other side, has little incentive to negotiate a rate structure with his attorney prior to the litigation; the district court must act later to ensure that the attorney does not recoup fees that the market would not otherwise bear. Indeed, the district court (unfortunately) bears the burden of disciplining the market, stepping into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively.

[1] Bearing these background principles in mind, the district court should, in determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel

(if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.[FN2]

*2 Although we clarify the application of the forum rule, we affirm the judgment of the district court in this case. It is clear that the district court would adhere to its fee award were we to vacate the district court's judgment and remand for reconsideration. Indeed, we believe that a reasonable, paying resident of Albany would have made a greater effort to retain an attorney practicing in the Northern District of New York, whether in Syracuse, Binghamton, Utica, or Kingston, than did plaintiffs. The rates charged by attorneys practicing in the Southern District of New York would simply have been too high for a thrifty, hypothetical client-at least in comparison to the rates charged by local attorneys, with which he would have been familiar.

## BACKGROUND

On April 22, 2003, plaintiffs filed a complaint against Albany County and its Board of Elections ("Albany defendants") alleging that Albany County's 2002 legislative redistricting plan violated § 2 of the Voting Rights Act of 1965. *See* 42 U.S.C. § 1973. On August 22, 2003, the District Court for the Northern District of New York (Mordue, *Judge*) enjoined Albany County from conducting its scheduled November 2003 election pending adoption by the Albany County Legislature of a revised redistricting plan.

Further proceedings below culminated in the dis-

trict court's rejection of plaintiffs' request that it order Albany County to hold a special election to take the place of the enjoined November 2003 election; plaintiffs then appealed to this court. On January 28, 2004, we vacated the district court's judgment and ordered the County to hold the special election on March 2, 2004. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 357 F.3d 260 (2d Cir.2004) ("*Arbor Hill I*").

Plaintiffs then moved in this court for an award of attorney's fees under 42 U.S.C. § 1973l(e). While we acknowledged the merit of the motion in principle, we remanded for a determination of the appropriate fee. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 369 F.3d 91 (2d Cir.2004) ("*Arbor Hill II*"). We noted that plaintiffs had not demonstrated that "special circumstances existed" that would justify the use of higher rates than those prevailing in the Northern District of New York in calculating that fee. *Arbor Hill II,* 369 F.3d at 96 (quoting *In re "Agent Orange" Prods. Liab. Litig.,* 818 F.2d 226, 232 (2d Cir.1987)).

During the course of this litigation, three entities have rendered legal services to the plaintiffs: (1) the Albany law firm of DerOhannesian & DerOhannesian ("D & D"), as local counsel; (2) the Washington, D.C.-based non-profit Lawyer's Committee for Civil Rights Under Law ("LCCRUL"), selected for its voting rights expertise; and (3) the Manhattan law firm of Gibson, Dunn & Crutcher ("Gibson Dunn"), chosen because of the firm's practice before the Second Circuit and the firm's "muscle," specifically, its ability to quickly prepare the appeal on an abbreviated briefing schedule.

**\*3** Gibson Dunn sought in the district court to recoup attorney's fees calculated on the basis of the hourly rate charged by most attorneys in the Southern District of New York (and the hourly rate usually charged by Gibson Dunn). The district court denied Gibson Dunn's request that it adjust the hourly rate it would use to calculate the fees due from that prevalent in the Northern District of New York. The district court explained, "[i]t is undisputed that plaintiffs did not even attempt to contact attorneys or law firms in the Northern District of New York outside of Albany County insofar as obtaining representation in this matter."Noting that "it was plaintiffs ['] obligation to submit factual support for their claim that there were no [law firms in Syracuse, Binghamton, Utica or Kingston] ready, willing or able to take [their] case," the district court held that plaintiffs had not adequately justified their request for higher fees.

In addition, the district court reduced the fee award proposed by Gibson Dunn in various other respects not relevant to this appeal. Plaintiffs then timely appealed the fee award, challenging only the district court's decision to award Gibson Dunn a fee based on the hourly rate commonly charged in the Northern District.

## ANALYSIS

### I. A Brief History of Attorney's Fees Awards

Courts in the United States have historically applied the "American Rule," under which each party is to bear its own costs of litigation, unmitigated by any fee-shifting exceptions. *See Alyeska Pipeline Servs. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In 1976, however, Congress enacted the Civil Rights Attorney's Fees Awards Act, which, like the provision of the VRA at issue in this appeal, provided that prevailing parties could recoup "reasonable attorney's fee[s]." *See*42 U.S.C. § 1988(b); cf. 42 U.S.C. § 1973l(e) ("In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment, the court, in its discretion, may allow the prevailing party.. a reasonable attorney's fee ....").

In the accompanying Senate Report, Congress implicitly endorsed two existing methods of calculating the "reasonable fee" that were developed in the 1970s by the circuit courts. *See Hensley v. Ecker-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*hart,* 461 U.S. 424, 429-30 & n. 3, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The first, developed by the Third Circuit, was the "lodestar" method. *See Lindy Bros. Builder, Inc. v. Am. Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973). The lodestar was the product of the attorney's usual hourly rate and the number of hours worked. *See id.* at 167 (directing district courts to calculate the lodestar using the attorney's "normal billing rate"); *see also City of Burlington v. Dague,* 505 U.S. 557, 559, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). After determining the lodestar, the district court could adjust it in setting the reasonable fee. *See generally Hensley,* 461 U.S. at 433, 103 S.Ct. 1933 ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate.....") (emphasis added); *Lindy,* 487 F.2d at 168-69.Thus, the lodestar method involved two steps: (1) the lodestar calculation; and (2) adjustment of the lodestar based on case-specific considerations.

**\*4** The second method, developed by the Fifth Circuit, was for district courts to consider twelve specified factors to establish a reasonable fee. *See Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974),[FN3] *abrogated on other grounds by Blanchard v. Bergeron,* 489 U.S. 87, 92-93, 96, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (declining to limit fee award to amount stipulated in attorney-client agreement). The *Johnson* method differed from the lodestar method in that it contemplated a one-step inquiry.

These two circuits had sought to channel the district court's discretion in different ways. The lodestar method was consistent with the law firm practice of accounting for each billable hour. *See Lindy,* 487 F.2d at 167 ("[T]he first inquiry of the court should be into the hours spent by the attorneys....."); *see also Gisbrecht v. Barnhart,* 535 U.S. 789, 800-01, 122 S.Ct. 1817, 152 L.Ed.2d 996 (2002) ("As it be-

came standard accounting practice to record hours spent on a client's matter, attorneys increasingly realized that billing by hours devoted to a case was administratively convenient....."). When the lodestar did not accurately reflect the market, the district court retained authority to adjust the lodestar to ensure that the fee ultimately awarded was reasonable. By contrast, under the *Johnson* method, the "hours claimed or spent on a case" were not "the sole basis for determining a fee."*Johnson,* 488 F.2d at 717.Rather than depending on market forces, the *Johnson* method relied on the district court's experience and judgment. *See id.* at 718 ("[T]he trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important"); *id.* at 720 (discussing the necessary "balancing process").*Compare id.*("By this discussion we do not attempt to reduce the calculation of a reasonable fee to mathematical precision."), *with Lindy,* 487 F.2d at 167.

In theory, therefore, a district court that adopted the lodestar method was expected to consider fewer variables than a district court utilizing the *Johnson* method. In practice, however, both considered substantially the same set of variables-just at a different point in the fee-calculation process. A district court using the lodestar method would set the lodestar *and then* consider whether, in light of variables such as the difficulty of the case, it should adjust the lodestar before settling on the reasonable fee it was ultimately inclined to award. *See, e.g., Silberman v. Bogle,* 683 F.2d 62, 64 (3d Cir.1982); *Baughman v. Wilson Freight Forwarding Co.,* 583 F.2d 1208, 1217-18 (3d Cir.1978) (permitting the district court to multiply the lodestar by a "contingency factor" and accepting, in theory, that obtaining an exceptional result might justify a further upward departure from the lodestar). By contrast, a district court employing the *Johnson* method would consider factors, such as the difficulty of the case, earlier in the fee-calculation process by weighing them in setting its tentative reasonable fee, from which there would seldom be a need to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                   Page 6
--- F.3d ----, 2008 WL 961313 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----, 2008 WL 961313)**

depart. *See, e.g., In re First Colonial Corp. of Am.,* 544 F.2d 1291, 1299-1300 (5th Cir.1977) (outlining a process whereby first, the attorney seeking fees would document the hours devoted to the case; second, the district court would consider the *Johnson* factors and set a reasonable hourly rate; and third, the district court would explain how it balanced the *Johnson* factors to arrive at the reasonable hourly rate).

**\*5** The Supreme Court adopted the lodestar method in principle, *see Hensley,* 461 U.S. at 433, 103 S.Ct. 1933;*Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), without, however, fully abandoning the *Johnson* method. Rather than using the attorney's own billing rate to calculate the lodestar and then examining the lodestar in light of case-specific variables to ensure that it was in fact a reasonable fee, as the Third Circuit had suggested, the Supreme Court instructed district courts to use a *reasonable hourly rate*-which it directed that district courts set in light of the *Johnson* factors-in calculating what it continued to refer to as the lodestar. *See Hensley,* 461 U.S. at 434 n. 9, 103 S.Ct. 1933 ("The district court also may consider other factors identified in [*Johnson* ] though it should note that many of these factors usually *are subsumed* within the initial calculation of hours reasonably expended at a *reasonable* hourly rate.") (citation omitted) (emphasis added); *Blum,* 465 U.S. at 898-900, 104 S.Ct. 1541.The Supreme Court collapsed what had once been a two-step inquiry into a single-step inquiry; it shifted district courts' focus from the reasonableness of the lodestar to the reasonableness of the hourly rate used in calculating the lodestar, which in turn became the *de facto* reasonable fee.

But the Supreme Court's emphasis on the Third Circuit's economic model, *see, e.g., Missouri v. Jenkins,* 491 U.S. 274, 283, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("Our cases have repeatedly stressed that attorney's fees....are to be based on market rates for the services rendered."), and its simultaneous invocation of the equitable *Johnson*

factors at an early stage of the fee-calculation process, proved to be in tension, *see Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541 ("We recognize, of course, that determining an appropriate 'market rate' for the services of a lawyer is inherently difficult....[since m]arket prices ... are determined by supply and demand."). While the Third Circuit had expected district courts to correct for market dysfunction, the Supreme Court now asked district court judges to hypothesize that market on the basis of their experience as lawyers within their districts and on the basis of affidavits provided by the parties. Generally speaking, the rates an attorney routinely charges are those that the market will bear; yet the Supreme Court required that the district courts conjure a different, "reasonable" hourly rate.

After *Hensley* and *Blum,* circuit courts struggled with the nettlesome interplay between the lodestar method and the *Johnson* method. *Compare Rutherford v. Harris County, Tex.,* 197 F.3d 173, 192 (5th Cir.1999) ("To decide an appropriate attorney's fee award, the district court was *first* required to calculate a lodestar fee depending on the circumstances of the case and the *Johnson* factors. The court was *next* obligated to consider whether the lodestar amount should be adjusted upward or downward, depending on the....*Johnson* factors.") (emphasis added), *with Murray v. Weinberger,* 741 F.2d 1423, 1430 (D.C.Cir.1984)("[T]he reasonable hourly rate which is incorporated into the lodestar figure generally reflects the reputation and ability of the attorney, the attorney's experience, and the level of skill required for the particular case."), *and Bebchick v. Wash. Area Metro. Transit Comm'n,* 805 F.2d 396, 404 (D.C.Cir.1986) ("Of course, 'the actual rate that applicant's counsel can command on the market is itself highly relevant proof of the prevailing community rate.' ").

**\*6** And the Supreme Court has not yet fully resolved the relationship between the two methods. In cases decided after *Hensley* and *Blum,* it has both (1) suggested that district courts should use the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Johnson* factors to adjust the lodestar, *see, e.g., Blanchard,* 489 U.S. at 94, 109 S.Ct. 939 (stating that the district court should arrive at an initial estimate and then "adjust this lodestar calculation by other factors"); *see also id.*("The *Johnson* factors may be relevant in adjusting the lodestar amount....."); *Pierce v. Underwood,* 487 U.S. 552, 582-83, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (Brennan, J., concurring) (suggesting that factors might exist "that would justify an enhancement of the lodestar"), and (2) reiterated its holding in *Hensley* and *Blum* that "many of the Johnson factors 'are subsumed within the initial calculation.'"*Penn. v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 564, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986).

Our court has done little to resolve this confusion. *Compare Kassim v. City of Schenectady,* 415 F.3d 246, 255-56 (2d Cir.2005) (affirming the district court's authority to "reduce the fee awarded to a prevailing plaintiff *below the lodestar* by reason of the plaintiff's 'partial or limited success' ") (emphasis added), *with Luciano v. Olsten Corp.,* 109 F.3d 111, 116 (2d Cir.1997) ("The product of the number of reasonable hours times a reasonable hourly rate, however, does not end the inquiry. There remain other considerations, based on the facts of the particular case, that may lead the district court to ultimately make an adjustment to the hourly structure.") (internal citations omitted), *and McDonald v. Pension Plan of the NYSA-ILA Pension Trust Fund,* 450 F.3d 91, 97 (2d Cir.2006) (lodestar calculated on the basis of "prevailing rate [specifically] for *ERISA* practitioners in this Circuit") (emphasis added), *and Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053, 1058 (2d Cir.1989) (suggesting, in determining the lodestar, that "smaller firms may be subject to their own prevailing market rate").

The net result of the fee-setting jurisprudence here and in the Supreme Court is that the district courts must engage in an equitable inquiry of varying methodology while making a pretense of mathematical precision. *See* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees,* 108 F.R.D. 237, 247 (1985) ("The *Lindy* process creates a sense of mathematical precision that is unwarranted....."). The "lodestar" is no longer a lodestar in the true sense of the word-"a star that leads," *Webster's Third International Dictionary* 1329 (1981). Nor do courts use it in the way the term was first used by the Third Circuit-as a base amount that is susceptible of ready adjustment; rather, circuit court deference to the district court's estimate of a "reasonable" hourly rate is a "lodestar" only in the sense that it is a guiding jurisprudential principle, *see Dague,* 505 U.S. at 562, 112 S.Ct. 2638 ("The 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence."). What the district courts in this circuit produce is in effect not a lodestar as originally conceived, but rather a "presumptively reasonable fee." *See id.*(holding that the fee applicant bears the "burden of showing that '... an adjustment is necessary to the determination of a reasonable fee' "). The focus of the district courts is no longer on calculating a reasonable *fee,* but rather on setting a reasonable hourly rate, taking account of all case-specific variables.

\*7 The district court's opinion, including the report and recommendation of Magistrate Judge David R. Homer, with which the district court agreed after *de novo* review, reflects the general confusion surrounding the lodestar calculation. In places, the district court appears to envision a two-step lodestar calculation process; yet elsewhere it seems to contemplate undertaking the calculation in one step. Likewise, at times, the district court emphasizes its role in approximating the workings of the market, but it also suggests some difference between "rates....paid by private retained clients....[and rates] ordered by courts."

The meaning of the term "lodestar" has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness. This opinion abandons its use.[FN4] We think the better course-and the one

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

most consistent with attorney's fees jurisprudence- is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case- specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the Johnson factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the "presumptively reasonable fee."

## II. The Forum Rule

[2] We turn now to the particular fee-calculation rule at issue in this case. It was against the muddled legal landscape we have just described that the Second Circuit promulgated what we will call the "forum rule." The Supreme Court directed that district courts should use the "prevailing [hourly rate] in the community" in calculating the lodestar-or what we are now calling the presumptively reasonable fee. After *Blum,* we explained that the "community" for purposes of this calculation is the district where the district court sits. *See Polk v. N.Y. State Dep't of Corr. Servs.,* 722 F.2d 23, 25 (2d Cir.1983).

However, district courts-and indeed our court- quickly succumbed to the general confusion surrounding the difference between a "lodestar" and a reasonable hourly rate. Sometimes, they considered the variation between indistrict and out-of-district rates in setting the hourly rate (which they then used to calculate the presumptively reasonable fee); but sometimes, they considered that variation only

in deciding whether to adjust the presumptively reasonable fee after they had arrived at it (on the basis of in-district rates).*Compare Polk,* 722 F.2d at 25 ("[T]he rate prevailing in the appropriate community is only one of many factors bearing on determination of a fee award."), with *Arbor Hill II,* 369 F.3d at 96-97 (intimating that a district court should permit plaintiffs to recover more than a fee calculated on the basis of the hourly rate usually charged by attorneys in the forum district only if plaintiffs could "show[ ].... that the case required special expertise beyond the competence of [forum district] law firms").[FN5]

*8 [3][4][5] We now clarify that a district court may use an out-ofdistrict hourly rate-or some rate in between the out-ofdistrict rate sought and the rates charged by local attorneys-in calculating the presumptively reasonable fee if it is clear that a reasonable, paying client would have paid those higher rates. We presume, however, that a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally. This presumption may be rebutted-albeit only in the unusual case-if the party wishing the district court to use a higher rate demonstrates that his or her retention of an out-ofdistrict attorney was reasonable under the circumstances as they would be reckoned by a client paying the attorney's bill. We believe that the district court's assessment of the reasonableness of a prevailing party's decision to retain out- ofdistrict counsel is best considered in setting the hourly rate-rather than in deciding whether to adjust a presumptively reasonable fee-for three reasons. First, our holding comports with the holdings of several sister circuits and with the Supreme Court's focus on reasonable hourly rates rather than reasonable fees. *See, e.g., Blum,* 465 U.S. at 895, 104 S.Ct. 1541 (emphasizing the importance of using the "market rate" in calculating attorney's fees); *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 175 (4th Cir.1994) ("In circumstances where it is reasonable to retain attorneys from other communities....the rates in those communities may also

--- F.3d ----                                                    Page 9
--- F.3d ----, 2008 WL 961313 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----, 2008 WL 961313)**

be considered."); *Maceira v. Pagan,* 698 F.2d 38, 40 (1st Cir.1983) ("If a local attorney could perform the service, a well-informed private client, paying his own fees, would probably hire local counsel at the local, average rate."); *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 769 (7th Cir.1982) (querying whether "the choice of counsel was improvident").

Second, in *Pierce v. Underwood,* a case interpreting the attorney's fees provision of the Equal Access to Justice Act ("EAJA"), the Supreme Court hinted that in the "broad spectrum of litigation," the difficulty of obtaining local counsel competent to prosecute a particular case is "little more than [a] routine reason[ ] why market *rates* are what they are,"487 U.S. 552, 573, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (emphasis added). The Supreme Court distinguished that "broad spectrum of litigation" from the attorney's fees provision of the EAJA, which stipulates that fees "shall be based upon prevailing market rates" but "shall not be awarded in excess of $125 per hour unless the court determines that....the limited availability of qualified attorneys for the proceedings involved justifies a higher fee."28 U.S.C. § 2412(d)(2)(A)(ii); *see Pierce,* 487 U.S. at 571-72, 108 S.Ct. 2541;*see generally Healey v. Leavitt,* 485 F.3d 63, 68 (2d Cir.2007).

Third and finally, our holding honors the Supreme Court's emphasis on the need to use the approximate market rate for an attorney's services in calculating the presumptively reasonable fee. *See Jenkins,* 491 U.S. at 283, 109 S.Ct. 2463.The legal communities of today are increasingly interconnected. To define markets simply by geography is too simplistic. Sometimes, legal markets may be defined by practice area. *See A.R. ex rel. R.V. v. New York City Dep't of Educ.,* 407 F.3d 65, 80 (2d Cir.2005) ("So long as the law provides for or permits fee awards based on geographic markets for services, a lawyer may be paid at different rates for otherwise indistinguishable services."). On the other hand, many cases (including many voting rights

cases) are intrinsically local, and the relevant legal market may be coextensive with or smaller than the district itself. By asking what a reasonable, paying client would do, a district court best approximates the workings of today's market for legal services. *See Mathur v. Bd. of Trs. of S. Ill. Univ.,* 317 F.3d 738, 744 (7th Cir.2003) ("The realities of the legal community today mean that though some attorney probably could have represented [the plaintiff], one factor or another prevented them from taking the case when he needed a lawyer."). Not incidentally, a reasonable, paying client might consider whether a lawyer is willing to offer his services in whole or in part *pro bono,* or to promote the lawyer's own reputational or societal goals. Indeed, by focusing on the hourly rate at which a client who wished to pay no more than necessary would be willing to compensate his attorney, the district court can enforce market discipline, approximating the negotiation that might ensue were the client actually required to pay the attorney's fees.

*\*9* In occasionally permitting a deviation from forum rates in setting the rate that will yield the presumptively reasonable fee, we have in mind no substantial change in circuit law; where circumstances have warranted it, we have not insisted on strict adherence to the forum rule. In *Polk,* we approved the use of an out-of-district hourly rate. 722 F.2d at 25 (considering whether "[c]ounsel might....have expected plaintiff's claim to be adjudicated in the Southern District"). In *Agent Orange,* although we emphasized that district courts should generally use "the hourly rates employed in the district in which the reviewing court sits" in calculating the presumptively reasonable fee, 818 F.2d at 232, we again upheld a district court's decision to use different rates.[FN6] And since *Polk* and *Agent Orange,* we have urged district courts where appropriate to employ out-of-district rates in calculating the fee due. *See, e.g., New York City Dep't of Educ.,* 407 F.3d at 81 & n. 17 ("[T]here is good reason for a district court not be wed to the rates in its own community. If they are lower than those in another district, skilled lawyers from such other district will be dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

suaded from taking meritorious cases in the district with lower rates.").

In both *Polk* and *Agent Orange,* the touchstone of our analysis was the belief that district courts should award fees just high enough "to attract competent counsel," *Lewis v. Coughlin,* 801 F.2d 570, 576 (2d Cir.1986).*See, e.g., Agent Orange,* 818 F.2d at 233 ("Undercompensation could deny counsel their right to fair and just fees; overcompensation would not be consistent with the need to prevent windfalls.");[FN7] *cf.Crescent Publ'g Group, Inc. v. Playboy Enters., Inc.,* 246 F.3d 142, 151 (2d Cir.2001) (explaining that an attorney-client agreement may provide compelling evidence of the "prevailing market rate").[FN8] We adhere to this touchstone, but we would not be true to it by insisting on an overly strict application of the forum rule. Rather, to reiterate, a district court should consider the rate reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee.

### III. The District Court's Decision

[6] For the foregoing reasons, we agree with plaintiffs that the district court may have applied the forum rule too strictly. They suggest that the district court calculated the presumptively reasonable fee (on the basis of in-district rates) and then queried whether the plaintiffs had shown sufficient cause to rebut the presumption that it was, in fact, the ultimate reasonable fee.

However, we find no error in the district court's fee award, even when evaluated under the analysis we use. We are confident that a reasonable, paying client would have known that law firms undertaking representation such as that of plaintiffs often obtain considerable non-monetary returns-in experience, reputation, or achievement of the attorneys' own interests and agendas-that might cause them to accept such representation despite a prevailing hourly rate that is lower than the law firm's customary billing rates, and that the client would have insisted on

paying his attorneys at a rate no higher than that charged by Albany attorneys (and there is no cross-appeal).

*10 Moreover, the considerable deference that we owe to a district court's assessment of the Johnson and other factors, *seeFarbotko,* 433 F.3d at 210 ("The district court is in closer proximity to and has greater experience with the relevant community whose prevailing market rate it is determining."), counsels against remanding this case to the district court for further, likely unnecessary, proceedings.

### CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court.

FN* The Honorable Sandra Day O'Connor, Associate Justice (Retired) of the United States Supreme Court, sitting by designation.

FN1. After due consideration of Plaintiffs-Appellants' petition for rehearing, which is denied, we have *sua sponte* amended our opinion.

FN2. Our decision today in no way suggests that attorneys from non-profit organizations or attorneys from private law firms engaged in *pro bono* work are excluded from the usual approach to determining attorneys' fees. The reasonableness of a fee award does not depend on whether the attorney works at a private law firm or a public interest organization, see *Blum v. Stenson,* 465 U.S. 886, 894, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization."), nor is the award necessarily limited because the attorney has agreed to undertake the case

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for a reduced fee compared to the customary market rate, *see Reiter v. MTA N.Y. City Transit Auth.,* 457 F.3d 224, 233 (2d Cir.2006). Nevertheless, the nature of representation and type of work involved in a case are critical ingredients in determining the "reasonable" hourly rate. *See, e.g., Blum,* 465 U.S. at 895 n. 11, 104 S.Ct. 1541 ("[R]equested rates [must be] in line with those prevailing in the community for *similar services....*" (emphasis added)); *see also Cohen v. W. Haven Bd. of Police Comm'rs,* 638 F.2d 496, 506 (2d Cir.1980) ("The fees that would be charged for similar work by attorneys of like skill in the area [is] the starting point for determination of a reasonable fee award."); *Pastre v. Weber,* 800 F.Supp. 1120, 1125 (S.D.N.Y.1991) (finding force in the "argument that [defendant] should not be required to pay for legal services at the rate Hughes Hubbard would charge to [its corporate clients] ... but should ... compensate plaintiff only for what would have been charged by a competent attorney specializing in civil rights litigation"). These factors may justify compensating an attorney at a rate lower than his or her customary rate for a different type of practice, regardless of whether the attorney has agreed to take the case on a *pro bono* or reduced-fee basis. All we are holding is that in calculating the reasonable hourly rate for particular legal services, a district court should consider all relevant circumstances in concluding what a reasonable client would expect to pay. Thus, attorneys-regardless of whether they are pursuing litigation on behalf of a paying client or a non-paying client-should receive out-of-district fees only if a reasonable, paying client would have retained out-of-district counsel.

FN3. The twelve *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson,* 488 F.2d at 717-19.

FN4. While we do not purport to require future panels of this court to abandon the term-it is too well entrenched-this panel believes that it is a term whose time has come.

FN5. Attorneys have had trouble understanding the strict forum rule. For instance, in this case, Michael C. Lynch, counsel to the Albany defendants, explained in an affidavit filed with this court in *Arbor Hill II* that the " 'relevant community' for purposes of....[setting the hourly rate] is the Albany, Capital District region in the Northern District of New York."*See also Farbotko v. Clinton County of New York,* 433 F.3d 204, 209 (2d Cir.2005) ("[T]he prevailing market rate for attorneys Syracuse and Albany....may not accurately reflect the rate prevailing across the entire Northern District."). The district court, by contrast, considered the "relevant community" to be the entire Northern District of New York.

Confusion surrounding the forum rule is endemic, and not unique to our circuit. Other circuits, too, have debated whether to consider out-of-district rates in setting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the reasonable *hourly rate* or in setting the reasonable *fee* (after arriving at a presumptively reasonable fee using in-district rates).*Compare Shakopee Mdewakanton Sioux Cmty. v. City of Prior Lake, Minn.,* 771 F.2d 1153, 1160 (8th Cir.1985) (noting that the district court should first "compute[ ] the base 'lodestar' figure by multiply[ing] the number of hours reasonably expended times the lawyer's regular hourly rate" and only then "look also to the ordinary fee for similar work in the community") (internal quotation marks omitted), *with Kan. Pub. Employees Ret. Sys. v. Reimer & Koger Assocs.,* 165 F.3d 627, 631 (8th Cir.1999) (readily upholding use of out-of-district rates in calculating the pre-sumptively reasonable fee). And those that have adopted a comparatively strict forum rule have struggled to apply it. *See, e.g., Gates v. Deukmejian,* 987 F.2d 1392, 1405 n. 14 (9th Cir.1992) (discussing whether to use Sacramento or San Francisco hourly rates); *McDonald v. Armontrout,* 860 F.2d 1456, 1460 n. 6 (8th Cir.1988) ("We are not at all convinced that central Missouri is the relevant 'community'..... [T]he argument for an expansive reading of 'community' is particularly strong in a case such as this, since Jefferson City is the capitol of the state and lawyers from throughout the state have business there.").*Compare Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 955 (1st Cir.1984) (using county-based version of the forum rule), *with Cunningham v. City of McKeesport,* 753 F.2d 262, 267 (3d Cir.1985) (location of attorney's home office is the relevant community), *and Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. E.P.A.,* 169 F.3d 755, 759 (D.C.Cir.1999) (announcing an ex-ception to the forum rule to govern cases

where "the home market is substantially less costly and the site of the bulk of the legal work").

FN6. Of the three cases cited in *Agent Orange,* two have since been called into ques-tion to the extent they purport to require strict application of the forum rule. *Compare Chrapliwy,* 670 F.2d at 768-69,*with People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205,* 90 F.3d 1307, 1310 (7th Cir.1996) ("The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate."); compare *Avalon Cinema Corp. v. Thompson,* 689 F.2d 137, 139-40 (8th Cir.1982) (en banc), *with TCBY Sys., Inc. v. RSP Co.,* 33 F.3d 925, 931 (8th Cir.1994) ("[Defendants] argue they should be awarded the Minneapolis rate because they reasonably chose Minneapol-is counsel after TCBY sued them. The [defendants] point out that they are Min-nesota residents who were forced to litig-ate the case in Arkansas under the agree-ment's forum selection clause, and they were unfamiliar with Arkansas counsel..... [T]he district court could have properly based the fee award on the higher Min-neapolis rates....").

FN7. Indeed, *Polk* said that the panel was simply applying established law. And when we decided *Polk,* circuit precedent was clear that district courts had consider-able flexibility in setting the relevant legal community for purposes of determining the hourly rate to be used in calculating the presumptively reasonable fee. *See, e.g., Cohen v. West Haven Bd. of Police Comm'rs,* 638 F.2d 496, 506 (2d Cir.1980) (holding that the district court should have looked to prevailing rates "in the area").

FN8. Were a strict forum rule the settled law of this circuit, we could not have used

--- F.3d ----

--- F.3d ----, 2008 WL 961313 (C.A.2 (N.Y.))

**(Cite as: --- F.3d ----, 2008 WL 961313)**

a lower hourly rate than the hourly rate prevailing in the district where the district court sat to calculate the presumptively reasonable fee in *Crescent Publishing.See also Sands v. Runyon,* 28 F.3d 1323, 1333-34 (2d Cir.1994) (permitting district court to consider retainer agreement in setting hourly rate below prevailing hourly rate in the district); *cf. Pinkham v. Camex, Inc.,* 84 F.3d 292, 294 (8th Cir.1996).*But see Reiter v. MTA New York City Transit Auth.,* 457 F.3d 224, 233 (2d Cir.2006) (vacating district court judgment because district court used hourly rate set forth in retainer agreement without considering prevailing Southern District rates).

C.A.2 (N.Y.),2008.

Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections

--- F.3d ----, 2008 WL 961313 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

APPENDIX K

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1826326 (N.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1826326)**

H

Lewis v. City of Albany Police Dept.
N.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
Phillip LEWIS, Plaintiff,
v.
CITY OF ALBANY POLICE DEPARTMENT and
William Bonanni, Defendants.
No. 1:04-CV-152.

April 24, 2008.

Getnick, Livingston, Atkinson, Gigliotti and Priore,
LLP, Patrick G. Radel, Esq., Utica, NY, for
Plaintiff.
Rehfuss, Liguori & Associates, P.C., John W.
Liguori, Esq., Latham, NY, Attorneys for Defend-
ant City of Albany.
David Brickman, Esq., Albany, NY, for Defendant
Bonanni.

### *MEMORANDUM-DECISION and ORDER*

DAVID N. HURD, United States District Judge.

### I. *INTRODUCTION*

*1 A trial was held on February 25, 26, 27, 28, and
March 6, 2008. The jury rendered a verdict on be-
half of plaintiff, Phillip Lewis ("Lewis" or
"plaintiff"), and against defendant William Bonanni
("Bonanni") finding that he used excessive physical
force in arresting plaintiff on November 23, 2002,
thus violating his constitutional rights. However,
the jury found that Bonanni did not perform a pub-
lic strip search of plaintiff as was alleged. The jury
also found that Bonanni's conduct in effecting the
arrest using excessive force upon Lewis violated
plaintiff's right to equal protection of the law due to
plaintiff's African-American race. Additionally, the
jury found that the City of Albany Police Depart-
ment ("the City") had a custom, policy, and prac-
tice that failed to properly train, supervise, and/or
discipline Bonanni, and that failure was a proxim-

ate cause of the violations of plaintiff's constitu-
tional rights. The jury found that the violations of
plaintiff's constitutional rights was a proximate
cause of compensatory or actual damages to him,
and awarded him the amount of $65,000.

Further, the jury found that Lewis was entitled to an
award of punitive damages against Bonanni. Upon
reconvening on March 6, 2008, after hearing clos-
ing arguments of counsel for Lewis and Bonanni,
the jury returned a verdict awarding plaintiff punit-
ive damages in the amount of $200,000.

The City and Bonanni filed motions for judgment
as a matter of law or in the alternative for a new tri-
al pursuant to Fed.R.Civ.P. 50(b) and 59, respect-
ively. Plaintiff opposed. Defendants replied. Oral
argument was heard on April 18, 2008, in Utica,
New York. Decision was reserved.

### II. *STANDARDS*

#### A. *Rule 50(b) Motion for Judgment as a Matter of Law*

In considering a motion for judgment as a matter of
law, the evidence must be considered in the light
most favorable to the non-movant, and all infer-
ences must also be drawn in the non-movant's fa-
vor. *Nimely v. City of New York,* 414 F.3d 381, 390
(2d. Cir.2005). Conflicting evidence cannot be
weighed and the witnesses' credibility cannot be
judged. *Id.* The judgment of the jury cannot be sup-
planted. *Id.* The motion may be granted only where
there was "no legally sufficient evidentiary basis
for a reasonable jury to find" in the non-movant's
favor. Fed.R.Civ.P. 50(a); *Nimely,* 414 F.3d at 390.
That is, the motion may not properly be granted un-
less "there is 'such a complete absence of evidence
supporting the verdict that the jury's findings could
only have been the result of sheer surmise and con-
jecture, or such an overwhelming amount of evid-
ence in favor of the movant that reasonable and fair
minded men could not arrive at a verdict against

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[the moving party].' " *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995) (alteration in original) (quoting *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992)).

**B. *Rule 59 Motion for a New Trial***

**\*2** On a motion for a new trial, "the trial judge is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner."*Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978). However, the mere fact that the trial judge may not agree with the jury's verdict is no reason alone to grant a new trial. *Mallis v. Bankers Trust Co.,* 717 F.2d 683, 691 (2d Cir.1983). Grant of a new trial is warranted only where the court " 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 875 (2d Cir.1992)(quoting *Smith v. Lightning Bolt Produc., Inc.,* 861 F.2d 363, 370 (2d Cir.1988)).

**C. *Remittitur***

A jury award of damages for federal constitutional violations will be upheld unless it is "so excessive 'as to shock the judicial conscience.' " *Wheatley v. Ford,* 679 F.2d 1037, 1039 (2d Cir.1982). If the award is found to be grossly excessive, a plaintiff may be ordered "to remit excessive damages or undergo a new trial, *Id.*It is appropriate to review the awards in comparable cases in determining a motion for remittitur. *Martinez v. Port Authority of N.Y. & N.J.,* No. 01 Civ 721, 2005 WL 2143333, at \*19 (S.D.N.Y. Sept. 2, 2005) (citing *Gardner v. Federated Dep't Stores, Inc.,* 907 F.3d 1348, 1353 (2d Cir.1990)), *aff'd,*445 F.3d 158, 160 (2d Cir.2006) (per curiam). It is appropriate to consider inflation when comparing prior jury verdicts and remittitur orders.*Id.* at \*20 & n. 9 (using United States Bureau of Labor Statistics calculator found at *http://data.bls.gov/cgi-bin/cpicalc .pl* as a "crude adjustment mechanism" to upwardly adjust awards

for comparison purposes), *see also Martinez,* 445 F.3d at 160 (finding no error in the district court's remittitur analysis).

The propriety of the amount of a punitive damages award likewise is not disturbed unless it shocks the judicial conscience. *Patterson v. Balsamico,* 440 F.3d 104, 120 (2d. Cir.2006). However, the following factors must be considered in the analysis: "(1) the degree of reprehensibility of the tortuous conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases."*Id.* (internal quotation omitted).

**III. *DISCUSSION***

Defendants make multiple arguments in support of their motions for judgment as a matter of law or in the alternative for a new trial and/or remittitur. These arguments can be categorized as challenging pre-trial rulings (admission of prior complaints and perjury charge, bifurcation, and jury selection), sufficiency of evidence (excessive force, equal protection, and municipal liability), jury instructions (oral addition to verdict form and lack of a qualified immunity charge), and amount of damages awarded, and will be addressed in this order rather than as presented by either defendant.

**A. *Admissibility of Evidence***

**1. *Prior Complaints***

**\*3** Defendants argue that admission of prior complaints of use of excessive force against African-American suspects by Bonanni constituted error sufficient to justify overturning the verdict of the jury. Pursuant to Rule 61 of the Federal Rules of Civil Procedure, an error in the admission of evidence is grounds for overturning a jury verdict only where letting the verdict stand would be inconsistent with substantial justice. Fed.R.Civ.P. 61. Where an error "does not affect the substantial rights of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1826326 (N.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1826326)**

parties," it must be disregarded. *Id.*

The prior complaints were properly admitted under Federal Rule of Evidence 404(b) with regard to Bonanni's identity, since, as he himself points out, his defense was that he did not participate in the physical arrest or use any force against plaintiff. Rather, Bonanni's contention throughout the proceeding was that he was in a vehicle down the block during Lewis's arrest. The circumstances alleged in the prior complaints are strikingly similar to those in this case-that Bonanni used excessive force upon the head of handcuffed African-American suspects. Additionally, the prior complaints were admissible to establish Bonanni's motivation and intent with regard to the use of force against Lewis (should the jury determine, as it did, that he was one of the officers who used excessive force against plaintiff) because plaintiff is African-American. Therefore, the prior complaints were relevant both as Bonanni's identity as a participant in the use of excessive force and if so, as to his motivation and intent for using such force against an African-American. *See* Fed.R.Evid. 404(b).

Bonanni argues that admission of the prior complaints was prejudicial because the ultimate verdict likely was based upon unrelated events in the prior complaints and that the jury may have inferred that he was an "evil person" because of the complaints. However, if the jury credited the testimony of three police officers that Bonanni was not even involved in the physical arrest of the plaintiff, it would then have had to completely ignore their version (and Bonanni's) of the events in order to base its verdict upon the prior complaints or any inference that he was an evil person. In other words, in order for defendant's proposition to stand up, the jurors would have had to, first, believe the officer witnesses' testimony that Bonanni was not even physically present at the arrest, and, second, disregard that testimony which they believed. This is far too speculative a ground upon which to base a finding of prejudice sufficient to substantially outweigh the probative value of the prior complaints. The sub-

stantial probative value of the relevant prior complaints is not substantially outweighed by the speculative danger of unfair prejudice, particularly given the limiting instructions to the jury. *See* Fed.R.Evid. 403, 105.

Further, the complaints in Bonanni's personnel file were relevant with regard to Lewis's *Monell* claims against the City. Their significant probative value as to whether the City failed to take proper steps in light of Bonanni's multiple alleged violations of African-American suspects' constitutional rights was not outweighed by a danger of unfair prejudice, especially in light of the limiting instructions given. *See* Fed.R.Evid. 403, 105.

**\*4** The City contends that as a general principle unsubstantiated or unfounded complaints are inadmissible against a municipality, citing *Berkovich v. Hicks,* 922 F.2d 1018, 1022-023 (2d Cir.1991). In that case the plaintiff, Berkovich, alleged civil rights violations related to his arrest, including a claim under *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018 (1978). The trial court denied discovery of prior civilian complaints and excluded all evidence relating to them at trial. *Berkovich,* 922 F.2d at 1021. Assuming without deciding that it was error to deny discovery of the complaints, the appellate court found that any resulting error was harmless because the complaints, all but one of which exonerated the defendant at issue, held minimal probative value. *Id.* at 1022.The Second Circuit found no abuse of discretion in the exclusion of the history of complaints at trial. *Id.* The court noted that under its " 'inclusionary' approach" to Rule 404(b), evidence of prior wrongful acts may be admitted for other relevant purposes except propensity. *Id.* The inclusion of such evidence, other than to prove propensity, is subject to the Rule 403 balance between probative value and, inter alia, unfair prejudice, *Id.*(noting that the "broad reach of th[e] 'inclusionary' approach" permits admission of evidence for any relevant purpose except propensity so long as unfair prejudice does not substantially outweigh probative value)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The court rejected each of Berkovich's arguments of relevance, *Id.* at 1022-23.Here, however, the relevant prior complaints had substantial probative value in that only one exonerated Bonanni and all were of sufficiently similar circumstances to merit admission to prove his modus operandi and the City's failure to discipline, train, and supervise him. *Cf. id.*(finding evidence lacking relevance, and therefore of minimal probative value, where the defendant was exonerated as to six of the seven prior complaints and there was no pattern to connect prior complaints to the current alleged acts). Thus, the admission of the prior complaints against Bonanni was not inconsistent with the Second Circuit's approach in *Berkovich.*

The prior complaints were properly admitted as against Bonanni to prove identity, motive and intent, and modus operandi, and as against the City as evidence of whether it failed to discipline, train and supervise Bonanni.

However, even if it was error to admit the prior complaints, such error would not be sufficient to overturn the jury verdict. Limiting instructions were given to the jury at the time the complaints were introduced into evidence, as well as in the final charge subsequent to the conclusion of the proof and the parties' arguments. Therefore, if there was error it did not affect the substantial rights of the parties, and letting the verdict stand is not inconsistent with substantial justice. *See*Fed.R.Civ.P. 61.

### 2. *Perjury Charges*

**\*5** Bonanni argues that the departmental records referencing perjury charges [FN1] brought against him in 1998 by a Special Prosecutor should not have been admitted into evidence, and further that since they were admitted he should not have been prevented from testifying as to the outcome of those charges. He contends that these errors were prejudicial because he relied in part on his own testimony to convince the jury that he did not phys-

ically participate in the arrest but rather was in a vehicle when Lewis was taken into custody .[FN2]He further argues that the probative value of the records was questionable.

> FN1. The charges alleged that Bonanni and another officer committed perjury in testimony regarding the one complaint of excessive force against Bonanni that was substantiated.

> FN2. He also relied upon the testimony of at least three of his fellow officers that he was not present at the physical arrest of plaintiff. The perjury charges and prior complaints had nothing to do with their testimony. Apparently, the jury also disbelieved the fellow officers' testimony as it did Bonanni's.

The departmental records referencing perjury charges against Bonanni were received in evidence only against the City relating to the charges of failure to discipline, train, or supervise. There were no departmental records indicating a disposition of the perjury charges. Perjury charges against Bonanni with no disposition in departmental records were relevant to Lewis's claim that the City failed to discipline, train, or supervise Bonanni, the purpose for which they were admitted. The probative value of this relevant evidence was not outweighed by a danger of undue prejudice and therefore was properly admitted. Bonanni proffered his own testimony that he was exonerated of the charges, with no background as to proceedings that led to his exoneration. Moreover, aside from the fact that such testimony would be self-serving, the best evidence of a disposition of the charges is the record. Here, there was no documentation of any proceedings or disposition of the charges. Accordingly, it was proper to preclude Bonanni from testifying regarding a disposition of the charges.

### B. *Bifurcation*

--- F.Supp.2d ----                                                    Page 5
--- F.Supp.2d ----, 2008 WL 1826326 (N.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1826326)**

Defendants argue that is was error to deny the City's motion to bifurcate the trial. The principle basis upon which defendants contend that the claims against Bonanni and the City should have been tried separately is that the evidence of prior complaints admitted for the purposes of proving the claims against the City misled the jury in its consideration of the claims against Bonanni.

The presumption is that all claims will be tried together, unless special and persuasive reasons constituting exceptional circumstances exist. *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 549 (S.D.N.Y.2005). A bifurcated trial may be appropriate "in order to (1) avoid prejudice; (2) provide for convenience; or, (3) expedite the proceedings and be economical."*Ismail v. Cohen,* 706 F.Supp. 243, 251 (S.D.N.Y.1989) The burden is upon the moving party to establish that bifurcation is appropriate. *DeVito v. Barrant,* No. 03-CV-1927, 2005 WL 2033722, at *11 (E.D .N.Y.2005). The prior complaints were admissible as against Bonanni on the excessive force claim for the limited purpose of establishing identity, which he brought in issue, and on the equal protection claim to establish motive, intent, and modus operandi. They were also admissible against the City on the *Monell* claim. Limiting instructions were given at the time the evidence was introduced and at the conclusion of the trial, reducing the possibility of any prejudice to defendants. Moreover, trying all the claims together would promote convenience, expedite the proceedings, and preserve judicial resources. *See DeVito,* 2005 WL 2033722, at *11 (noting that bifurcation "could cause a waste of judicial resources if witnesses and evidence must be presented twice").

**C. *Jury Selection***

**\*6** The City argues that disqualification of two [FN3] potential jurors for cause based upon their employment in the law enforcement field and the refusal to strike for cause a female juror suffering from generalized anxiety disorder were errors justifying a new trial.

FN3. The City's motion papers refer to three jurors excused because of their work in law enforcement. However, there were only two such jurors.

The City contends that the two people working in law enforcement stated that they could fairly and impartially weigh the evidence without bias or prejudice. However, their demeanor and actions during jury selection demonstrated that they could not be fair and open-minded in this case, including some of their answers to questions involving their law enforcement experiences. There was no error in dismissing these jurors for cause upon plaintiff's motion to do so.

As to the anxious juror, she stated that she understood that the trial process would not be confrontational to her and that she could work through her anxiety. She answered all of the questions during voir dire. Moreover, the defendants used a peremptory challenge. This juror was dismissed and did not serve on the jury. The City contends that requiring it to use one of three peremptory challenges shared by the two defendants for this juror limited the defendants' ability to empanel a fair and impartial jury. However, the City does not state how the use of this challenge limited the ability to empanel a fair and impartial jury. Additionally, counsel for both defendants indicated that the jury was satisfactory to them.

There was no error in the jury selection process.

**D. *Weight of Evidence***

**1. *Excessive Force***

Defendants point to testimony from Bonanni and three other officers to the effect that Bonanni was in a patrol vehicle down the block at the time of plaintiff's apprehension. They also point to the medical reports which allegedly showed minimal injuries suffered by plaintiff.

Lewis testified that, while he was on the pavement,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1826326 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----, 2008 WL 1826326)

in handcuffs, first one officer, and then Bonanni stepped on his head with his full weight and ground plaintiff's face into the pavement. Plaintiff's treating physician testified that he suffered abrasions and a contusion to his face and a closed head injury. Photographs admitted in evidence, although taken after he was treated, showed the injuries to plaintiff's face. This evidence, if credited, was a sufficient basis upon which the jury could find that Bonanni used excessive force upon Lewis.

Defendants also point to evidence such as medical records of de minimis injuries, Lewis admitting he assaulted the complainant and damaged his girlfriend's property, among other things, to support their argument that the amount of force used was appropriate. This argument is inapposite because the threshold issue was whether Bonanni participated in plaintiff's physical arrest or not. According to Bonanni and the other officers, he did not. If this were believed, then the excessive force claim would be decided in favor of defendant, with no consideration of the amount of force used. Similarly, if Lewis's version were believed, the issue would be decided in plaintiff's favor because under no circumstances could it be said that stepping on the head of an under control, handcuffed suspect laying on the ground, and grinding his face into the pavement was a proper, reasonable use of force.

*7 The jury's verdict demonstrated that it credited Lewis's version of events, rather than Bonanni's or the other officers. The verdict on the excessive force claim against Bonanni was not seriously erroneous or a miscarriage of justice, and a new trial is not warranted.

### 2. *Equal Protection*

Bonanni contends the jury's finding against him on the equal protection claim was against the weight of the evidence because plaintiff merely introduced the prior complaints from his personnel file. Plaintiff did introduce into evidence the prior complaints against Bonanni. Every complaint was made

by an African-American-100%. Bonanni testified that only 65% of the arrests he made were of African-Americans. The complaints were also very similar factually, such as kicking or hitting a handcuffed African-American suspect in the head. Further, there appeared to be no motivation other than race for Bonanni to assault the handcuffed Lewis in this manner. The jury's verdict on the equal protection claim against Bonanni was also not seriously erroneous or a miscarriage of justice, and a new trial is not warranted.

### 3. *Failure to Discipline, Train, or Supervise*

The City argues that the only evidence presented to support plaintiff's claim for failure to discipline, train, or supervise was the seven prior complaints, only one of which substantiated misconduct by Bonanni. The City points to evidence that it contends shows that it did properly discipline, train, and supervise Bonanni: he was required to participate in yearly in-service training including use of force, constitutional rights, and racial sensitivity; and its handling of the one substantiated complaint (turned matter over to the District Attorney, suspended Bonanni, mandated in-service training when Bonanni returned to work after acquittal).

All of the in-service training the City provided to Bonanni was the same training it required of all officers. Documentary evidence established that in a single year Bonanni was responsible for 10% of excessive force complaints against the City, which employed over 330 police officers. Additionally, all of the excessive force complaints against Bonanni were filed by African-Americans, who alleged strikingly similar misconduct. Despite having this information, the City did not require Bonanni to undergo additional training, no additional supervision was provided, and no written or verbal warnings were given. Further, the City's purportedly adequate response to the substantiated complaint of excessive force (assaulting a handcuffed African-American suspect) could be viewed as supporting Lewis's claim that the City failed to discipline, train, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1826326 (N.D.N.Y.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1826326)**

supervise Bonanni. The City initiated a disciplinary proceeding and suspended Bonanni from the police force when the complaint of an assault on a suspect was substantiated. A grand jury indicted Bonanni for assaulting the suspect. The City police department initiated departmental charges against Bonanni, which recommended termination. Bonanni was acquitted of the criminal charges related to that incident. The City then reinstated Bonanni with full back pay and benefits for the 2-1/2 years he was suspended. Upon his reinstatement, the City required only the same in-service training that would be required of any other officer, and there was no evidence that the City instituted any special supervision. The City has no record of the resolution of the departmental assault charges brought against Bonanni.

*8 In addition to the charges related to the assault, a special prosecutor brought charges against Bonanni and another officer alleging that they had committed perjury in testimony given regarding the assault alleged in the substantiated complaint. Departmental charges of perjury were also brought, again with a recommendation of dismissal. The City did not require any special training or supervision based upon the allegations of perjury. Again, the City failed to produce any record of the resolution of the criminal or departmental perjury charges.

The jury verdict finding that the City had a custom, policy, and practice that failed to properly train, supervise, and/or discipline Bonanni was not seriously erroneous. A new trial is not necessary to prevent a miscarriage of justice.

**E. *Oral Addition to Verdict Form***

The City argues that an oral addition to the verdict form during the explanation of Question One was a fundamental error of law requiring a new trial. This argument is based in large part on the assertion that it was error to admit the prior complaints of excessive force against African-American suspects against Bonanni. As discussed in detail above, the prior complaints were properly admitted for the limited purposes as the jury was instructed. Thus, to the extent that the City's motion in this regard is based upon error in admitting prior complaints it must be denied.

Additionally, the City misapprehends the explanation with regard to Question One. The explanation clearly set forth the limited purpose for which the jury could consider the prior complaints with regard to this question-the *identity* of Bonanni as the officer who stepped on plaintiff's head, while he was handcuffed on the pavement, and ground plaintiff's face into the pavement. The explanation did not suggest that the jury use the prior complaints in its consideration of whether the *amount* of force used was excessive; in fact, the jury was instructed that if it found that the events occurred as plaintiff testified, then the amount of force used was excessive as a matter of law.

The City further argues that even if the jury believed that Bonanni participated in the physical arrest of Lewis, it could have found that given the circumstances of the apprehension and plaintiff's resulting injuries, the amount of force used was not excessive. To the contrary, there are no circumstances that would justify the force used in Lewis's version of events, that Bonanni stepped on Lewis's head with his full weight and ground his face into the pavement, while Lewis was under control and handcuffed on the ground. Further, Bonanni did not testify that he used some other amount or type of force-he testified that he was in a vehicle at the time of the incident, and the explanation to the jury included this fact. The City cannot now rely upon a hypothetical version of events about which there was no evidence at trial as grounds for a new trial.

The City also objects to the amendment of page 22 of the jury charge to eliminate "for the sole purpose" from the instruction about the jury's limited consideration of prior civilian complaints with regard to claims against the City. It was clear from the limiting instructions given during the course of the trial that the prior complaints could be con-

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1826326 (N.D.N.Y.)
(Cite as: --- F.Supp.2d ----, 2008 WL 1826326)

sidered with regard to Bonanni's identity and motive as to the claims against him. Removing the "for the sole purpose" language from the written charge given to the jury merely reflected the limits of their use of the prior complaints as a whole.

### F. *Qualified Immunity*

**\*9** Defendants argue that it was error as a matter of law to deny the request to charge the jury on qualified immunity. They contend that the jury should have been permitted to determine if Bonanni's actions were reasonable in light of the circumstances.

Qualified Immunity insulates a governmental official performing discretionary functions from liability so long as his " 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988)(quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Qualified immunity also protects public officials from liability when it was objectively reasonable for them to believe that their actions did not violate a plaintiff's constitutional rights. *Martinez v. Simonetti,* 202 F .3d 625, 634 (2d Cir.2000). Legal questions pertaining to qualified immunity, such as whether violation of a federally protected right has been asserted, whether the asserted right was clearly established, and whether the facts "demonstrate the objective reasonableness of the public official's conduct," are for the court and not the jury. *Id.* at 632.

The issue is not whether plaintiff had a clearly established constitutional right to be free from the use of excessive force during arrest. Rather, the issue is whether it could have been objectively reasonable for Bonanni to believe that his actions did not violate Lewis's constitutional rights. The two versions of events about which there was evidence in this case were (1) Bonanni, as he testified, was in a vehicle and did not participate in the physical arrest of plaintiff; and (2) Bonanni, as Lewis testified, stepped on a handcuffed, prone Lewis's head and

ground his face into the pavement. In Bonanni's version, qualified immunity is not an issue because he was not even involved in the physical arrest. Thus, the issue only need be considered if Lewis's version was credited. Put simply, no police officer could reasonably believe that stepping on the head of an already-handcuffed, prone suspect and grinding his face into the pavement would not violate the suspect's right to be free from excessive force, regardless of the other surrounding circumstances. As a matter of law Bonanni was not entitled to qualified immunity and there was no error in denying a request to charge the jury on that defense.

### G. *Amount of Damages*

Defendants argue that both the compensatory and punitive damages awards are excessive. They contend that a new trial must be ordered unless plaintiff agrees to a remittitur.

### 1. *Compensatory*

Lewis testified that he was in significant physical pain during the time that Bonanni stood on his head and ground his face into the pavement. He yelled, to no avail, for Bonanni to stop. He felt extremely traumatized, degraded, and humiliated by the assault, which occurred on a public street in front of many neighborhood people. During the assault by Bonanni, pebbles and asphalt from the road were ground into the skin on plaintiff's face. The skin was abraded, plaintiff's face swelled, and a contusion formed. Medical records and testimony from the treating physician documented these injuries. The treating emergency room physician also diagnosed a closed head injury and gave plaintiff instructions regarding the closed head injury. Additionally, photographs of plaintiff's face, taken after he was treated at the hospital show the injuries. Plaintiff also testified that the pain and swelling from the physical injury lasted for several weeks. He suffered from headaches, difficulty sleeping, and nightmares for months. He described in some

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

detail his nightmares which involved Bonanni standing on his head and smirking at him.

**\*10** The jury awarded Lewis $65,000 in actual damages to compensate him for the physical and emotional injuries he suffered as a result of the assault by Bonanni. The City argues that the plaintiff's alleged injuries lacked any credible basis and therefore should be reduced to $1.00 nominal damages. It contends that his headaches, right eye blindness, and closed head trauma were caused by his history of glaucoma and fist-fights, not the assault by Bonanni. Credibility of the testimony is the province of the jury. Here there was sufficient evidence for the jury to determine that Lewis suffered injuries requiring compensation of more than nominal damages. Additionally, it is purely speculative, and not supported by any evidence, that plaintiff's headaches and closed head trauma were caused by some preexisting conditions. The right eye blindness admittedly was caused by glaucoma, and plaintiff did not seek, nor did the jury award, damages for blindness.

Bonanni argues that any mental anguish caused by the fact of plaintiff's arrest alone cannot be compensated. He also argues that Lewis's nightmares may have been caused by previous incidents with the police and therefore would not be compensable. There is no evidentiary basis for either of these arguments. Therefore, they are summarily rejected.

Next Bonanni argues that Lewis's proof of causation failed in that he did not have an expert testify that the injuries plaintiff attributed to the assault by Bonanni actually were caused by Bonanni, and not Officer Shanahan, who according to plaintiff's testimony stood on his head for a number of seconds before Bonanni did. This argument is unavailing. First, Bonanni never requested that the jury be instructed to allocate the physical injury component of actual damages between him and Officer Shanahan. Second, plaintiff testified that he was in significant pain while Bonanni was standing on his head grinding his face into the pavement. Further, he specifically related nightmares occurring months

after the assault in which he dreamed that Bonanni was again standing on his head, then smirking.

Bonanni also argues that there was a risk of significant duplication for different torts against different defendants. The jury found that Bonanni violated Lewis's constitutional rights by using excessive force because of race, causing plaintiff actual injuries. The jury further found that the City had a custom, policy, and practice that failed to properly train, supervise, and/or discipline Bonanni, which was a proximate cause the violations of plaintiff's constitutional rights. There were no duplicative torts and no risk of damages inflation-the City's failure was a proximate cause of Bonanni's infliction of injuries upon plaintiff. Therefore, the City and Bonanni are both responsible for the injuries suffered by plaintiff.

Bonanni contends that the compensatory damages award was too high when compared to damages awarded in similar cases. He cites several cases in support of his position.[FN4] *See Wheatley,* 679 F.2d at 1039-40 (remanding for remittitur to $25,000 from jury award of $55,000 where plaintiff's injury evidence was sketchy and his discomfort was short-lived); *Hynes v. LaBoy,* 887 F.Supp. 618, 626 (S.D.N.Y.1995) (finding no inadequacy in jury award of $1,500 for injuries of two cuts that required stitches and a black eye, which amounted to $250 per day for pain and suffering from the time of the injury to medical discharge from prison infirmary, after noting that due deference must be given to the jury's fact-finding); *Jones v. Huff,* 789 F.Supp. 526, 536-37 (N.D.N.Y.1992) (noting that the corrections officer who inflicted most of plaintiff's injuries was not a defendant, court awarded a total of $9,500 (apportioned among three defendants) for Eighth Amendment violations including slaps, punches, forcible stripping, and failure to intervene as plaintiff was beaten by other officers). Inflation adjustment must be made so that a meaningful comparison can be accomplished. Using the United States Bureau of Labor Statistics calculator, *see Martinez,* 2005 WL 2143333, at \*20 & n. 9,

yields the following: *Wheatley,* $54,843.75; *Hynes,* $2,083.59; *Jones,* $14,334.17, *Fiacco,* $48,287.64.

> FN4. Bonanni also cites *Fiacco v. City of Rensselaer,* 783 F.2d 319, 322, 324, 332-33 (2d Cir.1986) in support of a remittitur. He describes the plaintiff's injuries, but misstates that the *Fiacco* court declined to review the district court's remittitur order inferring that the remittitur order was proper. Actually, the *Fiacco* court found that because Fiacco accepted the remittitur order thereby consenting to the reduced award she could not challenge the remittitur order on appeal. The District Court had ordered a remittitur to $25,000 where plaintiff suffered scratches and bruises, required surgery to repair a tendon in her finger, and required an arm brace. *Id.*

**\*11** Plaintiff sets forth the following cases for comparison. In *Mendoza v. City of Rome,* 872 F.Supp. 1110, 1136 (N.D.N.Y.1994), a jury awarded compensatory damages of $200,000, on claims of false arrest, excessive use of force, and assault. There plaintiff suffered bruises and swelling of his knee, bruises to his forehead, headaches, and numbness to his wrists and hands.*Id.* at 1120.The injuries were not permanent, *Id.*Plaintiff also suffered shame, humiliation, and embarrassment. *Id.* at 1120-21.A remittitur to $62,500 ($89,276.74 when adjusted for inflation) was ordered.

An award of $190,000 was reduced to $100,000 where plaintiff sustained a laceration requiring several stitches and pain in his head in an assault.*Nash v. Sue Har Equities, LLC,* 45 A.D.3d 545, 546 (N.Y.App. Div.2d Dep't 2007). The plaintiff's injuries were not permanent. *Id.* Notably, the *Nash* Court was applying the more stringent material deviation from reasonable compensation standard applicable in New York State courts. *See Patterson,* 440 F.3d at 119.

In *Morales v. City of New York,* No. 99 Civ. 10004,

2001 WL 8594, at \*7 (S.D.N.Y. Jan. 2, 2001), plaintiff suffered dark bruises and traumatization during her lawful arrest. Although her injuries were not permanent, she required counseling for several months. The jury's award of $2.75 million shocked the conscience of the court, which ordered a remittitur to $50,000 ($59,766.52 adjusted for inflation), *Id.* at \*10.

In *Bender v. City of New York,* 78 F.3d 787, 792 (2d Cir.1996) the plaintiff suffered "a physical blow to the mouth that resulted in no bruise or cut, much less any permanent injury; 24 hours' confinement in a cell under extremely unpleasant conditions; an additional five hours of custody prior to release at arraignment; the pendency of disorderly conduct and assault charges for six months, prior to their dismissal; and emotional distress to the plaintiff that was manifested by nightmares and occasional loss of sleep over a period lasting a year and a half" as a result of various police misconduct. The jury awarded an aggregate of $300,700 against multiple defendants, which the Second Circuit found to be excessive, *Id.*However, only the intentional infliction of emotional distress component of $150,000 was challenged on appeal. *Id.* at 795.The court ordered a new trial unless the plaintiff agreed to remit $150,000. *Id.* After the remittitur, the damages award was $150,700 ($203,327.82 adjusted for inflation).

In *Becker v. City of New York,* 192 Misc.2d 194, 200-01 (N.Y. City Civ.Ct.2002), plaintiff suffered multiple lacerations requiring sutures to his face and head, multiple facial contusions, and swelling of one eye and both cheeks after being assaulted by a police officer. He also suffered humiliation and fright. *Id.* at 201.He was in the hospital for three days, and currently has a scar on his nose. *Id.* The court found that the jury award of $250,000 for past pain and suffering was "beyond what is reasonable compensation for" plaintiff's injuries. *Id.* The award was reduced to $150,000 ($176,508.89 adjusted for inflation).*Id.*

**\*12** Finally, plaintiff cites *Bert v. Port Authority of*

*N.Y. & N.J.,* 166 A.D.2d 351 (N.Y.App. Div. 1st Dep't 1990). In *Bert* three police officers assaulted and arrested plaintiff, in an incident with racial overtones. *Id.* at 351.Although he was detained only for a few hours and suffered no substantial mental or physical injury, he was subjected to "abject humiliation ... in the presence of young and impressionable members of his family."*Id.* at 352.Accordingly, the appellate court upheld the remittitur to $100,000 ($161,968.63 adjusted for inflation) which plaintiff had accepted.*Id.* at 351-52.

Upon close consideration of the evidence presented at trial, the racial motivation of Bonanni's excessive use of force, and the cases cited by the parties while giving due deference to the finding of the jury, the compensatory damages award of $65,000 in this case does not shock the judicial conscience. Accordingly, no remittitur is appropriate.

### 2. *Punitive*

The City seeks to have the jury's punitive damages reduced to the nominal amount of $1.00. The City argues that any additional amount will have no deterrent effect upon Bonanni since the City will indemnify him for the award and negative publicity regarding the case provided sufficient deterrence. The City has produced no authority for the proposition that a punitive damages award should be reduced to a nominal amount on the basis of an indemnification agreement. That proposition is rejected. The City relies upon *Schwenk v. Kavanaugh,* 4 F.Supp.2d 116 (N.D.N.Y.1998), where punitive damages of $1.00 were awarded because negative publicity provided sufficient deterrence. In *Schwenk,* the defendant was an elected public figure (district attorney), and news about the trial was widely disseminated in legal publications. That situation is not at all analogous to the situation here-a police officer used excessive force upon a handcuffed African-American lying on the street, because of the man's race.

Bonanni argues that a punitive award higher than

necessary to achieve the purpose of deterrence due to jury passion or bias, especially where the individual at whom the deterrence is directed are law enforcement officials responsible for the socially beneficial activities of preventing and stopping criminal behavior. The passion and bias Bonanni suggests played a role in the jury award resulted from the testimony and documents admitted at trial. It has been decided that there was no error in admitting the prior complaints and perjury charges. Moreover, it is particularly important to further the goal of deterring defendants such as Bonanni from participating in violations of constitutional rights given their positions of public trust, as defendant points out, with the socially beneficial goal of preventing criminal activity. Thus, this is not an adequate basis for eliminating the punitive damages award.

Bonanni also argues that the ratio of punitive damages to compensatory damages-because there was a substantial award of compensatory damages the punitive award should be no more than an equal amount. Because Bonanni's use of excessive force against Lewis was racially motivated and occurred while plaintiff was handcuffed, it is particularly reprehensible. Further, the punitive damages award is three times the amount of compensatory damages, an acceptable ratio. *See Patterson,* 440 F.3d at 121 (noting that a punitive damages award of " 'more than 4 times the amount of compensatory damages' " has been upheld by the United States Supreme Court (quoting *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23-24, 111 S.Ct. 1032, 1046 (1991))). Finally, a comparison of the difference between this award and those from comparable cases leads to the conclusion that this jury's $200,000 award of punitive damages is not so grossly excessive as to shock the judicial conscience. *See, e.g., Ismail v. Cohen,* 899 F.2d 183, (2d Cir.1990) (upholding $150,000 punitive damage award [$242,952.95 adjusted for inflation] ); *O'Neill v. Krzeminski,* 839 F.2d 9, 13-14 (2d Cir.1988) (finding, in an excessive force case where handcuffed suspect was repeatedly struck on the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

head by law enforcement officers, punitive damage award totaling $185,000 [$331,049.92 adjusted for inflation] against the two defendants not excessive).

### IV. *CONCLUSION*

*13 There was no error in the rulings pertaining to the admission of prior complaints and perjury charges, bifurcation, or jury selection. The jury's verdict was not against the weight of the evidence as to the excessive force, equal protection, or municipal liability claims. The purported oral addition to the verdict merely reiterated the instruction previously given to the jury. Bonanni was not entitled to qualified immunity as a matter of law if the jury credited Lewis's version of events, so there was no error in denying the request to include a qualified immunity charge. The jury awards of $65,000 in compensatory damages and $200,000 in punitive damages do not shock the judicial conscience.

Accordingly, it is

ORDERED that

1. Defendant William Bonanni's post-trial motions are DENIED;

2. Defendant the City of Albany Police Department's post-trial motions are DENIED;

3. Plaintiff may file and serve an application for attorneys fees and costs pursuant to 42 U.S.C. § 1988 on or before May 1, 2008; and

4. Defendants may file and serve an answer on or before May 8, 2008.

The application will be taken on submit without oral argument, and a final judgment will be entered thereafter.

IT IS SO ORDERED.

N.D.N.Y.,2008.
Lewis v. City of Albany Police Dept.
--- F.Supp.2d ----, 2008 WL 1826326 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX L

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2001 WL 237218 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 237218)

C

Bundy American Corp. v. K-Z Rental Leasing, Inc.
N.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
BUNDY AMERICAN CORPORATION, Plaintiff,
v.
K-Z RENTAL LEASING, INC. dba Rent-A-Wreck
of Mohawk; Frank Netti; Jan Malek, and Tom
Moriarty; Defendants.
No. 00-CV-260.

March 9, 2001.

Eva H. Posman, New York, NY, for Plaintiff, of
counsel.
Willard R. Pratt, III, Vernon, NY, for Defendants,
of counsel.

*MEMORANDUM-DECISION and ORDER*

HURD, J.
**\*1** Plaintiff brought this action alleging trademark
infringement and breach of contract by defendants.
On January 29, 2001, plaintiff submitted for filing a
Motion for Partial Summary Judgment, and a
Memorandum of Law, Affidavit by Lori Shaffron,
Affidavit by Eva H. Posman, Esq., and Statement of
Material Facts Not in Dispute in support of its mo-
tion. Pursuant to Local Rule 7.1(b)(1), plaintiff
served this motion and supporting documents upon
the defendants on December 8, 2000. Accordingly,
pursuant to internal court case management proced-
ures, the motion is considered filed as of December
8, 2000. Under Local Rule 7.1(b)(1)(B), opposition
papers must be served on the moving party within
twenty-one days from the date of service of the mo-
tion papers. Defendants failed to do so. Accord-
ingly, the plaintiff submitted its moving papers
without opposition. On January 29, 2001, a
scheduling notice was served on the parties setting
a motion return date of February 12, 2001. This no-
tice further extended defendants' time to respond to
the motion until 12:00 noon on February 12, 2001.

Before this deadline defendants filed a single Affi-
davit collectively sworn by Frank Netti, Jan Malek,
and Tom Moriary opposing summary judgment.

Local Rule 7.1(a) requires that a Memorandum of
Law be submitted with opposition to all motions.
Further, a summary judgment motion must be sup-
ported with a statement setting forth the material
facts that the moving party contends are not in is-
sue. L.R. 7.1(a)(3). An opposing party must file a
response to the movant's Statement of Facts. Failure
to do so constitutes an admission of the movant's
asserted non-disputed facts. *Id.* Moreover, failure to
oppose a motion is deemed consent to the granting
of the motion. L.R. 7.1(b)(3).

Here, plaintiff filed a Statement of Material Facts
not in Dispute, as required by Local Rule, in addi-
tion to two affidavits and a Memorandum of Law.
Defendants failed to respond to plaintiff's motion
by the date required by the local rules. This failure
in and of itself would be sufficient to deem as de-
fendants' consent to the granting of the motion. *See*
L.R. 7.1(b)(3). However, defendants were permitted
additional time to respond, which they did.

Defendants response consisted solely of a single af-
fidavit sworn to collectively by the three individual
defendants. No Memorandum of Law in opposition
was submitted. Furthermore, no response to
plaintiff's Statement of Material Facts was submit-
ted. Thus, the facts set forth by plaintiff are accep-
ted as undisputed. *See* L.R. 7.1(a)(3).

Summary judgment must be granted when the
pleadings, depositions, answers to interrogatories,
admissions and affidavits show that there is no
genuine issue as to any material fact, and that the
moving party is entitled to summary judgment as a
matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Richardson
v. New York State Dep't of Correctional Servs.,* 180
F.3d 426, 436 (2d Cir.1999). Facts, inferences
therefrom, and ambiguities must be viewed in a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp .,* 475 U.S. 574, 586 (1986); *Richardson,* 180 F .3d at 436;*Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250;*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. At that point the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co.,* 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248-49;*Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

*2 Plaintiff has met its initial burden of establishing the absence of a genuine issue of material fact. *See* Plaintiff's 7.1 Statement of Material Facts. Defendants, on the other hand, have adduced no evidence upon which a reasonable jury could return a verdict in their favor. Moreover, plaintiff has submitted competent proof of the amount of damages it suffered as a result of the defendants' trademark infringement and breach of contract. Defendants failed to file a memorandum of law raising any legal issue regarding such damages. Defendants further failed to raise any genuine issue of fact regarding such amount of damages. Based upon the established material facts, plaintiff is entitled to judgment as a matter of law on its trademark infringement and breach of contract claims, damages suffered as a result of the trademark infringement and breach of contract, and to the injunctive relief sought. Plaintiff is additionally entitled to recovery of attorneys fees. The only issue remaining is the amount of attorneys fees to which plaintiff is entitled.

Accordingly, it is

ORDERED that

1. Plaintiff's motion for partial summary judgment is GRANTED in its entirety;

2. Plaintiff is entitled to damages in the amount of $82,126.12 for breach of contract;

3. Plaintiff is entitled to damages in the amount of $246,699 for willful trademark infringement;

4. Defendants are ORDERED to cease and desist from using plaintiff's trademark "Rent-A-Wreck";

5. Defendants are ORDERED to refrain from operating a vehicle rental business at its current location or in the Herkimer, New York area for a period of two years from the date they discontinue their currently competing business;

6. Plaintiff may file and serve an affidavit with contemporaneous documents in support of its claim for attorneys fees on or before March 23, 2001; and

7. Defendants may file and serve a response to plaintiff's application for attorneys fees on or before April 6, 2001.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

N.D.N.Y.,2001.
Bundy American Corp. v. K-Z Rental Leasing, Inc.
Not Reported in F.Supp.2d, 2001 WL 237218 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.